**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**

---

DRAFTKINGS INC.,

       Plaintiff,

   v.

MICHAEL HERMALYN,

       Defendant.

---

Civil Action No. 1:24-cv-10299

## <u>VERIFIED COMPLAINT</u>

Plaintiff DraftKings Inc. ("DraftKings" or the "Company"), by its undersigned attorneys, hereby files this Verified Complaint against Defendant Michael Hermalyn ("Hermalyn"), and in support thereof, alleges as follows:

## <u>INTRODUCTION</u>

1.   Hermalyn, a senior executive compensated millions of dollars by DraftKings to oversee VIP customer acquisition and retention, hatched a secret plan over the past year to steal and use confidential information, solicit customers and employees and join a key competitor, Fanatics, Inc. ("Fanatics"), in brazen violation of his agreements with and duties to DraftKings. Hermalyn's scheme appears to have started as early as the February 2023 Super Bowl, when Hermalyn clandestinely met with Fanatics' CEO and leadership team to discuss employment. He took further disloyal steps over the summer, pretending he was "getting out of the industry" and improperly encouraging his subordinates to meet with Fanatics' CEO about employment there, while at the same time urging DraftKings to pay himself and his subordinates large retention payments, valued in the millions of dollars. Hermalyn's disloyal scheme

culminated late last week on the eve of this year's Super Bowl.  While he falsely claimed to be mourning the loss of a friend from Pennsylvania, Hermalyn instead secretly traveled to Fanatics offices in Los Angeles, negotiated an employment agreement with Fanatics, downloaded DraftKings' confidential business plans for the Super Bowl while sitting in Fanatics' offices, and fraudulently attempted to establish California residency during his 48-hour visit so he could resign from DraftKings and try to invalidate his non-compete agreements in California state court only a few days later.

2.      DraftKings is a leader in the fiercely competitive digital sports entertainment and gaming industry, best known for fantasy sports, mobile sports betting, and iGaming products. Before his sudden resignation late last week, Hermalyn was a senior DraftKings executive holding a position of trust and with access to some of the company's most valuable and sensitive trade secrets and other highly confidential information and business strategies.

3.      Hermalyn led DraftKings' VIP team, responsible for acquiring and retaining DraftKings' most loyal and high value potential players.  In the fantasy sports, mobile sports betting, and iGaming industry, businesses can sink or swim on the strength of their customer relationships.  DraftKings is one of only a few prominent companies competing for extremely scarce resources, especially the patronage of the relatively small number of high-net worth customers who wager significant sums on sporting events.  During his employment, Hermalyn was entrusted with knowing the identities and betting preferences of DraftKings' most loyal and significant customers and DraftKings' strategies to attract and retain those customers.

4.      Hermalyn repeatedly executed contractual agreements with DraftKings—in exchange for millions of dollars of compensation—in which he agreed not to use or disclose confidential DraftKings information, not to compete with DraftKings, and not to solicit

DraftKings' employees or customers.  Hermalyn's contractual agreements also state that any disputes with DraftKings about his obligations would be resolved in Massachusetts and pursuant to Massachusetts law.

5.      On Thursday, February 1, 2024—only ten days before Super Bowl LVIII, scheduled for February 11—Hermalyn abruptly resigned from his position at DraftKings to take a nearly identical role with Fanatics.  The Super Bowl is the most significant day in the gaming calendar and the most important event of the year for DraftKings and its business, not just because of the billions of dollars wagered, but also for the vital opportunities to strengthen relationships with VIP customers and business partners at events surrounding the game.  Without prompt injunctive relief barring Hermalyn from violating his agreements with DraftKings, Hermalyn will be free to launch an unlawful and targeted attack against DraftKings' business and divert its most valuable customers immediately prior to one of the most business critical weekends for DraftKings.  Customer loyalty is one of the most important competitive edges in the gaming industry.  Hermalyn knows DraftKings' playbook on how to engage and retain VIP clients.  On information and belief, Hermalyn, acting in concert with Fanatics, timed his departure and theft of confidential information to coincide with the critical days leading up to the Super Bowl to further a scheme to irreparably interfere with DraftKings' customer and business relationships by pursuing those relationships at Fanatics using the confidential information and goodwill that he obtained at DraftKings.  In his agreements, Hermalyn expressly agreed that DraftKings would suffer irreparable harm in the event of a breach or threatened breach of his obligations to the company. Hermalyn is now in active breach of his agreements, and DraftKings is being irreparably harmed as a result.  DraftKings paid Hermalyn millions of dollars in compensation pursuant to his written agreements, and is entitled to the benefit of its bargain.  Immediate judicial intervention is required.

6.     Hermalyn's brazen disregard of his contractual obligations to DraftKings is just the tip of the iceberg.  DraftKings has discovered that on his way out the door, and from a non-DraftKings device, Hermalyn viewed and downloaded trade secrets and other highly sensitive confidential information of DraftKings.  On January 29, Hermalyn emailed DraftKings employees and external potential partners that "a friend passed, dealing with that today / tomorrow."  He further proposed "[t]wo options for Wednesday, keep as is and my team can tackle . . . or push to next week?"  He closed by thanking everyone "so much for understanding."  During the next several days, Hermalyn was essentially AWOL: ignoring communications from his DraftKings colleagues, rescheduling meetings, and failing to conduct business as usual.  DraftKings has since learned, through geolocation data and access account records, Hermalyn had in fact traveled to California and visited Fanatics offices in Los Angeles on January 29 and 30.

7.     While there, and while still employed by DraftKings, Hermalyn accessed and downloaded confidential and important DraftKings information—some of which only a handful of other DraftKings employees could access.  This information includes, among other things, a detailed list of business partners, such as representatives of teams and leagues, as well as athletes, celebrities, influencers, vendors, and corporate officers and directors who are attending the 2024 Super Bowl, as well as a presentation reflecting DraftKings' marketing strategy and value proposition for prospective business partners to enter into commercial engagements with DraftKings.  Given his impending resignation, there was no legitimate business reason for Hermalyn to download these highly confidential documents to a non-DraftKings device. On information and belief, Hermalyn has misappropriated DraftKings' confidential information to further the business interests of Fanatics, even before he was on the payroll of his new employer.

8.     In the hands of a competitor like Fanatics, the information Hermalyn accessed and

downloaded represents a significant threat to DraftKings' business—especially during the crucial days leading up to and during the Super Bowl.  Injunctive relief is urgently necessary to prevent Hermalyn from using and disclosing the extraordinarily sensitive information he downloaded and, on information and belief, stole, to harm DraftKings any more than he already has.

9.     Hermalyn and Fanatics took additional fraudulent steps to further their scheme.  On the same day that Hermalyn resigned from DraftKings, he filed a 26-page lawsuit—obviously prepared well in advance by two sophisticated large law firms—in California Superior Court in Los Angeles seeking to void his non-competition covenants on the grounds that he is a California resident.  In that lawsuit, Hermalyn claims that he supposedly became a California resident during the few days he was covertly visiting Fanatics in Los Angeles.  But Hermalyn maintains a multi-million dollar residence in New Jersey, where his wife still works and his kids go to school.  He is no more a Californian than Governor Murphy.  And in an effort to prevent his sham California lawsuit from being removed to federal court, Hermalyn and Fanatics acted in concert to cause Fanatics to form a sham corporation in the State of Nevada the day before they filed that lawsuit.

10.    DraftKings has conducted a limited investigation in the days since Hermalyn's sudden resignation.  But even that initial investigation has revealed that during his employment with DraftKings Hermalyn engaged in numerous other acts of deception, lies, and other misconduct.  DraftKings has already uncovered evidence showing that Hermalyn actively solicited DraftKings employees to join Fanatics this past year, and spent thousands of dollars of DraftKings' money to enter into an agreement with a restaurant group with which Hermalyn had, on information and belief, an undisclosed personal affiliation.

11.    Discovery in this litigation will establish the full extent of Hermalyn's misconduct. On this record, Hermalyn's misdeeds urgently warrant injunctive relief to protect DraftKings from

suffering further irreparable harm to its valuable customer and business relationships.  Immediate injunctive relief is necessary because Hermalyn is acting in concert with DraftKings' direct competitor and is engaging in a pattern of deceit and dishonesty, including, but not limited to, illicitly downloading, retaining, and using DraftKings' valuable confidential information concerning DraftKings' Super Bowl and other sensitive business strategies.

## PARTIES

12.     DraftKings is a Nevada corporation with a principal place of business in Boston, Massachusetts.

13.     Hermalyn is a natural person who, on information and belief, is domiciled and resides in New Jersey.  From approximately September 14, 2020 until February 1, 2024, Hermalyn was an employee of DraftKings, living first in New York and then in New Jersey.  During his employment with DraftKings, Hermalyn held the titles of Senior Vice President of Business Development and Vice President of VIP Management.

## JURISDICTION AND VENUE

14.     This Court has subject-matter jurisdiction to adjudicate this action under 28 U.S.C. §§ 1331, 1332(a)(2), 1367.

15.     This Court has personal jurisdiction over Hermalyn pursuant to the forum-selection clauses in the Nonsolicitation, Nondisclosure & Assignment of Inventions Agreement dated August 31, 2020 (Ex. A) (the "Confidentiality Agreement") and the Noncompetition Covenant dated August 16, 2023 (Ex. B) (the "Noncompetition Covenant"), through which Hermalyn has irrevocably submitted to the exclusive jurisdiction of the United States District Court for the District of Massachusetts and the laws of the Commonwealth of Massachusetts for purposes of this dispute.  *See* Confidentiality Agreement § 9; Noncompetition Covenant § (f).  These forum-

selection provisions expressly provide that Hermalyn "submit[s] to the personal jurisdiction of such court[]" and "waive[s] any other requirement (whether imposed by statute, rule of court, or otherwise) with respect to personal jurisdiction" for "any dispute arising" under the Confidentiality Agreement or the Noncompetition Covenant.  *See* Confidentiality Agreement § 9; Noncompetition Covenant § (f).

16.     This Court also has personal jurisdiction over Hermalyn because his tortious acts caused harm to DraftKings in Massachusetts, where it has its principal place of business.

17.     Venue in this Court is proper because the parties contractually agreed that this Court would serve as the exclusive venue for this dispute.  *See* Confidentiality Agreement § 9; Noncompetition Covenant § (f).  Venue is also proper because DraftKings has its principal place of business in Suffolk County, Massachusetts.

## STATEMENT OF FACTS

## I.   DraftKings and Fanatics Are Fierce Competitors in the Digital Sports Betting and iGaming Industry

18.     Online sports betting and iGaming is a fiercely competitive industry.  There are a handful of online gaming businesses that compete for the small number of high-net worth players who drive substantial revenue for these businesses.  These competitors jealously guard the customer relationships that they establish, the technology that they create, and the marketing strategies that they develop to pursue their own respective share of the market.

19.     DraftKings is a digital sports entertainment and gaming company known for its industry-leading fantasy sports, mobile sports betting, and iGaming products.  Headquartered in Boston, DraftKings is a multi-channel provider of sports betting and gaming technologies, powering sports and gaming entertainment across U.S. and global markets.

20.    DraftKings has three core business-to-consumer vertical business lines: Fantasy Sports; DraftKings Sportsbook; and DraftKings Casino, commonly referred to as its iGaming business. Fantasy Sports is available for free in every state. DraftKings' Sportsbook offers online and retail betting for major U.S. and international sports and, along with paid Fantasy Sports, operates in legalized markets across the United States. DraftKings Casino (*i.e.*, its iGaming business) brings consumers casino games online, and is available in Connecticut, New Jersey, Michigan, Pennsylvania, and West Virginia. The business of DraftKings is global in its scope, especially with respect to high net-worth VIP players who frequently have residences in multiple jurisdictions throughout the world.

21.    Fanatics is a digital sports platform operating businesses throughout the United States. According to its website, one such business is Fanatics Betting & Gaming, an online and retail sports betting and online casino real-money wagering platform. The Fanatics Sportsbook app allows customers to place bets on a substantially similar range of sporting events as DraftKings' Sportsbook and is similarly available in certain jurisdictions where sports betting is legal. Fanatics iGaming, like DraftKings' Casino, provides customers with the opportunity to play casino games including slots, table games, and live-action dealers, and is currently available in Pennsylvania and West Virginia.

22.    Fanatics' businesses compete directly throughout the United States with DraftKings.

## II.    Hermalyn Received and Accessed DraftKings' Trade Secrets and Other Highly Confidential Information

23.    The trade secrets and confidential information that Hermalyn learned and accessed in his role leading DraftKings' VIP team are among the most valuable owned by DraftKings, and correspondingly, the most attractive that any competitor—like Fanatics—could hope to steal.

24.     In his role leading this critical team, Hermalyn was responsible for developing and managing two distinct segments of the VIP business.

25.     Hermalyn supervised and oversaw DraftKings' VIP hosts, the network of DraftKings employees working one-on-one with VIP players as the "human face" of DraftKings. Once a VIP becomes a hosted player, they have access to additional benefits and perks (*e.g.* tickets to sporting events and dinners).  These types of personal, one-on-one relationships are important to develop brand loyalty and encourage VIP players to stay with DraftKings rather than leave for a competitor.

26.     Hermalyn was responsible for DraftKings' events and experiences business. During marquee sporting events throughout the year (*e.g.*, Super Bowl, Formula One races, Kentucky Derby, etc.), DraftKings arranges to host VIP players at events to build brand loyalty and further encourage and incentivize a long term relationship.  These events frequently include VIP players and business partners, such as teams, leagues, casinos, athletes, celebrities, influencers, vendors, and corporate officers and directors.

27.     In overseeing these business segments, Hermalyn accessed and received some of DraftKings' most valuable trade secrets and other confidential information, including:

- **VIP Player Lists** – Hermalyn received comprehensive VIP player lists containing a wide range of information critical to forging personal connections with VIP players.  Such information would be incredibly valuable to a competitor—like Fanatics—in trying to recruit these VIP players away from DraftKings by establishing their own personal relationships through the use of DraftKings' intelligence.

- **Research and Development** – Hermalyn managed and developed player promotions and incentives.  Most notably, Hermalyn managed the VIP Hosts who used

DraftKings' Dynasty Program to identify and reward customers based on their loyalty and repeat business. Hermalyn had intimate knowledge of DraftKings' strategies for identifying loyal customers, providing tailored incentives and rewards, building relationships with them, managing their questions and interests, and ensuring ongoing loyalty. In the hands of Fanatics, this information would provide a roadmap for how to mimic DraftKings' analysis of the sports betting and iGaming customer base, as well as how to develop programs, promotions, and incentives specifically geared towards luring that customer base away from DraftKings to Fanatics.

- **Partnership Relationships** – Hermalyn was intimately familiar with the fundamental relationships and points of contact with DraftKings' critical business partners, such as teams, leagues, casinos, athletes, celebrities, influencers, vendors, and corporate officers and directors, as well as a host of other organizations and individuals that are essential to the advancement of DraftKings' marketing strategy. In other cases, these relationships form a core component of DraftKings' marketing strategy, advancing DraftKings' reputation as a well-established and reliable brand in the online sports betting and gaming space that can be trusted for both casual and VIP players alike. If Fanatics were to access this information, it could accelerate its business in the sports betting and iGaming space by capitalizing on DraftKings' significant investment of time and money in identifying valuable partnerships and securing those connections. Hermalyn also knew the terms of DraftKings' engagements with its partners. Fanatics could use that confidential information to undercut DraftKings in contract negotiations with these partners.

- **Employee Information** – As a supervisor, Hermalyn had access to employee lists, compensation information, and performance reviews and metrics for a wide range of DraftKings' employees.  Hermalyn could use that information to help Fanatics refine its own employee retention and recruitment procedures.  Hermalyn could also use that information improperly to solicit DraftKings employees based on his knowledge of their confidential employment terms and compensation, performance, customer relationships and knowledge of trade secrets and confidential business plans.

28.     Finally, as a senior leader with DraftKings, Hermalyn regularly participated in executive meetings where he was privy to confidential financial information, performance information, as well as business plans and prospects that transcend the VIP team and extend to DraftKings' broader strategic approach to the market.

## III.   DraftKings Takes Reasonable Precautions to Protect Its Trade Secrets and Other Highly Confidential Information

29.     DraftKings places a high value on its trade secrets and other confidential information, and as a result, has implemented a robust infrastructure of agreements, policies, and technological safeguards to maintain the secrecy of such information.

30.     For instance, DraftKings requires all employees upon commencing employment to execute their own confidentiality agreement, mandating that they not use or disclose any confidential or proprietary information except on behalf of DraftKings.

31.     DraftKings also promulgates a document containing all of its "Information Security Policies," which govern the manner in which DraftKings' employees are expected to safeguard DraftKings' information assets.  Such policies include the:

- Acceptable Use Policy

- Database Credentials Policy

- Email & Electronic Messaging System Use Policy

- Employee Termination Policy

- Information Sensitivity Policy

- Password Policy

- Removable Media Policy

- Risk Assessment Policy

- Training Policy

32.    In addition, all DraftKings' employees are trained and re-trained on an annual basis with respect to DraftKings' information security policies and must acknowledge that they have received such training and that they agree to abide by such policies.

33.    As for technological safeguards, all DraftKings' devices are encrypted so that in the event that they are lost or stolen, an unauthorized user would not be able to access any DraftKings' information that is stored or normally accessible from the device.

34.    In addition, in order to access DraftKings' Google workspace—that houses DraftKings' trade secrets and other highly sensitive confidential information—DraftKings employees must enter a password that they need to update every 90 days, as well as engage in a two-step authentication process.

35.    Once in DraftKings' Google workspace, access rights to particular folders and files is strictly limited to those employees who would have a legitimate business reason for consulting such materials.

36.    DraftKings has also implemented a host of data loss prevention systems that actively monitor the sharing and transfer of any DraftKings' files or folders outside of the DraftKings' IT infrastructure, either through the use of USB devices, external cloud platforms, or

through email.  In the event that any of these systems identify suspicious activity, DraftKings' IT team immediately launches a thorough investigation to determine whether a DraftKings' employee has engage in conduct that violates the law or DraftKings' policies.

**IV.    Hermalyn Agrees to the Confidentiality Agreement and the Noncompetition Covenant in Exchange for His Employment and Valuable Equity in DraftKings**

37.    Hermalyn signed a number of agreements with DraftKings throughout his employment committing to certain post-termination obligations.

### A. *The Confidentiality Agreement*

38.    As a condition of his employment, Hermalyn entered into the Confidentiality Agreement, which is governed by Massachusetts law.  *Id*. § 9.

39.    Through that agreement, Hermalyn affirmed his duty of loyalty to DraftKings, committing that during his employment he "will devote [his] best efforts on behalf of the Company," and further agreeing "not to provide any services to any Competing Business or engage in any conduct which may create an actual or appear to create a conflict of interest."  *Id*. § 1.

40.    A "Competing Business" is defined as "any person, firm, association, corporation or any other legal entity that is engaged in a business that is competitive with any aspect of the Business of the Company," which includes "the research, design, development, marketing, sales, operations, maintenance and commercial exploitation pertaining to the operation of, and providing products and services for . . . Regulated Gaming."  *Id*. Definitions (i)-(ii).

41.    "Regulated Gaming" is defined as "the operation of games of chance or skill or pari-mutuel or fixed odds games (including, but not limited to, lotteries, pari-mutuel betting, bingo, race tracks, jai alai, legalized bookmaking, off-track betting, casino games, racino, keno, and sports betting or any play for fun (non-wagering) versions of the foregoing) and any type of ancillary service or product related to or connected with the foregoing."  *Id*. Definitions (ii).

42.     Hermalyn further agreed to safeguard DraftKings "Confidential Information," promising that he will "not, during or after [his] employment: (i) use any Confidential Information for any purpose that is not authorized by the Company; (ii) disclose any Confidential Information to any person or entity, except as authorized by the Company in connection with Employee's job duties; or (iii) remove or transfer Confidential Information from the Company's premises or systems except as authorized by the Company." *Id*. § 5.

43.     "Confidential Information" is defined as "all information or a compilation of information, in any form (tangible or intangible or otherwise), that is not generally known to competitors or the public, which Company considers to be confidential and/or proprietary, including but not limited to: research and development; techniques; methodologies; strategies; product information, designs, prototypes and technical specifications; algorithms, source codes, object codes, trade secrets or technical data; training materials methods; internal policies and procedures; marketing plans and strategies; pricing and cost policies; customer, supplier, vendor and partner lists and accounts; customer and supplier preferences; contract terms and rates; financial data, information, reports, and forecasts; inventions, improvements and other intellectual property; product plans or proposed product plans; know-how; designs, processes or formulas; software and website applications; computer passwords; market or sales information, plans or strategies; business plans, prospects and opportunities (including, but not limited to, possible acquisitions or dispositions of businesses or facilities); information concerning existing or potential customers, partners or vendors.  Confidential Information shall also mean of or related to Company's current or potential customers, vendors or partners that is considered to be confidential or proprietary to the applicable customer, vendor or partner." *Id*. Definitions (iii).

44.     Relatedly, Hermalyn promised that upon termination of his employment for any reason, he "will immediately surrender to the Company all Company property in [his] possession, custody, or control, including any and all documents, electronic information, and materials of any nature containing any Confidential Information, without retaining any copies." *Id*. § 5.

45.     DraftKings made clear, however, that "[p]ursuant to 18 U.S.C. Section 1833(b), [Hermalyn] shall not be held criminally or civilly liable under any Federal or State trade secret law for the disclosure of a trade secret that: (1) is made in confidence to a Federal, State, or local government official, either directly or indirectly, or to any attorney, and solely for the purpose of reporting or investigating a suspected violation of law; or (2) is made in a complaint or other document filed in a lawsuit or other proceeding, if such filing is made under seal." *Id*.

46.     In addition to his confidentiality and return of property obligations, Hermalyn also agreed to certain narrowly tailored non-solicitation obligations.  For instance, he agreed that during his employment and for twelve (12) months after the termination of his employment, he would "not directly or indirectly either for [himself] or for any other person, partnership, legal entity, or enterprise, solicit or transact business, or attempt to solicit or transact business with, any of the Company's customers, clients, vendors or partners, or with any of the Company's prospective customers, clients, vendors or partners about which [Hermalyn] learned Confidential Information . . . or which [Hermalyn] had some involvement or knowledge related to the Business of the Company." *Id.* § 2.

47.     He similarly committed that during his employment and the same twelve (12)-month post-termination period, he would not "directly or indirectly either for [himself] or for any other person, partnership, legal entity, or enterprise: (i) solicit, in person or through supervision or control of others, an employee, advisor, consultant or contractor of the Company for the purpose

of inducing or encouraging the employee, advisor, consultant or contractor to leave his or her relationship with the Company or to change an existing business relationship to the detriment of the Company; (ii) hire away an employee, advisor, consultant or contractor of the Company; or (iii) help another person or entity hire away a Company employee, advisor, consultant or contractor." *Id.* § 3.

48.     Hermalyn also acknowledged and agreed that any breach or threatened breach of the Confidentiality Agreement "would cause the Company irreparable harm for which monetary damages are inadequate" and that as a result, if he breaches or threatens to breach the agreement, "the Company shall be entitled to an injunction restraining such breach or threatened breach, or requiring specific performance, in addition to any and all rights and remedies at law and equity." *Id*. § 8. Hermalyn further agreed that "[t]he Company shall not be obligated to present additional evidence of irreparable harm or the insufficiency of monetary damages and, to the extent permitted by law or under applicable court rule, does not need to post a bond or other surety." *Id.*

49.     Finally, Hermalyn assented that "[i]f the Company prevails in any request to have [him] specifically perform [his] obligations under this Agreement (including pursuant to a temporary restraining order or preliminary injunction), the Company shall be entitled to receive from [him] the Company's costs of suit, including reasonable attorney's fees, costs and expenses (in addition to any other relief sought, available or awarded under this Agreement)." *Id*.

**B.   *Noncompetition Covenants***

50.     Throughout his employment with DraftKings, Hermalyn was offered the opportunity to receive valuable equity in the company in exchange for his agreement to abide by certain non-competition restrictions all governed by Massachusetts law. *See, e.g.*, Noncompetition Covenant § (f).

51.     ***Hermalyn agreed to these restrictions no less than 12 times in exchange for his receipt of millions of dollars in DraftKings equity.***

52.     In the Noncompetition Covenant, Hermalyn professed his loyalty to DraftKings, promising that during his employment, he would "not, anywhere within the Restricted Area, acting individually, or as an owner, shareholder, partner, employee, contractor, agent or otherwise (other than on behalf of the Company), provide services to a Competing Business." *Id*. § (a).

53.     He also agreed that for a period of twelve (12) months following the end of his employment, he would "not, anywhere within the Restricted Area, acting individually, or as an owner, shareholder, partner, employee, contractor, agent or otherwise (other than on behalf of Company): (1) provide services to a Competing Business that relate to any aspect of the Business of the Company . . . for which [he] performed services or received Confidential Information . . . at any time during the six (6) month period prior to such termination; or (2) commit a Threatened Breach of the obligation set forth in the immediately preceding clause." *Id*.

54.     The Noncompetition Covenant contains substantially similar definitions of "Competing Business," "Business of the Company," (which includes "Gaming") and "Confidential Information" as are included in the Confidentiality Agreement. *Compare* Noncompetition Covenant §§ (a)(i), (iv), (v), and (viii) *with* Confidentiality Agreement, Definitions (i)-(iii).

55.     The "Restricted Area" is defined as "any place within the United States or anywhere else in the world, since Competing Businesses operate globally and without meaningful limitation to compete caused by geographic locations, and because the Business of the Company is global in nature due to the specialized industries in which the Company and Competing Businesses operate, which Employee acknowledges and agrees is reasonable." *Id*. § (a)(vii).

56.     Hermalyn further agreed that in the event that he breaches or threatens to breach the Noncompetition Covenant, the duration shall be extended "for an additional period of time equal to the time that elapses from the commencement of such breach [or] Threatened Breach . . . to the later of: (i) the termination of such breach [or] Threatened Breach . . . or (ii) the final non-appealable resolution of any litigation or other legal proceeding stemming from such breach [or] Threatened Breach." *Id*. § (g).

57.     Hermalyn also acknowledged that "the enforcement of the Noncompetition Covenant is necessary, among other things, to ensure the preservation, protection and continuity of the Company's Confidential Information, trade secrets and goodwill" and that "due to the proprietary nature of the Business of the Company and relationships with others, the restrictions . . . set forth herein are reasonable as to duration and scope." *Id*. § (d).

58.     Finally, as with the Confidentiality Agreement, Hermalyn acknowledged and agreed that his breach or threatened breach of the Noncompetition Covenant would cause DraftKings irreparable harm, entitling it to provisional injunctive relief without a need to submit additional evidence of irreparable harm or the insufficiency of monetary damages, as well as entitle DraftKings to its attorneys' fees and costs should it prevail in an enforcement action. *Id*. § (e).

## V.    Hermalyn Executes His Plan to Steal Trade Secrets And Confidential Information To Use At Fanatics

59.     In the week leading up to his DraftKings departure and the 2024 Super Bowl – the most critical time for any sports betting business and thus when Hermalyn's defection to Fanatics could give it the maximum unfair advantage and cause DraftKings maximum injury – Hermalyn viewed and downloaded and, on information and belief, stole many of DraftKings' most commercially sensitive documents. Hermalyn had no legitimate business reason to be accessing,

let alone downloading, these documents from DraftKings' systems at a time when he clearly has already planned to defect to Fanatics.

60.     On January 23, 2024, Hermalyn accessed a "VIP Founders Club" PowerPoint presentation. Out of DraftKings' thousands of employees, only 23 have access rights to this document. This presentation was created in 2021 and describes a proposed loyalty program for recruiting top-tier VIP players. In essence, it provides a roadmap for designing and executing a gaming-industry VIP rewards program. This presentation identifies benefits to be provided to VIP customers and explains the metrics and analyses conducted to determine what customers should be accorded VIP status. In other words, the information in this document is exactly the information a competitor would need to create its own VIP rewards program.

61.     It is unclear how Hermalyn could contend to have a legitimate business purpose for accessing this document at this time. It reflects the blueprint for creating a new VIP rewards program that DraftKings never ultimately implemented. Although this particular program was not implemented, the presentation contains valuable information concerning how DraftKings' scales and values customers, as well as how to successfully structure VIP rewards to incentivize and recruit customers. Hermalyn's role at DraftKings involved managing its existing, successful VIP program; his ordinary business responsibilities did not create any reason for him to review a years-old roadmap document created to guide the development of a different program from its origin. Rather, the only plausible reason why Hermalyn would have accessed this April 2021 document in January 2024 was to misappropriate its extremely valuable and confidential contents to use and disclose for Fanatics' benefit in competing unfairly with DraftKings.

62.     Then, on January 24, Hermalyn downloaded a document entitled "BD [Business Development] Team Tracker – Weekly Report." Again, only 23 DraftKings employees have

access rights to this document.  This report is a 181-page chart containing, among other things:  (i) lists of short-term and long-term priority deals and projects; (ii) lists of then-ongoing contracts and their current status (*i.e.*, executed, in the process of being executed, or being negotiated through redline exchanges); (iii) identification of target markets, media, and platforms; and (iv) internal questions and comments from DraftKings employees and department representatives reflecting DraftKings' confidential business strategies.  This document would allow Fanatics to evaluate the entire landscape of DraftKings business contracts, prospects, and active contract negotiations, and provide a window into how Fanatics can undercut and outbid DraftKings for those very same deals.

63.    On information and belief, Hermalyn also had no legitimate business reason to access this document, especially nearly one week prior to his departure.  The "BD [Business Development] Team Tracker – Weekly Report" was last updated in late November 2023, and existed to allow teams involved in active negotiations with partners to centralize updates to their negotiations and compare their negotiations to past agreements.  There was also no legitimate business reason for Hermalyn to review this document since he would be resigning from DraftKings only a week later.  The only plausible reason for Hermalyn to access this document was for him to misappropriate the information about DraftKings' existing and potential contractual agreements, its planned and priority partnerships, and other business development opportunities, and to use and disclose that information for Fanatics' benefit in competing unfairly with DraftKings.

64.    Armed with core DraftKings information—information that would be of great value in operating a competitor like Fanatics—on information and belief, Hermalyn put into action a calculated plan to exit DraftKings at the most damaging possible time.

65.     On January 29, Hermalyn informed two DraftKings employees and external potential partners that a "close friend" had died.  He told DraftKings he would be taking a leave on January 29 and January 30.  Hermalyn canceled meetings scheduled for January 29, moving some to February 1.

**From:** Michael Hermalyn on behalf of Michael Hermalyn <m.hermalyn@draftkings.com>
**Sent:** Monday, January 29, 2024 1:01 PM EST
**To:** ███████████████████████████████████████████████████████
**Subject:** DK // Project ON+

████, a friend passed, dealing with that today / tomorrow. Two options for Wednesday, keep as is and my team can tackle… or push to next week? Thanks so much for understanding.

66.     On January 30, Hermalyn informed another DraftKings employee that in light of his leave, he would need to cancel a planned VIP onsite in Boston for the core VIP team to prepare for the Super Bowl.  This onsite was scheduled to run from January 29 through February 2.  Hermalyn did not respond to most, if not all, emails from his DraftKings colleagues during his time off—purportedly because he was mourning the loss of a friend from Pennsylvania.

67.     Geolocation data, call logs, and other activity on Hermalyn's  DraftKings' account have revealed that, under cover of his purported "leave," Hermalyn traveled to California on January 29 and went to Fanatics' offices in Los Angeles.  On January 30, while physically present in Fanatics' offices, Hermalyn accessed DraftKings' Google workspace from a non-DraftKings device and downloaded a commercially sensitive document—the "(Master) SB 2024" spreadsheet, a document to which only 21 DraftKings employees, out of thousands, have access rights.

68.     This spreadsheet contains a compilation of all of DraftKings' plans for entertaining its key partners at the 2024 Super Bowl.  These business partners include representatives of teams and leagues, as well as athletes, celebrities, influencers, vendors, and corporate officers and directors who are invited to special events (like the Super Bowl) and are critical to DraftKings'

business development efforts to recruit and retain VIP customers.  In addition to identifying these business partners, the spreadsheet lists the corresponding DraftKings employees who maintain relationships with each business partner and would serve as their point of contact at the Super Bowl—information that would be extremely valuable to a competitor seeking to enter into a similar business relationship with them.  The spreadsheet also includes information reflecting the number of VIP customers who will also be attending those events, which, if in the hands of a competitor, would allow them to attend the same events as DraftKings VIPs and potentially solicit them.

69.     Hermalyn had no legitimate business reason to download the "(Master) SB 2024" spreadsheet to a non-DraftKings device, especially because he knew that he would no longer be employed by DraftKings by the Super Bowl.  On information and belief, Hermalyn downloaded DraftKings' sensitive Super Bowl strategies in order to share the information with Fanatics, with which he was actively negotiating the terms of his future employment.

70.     On the same trip to California, Hermalyn also repeatedly accessed and downloaded a presentation entitled "BD_Gaming101."  DraftKings' business development team uses this document to pitch potential business partners on the value proposition of partnering with DraftKings, including confidential information about the profile of DraftKings' customers and its other business partnerships.  DraftKings requires potential partners to execute a non-disclosure agreement before viewing the presentation.

71.     Once again, Hermalyn had no legitimate business reason to review this document while he was in California, as he was not participating in any partnership pitches and was not scheduled to participate in any partnership pitches in the near future.  On information and belief, Hermalyn downloaded this presentation as well in order to share it with Fanatics.

72.     Hermalyn abruptly informed DraftKings on February 1 that he was resigning from DraftKings to join Fanatics as the President of its VIP Team, precisely the same position that he held on behalf of DraftKings.  He also claimed that he would be heading up its Los Angeles office.

73.     And yet, despite his resignation, that same day, Hermalyn again downloaded the "BD-Gaming 101" presentation, again without any legitimate business reason for doing so.

74.     The upcoming Super Bowl will occur on February 11—one week after Hermalyn's resignation, but with enough time for Hermalyn to download and use DraftKings' confidential and proprietary Super Bowl information and strategies to compete unfairly against DraftKings in the most important days in the sports gaming calendar.

## VI.   After Hermalyn's Theft and Resignation, He Sues in California To Invalidate His Enforceable Restrictive Covenants

75.     On February 1, 2024—the day of his resignation, Hermalyn filed a 26-page complaint in California Superior Court for the County of Los Angeles seeking declaratory and injunctive relief alleging violations of California Business & Professions Code Sections 16600, 16600.1, 16600.5, and 17200.  Hermalyn simultaneously filed an *Ex Parte* Application for a Temporary Restraining Order and an Order to Show Cause Regarding Preliminary Injunction seeking to invalidate his non-compete agreement as a "resident" of California.

76.     These extensive legal papers demonstrate that Hermalyn had been coordinating with Fanatics and its lawyers for weeks—possibly months—to evade his non-competition obligations to DraftKings.

77.     On information and belief, Hermalyn manufactured his purported "residency" in California solely to evade the obligations of his contractual agreements with DraftKings—despite having resided in New Jersey with his family for years.

78.     During his DraftKings employment from September 2020 through February 1, 2024, Hermalyn resided in Bay Head, New Jersey.  Hermalyn also routinely traveled to Massachusetts for DraftKings business.

79.     Hermalyn owns a home in Bay Head, New Jersey which he purchased in December 2021 for $4,100,000.  Hermalyn pays property and income tax in the state of New Jersey.

80.     Hermalyn previously lived in New York and is registered to vote in New York. Approximately three weeks prior to his resignation from DraftKings, he told a colleague that he intended to move back to New York City and send his children to a public school located on the Upper West Side of Manhattan.

81.     Hermalyn's children attend schools in New Jersey and his wife is currently employed as a Director of Sales for Tory Burch in New York City, her employer for over seven years.

82.     On information and belief, Hermalyn's new-found "residence" in California is a hastily manufactured litigation gambit.  It is a transparent effort to flee a jurisdiction that enforces non-competition agreements to one that does not.  Hermalyn's desire to avoid his bargained-for obligations simply by devising a plan to "move" to California irreparably harms DraftKings.

83.     Hermalyn claims that during his visit to California which spanned January 29 to January 31, he: (1) signed a lease for an apartment in Los Angeles (location, size, cost, and duration of lease unknown); (2) obtained a California driver's license; (3) purchased a car registered in California; (4) registered to vote in California; (5) obtained an appointment with a physician in California; and (6) contacted summer camps and "joined waitlists."  Then, on February 1, 2024, he filed suit in California state court claiming to be a California resident who could not be held to his contractual non-competition obligations and Massachusetts forum-selection clauses.  In short,

what Hermalyn would have this Court believe is that anyone with some spare cash and a phone can become a California resident in less time than the average trip to Disneyland.

**VII.    If Hermalyn Is Permitted to Use DraftKings' Trade Secrets and Confidential Information, and Continue His Employment with Fanatics, DraftKings Will Continue To Suffer Irreparable Harm**

84.    The irreparable competitive injury that DraftKings will suffer in the absence of emergency relief is all the more pronounced given the various aggravating factors evidenced by Hermalyn's conduct.

85.    During the final weeks of his employment with DraftKings, Hermalyn, on information and belief, in concert with and at the direction of Fanatics, engaged in a pattern of stealth, deception, and outright lies on the eve of the Super Bowl, the most important gaming event of the year.  On information and belief, the reason behind the timing is readily apparent: to cause the maximum harm to DraftKings, and its customer relationships, and to provide the maximum competitive benefit to Fanatics.

86.    On information and belief, through misappropriation and exploitation of DraftKings' trade secrets and confidential information, including information relating specifically to DraftKings' strategies, events, and activities during the Super Bowl, Hermalyn and Fanatics hope to interfere with and commandeer DraftKings' most important long-term customer and partner relationships *this weekend*.

87.    Hermalyn, formerly the head of DraftKings' VIP team, is assuming the role of President of Fanatics VIP.  He will be competing directly *against* DraftKings for the very same VIP players he was working to solicit just weeks prior on DraftKings' behalf—players that drive a significant percentage of overall revenue in the sports betting and iGaming industry.  DraftKings welcomes fair competition.  But this is a paradigm record of unfair competition.  On information and belief,  Hermalyn and Fanatics are using, and without injunctive relief, will continue to use

DraftKings' trade secrets and confidential information to recruit VIP players to Fanatics.

## VIII.   DraftKings' Post-Resignation Investigation Uncovers Additional Wrongdoing

88.   Once it became clear that Hermalyn had been lying to DraftKings for at least several weeks leading up to his resignation, DraftKings immediately launched a preliminary investigation of Hermalyn's activities at DraftKings.   The preliminary investigation revealed that Hermalyn engaged in widespread misconduct, including, on information and belief, unlawfully soliciting DraftKings employees on behalf of Fanatics in 2023, inducing DraftKings to award him a multi-million dollar retention grant under false pretenses, and entering into a self-dealing transaction.

89.   In February 2023, Hermalyn attended a Super Bowl party with Fanatics executives. After that party, by email dated February 17, Matt King, Fanatics Betting and Gaming's Chief Executive Officer, requested a meeting with Hermalyn ostensibly to discuss an employment position for Hermalyn with Fanatics.

90.   After meeting with Hermalyn, Fanatics targeted and attempted to poach other employees in DraftKings' VIP organization, all of whom, like Hermalyn, are bound by post-termination non-competes.

91.   For example, Fanatics offered Robert Ferrara ("Ferrara"), a VIP representative who reported to Hermalyn, a senior level "strategy" role reporting to Alex Lee, Senior Vice President & General Manager of Fanatics Loyalty.   Fanatics also attempted to hire at least two other DraftKings VIP representatives—both of whom also reported to Hermalyn.

92.   On July 20, 2023, Ferrara notified DraftKings that he was resigning to assume a role with Fanatics that Ferrara claimed was in a non-competitive part of Fanatics' business. Specifically, Ferrara claimed that he was going to work in Fanatics' collectibles business, as opposed to its gaming business.

93.   Later that day, disregarding his contractual commitments not to solicit DraftKings

employees, Hermalyn emailed members of his VIP team multiple times encouraging them to meet with "Mike," presumably Michael Rubin, Fanatics' Chief Executive Officer, describing him as "one of us."

94.     Hermalyn's email encouraging members of his team to explore employment opportunities with a direct competitor constitutes a breach of his duty of loyalty and contractual non-solicitation obligations to DraftKings.

95.     Hermalyn's email also states that he was "getting out of the industry" at the time— on information and belief, a thinly veiled reference to his plan to avoid his noncompete obligations by claiming to work in a non-competitive capacity with Fanatics—like Ferrara.

96.     This is only the beginning of Hermalyn's deception and disloyalty.  In July 2023, Hermalyn affirmed his loyalty and devotion to DraftKings, falsely portraying himself to DraftKings' management as a white knight against Fanatics' recruitment campaign.  Hermalyn informed DraftKings' management about Fanatics' efforts to recruit him and the VIP team and falsely stated that he was trying to persuade his team to remain with DraftKings.  On information and belief, Hermalyn leveraged his lies and self-dealing to trick DraftKings into awarding him a lucrative retention compensation package.

97.     Unaware that Hermalyn was a double agent encouraging his subordinates to meet with Fanatics' CEO, on July 31, 2023, DraftKings awarded Hermalyn a multi-million dollar equity

grant under false pretenses through another equity agreement.  That agreement, as the ones before it, prohibited Hermalyn from competing with DraftKings for 12 months following the end of his employment.

98.     On information and belief, after Hermalyn unlawfully and surreptitiously solicited his own DraftKings subordinates to consider joining Fanatics, he informed DraftKings management that in order to retain his subordinates, DraftKings would need to pay them generous retention packages.

99.     At all relevant times, Hermalyn was aware that DraftKings fiercely protects its confidential and proprietary information concerning its VIP customers and customer strategies, both in connection with the Super Bowl and more broadly.  As a result of Fanatics' recruitment of Ferrara, described above, Hermalyn knew that DraftKings enforces the restrictive covenants it obtains from its employees, including but not limited to, the non-competition covenants, to protect against employees unfairly competing, particularly as it relates to Fanatics and other major competitors.  On this record, Hermalyn's breach of his contractual obligations and fiduciary duties is knowing and willful.

100.     Hermalyn's deceptive conduct was not limited to assisting Fanatics' efforts to raid DraftKings' workforce or poach Hermalyn and his subordinates.

101.     He also arranged for DraftKings to purchase thousands of dollars worth of dinners at three New York City restaurants owned by an entity with which, on information and belief, he is affiliated, ostensibly for the purpose of entertaining VIP clients.  Hermalyn signed the contract on behalf of DraftKings with those very restaurants.  On information and belief, Hermalyn never disclosed his affiliation to anyone at DraftKings when he made this arrangement.  Furthermore, to date, DraftKings has not uncovered evidence that Hermalyn entertained any VIP clients at these

restaurants.

## IX.    Hermalyn Exacts Revenge on DraftKings After He Is Held Accountable For Workplace Misconduct.

102.    In the weeks leading up to Hermalyn's departure, Hermalyn became aware that he was under investigation for workplace misconduct.  On January 26, 2024, Hermalyn was informed that DraftKings was taking immediate disciplinary action towards him, including by reducing his compensation and title, while DraftKings continued to evaluate his conduct.  After this meeting, Hermalyn expressed that his desire was to move forward with DraftKings and remain employed.  However, DraftKings' disciplinary action and ongoing observation of his conduct, on information and belief, motivated Hermalyn to finally carry out his scheme, that appears to have been hatched as early as February 2023, to leave DraftKings for Fanatics and inflict maximum harm upon DraftKings on his way out.  So, he decided to travel to Los Angeles to Fanatics' offices, download DraftKings' confidential information while there and then resign the week before the Super Bowl – with no warning or notice.

103.    The investigation was prompted by a female employee's allegations about inappropriate workplace treatment, and thereafter numerous additional employees raised allegations of improper conduct including theft of company funds, inappropriate behavior towards women and bullying.  In part, DraftKings learned the following:

- Hermalyn used a corporate credit card to purchase thousands of dollars of wine intended for personal use with his friends, while describing in DraftKings' expense records that the purchase was for VIP entertainment and gifts.  He also used his corporate credit card to book first-class plane tickets in violation of company policy;

- Hermalyn further directed DraftKings funds to his close friends' business, without

29

disclosing his relationship, by ensuring that the company's 2023 holiday gifting initiative was run through a high-end boutique owned by that friend;

- Hermalyn violated DraftKings' policies with respect to expense reimbursement, on information and belief, using company funds for his own personal benefit. He spent thousands of dollars in company funds on merchandise featuring the company's logo and intellectual property that he did not obtain approval to use. He miscoded the invoices as "holiday giving"; and

- Numerous female DraftKings employees made allegations that Hermalyn made them feel uncomfortable in the workplace. For example, these allegations include that he: (i) inappropriately berated a female employee during a meeting with co-workers; (ii) engaged in unwelcome physical contact with a female employee without her consent; (iii) made inappropriate comments regarding his female colleague's physical appearance; and (iv) numerous other allegations that are still outstanding.

104.    DraftKings' investigation is ongoing, and DraftKings reserves the right to add additional claims against Hermalyn in the future as the evidence warrants.

### COUNT I – Breach of Contract by Misappropriation (Confidentiality Agreement)

105.    DraftKings repeats and realleges the foregoing paragraphs as if fully set forth herein.

106.    The Confidentiality Agreement is a valid and binding contractual agreement, as described above.

107.     DraftKings fully performed its obligations under the Confidentiality Agreement.

108.    The Confidentiality Agreement was made for valid consideration, including the

compensation Hermalyn received in the course of his employment.

109.     In the Confidentiality Agreement, Hermalyn agreed to safeguard DraftKings "Confidential Information," promising that he will "not, during or after [his] employment: (i) use any Confidential Information for any purpose that is not authorized by the Company; (ii) disclose any Confidential Information to any person or entity, except as authorized by the Company in connection with Employee's job duties; or (iii) remove or transfer Confidential Information from the Company's premises or systems except as authorized by the Company."  *Id*. § 5.

110.     Hermalyn further agreed that upon termination of his employment for any reason, he "will immediately surrender to the Company all Company property in [his] possession, custody, or control, including any and all documents, electronic information, and materials of any nature containing any Confidential Information, without retaining any copies."  *Id.* § 5.

111.     Hermalyn also affirmed his duty of loyalty to DraftKings, committing that during his employment he "will devote [his] best efforts on behalf of the Company," and further agreeing "not to provide any services to any Competing Business or engage in any conduct which may create an actual or appear to create a conflict of interest."  *Id*. § 1.

112.     As described in detail above, Hermalyn breached these provisions of the Confidentiality Agreement, including by stealing DraftKings' trade secrets and other confidential information to use for Fanatics' benefit.

113.     DraftKings has suffered and will suffer damages and irreparable harm as a direct and proximate result of Hermalyn's breach of the Confidentiality Agreement, including the loss of its trade secrets and other confidential information, and will continue to suffer irreparable harm as a result of that breach for which there is no adequate remedy at law.

**COUNT II – Breach of Contract by Employee Solicitation (Confidentiality Agreement)**

114.   DraftKings repeats and realleges the foregoing paragraphs as if fully set forth herein.

115.   The Confidentiality Agreement is a valid and binding contractual agreement, as described above.

116.    DraftKings fully performed its obligations under the Confidentiality Agreement.

117.   The Confidentiality Agreement was made for valid consideration, including the compensation Hermalyn received in the course of his employment.

118.   In the Confidentiality Agreement, Hermalyn agreed that during his employment and for the twelve (12) months following the termination of his employment, he would not "directly or indirectly either for [himself] or for any other person, partnership, legal entity, or enterprise: (i) solicit, in person or through supervision or control of others, an employee, advisor, consultant or contractor of the Company for the purpose of inducing or encouraging the employee, advisor, consultant or contractor to leave his or her relationship with the Company or to change an existing business relationship to the detriment of the Company; (ii) hire away an employee, advisor, consultant or contractor of the Company; or (iii) help another person or entity hire away a Company employee, advisor, consultant or contractor.  *Id*. § 3.

119.   Hermalyn affirmed his duty of loyalty to DraftKings, committing that during his employment he "will devote [his] best efforts on behalf of the Company," and further agreeing "not to provide any services to any Competing Business or engage in any conduct which may create an actual or appear to create a conflict of interest."  *Id*. § 1.

120.   As described in detail above, Hermalyn breached these provisions of the Confidentiality Agreement, including by encouraging subordinate members of his VIP team to

meet with, on information and belief, Fanatics' CEO Michael Rubin and explore employment opportunities with Fanatics.

121.    DraftKings has suffered damages as a direct and proximate result of Hermalyn's breach of the Confidentiality Agreement, including being forced to replace at least one member of the VIP team who resigned to commence employment with Fanatics, and forced to pay additional retention packages to other employees.

122.    By virtue of his lawsuit in California seeking to invalidate his employee non-solicitation restrictions, Hermalyn has threatened to breach such restrictions, in which case DraftKings would suffer irreparable harm as the result of Hermalyn's breach of the Confidentiality Agreement, including the loss of valuable members of the VIP team, and will continue to suffer irreparable harm as a result of that breach for which there is no adequate remedy at law.

**COUNT III – Breach of Contract by Competition (Noncompetition Covenant)**

123.    DraftKings repeats and realleges the foregoing paragraphs as if fully set forth herein.

124.    Throughout his employment with DraftKings, Hermalyn was offered the opportunity on multiple occasions to receive valuable equity in DraftKings in exchange for his agreement to abide by certain non-competition restrictions that are substantially similar to those found in the Noncompetition Covenant.  The Noncompetition Covenant is a valid and binding contractual agreement that Hermalyn affirmed 12 times during his DraftKings employment.

125.     DraftKings fully performed its obligations under the Noncompetition Covenant.

126.    Under the Noncompetition Covenant, Hermalyn agreed that for a period of twelve (12) months following the end of his employment, he would "not, anywhere within the Restricted Area, acting individually, or as an owner, shareholder, partner, employee, contractor, agent or

otherwise (other than on behalf of Company): (1) provide services to a Competing Business that relate to any aspect of the Business of the Company . . . for which [he] performed services or received Confidential Information . . . at any time during the six (6) month period prior to such termination; or (2) commit a Threatened Breach of the obligation set forth in the immediately preceding clause." *Id.* (a)

127.    The Noncompetition Covenant contains substantially similar definitions of "Competing Business," "Business of the Company," (which includes "Gaming") and "Confidential Information" as appears in the Confidentiality Agreement. *Compare* Noncompetition Covenant §§ (a)(i), (iv), (v), and (viii) *with* Confidentiality Agreement, Definitions (i)-(iii). The "Restricted Area" is defined as "any place within the United States or anywhere else in the world, since Competing Businesses operate globally and without meaningful limitation to compete caused by geographic locations, and because the Business of the Company is global in nature due to the specialized industries in which the Company and Competing Businesses operate, which Employee acknowledges and agrees is reasonable." *Id.* § (vii).

128.    Hermalyn breached the Noncompetition Covenant by accepting employment with Fanatics, a direct competitor of DraftKings, in substantially the same position he held at DraftKings within the Restricted Area during the 12-month period following the termination of his employment. Furthermore, Hermalyn has not established his status as a California resident.

129.    DraftKings has suffered and will suffer damages and irreparable harm as a direct and proximate result of Hermalyn's breach of the Noncompetition Covenant, including the loss of its client relationships, good will, significant business opportunities, reputational status, as well as its trade secrets and other confidential information, and will continue to suffer irreparable harm as a result of that breach for which there is no adequate remedy at law

**COUNT IV – Misappropriation of Trade Secrets in Violation of the Defend Trade Secrets Act (DTSA) (18 U.S.C. § 1836)**

130.    DraftKings repeats and realleges the foregoing paragraphs as if fully set forth herein.

131.    Hermalyn misappropriated DraftKings' trade secrets including but not limited to: (i) the "(Master) SB 2024" spreadsheet containing all of DraftKings' plans for entertaining its key partners, including representatives of teams and leagues, as well as athletes, celebrities, influencers, vendors, and corporate officers and directors, at the 2024 Super Bowl, the corresponding DraftKings employees who maintain relationships with each business partner and would serve as their point of contact at the Super Bowl, what events the key partners would be attending, as well as the number of VIP customers who will also be attending those same events; (ii) the presentation entitled "BD_Gaming101" reflecting DraftKings' pitch to potential business partners on the value proposition of partnering with DraftKings, including the profile of DraftKings' customers and its other business partnerships; (iii) the "VIP Founders Club" PowerPoint presentation describing a proposed loyalty program for recruiting top-tier VIP players, identifying benefits to be provided to VIP customers, explaining the metrics and analyses conducted to determine what customers should be accorded VIP status, and providing a roadmap for designing and executing a gaming-industry VIP rewards program; and (iv) the "BD [Business Development] Team Tracker – Weekly Report," containing, among other things:  (a) lists of short-term and long-term priority deals and projects; (b) lists of then-ongoing contracts and their current status (*i.e.*, executed, in the process of being executed, or being negotiated through redline exchanges); (c) identification of target markets, media, and platforms; and (d) internal questions and comments from DraftKings employees and department representatives reflecting DraftKings' confidential business strategies. This information constitutes protectable trade secrets owned by DraftKings, pursuant to 18 U.S.C.

§ 1839(3).

132.    DraftKings relies on the above trade secrets in providing its gaming services in interstate commerce—including in Arizona, Colorado, Connecticut, Illinois, Indiana, Iowa, Louisiana, Maine, Massachusetts, Michigan, New Hampshire, New Jersey, New York, Oregon, Pennsylvania, Tennessee, Virginia, Vermont, West Virginia, and Wyoming, as well as internationally.

133.    DraftKings' trade secrets, including but not limited to lists of important business partners including teams, leagues, casinos, athletes, celebrities, influencers, vendors, and corporate officers and directors, and detailed information concerning strategies for pitching to prospective partners, framework for developing promotional programs, deals and projects, contract terms, as well as target markets, medias, and platforms—which are generated by a substantial investment by DraftKings of money, time, and energy—derive independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable through proper means by, another person or business who can obtain economic value from the disclosure or use of that information.

134.    DraftKings has taken reasonable measures to protect the confidentiality of its trade secrets.   As described above, DraftKings requires employees to enter into confidentiality agreements prohibiting the use or disclosure of DraftKings' trade secrets.   Additionally, DraftKings has robust policies in place that are also designed to protect DraftKings' trade secrets. Finally, DraftKings uses a host of technological safeguards to ensure that its trade secrets do not fall into the hands of competitors.

135.    DraftKings does not consent to the acquisition, disclosure or use of its trade secrets by anyone other than authorized personnel using them within the scope of the contractual

obligations of their employment with DraftKings. DraftKings did not consent to Hermalyn acquiring, disclosing or using DraftKings trade secrets for any purpose whatsoever following his termination of employment.

136.    DraftKings disclosed and provided its trade secrets to Hermalyn in confidence, while he was an employee of the company, pursuant to a duty to maintain the confidentiality and secrecy of that information.

137.    Hermalyn breached that confidence by improperly acquiring, disclosing and/or using DraftKings trade secrets, including by accessing and downloading them from a non-DraftKings device while inside the offices of Fanatics, and with the intent to benefit Fanatics.

138.    Before resigning from DraftKings, Hermalyn knew that the documents he accessed and downloaded contained highly valuable trade secrets based on his years of executive experience working for DraftKings.

139.    DraftKings disclosed to Hermalyn in the Confidentiality Agreement that "[p]ursuant to 18 U.S.C. Section 1833(b), [Hermalyn] shall not be held criminally or civilly liable under any Federal or State trade secret law for the disclosure of a trade secret that: (1) is made in confidence to a Federal, State, or local government official, either directly or indirectly, or to any attorney, and solely for the purpose of reporting or investigating a suspected violation of law; or (2) is made in a complaint or other document filed in a lawsuit or other proceeding, if such filing is made under seal." *Id*. § 5.

140.    Hermalyn knew and was aware of his duties to refrain from disclosing or using DraftKings' trade secrets.

141.    DraftKings has suffered irreparable harm as a direct and proximate result of Hermalyn's misappropriation, and will continue to suffer irreparable harm if Hermalyn is not

permanently enjoined from retaining, using, or disclosing DraftKings' trade secrets.

142.   DraftKings also seeks an award of actual damages in an amount to be proven at trial under 18 U.S.C. § 1836(b)(3)(B).

143.   Hermalyn's misappropriation of DraftKings' trade secrets was conducted through improper means, willful, malicious, bad faith conduct, and theft, as demonstrated by his deception regarding his involvement with Fanatics, entitling DraftKings to attorneys' fees and exemplary damages. 18 U.S.C. § 1836(3)(C)-(D).

## COUNT V – Misappropriation of Trade Secrets in Violation of the Massachusetts Uniform Trade Secrets Act (MUTSA) (M.G.L. c. 93, §§ 42 to 42G)

144.   DraftKings repeats and realleges the foregoing paragraphs as if fully set forth herein.

145.   Hermalyn misappropriated DraftKings' trade secrets including but not limited to: (i) the "(Master) SB 2024" spreadsheet containing all of DraftKings' plans for entertaining its key partners, including representatives of teams and leagues, as well as athletes, celebrities, influencers, vendors, and corporate officers and directors, at the 2024 Super Bowl, the corresponding DraftKings employees who maintain relationships with each business partner and would serve as their point of contact at the Super Bowl, what events the key partners would be attending, as well as the number of VIP customers who will also be attending those same events; (ii) the presentation entitled "BD_Gaming101" reflecting DraftKings' pitch to potential business partners on the value proposition of partnering with DraftKings, including the profile of DraftKings' customers and its other business partnerships; (iii) the "VIP Founders Club" PowerPoint presentation describing a proposed loyalty program for recruiting top-tier VIP players, identifying benefits to be provided to VIP customers, explaining the metrics and analyses conducted to determine what customers should be accorded VIP status, and providing a roadmap for designing and executing a gaming-

industry VIP rewards program; and (iv) the "BD [Business Development] Team Tracker – Weekly Report," containing, among other things:  (a) lists of short-term and long-term priority deals and projects; (b) lists of then-ongoing contracts and their current status (*i.e.*, executed, in the process of being executed, or being negotiated through redline exchanges); (c) identification of target markets, media, and platforms; and (d) internal questions and comments from DraftKings employees and department representatives reflecting DraftKings' confidential business strategies. This information constitutes protectable trade secrets owned by DraftKings, pursuant to M.G.L. c. 93, §§ 42 to 42G.

146.    DraftKings' trade secrets, including but not limited to lists of important business partners including teams, leagues, casinos, athletes, celebrities, influencers, vendors, and corporate officers and directors, and detailed information concerning strategies for pitching to prospective partners, framework for developing promotional programs, deals and projects, contract terms, as well as target markets, medias, and platforms—which are generated by a substantial investment by DraftKings of money, time, and energy—derive independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable through proper means by, another person or business who can obtain economic value from the disclosure or use of that information.

147.    DraftKings has taken reasonable measures to protect the confidentiality of its trade secrets.  As described above, DraftKings requires employees to enter into confidentiality agreements prohibiting the use or disclosure of DraftKings' trade secrets.  Additionally, DraftKings has robust policies in place that are also designed to protect DraftKings' trade secrets. Finally, DraftKings uses a host of technological safeguards to ensure that its trade secrets do not fall into the hands of competitors.

148.    DraftKings does not consent to the acquisition, disclosure or use of its trade secrets by anyone other than authorized personnel using them within the scope of the contractual obligations of their employment with DraftKings. DraftKings did not consent to Hermalyn acquiring, disclosing or using DraftKings trade secrets for any purpose whatsoever following his termination of employment.

149.    DraftKings disclosed and provided its trade secrets to Hermalyn in confidence, while he was an employee of the company, pursuant to a duty to maintain the confidentiality and secrecy of that information.

150.    Hermalyn breached that confidence by improperly acquiring, disclosing and/or using DraftKings trade secrets, including by accessing and downloading them from a non-DraftKings device while inside the offices of Fanatics, and with the intent to benefit Fanatics.

151.    Before resigning from DraftKings, Hermalyn knew that the documents he accessed and downloaded contained highly valuable trade secrets based on his years of executive experience working for DraftKings.

152.    Hermalyn knew and was aware of his duties to refrain from disclosing or using DraftKings' trade secrets.

153.    DraftKings has suffered irreparable harm as a direct and proximate result of Hermalyn's misappropriation, and will continue to suffer irreparable harm if Hermalyn is not permanently enjoined from retaining, using, or disclosing DraftKings' trade secrets.

154.    DraftKings also seeks an award of actual damages in an amount to be proven at trial under M.G.L. c. 93, § 42B(a).

155.    Hermalyn's misappropriation of DraftKings' trade secrets was conducted through willful and malicious conduct, as demonstrated by his deception regarding his involvement with

Fanatics, entitling DraftKings to attorneys' fees and exemplary damages.  M.G.L. c. 93, § 42B(b).

### COUNT VI – Misappropriation of Confidential Business Information

156.    DraftKings repeats and realleges the foregoing paragraphs as if fully set forth herein.

157.    Hermalyn misappropriated DraftKings' confidential business information by accessing and downloading the documents described above for no legitimate purpose as he prepared to depart DraftKings.  These documents included confidential information.

158.    DraftKings has taken reasonable measures to protect the confidentiality of its confidential information.   As described above, DraftKings requires employees to enter into confidentiality agreements prohibiting the use or disclosure of DraftKings' confidential information.  Additionally, DraftKings has robust policies in place that are also designed to protect DraftKings' confidential information.  Finally, DraftKings uses a host of technological safeguards to ensure that its confidential information does not fall into the hands of competitors.

159.    DraftKings does not consent to the acquisition or use of its confidential information by anyone other than authorized personnel using them within the scope of the contractual obligations of their employment with DraftKings. DraftKings did not consent to Hermalyn acquiring or using DraftKings confidential information for any purpose whatsoever following his termination of employment.

160.    DraftKings disclosed and provided its confidential information to Hermalyn in confidence, while he was an employee of the company, pursuant to a duty to maintain the confidentiality and secrecy of that information.

161.    Hermalyn breached that confidence by accessing and downloading DraftKings confidential information, including from a non-DraftKings device while inside the offices of Fanatics, and with the intent to benefit Fanatics.

162.    DraftKings has suffered irreparable harm as the direct and proximate result of Hermalyn's misconduct, and will continue to suffer irreparable harm if Hermalyn is not permanently enjoined from retaining, using, or disclosing DraftKings' confidential information.

<strong><u>COUNT VII – Breach of Duty of Loyalty</u></strong>

163.    DraftKings repeats and realleges the foregoing paragraphs as if fully set forth herein.

164.    Hermalyn was a key executive of DraftKings, occupying the position of Senior Vice President of Business Development and Vice President of VIP Management.

165.    In these roles, Hermalyn occupied positions of trust and confidence, and had access to DraftKings' valuable trade secrets and other confidential information.

166.    Hermalyn owed DraftKings a duty of loyalty as its key employee and a senior executive on the VIP team.

167.    As described above, Hermalyn violated his duty of loyalty during his employment with DraftKings by soliciting VIP team members on behalf of Fanatics, lying to DraftKings about his intentions to remain employed with DraftKings, engaging in self-dealing by funneling a DraftKings' contract to restaurants owned by an entity with which, on information and belief, he was affiliated without disclosing such affiliation,  misusing corporate funds for his own personal gain, and ultimately stealing DraftKings' trade secrets and other confidential information to benefit Fanatics.

168.    Upon information and belief, DraftKings has suffered damages as a result of Hermalyn's breach of loyalty, including the competitive harm resulting from Fanatics' exploitation of its trade secrets and confidential information, the loss of a valuable member of the VIP team, the enhanced retention packages paid to other members of the VIP team, and Hermalyn's own enhanced retention package worth millions of dollars, and thousands of dollars of DraftKings'

funds directed by Hermalyn in a self-dealing transaction.

## COUNT VIII – Conversion

169.     DraftKings repeats and realleges the foregoing paragraphs as if fully set forth herein.

170.     As described above, Hermalyn has no right of possession in DraftKings trade secrets and confidential information at the time he downloaded materials at the offices of Fanatics, and since his resignation as an employee of DraftKings.  Hermalyn similarly has no right of possession of some or all of the thousands of dollars of DraftKings' funds directed by Hermalyn, upon information and belief, in a self-dealing transaction.

171.     Hermalyn intentionally and wrongfully exercised control or dominion over DraftKings' property, and conducted a scheme of wrongful acts with the intention to appropriate the property and deprive DraftKings' of its property.

172.     DraftKings' retained at the time of the conversion, and still retains, ownership in the property.

173.     As a direct and proximate result of Hermalyn's conversion of DraftKings' property, DraftKings is entitled to compensatory and punitive damages, as Hermalyn's acts were maliciously taken in willful disregard of DraftKings' rights.

## PRAYER FOR RELIEF

WHEREFORE, DraftKings respectfully requests that the Court enter an order and judgment against Hermalyn as follows:

A)      For a temporary restraining order against Hermlayn, including but not limited to:

- restraining and enjoining him from directly or indirectly providing any services to Fanatics or its subsidiaries, affiliates, and joint ventures relating to: (i) the research, design, development, marketing, sales, operations, maintenance and commercial

exploitation pertaining to the operation of, and providing products and services for, the operation of games of chance or skill or pari-mutuel or fixed odds games (including, but not limited to, lotteries, pari-mutuel betting, bingo, race tracks, jai alai, legalized bookmaking, off-track betting, casino games, racino, keno, and sports betting or any play for fun (non-wagering) versions of the foregoing) and any type of ancillary service or product related to or connected with the foregoing; or (ii) any other aspect of the Business of the Company for which he performed services or received Confidential Information (each as defined in the Noncompetition Covenant) at any time during the six (6) month period prior to February 1, 2024;

- restraining and enjoining him from directly or indirectly soliciting or transacting business, or attempting to solicit or transact business with, any of DraftKings' customers, clients, vendors or partners, or with any of DraftKings' prospective customers, clients, vendors or partners about which Hermalyn learned Confidential Information (as defined in the Noncompetition Covenant) or which Hermalyn had some involvement or knowledge relating to: (i) the research, design, development, marketing, sales, operations, maintenance and commercial exploitation pertaining to the operation of, and providing products and services for, the operation of games of chance or skill or pari-mutuel or fixed odds games (including, but not limited to, lotteries, pari-mutuel betting, bingo, race tracks, jai alai, legalized bookmaking, off-track betting, casino games, racino, keno, and sports betting or any play for fun (non-wagering) versions of the foregoing) and any type of ancillary service or product related to or connected with the foregoing; or (ii) any aspect of the Business

of the Company (as defined in the Noncompetition Covenant);

- restraining and enjoining Hermalyn from directly or indirectly: (a) soliciting, in person or through supervision or control of others, an employee, advisor, consultant or contractor of DraftKings for the purpose of inducing or encouraging the employee, advisor, consultant or contractor to leave his or her relationship with DraftKings or to change an existing business relationship to the detriment DraftKings; (b) hiring away an employee, advisor, consultant or contractor of DraftKings; or (c) helping another person or entity hire away a DraftKings employee, advisor, consultant or contractor;

- restraining and enjoining Hermalyn from using or disclosing any of DraftKings' Confidential Information (as defined in the Confidentiality Agreement);

- directing Hermalyn, within three (3) days of the entry of such order, to: (a) return to DraftKings all DraftKings' Confidential Information such that no Confidential Information remains in his possession, custody, or control; (b) identify to DraftKings in writing any disclosure of DraftKings' Confidential Information (as defined in the Confidentiality Agreement) he made to any third party apart from any such disclosures he made in his ordinary course of business as an employee of DraftKings; and (c) certify to DraftKings his compliance with (a) and (b) above under the pains and penalties of perjury.

B)     Awarding DraftKings preliminary and permanent injunctive relief, including but not limited to:

- restraining and enjoining him from directly or indirectly providing any services to Fanatics or its subsidiaries, affiliates, and joint ventures relating to: (i) the research,

design, development, marketing, sales, operations, maintenance and commercial exploitation pertaining to the operation of, and providing products and services for, the operation of games of chance or skill or pari-mutuel or fixed odds games (including, but not limited to, lotteries, pari-mutuel betting, bingo, race tracks, jai alai, legalized bookmaking, off-track betting, casino games, racino, keno, and sports betting or any play for fun (non-wagering) versions of the foregoing) and any type of ancillary service or product related to or connected with the foregoing; or (ii) any other aspect of the Business of the Company for which he performed services or received Confidential Information (each as defined in the Noncompetition Covenant) at any time during the six (6) month period prior to February 1, 2024;

- restraining and enjoining him from directly or indirectly soliciting or transacting business, or attempting to solicit or transact business with, any of DraftKings' customers, clients, vendors or partners, or with any of DraftKings' prospective customers, clients, vendors or partners about which Hermalyn learned Confidential Information (as defined in the Noncompetition Covenant) or which Hermalyn had some involvement or knowledge relating to: (i) the research, design, development, marketing, sales, operations, maintenance and commercial exploitation pertaining to the operation of, and providing products and services for, the operation of games of chance or skill or pari-mutuel or fixed odds games (including, but not limited to, lotteries, pari-mutuel betting, bingo, race tracks, jai alai, legalized bookmaking, off-track betting, casino games, racino, keno, and sports betting or any play for fun (non-wagering) versions of the foregoing) and any type of ancillary service or

product related to or connected with the foregoing; or (ii) any aspect of the Business of the Company (as defined in the Noncompetition Covenant);

- restraining and enjoining Hermalyn from directly or indirectly: (a) soliciting, in person or through supervision or control of others, an employee, advisor, consultant or contractor of DraftKings for the purpose of inducing or encouraging the employee, advisor, consultant or contractor to leave his or her relationship with DraftKings or to change an existing business relationship to the detriment DraftKings; (b) hiring away an employee, advisor, consultant or contractor of DraftKings; or (c) helping another person or entity hire away a DraftKings employee, advisor, consultant or contractor;

- restraining and enjoining Hermalyn from using or disclosing any of DraftKings' Confidential Information (as defined in the Confidentiality Agreement);

C)      Restitution of any vested equity that Hermalyn received in exchange for any noncompetition covenants contained in his equity agreements;

D)      Awarding DraftKings actual and compensatory damages in an amount to be determined at trial, including costs, fees, and pre- and post-judgment interest;

E)      Awarding DraftKings its costs, expenses, and reasonable attorneys' fees;

F)      Awarding DraftKings exemplary, treble, and/or punitive damages;

G)      Awarding DraftKings recoupment and/or disgorgement of any equity grants and other compensation paid to Hermalyn during his period of disloyalty; and

H)      Awarding DraftKings such further and other relief as the Court deems just and proper.

## JURY TRIAL DEMAND

174.    DraftKings hereby demands a jury trial.


Dated: February 5, 2024                    Respectfully submitted,

                                           */s/ Andrew S. Dulberg*
                                           William F. Lee (BBO #291960)
                                           Andrew S. Dulberg (BBO #675405)
                                           WILMER CUTLER PICKERING
                                           HALE AND DORR LLP
                                           60 State Street
                                           Boston, MA 02109
                                           Telephone: (617) 526-6000
                                           william.lee@wilmerhale.com
                                           andrew.dulberg@wilmerhale.com

                                           **GIBSON, DUNN & CRUTCHER LLP**
                                           Orin Snyder (*pro hac vice pending*)
                                           Harris M. Mufson (*pro hac vice pending*)
                                           Justin M. DiGennaro (*pro hac vice pending*)
                                           200 Park Avenue
                                           New York, NY  10166-0193
                                           Tel:  212.351.4000
                                           Fax:  212.351.4035
                                           OSnyder@gibsondunn.com
                                           HMufson@gibsondunn.com
                                           JDiGennaro@gibsondunn.com

                                           Jason C. Schwartz (*pro hac vice pending*)
                                           1050 Connecticut Avenue, N.W.
                                           Washington, D.C. 20036
                                           Tel:  202.955.8500
                                           JSchwartz@gibsondunn.com


                                           *Attorneys for Plaintiff DraftKings Inc.*

## <u>VERIFICATION</u>

I, Gregory Karamitis, Chief Revenue Officer, verify that I have read the allegations contained in this Verified Complaint; that, other than allegations made upon information and belief, those allegations are true and correct based on my knowledge and belief which, in some instances, is based on information that was provided to me from DraftKings' personnel and from DraftKings records.

SIGNED UNDER THE PAINS AND PENALTIES OF PERJURY THIS 5th DAY OF FEBRUARY 2024

_____
Gregory Karamitis

49