# EXHIBIT B

*(2022 Time-Based Vesting – 4 Years Quarterly)*

**DRAFTKINGS INC.**

**RESTRICTED STOCK UNIT GRANT NOTICE**
**AND NON-COMPETITION COVENANT**
**(2020 INCENTIVE AWARD PLAN)**

**DRAFTKINGS INC.**, a Nevada corporation (the "***Company***"), pursuant to its 2020 Incentive Award Plan, as may be amended from time to time (the "***Plan***"), hereby grants to Participant the number of restricted stock units ("***RSUs***") set forth below, each of which represents the right to receive one Common Share without any payment for such shares.  This award is subject to all of the terms and conditions as set forth in this notice, in the corresponding Restricted Stock Unit Agreement and the Plan, which are attached hereto and incorporated herein in their entirety.  Capitalized terms not explicitly defined herein but defined in the Plan or the Restricted Stock Unit Agreement will have the same definitions as in the Plan or the Restricted Stock Unit Agreement.  If there is any conflict between the terms in this notice, Exhibit A to this notice, the corresponding Restricted Stock Unit Agreement and the Plan, then such conflict or inconsistency shall be resolved by giving such documents precedence in the following order: Exhibit A, this notice, the corresponding Restricted Stock Unit Agreement then the Plan.

As required by the Massachusetts Noncompetition Agreement Act, you and the Company acknowledge and agree that the RSUs constitute fair and reasonable consideration and mutually-agreed upon consideration for the Noncompetition Covenant set out in Attachment III hereto (the "***Noncompetition Covenant***").  Such consideration is specifically designated and you acknowledge the receipt and sufficiency of the consideration.  You must review and execute the Noncompetition Covenant as this grant of RSUs is conditioned upon (i) the Noncompetition Covenant becoming effective pursuant to paragraph (l) in Attachment III, and (ii) your Relationship (as defined below in Section (a)(xv) of the Noncompetition Covenant) with the Company being active, in good standing, and not having been terminated on the date such Noncompetition Covenant becomes effective.

| | |
|---|---|
| Participant | Michael Hermalyn |
| Date of Grant: | 31-Jul-2023 |
| Vesting Commencement Date: | 01-Sep-2023 |
| Number of RSUs: | 104,870 |

**Type of Grant:**    Restricted Stock Units

**Vesting Schedule:**  This award shall vest pursuant to the schedule set forth in Exhibit A, which is attached hereto and incorporated herein in its entirety.

**Additional Terms/Acknowledgements:**  Participant acknowledges receipt of, and understands and agrees to, this Restricted Stock Unit Grant Notice, the corresponding Restricted Stock Unit Agreement and the Plan.  Participant acknowledges and agrees that this Restricted Stock Unit Grant Notice and the corresponding Restricted Stock Unit Agreement may not be modified, amended or revised except as provided in the Plan.  Participant further acknowledges that as of the Date of Grant, this Restricted Stock Unit Grant Notice, the corresponding Restricted Stock Unit Agreement, and the Plan set forth the entire understanding between Participant and the Company regarding this RSU award and supersede all prior oral and written agreements, promises and/or representations on that subject with the exception of the following agreements only.

OTHER AGREEMENTS: _____

_____

_____

By accepting these RSUs, you consent to receive such documents by electronic delivery and to participate in the Plan through an on-line or electronic system established and maintained by the Company or another third party designated by the Company.

DRAFTKINGS INC.                                 PARTICIPANT

By:_____            By: *Michael Hermalyn*
            Jason Robins

Title: Chief Executive Officer                  Name:  Michael Hermalyn

                                                Date of Acceptance: 16-Aug-2023 06:59 MDT

ATTACHMENTS:  Restricted Stock Unit Agreement, 2020 Incentive Award Plan, Noncompetition
                Covenant

**EXHIBIT A**

**VESTING SCHEDULE**

RSUs shall vest in equal installments every three months following the Vesting Commencement Date set forth in the Restricted Stock Unit Grant Notice so that the RSUs are fully vested on the fourth anniversary of the Vesting Commencement Date.  Each installment that vests on each three-month vesting date will be rounded down to the nearest full number of RSUs, with the remaining number of RSUs vesting on the last vesting date.

**ATTACHMENT I**

**RESTRICTED STOCK UNIT AGREEMENT**

**DRAFTKINGS INC.**

**2020 INCENTIVE AWARD PLAN**

**RESTRICTED STOCK UNIT AGREEMENT**


Pursuant to your Restricted Stock Unit Grant Notice ("***Grant Notice***") and this Restricted Stock Unit Agreement (this "***Agreement***" or this "***Restricted Stock Unit Agreement***"), DraftKings Inc., a Nevada corporation (the "***Company***"), has granted you the number of RSUs under its 2020 Incentive Award Plan (the "***Plan***") indicated in your Grant Notice, each of which represents the right to receive one Common Share. The RSUs are granted to you effective as of the date of grant set forth in the Grant Notice (the "***Date of Grant***"). If there is any conflict between the terms in the Grant Notice, Exhibit A to the Grant Notice, this Restricted Stock Unit Agreement and the Plan, then such conflict shall be resolved by giving such documents precedence in the following order: Exhibit A, the Grant Notice, this Restricted Stock Unit Agreement then the Plan. Capitalized terms not explicitly defined in this Restricted Stock Unit Agreement or in the Grant Notice but defined in the Plan will have the same definitions as in the Plan.

The details of the RSUs, in addition to those set forth in the Grant Notice and the Plan, are as follows:

1. **VESTING; NO SHAREHOLDER RIGHTS**. The RSUs will vest as provided in your Grant Notice. Vesting will cease upon the termination of your service with the Company and its Subsidiaries except as may be provided otherwise in the Vesting Schedule in Exhibit A to your Grant Notice or in an employment or other agreement between you and the Company. You will not be deemed to be the holder of, or have any of the rights of a stockholder with respect to any RSUs unless and until they have vested and the Company has issued and delivered Common Shares to you and your name shall have been entered as a stockholder of record on the books of the Company.

2. **NUMBER OF RSUS**. The number of RSUs are set forth in your Grant Notice and will be adjusted in the event of changes in capital structure and similar events as provided in Section 12 of the Plan.

3. **SETTLEMENT**. Subject to Section 8, each RSU will be settled by delivery to you of one Common Share as promptly as practicable, and in any event within 60 days, following the date on which the RSU vests and no later than March 15 of the year following the year in which the vesting date occurs. The Company may, in its sole discretion, deliver cash in lieu of all or any portion of the Common Shares otherwise deliverable in respect of the RSUs in an amount equal to such number of Common Shares multiplied by the Fair Market Value of a Common Share on the date when such shares would otherwise have been issued, as determined by the Board.

4. **SECURITIES LAW COMPLIANCE**. In no event shall the Company deliver Common Shares upon vesting of the RSUs unless such shares are then registered under the Securities Act or, if not registered, the Company has determined that the issuance of the shares would be exempt from the registration requirements of the Securities Act. The issuance of Common Shares is also subject to compliance with all other applicable laws and regulations.

5. **OTHER TERMS**.

(a) In considering the acceptance of this award of RSUs, you understand, acknowledge, agree and hereby stipulate that you should use the same independent investment judgment

that you would use in making other investments in corporate securities.  Among other things, stock prices will fluctuate over any reasonable period of time and the price of Common Shares may go down as well as up.  No guarantees are made as to the future prospects of the Company or the Common Shares.  No representations are made by the Company.

(b)     Notwithstanding anything to the contrary in this Restricted Stock Unit Agreement, the Common Shares issued under this Restricted Stock Unit Agreement, any other restricted stock unit agreement or any stock option agreement, and all amounts that may be received by you in connection with any disposition of any such Common Shares shall be subject to applicable recoupment, "clawback" and similar provisions under law, as well as any recoupment, "clawback" and similar policies of the Company that may be adopted at any time and from time to time in order to comply with the Dodd-Frank Wall Street Reform and Consumer Protection Act or other applicable law.

6.     **TRANSFERABILITY**.  Except as otherwise provided in this Section 6 or in the Plan, the RSUs are not assignable or transferable, except by will or by the laws of descent and distribution.  Without limiting the generality of the foregoing, the RSUs may not be sold, assigned, transferred or otherwise disposed of, or pledged or hypothecated in any manner (whether by operation of law or otherwise), and shall not be subject to execution, attachment or other process. Any assignment, transfer, sale, pledge, hypothecation or other disposition of the RSUs or any attempt to make any such levy of execution, attachment or other process will cause the RSUs to terminate immediately, unless the Chief Legal Officer of the Company, in his sole discretion, specifically waives applicability of this provision.

(a)     **Certain Trusts**.  Upon receiving written permission from the Chief Legal Officer of the Company, you may transfer the RSUs to a trust if you are considered to be the sole beneficial owner (determined under Section 671 of the Code and applicable state law) while the RSUs are held in the trust.  You and the trustee hereby agree to enter into transfer and other agreements required by the Company.

(b)     **Domestic Relations Orders**.  Upon receiving written permission from the Chief Legal Officer of the Company, and provided that you and the designated transferee enter into transfer and other agreements required by the Company, you may transfer the RSUs pursuant to the terms of a domestic relations order, official marital settlement agreement or other divorce or separation instrument that contains the information required by the Company to effectuate the transfer.  You are encouraged to discuss the proposed terms of any division of these RSUs with the Company prior to finalizing the domestic relations order or marital settlement agreement to help ensure the required information is contained within the domestic relations order or marital settlement agreement.

(c)     **Beneficiary Designation**.  Upon receiving written permission from the Chief Legal Officer of the Company, you may, by delivering written notice to the Company, in a form approved by the Company and any broker designated by the Company to administer its equity program, designate a third party who, on your death, will thereafter be entitled to receive the Common Shares or other consideration in settlement of the vested RSUs.  In the absence of such a designation, your executor or administrator of your estate will be entitled to receive, on behalf of your estate, the Common Shares or other consideration in settlement of the vested RSUs.

7.     **RSUS NOT A SERVICE CONTRACT**.  The RSUs are not an employment or service contract, and nothing in the RSUs will be deemed to create in any way whatsoever any obligation on your part to continue in the employ or service of the Company or an Affiliate, or of the Company or an Affiliate to continue your employment or service.  In addition, nothing in the RSUs will obligate the Company or an Affiliate, their respective stockholders, boards of directors, officers or employees to

continue any relationship that you might have as a member of the Company's Board or a consultant for the Company or an Affiliate.

8.      WITHHOLDING OBLIGATIONS.

(a)      At the time the RSUs vest, in whole or in part, and at any time thereafter as requested by the Company, you hereby agree to make adequate provision for (including by means of a "same day sale" pursuant to a program developed under Regulation T as promulgated by the Federal Reserve Board to the extent permitted by the Company), any sums required to satisfy the federal, state, local and foreign tax withholding obligations of the Company or an Affiliate, if any, which arise in connection with the vesting and settlement of the RSUs.

(b)      In the event that you fail to make the adequate provisions contemplated by Section 8(a) above, then, subject to compliance with any applicable legal conditions or restrictions, the Company shall have the option in its sole discretion (but not the obligation) to withhold from fully vested Common Shares otherwise issuable to you upon the settlement of the RSUs a number of whole Common Shares having a Fair Market Value, determined by the Company as of the date of vesting or settlement as applicable, not in excess of the amount of tax required to be withheld by law (or such lower amount as may be necessary to avoid classification of the RSUs as a liability for financial accounting purposes).

(c)      The Company assumes no responsibility for individual income taxes, penalties or interest related to grant, vesting or settlement of any RSU.  Neither the Company nor any affiliate makes any representation or undertaking regarding the treatment of any tax withholding in connection with the grant, vesting or settlement of the RSUs. **You should consult with your personal tax advisor regarding the tax ramifications, if any, which result from receipt of the RSUs, the subsequent issuance, if any, of Common Shares on settlement of the RSUs, and subsequent disposition of any such Common Shares.** You acknowledge that the Company may be required to withhold federal, state and/or local taxes in connection with the vesting and/or settlement of the RSUs. **No RSUs will vest or be settled unless and until you have made the adequate provisions contemplated by Section 8(a) or the Company has exercised its option to withhold the necessary amount of Common Shares pursuant to Section 8(b) above.** The Company will have no obligation to issue a certificate for Common Shares in respect of the RSUs unless the obligations set forth in this Section 8 are satisfied.

9.      SECTION 409A; TAX CONSEQUENCES.  It is the Company's intent that all benefits under this Restricted Stock Unit Agreement and Grant Notice shall be exempt from Section 409A of the Internal Revenue Code ("Section 409A") to the extent applicable, and that this Restricted Stock Unit Agreement shall be administered accordingly. Notwithstanding anything to the contrary contained in this Restricted Stock Unit Agreement, Grant Notice or any employment agreement you have entered into with the Company, to the extent that any benefit under this Restricted Stock Unit Agreement is determined by the Company to constitute "non-qualified deferred compensation" subject to Section 409A and is payable to you by reason of termination of your employment, then (a) such benefit shall be made or provided to you only upon a "separation from service" as defined for purposes of Section 409A under applicable regulations and (b) if you are a "specified employee" (within the meaning of Section 409A and as determined by the Company), such benefit shall not be made or provided before the date that is six months after the date of your separation from service (or your earlier death). Each benefit under this Restricted Stock Unit Agreement shall be treated as a "separate payment" under Section 409A. You hereby agree that the Company does not have a duty to design or administer the Plan or its other compensation programs in a manner that minimizes your tax liabilities.  You will not make any claim against the Company, or any of its officers, directors, employees or Affiliates related to tax liabilities arising from the RSUs or your other compensation.

10.      **NOTICES**.  Any notices provided for in the Restricted Stock Unit Agreement or the Plan will be given in writing and will be deemed effectively given upon receipt.  The Company may, in its sole discretion, decide to deliver any documents related to participation in the Plan and these RSUs by electronic means or to request your consent to participate in the Plan by electronic means.  By accepting these RSUs, you consent to receive such documents by electronic delivery and to participate in the Plan through an on-line or electronic system established and maintained by the Company or another third party designated by the Company.

11.      **AGREEMENT SUMMARIES**.  In the event that the Company provides you (or anyone acting on your behalf) with summary or other information concerning, including or otherwise relating to your rights or benefits under this Restricted Stock Unit Agreement (including, without limitation, the RSUs and any vesting thereof), such summary or other information shall in all cases be qualified in its entirety by Exhibit A, the Grant Notice, this Restricted Stock Unit Agreement and the Plan and, unless it explicitly states otherwise and is signed by an officer of the Company, shall not constitute an amendment or other modification hereto.

12.      **ACKNOWLEDGEMENTS**.  You understand, acknowledge, agree and hereby stipulate that: (1) you are executing this Restricted Stock Unit Agreement voluntarily and without any duress or undue influence by the Company or anyone else; (2) the RSUs are intended to be consideration in exchange for the promises and covenants set forth in this Restricted Stock Unit Agreement; (3) you have carefully read, considered and understand all of the provisions of this Restricted Stock Unit Agreement and the Company's policies reflected in this Restricted Stock Unit Agreement; (4) you have asked any questions needed for you to understand the terms, consequences and binding effect of this Restricted Stock Unit Agreement and you fully understand them; (5) you were provided an opportunity to seek the advice of an attorney and/or a tax professional of your choice before accepting this award of RSUs; and (6) the obligations and restrictions set forth in this Restricted Stock Unit Agreement are fair and reasonable.

**ATTACHMENT II**

**2020 INCENTIVE AWARD PLAN**

## ATTACHMENT III

## NONCOMPETITION COVENANT

(a)  During the period of your Relationship (defined below) with the Company (defined below), you ("you" or "your") agree to not, anywhere within the Restricted Area (defined below), acting individually, or as an owner, shareholder, partner, employee, contractor, agent or otherwise (other than on behalf of the Company), provide services to a Competing Business (defined below) or commit a Threatened Breach (defined below) of such obligation.  For a period of twelve (12) months following termination of your Relationship with the Company you agree to not, anywhere within the Restricted Area, acting individually, or as an owner, shareholder, partner, employee, contractor, agent or otherwise (other than on behalf of Company): (1) provide services to a Competing Business that relate to any aspect of the Business of the Company (defined below) (i.e., FSC (defined below), Gaming (defined below), Marketplace (defined below), Media (defined below), Other Products and Services (defined below), and/or Incidental Products and Services (defined below)) for which you performed services or received Confidential Information (defined below) at any time during the six (6) month period prior to such termination; or (2) commit a Threatened Breach of the obligation set forth in the immediately preceding clause. For example, in the event that you performed services for the FSC aspect of the Business of the Company and received Confidential Information about the Gaming aspect of the Business of the Company during the six (6) month period prior to the termination of your Relationship with the Company, then for twelve (12) months after such termination, you shall not, anywhere within the Restricted Area, acting individually, or as an owner, shareholder, partner, employee, contractor, agent or otherwise (other than on behalf of the Company), provide services to a Competing Business that relates to FSC or Gaming, or commit a Threatened Breach of that obligation.  The foregoing shall not be construed to preclude you from owning up to one percent (1%) of the outstanding stock of a publicly held corporation that constitutes or is affiliated with a Competing Business.

As set out in the Massachusetts Noncompetition Act, Mass. General Laws c. 149, s. 24L, you specifically agree that the opportunity for, or the receipt of, the RSUs (as defined in the first paragraph of this Restricted Stock Unit Grant Notice and Non-Competition Covenant (2020 Incentive Award Plan) (the "Restricted Stock Unit Grant Notice")) granted to you as set forth in this Restricted Stock Unit Grant Notice are fair and reasonable consideration for this Noncompetition Covenant. You and the Company further agree that the opportunity for, or the receipt of, the RSUs is mutually agreed upon consideration for this Noncompetition Covenant. Such consideration is specifically designated and you acknowledge the receipt and sufficiency of the consideration.

For purposes of this Attachment III:

i.    "Business of the Company" shall mean the research, design, development, marketing, broadcasting, streaming, promotion, sales, operations, maintenance and commercial exploitation pertaining to the operation of, and providing products and services for: (1) fantasy sports contests ("FSC"); (2) Gaming; (3) Marketplace; (4) Media; (5) all other products and services that exist, are in development, or are under consideration by the Company during your Relationship with the Company ("Other Products and Services"); and (6) all products and services incidentally related to, or which are an extension, development or expansion of, FSC, Gaming, Marketplace, Media or Other Products and Services ("Incidental Products and Services").

ii.    "Cause" has the meaning ascribed to it in Section (b).

iii.   "Company" shall mean DraftKings Inc., a Nevada corporation, and any person or entity controlled by, controlling, or under common control with DraftKings Inc., a Nevada corporation, including affiliates and subsidiaries. "Control" (and its derivatives) means the direct or indirect possession of the power to direct or cause the direction of the management and policies of an entity, whether through ownership, by contract or otherwise.

iv.   "Competing Business" shall mean any person, firm, association, corporation or any other entity that is engaged in a business or activity (whether online, at a physical location or otherwise) that is competitive with any aspect of the Business of the Company, including, but not limited to: Action Network, Barstool Sports, BetAmerica, BetEasy, Betfair, Betgenius, BetStars, BetQL, Bet365, Bleacher Report, Borgata, Caesars, Candy Digital, Dapper Labs, Entain, ESPN, FanDuel, Flutter Entertainment PLC, FoxBet, FoxSports, GAN, Golden Nugget, Harrah's, Holdings PLC, International Game Technology, Kambi, Light & Wonder, LooksRare, MGM, NiftyGateway, Ocean Casino Resort, Oddschecker, OpenSea, Paddy Power, Pala, Penn National Gaming, Playtech, PointsBet, Pokerstars, Rarible, Resorts, Rivers Casino, Rush Street Interactive, Scientific Games, Sky Betting & Gaming, Sorare, Sportradar, Sportsbet, SugarHouse, theScore, Tropicana, TVG, Unibet, Virgin, Wynn, William Hill, 888, and  any of the foregoing persons or entities later known by a different name, any person or entity that acquires, is acquired by, merges with, is spun off by, or otherwise combines with or separates from any of the foregoing persons or entities or enters into an agreement to do so, any person or entity directly or indirectly controlling, controlled by, or under common control with any of the foregoing persons or entities, including, but not limited to, any direct and indirect subsidiaries, affiliates, and ventures of any of the foregoing persons or entities, and any successor or assign of any of the foregoing persons or entities.

v.    "Confidential Information" shall have the same meaning as set forth in any and all Nonsolicitation, Nondisclosure & Assignment of Invention Agreements, or agreements with respect to substantially similar subject matter, (collectively, the "NDA") that you entered into with the Company. Confidential Information shall also mean all information or a compilation of information, in any form (tangible or intangible or otherwise), that is not generally known to competitors of the Company or the public, which Company considers to be confidential and/or proprietary, including, but not limited to: research and development; techniques; methodologies; strategies; product information, designs, prototypes and technical specifications; algorithms, source codes, object codes, trade secrets and technical data; training materials and methods; internal policies and procedures; marketing plans and strategies; pricing and cost policies; customer, supplier, vendor and partner lists and accounts; customer and supplier preferences; contract terms and rates; financial data, information, reports, and forecasts; inventions, improvements and other intellectual property; product plans and proposed product plans; know-how; designs, processes and formulas; software and website applications; computer passwords; market and sales information, plans and strategies; business plans, prospects and opportunities (including, but not limited to, possible acquisitions or dispositions of businesses or facilities); information concerning existing or potential customers, partners or vendors.  Confidential Information shall also mean information related to Company's current or potential customers, vendors or partners that is considered to be confidential or proprietary to the applicable customer, vendor or partner.

Confidential Information does not include information that is: in the public domain (other than as a result of disclosure by you); approved in writing for unrestricted release by Company; or produced or disclosed pursuant to a valid subpoena or court order, provided you have given Company written notice of such anticipated production or disclosure (to the extent not prohibited by such subpoena or court order) such that Company has an actual, reasonable opportunity to defend, limit or protect such production or disclosure.

vi.     "Control" has the meaning ascribed to it in the definition of Company.

vii.    "FSC" shall mean any fantasy or simulated activity or contest where winning outcomes are determined predominantly by accumulated statistical results of the performance of individuals in athletic or other events; the wining outcome reflects the knowledge and skill of the participant; and a winning outcome is not based solely on the performance of a single team or individual.

viii.   "Gaming" shall mean games of chance or skill, pari-mutuel, fixed odds, pools or otherwise (including, but not limited to, lottery, pari-mutuel betting, bingo, horse and dog racing, simulated racing and sporting events, jai alai, sports betting, online casino games/iGaming, social casino, poker and keno) whether played for real money or cash equivalent, virtual currency, free, or otherwise and any type of ancillary service or product related to the foregoing.

ix.     "Incidental Products and Services" has the meaning ascribed to it in the definition of Business of the Company.

x.      "Marketplace" shall mean a digital platform facilitating the purchase and sale of non-fungible tokens and other collectibles.

xi.     "Media" shall mean the development, distribution, procurement and programming of content offerings in audio and video focused media related to sports, Gaming, FSC, Marketplace or Other Products and Services.

xii.    "Noncompetition Covenant" shall mean this noncompetition covenant, Attachment III, as also set forth in the second paragraph of the Restricted Stock Unit Grant Notice.

xiii.   "NDA" has the meaning ascribed to it in the definition of Confidential Information.

xiv.    "Other Products and Services" has the meaning ascribed to it in the definition of Business of the Company.

xv.     "Relationship" shall mean your relationship with the Company, whether as an owner, shareholder, partner, employee, contractor, agent, advisor or consultant.

vii.    "Restricted Area" shall mean any place within the United States or anywhere else in the world, since Competing Businesses operate globally and without meaningful limitation to compete caused by geographic locations, and because the Business of the Company is global in nature due to the specialized industries in which the Company and Competing Businesses operate, which Employee acknowledges and agrees is reasonable.

xvi.    "RSUs" has the meaning ascribed to it in Section (a), second paragraph.

xvii.   "<u>Terms and Conditions</u>" shall mean any of terms, conditions, covenants, representations, warranties, duties or obligations set forth in this Noncompetition Covenant.

xviii.  "<u>Threatened Breach</u>" shall mean any attempt by you to engage in conduct that would breach these Terms and Conditions.

(b)  You and the Company agree that this Noncompetition Covenant may not be enforceable against you in the event the Company terminates your Relationship without Cause. In the event of a termination without Cause, all other agreements between you and the Company shall remain in full force and effect. You and the Company acknowledge and agree that "Cause" shall mean, for the purposes of this Noncompetition Covenant: (i) gross misconduct by you, which results in loss, damage or injury to the Company, its goodwill, business or reputation; (ii) your commission or attempted commission of an act of embezzlement, fraud or breach of fiduciary duty, which results or could result in loss, damage or injury to the Company, its goodwill, business or reputation; (iii) your unauthorized or attempted unauthorized disclosure or misappropriation of any trade secret or Confidential Information of the Company or any third party that has a business relationship with the Company; (iv) your conviction of or plea of nolo contendere to, a felony under any state or federal law, which materially interferes or could interfere with your ability to perform your services for the Company or which results or could result in loss, damage or injury to the Company, its goodwill, business or reputation; (v) a breach or Threatened Breach by you, in any material respect, of these Terms and Conditions, the NDA or any other material agreement between you and the Company; (vi) your failure to perform your assigned duties and responsibilities to the reasonable satisfaction of the Company, which failure continues, in the reasonable judgment of the Company, after written notice given to you by the Company; (vii) your use of controlled substances, illicit drugs, alcohol or other substances or behavior by you, in each case, that interferes with your ability to perform your services for the Company or that otherwise results or could result in loss, damage or injury to the Company, its goodwill, business or reputation; (viii) the existence or prior existence of a reasonable basis for the Company's dissatisfaction with you, entertained in good faith, for reasons, including, but not limited to, lack of capacity or diligence, failure to conform to usual standards of conduct, or other culpable or inappropriate behavior; or (ix) there exists or existed grounds for discharge reasonably related, in the Company's good faith judgment, to the needs of the Business of the Company.  Any determination of whether Cause exists shall be made by the Company in its sole and absolute discretion.  Any failure, delay or omission by the Company to make a determination of whether Cause exists will in no way be construed as a waiver of such right to do so at a later time.

(c)  You agree to communicate the contents of all post-Relationship obligations in this Noncompetition Covenant to any Competing Business that you intend to be employed by, associated with, or represent.  You understand and agree that the Company may, in its sole and absolute discretion, also share any post-Relationship obligation in this Noncompetition Covenant with any future (or potential) employer, association, contractor, owner or partner that is a Competing Business that seeks to associate, contract, partner or employ you for your services.

(d)  You agree that the enforcement of this Noncompetition Covenant is necessary, among other things, to ensure the preservation, protection and continuity of the Company's Confidential Information, trade secrets and goodwill.  You agree that, due to the proprietary nature of the Business of the Company and relationships with others, the restrictions during your Relationship with the Company and post-Relationship restrictions set forth herein are

reasonable as to duration and scope.  You acknowledge that this Noncompetition Covenant is necessary because, among other things, the Company's interests cannot be adequately protected through an alternative restrictive covenant, including, but not limited to, the NDA.

(e)  You agree that any breach, Threatened Breach or challenge to the enforceability of this Noncompetition Covenant would cause the Company to suffer immediate and irreparable harm for which monetary damages are inadequate.  Accordingly, in the event of a breach, Threatened Breach or challenge to the enforceability of this Noncompetition Covenant, the Company shall be automatically entitled to a temporary, preliminary and permanent injunction restraining such breach, Threatened Breach or challenge requiring specific performance, in addition to any and all rights and remedies at law and equity. The Company shall not be obligated to present additional evidence of irreparable harm or the insufficiency of monetary damages and, to the extent permitted by law or under applicable court rule, does not need to post a bond or other surety.  Nothing herein shall be construed as prohibiting the Company from pursuing any other remedy available to the Company for such breach, Threatened Breach or challenge.  In the event the Company prevails in any request to enforce your obligations under this Noncompetition Covenant (including pursuant to a temporary restraining order or preliminary or permanent injunction), the Company shall be entitled to receive from you the Company's reasonable attorney's fees, costs and expenses incurred (in addition to any other relief sought, available or awarded under this Noncompetition Covenant).  In the event that you commit a breach, Threatened Breach or challenge of your obligations under this Noncompetition Covenant that causes the Company to incur attorneys' fees, costs or expenses before you relent such breach, threats or challenge, the Company shall be entitled to its reasonable attorney's fees, costs and expenses incurred prior to you relenting (in addition to any other relief sought, available or awarded under this Noncompetition Covenant).

(f)  You and the Company hereby mutually agree to the exclusive jurisdiction of the Business Litigation Session ("BLS") of the Suffolk Superior Court of the Commonwealth of Massachusetts (and, in the event that the BLS declines to accept jurisdiction, to the exclusive jurisdiction of the Suffolk Superior Court of the Commonwealth of Massachusetts) or the United States District Court for the District of Massachusetts for any dispute arising hereunder. Accordingly, with respect to any such court action, you (a) submit to the personal jurisdiction of such courts; (b) consent to service of process by regular mail to your last known address; and (c) waive any other requirement (whether imposed by statute, rule of court, or otherwise) with respect to personal jurisdiction or service of process.  In the event that you commence a legal action or other proceeding outside of Massachusetts against the Company concerning a dispute arising from or relating to this Noncompetition Covenant you shall reimburse the Company for its reasonable attorneys' fees, costs and expenses incurred in the event that the Company prevails in staying, transferring, dismissing or otherwise defending such action or proceeding, regardless of whether such fees, costs and expenses are incurred in the forum where you commenced the action or in a Massachusetts forum. This Noncompetition Covenant shall be governed by the internal substantive laws of Massachusetts, without regard to the doctrine of conflicts of law.

**<u>YOU AND THE COMPANY IRREVOCABLY WAIVE, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT TO A TRIAL BY JURY IN ANY LEGAL PROCEEDING DIRECTLY OR INDIRECTLY ARISING OUT OF OR RELATING TO THIS NONCOMPETITION COVENANT. EACH PARTY HERETO CERTIFIES THAT THIS WAIVER IS KNOWINGLY, WILLINGLY, AND VOLUNTARILY MADE.</u>**

(g)  In the event that: (i) you breach, commit a Threatened Breach or challenge the enforceability of this Noncompetition Covenant, or (ii) the Company seeks to enforce these Terms and Conditions, you agree to an extension of the duration of the covenant set forth in Section (a) on the same Terms and Conditions for an additional period of time equal to the time that elapses from the commencement of such breach, Threatened Breach or challenge to the later of: (i) the termination of such breach, Threatened Breach or challenge; or (ii) the final non-appealable resolution of any litigation or other legal proceeding stemming from such breach, Threatened Breach or challenge.

(h)  The failure, delay or omission by the Company to enforce any of these Terms and Conditions will in no way be construed as a waiver of these Terms and Conditions and will not affect the right of the Company thereafter to enforce this Noncompetition Covenant in accordance with these Terms and Conditions. No waiver of any of these Terms and Conditions, or breach, Threatened Breach or challenge thereof, shall be deemed a waiver of any of the other Terms and Conditions or breach of this Noncompetition Covenant. In the event the Company provides a waiver or consent on one (1) particular occasion, it is effective only as to that occasion and does not affect other occasions. No Terms and Conditions may be waived or consented to by Company unless such waiver is in writing.

(i)  These Terms and Conditions shall be construed as separable and divisible from every other term, condition, covenant, representation, warranty, duty or obligation set forth in this Noncompetition Covenant , and the enforceability of any one (1) term, condition, covenant, representation, warranty, duty or obligation set forth in this Noncompetition Covenant shall not limit the enforceability, in whole or in part, of any other term, condition, covenant, representation, warranty, duty or obligation set forth in this Noncompetition Covenant.  In the event that a court, arbitrator or other body of competent jurisdiction holds any of these Terms and Conditions to be invalid, illegal, void, or less than fully enforceable as to time, scope or otherwise, the parties agree that this Noncompetition Covenant shall be reformed to the minimum extent necessary to cause the term, condition, covenant, representation, warranty, duty or obligation set forth in this Noncompetition Covenant  to be valid, legal, and enforceable while preserving to the greatest extent permissible the original intent of the parties as expressed in, and the benefits to the parties provided by, this Noncompetition Covenant (including, but not limited to, the term, condition, covenant, representation, warranty, duty or obligation set forth in this Noncompetition Covenant held as invalid, illegal, void, or less than fully enforceable).

(j)  Except as set forth in the Massachusetts Noncompetition Act, your obligations under this Noncompetition Covenant shall survive the termination of your Relationship with the Company regardless of the manner of such termination.

(k)  The rights granted to the Company under this Noncompetition Covenant shall inure to the benefit of, and be enforceable by, the successors or assigns of Company.

(l)  This Noncompetition Covenant shall not become effective until the later of (a) at least ten (10) business days after you have received this Restricted Stock Unit Grant Notice, or (b) the date this Noncompetition Covenant is executed by you.  The obligations in this Noncompetition Covenant are intended to supplement – not replace – those in all prior noncompetition agreements between you and the Company; provided, however, that in the event a conflict arises between this Noncompetition Covenant and prior noncompetition covenants between you and the Company, then such conflict or inconsistency shall be resolved by giving precedence to this Noncompetition Covenant.

(m)  Before agreeing to this Noncompetition Covenant, you have the right to consult with counsel. You understand and acknowledge that you have asked any questions needed for you to understand these Terms and Conditions, consequences and binding effect of this Noncompetition Covenant, and you fully understand them, including, but not limited to, the concept that you are waiving the right to a trial by jury.

(n)  In the event that you breach, commit a Threatened Breach, or challenge the enforceability of this Noncompetition Covenant, in addition to any other rights and remedies available to the Company, you agree that the Company shall have the right (in its sole and absolute discretion, for any reason or no reason) to deem that any and all vested RSUs (to the extent not settled in common shares) and unvested RSUs have been forfeited.

(o)  The parties agree that nothing in this Noncompetition Covenant is intended to guarantee your Relationship for any period of time.  The parties enter this Noncompetition Covenant with the understanding that your position, title, duties and responsibilities could change in a material way in the future and, in light of that understanding, the parties intend that this Noncompetition Covenant shall follow you throughout the entire course of your Relationship with the Company, and such subsequent material change shall not affect the enforceability or validity of this Noncompetition Covenant.

ACKNOWLEDGED AND AGREED:

| Michael Hermalyn |
|---|
| (Signature) |

| Michael Hermalyn |
|---|
| Name |

| 16-Aug-2023 06:59 MDT |
|---|

DRAFTKINGS INC.:

Title:    Chief Executive Officer

DATE: 16-AUG-2023 06:59 MDT