**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**

DRAFTKINGS INC.,

        Plaintiff,

   v.

MICHAEL HERMALYN,

        Defendant.

Civil Action No. 1:24-cv-10299

**MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFF'S**
**MOTION FOR TEMPORARY RESTRAINING ORDER**

# TABLE OF CONTENTS

INTRODUCTION ................................................................................................................1

STATEMENT OF FACTS ..................................................................................................4

ARGUMENT ......................................................................................................................6

    I.    DRAFTKINGS IS LIKELY TO SUCCEED ON THE MERITS ............................................7

        A.    Trade Secrets Misappropriation ..................................................................7

            1.    The Documents Hermalyn Accessed And Downloaded Contain Protectable Trade Secrets................................................7

            2.    DraftKings' Trade Secrets Derive Independent Economic Value from Their Secrecy ....................................................8

            3.    DraftKings Took Reasonable Efforts To Protect Its Trade Secrets .9

            4.    Hermalyn Misappropriated DraftKings' Trade Secrets ................10

        B.    Breach Of Contract ..................................................................................11

            1.    Hermalyn Has Breached and Will Continue to Breach His Nondisclosure Agreement................................................11

            2.    Hermalyn Has Breached and Will Continue to Breach His Nonsolicitation Agreements............................................12

            3.    Hermalyn Has Breached and Will Continue To Breach His Noncompetition Obligations........................................13

            4.    Hermalyn Cannot Avoid His Contractual Obligations By Purporting to Move to California....................................15

        C.    Hermalyn Is Violating His Duty of Loyalty ............................................16

        D.    Hermalyn Is Committing the Tort of Conversion....................................17

    II.    DRAFTKINGS WILL BE IMMEDIATELY AND IRREPARABLY INJURED ABSENT EMERGENCY RELIEF ..........................................................................18

    III.    THE BALANCE OF EQUITIES FAVORS GRANTING A TEMPORARY RESTRAINING ORDER ......................................................................................19

    IV.    A TEMPORARY RESTRAINING ORDER IS IN THE PUBLIC INTEREST ........................19

CONCLUSION..................................................................................................................20

i

## TABLE OF AUTHORITIES

**Cases**

*Acordia Ne., Inc. v. Acad. Risk Res. & Ins., LLC*,
2005 WL 704870 (Mass. Super. Ct. Jan. 5, 2005)................................................................17

*Albert's Organics, Inc. v. Holzman*,
445 F. Supp. 3d 463 (N.D. Cal. 2020) ....................................................................................8

*Allstate Ins. Co. v. Fougere*,
2019 WL 4776986 (D. Mass. Sept. 30, 2019) ........................................................................9

*Aspect Software, Inc. v. Barnett*,
787 F. Supp. 2d 118 (D. Mass 2011) ......................................................................12, 16, 18

*Augat, Inc. v. Aegis, Inc.*,
409 Mass. 165 (1991) ...........................................................................................................16

*Bio-Imaging Techs., Inc. v. Marchant*,
584 F. Supp. 2d 322 (D. Mass. 2008) ....................................................................18, 19, 20

*Blades of Green, Inc. v. Go Green Lawn & Pest, LLC*,
598 F. Supp. 3d 348 (D. Md. 2022)........................................................................................7

*Bruno Int'l Ltd. v. Vicor Corp.*,
2015 WL 5447652 (D. Mass. Sept. 16, 2015) ......................................................................11

*Builder Servs. Grp., Inc. v. Harkins*,
2023 WL 4685943 (D. Mass. July 21, 2023)...................................................................10, 18

*Corp. Techs., Inc. v. Harnett ("Harnett I")*,
943 F. Supp. 2d 233 (D. Mass. 2013) ..............................................................12, 13, 18, 20

*Corp. Techs., Inc. v. Harnett ("Harnett II")*,
731 F.3d 6 (1st Cir. 2013)................................................................................................11, 12

*CVS Pharmacy, Inc. v. Lavin*,
951 F.3d 50 (1st Cir. 2020)......................................................................................................7

*Diomed, Inc. v. Vascular Sols., Inc.*,
417 F. Supp. 2d 137 (D. Mass. 2006) .....................................................................................8

*EMC Corp. v. Donatelli*,
2009 WL 1663651 (Mass. Super. Ct. May 5, 2009)..............................................................16

*EMC Corp. v. Pure Storage, Inc.*,
2016 WL 7826662 (D. Mass. Aug. 19, 2016) .........................................................................8

*FrontRunner HC, Inc., v. Waveland RCM, LLC*,
2020 WL 7321161 (D. Mass. Dec. 11, 2020)........................................................................11

*G&L Plumbing, Inc. v. Kibbe*,
  2023 WL 6881597 (D. Mass. Oct. 18, 2023) ....................................................7, 10, 17

*Genzyme Corp. v. Melvin*,
  2023 WL 3173131 (Mass. Super. Ct. Apr. 4, 2023) ..................................................14

*Goldstein v. Batista Contracting LLC*,
  2023 WL 3113275, at *2 (D. Mass. Apr. 27, 2023) ....................................................7

*KPM Analytics N. Am. Corp. v. Blue Sun Sci., LLC*,
  2021 WL 2982866 (D. Mass. July 15, 2021) ............................................................16

*Lombard Med. Techs., Inc. v. Johannessen*,
  729 F. Supp. 2d 432 (D. Mass. 2010) ........................................................14, 18, 20

*Marcam Corp. v. Orchard*,
  885 F. Supp. 294 (D. Mass. 1995) ............................................................................18

*McCormick v. Lischynsky*,
  539 F. Supp. 3d 225 (D. Mass. 2021) ......................................................................17

*Nat'l Med. Care, Inc. v. Sharif*,
  2020 WL 6318922 (D. Mass. Sept. 2, 2020) ............................................................14

*Netcracker Tech. Corp. v. Laliberte*,
  2020 WL 6384312 (D. Mass. Oct. 30, 2020) ..............................................................9

*New England Cir. Sale v. Randall*,
  1996 WL 1171929 (D. Mass. June 4, 1996) ........................................................19, 20

*Nuance Commc'ns, Inc. v. Kovalenko*,
  2022 WL 2347112 (D. Mass. June 29, 2022) ......................................................14, 20

*Organ Recovery Sys., Inc. v. Pres. Sols.*,
  2012 WL 116041, at *9 (N.D. Ill. Jan. 16, 2012) ........................................................8

*Oxford Glob. Res., Inc. v. Guerriero*,
  2003 WL 23112398 (D. Mass. Dec. 30, 2003) ........................................................16

*Shipley Co., Inc. v. Clark*,
  728 F. Supp. 818 (D. Mass. 1990) ............................................................................18

*SimpliVity Corp. v. Bondranko*,
  204 F. Supp. 3d 340 (D. Mass. 2016) ..................................................................18, 19

*Thermal Eng'g Int'l (USA) Inc. v. Lanaville*,
  646 F. Supp. 3d 202 (D. Mass. 2022) ......................................................................12

*TouchPoint Sols., Inc. v. Eastman Kodak Co.*,
  345 F. Supp. 2d 23 (D. Mass. 2004) ..........................................................................9

**Statutes**

18 U.S.C. § 1836(b)(1) ........................................................................................................7

18 U.S.C. § 1839(3) .............................................................................................................8

M.G.L. c. 93 § 42(4) ............................................................................................................8

M.G.L. c. 149 § 24L(b) .......................................................................................................14

M.G.L. c. 149 § 24L(b)(iii) .................................................................................................14

M.G.L. c. 149 § 24L(b)(iv) .................................................................................................14

M.G.L. c. 149 § 24L(b)(v) ..................................................................................................15

M.G.L. c. 149 § 24L(b)(vi) ...........................................................................................14, 15

## INTRODUCTION

Defendant Michael Hermalyn, a senior executive who Plaintiff DraftKings Inc. ("DraftKings") paid millions of dollars to oversee VIP customer acquisition and retention, hatched a secret plan over the past year to steal and use DraftKings' confidential information, solicit DraftKings' customers and employees, and, ultimately, to join a direct DraftKings competitor, Fanatics, Inc. ("Fanatics") in brazen violation of his contracts with and duties to DraftKings, his employer. As early as the February 2023 Super Bowl, Hermalyn was clandestinely meeting with Fanatics' CEO and leadership team to discuss employment. Then, over the summer, he encouraged other employees on his VIP customer team to meet with Fanatics' CEO, even as he convinced DraftKings to pay himself and those same team members millions of dollars in retention bonuses. Hermalyn's scheme culminated on the eve of this year's Super Bowl, one of the most important days on the sports gaming calendar. On February 1, 2024, he quit his job without warning to take a position performing the same functions, and soliciting the same customers, for Fanatics as President of Fanatics' VIP program. Hermalyn had told DraftKings just days before that "a friend passed" and he would need to be out of the office to "deal[] with that." Compl. ¶ 6. But geolocation information from his company-issued cellphone and email shows Hermalyn secretly flew to Fanatics' offices in California. While in California, Hermalyn viewed and downloaded multiple documents from DraftKings' systems containing highly confidential DraftKings trade secrets and confidential and proprietary information—including highly confidential information regarding DraftKings' plans for entertaining key partners at the Super Bowl. These business partners are athletes, executives, celebrities, influencers, and the representatives of major DraftKings business partners; DraftKings invites them to special events (like the Super Bowl) and they are critical to DraftKings' business development efforts to recruit

1

and retain VIP customers.  The downloaded information also included the identities of DraftKings employees with key partner relationships, as well as the planned locations for VIP customer events and the number of VIP attendees at those events over Super Bowl weekend.  Disclosure of this information to a competitor, like Fanatics, could result in an extraordinary unfair competitive advantage to Fanatics and risks irreparable harm to DraftKings by threatening the possibility that Fanatics could interfere with and commandeer DraftKings' ongoing relationships.  DraftKings believes Hermalyn has already disclosed this information to Fanatics—he downloaded it while in California and visiting Fanatics' offices.  Injunctive relief is necessary to halt any further harm.

Hermalyn downloaded other confidential DraftKings documents as well in the final days before he resigned to join Fanatics.  For example, he downloaded a document that detailed the activity of DraftKings' business development team on a weekly basis from May 2022 through November 2023, identifying the teams and leagues, marketplaces, media companies, influencers, and content-distribution platforms with which DraftKings was negotiating or had executed partnerships, including its priorities for future partnership deals.  Disclosure of this document would allow a competitor to identify DraftKings' business priorities and strategy and interfere with DraftKings' ongoing or planned negotiations with existing or potential business partners.

The information that Hermalyn viewed and downloaded is vital to DraftKings' ability to maintain and grow its business with essential constituencies—both the relatively small number of high-net worth customers who wager significant sums on sporting events and the important business partners who help DraftKings engage and retain those VIP customers.  That is especially the case for a marquee event like the Super Bowl—this Sunday—where players in the gaming industry compete for these relationships.  Hermalyn's possession of DraftKings' trade secrets irreparably injures DraftKings' ability to compete at the Super Bowl and beyond.  Injunctive relief

2

is urgently necessary to prevent Hermalyn from using and disclosing DraftKings' confidential information and trade secrets any more than he already has.

The same day Hermalyn abruptly resigned from DraftKings, on February 1, he also filed a California lawsuit against DraftKings, claiming he plans to become a California resident—a hastily constructed effort to evade enforcement of his contracts with DraftKings on the purported basis that they are unenforceable in California.  But Hermalyn has lived for years in New Jersey, where his wife still works and his kids go to school.  On this record, Hermalyn's purported move is categorically insufficient to invalidate his contractual promise not to compete with DraftKings or solicit its customers and employees—contracts that comport with every aspect of Massachusetts law on non-competition covenants.

The "move" from New Jersey to California was not the only made-for-litigation gambit Hermalyn and his counsel manufactured in connection with the California litigation.  Fanatics established a new LLC in the days before Hermalyn's resignation, ostensibly for the sole purpose of attempting to defeat diversity jurisdiction in California federal court, hoping that a state court would be more willing to permit Hermalyn to flee his otherwise enforceable obligations.

DraftKings' preliminary investigation since Hermalyn resigned has revealed that Hermalyn's misappropriation of DraftKings trade secrets and confidential information is not an isolated incident of theft, disloyalty, and misconduct.  DraftKings has learned that last year Hermalyn covertly encouraged his subordinates on the DraftKings VIP team to leave DraftKings and join Fanatics, successfully inducing one subordinate to do so.  Hermalyn also persuaded DraftKings to award him millions of dollars in new DraftKings equity under the false pretenses that he remained loyal to DraftKings.  In light of Hermalyn's theft of DraftKings' trade secrets and confidential information while at Fanatics' office, his abrupt resignation and breach of his non-

competition agreement, and the evidence of misconduct DraftKings continues to uncover, DraftKings has no choice but to file this action to halt immediate and irreparable harm, in the crucial days leading up to and during the Super Bowl, caused by Hermalyn's exploitation of its trade secrets and other highly confidential information on behalf of Fanatics, a direct competitor.

For the reasons below, and supported by the Verified Complaint and Affidavits of Gregory Karamitis and Brian Harris, this Court should grant DraftKings' Emergency Motion and enjoin Hermalyn from using, reviewing, and disclosing DraftKings' information in any way, requiring him to return information he stole, and from working as president of Fanatics' VIP program.

## STATEMENT OF FACTS

DraftKings is a leader in the fiercely competitive digital sports entertainment and gaming industry, best known for fantasy sports and mobile sports betting and iGaming products. Affidavit of Gregory Karamitis ("Karamitis Aff.") ¶¶ 3, 18. In DraftKings' industry, online gaming businesses compete for a small number of key partners—including athletes, celebrities, influencers, and representatives of corporate partners like professional sports leagues and teams—as well as VIP customers who regularly wager significant sums online. *Id.* ¶¶ 9, 18. Until his abrupt resignation on February 1 to start a new position with Fanatics, one of DraftKings' direct competitors, Hermalyn was a senior executive at DraftKings, managing DraftKings' industry-leading VIP team to engage DraftKings' most loyal customers. *Id.* ¶¶ 6, 10–13.

The VIP team is critical to the success of DraftKings' business: it is dedicated to fostering personal relationships with DraftKings' most loyal and influential customers, responsible for a significant share of DraftKings' revenue and business development prospects. *Id.* ¶¶ 8–13. As the leader of the VIP team, Hermalyn regularly accessed and used DraftKings' most valuable and sensitive trade secrets and other highly confidential information, including, but not limited to: (i)

4

comprehensive VIP customer lists containing a wide range of customer information; (ii) research and analytics regarding development of VIP and loyalty programs; and (iii) points of contact with critical partners essential to the advancement of DraftKings' marketing strategy. *Id.* ¶¶ 14–16.

To protect its business interests, and conforming with Massachusetts law, DraftKings required Hermalyn to enter into a Nonsolicitation, Nondisclosure & Assignment of Inventions Agreement before his employment, in which he promised not to misuse or disclose DraftKings' trade secret and confidential information or, for twelve months following his employment, solicit DraftKings' employees or clients. Compl. ¶¶ 38–39, 46 & Ex. A. In exchange for millions of dollars in compensation, Hermalyn also entered into Noncompetition Covenants that prohibited him, for a limited period of time after the termination of his employment, from competing against DraftKings in the sports betting and online gaming business. *Id.* ¶¶ 50–51 & Ex. B.

Hermalyn has brazenly violated and continues to violate these agreements, as well as his obligations under common law. Specifically, on February 1, 2024, Hermalyn suddenly informed DraftKings that he was resigning to join Fanatics as President of its VIP team—a role identical to his position at DraftKings. Karamitis Aff. ¶¶ 6, 30. DraftKings subsequently discovered that, in the week before he resigned, Hermalyn viewed and downloaded multiple documents detailing DraftKings' business strategies and confidential information, including the blueprint for a VIP player recruiting program  and a 181-page chart detailing DraftKings' business contracts and prospects. *Id.* ¶¶ 24–27 (the "VIP Founders Club" Presentation and the "BD Team Tracker Weekly Report" "); Affidavit of Brian Harris ("Harris Aff.") ¶¶ 17–18, 25.

On January 30, after telling DraftKings he needed to take time off following the death of a friend, Hermalyn traveled to California; went to Fanatics' Los Angeles headquarters; and, while inside or in close proximity to Fanatics' offices, accessed the DraftKings corporate Google

Workspace from a non-DraftKings device and downloaded a sensitive document, the "(MASTER) SB 2024" spreadsheet, containing detailed information about key partners—athletes, celebrities, influencers, and corporate representatives like professional sports leagues and teams—attending the Super Bowl.  Karamitis Aff. ¶¶ 21–23; Harris Aff. ¶¶ 19–24.  It includes information about each partner's employment or other affiliation, their travel itinerary for the Super Bowl, and what events they will attend.  Karamits Aff.  ¶ 22.  And it also reflects the number of VIP customers attending various DraftKings events during Super Bowl weekend.  *Id.* ¶ 22–23.

Also on January 30, and again on January 31, Hermalyn downloaded DraftKings' document "BD_Gaming 101"—a pitch deck DraftKings uses to present on the online gaming industry to potential business partners (who must sign non-disclosure agreements in order to view the presentation).  *Id.* ¶ 28; Harris Aff. ¶¶ 19–24.  The deck includes DraftKings' confidential strategies for building such partnerships .  Karamits Aff.  ¶ 28.

Hermalyn is now undertaking the same job responsibilities at Fanatics as he did at DraftKings.  He will be competing directly *against* DraftKings for the same VIP players he worked to engage and retain for DraftKings only days ago—players who drive a significant percentage of the industry's overall revenue.  Hermalyn's covert theft of DraftKings' documents shows he intends to use and disclose DraftKings' trade secret information for Fanatics' benefit.  This peril is urgent:  Hermalyn could deploy stolen information to interfere with DraftKings' precious long-term relationships with its most important partners and loyal customers in the vital days leading up to and during the Super Bowl this weekend, February 11.  *Id.* ¶¶ 29–30.

## ARGUMENT

A court evaluating a motion for a temporary restraining order considers four factors: (1) the likelihood the movant will succeed on the merits; (2) whether the movant is likely to suffer

irreparable harm in the absence of preliminary relief; (3) the balance of hardships; and (4) whether an injunction is in the public interest. *CVS Pharmacy, Inc. v. Lavin*, 951 F.3d 50, 55 (1st Cir. 2020); *see Goldstein v. Batista Contracting LLC, 2023 WL 3113275, at \*2* (D. Mass. Apr. 27, 2023) (same factors apply to a temporary restraining order as to a preliminary injunction).

## I.     DraftKings Is Likely To Succeed On The Merits

DraftKings is likely to succeed on the merits of its claims for trade secrets misappropriation, breach of contract, breach of duty of loyalty, and conversion.

### A.     Trade Secrets Misappropriation

To prevail on its trade secrets claim under both the federal Defend Trade Secrets Act ("DTSA"), 18 U.S.C. §§ 1836 *et seq*., and the Massachusetts Uniform Trade Secret Act ("MUTSA"), M.G.L. c. 93 §§ 42–42G, a plaintiff must show that (1) the information at issue constitutes a trade secret, (2) the trade secret derives independent economic value from its secrecy, (3) the plaintiff took reasonable steps to keep the information secret, and (4) the defendant misappropriated the trade secret. *See* 18 U.S.C. §§ 1836(b)(1), 1839(3); *G&L Plumbing, Inc. v. Kibbe*, 2023 WL 6881597, at \*3 (D. Mass. Oct. 18, 2023).[1] DraftKings satisfies these elements.

#### 1.     The Documents Hermalyn Accessed And Downloaded Contain Protectable Trade Secrets

The documents Hermalyn reviewed and downloaded immediately before he joined DraftKings' direct competitor contain paradigmatic protectable trade secrets: (i) DraftKings' compilation of key business contacts, their points of contact at DraftKings, and the Super Bowl

---

[1] To prevail on its DTSA claim, DraftKings must also show that the alleged trade secrets are "related to a product or service used in, or intended for use in, interstate or foreign commerce." 18 U.S.C. § 1836(b)(1). DraftKings indisputably satisfies this requirement: these trade secrets pertain to its gaming services which are offered in states across the country, and even internationally. Compl. ¶¶ 18–19; Karamitis Aff. ¶ 3; *see Blades of Green, Inc. v. Go Green Lawn & Pest, LLC*, 598 F. Supp. 3d 348, 355 (D. Md. 2022) ("[C]ourts routinely conclude that a plaintiff satisfies its pleading burden [under the DTSA] by alleging that it is engaged in national or international sales.").

events they plan to attend, in the "(MASTER) SB 2024" spreadsheet; (ii) confidential information regarding DraftKings' executed contracts and contracts under negotiation, as well as marketing strategies (such as identification of target markets, media, and platforms), in DraftKings' BD Team Tracker Weekly Report; and (iii) DraftKings' confidential and proprietary strategy for developing a top-tier VIP program, in the VIP Founders Club PowerPoint document.

Courts routinely recognize this as textbook trade secrets under both the DTSA and the MUTSA.  *See* 18 U.S.C. § 1839(3) (trade secrets include "all forms and types of financial [and] business[] information"); M.G.L. c. 93, § 42(4) (protecting compilations of information including customer lists, business strategies, financial and customer data); *EMC Corp. v. Pure Storage, Inc.*, 2016 WL 7826662, at *6 (D. Mass. Aug. 19, 2016) (noting compilations of business contact information are "routinely granted trade secret protection," because "[t]he fact that individual aspects of the 'lists' may be public does not prevent the entire compilation from being a trade secret"); *Organ Recovery Sys., Inc. v. Pres. Sols.*, 2012 WL 116041, at *9 (N.D. Ill. Jan. 16, 2012) (recognizing business partner lists are protectable trade secrets); *Albert's Organics, Inc. v. Holzman*, 445 F. Supp. 3d 463, 473 (N.D. Cal. 2020)  (same); *Diomed, Inc. v. Vascular Sols., Inc.*, 417 F. Supp. 2d 137, 144–45 (D. Mass. 2006) (same as to business and marketing strategies).

### 2.      DraftKings' Trade Secrets Derive Independent Economic Value from Their Secrecy

The trade secrets Hermalyn accessed and downloaded derive independent economic value from their secrecy.  DraftKings operates in the fiercely competitive digital sports entertainment and gaming industry in which its strong VIP relationships are the lifeblood of its business. Karamitis Aff. ¶¶ 9, 17, 18.  DraftKings' success in the gaming space is owed in large part to the secrecy of its confidential VIP program, the body of knowledge DraftKings has accumulated about

its VIP players, its marketing strategies for fostering new customer relationships, and the pricing and other deal terms reached with its VIP players and other customers. *Id.* ¶¶ 15–18.

In a competitor's hands—particularly days before the Super Bowl—this information positions Hermalyn and Fanatics to damage DraftKings' position in the market by interfering with and commandeering DraftKings' relationships and partnerships based on DraftKings' trade secrets. *Id.* ¶¶ 13, 22–23, 29. DraftKings' trade secrets meet the independent economic value requirement. *See, e.g.*, *Allstate Ins. Co. v. Fougere*, 2019 WL 4776986, at *21 (D. Mass. Sept. 30, 2019) (independent economic value in confidentiality of compilations of customer information).

### 3.    DraftKings Took Reasonable Efforts To Protect Its Trade Secrets

DraftKings took reasonable steps to maintain the secrecy of its trade secrets. "[C]ourts do not require the possessor of a trade secret to take heroic measures to preserve its secrecy, only all proper and reasonable steps." *Netcracker Tech. Corp. v. Laliberte*, 2020 WL 6384312, at *4 (D. Mass. Oct. 30, 2020) (citations omitted). Courts assess reasonableness by considering the existence of confidentiality agreements, the manner in which the confidential information was stored, the extent to which it was disclosed, and the degree to which it is publicly available. *TouchPoint Sols., Inc. v. Eastman Kodak Co.*, 345 F. Supp. 2d 23, 29 (D. Mass. 2004).

DraftKings' robust measures to protect its trade secrets are significantly more than merely "reasonable." DraftKings requires all employees to execute confidentiality agreements upon commencing employment and annually refreshes them on their obligations to protect DraftKings' trade secrets and confidential information. Harris Aff. ¶ 9. In addition to implementing standard corporate security measures—i.e., password protecting company laptops, requiring password changes every 90 days, using firewalls, and requiring two-factor authentication—DraftKings significantly limits those employees who can access the very documents Hermalyn stole. *Id.* ¶¶

9

10–15, 18.  DraftKings employs specialized tools to monitor unusual download activity, and to immediately investigate any activity those systems identify as suspicious.  *Id.* at ¶¶ 15–16.

Courts routinely find these efforts more than qualify as reasonable measures to protect trade secrets.  *See G&L Plumbing, Inc.*, 2023 WL 6881597, at *5 (likelihood of success on proving reasonable measures even where trade secrets were *not* subject to confidentiality agreement but were password-protected with restricted access); *Builder Servs. Grp., Inc. v. Harkins*, 2023 WL 4685943, at *6 (D. Mass. July 21, 2023) (similar).

### 4.     Hermalyn Misappropriated DraftKings' Trade Secrets

There is no question Hermalyn misappropriated DraftKings' trade secrets.  To prove misappropriation, DraftKings need only show that Hermalyn acquired one of its trade secrets through improper means, or disclosed or used without consent a trade secret that was acquired by improper means.  *See Builder Servs. Grp., Inc.*, 2023 WL 4685943, at *4.  Improper means includes theft or inducement of a breach of duty to maintain secrecy.  *Id.* at *6.

At minimum, Hermalyn misappropriated DraftKings' trade secret "(MASTER) SB 2024" spreadsheet and "BD_Gaming101" presentation, downloading those documents at Fanatics' offices and using a non-DraftKings device.  Harris Aff. ¶ 24.  This was a knowing and malicious breach of Hermalyn's contractual obligation not to use DraftKings confidential information for unauthorized purposes, or to remove such information from the company's systems without authorization.  Compl. Ex. A § 5.  And it was a transparent attempt to assist his new employer in unlawfully competing against DraftKings at the Super Bowl this weekend.  Compl. ¶ 88.

In the First Circuit, these straightforward facts are axiomatic misappropriation.  *See G&L Plumbing, Inc.*, 2023 WL 6881597, at * 5 (granting TRO on trade secrets claim where employee sent data from his company cell phone to his personal phone, in violation of company policy);

*FrontRunner HC, Inc.*, *v. Waveland RCM, LLC*, 2020 WL 7321161, at *11 (D. Mass. Dec. 11, 2020) (granting injunction where former employee downloaded company data to personal email).[2]

### B.      Breach Of Contract

DraftKings is also likely to succeed on its claims for breach of contract.  There can be no meaningful dispute that Hermalyn and DraftKings agreed—and Hermalyn received significant consideration for agreeing—that Hermalyn would not disclose DraftKings' confidential information, or compete with DraftKings or solicit DraftKings' employees or customers within reasonable limits.  DraftKings performed by hiring and paying him.  Hermalyn has breached those promises.  And DraftKings faces irreparable harm as a result.

### 1.      Hermalyn Has Breached and Will Continue to Breach His Nondisclosure Agreement

In August 2020, as part of accepting his offer to work at DraftKings, Hermalyn executed a "Nonsolicitation, Nondisclosure & Assignment of Inventions Agreement" promising that he would not remove or use the company's confidential information for any unauthorized purpose. *See* Compl. Ex. A.  Hermalyn broke his promise.  He used confidential information without authorization to compete with DraftKings, and removed confidential information from DraftKings' systems by downloading it to a non-DraftKings device without authorization.  And if he has not already disclosed the information he took to Fanatics, he will soon.  Evidence a departing employee "took with him . . . notes that contained confidential information" is sufficient to "support [a] preliminary injunction" enforcing a non-disclosure agreement.  *Corp. Techs., Inc.*

---

[2]  For the same reasons that DraftKings is likely to succeed on the merits of its statutory claims for trade secret misappropriation, it is also likely to succeed in proving that Hermalyn misappropriated confidential business information in violation of common law. *See* Compl. Counts IV and V; *Bruno Int'l Ltd. v. Vicor Corp.*, 2015 WL 5447652, at *11 (D. Mass. Sept. 16, 2015) (statutory and common law claims "receive effectively the same liability analysis").

*v. Harnett ("Harnett II")*, 731 F.3d 6, 14 (1st Cir. 2013).  These facts far exceed that standard.

Nor is there any doubt that the information Hermalyn stole was confidential.  It was not known outside of DraftKings; its access was limited to a small number of employees, protected with security measures; it is enormously valuable to DraftKings and DraftKings' competitors; and duplicating that information would take a competitor like Fanatics significant time and resources. Harris Aff. ¶¶ 10–15, 18 ; Karamitis Aff. ¶¶ 29–30; *Corp. Techs. v. Harnett ("Harnett I")*, 943 F. Supp. 2d 233, 240 (D. Mass. 2013), *aff'd*, 731 F.3d 6 (1st Cir. 2013).

Injunctive relief is also warranted under the "inevitable disclosure" doctrine, finding "trade secret misappropriation" where, as here, a "former employee's new employment will inevitably lead him to rely on his knowledge of the plaintiff's trade secrets."  *Harnett II*, 731 F.3d at 14; *see also Aspect Software, Inc. v. Barnett*, 787 F. Supp. 2d 118, 129, 130 n.11 (D. Mass 2011).  .

## 2.    Hermalyn Has Breached and Will Continue to Breach His Nonsolicitation Agreements

Hermalyn's August 2020 agreement also restricts him, during his employment and for a period of twelve months thereafter, from soliciting DraftKings employees to "leave [their] relationship with the Company."  Compl. Ex. A at ¶ 3.  But Hermalyn has already breached this term of his agreement—most egregiously when he emailed his subordinates on the VIP team while employed by DraftKings and actively encouraged them to meet with Fanatics' Chief Executive Officer.  Compl. ¶ 93.  "Courts in Massachusetts . . . routinely uph[o]ld" similar non-solicitation provisions, because "employers have an interest in preserving the talent and goodwill of their employees."  *Thermal Eng'g Int'l (USA) Inc. v. Lanaville*, 646 F. Supp. 3d 202, 206 (D. Mass. 2022) (citation omitted).  DraftKings is likely to succeed on its claim that the applicable anti-raiding provision binds Hermalyn here.  Similarly, the agreement's provision restricting Hermalyn,

for a limited, twelve-month period, from soliciting customers that he was involved with or learned about while working for DraftKings, Compl. Ex. A at ¶ 2, is valid under Massachusetts law, and Hermalyn should be required to comply with it.  *E.g.*, *Harnett I*, 943 F. Supp. 2d at 238–39.

### 3.   Hermalyn Has Breached and Will Continue To Breach His Noncompetition Obligations

During his time working for DraftKings, Hermalyn agreed to noncompetition covenants in exchange for millions of dollars in compensation, most recently on August 16, 2023 (the "Noncompetition Covenant").  Compl. Ex. B.  The Noncompetition Covenant bars Hermalyn, for twelve months following the termination of his employment, from providing services to DraftKings' competitors "that relate to any aspect of the Business of the Company . . . for which [Hermalyn] performed services or received Confidential Information . . . at any time during the six (6) month period prior to [his] termination."  Compl. Ex. B, Att. III ¶ (a).  Hermalyn's work for Fanatics, in which he is undertaking the *same* responsibilities he had at DraftKings and competing for the *same* VIP players he once recruited to DraftKings, plainly violates this provision.

DraftKings will also be able to prove that the Noncompetition Covenant is lawful and enforceable: it complies with each of the requirements of the Massachusetts Noncompetition Agreement Act ("MNAA").  *See* M.G.L. c. 149 § 24L(b).  The agreement is supported by reasonable, "mutually-agreed upon consideration," and meets the MNAA's requirements that it be in writing, advise Hermalyn of his right to seek counsel, and provide Hermalyn at least a ten-day consideration period.  *Id.* at § 24L(b)(ii), (vii); Compl. Ex. B §§ (a), (*l*), (m).  In addition, the agreement is consistent with public policy because it is reasonable in scope and no broader than necessary to protect DraftKings' legitimate interests.  *See id.* at § 24L(b)(iii)–(viii); *infra* at 20.

*Reasonable Duration.*  Consistent with the MNAA, the period during which Hermalyn is

restricted from competing with DraftKings does not "exceed 12 months from the date of cessation of employment." M.G.L. c. 149 § 24L(b)(iv); *see also Nuance Commc'ns, Inc. v. Kovalenko*, 2022 WL 2347112, at *6 (D. Mass. June 29, 2022).

*Reasonable Scope.* The agreement is also "reasonable in the scope of proscribed activities in relation to the interests protected." M.G.L. c. 149 § 24L(b)(vi). It restricts Hermalyn only from competing with aspects of DraftKings' business that he worked in, or for which he received confidential information in the six months before his termination. Compl. Ex. B. Att. III ¶ (a); *cf. Genzyme Corp. v. Melvin*, 2023 WL 3173131, at *3 (Mass. Super. Ct. Apr. 4, 2023) (broader agreement found "reasonable with respect to the scope of activities it restricts").

The agreement is "no broader than necessary" to protect DraftKings' trade secrets, confidential information, and/or goodwill. M.G.L. c. 149 § 24L(b)(iii). Hermalyn's job focused on soliciting and maintaining relationships with a relatively small population of VIP players that DraftKings competes to attract. Courts have found this type of goodwill interest can be adequately protected only by noncompetition restrictions, *see Nat'l Med. Care, Inc. v. Sharif*, 2020 WL 6318922, at *12 (D. Mass. Sept. 2, 2020); *Nuance Commc'ns, Inc.*, 2022 WL 2347112, at *6, making the Noncompetition Covenant "presumptively reasonable." M.G.L. c. 149 § 24L(b)(vi).

*Reasonable Geographic Reach.* Finally, the global scope of the Noncompetition Covenant is reasonable because DraftKings maintains offices around the world and competes internationally with other companies in the digital sports entertainment and gaming sectors. *See* Karamits Aff. ¶¶ 3, 18; *Lombard Med. Techs., Inc. v. Johannessen*, 729 F. Supp. 2d 432, 439 (D. Mass. 2010). Even if Hermalyn could show a global restriction is overbroad, he is still subject to earlier noncompetition agreements that restrict his ability to compete in the U.S., a "presumptively reasonable" geographic limitation given that Hermalyn provided services nationwide. Karamits

14

Aff. ¶¶ 10–13; , M.G.L. c. 149 § 24L(b)(v).  In any event, the appropriate remedy for an overbroad covenant is not to invalidate the agreement but to reform it "to render it valid and enforceable," *id.* § 24L(d), something the parties' agreement also requires.  Compl. Ex. B, Att. III ¶ (i).

A restriction prohibiting Hermalyn from performing the *same* functions, soliciting the *same* VIP players, in the *same* geographic regions as his job for DraftKings (all of which Hermalyn is now doing) is plainly valid, legal, and enforceable.

### 4.     Hermalyn Cannot Avoid His Contractual Obligations By Purporting to Move to California

Hermalyn's own course of conduct shows he believes the Noncompetition Covenant would be enforced if analyzed under Massachusetts law—as the contract itself says it must be.  Compl. Ex. B, Att. III ¶ (f).  On the same three-day trip (spanning January 29 to 31, 2024) to Fanatics' California headquarters that saw him downloading DraftKings' confidential information, Hermalyn also (1) signed a lease of an apartment in Los Angeles (location, size, duration of lease unknown), (2) obtained a California driver's license, (3) purchased a car registered in California, (4) registered to vote in California, (5) obtained an appointment with a physician in California, and (6) contacted summer camps and "joined waitlists."  Compl. ¶ 83.  Then on February 1, 2024, he filed suit in California state court claiming to be a California resident who could not possibly be held to his contractual non-competition obligations and Massachusetts forum-selection clauses. *Id.* ¶ 75.  What's more, Fanatics formed a Nevada LLC to employ Hermalyn on January 31, 2024 —a clear sham to evade federal court diversity jurisdiction over Hermalyn's action.  *Id.* ¶ 9.

Hermalyn has resided with his family for years in a multi-million dollar home in New Jersey.  Compl. ¶ 79.  His children attend schools in New Jersey, and his wife is employed in New York City.  *Id.* ¶ 81.  He is not a California resident simply because he spent a weekend in the state

last month.  And, even if he were, Massachusetts courts have refused to apply foreign law, in breach of an otherwise valid choice of law provision, in similar contexts—even where no fraud was involved.  This is because employees should not be "allow[ed] . . . to escape the obligations of the[ir] contract by, in essence, fleeing the jurisdiction." *Oxford Glob. Res., Inc. v. Guerriero*, 2003 WL 23112398, at *6 (D. Mass. Dec. 30, 2003); *see also EMC Corp. v. Donatelli*, 2009 WL 1663651, at *4 (Mass. Super. May 5, 2009) (employee cannot "choose for his new residence . . . the one state where the likelihood of his defeating his non-competition covenant may be the greatest"); *Aspect Software, Inc.*, 787 F. Supp. 2d at 127 (Massachusetts choice-of-law provision enforceable even though employee had become California resident and was working in California).

## C.    Hermalyn Is Violating His Duty of Loyalty

Employees "who occupy positions of trust and confidence," including "executives [and] . . . employees who are given access to confidential information," have a fiduciary duty of loyalty to their employers. *KPM Analytics N. Am. Corp. v. Blue Sun Sci., LLC*, 2021 WL 2982866, at *19 (D. Mass. July 15, 2021).  Hermalyn was subject to this duty of loyalty.  *Id.*; Harris Aff. ¶ 9.  His obligations did not terminate with his employment:  he still has a duty not to misappropriate DraftKings' confidential information.  *Augat, Inc. v. Aegis, Inc.*, 409 Mass. 165, 173 (1991).

DraftKings has shown that Hermalyn has violated and is continuing to violate this duty of loyalty.  Among other things, he solicited his subordinates on the VIP team in July 2023 to work for Fanatics, Compl. ¶¶ 93–94; lied to DraftKings about his intentions to remain employed at the company, *id.* ¶¶ 95–96; used the company's corporate credit for unauthorized, personal expenses (e.g., thousands of dollars on wine for friends) *id.* ¶¶ 100–101, 103; and engaged in self-dealing by arranging for DraftKings to purchase approximately $150,000 worth of dinners at three New York City restaurants in which he had an interest, without disclosing that interest. *Id.*  Most

critically, DraftKings has evidence showing Hermalyn violated his duty of loyalty by bringing DraftKings' confidential and proprietary information into the Fanatics Headquarters, so that Fanatics could benefit. *Id*. ¶ 167; Harris Aff. ¶¶ 17–25. Hermalyn is now working for Fanatics to solicit the same VIP players who DraftKings employed him to keep loyal to their organization—a job that will inevitably require him to misappropriate additional of DraftKings' highly sensitive and confidential business information. *Supra* at 12. Based on the record that DraftKings has developed at this preliminary stage, DraftKings has demonstrated a likelihood of success on its breach of fiduciary duty claim. *See, e.g.*, *Acordia Ne., Inc. v. Acad. Risk Res. & Ins., LLC*, 2005 WL 704870, at *1 (Mass. Super. Ct. Jan. 5, 2005) (granting TRO based on similar record).

### D. Hermalyn Is Committing the Tort of Conversion

Finally, DraftKings is likely to succeed on the merits of its conversion claim because the evidence suggests that Hermalyn has and is "intentionally and wrongfully exercis[ing] acts of ownership, control or dominion" over DraftKings' property, with the intention of depriving DraftKings of its use, and that this misappropriation of DraftKings' property has and will caused the company harm. *See McCormick v. Lischynsky*, 539 F. Supp. 3d 225, 235 (D. Mass. 2021) (elements of conversion claim). As set forth in detail above, Hermalyn accessed highly sensitive, trade secret information that he had no legitimate business reason to access. There can be no reasonable dispute that DraftKings has an ownership interest in this confidential business information. *E.g.*, *G&L Plumbing, Inc.* 2023 WL 6881597, at *6–7 (granting preliminary injunction for conversion claim). And, as detailed in the following section, the harm that DraftKings has and will suffer if this information is shared with Fanatics or any of DraftKings' other competitors is evident, particularly given the intense competition across the online gaming industry to secure the participation of the VIP players that the documents concerned. *See id.* at *7.

17

**II.      DraftKings Will Be Immediately And Irreparably Injured Absent Emergency Relief**

DraftKings faces immediate, irreparable harm if injunctive relief is not granted.  Otherwise Hermalyn and Fanatics will be free to unlawfully compete against DraftKings—using misappropriated DraftKings trade secrets and other confidential information and poaching DraftKings' customers, partners, and employees during the most important days of the year.

Where, as here, a former employee misappropriated trade secrets, irreparable harm is presumed where the plaintiff establishes a likelihood of success on the merits.  *Builder Servs. Grp., Inc.*, 2023 WL 4685943, at *6.  And where a former employee uses confidential information to benefit a direct competitor, the former employer is gravely harmed.  *See Marcam Corp. v. Orchard*, 885 F. Supp. 294, 296–97 (D. Mass. 1995) (enjoining former manager involved in top-level discussions regarding product development and sales from working for, and providing confidential information to, a competitor).  "As a general rule, a breach of non-compete agreements tied to trade secrets concerns triggers a finding of irreparable harm." *Aspect Software, Inc.*, 787 F. Supp. 2d at 130. That is because the injury from violation of a non-competition agreement is "so hard to quantify" and because an employee working for a direct competitor "often cannot avoid the inevitable disclosure of confidential information,"  *SimpliVity Corp. v. Bondranko*, 204 F. Supp. 3d 340, 350 (D. Mass. 2016).  Courts in this district regularly grant injunctive relief in these circumstances.  *E.g.*, *Aspect Software, Inc.*, 787 F. Supp. 2d at 130–32*; Lombard Med. Techs.*, 729 F. Supp. 2d at 442; *Bio-Imaging Techs., Inc. v. Marchant*, 584 F. Supp. 2d 322, 330–31 (D. Mass. 2008); *Shipley Co., Inc. v. Clark*, 728 F. Supp. 818, 827–28  (D. Mass. 1990); *Harnett I*, 943 F. Supp. 2d at 242–43, 248.

Irreparable harm to DraftKings is certain in the absence of injunctive relief "[g]iven the value of the confidential information retained by [Hermalyn], the similarities of his new and old

positions, and the overlap between [DraftKings'] and [Fanatics'] products and customers." *SimpliVity Corp.*, 204 F. Supp. 3d at 351.  DraftKings is one of only a few prominent companies competing for the patronage of the relatively small number of high-net worth customers who wager significant sums on sporting events.  Hermalyn is one of the only individuals at DraftKings who knows the identity or contact information of some of DraftKings' most loyal and significant customers.  And on his way out the door Hermalyn downloaded a trove of DraftKings documents containing confidential business strategy, partner information, and confidential business terms and projects.  Injunctive relief is necessary to protect the confidential information, customer relationships, and competitive advantages DraftKings invested time and resources to develop.

## III.    The Balance of Equities Favors Granting A Temporary Restraining Order

The immediate and irreparable harm DraftKings will suffer if emergency relief is not granted outweighs any harm to Hermalyn.  The parties agreed at the outset that any violation of the Noncompetition Covenant would cause DraftKings irreparable harm, Compl. Ex. B, Att. III ¶ (e), which "is a factor properly added to the scale in weighing the equities," *Alexander & Alexander, Inc. v. Danahy*, 21 Mass. App. Ct. 488, 501 (1986).  The only "harm" to Hermalyn would be honoring the terms of the employment agreement he freely accepted in exchange for millions of dollars of compensation.  *See* Compl. Ex. B.  This Court has explained that "the balance of hardships weigh[] in [the employer's] favor" where, as here, the employee "has voluntarily chosen to leave [the employer] after freely entering into a non-compete agreement" and enjoying the benefits of that bargain.  *Bio-Imaging Techs.*, 584 F. Supp. 2d at 330.

## IV.    A Temporary Restraining Order Is In The Public Interest

"It is in society's best interest to recognize and enforce agreements which were voluntarily issued into and accepted."  *New England Cir. Sale v. Randall*, 1996 WL 1171929, at *3 (D. Mass.

June 4, 1996).  Accordingly, injunctive relief enforcing restrictive covenants "serve[] the public interest in enforcing contractual arrangements," *Bio-Imaging Techs., Inc.*, 584 F. Supp. 2d at 330, and this Court has regularly granted them on facts analogous to those presented here.  *E.g.*, *Nuance Commc'ns*, 2022 WL 2347112, at *11; *New England Cir. Sale*, 1996 WL 1171929, at *3.

Because "[t]he time-bound non-solicitation and non-disclosure obligations in this case" would last for no more than twelve months, they are "less restrictive than other covenants that Massachusetts courts frequently uphold," *Harnett I*, 943 F. Supp. 2d at 245, and their enforcement would not offending the public's interest in "the free alienability of employees," *Bio-Imaging Techs.*, 584 F. Supp. 2d at 330.  Where, as here, the obligation is "designed to protect [the plaintiff's] confidential information and good will, the agreements should be enforced." *Lombard Med. Techs.*, 729 F. Supp. 2d at 443 (D. Mass. 2010).

## CONCLUSION

For the foregoing reasons, DraftKings respectfully requests the Court issue a temporary restraining order consistent with the Proposed Temporary Restraining Order filed herewith.

Dated: February 5, 2024                    Respectfully submitted,

                                           */s/ Andrew S. Dulberg*
                                           William F. Lee (BBO #291960)
                                           Andrew S. Dulberg (BBO #675405)
                                           **WILMER CUTLER PICKERING
                                               HALE AND DORR LLP**
                                           60 State Street
                                           Boston, MA 02109
                                           Telephone: (617) 526-6000
                                           william.lee@wilmerhale.com
                                           andrew.dulberg@wilmerhale.com

                                           **GIBSON, DUNN & CRUTCHER LLP**
                                           Orin Snyder (*pro hac vice pending*)
                                           Harris M. Mufson (*pro hac vice pending*)
                                           Justin M. DiGennaro (*pro hac vice pending*)
                                           200 Park Avenue
                                           New York, NY  10166-0193
                                           Tel:  212.351.4000
                                           Fax:  212.351.4035
                                           OSnyder@gibsondunn.com
                                           HMufson@gibsondunn.com
                                           JDiGennaro@gibsondunn.com

                                           Jason C. Schwartz (*pro hac vice pending*)
                                           1050 Connecticut Avenue, N.W.
                                           Washington, D.C. 20036
                                           Tel:  202.955.8500
                                           JSchwartz@gibsondunn.com

                                           *Attorneys for Plaintiff DraftKings Inc.*

21

## <u>CERTIFICATE OF SERVICE</u>

I, Andrew S. Dulberg, counsel for Plaintiff, hereby certify that this document has been filed through the Court's ECF system and will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF).  This document is being sent by email to counsel for Defendant and will also be sent by courier to the addresses below.

Brad D. Brian
Bethany W. Kristovich
Anne K. Conley
MUNGER, TOLLES & OLSON LLP
350 South Grand Avenue, 50th Floor
Los Angeles, CA 90071-9100
Brad.Brian@mto.com
Bethany.Kristovich@mto.com
Anne.Conley@mto.com


*/s/ Andrew S. Dulberg*
Andrew S. Dulberg

22