**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

DRAFTKINGS, INC.,

                *Plaintiff*,

    v.

MICHAEL Z. HERMALYN,

                *Defendant.*

Civil Action No. 1:24-cv-10299-JEK

**Oral Argument Requested**

---

## DEFENDANT MICHAEL Z. HERMALYN'S OPPOSITION TO PLAINTIFF'S MOTION FOR TEMPORARY RESTRAINING ORDER

# TABLE OF CONTENTS

**Page**

INTRODUCTION ...................................................................................................................1

FACTUAL BACKGROUND ..................................................................................................3

LEGAL STANDARD ..............................................................................................................6

I.    DraftKings Failed To Show A Likelihood Of Success.....................................................7

        A.    Plaintiff Failed To Show A Likelihood Of Success On Its Claims For Breach Of Contract Because The Agreements Are Unenforceable.........................7

                1.    The Restrictions Are Unenforceable Under Applicable California Law. ....................................................................................................................7

                2.    Even If Massachusetts Law Were To Apply (It Does Not), The Post-Employment Non-Compete Is Invalid And Unenforceable. .............11

                3.    The Non-Solicit Agreement Is Also Invalid Under Massachusetts Law And, In Any Event, There Was No Breach. .....................................13

        B.    DraftKings Failed To Show A Likelihood Of Success On Its Claims Concerning Trade Secrets And Confidential Information. ....................................14

II.    DraftKings Failed to Show Irreparable Harm....................................................................19

III.    The Balance of the Equities Favors Defendant...................................................................19

IV.    There Is A Substantial Question Whether This Action Should Proceed in Massachusetts. .......................................................................................................................20

CONCLUSION.......................................................................................................................20

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Akibia, Inc. v. Hood*,
 2012 WL 10094508 (Mass. Super. Oct. 9, 2012), *aff'd*, 2012 WL 12370255
 (Mass. App. Ct. Nov. 21, 2012)................................................................................11

*Allscripts Healthcare, LLC v. DR/Decision Res., LLC*,
 592 F. Supp. 3d 1 ........................................................................................................6

*AMN Healthcare, Inc. v. Aya Healthcare Servs., Inc.*,
 239 Cal. Rptr. 3d 577 (2018) .....................................................................................10

*Application Grp., Inc. v. Hunter Grp., Inc.*,
 61 Cal. App. 4th 881 (1998) .........................................................................................9

*Ascension Ins. Holdings, LLC v. Underwood*,
 2015 WL 356002 (Del. Ch. Jan. 28, 2015) (Delaware)...............................................8

*Bank One, Tex., N.A. v. Montle*,
 964 F.2d 48 (1st Cir. 1992)...........................................................................................9

*Banner Indus. v. Bilodeau*,
 2003 WL 831974 (Mass. Super. Feb. 27, 2003)..........................................................19

*Brinkman v. Schweizer Aircraft Corp.*,
 2011 WL 863499 (N.D. Cal. Mar. 10, 2011)................................................................9

*Bruett v. Walsh*,
 2019 WL 2605705 (Mass. Super. May 9, 2019).....................................................13, 14

*Digecor, Inc. v. E.Digital Corp*,
 2009 WL 706888 (D. Utah Mar. 13, 2009) (Washington) ...........................................8

*Edwards v. Arthur Andersen LLP*,
 44 Cal.4th 937 (2008) .............................................................................................8, 10

*Edwards v. Athena Cap. Advisors, Inc.*,
 2007 WL 2840360 (Mass. Super. Aug. 9, 2007)..........................................................13

*Empower Energy Sols. Inc. v. Solar Wolf Energy, Inc.*,
 2021 WL 7210985 (D. Mass. Aug. 18, 2021) ...............................................................7

*Ferring Pharms. Inc. v. Braintree Lab'ys, Inc.*,
 38 F. Supp. 3d 169 (D. Mass. 2014) ......................................................................15, 16

*G. Cos. Mgmt,., LLC v. LREP Ariz., LLC*,
88 Cal. App. 5th 342 (2023) ..........................................................................20

*Gertz v. Vantel Int'l/Pearls in the Oyster Inc.*,
2020 WL 3977404 (D. Mass. July 14, 2020) .................................................14

*In re Halmar Distributors, Inc.*,
968 F.2d 121 (1st Cir. 1992) .........................................................................18

*Intershop Commc'ns v. Super. Ct.*, 104 Cal. App. 4th 191, 200 (2002) .................20

*Harrell v. Backstage Salon & Day Spa, Inc.*,
2022 WL 618681 (Mass. Super. Feb. 22, 2022) ..............................11, 12, 19

*Hawes v. Club Ecuestre El Comandante*,
598 F.2d 698 (1st Cir. 1979) ...........................................................................9

*Hearst Stations Inc. v. Aereo, Inc.*,
977 F. Supp. 2d 32 (D. Mass. 2013) .............................................................19

*IKON Off. Sols., Inc. v. Belanger*,
59 F. Supp. 2d 125 (D. Mass. 1999) .............................................................19

*Intershop Commc'ns v. Super. Ct.*,
104 Cal. App. 4th 191 (2002) ........................................................................20

*KMS, LLC v. Major League Trucking, Inc.*,
2023 WL 4745721 (C.D. Cal. July 25, 2023) ................................................18

*McGowan v. Weinstein*,
505 F. Supp. 3d 1000 (C.D. Cal. 2020) ........................................................18

*Me. Pointe, LLC v. Starr*,
2011 WL 379279 (D. Mass. Feb. 3, 2011) ....................................................12

*Medtronic, Inc. v. Walland*,
2021 WL 4131657 (S.D.N.Y. Sept. 10, 2021)..................................................8

*Nucleus Rsch. Inc. v. 3Sixty Insights Inc.*,
2023 WL 8371975 (D. Mass. Sept. 7, 2023) .................................................19

*Oxford Global Res., LLC v. Hernandez*,
2017 WL 2623137 (Mass. Super. June 9, 2017), *aff'd* (Mass. 2018)...................12

*Oxford Global Resources, LLC v. Hernandez*,
106 N.E.3d 556 (2018)..........................................................................7, 8, 9

*Pactiv LLC v. Perez*,
2020 WL 7123070 (N.D. Ill. Dec. 4, 2020) (Illinois)......................................8

*Patriot Energy Grp., Inc. v. Kiley, No.*
2014 WL 880880 (Mass. Super. Ct. Feb. 26, 2014) .......................................................17

*Russomano v. Novo Nordisk Inc.*,
960 F.3d 48 (1st Cir. 2020) ............................................................................................6

*Six Dimensions, Inc. v. Perficient, Inc.*,
2017 WL 10676897 (S.D.N.Y. Mar. 28, 2017) ..............................................................9

*Sourcing Unlimited, Inc. v. Elektroteks, LLC*,
2021 WL 2875713 (D. Mass. July 8, 2021)...................................................................18

*Take it Away, Inc. v. The Home Depot, Inc.*,
2009 WL 458552 (D. Mass. Feb. 6, 2009), *aff'd*, 374 F. App'x 47 (1st Cir.
2010) ...............................................................................................................................16

*Townsend Oil Co. v. Tuccinardi*,
2020 WL 958520 (Mass. Super. Ct. Jan. 16, 2020).................................................12, 20

*Tri-Nel Mgmt., Inc. v. Bd. of Health of Barnstable*,
741 N.E.2d 37 (Mass. 2001) .........................................................................................19

*U.S. Elec. Servs., Inc. v. Schmidt*,
2012 WL 2317358 (D. Mass. June 19, 2012) ................................................................12

*United Rentals, Inc. v. Pruett*,
296 F. Supp. 2d 220 (D. Conn. 2003) (Connecticut)......................................................8

*Verdugo v. Alliantgroup, LP*,
237 Cal. App. 4th 141 (2015) .......................................................................................20

*Viken Detection Corp. v. Videray Techs. Inc.*,
384 F. Supp. 3d 168 (D. Mass. 2019) ..............................................................15, 16, 17

*Wells Fargo Ins. Servs. USA, Inc. v. McQuate*,
276 F. Supp. 3d 1089 (D. Colo. 2016)............................................................................9

*Welter v. Med. Pro. Mut. Ins. Co.*,
2023 WL 2988627 (D. Mass. Feb. 23, 2023) ................................................................15

## Statutes and Rules

18 U.S.C. §1839(3)(B)...........................................................................................................15

Cal. Bus. & Prof. Code § 16600 ...................................................................................2, 8, 10

M.G.L. c. 93 § 42..............................................................................................................15, 16

M.G.L. c. 149, § 24L ...............................................................................................................11, 13

## **Declarations**

Declaration of Russell Beck in Support of Defendant's Opposition to Plaintiff's Motion for a Temporary Restraining Order

Declaration of Robert Ferrara in Support of Defendant's Opposition to Plaintiff's Motion for a Temporary Restraining Order

Declaration of Michael Z. Hermalyn in Support of Defendant's Opposition to Plaintiff's Motion for a Temporary Restraining Order

Plaintiff's motion is long on rhetoric and accusations, but short on facts and evidence. DraftKings, Inc. ("DraftKings")—a large public company—has invoked its go-to playbook to trash its former employee, Defendant Michael Z. Hermalyn, in a transparent attempt to ruin him professionally and personally. DraftKings seeks to knock out Hermalyn, a resident of California, who has spent years working in the sports, betting and gaming industry and fostering his own personal network, from pursuing a better opportunity with his new employer, FVP, LLC ("Fanatics VIP") in Los Angeles. But Hermalyn has every right to do that; and DraftKings cannot prevent Hermalyn from using his own skillset and relationships to work for a different company in California—those are not protectable interests in any jurisdiction. The sweeping post-employment restrictions DraftKings seeks to enforce, including the Massachusetts forum and jurisdiction clauses, are ***void and unenforceable*** under well-established California law and public policy. California law affords employees like Hermalyn the opportunity to move there and start new jobs, free from restraints imposed by their former employers even in other states. There is nothing untoward about Hermalyn's decision to move to California to work for a California company.

Recognizing this, DraftKings' Complaint and Motion for a Temporary Restraining Order ("Motion") deflects, spinning a conspiracy theory from whole cloth about "misappropriation" and "theft." It is based on salacious allegations designed to achieve DraftKings' public relations objective of imposing maximum damage to Hermalyn's reputation and livelihood. The lack of merit to DraftKings' made-for-media hit piece is revealed most plainly in the patchwork of falsehoods, exaggerations, and allegations made "upon information and belief" that DraftKings principally relies on. After stripping all that away, though, injunctive relief is not warranted because there is nothing to enjoin: Hermalyn has none of DraftKings' protectable information. Indeed, prior to resigning from DraftKings, Hermalyn took affirmative steps to ensure he was no longer in possession of ***any*** DraftKings property or confidential information, and would take none

to his new employer.  ***He was responsible***.  He returned DraftKings-issued devices.  He worked with his counsel to ensure that any documents and information developed in connection with his work for DraftKings were not in his possession.  He even sent his personal phone to his counsel, and bought a new phone (disabling iCloud), to ensure that it did not contain DraftKings information.  He confirmed to DraftKings in his resignation notice his belief that he had turned over all DraftKings property and information to his lawyer.  And Hermalyn has never used or shared any DraftKings information with Fanatics or any third party.

DraftKings has failed to satisfy the high bar for a temporary restraining order.  On the contract claims, DraftKings' agreements with Hermalyn contain overbroad post-employment restrictions that purport to extend to "any place within the United States or ***anywhere else in the world***," and contain Massachusetts law and forum provisions.  But under longstanding California law, each of these provisions is void and unenforceable.  Cal. Bus. & Prof. Code § 16600.[1] California recently enacted new laws that further strengthen these protections:  As of January 1, 2024, an employer like DraftKings is ***prohibited*** from attempting to enforce a contract that is void under California law "regardless of whether the contract was signed and the employment was maintained outside of California."  Cal. Bus. & Prof. Code § 16600.5(b).  Such an employer is subject to ***injunctive relief and liable for damages*** to the extent it enters into such a contract or attempts to enforce one against a California resident.  Cal. Bus. & Prof. Code § 16600.5(e).  The California Legislature emphasized that they "prohibit any employer from attempting to enforce a void contract, ***including seeking enforcement in a non-California court***."  Beck Decl., Ex. A, (Assem. Com. on Lab. & Employment, p. AP1-2).  Even if Massachusetts law were to apply (it does not), the covenants are also unenforceable:  The covenants protect no legitimate business interest recognized in Massachusetts; there is no risk to DraftKings' trade secrets or confidential

---

[1]  Unless otherwise noted, all case citations omit internal quotes, citations, and alterations, and all emphasis is added.

information; to the extent any goodwill is at issue, it belongs to Hermalyn, not DraftKings; and the restrictions are facially overbroad.

DraftKings has not identified any trade secrets or confidential information that are actually at risk—and, Hermalyn does not have them and has not used them. Nor has DraftKings met its heavy burden of showing that Hermalyn improperly accessed, disseminated, or used DraftKings information at all, let alone that an injunction is warranted. After wading through DraftKings' rhetoric and name-calling, the Complaint describes four documents Hermalyn allegedly "accessed" or "downloaded . . . before he resigned to join Fanatics," (TRO 2)—*i.e.*, *while he was still working at DraftKings and performing his duties there*. But DraftKings' trumped-up contentions could not be further from the truth, as detailed below. Indeed, one of the two emails featured in DraftKings' Complaint is blatantly misrepresented—despite the fact that its contents is well known to DraftKings' lead lawyers in this case, *Gibson Dunn*—demonstrating the great lengths to which DraftKings has gone to distort the record. DraftKings failed to present actual *evidence* that Hermalyn misappropriated confidential, commercially valuable information that it took reasonable measures to protect. DraftKings also failed to show either a likelihood of success on the merits or irreparable harm on its trade secrets and confidentiality claims; and, as noted above, Hermalyn has no DraftKings information, and so there is no need for an injunction.

## FACTUAL BACKGROUND

Hermalyn, a California resident, recently accepted an offer of employment from Fanatics VIP, a California-based affiliate of the digital sports platform Fanatics Holdings, Inc. Hermalyn Decl. ¶¶ 3, 5, 11. Hermalyn serves as the President of Fanatics VIP and the Head of Fanatics' Los Angeles office, which opened in 2022. *Id.* ¶ 11. This position requires Hermalyn to live and work in Los Angeles, where Fanatics employs approximately 80 people. *Id.* ¶ 18. Serving as the Head of the Los Angeles office will require Hermalyn to take on multiple responsibilities, including

overseeing the planned consolidation of Fanatics' multiple Los Angeles-area offices into a single location. *Id.* ¶ 20. There is no dispute that Fanatics VIP has no offices, employees, operations or presence in Massachusetts. Hermalyn's discussions concerning the opportunity to work for Fanatics VIP started shortly before he accepted the offer on February 1, 2024. *Id.* ¶¶ 12-13, 37. Hermalyn did not have an offer to join Fanatics VIP until January 27, which was not finalized until February 1. *Id.* ¶¶ 16, 37.

Prior to his employment with Fanatics VIP, Hermalyn worked for DraftKings for less than 3.5 years, from September 14, 2020 to February 1, 2024, where his internal title was Vice President of Growth. Hermalyn Decl. ¶ 21. In that role, he was responsible for developing and acquiring certain categories of customers. *Id.* Until the near end of his employment with DraftKings, Hermalyn resided in Bay Head, New Jersey, where he worked from his home or out of DraftKings' New York office. *Id.* ¶¶ 6, 22. There is no dispute that Hermalyn **never resided or worked in Massachusetts**, nor was he ever based out of DraftKings' Massachusetts office. *Id.* ¶ 22.

In connection with his employment by DraftKings, Hermalyn signed nearly a dozen agreements that contained one-sided, facially overbroad post-employment restrictive covenants. Hermalyn Decl. ¶ 62. In 2020, as a condition of his employment, he signed a Nonsolicitation, Nondisclosure & Assignment of Inventions Agreement ("Non-Solicit"). *Id.* The Non-Solicit contains no geographic limitation and applies everywhere in the world, despite the fact that Hermalyn's work was far more limited. *See* Compl. Ex. A (ECF 1-1). At the same time, he also signed the first noncompetition covenant ("2020 Covenant"), which provided a six-month restriction on his ability to work for a competing business in the U.S. *Id.* In the subsequent years— without the ability to negotiate any of these agreements and without being represented by counsel—he executed a series of restricted stock unit grants as a condition to receiving his equity compensation. Hermalyn Decl. ¶ 64; Compl. Ex. B (ECF 1-2). These agreements contained

additional non-competition covenants that became more onerous and burdensome over time. For example, and in contrast to the 2020 Covenant, the last set of non-competes, dated August 16, 2023 ("Non-Compete," and collectively with the Non-Solicit, the "Restrictive Covenants"), purport to restrict Hermalyn's ability for an entire year to do any work relating to services he performed at DraftKings and beyond, ***anywhere in the world***. Compl. Ex. B.

On February 1, 2024, Hermalyn resigned from DraftKings and accepted an offer from Fanatics VIP, which is organized and headquartered in California. *See* Hermalyn Decl. ¶¶ 11, 45. Before Hermalyn resigned from DraftKings, he took affirmative steps to ensure that he no longer possessed any DraftKings property or confidential information. *Id.* ¶ 45. Among other things:

- He segregated his personal information from DraftKings' information and gave the information he accumulated while working at DraftKings to his counsel. *Id.*
- He ceded control of his personal email and iCloud accounts to his counsel. *Id.*
- He also gave the devices that DraftKings had issued to him to his counsel, along with his own personal phone. *Id.*
- He purchased a new personal phone to ensure that it did not contain any of DraftKings' information. *Id.*

Hermalyn informed DraftKings that he had taken these steps in his resignation letter. *Id.* ***To be clear***: Hermalyn did not and has not improperly accessed, disseminated, misappropriated or used any DraftKings' information in connection with his employment at Fanatics VIP, and that includes the four documents alleged by Plaintiff. Specifically:

- Prior to having an offer from Fanatics VIP, on January 23, 2024, Hermalyn accessed the ***2021*** Presentation—which is three years old and primarily related to a stale DraftKings loyalty program that was never put into effect—**<u>solely</u>** in connection with onboarding DraftKings' new Vice President of Loyalty and E-Commerce. Hermalyn Decl. ¶¶ 56-57.
- With respect to the BD Team Tracker Report and the BD Gaming 101, Hermalyn does not believe he accessed these documents between January 24 and February 1, 2024. He did **<u>not</u>** provide them or the information therein to anyone outside DraftKings. *Id.* ¶¶ 59-61.
- On January 30, 2024, Hermalyn accessed the Master SB 2024 document in connection with his employment at DraftKings **<u>only</u>**. He did so to direct his DraftKings' colleague to certain VIP customers that still required invitations from DraftKings to Super Bowl events. Again, Hermalyn did not provide this document or the information therein to anyone outside DraftKings. *Id.* ¶ 60.

In addition, on January 29, 2024, before leaving DraftKings and accepting a position with Fanatics VIP, Hermalyn moved his residence and domicile to Los Angeles, California, where he is required to live and work in connection with his new employment. *Id.* ¶ 8. Hermalyn therefore signed a rental agreement for an apartment in Los Angeles, and plans to move into a family home with his wife and two school-aged daughters when they join him in California after this academic year is complete. *Id.* ¶ 9. Hermalyn has obtained a California driver's license, purchased a car in California, registered to vote in California, and obtained an appointment with a physician in California. *Id.* ¶ 10. Hermalyn plans to enroll his daughters in school in Los Angeles in the Fall; he has already contacted summer camps and joined waitlists for his daughters. *Id.* ¶ 9. Hermalyn's new role at Fanatics VIP presents an exciting opportunity for him to grow personally and professionally. *Id.* ¶ 65. If the Non-Solicit and Non-Compete are enforced, he would be unable to work in his field for an entire year and would suffer related and significant harms of lost opportunities, professional growth, and contacts. *Id.* ¶¶ 66-69.

## LEGAL STANDARD

"[A]llowance of a TRO, as with a preliminary injunction, is an extraordinary and drastic remedy that is never awarded as of right." *Allscripts Healthcare, LLC v. DR/Decision Res., LLC*, 592 F. Supp. 3d 1, 3 (D. Mass. 2022). There are four factors a trial court must consider when ruling on a request for a temporary restraining order or preliminary injunction, on which Plaintiff bears the burden of proof: (1) "the movant's likelihood of success on the merits;" (2) "whether and to what extent the movant will suffer irreparable harm" absent injunctive relief; (3) "the balance of [relative] hardships, that is, the hardship to the nonmovant if enjoined as opposed to the hardship to the movant if no injunction issues;" and (4) "the effect, if any, that an injunction [or the lack of one] may have on the public interest." *Russomano v. Novo Nordisk Inc.*, 960 F.3d 48, 52 (1st Cir. 2020). Likelihood of success on the merits is the most significant factor in the analysis and if the

movant "cannot demonstrate that he is likely to succeed in his quest, the remaining factors become matters of idle curiosity." *Id.* at 53.

## ARGUMENT

I.    **DRAFTKINGS FAILED TO SHOW A LIKELIHOOD OF SUCCESS.**

   A.    **Plaintiff Failed To Show A Likelihood Of Success On Its Claims For Breach Of Contract Because The Agreements Are Unenforceable.**

Under Massachusetts' choice-of-law analysis, which governs Plaintiff's contractual claims,[2] California law governs and renders void and unenforceable the non-compete and non-solicitation restrictions underlying Counts II and III, <u>notwithstanding</u> the Massachusetts choice-of-law provision in the Agreements. Even if Massachusetts law did supply the rule of decision (it does not), Plaintiff still cannot demonstrate likelihood of success.[3]

1.    **The Restrictions Are Unenforceable Under Applicable California Law.**

*a. California Substantive Law Governs*

Under Massachusetts law, the Massachusetts choice-of-law provisions in the Restrictive Covenants should <u>not</u> be enforced and California law should apply. In *Oxford Global Resources, LLC v. Hernandez,* the SJC reviewed an analogous situation, in which a Massachusetts plaintiff sought enforcement of a non-competition and non-solicitation agreement's Massachusetts choice-of-law provision against a California defendant trying to do business in California, and decided that California law applied. 106 N.E.3d 556, 560 (Mass. 2018). *Oxford* held that such choice-of-law provisions are "not enforceable" where (i) per Massachusetts' choice-of-law rules "California substantive law would apply" because California has the most significant relationship with the

---

[2]    *See Empower Energy Sols. Inc. v. Solar Wolf Energy, Inc.*, 2021 WL 7210985, at *5 (D. Mass. Aug. 18, 2021) ("Having determined that state law governs these matters, the court must apply the choice of law rules of Massachusetts, the forum state, to determine which state's laws apply.").

[3]    Defendant contends that DraftKings has failed to show likelihood of success based on the arguments in this Memorandum, but he does not concede that DraftKings has adequately alleged any claim or element of a claim and expressly reserves and does not waive all arguments and defenses to Plaintiff's Complaint.

dispute, and (ii) "where the application of Massachusetts substantive law would violate the fundamental public policy of California favoring open competition and employee mobility." *Id.*[4] Here, as in *Oxford*, both are true.

On public policy, *Oxford* held that "the application of Massachusetts substantive law" to identical breach of non-competition and non-solicitation claims "would **violate** the fundamental public policy of California favoring open competition and employee mobility." *Id.* California's "settled legislative policy in favor of open competition and employee mobility" outweighed Massachusetts' interest, which was "less categorical than the absolute prohibition under California law." *Id.* at 564-5 (citing Cal. Bus. & Prof. Code § 16600; *Edwards v. Arthur Andersen LLP*, 44 Cal.4th 937 (2008)). As detailed below, since *Oxford*, California has only strengthened its policy against restrictive covenants, further bolstering the rationale supporting *Oxford's* holding.

Next, Massachusetts determines the state with the most significant relationship to the transaction and parties by weighing "(a) the place of contracting, (b) the place of negotiation of the contract, (c) the place of performance, (d) the location of the subject matter of the contract, and (e) the domicile, residence, nationality, place of incorporation and place of business of the parties." *Oxford Glob. Res.*, 106 N.E.3d at 563. California is the clear winner. For example, *Oxford* concluded that California had a greater interest than Massachusetts when the plaintiff "executed, performed, and allegedly committed a breach of the agreement in California." *Id.* at 471. Here, ***nothing has happened in the Commonwealth***. Rather, Hermalyn executed the covenants with DraftKings in New York and New Jersey, Hermalyn Decl. ¶ 62, and the alleged breaches occurred

---

[4] *Oxford* is by no means alone. *See, e.g.*, *Medtronic, Inc. v. Walland*, 2021 WL 4131657, at *7 (S.D.N.Y. Sept. 10, 2021) (applying California law and § 16600 to restrictive covenants despite New York choice of law provision); *Ascension Ins. Holdings, LLC v. Underwood*, 2015 WL 356002, at *5 (Del. Ch. Jan. 28, 2015) (Delaware); *Digecor, Inc. v. E.Digital Corp*, 2009 WL 706888, at *5 (D. Utah Mar. 13, 2009) (Washington); *United Rentals, Inc. v. Pruett*, 296 F. Supp. 2d 220, 233 (D. Conn. 2003) (Connecticut); *Pactiv LLC v. Perez*, 2020 WL 7123070, at *6 (N.D. Ill. Dec. 4, 2020) (Illinois).

in California, where Hermalyn is domiciled. *Id.* ¶¶ 5; Compl. ¶ 1. California is thus the "place of performance" and the "location of the subject matter" of the Restrictive Covenants. *See Oxford Glob. Res*, 106 N.E.3d at 563 (subject matter of non-compete and non-solicitation agreement was California where plaintiff alleged defendant "committ[ed] a breach of the agreement in California"); *Application Grp., Inc. v. Hunter Grp., Inc.*, 61 Cal. App. 4th 881, 904 (1998) ("[T]he subject matter of the contract is arguably subsequent employment which was, in this case, employment by a competitor who is 'located' in California'").[5]

Meanwhile, Massachusetts has little to no interest in this dispute: Hermalyn ***never*** lived or worked in Massachusetts, and he was ***never*** based out of or affiliated with DraftKings' Massachusetts office. There is no dispute that Fanatics VIP is located in California, and has no operations, offices, or employees in Massachusetts. Given California's predominance, "California undoubtedly has the most significant relationship to the agreement and the parties." *Oxford Glob. Res*, 106 N.E.3d at 564. DraftKings attacks Hermalyn's residency change as "fraud" because it purportedly occurred too quickly. Compl. ¶ 1. But California imposes no durational requirements, and there is nothing fraudulent about relocating for a job opportunity.[6] Moving to California was a component and requirement of Hermalyn's job at Fanatics VIP, Hermalyn Decl. ¶ 18, and despite DraftKings' bluster, it presents no evidence that rebuts Hermalyn's sworn declaration that he has established residency and employment in California and will move his family there.

---

[5] *See also Wells Fargo Ins. Servs. USA, Inc. v. McQuate*, 276 F. Supp. 3d 1089, 1104 (D. Colo. 2016) (applying Colorado law to non-compete although agreement had a West Virginia choice of law provision because, in part, "subject matter of the contract and the non-compete provision at issue [was] 'located'—to be enforced—in Colorado"); *Six Dimensions, Inc. v. Perficient, Inc.*, 2017 WL 10676897, at *4-9 (S.D.N.Y. Mar. 28, 2017) (holding that proper venue for breach of contract, tortious interference, and trade secret misappropriation action based on former employee's alleged violation of post-employment covenants was former employee's location, which was where alleged violations occurred, <u>not</u> location of former employer, and collecting cases).

[6] *Cf. Brinkman v. Schweizer Aircraft Corp.*, 2011 WL 863499, at *3 (N.D. Cal. Mar. 10, 2011) (citing *Hawes v. Club Ecuestre El Comandante*, 598 F.2d 698 (1st Cir. 1979) ("[A] citizen of the United States can instantly transfer his citizenship from one state to another…."); *see also Bank One, Tex., N.A. v. Montle*, 964 F.2d 48, 53 (1st Cir. 1992) (rejecting "implicat[ion] that there was something impermissible about changing domicile to defeat federal court's jurisdiction" because "the motive for change in residence is irrelevant in determining domicile").

### b. *California Law Voids Hermalyn's Restrictive Covenants.*

California's longstanding public policy—codified in statutes and consistently recognized by its courts—strongly favors employee mobility and disfavors anticompetitive restraints on trade, including those in non-compete and non-solicitation covenants. Under California Business and Professions Code Section 16600, "***every contract*** by which anyone is restrained from engaging in a lawful profession, trade, or business of any kind is to that extent ***void***." Cal. Bus. & Prof. Code § 16600. This provision applies both to "true" non-competition provisions and also other restrictive covenants, *Edwards*, 44 Cal. 4th at 946-48 (non-solicitation and no-service provisions), including confidentiality provisions, *see AMN Healthcare, Inc. v. Aya Healthcare Servs., Inc.*, 239 Cal. Rptr. 3d 577, 591 (Cal. App. 2018).

California's legislature has endorsed a strong interpretation of Section 16600 as demonstrating California's "settled public policy in favor of open competition." *E.g.*, Beck Decl., Ex. B (S. Committee Bill Analysis, Cal. S. B. 699 (Apr. 18, 2023)). Effective January 1, 2024, California further strengthened this protection: New Section 16600.5 provides that "[a]n employer or former employer shall not attempt to enforce a contract that is void under this chapter ***regardless of whether the parties signed the contract and whether the employment was maintained outside of California***." Cal. Bus. & Prof. Code § 16600.5(b).[7] An employer like DraftKings who attempts to enforce an unlawful restrictive covenant commits "a civil violation" and a former employee has the right to "bring a private action . . . for ***injunctive relief*** or the recovery of actual damages, or both" against the former employer. *Id.* § 16600.5(d)-(e). Hermalyn has done exactly that, and as this Court is aware, that action in California was filed first and is already pending.

---

[7]   The California Legislature noted that "California's public policy against restraint of trade law trumps other state laws when an employee seeks employment in California, ***<u>even if the employee had signed the contractual restraint while living outside of California and working for a non-California employer</u>***." Beck Decl., <u>Ex. C</u>, § 1(e).

2.      **Even If Massachusetts Law Were To Apply (It Does Not), The Post-Employment Non-Compete Is Invalid And Unenforceable.**

      *a.   DraftKings Does Not Need the Non-Compete Agreement To Protect Any Legitimate Business Interest.*

Even if Massachusetts law were to apply, absent a legitimate interest needing protection—which does not exist here—a non-compete is invalid and its invalidity cannot be remedied. "Protection of the employer from ordinary competition . . . is not a legitimate business interest, and a covenant not to compete designed solely for that purpose will not be enforced." *Akibia, Inc. v. Hood*, 2012 WL 10094508, at *7 (Mass. Super. Oct. 9, 2012), *aff'd*, 2012 WL 12370255 (Mass. App. Ct. Nov. 21, 2012). "That is because the right of employees to use their knowledge, experience, and skill to compete against their prior employer 'promotes the public interest in labor mobility and the employee's freedom to practice his profession and in mitigating monopoly.'" *Harrell v. Backstage Salon & Day Spa, Inc.*, 2022 WL 618681, at *5 (Mass. Super. Feb. 22, 2022).

    The Massachusetts Noncompetition Agreement Act ("MNAA") provides that non-competition agreements are valid ***only if*** an employer needs to protect an enumerated legitimate interest, *i.e.*, (1) trade secrets, (2) confidential information, or (3) goodwill. M.G.L. c. 149, § 24L(b)(iii). Moreover, although the MNAA grants courts the discretion to "reform or otherwise revise a noncompetition agreement so as to render it valid and enforceable," that discretion exists ***only*** "to the extent necessary to protect the applicable legitimate business interests." *Id*. § 24L(d).

    Here, the Non-Compete is not justified to protect DraftKings' trade secrets or confidential information, because Hermalyn possesses none. Hermalyn did ***not*** "steal" or otherwise take DraftKings' confidential information (Def.'s Mem. in Support of TRO ("TRO") 10), and the Complaint's allegations about the specific documents are false. *See supra* p. 5. The Complaint references information Hermalyn previously had *access* to at DraftKings, Compl. ¶¶ 23-28, but, as described above, prior to resigning, Hermalyn took numerous steps to ensure he was not in

possession of DraftKings' property or information. He carried with him only his own memory and general skills, which are not secrets that belong to the employer. *See Oxford Global Res., LLC v. Hernandez*, 2017 WL 2623137, at *3 (Mass. Super. June 9, 2017), *aff'd*, (Mass. 2018).[8]

The Non-Compete is also not necessary to protect any goodwill attributable to DraftKings, as opposed to Hermalyn personally. DraftKings alleges only the latter. *See* Karamitis Aff. (ECF No. 5) ¶ 8 ("Mr. Hermalyn was responsible for . . . developing and maintaining relationships with high-value individual customers."). Goodwill is an employee's "who maintains distinctly personal or professional relationships with customers, so that the business entity possesses little of it." *Harrell*, 2022 WL 618681, at *5 (invalidating non-compete because goodwill belonged to former employee); *Townsend Oil Co. v. Tuccinardi*, 2020 WL 958520, at *4 (Mass. Super. Ct. Jan. 16, 2020) ("If a customer decides to switch from [the employer] to [the former employee] because they are personally loyal to [the former employee], that means that the goodwill as to that customer belongs to [the former employee], not [the employer]. That provides no lawful basis to bar [the former employee] from competing against [the employer].").

### b. The Non-Compete Agreement Is Overbroad and Unreasonable

Because DraftKings has no legitimate interest in need of protection, no restrictions on Hermalyn are reasonable. The broad prohibitions and sweeping geographic scope in the Non-Compete show DraftKings' true intent: to restrict lawful competition altogether. Under Massachusetts law, non-competes may not be used to protect an employer from ***ordinary*** competition—which is not a legitimate business interest. *See, e.g.*, *Me. Pointe, LLC v. Starr*, 2011 WL 379279, at *3 (D. Mass. Feb. 3, 2011). Accordingly, to be enforceable, a non-compete's limits

---

[8]  Contrary to DraftKings' suggestion (TRO 12), alleged "inevitable future conduct" is <u>not</u> sufficient to support an injunction. *See U.S. Elec. Servs., Inc. v. Schmidt*, 2012 WL 2317358, at *9 (D. Mass. June 19, 2012).

on "geographic reach" and "proscribed activities" must be reasonable. M.G.L. c. 149, § 24L(b)(v)-(vi). The Non-Competition Agreement at issue does not satisfy those fundamental requirements.

Instead, the Non-Competition Agreement purports to prohibit Hermalyn from performing *any services whatsoever* that are in any way "related to" any DraftKings businesses he was involved with *or* about which he received confidential information. Such a vague and overly broad restriction is by no means "reasonable in the scope of proscribed activities in relation to the interests protected," and is in no way "limited to only the specific types of services provided by the employee." M.G.L. c. 149, § 24L(b)(vi) (establishing a presumption of reasonableness *only if* restriction is so limited). When such overbroad prohibitions are combined with an *unlimited* geographic scope, as here, it is apparent that the covenant is "intended to restrain ordinary competition" and is therefore invalid under Massachusetts law. *Edwards v. Athena Cap. Advisors, Inc.*, 2007 WL 2840360, at *3 (Mass. Super. Aug. 9, 2007) (finding non-compete likely unenforceable rather than reforming it where clause was overbroad in multiple aspects); *see also* M.G.L. c. 149, § 24L(b)(v) (presumptively reasonable reach is "limited to only the geographic areas in which the employee . . . provided services or had a material presence or influence").

### 3. The Non-Solicit Agreement Is Also Invalid Under Massachusetts Law And, In Any Event, There Was No Breach.

Hermalyn's Non-Solicit is invalid under Massachusetts law for the same reasons as his Non-Compete—DraftKings has no legitimate business interest in need of protection. Like a non-compete, a non-solicitation agreement is *__only__* enforceable if it is needed to protect the employer's legitimate business interest in its trade secrets, confidential information, or goodwill. *Bruett v. Walsh*, 2019 WL 2605705, at *2 (Mass. Super. May 9, 2019). Hermalyn possesses no confidential information or trade secrets, and any goodwill at issue belongs to him, not to DraftKings.[9] The

---

[9] The Non-Solicit is also impermissibly broad because it prohibits Hermalyn from transacting any business with

one alleged purported employee solicitation—Hermalyn's July 2023 email, Compl. ¶ 93—is made on "information and belief" and is, predictably, false. This email from Hermalyn was a script for a departing colleague, Robert Ferrara, to use with a client contact—with which **Gibson Dunn**, DraftKings' lead lawyers in this action, were involved and are therefore well aware of the who's who in the script. Hermalyn Decl. ¶¶ 41-43; Ferrara Decl. ¶¶ 7-9. The email was meant to explain that **Mr. Ferrara** was leaving the industry and to put the client in touch with "Mike"—*i.e.*, **Mike Hermalyn** (who remained at DraftKings), **not** Michael Rubin, the Fanatics' CEO—to take over the client relationship for DraftKings. Hermalyn Decl. ¶ 42; Ferrara Decl. ¶¶ 7-9.

**B.** **DraftKings Failed To Show A Likelihood Of Success On Its Claims Concerning Trade Secrets And Confidential Information.**

DraftKings argues that records indicating that Hermalyn "accessed" four DraftKings documents—documents he had permission to access and that concerned his role and responsibilities—***prior*** to his resignation from DraftKings somehow support its likelihood of success on claims that Hermalyn misappropriated trade secrets (Counts IV & V), breached his Non-Disclosure agreement (Count I), misappropriated confidential information (Count VI), and breached his duty of loyalty (Count VII).

DraftKings' proof falls short. DraftKings failed to put forth evidence that Hermalyn retained, disseminated, or otherwise used or disclosed the information in these documents or any other protected DraftKings' information. But DraftKings' own allegations undercut its claim that any of the information allegedly "accessed" is a trade secret. DraftKings further obscures the reality of (1) how Hermalyn accessed these documents—from devices which he gave to his

---

customers, including those with whom he did not work at DraftKings, or former customers, even if he did not solicit them and they independently choose to work with him. *See Walsh*, 2019 WL 2605705, at *3-5 (refusing to extend injunction to prohibit former employee from transacting business with customers who reached out to him absent solicitation because would impermissibly infringe on the goodwill belonging to him and place substantial burden on customers); *see also Gertz v. Vantel Int'l/Pearls in the Oyster Inc.*, 2020 WL 3977404, at *8 (D. Mass. July 14, 2020) (finding that a non-solicitation provision that "limit[ed] the freedom of non-contracting parties" stated plausible claim that provision was unenforceable).

counsel when he left DraftKings and no longer possesses; and (2) why he accessed them—in the course of his day-to-day responsibilities. Hermalyn Decl. ¶¶ 44-61.

To prevail under either the federal Defense of Trade Secrets Act ("DTSA") or the Massachusetts Uniform Trade Secrets Act ("MUTSA"), a plaintiff must establish three elements: "1) the information at issue constitutes a trade secret, 2) the plaintiff took reasonable measures to secure the confidentiality of the information, and 3) the defendant obtained the trade secret through improper means." *Viken Detection Corp. v. Videray Techs. Inc*., 384 F. Supp. 3d 168, 177 (D. Mass. 2019) (noting DTSA and MUTSA standard are "substantially similar"); *see also* M.G.L. c. 93 § 42(4)(i); 18 U.S.C. §1839(3)(B). DraftKings' allegations fall short.

### 1. Plaintiff Failed To Show That the Information At Issue Involved Trade Secrets or Protected Information.

DraftKings fails the threshold inquiry, as it does not show that the materials allegedly misappropriated constitute a trade secret. *See Welter v. Med. Pro. Mut. Ins. Co.*, 2023 WL 2988627, at *17 (D. Mass. Feb. 23, 2023) (dismissing DTSA and MUTSA claims for failure to allege trade secret). DraftKings makes sweeping allegations about the wide range of "valuable trade secrets" that Hermalyn received during his employment that "could" or "would" benefit a competitor. Compl. ¶¶ 27-28. It further alleges, ***without proof***, that prior to leaving DraftKings, Hermalyn "viewed and downloaded and, ***on information and belief***, stole many of DraftKings' most commercially sensitive documents." *Id.* ¶ 59. But DraftKings only presents any actual allegations about four documents: (1) an old 2021 presentation titled "VIP Founders Club," *id*. ¶ 59; (2) the "BD [Business Development] Team Tracker – Weekly Report," *id.* ¶ 62; (3) the "(Master) SB 2024" spreadsheet, *id.* ¶ 67; and (4) a presentation titled "BD_Gaming101," *id.* ¶ 70.

Tellingly, DraftKings does not submit these documents in support of its motion, and DraftKings' vague and conclusory allegations about these documents fail to show with the requisite specificity that they involved trade secrets at all. *See Ferring Pharms. Inc. v. Braintree*

*Lab'ys, Inc.*, 38 F. Supp. 3d 169, 175 (D. Mass. 2014) (dismissing trade secret claim for failure to "identif[y] with adequate specificity any trade secrets in materials that have not been submitted with the pleadings"). "The party asserting the claim must identify with adequate specificity the trade secret or proprietary information that was allegedly misappropriated by the defendant." *Id.*; *see also* M.G.L. c. 93 § 42D(b) ("In alleging trade secrets misappropriation a party must state with reasonable particularity the circumstances thereof, including the nature of the trade secrets and the basis for their protection."). Trade secrets must "derive economic value" (DTSA), or "provide[] economic advantage" (MUTSA), "actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, others who might obtain economic advantage from its acquisition, disclosure or use" (both). M.G.L. c. 93 § 42(4)(i); 18 U.S.C. § 1839(3)(B). "[M]atters of public knowledge or information generally known in an industry cannot be a trade secret." *Viken*, 384 F. Supp. 3d at 177. While there is "no bright line," courts often consider the following when assessing the secrecy or confidentiality of information:

> (1) the extent to which the information is known outside the business; (2) the extent to which it is known by employees and others involved in the business; (3) the extent of measures taken by the employer to guard the secrecy of the information; (4) the value of the information to the employer and to his competitors; (5) the amount of effort or money expended by the employer in developing the information; and (6) the ease or difficulty with which the information could be properly acquired or duplicated by others.

*Ferring Pharms.*, 38 F. Supp. 3d at 175. DraftKings makes no allegations about the effort or money it expended creating the four documents, or how easily they could be duplicated by others. *Take it Away, Inc. v. The Home Depot, Inc.*, 2009 WL 458552, at *6 (D. Mass. Feb. 6, 2009) (rejecting purported trade secret that "once implemented, would be extremely easy to duplicate"), *aff'd*, 374 F. App'x 47 (1st Cir. 2010). Moreover, its allegations concerning each document are deficient.

- **First**, despite its conclusory assertion that the (stale) 2021 presentation would "be beneficial" for a competitor, Karamatis Decl. ¶ 7, DraftKings' own allegations undermine any economic advantage the presentation might provide. Not only was it several "years-old," but it merely described a proposed loyalty program that "DraftKings never ultimately

implemented." Compl. ¶ 61. That could hardly be one of DraftKings' "most commercially sensitive documents," *id.* ¶ 59, and would not be of any competitive value. Hermalyn Decl. ¶ 56; *see also* Ferrara Decl. ¶ 10.

- **Second**, the "BD Team Tracker – Weekly Report" is allegedly "181" pages and DraftKings makes no attempt to segregate the information in it that is arguably protectable from that which could be discerned or is known in the industry. *See* Compl. ¶¶ 62-63. The document, which purportedly "allow[ed] teams involved in active negotiations . . . to centralize updates," had not been updated for around two months, *id.* ¶ 63, and Hermalyn did not use it. Hermalyn Decl. ¶ 59.

- **Third**, the "(Master) SB 2024" allegedly contained entertainment plans and customer and vendor lists related to Super Bowl events. *Id.* ¶¶ 67-68. DraftKings claims the potential value here is that a competitor could attend the same Super Bowl events as DraftKings and meet some of its customers. *Id.* ¶ 68. However, DraftKings does not allege that these events, their potential attendees, and whether those attendees were DraftKings customers were not "public knowledge or information generally known in [the] industry. . . ." *Viken*, 384 F. Supp. 3d at 177. Indeed, DraftKings **admits** that at least portions of the information related to widely known individuals. Karamitis Decl. ¶ 23 ("celebrities, athletes, influencers, and organizations like leagues and team").

- **Fourth**, DraftKings asserts the purported secrecy of unspecified portions of the "BD_Gaming 101" presentation. *Id.* ¶ 70. This presentation appears to be a marketing "pitch [for] potential business partners." *Id.* However, a party's allegations that its marketing strategies are "protectable trade secrets" are insufficient when they are not alleged to be proprietary or "the product of significant effort or investment." *Ferring*, 38 F. Supp. 3d at 176 (dismissing for failing to state a claim). Those allegations are conspicuously absent. DraftKings also fails to allege how many DraftKings' employees had access to this document. *See Patriot Energy Grp., Inc. v. Kiley*, 2014 WL 880880, at *11 (Mass. Super. Feb. 26, 2014).

As noted above, the only thing that Hermalyn carried with him to his new job was his skillset, knowledge, and personal relationships. His professional experience with customers and loyalty retention do not belong to DraftKings and are not trade secrets. *Cf.* TRO 4-5.

## 2.    DraftKings Failed To Show Any Misappropriation.

DraftKings also must establish that Hermalyn "obtained the trade secret[s] through improper means." *Viken*, 384 F. Supp. 3d at 177. DraftKings cannot show that Hermalyn "illicitly download[ed], retain[ed], and us[ed] DraftKings'" information. Compl. ¶ 11. DraftKings had *authorized* Hermalyn to access each of the four documents at issue because they were relevant to his job responsibilities. *See id.* ¶¶ 25-26, 60, 62, 67, 70. To the extent he accessed them at all, he

would have done so **solely** to do his work for DraftKings. Hermalyn Decl. ¶¶ 54-61. He did not use, provide or disclose the information in these documents to Fanatics or anyone else. *Id.* DraftKings does not allege otherwise, except, of course, "on information and belief." Compl. at ¶¶ 5, 7-8, 59, 63, 69, 71, 86, 87, 168. And, he has *relinquished* all of his devices, including the "non-DraftKings device" (*i.e.*, his personal phone, which he used for work), that he allegedly used to access documents the week of January 29. Compl. ¶¶ 7, 67.[10]

## C. DraftKings Failed To Show A Likelihood Of Success On Its Conversion Claim

DraftKings' conversion claim (Count VIII) is premised on its unavailing trade secrets arguments and fails for the same reasons. It also fails under both California and Massachusetts law for two other reasons. **First**, DraftKings has **not** alleged it was deprived of tangible property. As Plaintiff notes, conversion requires an "intention of depriving DraftKings of its [properties' use]." (TRO 17). But the alleged properties are intangible, and DraftKings at most alleges Hermalyn "viewed and downloaded" them, *id.* at 1, not that Hermalyn intended to or even could deprive DraftKings of its use or rights. Thus its conversion claim fails.[11] **Second**, DraftKings has not alleged that Hermalyn refused to return the information, as is necessary given that his only alleged access was when he was employed by DraftKings and thus lawful, and he *has* relinquished his devices. *See* TRO 2 (alleged access occurred "before he resigned to join Fanatics").[12]

---

[10] DraftKings claims that Hermalyn did so while at Fanatics' office, purportedly because on January 29 and 30, 2024 he sent emails from a Los Angeles wireless network that was associated with an IP address that had the word "fanatics" in its name. Harris Decl. (ECF 6) ¶¶ 21-24. But this cannot be accurate because Hermalyn was not in Fanatics' Los Angeles office until February 6, 2024. Hermalyn Decl. ¶ 17.

[11] *See McGowan v. Weinstein*, 505 F. Supp. 3d 1000, 1022 (C.D. Cal. 2020) ("[C]opies of documents—as opposed to the documents themselves—does not amount to an interference with the owner's property sufficient to constitute conversion…."); *Sourcing Unlimited, Inc. v. Elektroteks, LLC*, 2021 WL 2875713, at *12 (D. Mass. July 8, 2021) ("This Court has consistently held that a plaintiff is not entitled to recover for conversion of intangible property.").

[12] *In re Halmar Distributors, Inc.*, 968 F.2d 121, 129 (1st Cir. 1992), *opinion corrected* (July 16, 1992) ("Where a defendant's possession is not wrongful in its inception, demand and refusal are prerequisites to an action for conversion."); *KMS, LLC v. Major League Trucking, Inc.*, 2023 WL 4745721, at *3 (C.D. Cal. July 25, 2023) ("[W]hen the defendant lawfully acquires possession of property with consent of the owner, demand for its possession is necessary to create a liability for conversion or unlawful withholding of the property").

## II. DRAFTKINGS FAILED TO SHOW IRREPARABLE HARM.

Since DraftKings cannot establish likelihood of success on the merits, the Court "need not address irreparable harm…." *Nucleus Rsch. Inc. v. 3Sixty Insights Inc.*, 2023 WL 8371975, at *5 (D. Mass. Sept. 7, 2023). However, DraftKings' showing of irreparable harm is also not sufficient. DraftKings must demonstrate "substantial injury that is not accurately measurable or adequately compensable by money damages. Plaintiffs alleging irreparable harm must show more than a tenuous or overly speculative forecast of anticipated harm." *Hearst Stations Inc. v. Aereo, Inc.*, 977 F. Supp. 2d 32, 40 (D. Mass. 2013). DraftKings' irreparable harm argument relies on Hermalyn's Non-Compete, which is invalid, and alleged misappropriation, of which there was none. TRO 18–19. Again, Hermalyn **has no confidential DraftKings information** to disseminate or use. DraftKings' argument is purely speculative. Hermalyn's knowledge of "the identity or contact information of some of DraftKings' most loyal and significant customers" (TRO 19) is not even protected information, let alone irreparable harm.[13] And, even if DraftKings had shown likelihood of customer loss (it has not), that is compensable in monetary damages. *See Tri-Nel Mgmt., Inc. v. Bd. of Health of Barnstable*, 741 N.E.2d 37, 46 (Mass. 2001). ("Economic harm alone … will not suffice as irreparable harm unless the loss threatens the very existence of the movant's business."); *see also IKON Off. Sols., Inc. v. Belanger*, 59 F. Supp. 2d 125, 132 (D. Mass. 1999) ("[L]oss of [customer] revenue is calculable through evidence of past earnings on the accounts and, if necessary, through the use of expert testimony.").

## III. THE BALANCE OF THE EQUITIES FAVORS DEFENDANT

Plaintiff has failed to show that any risk of irreparable harm to itself outweighs the harm to Hermalyn from imposing an injunction. Plaintiff's **sole** argument on its own side is that the

---

[13]   *See Harrell.*, 2022 WL 618681, at *6 ("The mere fact that a person assume[s] a similar position at a competitor does not, without more, make it inevitable that he will use or disclose trade secret information[.]") (internal quotations omitted); *Banner*, 2003 WL 831974, at *4 ("[The plaintiff] cannot claim protection for its client lists . . . absent a showing that [the former employee] has these lists in his possession.").

"parties agreed at the outset that any violation of the Noncompetition Covenant would cause DraftKings irreparable harm…" TRO 19. But that agreement is void, and thus irrelevant. On the flip side, Hermalyn would face a substantial risk of irreparable harm if the Court prohibits him from practicing his profession for an entire year. *See* Hermalyn Decl. ¶¶ 65-69. An employee's right to practice his profession outweighs an employer's "speculative interest in protecting its investment in its employees, or its monetary interest in stifling adverse competition." *Banner Indus. v. Bilodeau*, 2003 WL 831974, at *4 (Mass. Super. Feb. 27, 2003); *see also Townsend Oil Co.*, 2020 WL 958520, at *5 (balance of hardships favored employee when the employer's risk was merely potential loss of some customers—which was easily quantifiable—while an injunction would "effectively prevent [the employee] from working in his field").

## IV. THERE IS A SUBSTANTIAL QUESTION WHETHER THIS ACTION SHOULD PROCEED IN MASSACHUSETTS.

Finally, there is a substantial likelihood that this action will be dismissed on *forum non conveniens* grounds, further justifying denial of the Motion. Apart from the void forum selection clauses in the Restrictive Covenants, Hermalyn lacks any connection to the Commonwealth, as he has never lived or worked here. Most of the events in the Complaint allegedly took place in California, and literally ***none*** took place in Massachusetts. California substantive law, which (as explained above) governs here, and would not enforce such agreements. *See Intershop Commc'ns v. Super. Ct.*, 104 Cal. App. 4th 191, 200 (2002) ("[A] forum selection clause will not be enforced if to do so would bring about a result contrary to the public policy of this state."); *see also G. Cos. Mgmt,., LLC v. LREP Ariz., LLC*, 88 Cal. App. 5th 342, 350-51 (2023) (refusing to enforce exclusive jurisdiction clause where unwaivable rights of California resident and employee might be diminished); *Verdugo v. Alliantgroup, LP*, 237 Cal. App. 4th 141, 147, 154 (2015) (same).

## CONCLUSION

For these reasons, Plaintiff's Motion should be denied in its entirety.

Dated: February 7, 2024

Respectfully submitted,

*Attorneys for Defendant Michael Z. Hermalyn*

/s/ *Russell Beck*
Russell Beck (BBO# 561031)
Stephen Riden (BBO# 644451)
Beck Reed Riden LLP
155 Federal Street, Suite 1302
Boston, MA 02110
Tel.: (617) 500-8660
Fax: (617) 500-8665
rbeck@beckreed.com
sriden@beckreed.com

## **CERTIFICATE OF SERVICE**

I hereby certify that a true copy of the above document was served on Plaintiff's counsel on the date below via email and will be filed through the ECF System and sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF).

Dated:  February 7, 2024

/s/  *Russell Beck*
Russell Beck