UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

DRAFTKINGS, INC.,

        *Plaintiff*,

  v.

MICHAEL Z. HERMALYN,

        *Defendant*.

Civil Action No. 1:24-cv-10299-JEK

**DECLARATION OF DEFENDANT MICHAEL Z. HERMALYN
IN SUPPORT OF DEFENDANT'S OPPOSITION TO PLAINTIFF'S MOTION FOR
TEMPORARY RESTRAINING ORDER**

## DECLARATION OF MICHAEL Z. HERMALYN

I, Michael Z. Hermalyn, hereby declare, under penalty of perjury, the following:

1. I am over the age of 18 and have personal knowledge of the facts set forth in this Declaration. If called upon to do so, I could and would testify competently thereto.

2. I have been falsely accused by DraftKings, Inc. ("DraftKings") of "hatch[ing] a secret plan over the past year to steal and use confidential information, solicit customers and employees, and join a key competitor, Fanatics, Inc. [*sic*]." ***I did no such thing***. Other than leaving DraftKings for a once-in-a-lifetime opportunity to report directly to the Chair and CEO of Fanatics Holdings, Inc., Michael Rubin, and have the opportunity to work alongside his executive team, DraftKings' narrative is entirely fabricated. There was no secret plan to steal or use information or to solicit customers or employees, much less a year-long plan.

3. When I decided to leave, I knew from past experience with DraftKings that they would likely come after me aggressively and malign me as they have done with others. However, I am shocked and disappointed to see that they would go so far as they have and actually make so many completely false and fabricated accusations against me in court. I had specifically done everything I could to make sure they could not – truthfully – claim that I engaged in some unlawful conduct, and I worked closely with counsel to do my level best to ensure that I retained no DraftKings information or property. And, pending authorization from a court, I have also been very careful to avoid soliciting a single client or former colleague. As a result, as far as I am aware, not a single client or employee has moved from DraftKings to Fanatics Holdings, Inc., its California-based affiliate, FVP, LLC ("Fanatics VIP"), or any other Fanatics affiliate (collectively, "Fanatics") since I have been at Fanatics.

4. Contrary to DraftKings' false narrative, last month, January 2024, was the first time that I looked into joining Fanatics. As discussed below, my decision was easy and quick, and the opportunity at Fanatics VIP is far better for me, my wife and children, and my career.

**I.   CURRENT RESIDENCE IN CALIFORNIA AND EMPLOYMENT WITH FANATICS IN LOS ANGELES, CALIFORNIA**

5. I am a California citizen and resident of Los Angeles, California.

6. Prior to moving to California, I lived in Bay Head, New Jersey. I have never lived or worked in Massachusetts.

7. On January 27, 2024, I received an initial, exciting job offer from Fanatics. After discussing it with my wife, I decided I was likely going to take the job. The next morning, January 28, I decided I was going to take the job (subject to agreeing on key offer terms) and booked a ticket to fly out to Los Angeles that night. A true and correct copy of my eTicket Itinerary and Receipt is attached as Exhibit A.

8. I began the process of moving to California the next day, January 29, 2024, to allow me to accept a unique opportunity to significantly advance my career by joining Fanatics' executive team and reporting directly to Mr. Rubin. Because of that, I intend to live and work in California for the foreseeable future.

9. To that end, I leased an apartment in California, and I intend to move into a family home when my wife and children join me in California after the conclusion of the academic school year this spring. I intend to enroll my two daughters in school in Los Angeles for the next school year and have already contacted summer camps and joined various waitlists.

10. Since moving to California, I obtained a California driver's license, I purchased a car in California, I registered the car in California, I registered to vote in California, and I obtained appointments with a physician and a dentist in California.

11. On February 1, 2024, I accepted an offer for employment from Fanatics VIP, which is headquartered in Los Angeles, California, to join as its President and to be the Head of Fanatics' Los Angeles office, located at 11601 Wilshire Blvd Los Angeles, California 90025.

12. Contrary to DraftKings, Inc.'s accusation that I "secretly hatched a plan over the past year" to join Fanatics, I did not seriously consider leaving DraftKings to join Fanatics (or any of its affiliates) until I met with Fanatics CEO, Michael Rubin, on January 27, 2024, in Pennsylvania.

13. Prior to that, I first contemplated leaving and considering Fanatics as a possibility earlier in January, when I had heard a rumor about Fanatics looking for a head of VIP. I reached out to Mr. Rubin on January 11, 2024. We spoke that night and arranged for me to meet him during the week of January 23, 2024. Our meeting was ultimately held on January 23, and later that week, I met with other members of the Fanatics executive team.

14. The next day, January 27, I met with Mr. Rubin in person in Pennsylvania. We talked about the other meetings and the team, and to my surprise, he made me an offer on the spot.

15. I went home that night and discussed the opportunity with my wife. The next morning when I woke up, it all sank in. That was the moment that it was clear to me that I wanted to work with that team, and that I could not turn down the opportunity.

16. To be clear: the January 27, 2024 meeting was the first time that I was ever given an offer to join Fanatics. I had no offer prior to that. I had never even thought seriously about leaving DraftKings, much less joining Fanatics, until January 11, 2024, and really not until I had my meetings starting on January 23, 2024.

17. I did not visit Fanatics' Los Angeles office—or any Fanatics office—prior to accepting Fanatics VIP's offer of employment. The first day I was in Fanatics' Los Angeles office was February 6, 2024 – after I resigned from DraftKings.

18. My position with Fanatics VIP requires that I live and work in person in Los Angeles, where I understand that Fanatics already employs approximately 80 people and where I plan to further build out my Fanatics VIP team.

19. Fanatics is a leading digital sports platform business in the United States, including California, and operates across a number of industries, including collectibles, commerce (the design, manufacturing, and sale of licensed apparel and hard goods), betting and gaming, and with emerging businesses in live events, media, and more.

20. As Head of Fanatics' Los Angeles office, I will oversee and administer the operations of the Los Angeles office (which houses employees from multiple Fanatics businesses) and oversee the planned consolidation of Fanatics' multiple Los Angeles-area offices into a single location.

## II.   PRIOR EMPLOYMENT WITH DRAFTKINGS

21. Prior to joining Fanatics VIP, I worked for DraftKings for less than 3.5 years—from September 2020 to January 2024. My internal title was Vice President of Growth. In that role, I was responsible for managing and acquiring certain categories of customers.

22. During my employment with DraftKings, I worked out of DraftKings' New York City office or from my home office in New Jersey. I have never resided in Massachusetts, was never employed in Massachusetts, and was never assigned to work out of DraftKings' Massachusetts office at any point.

23. DraftKings' Complaint is filled with false accusations.

*The SAGA Restaurant Group Accusations are False*

24. Among other things, DraftKings alleges "on information and belief" that I "engag[ed] in self-dealing by funneling a DraftKings contract to restaurants owned by an entity with which [I] was affiliated without disclosing such information." Compl. ¶ 167. That accusation is false. As part of my responsibilities for DraftKings, I successfully leveraged my friendship with one of the owners of the SAGA restaurant group and secured an arrangement for DraftKings to have preferred access to difficult-to-secure reservations, including on short notice.

25. I received absolutely no benefit from this transaction. To the contrary, I used my friendship to help advance DraftKings' interests.

26. Several DraftKings executives, including DraftKings Co-Founder Matt Kalish, as well as DraftKings' (1) Senior Director, VIP Strategy & Operations, (2) Senior Manager, Player Development, and (3) Manager, VIP New Business, were aware of my connection to SAGA. In fact, Mr. Kalish took advantage of that relationship on at least one occasion. Following a golf outing with former President Donald Trump attended by Mr. Kalish, he contacted me to ask for assistance in securing a dinner reservation, and I directed him to my friend at CrownShy, which is owned by the SAGA restaurant group.

*The HR Investigation Allegations are Exaggerated*

27. On January 3, 2024, DraftKings advised me that there was an internal HR investigation involving a complaint concerning me.

28. I was not suspended during the investigation. I was not terminated or threatened with termination based on the results of the investigation.

29. On January 26, 2024, I was informed by Jessica Nokes, a member of the human resources department at DraftKings, and Shawn Henley, my direct supervisor and DraftKings'

Chief Customer Officer, during an hour-long Zoom call, that the investigation had been completed and was closed. So everyone was on the same page, I asked Ms. Nokes and Mr. Henley to confirm that the investigation was, in fact, closed, and both responded "yes."

### *The Accusations Concerning My Friend's Death Are Horrid*

30. On Saturday, January 27, 2024, my close friend for more than a decade, Ben Jankowski, lost his battle with cancer. I was devastated by this loss, both for myself and for Mr. Jankowski's family.

31. Over the following days, I communicated with Ben's family and tried to participate in efforts to set up a fund in his memory. I also communicated with many people who knew Ben and with people who knew my relationship with him and had reached out to express their condolences. Some of those communications are reflected in my LinkedIn account. A true and correct copy of a printout of those communications is attached hereto as Exhibit B.

32. DraftKings' accusation that I falsely claimed to be mourning the death of my friend in late January is both wrong and disappointing.

33. The week of January 29, 2024 was particularly difficult for me emotionally.

34. In addition to grieving the death of my friend, I was contemplating an opportunity to make a significant advancement in my career by joining Fanatics VIP – an offer that I had decided that I wanted to accept, which meant an immediate move to California, uprooting my family. It was a big decision, though in some ways it was an easy decision to make, especially after discussing it with my wife. Adding to the complexity of that week, I had several meetings relating to my employment at DraftKings scheduled for that week (the week of January 29). However, given that I expected to join Fanatics VIP, to avoid hearing information about DraftKings while I had an offer pending from Fanatics, I purposely did not attend these meetings,

as I thought that was in DraftKings' and my best interests. So, I took some personal time away from work and responded to outreach from colleagues only when I believed they urgently needed my assistance.

35. To be clear: the time I took off to avoid creating any further issues with DraftKings was just over *three days*.

36. That was the time needed to allow me to move to California and negotiate the final terms of an offer from Fanatics VIP. Given that, I worked extremely hard during those few days to balance finalizing my negotiations and expected job change with making sure that I did my best to avoid causing any issues for DraftKings beyond what would naturally be caused by an employee leaving a company.

**III.   HISTORY WITH FANATICS**

37. My conversations concerning the opportunity to work for Fanatics VIP and my decision to do so did not begin until last month (January 2024), shortly before I accepted Fanatics VIP's offer on February 1, 2024. As stated above, I did not even have an offer to join Fanatics VIP or any of its affiliates until January 27, 2024 – after I met with Mr. Rubin in Pennsylvania. That offer was not finalized until February 1, 2024.

38. Prior to my January 27, 2024 discussion with Mr. Rubin, I had met him briefly only a few times. The first time I met Mr. Rubin was in 2023, in passing at a Super Bowl party. We had a cursory encounter that lasted no more than ten seconds and did not concern me working for Fanatics or any of its affiliates. I met Mr. Rubin for a second time at a party in April or May of 2023, where I reintroduced myself. That encounter was similarly brief and non-substantive. Several months later, I received a call from Mr. Rubin in which he asked me about coming to Fanatics. I told him that I was not interested. That was around the time that I was working to retain three people who had received offers from Fanatics, two of whom I solely and successfully

8

convinced to stay at DraftKings. I saw Mr. Rubin for a third time in November 2023 at two different Formula One events. These interactions were also brief, and we did not discuss any employment opportunities.

39. I did not discuss joining Fanatics or any of its affiliates with Mr. Rubin or anyone else during 2023. Nor have I *ever* encouraged any of my DraftKings colleagues to do so, or put any of my colleagues in touch with Fanatics' CEO or any other Fanatics executives.

40. Since my resignation from DraftKings, I have not conducted any outreach to DraftKings' customers or clients, and I have not solicited any DraftKings employees.

### *DraftKings' "Presumed" Interpretation of My Email is False*

41. DraftKings alleges that an email I sent on July 20, 2023 to my former colleague Robert Ferrara, "presumably" refers to Mr. Rubin and reflects me "encouraging members of [my] team to explore employment opportunities" with Fanatics. Compl. ¶ 93. That is false.

42. In that correspondence, I was providing Mr. Ferrara, who was leaving DraftKings, with an email script to send to a current customer. The script was to explain that *Mr. Ferrara*—not I—was leaving the industry, and to encourage the client to meet with "Mike"—*me, not Mr. Rubin*—so I could further develop the client relationship *for DraftKings*. The email says that the client had met "Mike"—again, me—at a Super Bowl party because I had met that client at a Super Bowl party.

43. This script was prepared by a team that included me, DraftKings' in-house lawyers, and DraftKings' Chief Customer Officer Shawn Henley. Outside counsel at Gibson Dunn – counsel for DraftKings in this matter – was also involved. For DraftKings and its counsel to now portray the script otherwise in this case is a shocking misrepresentation to the Court.

### IV. I DO NOT POSSESS AND HAVE NOT DISCLOSED DRAFTKINGS' INFORMATION OR PROPERTY

44. DraftKings alleges "on information and belief" that I "stole" confidential information and trade secrets. That accusation is false.

45. Prior to my resignation, on February 1, 2024, I undertook in good faith to ensure to the best of my ability that I was no longer in possession of any DraftKings property or confidential information:

- I gave my DraftKings-issued devices – two computers – and my personal phone to my counsel, and I purchased a new personal phone. I also returned my corporate credit card and a mifi device.

- I ceded access to my personal email and iCloud accounts to my counsel.

- I also segregated my personal information from any information I accumulated from my work at DraftKings, which I also gave to my counsel.

46. I informed DraftKings at the time of my resignation that I undertook this process.

47. The other day, I found an old laptop. I have not used or otherwise accessed this laptop in several months, and certainly not since my resignation from DraftKings. I do not know whether it belongs to DraftKings; it may or may not belong to DraftKings, and I have no reason to believe that it does. However, in an abundance of caution, I turned this additional laptop over to my counsel as well.

*Use of My Personal Phone Was Permitted
and Explains the False Accusations*

48.     The phone that I used for work while employed at DraftKings was not a device that DraftKings issued to me; it was my personal phone. DraftKings allowed the use of personal devices, including my personal phone. No DraftKings VIP employee has a company-issued phone.

49.     I regularly accessed DraftKings' documents on this phone while performing work for DraftKings, particularly when I was traveling.

50.     It is my understanding and belief that when DraftKings alleges that I downloaded or accessed documents on a "non-DraftKings device," *e.g.*, Compl. ¶ 67, that device was my personal phone. As noted above, I gave this phone to my counsel *prior to my resignation* from DraftKings.

51.     I no longer possess any DraftKings information that may have been on that phone.

*DraftKings' Accusations That I Took, Used,
or Disclosed Its Information Are False*

52.     I did not, before or after my departure from DraftKings, provide DraftKings' confidential information or any DraftKings documents to Fanatics or any of its affiliates, including Fanatics VIP.

53.     In other words, contrary to DraftKings' unsubstantiated fears and allegations, I did not give Fanatics or any of its affiliates, including Fanatics VIP, the opportunity to access, view, copy, or otherwise record DraftKings' information.

*DraftKings' Accusations That I Improperly
Accessed Its Information Are False*

54.     While employed at DraftKings, I had authorization to access various internal documents that related to my job responsibilities. I regularly accessed these documents to do my

11

job. I continued to perform my duties to DraftKings up until my resignation, therefore, I continued to access many of these documents in that capacity and only in that capacity.

55. The Complaint claims that I accessed four documents: (1) a "VIP Founders Club" PowerPoint presentation; (2) a "BD Team Tracker – Weekly Report;" (3) a "(Master) SB 2024" spreadsheet; and (4) a "BD_Gaming 101" presentation. These are each documents that I had access to during the normal course of my work at DraftKings. I did not access these documents to give them, or the information in them, to Fanatics or any of its affiliates, including Fanatics VIP or anyone else. I did not give these documents, or the information in them, to Fanatics or any of its affiliates, including Fanatics VIP, or anyone else. As of my resignation from DraftKings on February 1, I do not have access to, or any copies of, any of these documents.

56. I accessed the "VIP Founders Club" Presentation on January 23, 2024. I did so to prepare to onboard a new employee who was starting work at DraftKings during the following week. This new employee, Chika Chandrashekar, had been hired to work as a Vice President of Loyalty and E-Commerce at DraftKings, and I thought that the presentation would have relevant information for his onboarding. I did not disclose this presentation or the information in it to Fanatics or any of its affiliates, including Fanatics VIP or anyone else. Additionally, the information in it—consisting of outdated plans for a program that DraftKings never implemented—would not be of any competitive value to Fanatics or any of its affiliates, including Fanatics VIP.

57. I did not access the "VIP Founders Club" presentation to give it, or the information in it, to Fanatics or any of its affiliates, including Fanatics VIP, or anyone else. I did not give the "VIP Founders Club" presentation, or the information in it, to Fanatics or any of its affiliates, including Fanatics VIP. Rather, it was a presentation that I created that I thought might have some

helpful information to aid the new Vice President of Loyalty in his onboarding. As of my resignation from DraftKings on February 1, I do not have access to, or any copies of, the "VIP Founders Club" presentation.

58. As of January 23, when I accessed the "VIP Founders Club" presentation, I had not received an offer to join Fanatics VIP and had no reason to think that I would be leaving DraftKings any time soon. I do not believe that I accessed or downloaded the "BD Team Tracker – Weekly Report" on January 24, 2024 (or thereafter). This report is something I would have regularly reviewed in advance of weekly team calls for the non-casino business development meeting that I attended about once a month. It was my customary practice to review this report in advance of the team calls I planned to attend. Again, as of January 24, 2024, I had not received an offer to join Fanatics VIP and did not expect that I would be leaving DraftKings any time soon.

59. If I did access or download the "BD Team Tracker – Weekly Report," I did not do so to give it, or the information in it, to Fanatics or any of its affiliates, including Fanatics VIP, or anyone else. I did not give the "BD Team Tracker – Weekly Report," or the information in it, to Fanatics or any of its affiliates, including Fanatics VIP, or anyone else. As of my resignation from DraftKings on February 1, I do not have access to, or any copies of, the "BD Team Tracker – Weekly Report."

60. I accessed the "(Master) SB 2024" spreadsheet on January 30, 2024. I did so because a DraftKings employee named Brittany Goodman contacted me. Ms. Goodman worked on the DraftKings team that was running the upcoming Super Bowl events. She communicated to me that there were certain VIPs who had not yet been sent invitations to Super Bowl events DraftKings was hosting. I accessed the "(Master) SB 2024" spreadsheet to review the list of VIP customer names and direct Ms. Goodman and other DraftKings employees on which customers

still needed invitations and how to contact them. I did not access or download the "(Master) SB 2024" spreadsheet to give it, or the information in it, to Fanatics or any of its affiliates, including Fanatics VIP, or anyone else. I did not give the "(Master) SB 2024" spreadsheet, or the information in it, to Fanatics or any of its affiliates, including Fanatics VIP. As of my resignation from DraftKings on February 1, I do not have access to, or any copies of, the "(Master) SB 2024" spreadsheet.

61. I do not believe that I accessed or downloaded a "BD_Gaming 101" presentation on January 29 or 30. If I did access or download the ""BD_Gaming 101" presentation, I did not do so to give it, or the information in it, to Fanatics or any of its affiliates, including Fanatics VIP, or anyone else. I did not give the "BD_Gaming 101" presentation, or the information in it, to Fanatics or any of its affiliates, including Fanatics VIP, or anyone else. As of my resignation from DraftKings on February 1, I do not have access to, or any copies of, the "BD_Gaming 101" presentation.

## V.   DRAFTKINGS' NONCOMPETE AND NONSOLICIT AGREEMENTS

62. When I joined DraftKings in September 2020, I was required to sign a nonsolicitation agreement and a noncompete agreement as a condition of employment. To the best of my recollection, I signed these agreements with DraftKings while I was located at my then-home in New Jersey, at my work in New York, or otherwise remotely with DocuSign.

63. I was not independently represented by counsel at the time I signed any of the aforementioned agreements.

64. I did not negotiate any of these agreements, and it was my understanding that any attempt to do so would be a non-starter, resulting in termination and/or equity (a significant part of my compensation) not being granted.

## VI.    HARM FROM THE ENFORCEMENT OF THE AGREEMENTS

65. My new role at Fanatics VIP represents an important growth opportunity for me professionally and personally.

66. If DraftKings uses the noncompetition and nonsolicitation agreements to prohibit me from working for Fanatics VIP in California, I will not only effectively be entirely prohibited from working in my chosen field and from working for a company for which I wish to work, but I will lose a unique opportunity to significantly advance my career.  This will impact me, my wife and children, and the plans for our future.

67. In addition, being forced to sit out of my industry during the pendency of litigation will cause me significant harm in professional growth, opportunities, and contacts that I have personally developed over decades.

68. It would be extremely burdensome in time and cost, and highly inconvenient, if I were forced to defend against an action brought against me by my former employer in Massachusetts—particularly when I have never lived or worked in Massachusetts, and now live and work in California, where my wife and daughters will also be living after the end of the current school year.

69. In contrast, I do not believe that my working for Fanatics VIP would irreparably harm DraftKings.  I am fully able to perform my work for Fanatics VIP without causing any harm to DraftKings beyond that which would naturally arise from ordinary competition.

I declare under penalty of perjury that the foregoing is true and correct.

Executed February  7 , 2024.

By: _____
       Michael Z. Hermalyn

## CERTIFICATE OF SERVICE

I hereby certify that a true copy of the above document was served on Plaintiff's counsel on the date below via email and will be filed through the ECF System and sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF).

Dated:  February 7, 2024

/s/   *Russell Beck*