**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**

DRAFTKINGS INC.,

          Plaintiff,

    v.

MICHAEL HERMALYN,

          Defendant.

Civil Action No. 1:24-cv-10299-JEK

**MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANT'S MOTION FOR
CLARIFICATION AND REFINEMENT**

Plaintiff DraftKings Inc. ("DraftKings") respectfully submits this Opposition to Defendant Michael Hermalyn's ("Hermalyn") Motion for Clarification and Refinement (ECF 48, the "Motion") and related memorandum of law (ECF 49, the "MOL"), which seek to modify the terms of this Court's February 8, 2024 Temporary Restraining Order (ECF 44, the "Order").

**INTRODUCTION**

The Order is crystal clear, does not require any "clarification," and should not be modified. The Court judiciously crafted the Order to maintain the status quo and ensure DraftKings is not irreparably harmed by Hermalyn's theft of its trade secrets and confidential information. Now, under the auspices of "clarification and refinement," Hermalyn actually requests that the Court reconsider its prior ruling. But there is no reason for the Court to do so.

In fact, the need to maintain the status quo, and not modify the Order, is all the more urgent today in light of disturbing forensic evidence recently uncovered by DraftKings. As described in more detail below, in the days before his departure, Hermalyn sent nearly one dozen highly-

1

sensitive documents containing DraftKings most highly confidential and proprietary business information—including contact information for business partners and summaries of VIP program details—to his own Slack account, which he subsequently accessed, viewed, or downloaded. Plain and simple, this is further evidence of his pre-departure theft of trade secrets and other confidential information, and magnifies the risk of irreparable harm here.

Before issuing the Order, the Court concluded DraftKings is likely to succeed on its claim that Hermalyn stole its trade secrets and confidential information to use in his new competitive role at Fanatics Inc. ("Fanatics"). *See* ECF 46 ("Hearing Tr.") at 55:16-56:6. The Court also recognized Hermalyn and Fanatics could, absent a temporary restraining order, readily exploit DraftKings' trade secrets and confidential information to irreparably harm DraftKings' relationships with its current and prospective customers, clients, vendors, and partners. Hearing Tr. at 51:20-21; 55:17-22; 56:2-56:6. Indeed, because Hermalyn stole vendor and partner lists and contact information, vendor and partner contract terms and negotiation statuses, marketing pitch materials for potential vendor and partnership engagements, as well as VIP customer information and loyalty program details (*see* ECF 1 ("Compl.") ¶¶ 27, 60-63, 67-74, 84-87; ECF 5 ¶¶ 14-15, 17, 21-30), the Order rightfully recognizes Hermalyn must be restricted with respect to DraftKings' current and prospective customers, clients, vendors, and partners.

The scope of the Order is identical to the restrictions contained in DraftKings' proposed order and the contract to which Hermalyn voluntarily agreed. *Compare* Order ¶ (d) *with* ECF 3-1 ¶ (d) *and* ECF 1-1 (the "Confidentiality Agreement") § 2. And that scope has been abundantly clear since the Court's ruling at the February 8 hearing. No clarification was necessary then, nor is any required now, in particular under the guise of an "emergency." In fact, after the Court issued the Order on the record, Hermalyn's counsel requested that the Order remain in effect for two

weeks <u>longer</u> than the Court initially proposed, citing February vacation and counsel's birthday. *Id*. at 59:9-63:9.

The need to ensure Hermalyn is restricted from unfairly competing with DraftKings and exploiting the confidential information he stole has only become more acute since the hearing. Among other things, DraftKings has uncovered additional evidence of Hermalyn's misappropriation, he has failed to return all of DraftKings' trade secrets and confidential information, and he has actively sought to overturn the Order through a collateral attack in California state court.

**Recently Discovered Evidence**.  DraftKings just recently uncovered disturbing evidence of misappropriation, on top of the evidence DraftKings included in its verified complaint. Specifically, after business hours, at 8:26 p.m. ET on January 16—and just five days after Hermalyn admittedly spoke with Fanatics CEO Michael Rubin about a job leading Fanatics' VIP team (ECF 36 ¶¶ 12-13)—Hermalyn sent his own account nearly a dozen documents containing DraftKings' trade secrets and confidential information through DraftKings' internal "Slack" messaging channel.  *See* Affidavit of Brian Harris dated February 20, 2024 ("Harris Aff." attached as Exhibit A), ¶ 4.  Hermalyn sent to his own Slack account, and subsequently accessed, viewed, and/or downloaded, an excel spreadsheet entitled "MZH_ExecView.xlsx," which contains a list of over 100 of DraftKings' most important corporate business partners, the contact information of more than 500 individuals of then-current partners and other prospective partners, as well as the details of partner contracts and engagements.  *Id*. ¶ 5.  Hermalyn also sent to his own Slack account documents containing confidential information about: (i) DraftKings' performance incentive plan; (ii) the financial performance of DraftKings' VIP program; and (iii) DraftKings' branded merchandise, among other highly-sensitive information.  *Id*.  Hermalyn had access to Slack on his

personal devices, and could have downloaded certain of these confidential DraftKings documents onto a personal device.  *Id*. ¶ 4.  These are precisely the type of customer, client, vendor, and partner-oriented documents that could be readily exploited by Hermalyn to irreparably harm DraftKings.  Compl. ¶ 27; ECF 5 ¶¶ 14-15, 17.

Approximately fifteen minutes after sending these materials to himself, at 8:43 p.m. ET, Hermalyn conducted a Google search on his DraftKings laptop for "move big files."  Harris Aff. ¶ 7.  He then visited a website called "Transfernow.net"—an online platform designed specifically for transferring large files and data.  *Id*. ¶ 7.  This troubling conduct is consistent with Hermalyn's behavior earlier in the day on January 16, when he visited "Dropbox.com" on his DraftKings laptop—another online platform designed for transferring large files and data.  *Id*. ¶ 8.  DraftKings specifically prohibited Hermalyn from using a personal Dropbox or similar file-sharing platforms on his DraftKings laptop  *Id*. ¶ 9.  This pattern of activity all but confirms that Hermalyn engaged in misappropriation of DraftKings' trade secrets and confidential information relating to its current or prospective customers, clients, vendors, and partners.

**Hermalyn Has Failed to Return DraftKings' Confidential Information in Contravention of this Court's Order**.  In addition, Hermalyn has failed to comply with the Order, which expressly requires him to return to DraftKings all of its trade secrets and confidential information by February 12.  Order ¶ (f).  As a senior executive with DraftKings, Hermalyn regularly accessed its most sensitive information, including: (i) comprehensive VIP player lists containing information critical to forging personal connections with VIP players; (ii) research and development concerning player promotions and incentives; (iii) points of contact with critical vendors and business partners; and (iv) employee lists, compensation information, and performance reviews and metrics.  Compl. ¶ 27.  Hermalyn admits he "regularly accessed

4

DraftKings' documents" on his personal phone," ECF 36 ¶¶ 48-49, and affirmed he provided his personal devices and accounts to counsel prior to his resignation to ensure he "was no longer in possession of any DraftKings property or confidential information." *Id*. ¶ 45. But the sum total of material he returned to DraftKings is the partial contact information for certain DraftKings employees and a mere eleven DraftKings customers. *See* Letter from H. Mufson to R. Beck dated February 15, 2024 ("Deficiency Letter," attached as Exhibit B) at 1-2. To date, Hermalyn failed to return any of the trade secrets and confidential information that DraftKings knows he surreptitiously and unlawfully downloaded to his personal devices or any other DraftKings' material residing on his personal phone. Compl. ¶¶ 59-63, 67-74. In fact, Hermalyn admits in his sworn certification he has retained DraftKings' business contacts and documents in contravention of the Order. *See* Cert. of Def. Michael Z. Hermalyn of Compliance with Court Order ("Hermalyn Certification," attached as Exhibit C) ¶¶ 4-5.

**Hermalyn's Efforts to Overturn this Court's Order**. In addition to defying the Order, and before he filed the instant Motion, Hermalyn first sought to overturn this Court's well-reasoned Order in a California state court. On February 13, Hermalyn filed an *ex parte* application for a temporary restraining order in California state court, on the basis that "a federal district court in Massachusetts has issued a far-reaching TRO preventing [me] from doing any business with current or prospective clients and partners of DraftKings." Pl. Hermalyn's *Ex Parte* Appl. for (1) A TRO & (2) An Order to Show Cause Re Preliminary Injunction; Mem. of Points & Authorities in Support Thereof ("Hermalyn California Brief," attached as Exhibit D) at 11. Hermalyn sought, among other things, an order to restrain and enjoin DraftKings from "attempting to enforce a contract [with Hermalyn] that is void [under California law], regardless of whether the contract

was signed and the employment was maintained outside of California."[1]  *Id*. at 3.  But this Court has ruled underline twice that Massachusetts law governs the restrictive covenants in Hermalyn's contracts with DraftKings.  *See* ECF 29; Hearing Tr. at 53:15-55:15.  Nevertheless, Hermalyn has requested a contrary ruling from a California state court that "California law applies" to his restrictive covenants and "that these covenants are void," hoping that the state court can "influence" this Court to reverse itself.  Hermalyn California Brief at 11-12 (internal quotes omitted).[2]

The Motion, styled as one for "clarification and refinement," is nothing more than Hermalyn's latest attempt to reverse the Order through what amounts to an improper motion for reconsideration.  Hermalyn has not pointed to a change in the law or any newly discovered evidence.  Nor has Hermalyn shown that the Order is the result of a "manifest error of law" or "clearly unjust," as is his burden on a motion for reconsideration.  There is simply no basis for clarification, refinement, or reconsideration.

There is nothing confusing about the Order.  Hermalyn understands the Order, he just does not like or want to follow it.  Hermalyn discussed the Order in a sworn statement in the California state court.  *See* Declaration of Michael Z. Hermalyn ISO *Ex Parte* Application for (1) A Temporary Restraining Order and (2) An Order to Show Cause Regarding Preliminary Injunction ("Hermalyn California Decl.," attached as Exhibit E), ¶ 22.  This declaration makes abundantly

---

[1] Prior to issuing the Order, the Court correctly observed that adopting Hermalyn's argument and ignoring his contractual choice of law provision would provide a "massive incentive for employees all over the country to move to California, in breach of noncompetition and nonsolicitation agreements that are otherwise enforceable in every other state across the country."  Hearing Tr. at 37:5-9.

[2] The California state court removed Hermalyn's *ex parte* hearing from its calendar for procedural reasons and Hermalyn has not re-noticed a hearing date.

clear that Hermalyn is having difficulty performing his job at Fanatics without the ability to access

and use DraftKings' trade secrets and confidential information.  Hermalyn specifically avers that:

> DraftKings has obtained a temporary restraining order from the
> Massachusetts federal court that prevents me from doing business
> with any current [or prospective] DraftKings customer, client,
> vendor, or partner about which I learned confidential information or
> which I had any business involvement or knowledge . . . .  ***The effect
> of this restriction on my ability to do my job at Fanatics is severe***.
> Building and maintaining relationships with customers and partners
> is at the core of my job responsibilities as the head of Fanatics' VIP
> business.   Each day that I cannot build and maintain such
> relationships magnifies the harm of this restriction and threatens to
> further ***damage my reputation and my utility to Fanatics***.
>
> Absent a temporary restraining order, my professional growth and
> work-related opportunities will be jeopardized.

*Id*. ¶¶ 22-23 (emphasis added).  This cannot be over-emphasized: Hermalyn admits in a sworn

declaration that his inability to access and use DraftKings' trade secrets and confidential

information severely inhibits his ability to perform his job at Fanatics.

Hermalyn had no issue understanding the scope of the Order when he made that sworn

statement.  Hermalyn's attempt to overturn the Order and his clear failure to comply with it

underscore the necessity to maintain the status quo and ensure he does not unfairly compete with

DraftKings until a more complete record regarding Hermalyn's theft and deceit is before the Court

on DraftKings' motion for a preliminary injunction.

The series of new arguments Hermalyn advances for the first time are improper on a motion

for reconsideration.  But even if this Court were to consider them, each is meritless.  Hermalyn

says the Order imposes a "backdoor" noncompete on him.  That is incorrect: he remains gainfully

employed by Fanatics and free to solicit and transact business with non-DraftKings' business

contacts so long as he does not use DraftKing's trade secrets and confidential information.  He

miscites Massachusetts law because courts readily enforce restrictions on transacting business with

individuals and entities regardless of whether there has been any active solicitation.  And he ignores the irreparable harm DraftKings would suffer as a result of his theft of its trade secrets and confidential information if he were permitted to transact business with DraftKings customers and business partners regardless of whether they had a pre-existing relationship with Fanatics.  Finally, Hermalyn's claim that it is impossible for him to identify the business contacts covered by the Order is disingenuous at best because the Order makes clear that it covers only those contacts about which he learned confidential information or which he had some involvement or knowledge while employed by DraftKings.  For all of these reasons, the Motion should be denied.

**PROCEDURAL BACKGROUND**

This case arises out of Hermalyn's misappropriation of DraftKings' trade secrets and confidential information on the eve of his resignation to join a direct competitor—Fanatics—in violation of his contractual obligations.  *See generally* Compl.  DraftKings filed its complaint against Hermalyn on February 5, asserting eight causes of action, including: (i) breach of contractual confidentiality restrictions; (ii) breach of contractual employee non-solicitation restrictions; (iii) breach of contractual non-competition restrictions; (iv) misappropriation of trade secrets under the DTSA; (v) misappropriation of trade secrets under the MUTSA; (vi) misappropriation of confidential business information; (vii) breach of duty of loyalty; and (viii) conversion.  *Id*. ¶¶ 105-173.

DraftKings also filed a motion for entry of a temporary restraining order enjoining Hermalyn from: (i) using or disclosing DraftKings' trade secrets and confidential information; (ii) soliciting or transacting business with DraftKings customers, clients, vendors, and partners about which he learned confidential information or which he had some involvement or knowledge while employed by DraftKings; (iii) soliciting or hiring DraftKings employees; and (iv) providing

8

competitive services to Fanatics.  *See* ECF 3, 3-1.  In its submissions to this Court—including a sworn affidavit and verified complaint—DraftKings explained in great detail how the trade secrets and confidential information that Hermalyn has misappropriated could be exploited on behalf of Fanatics to irreparably harm DraftKings' commercial relationships with its current and prospective customers, clients, vendors, and partners.  *See* Compl. ¶¶ 27, 60-63, 67-74, 84-87; ECF 4 at 18-19; ECF 5 ¶¶ 14-15, 17, 21-30.

During the February 8 hearing on DraftKings' request for a temporary restraining order, the Court granted DraftKings' motion and issued a temporary restraining order "to preserve the status quo until more of the facts can be determined and the parties can have a full opportunity for briefing DraftKings' forthcoming preliminary injunction motion."  Hearing Tr. at 51:7-12.  The Court ruled that Hermalyn's "possible misappropriation of trade secrets—here DraftKings business partner lists, VIP list, and business plans, ahead of a major revenue generating event, the Super Bowl—threatens irreparable harm to DraftKings."  *Id*. at 56:2-56:6.  However, the Court explained that "I am not convinced that DraftKings will suffer irreparable harm if Mr. Hermalyn continues to work for Fanatics pending a more fulsome consideration of DraftKings' claims on a preliminary injunction motion."  *Id*. at 56:7-11.  The Court ruled that "***[t]he other provisions of the proposed temporary restraining order, in my view, adequately protect DraftKings from loss of its trade secrets and confidential information***."  *Id*. at 56:11-14 (emphasis added).  The Court also made clear that it was leaving open the possibility of enjoining Hermalyn from working for Fanatics in the near future, observing that "[t]here is precedent for enjoining a new employee from working for an employer when the court finds a likelihood of success on the merits of a breach of noncompetition agreement, and I intend to consider whether DraftKings has met its burden to obtain that form of relief at the preliminary injunction phase of this case."  *Id*. at 56:20-56:25.  The

Court concluded by holding that "[i]n all other respects, however, I'll enter the order to restrain Mr. Hermalyn from making any use of DraftKings' confidential information and trade secrets, as well as from soliciting DraftKings' clients and employees. And it will stay in effect until resolution of the preliminary injunction motion." *Id*. at 57:3-8. That same day, the Court adopted the language in the proposed temporary restraining order DraftKings filed on February 5, striking only paragraph (c) (which would have barred Hermalyn from working at Fanatics entirely).

The Court proposed a two-week discovery period followed by a preliminary injunction hearing, to which DraftKings agreed. Hearing Tr. at 59:9-19. Hermalyn requested four weeks of discovery to account for February vacation and counsel's birthday. *Id*. at 60:9-14. In response, the Court explained that, "my interest in moving this along quickly is that this order is restraining Mr. Hermalyn," and that his proposed discovery schedule would be "pushing us into six weeks" until the Order could potentially be adjusted at the preliminary injunction hearing. *Id*. at 60:15-20. Hermalyn confirmed he wanted the Order to remain in place longer—until the preliminary injunction hearing on April 2, 2024, *id*. at 60:22-63:9, creating and extending the very "emergency" about which he now complains.

Now, Hermalyn seeks to significantly water-down critical protections in the Order—via a motion for reconsideration dressed up as a motion for "clarification and refinement"—so that he can transact business with the same DraftKings' business contacts about which he learned confidential information or which he had some involvement or knowledge while employed by DraftKings. *See generally* MOL. Because Hermalyn's motion is a request for reconsideration in disguise—the elements for which he cannot meet—it should be denied.

**ARGUMENT**

**I.      Hermalyn's Motion Improperly Seeks Reconsideration of the Order.**

Hermalyn's motion for "clarification and refinement" should be denied outright as an improper request for reconsideration by another name—one that does not address, let alone satisfy, any of the requirements for such extraordinary relief.

A.      Hermalyn Requests Reconsideration, Not "Clarification and Refinement"

Hermalyn asks the Court to reconsider and revise its Order by: (i) removing the phrases "transacting business," "transact business with," "vendor or partners," and "prospective customers, clients, vendors, or partners" from paragraph (d); and (ii) inserting language permitting him to respond to outreach from such business contacts.  *See* MOL at 3-8.  Hermalyn objects to these terms—not because he does not understand them and needs "clarification"—but because he *does* understand them and dislikes the restrictions they place upon him.  The terms come directly from his Confidentiality Agreement with DraftKings, which he understood and to which he agreed. *Compare* Order ¶ (d) *with* Confidentiality Agreement § 2.  And he had no problem summarizing the clear scope of the Order in his California state court action, stating under oath that "[t]he effect of this restriction on my ability to do my job at Fanatics is severe."  Hermalyn California Decl. ¶ 22.

Courts regularly reject Hermalyn's precise type of procedural sophistry—*i.e.*, mischaracterizing a motion for reconsideration as a motion for "clarification"—when there is nothing unclear about a court's order and the moving party simply disagrees with it.  *See, e.g.*, *Barbaro v. United States on Behalf of Fed. Bureau of Prisons*, 2007 WL 9805534, at *1 (D. Mass. May 23, 2007) ("The court thus construes plaintiff's motion [for clarification] as a Motion for Reconsideration."); *Ebert v. Twp. of Hamilton*, 2018 WL 4961467, at *2 (D.N.J. Oct. 15, 2018)

("Courts commonly construe motions for clarification as motions for reconsideration."); *Vogelsberg v. Kim*, 2020 WL 8665293, at *1 (W.D. Wis. Dec. 7, 2020) (construing motion for clarification as motion for reconsideration because movant was "challenging [the court's] reasoning, not expressing confusion about the meaning or scope of the order").

For example, in *Ebert*, the court rejected the plaintiffs' styling of their motion as one for clarification because they did "not seek clarification regarding something ambiguous or vague." 2018 WL 4961467, at *4 (internal quotes and citations omitted).  Rather, the court observed, "Plaintiffs use[d] the guise of a motion for clarification to identify specific portions of and essentially disagree with the Court's Opinion and Order."  *Id*. at *3.  Because the Plaintiffs sought "modification, akin to alteration or amendment which contravenes the purpose of a motion for clarification," the court denied the motion.  *Id*. at *4 (internal quotes omitted).

Just as in *Ebert*, Hermalyn does not actually seek "clarification of something ambiguous or vague."  *Id*. at *4.  The terms Hermalyn seeks to "clarify" are derived from the Confidentiality Agreement he signed and are clear and straightforward.  "Transacting business" and "transact business with" have a well-established definition.  *See Transact*, BLACK'S LAW DICTIONARY (11th Ed. 2019) ("To carry on or conduct (negotiations, business, etc.) to a conclusion.").  The meaning of "vendors and partners" is similarly obvious, and the Complaint provides additional guidance by defining "business partners" as "teams, leagues, casinos, athletes, celebrities, influencers, vendors, and corporate officers and directors . . . that are essential to the advancement of DraftKings' marketing strategy."  Compl. ¶ 27.  The Order also closely tethers the meaning of "prospective" business contacts to *only* those individuals and entities "about which Mr. Hermalyn learned confidential information or which Mr. Hermalyn had some involvement or knowledge" while employed by DraftKings.  Order ¶ (d).  The Court should reject Hermalyn's mischaracterization

of the Motion.  *See Ebert*, 2018 WL 4961467, at \*4.[3]

B.      Hermalyn Cannot Meet The Requirements For Reconsideration

Properly characterized, Hermalyn's request for reconsideration seeks an "extraordinary remed[y]," *BRT Mgmt., LLC v. Malden Storage, LLC*, 2024 WL 421988, at \*1 (D. Mass. Feb. 5, 2024), "appropriate only in a limited number of circumstances: if the moving party presents newly discovered evidence, if there has been an intervening change in the law, or if the movant can demonstrate that the original decision was based on a manifest error of law or was clearly unjust." *Thorpe v. Excel Inc.*, 2023 WL 6466370, at \*1 (D. Mass. Oct. 4, 2023) (quoting *United States v. Allen*, 573 F. 3d 42, 53 (1st Cir. 2009)).  Hermalyn cannot meet any of these requirements.

Hermalyn presents no newly discovered evidence or intervening change in the law in the week since the Court's Order.  Nor does he argue that the scope of the Order's restrictions is "based on a manifest error of law or was clearly unjust."  *See Thorpe*, 2023 WL 6466370, at \*1.  Rather, he simply regurgitates one argument from his original opposition to Plaintiff's motion for a temporary restraining order that "[t]he Non-Solicit is . . . impermissibly broad because it prohibits Hermalyn from transacting <u>any</u> business with customers . . . even if he did not solicit them and they independently choose to work with him."  ECF 33 at 13 n.9 (emphasis in original).  Even though the Court considered and rejected this argument by entering the Order, Hermalyn rehashes his objection that the Order "prevent[s] Hermalyn from working or interacting with *any* of DraftKings' customers, clients, vendors, or partners in his new role at Fanatics, ***even if*** Hermalyn

---

[3] The case Hermalyn cites, *KPM Analytics N. Am. Corp. v. Blue Sun Sci., LLC*, 578 F. Supp. 3d 101 (D. Mass. 2021), is entirely distinct, as the non-solicitation preliminary injunction at issue contained genuine ambiguity concerning the definition of "party," and the plaintiff's broader interpretation of the term extended to entities with "no prior connection to the defendants."  *Id.* at 105.  Here, no such ambiguity exists and Hermalyn's restrictions are limited to those business contacts about which he learned confidential information or which he had some involvement or knowledge while employed by DraftKings.  *See* Order ¶ (d).

took no part in soliciting or bringing them over to Fanatics."  MOL at 4 (emphasis in original).

But "a motion for reconsideration is not a vehicle for giving an unhappy litigant an additional

chance to sway the judge, nor is it intended to allow a party to make arguments already presented

to, and rejected by, the court."  *Antony v. Duty Free Americas, Inc.*, 705 F. Supp. 2d 112, 115 (D.

Mass. 2010) (internal quotes omitted).

Hermalyn also argues, for the first time, that the Order should not apply to: (i) DraftKings'

business contacts who are also Fanatics' business contacts; (ii) "internal services" at Fanatics; (iii)

DraftKings' vendors or partners; or (iv) certain of DraftKings' prospective business contacts.  *See*

MOL at 5-8.  But the law is clear that Hermalyn may not raise new arguments for the first time in

his motion for reconsideration.  *See, e.g.*, *Caribbean Mgmt. Grp., Inc. v. Erikon LLC*, 966 F.3d 35,

45 (1st Cir. 2020) (holding that "a party may not advance new arguments [in a motion for

reconsideration] when such arguments could and should have been advanced at an earlier stage of

the litigation."); *Cochran v. Quest Software, Inc.*, 328 F.3d 1, 11 (1st Cir. 2003) ("It is generally

accepted that a party may not, on a motion for reconsideration, advance a new argument that could

(and should) have been presented prior to the district court's original ruling.").  Because Hermalyn

has not satisfied the heavy burden for reconsideration, the Motion should be denied.

**II.     Hermalyn's Motion Lacks Merit.**

In addition to mischaracterizing the nature of his motion, failing to meet the operative

requirements for reconsideration, and raising arguments that have already been waived,

Hermalyn's substantive arguments for amending the Order fail on their own merits.

**A.     The Order Appropriately Maintains The Status Quo**

The Court was perfectly clear during the February 8 hearing that its goal in granting the

Order was "primarily to preserve the status quo until more of the facts can be determined."  Hearing

Tr. at 51:9-10.  The Court decided that the status quo as of February 8 was for Hermalyn to remain employed by Fanatics—earning a living—and "oversee[ing] and administer[ing] the operations of the Los Angeles office (which houses employees from multiple Fanatics businesses) and oversee[ing] the planned consolidation of Fanatics' multiple Los Angeles-area offices into a single location."  ECF 36 ¶ 20.  The Court also decided that the status quo was for Hermalyn to honor his restrictive covenant obligations in the Confidentiality Agreement by not soliciting or transacting business with DraftKings' current and prospective customers, clients, vendors, and partners about which he learned confidential information or which he had some involvement or knowledge while employed by DraftKings, and not using or disclosing DraftKings' trade secrets and confidential information.

Hermalyn's proposed amendments to the Order would upend that status quo and open the door to unfair competition causing DraftKings irreparable harm.  He seeks permission to transact business on behalf of Fanatics with the same current and prospective DraftKings' business contacts about which he learned confidential information or which he had some involvement or knowledge while employed by DraftKings, *even though he remains in possession of the DraftKings' trade secrets and confidential information that he misappropriated*.  But this has never been, nor should it become, the status quo.  In other words, Hermalyn's proposed amendments contravene the Court's primary goal in granting the Order in the first place, *i.e.*, preservation of the status quo.

B.    The Current Language Of The Order Is Essential To Protect DraftKings from Irreparable Harm

The Court has already found that Hermalyn's possible misappropriation of DraftKings' trade secrets and confidential information poses a threat of irreparable harm.  Hearing Tr. 56:2-56:6.  The Order thus reflects the Court's well-reasoned judgment that Hermalyn must be subject to additional guardrails—beyond merely prohibiting the use and disclosure of DraftKings' trade

secrets and confidential information—to ensure he does not irreparably harm DraftKings. *Id.* at 56:11-14 (permitting Hermalyn to work for Fanatics because "[t]he other provisions of the proposed temporary restraining order . . . adequately protect DraftKings from loss of its trade secrets and confidential information"); 57:3-8 ("In all other respects, however, I'll enter the order to restrain Mr. Hermalyn from making any use of DraftKings' confidential information and trade secrets, as well as from soliciting DraftKings' clients and employees.").

Those guardrails are more important today than they were when the Court entered the Order. Since the hearing, DraftKings has uncovered Hermalyn's pattern of activity reflecting an even more troubling and extensive campaign of misappropriation. *See* Harris Aff. ¶¶ 4-9. Hermalyn has also repeatedly demonstrated his determination to invalidate and escape the Order, as well as his restrictive covenants, to unfairly compete with DraftKings. He continues to pursue his California state court action seeking to void—under California law—the very restrictive covenants that the Order enforced. *See* Hermalyn California Brief. And he has retained DraftKings' trade secrets and confidential information despite the Order requiring him to return all such material. *See* Deficiency Letter at 1-2; Hermalyn Certification ¶¶ 4-5. On this record, it is no surprise that Hermalyn seeks change to the Order so he can escape his contractual obligations and transact business with DraftKings' business contacts, all to DraftKings' irreparable detriment. But now is not the time to release Hermalyn from the Order's restrictions. His continued attempts to escape his commitments and inflict irreparable harm on DraftKings should be denied.

C.    Hermalyn's New Arguments Are Meritless

Finally, even if the Court were to consider Hermalyn's new arguments on reconsideration, *see supra* Section I(B), they are meritless:

*First*, Hermalyn repeatedly says the terms "transacting business," "transact business with,"

16

"vendors or partners," and "prospective customers, clients, vendors, or partners" in paragraph (d) of the Order amount to a "backdoor" noncompete. *See* MOL at 3-8. This makes no sense. The Order permits Hermalyn to remain employed by Fanatics, solicit and transact business with non-DraftKings business contacts, and oversee and administer the operations of Fanatics' Los Angeles office. *See supra* Section II(A). Non-competes prohibit such plainly competitive activities.

*Second*, Hermalyn says a restriction that prohibits him from responding to or transacting business with a customer he did not affirmatively solicit is unenforceable in Massachusetts. MOL at 4-5. But Massachusetts courts will enforce restrictive covenants that prohibit a former employee from transacting business with their former employer's business contacts, regardless of whether the former employee actively solicited the contact. *See, e.g.*, *Davey v. Acklie Grp.*, 2004 WL 856636, at *6 (Mass. Super. Mar. 12, 2004) ("[T]he agreement itself prohibits soliciting directly or indirectly or doing business of a transportation nature with DLS's customers. It made no difference under the agreement who solicited whom."); *NuVasive, Inc. v. Day*, 2021 WL 1087982, at *8 (D. Mass. Feb. 18, 2021) ("Serving as the primary contact for BIDMC, a client that Day worked with during his employment at NuVasive . . . is a violation of his non-solicitation agreement."). Indeed, the Massachusetts Noncompetition Agreement Act specifically states that its new requirements do *not* apply to "covenants not to solicit or transact business with customers, clients, or vendors of the employer." Mass. Gen. Laws ch. 149, § 24L. If "transacting business" restrictions were unenforceable in Massachusetts, then there would be no reason for this carveout in the statute.

Hermalyn's reliance on *Townsend Oil Co., Inc. v. Tuccinardi*, 2020 WL 958520 (Mass. Super. Jan. 16, 2020) is misplaced. The contractual provision at issue in that case stated only that the employee "may not solicit or attempt to solicit, directly or indirectly, any client or customer,"

*id*. at *1 (internal quotes omitted), whereas the Order and Confidentiality Agreement both state that Hermalyn may not "transact business" with certain DraftKings' business contacts. As a result, the holding in *Tuccinardi* is predicated on what constitutes prohibited conduct under narrower contractual language and has no bearing on the enforceability of different and broader language in the Order and Confidentiality Agreement under Massachusetts law.

*Third*, Hermalyn says it would be unfair to prohibit him from transacting business with current Fanatics business contacts who fall within the scope of the Order because DraftKings does not have exclusive relationships with them. MOL at 5. But to start, Hermalyn presents no evidence supporting his non-exclusivity assertion. *See Morrissey v. Massachusetts*, 2022 WL 1463051, at *9 (D. Mass. May 9, 2022) (refusing to accept "an unsupported statement in the defendants' brief" in the absence of "an affidavit to support the brief's contentions"). But even if he had, DraftKings' business contacts' purported pre-existing affiliation with Fanatics does not diminish the risk of irreparable harm to DraftKings if Hermalyn uses its trade secrets or confidential information to solidify or enhance that affiliation.

*Fourth*, Hermalyn says he may be restricted from providing "internal services at Fanatics with respect to DraftKings' customers, clients, vendors, or partners." MOL at 5. But that is because the confidential documents Hermalyn misappropriated concern strategies for the development of partnership relationships and VIP customer programs—*precisely* the sort of information that Hermalyn could exploit by performing "internal services at Fanatics" to indirectly solicit and transact business with DraftKings' business contacts and cause DraftKings irreparable harm. *See* Compl. ¶¶ 27, 60-63, 67-74, 84-87; ECF 4 at 18-19; ECF 5 ¶¶ 14-15, 17, 21-30.

*Fifth*, Hermalyn says he should be permitted to solicit and transact business with DraftKings' "vendors or partners" because DraftKings supposedly "made no evidentiary showing"

that such restrictions are "necessary to prevent irreparable harm."  MOL at 7.  But DraftKings clearly demonstrated the essential role played by partners (which includes vendors) to advancing its marketing strategy and building its brand, as well as how several of the documents Hermalyn misappropriated could be exploited to irreparably harm DraftKings' relationships with such partners.  *See* Compl. ¶¶ 27, 62-63, 67-74, 84-87; ECF 4 at 18-19; ECF 5 ¶¶ 14-15, 21-23, 26-30. The Court accepted this showing, ruling that Hermalyn's "possible misappropriation of trade secrets—here DraftKings **business partner lists** . . . threatens irreparable harm to DraftKings." Hearing Tr. 56:2-6 (emphasis added).  DraftKings has established, and the Court has agreed, that its "vendors [and] partners" are just as fertile ground for irreparable harm as its customers.

*Sixth*, Hermalyn makes a series of arguments claiming that he is unaware of the business contacts that are subject to the Order's restrictions.  MOL at 7-8.  But this argument only makes sense if one ignores the actual language of the restriction.  The Order's restrictions are limited to those DraftKings' business contacts "about which Mr. Hermalyn learned confidential information or which Mr. Hermalyn had some involvement or knowledge" while employed by DraftKings. Order ¶ (d).  Hermalyn necessarily must know about the individuals and entities subject to the Order's restrictions in order for them to actually be restricted.

*And finally*, Hermalyn asks that the term "prospective" in the Order apply only to DraftKings' clients and customers "that DraftKings is actively pursuing as a potential client or customer and that Hermalyn worked with or had confidential information about during the six months prior to February 1, 2024."  MOL at 8.  In support of this request, he cites *Robert Half Int'l, Inc. v. Simon*, 2020 WL 1218988 (Mass. Super. Jan 29, 2020) for the proposition that an employer has "no legitimate interest in protecting goodwill as to clients and prospective clients that defendant did not support while working for plaintiffs."  *Id*. at 7.  Hermalyn's argument, and

reliance upon *Robert Half*, is confusing to say the least because the Order is *already* limited to business contacts "about which Mr. Hermalyn learned confidential information or which Mr. Hermalyn had some involvement or knowledge" while employed by DraftKings.  Order ¶ (d). Hermalyn's requested insertion of the words "actively pursuing"—which do not appear in the Confidentiality Agreement and which are far more vague and ambiguous than any terms in the Order—would essentially require DraftKings to disclose its current prospecting activities to Hermalyn while he is employed by a direct competitor, thereby ceding a competitive advantage while ironically attempting to secure protection for such prospects.  And Hermalyn provides no explanation or authority to support the six-month lookback period, which also does not appear in the Confidentiality Agreement and which he appears to have invented out of whole cloth.

In short, none of Hermalyn's unfounded critiques comes close to demonstrating the Order was made in "manifest error of law" or would be "clearly unjust," *see Thorpe*, 2023 WL 6466370, at *1, to support reconsideration.

## CONCLUSION

For the reasons above and in DraftKings' Verified Complaint and Memorandum In Support of its Motion for Temporary Restraining Order, the Court should deny the Motion.

Dated: February 20, 2024

Respectfully submitted,

/s/  Andrew S. Dulberg
William F. Lee (BBO #291960)
Andrew S. Dulberg (BBO #675405)
WILMER CUTLER PICKERING
Hale AND DORR LLP
60 State Street
Boston, MA 02109
(617) 526-6000
william.lee@wilmerhale.com
andrew.dulberg@wilmerhale.com

Orin Snyder (*pro hac vice*)
Harris M. Mufson (*pro hac vice*)
Justine Goeke (*pro hac vice*)
Christine Demana (*pro hac vice forthcoming*)
Justin M. DiGennaro (*pro hac vice*)
GIBSON, DUNN & CRUTCHER LLP
200 Park Avenue
New York, NY 10166-0193
(212) 351-4000
OSnyder@gibsondunn.com
HMufson@gibsondunn.com
JGoeke@gibsondunn.com
CDemana@gibsondunn.com
JDiGennaro@gibsondunn.com

Jason C. Schwartz (*pro hac vice*)
GIBSON, DUNN & CRUTCHER LLP
1050 Connecticut Avenue, N.W.
Washington, D.C. 20036-5306
(202) 955-8500
JSchwartz@gibsondunn.com

*Attorneys for Plaintiff DraftKings Inc.*

## <u>CERTIFICATE OF SERVICE</u>

I, Andrew S. Dulberg, counsel for DraftKings, hereby certify that this document has been filed through the Court's ECF system and will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF).

<u>/s/  Andrew S. Dulberg</u>
Andrew S. Dulberg