# EXHIBIT E

1 | BRAD D. BRIAN (SBN 79001)
brad.brian@mto.com
2 | BETHANY W. KRISTOVICH (SBN 241891)
bethany.kristovich@mto.com
3 | ANNE K. CONLEY (SBN 307952)
anne.conley@mto.com
4 | MUNGER, TOLLES & OLSON LLP
350 South Grand Avenue, 50th Floor
5 | Los Angeles, California 90071-3426
Telephone:     (213) 683-9100
6 | Facsimile:     (213) 687-3702

7 | *Attorneys for Plaintiff*
*MICHAEL Z. HERMALYN*

8

9 | SUPERIOR COURT OF THE STATE OF CALIFORNIA

10 | COUNTY OF LOS ANGELES, CENTRAL DISTRICT

11

12 | | Case No. 24STCV02694

13 | MICHAEL Z. HERMALYN and
FVP, LLC, | **DECLARATION OF MICHAEL Z. HERMALYN ISO *EX PARTE***

14 | Plaintiffs, | **APPLICATION FOR (1) A TEMPORARY RESTRAINING ORDER AND (2) AN**

15 | vs. | **ORDER TO SHOW CAUSE REGARDING PRELIMINARY INJUNCTION**

16 | DRAFTKINGS, INC.,

17 | Defendant. | *[Filed Concurrently: Ex Parte Application;*
*Memorandum of Points and Authorities;*

18 | | *Declaration of Anne K. Conley; Request for*
*Judicial Notice; [Proposed] Order]*

19

20 | | Hearing Date:   February 14, 2024
Time:             8:30 a.m.

21 | | Dept:             86
Judge:            Hon. Mitchell L. Beckloff

22 | | Action Filed:   February 1, 2024

23 | | Trial Date:      N/A

24

25

26

27

28

**DECLARATION OF MICHAEL Z. HERMALYN**

I, Michael Z. Hermalyn, declare the following:

1.      I am over the age of 18 and have personal knowledge of the facts set forth in this Declaration submitted in support of my *Ex Parte* Application for (1) a Temporary Restraining Order and (2) an Order to Show Cause Regarding Preliminary Injunction.  If called upon to do so, I could and would testify competently thereto.

**CURRENT RESIDENCE IN CALIFORNIA AND EMPLOYMENT WITH FANATICS**

2.      I am currently a resident of Los Angeles, California.  Prior to moving to Los Angeles on January 29, 2024, I was a Bay Head, New Jersey resident.  I intend to live and work in California for the foreseeable future.  I have leased an apartment in California, and I intend to move into a family home when my wife and children join me in California after the conclusion of the academic school year this spring.  I intend to enroll my two daughters in school in Los Angeles for the next school year and have already contacted summer camps and joined various waitlists.  Since moving to California, I obtained a California driver's license, I purchased a car in California, I registered the car in California, I registered to vote in California, and I obtained appointments with a physician and a dentist in California.

3.      On February 1, 2024, I accepted an offer for employment from FVP, LLC, also known as Fanatics VIP, which is headquartered in California, to join as President of Fanatics VIP and to be the Head of Fanatics' Los Angeles office, located at 11601 Wilshire Blvd Los Angeles, CA 90025.

4.      Fanatics is a leading digital sports platform, operating businesses across the United States, including California, and across a number of industries, including collectibles, commerce (the design, manufacturing, and sale of licensed apparel and hard goods), and betting and gaming, and with emerging businesses in live events, media, and more.

5.      My position with Fanatics VIP requires that I live and work in person in Los Angeles, where I understand that Fanatics already employs approximately 80 individuals, and where I plan to further build out my Fanatics VIP team.

6.      I believe that my skills and experience will facilitate the expansion of Fanatics' California operations and provide additional leadership at the senior level on the West Coast.

7.      As Head of Fanatics' Los Angeles office, I will oversee and administer the operations of the Los Angeles office (which houses employees from multiple Fanatics businesses) and oversee the planned consolidation of the greater Los Angeles-area offices (including Fanatics' Irvine location) into a single location in Los Angeles.

**PRIOR EMPLOYMENT WITH DRAFTKINGS**

8.      Prior to joining Fanatics VIP, I worked for DraftKings, Inc. for less than 3.5 years, from September 2020 to January 2024.  My internal title was Vice President of Growth.  In that role, I was responsible for retaining and acquiring certain categories of customers.

9.      During my employment with DraftKings, I worked out of DraftKings' New York City office, when I worked in an office.  I have never resided in Massachusetts, was never employed in Massachusetts, and was never assigned to work out of DraftKings' Massachusetts office at any point.

**RESIGNATION FROM DRAFTKINGS**

10.      I resigned from DraftKings on February 1, 2024.

11.      Prior to resigning from DraftKings, I took good-faith steps to ensure to the best of my ability that I was no longer in possession of any DraftKings property or confidential information. I gave DraftKings-issued devices to my counsel.  I sent my personal phone to counsel and bought a new phone to ensure that it did not contain any DraftKings information.  I confirmed to DraftKings in my resignation notice my belief that I had turned over all DraftKings property (*e.g.*, my work computers, corporate credit card, portable wifi) and information to my lawyer.  Shortly after turning over those devices and accounts, I discovered that I was in possession of an old laptop that belongs to DraftKings, which I have since turned over to my counsel.  I had not used or otherwise accessed this laptop in several months, and certainly did not access or use it since finding it and then turning it over to my counsel after my resignation from DraftKings.  I understand that it too has been given to DraftKings.  I also understand DraftKings believes that there may be a fourth laptop.  I have no

DECL. OF MICHAEL Z. HERMALYN ISO
*EX PARTE* APPLICATION FOR TRO AND OSC RE PRELIMINARY INJUNCTION

recollection of ever receiving a fourth laptop, I looked but have not located a fourth laptop, and therefore I believe that DraftKings' information is incorrect.

12.    Prior to my resignation, I also attempted to organize contacts into those that I believe DraftKings may contend are its contacts, those that are clearly personal contacts (*e.g.*, family members and friends), and those other contacts that I believe are mine, but because I met those individuals during the timeframe that I worked for DraftKings, I segregated those contacts so my counsel could work with DraftKings to get them the contacts from this group, if any, that DraftKings claims belong to it.

13.    I understand that my attorneys have provided the first category of contacts—those that DraftKings may contend are its contacts—to DraftKings.  I also understand that my attorneys have been trying to get DraftKings to agree to a protocol or procedure for reviewing the contacts that I have made during the time I was employed by DraftKings.  To be clear, I have not had access to either of these categories of contacts since resigning from DraftKings, as they were turned over to my counsel.

### DRAFTKINGS' NON-COMPETE AND NON-SOLICIT AGREEMENTS

14.    When I joined DraftKings in 2020, I was required to sign a non-solicitation agreement and a non-compete agreement as a condition of employment.  A true and correct redacted copy of these agreements are attached hereto as **Exhibit A**.  The documents have been redacted to omit irrelevant personal information (e-mail and IP addresses).

15.    During my employment with DraftKings, in order to receive my equity compensation, I was required to sign multiple additional non-compete agreements as part of Restricted Stock Unit Grants.  A true and correct copy of the non-compete agreement attached to one Restricted Stock Unit Grant in 2023 is attached hereto as **Exhibit B**.

16.    To the best of my recollection, I signed these agreements with DraftKings while I was located at my then-home in New Jersey, at my work in New York, or otherwise remotely with DocuSign.  To the best of my recollection, I never signed any of these agreements in Massachusetts.

17.    I was not independently represented by counsel at the time I signed these agreements.

18.     I did not negotiate the agreements, and it was my understanding that any attempt to do so would be a non-starter, resulting in termination and/or equity (a significant part of my compensation) not being granted.

### HARM REQUIRING INTERIM RELIEF

19.     My new role at Fanatics VIP represents an important growth opportunity for me professionally and personally.  It is a once-in-a-lifetime chance to report directly to the Chair and CEO of Fanatics Holdings, Inc., Michael Rubin, work alongside his executive team, and lead Fanatics' Los Angeles office and VIP business.  In that role, it is critical that I am unrestricted in my efforts to grow and lead the VIP business at Fanatics, which unlike DraftKings, is in a nascent stage.

20.     As it stands, there is nothing stopping DraftKings from interfering with my choice to work at Fanatics VIP or my ability to effectively carry out my duties to the company.  It is my belief, based on my experience at DraftKings, that DraftKings views Fanatics as a threat to DraftKings' VIP business.  DraftKings therefore has every incentive to disrupt my efforts to develop client relationships and business development initiatives for Fanatics.

21.     DraftKings' recent lawsuit against me in Massachusetts federal court is emblematic of the great lengths that DraftKings will go to interfere with my employment at Fanatics.  The Complaint in that matter accuses me of every misdeed under the sun—from trade secret theft to "hatch[ing] a secret plan" over the past year "to steal and use confidential information, solicit customers and employees and join a key competitor, Fanatics, Inc."  I believe that these allegations were made in furtherance of DraftKings' public relations campaign to smear my name and impede my work at Fanatics, including by hindering my ability to form and foster relationships on behalf of my new employer.  Most importantly, DraftKings' allegations that I have acted unethically are false and have caused me significant harm—personally and professionally.  These underhanded tactics substantiate my fear that DraftKings is interfering with my current employment, my relationships, and my reputation.

22.     Based on these false accusations, DraftKings has obtained a temporary restraining order from the Massachusetts federal court that prevents me from doing business with any current

DraftKings customer, client, vendor, or partner, as well as any *prospective* DraftKings customer, client, vendor, or partner about which I learned confidential information or which I had any business involvement or knowledge.  (This restriction mirrors the non-solicitation provision in DraftKings' unlawful non-compete agreement, *see* Exhibit A at 2.)  The effect of this restriction on my ability to do my job at Fanatics is severe.  Building and maintaining relationships with customers and partners is at the core of my job responsibilities as the head of Fanatics' VIP business.  Each day that I cannot build and maintain such relationships magnifies the harm of this restriction and threatens to further damage my reputation and my utility to Fanatics.

23.     Absent a temporary restraining order, my professional growth and work-related opportunities will be jeopardized.  I will also continue to suffer harm personally, as well as to my reputation in the industry, which I have worked tirelessly to build and maintain over many years.  Finally, without injunctive relief, my relationships with the contacts that I have personally developed over the years may be irreparably harmed.

**INTERIM HARM TO DRAFTKINGS**

24.     By contrast, the interim harm to DraftKings that would result from a temporary restraining order would be minimal, if any.  Having worked as an executive for DraftKings for more than three years, I know that the publicly traded company will maintain a dominant presence in the industry.  It has scores of executives in the VIP space that have longstanding relationships, including with DraftKings' top customers.

25.     Other than a restraint on DraftKings' ability to profit from a violation of my fundamental right to work in my chosen profession in California, I am not aware of any other harm that DraftKings will suffer in the time between the granting of this temporary restraining order and an eventual preliminary injunction.

1    I declare under penalty of perjury under the laws of the State of California that the foregoing

2 is true and correct.

3    Executed February 13, 2024, in Los Angeles, California.

4

5

6    By: _____

7            Michael Z. Hermalyn

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

DECL. OF MICHAEL Z. HERMALYN ISO
*EX PARTE* APPLICATION FOR TRO AND OSC RE PRELIMINARY INJUNCTION

# EXHIBIT A

## Addendum A

## NONSOLICITATION, NONDISCLOSURE & ASSIGNMENT OF INVENTIONS AGREEMENT

The undersigned Employee (the "Employee"), executes this Nonsolicitation, Nondisclosure & Assignment of Inventions Agreement (the "Agreement") in consideration of, and a material inducement for, the Company's (as defined below) relationship with Employee, whether by employment, contractor, or in advisory or consulting capacities, or otherwise, and in consideration of receiving any form of compensation or benefit from or in the Company. Employee understands and agrees that this Agreement shall remain in effect and survive any and all changes in Employee's job duties, titles and compensation during Employee's relationship with Company.

## Definitions

i. "Company" shall mean any entity controlled by, controlling, or under common control with DraftKings Inc., including affiliates and subsidiaries. Control means the direct or indirect possession of the power to direct or cause the direction of the management and policies of an entity, whether through ownership, by contract or otherwise.

i. "Competing Business" shall mean any person, firm, association, corporation or any other legal entity that is engaged in a business that is competitive with any aspect of the Business of the Company, including but not limited to: FanDuel, Paddy Power Betfair, William Hill and bet365.

ii. "Business of the Company" shall mean the research, design, development, marketing, sales, operations, maintenance and commercial exploitation pertaining to the operation of, and providing products and services for: (1) fantasy sports contests ("FSC"); (2) Regulated Gaming (defined below); (3) all other products and services that exist, are in development, or are under consideration by the Company during your relationship with the Company ("Other Products and Services"); and (4) all products and services incidentally related to, or which are an extension, development or expansion of, FSC, Regulated Gaming and/or Other Products and Services ("Incidental Products and Services").

ii. "Regulated Gaming" shall mean the operation of games of chance or skill or pari-mutuel or fixed odds games (including, but not limited to, lotteries, pari-mutuel betting, bingo, race tracks, jai alai, legalized bookmaking, off-track betting, casino games, racino, keno, and sports betting or any play for fun (non-wagering) versions of the foregoing) and any type of ancillary service or product related to or connected with the foregoing.

iii. "Confidential Information" shall mean all information or a compilation of information, in any form (tangible or intangible or otherwise), that is not generally known to competitors or the public, which Company considers to be confidential

and/or proprietary, including but not limited to: research and development; techniques; methodologies; strategies; product information, designs, prototypes and technical specifications; algorithms, source codes, object codes, trade secrets or technical data; training materials methods; internal policies and procedures; marketing plans and strategies; pricing and cost policies; customer, supplier, vendor and partner lists and accounts; customer and supplier preferences; contract terms and rates; financial data, information, reports, and forecasts; inventions, improvements and other intellectual property; product plans or proposed product plans; know-how; designs, processes or formulas; software and website applications; computer passwords; market or sales information, plans or strategies; business plans, prospects and opportunities (including, but not limited to, possible acquisitions or dispositions of businesses or facilities); information concerning existing or potential customers, partners or vendors.  Confidential Information shall also mean of or related to Company's current or potential customers, vendors or partners that is considered to be confidential or proprietary to the applicable customer, vendor or partner.

Confidential Information does <u>not</u> include: information in the public domain (other than as a result of disclosure by you); approved in writing for unrestricted release by Company; or produced or disclosed pursuant to a valid court order, provided you have given Company written notice of such request such that Company has an actual, reasonable opportunity to defend, limit or protect such production or disclosure.

1. **Duty of Loyalty**.  During the period of Employee's relationship with the Company, Employee will devote Employee's best efforts on behalf of the Company.  Employee agrees not to provide any services to any Competing Business or engage in any conduct which may create an actual or appear to create a conflict of interest, without the expressed, written permission of the Company.

2. **Nonsolicitation of Customers, Clients or Vendors**.  During the period of Employee's relationship with the Company and for a period of twelve (12) months after termination of such relationship (for any reason), Employee shall not directly or indirectly either for him/herself or for any other person, partnership, legal entity, or enterprise, solicit or transact business, or attempt to solicit or transact business with, any of the Company's customers, clients, vendors or partners, or with any of the Company's prospective customers, clients, vendors or partners about which Employee learned Confidential Information (as defined below) or which Employee had some involvement or knowledge  related to the Business of the Company.

3. **Nonsolicitation of Employees and Contractors**.  During the period of Employee's relationship with the Company and for a period of twelve (12) months after termination of such relationship (for any reason), Employee will not directly or indirectly either for him/herself or for any other person, partnership, legal entity, or enterprise: (i) solicit, in person or through supervision or control of others, an employee, advisor, consultant or contractor of the Company for the purpose of inducing or encouraging the employee, advisor, consultant or contractor to leave his or her relationship with the Company or to change an existing business relationship

to the detriment of the Company, (ii) hire away an employee, advisor, consultant or contractor of the Company; or (iii) help another person or entity hire away a Company employee, advisor, consultant or contractor.

4. **Nondisclosure of Customer, Partner and Vendor Information**.  Employee understands and agrees that it is essential to the Company's success that all nonpublic customer, partner, and vendor information is deemed and treated as Confidential Information and a confidential trade secret. Employee will not directly or indirectly either for him/herself or for any other person, partnership, legal entity, or enterprise use or disclose any such customer, partner, or vendor information except as may be necessary in the normal conduct of the Company's business for the specific customer, partner, or vendor.  Employee agrees that at the end of Employee's relationship with the Company, or upon request by the Company, Employee will return to the Company any materials containing such information.

5. **Nondisclosure of Confidential Information**.  All such Confidential Information is (and will be) the exclusive property of the Company, and Employee shall not, during or after Employee's employment: (i) use any Confidential Information for any purpose that is not authorized by the Company; (ii) disclose any Confidential Information to any person or entity, except as authorized by the Company in connection with Employee's job duties; or (iii) remove or transfer Confidential Information from the Company's premises or systems except as authorized by the Company.

Upon termination of Employee's relationship (for any reason), or upon the request of the Company, Employee will immediately surrender to the Company all Company property in Employee's possession, custody, or control, including any and all documents, electronic information, and materials of any nature containing any Confidential Information, without retaining any copies.

Employee understands that the Company is now and may hereafter be subject to non-disclosure or confidentiality agreements with third persons that require the Company to protect or refrain from use of Confidential Information.  Employee agrees to respect and be bound by the terms of such agreements in the event Employee has access to such Confidential Information.

Notwithstanding the foregoing or anything to the contrary in this Agreement or any other agreement between the Company and the Employee, nothing in this Agreement shall limit the Employee's right to discuss Employee's employment or report possible violations of law or regulation with the Equal Employment Opportunity Commission, United States Department of Labor, the National Labor Relations Board, the Securities and Exchange Commission, or other federal government agency or similar state or local agency or to discuss the terms and conditions of his employment with others to the extent expressly permitted by Section 7 of the National Labor Relations Act or to the extent that such disclosure is protected under the applicable provisions of law or regulation, including but not limited to "whistleblower" statutes or other similar provisions that protect such disclosure.  Employee agrees to take all reasonable steps to ensure that the Company's Confidential Information is not made public during any such disclosure.  Pursuant to 18 U.S.C. Section 1833(b), the Employee shall not be held criminally or civilly liable under any Federal or State trade secret law for the disclosure of a

trade secret that: (1) is made in confidence to a Federal, State, or local government official, either directly or indirectly, or to an attorney, and solely for the purpose of reporting or investigating a suspected violation of law; or (2) is made in a complaint or other document filed in a lawsuit or other proceeding, if such filing is made under seal.

6. **Assignment of Inventions**.  Employee expressly understands and agrees that any and all right or interest Employee obtains in any designs, trade secrets, technical specifications and technical data, know-how and show-how, customer and vendor lists, marketing plans, pricing policies, inventions, concepts, ideas, expressions, discoveries, improvements and patent or patent rights which are authored, conceived, devised, developed, reduced to practice, or otherwise obtained by him during the term of this Agreement which relate to or arise out of his relationship with the Company and which relate to the business of the Company are expressly regarded as "*works for hire*" or works invented or authored within the scope of employment or engagement, whether as an adviser, consultant, officer, executive, director or other capacity (the "Inventions").  Employee hereby assigns to the Company the sole and exclusive right to such Inventions.  Employee agrees to disclose all Inventions fully and in writing to the Company promptly after development, conception, invention, creation or discovery of the same, and at any time upon request.  Employee will provide all assistance that the Company reasonably requests to secure or enforce its rights throughout the world with respect to Inventions, including signing all necessary documents to memorialize those rights and take any other action which the Company shall deem necessary to assign to and vest completely in the Company, to perfect trademark, copyright and patent protection with respect to, or to otherwise protect the Company's trade secrets and proprietary interest in such Inventions.  The obligations of this Section shall continue beyond the termination of Employee's relationship with respect to such Inventions conceived of, reduced to practice, or developed by the Employee during the term of this Agreement.  The Company agrees to pay any and all copyright, trademark and patent fees and expenses or other costs incurred by Employee for any assistance rendered to the Company pursuant to this Section.

In the event the Company is unable, after reasonable effort, to secure Employee's signature on any patent application, copyright or trademark registration or other analogous protection relating to an Invention, the Employee hereby irrevocably designates and appoints the Company and its duly authorized officer and agent and his agent and attorney-in-fact, to act for and on his behalf and stead to execute and file any such application or applications and to do all other lawfully permitted acts to further the prosecution and issuance of letters patent, copyright or other analogous protection thereon with the same legal force and effect as if executed by the Employee.

In Attachment A to this Agreement, Employee has listed all Inventions that relate to the Business of the Company's that Employee (alone or jointly with others) made, conceived, or first reduced to practice by Employee prior to Employee's execution of this Agreement, and in which Employee has any property interest or claim of ownership.  If no such Inventions are listed in said Attachment, Employee represents that Employee has no such Inventions.

To the extent Employee is a citizen of and subject to law of a state which provides a limitation on invention assignments, then this Agreement's assignment shall not include inventions excluded under such law.

7. **Absence of Conflicting Agreements**.  Employee understands that the Company does not desire to acquire from Employee any trade secrets, know-how or confidential business information that Employee may have acquired from others, and Employee agrees not to disclose any such information to the Company or otherwise utilize any such information in connection with Employee's performance of duties with the Company.  Employee represents that Employee is not bound by any agreement or any other existing or previous business relationship which purports to conflict or impact the full performance of Employee's duties and obligations to the Company.

8. **Remedies Upon Breach**.  Employee agrees that any action that violates this Agreement would cause the Company irreparable harm for which monetary damages are inadequate.  Accordingly, in the event of a breach, or threatened breach, the Company shall be entitled to an injunction restraining such breach or threatened breach, or requiring specific performance, in addition to any and all rights and remedies at law and equity.  The Company shall not be obligated to present additional evidence of irreparable harm or the insufficiency of monetary damages and, to the extent permitted by law or under applicable court rule, does not need to post a bond or other surety.  Nothing herein shall be construed as prohibiting the Company from pursuing any other remedy available to the Company for such breach or threatened breach.  If the Company prevails in any request to have Employee specifically perform his/her obligations under this Agreement (including pursuant to a temporary restraining order or preliminary injunction), the Company shall be entitled to receive from Employee the Company's costs of suit, including reasonable attorney's fees, costs and expenses (in addition to any other relief sought, available or awarded under this Agreement).

9. **Jurisdiction, Venue and Choice of Law** The parties hereby mutually agree to the exclusive jurisdiction of the Superior Court (inclusive of the Business Litigation Session) of the Commonwealth of Massachusetts or the United States District Court for the District of Massachusetts for any dispute arising hereunder.  Accordingly, with respect to any such court action, Employee (a) submits to the personal jurisdiction of such courts; (b) consents to service of process by regular mail to your last known address; and (c) waives any other requirement (whether imposed by statute, rule of court, or otherwise) with respect to personal jurisdiction or service of process.  If Employee commences a legal action or other proceeding against the Company concerning a dispute arising from or relating to this Agreement outside of Massachusetts, Employee shall reimburse the Company for its reasonable attorneys' fees, costs and expenses if Company prevails in staying, transferring, dismissing or otherwise defending such action or proceeding based on the location of the action or proceeding, regardless of whether such fees, costs and expenses are incurred in the forum where you commenced the action or in a Massachusetts forum.  This Agreement shall be governed by the internal substantive laws of Massachusetts, without regard to the doctrine of conflicts of law.

10. **At-Will Employment.** Employee agrees and acknowledges that Employee is an employee "at will" and nothing in this Agreement is intended to guarantee employment for any period of time. Even though the nature of Employee's relationship with the Company is as an "at will" employee, the parties enter this Agreement with the understanding that Employee's position, title, duties and responsibilities could change in a material way in the future and, in light of that understanding, the parties intend that this Agreement shall follow Employee throughout the entire course of Employee's employment with the Company, and such subsequent material change shall not affect the enforceability or validity of this Agreement.

11. **Return of Property**. Employee agrees that, at the time of termination of Employee's employment (for any reason), Employee will return immediately to the Company, in good condition, all property of the Company. This return of property includes, without limitation, a return of physical property (such as computer, phone or other mobile devices, credit card, promotional materials, etc.) and intangible property (such as computer passwords).

12. **Litigation and Regulatory Cooperation**. During and after the Employee's relationship with the Company, Employee shall cooperate fully with the Company in the defense or prosecution of any claims or actions now in existence or that may be brought in the future against or on behalf of the Company by/against third parties that relate to events or occurrences that transpired while the Employee was employed by the Company. Employee's full cooperation in connection with such claims or actions shall include, but not be limited to, being available to meet with counsel to prepare for discovery or trial and to act as a witness at mutually convenient times. During and after the Employee's employment, Employee also shall cooperate fully with the Company in connection with any investigation or review of any federal, state, or local regulatory authority as any such investigation or review relates to events or occurrences that transpired while the Employee was employed by the Company, unless such claim is brought by Employee.

13. **Communication to Future Employers**. Employee agrees to communicate the contents of all post-relationship obligations in this Agreement to any Competing Business that you intend to be employed by, associated with, or represent. Employee understands and agrees that the Company may, in its discretion, also share any post-employment obligation set out in this Agreement with any future employer or potential employer of Employee, or any entity which seeks to be associated with Employee for Employee's services.

14. **Miscellaneous**. Any waiver by the Company of a breach of any provision of this Agreement shall not operate or be construed as a waiver of any subsequent breach hereof. If a court determines that one or more of the provisions contained in this Agreement shall be invalid or unenforceable, such court shall construe, reform or otherwise revise such provision(s) and/or sever such provisions from this Agreement so as to render it enforceable to the maximum extent allowed by law. Any part of this Agreement which is prohibited or which is held to be void or unenforceable shall be ineffective only to the extent of such prohibition without invalidating the remaining provisions of this Agreement. The obligations of Employee under this Agreement shall survive the termination of the Employee's relationship with the Company regardless of the manner of such termination. All covenants and agreements hereunder shall inure to the benefit of and be enforceable by the successors of the Company. This Agreement

DocuSign Envelope ID: E9295787-3E3F-4E29-93FA-485579F547E0

amends, supplants and supersedes any agreement previously executed between the parties regarding the subject matter of this Agreement.

Employee recognizes and agrees that the enforcement of this Agreement is necessary, among other things, to ensure the preservation, protection and continuity of Confidential Information, trade secrets and goodwill of the Company. Employee agrees that, due to the proprietary nature of the Business of the Company and relationships with others, the post-employment restrictions set forth above are reasonable as to duration and scope.

Employee is advised to consult with an attorney before entering into this Agreement.

PLEASE DO NOT SIGN THIS AGREEMENT IF YOU HAVE INVENTIONS TO DISCLOSE. PLEASE REACH OUT TO YOUR RECRUITER TO COMPLETE A SEPARATE INVENTIONS DOCUMENT (ATTACHMENT A – ON NEXT PAGE FOR REFERENCE) IN THE EVENT THAT YOU HAVE INVENTIONS TO DECLARE.

**IN WITNESS WHEREOF,** the undersigned Employee and the Company have executed this Nonsolicitation, Nondisclosure and Assignment of Inventions Agreement as an instrument under seal as of                    .

**DraftKings Inc.**                                            **Employee**

**By: Jason Robins**

**Title:**  Chief Executive Officer                    **Signature**

                                                                            Michael Hermalyn
                                                                            **Print Name**

DocuSign Envelope ID: E9295787-3E2E-4E29-92FA-A95578E547E0

# NONSOLICITATION, NONDISCLOSURE & ASSIGNMENT OF INVENTIONS AGREEMENT

### ATTACHMENT A

List of all inventions or improvements (referred to in Section 6 of the Agreement) made by you, alone or jointly with others, prior to joining the Company.

| Right, Title or Interest<br>(If none, please write "NONE".) | Date Acquired | Identifying Number or Brief Description of Inventions or Improvements |
|---|---|---|
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |

Name of Employee:

_____
Print

_____
Sign

_____
DATE

**Addendum B**
**Noncompetition Covenant**

(a) During the period of your relationship with Company, you agree to not, anywhere within the Restricted Area (defined below), acting individually, or as an owner, shareholder, partner, employee, contractor, agent or otherwise (other than on behalf of Company): provide services to a Competing Business (defined below). For a period of six (6) months following termination of your relationship with Company (for any reason other than referenced below in section (b)), you agree to not, anywhere within the Restricted Area, acting individually, or as an owner, shareholder, partner, employee, contractor, agent or otherwise (other than on behalf of Company): provide services to a Competing Business that relate to any aspect of the Business of the Company (i.e., FSC, Regulated Gaming, Other Products and Services, and/or Incidental Products and Services) for which you performed services or received confidential information at any time during the six (6) month period prior to such termination. For example, if you performed services for the FSC aspect of the Business of the Company and received confidential information about the Regulated Gaming aspect of the Business of the Company during the six (6) month period prior to the termination of your relationship with the Company (for any reason other than referenced below in section (b)), then for six (6) months after such termination, you shall not, anywhere within the Restricted Area, acting individually, or as an owner, shareholder, partner, employee, contractor, agent or otherwise (other than on behalf of Company), provide services to a Competing Business that relate to FSC or Regulated Gaming. The foregoing shall not be construed to preclude you from owning up to one percent (1%) of the outstanding stock of a publicly held corporation that constitutes or is affiliated with a Competing Business.

As set out in the Massachusetts Noncompetition Act, you and the Company agree that the option constitutes mutually-agreed upon consideration for this Noncompetition Covenant. Such consideration is specifically designated and you acknowledge the receipt and sufficiency of the consideration.

    i.    "Company" shall mean any entity controlled by, controlling, or under common control with DraftKings Inc., including affiliates and subsidiaries. Control means the direct or indirect possession of the power to direct or cause the direction of the management and policies of an entity, whether through ownership, by contract or otherwise.

    ii.    "Restricted Area" shall mean the entire United States since the Business of the Company encompasses the entire United States, of which you acknowledge and agree.

    iii.    "Competing Business" shall mean any person, firm, association, corporation or any other legal entity that is engaged in a business that is competitive with any aspect of the Business of the Company, including but not limited to: FanDuel, Paddy Power Betfair, William Hill and bet365.

iv.  "Business of the Company" shall mean the research, design, development, marketing, sales, operations, maintenance and commercial exploitation pertaining to the operation of, and providing products and services for: (1) fantasy sports contests ("FSC"); (2) Regulated Gaming (defined below); (3) all other products and services that exist, are in development, or are under consideration by the Company during your relationship with the Company ("Other Products and Services"); and (4) all products and services incidentally related to, or which are an extension, development or expansion of, FSC, Regulated Gaming and/or Other Products and Services ("Incidental Products and Services").

v.  "Regulated Gaming" shall mean the operation of games of chance or skill or pari-mutuel or fixed odds games (including, but not limited to, lotteries, pari-mutuel betting, bingo, race tracks, jai alai, legalized bookmaking, off-track betting, casino games, racino, keno, and sports betting or any play for fun (non-wagering) versions of the foregoing) and any type of ancillary service or product related to or connected with the foregoing.

vi.  "Confidential Information" shall mean all information or a compilation of information, in any form (tangible or intangible or otherwise), that is not generally known to competitors or the public, which Company considers to be confidential and/or proprietary, including but not limited to: research and development; techniques; methodologies; strategies; product information, designs, prototypes and technical specifications; algorithms, source codes, object codes, trade secrets or technical data; training materials methods; internal policies and procedures; marketing plans and strategies; pricing and cost policies; customer, supplier, vendor and partner lists and accounts; customer and supplier preferences; contract terms and rates; financial data, information, reports, and forecasts; inventions, improvements and other intellectual property; product plans or proposed product plans; know-how; designs, processes or formulas; software and website applications; computer passwords; market or sales information, plans or strategies; business plans, prospects and opportunities (including, but not limited to, possible acquisitions or dispositions of businesses or facilities); information concerning existing or potential customers, partners or vendors. Confidential Information shall also mean of or related to Company's current or potential customers, vendors or partners that is considered to be confidential or proprietary to the applicable customer, vendor or partner.

Confidential Information does not include: information in the public domain (other than as a result of disclosure by you); approved in writing for unrestricted release by Company; or produced or disclosed pursuant to a valid court order, provided you have given Company written notice of such request such that Company has an actual, reasonable opportunity to defend, limit or protect such production or disclosure.

(b) You and the Company agree that the Noncompetition Covenant shall not be enforceable against you if the Company terminates your employment without Cause or if you are laid off. In the event of a termination without Cause or layoff, all other agreements with the Company (including without limitation the Award Agreement (as defined in the Stock Option Grant Notice)), shall remain in full force and effect. You and the Company acknowledge and agree that "Cause" shall mean, for the purposes of this Noncompetition Covenant, that there exists either (1) a reasonable basis for the Company's dissatisfaction with you, entertained in good faith, for reasons, including but not limited to, lack of capacity or diligence, failure to conform to usual standards of conduct, or other culpable or inappropriate behavior, or (2) grounds for discharge reasonably related, in the Company's honest judgment, to the needs of the Business of the Company.

(c) You agree to communicate the contents of all post-relationship obligations in this Noncompetition Covenant to any Competing Business that you intend to be employed by, associated with, or represent. You understand and agree that the Company may, in its discretion, also share any post-relationship obligation in this Noncompetition Covenant with any future (or potential) employer or association that is a Competing Business that seeks to be associated with you or employ you for your services.

(d) You agree that the enforcement of the Noncompetition Covenant is necessary, among other things, to ensure the preservation, protection and continuity of the Company's Confidential Information, trade secrets and goodwill of the Company. You agree that, due to the proprietary nature of the Business of the Company and relationships with others, the post-employment restrictions set forth above are reasonable as to duration and scope.

(e) You agree that any action that violates this Noncompetition Covenant would cause the Company irreparable harm for which monetary damages are inadequate. Accordingly, in the event of a breach, or threatened breach, of this Noncompetition Covenant, the Company shall be entitled to an injunction restraining such breach or threatened breach, or requiring specific performance, in addition to any and all rights and remedies at law and equity. The Company shall not be obligated to present additional evidence of irreparable harm or the insufficiency of monetary damages and, to the extent permitted by law or under applicable court rule, does not need to post a bond or other surety. Nothing herein shall be construed as prohibiting the Company from pursuing any other remedy available to the Company for such breach or threatened breach. If the Company prevails in any request to have you specifically perform your obligations under this Noncompetition Covenant (including pursuant to a temporary restraining order or preliminary injunction), the Company shall be entitled to receive from you the Company's costs of suit, including reasonable attorney's fees (in addition to any other relief sought, available or awarded under this Noncompetition Agreement).

(f) You and the Company hereby mutually agree to the exclusive jurisdiction of the Superior Court (inclusive of the Business Litigation Session) of the Commonwealth of Massachusetts or the United States District Court for the District of Massachusetts for any dispute arising hereunder. Accordingly, with respect to any such court action, you (a)

DocuSign Envelope ID: E9395787-3E3F-4E29-93FA-4B5578F547E0

submit to the personal jurisdiction of such courts; (b) consent to service of process by regular mail to your last known address; and (c) waive any other requirement (whether imposed by statute, rule of court, or otherwise) with respect to personal jurisdiction or service of process. If you commence a legal action or other proceeding against the Company concerning a dispute arising from or relating to this Noncompetition Covenant outside of Massachusetts you shall reimburse the Company for its reasonable attorneys' fees, costs and expenses if Company prevails in staying, transferring, dismissing or otherwise defending such action or proceeding based on the location of the action or proceeding, regardless of whether such fees, costs and expenses are incurred in the forum where you commenced the action or in a Massachusetts forum. This Noncompetition Covenant shall be governed by the internal substantive laws of Massachusetts, without regard to the doctrine of conflicts of law.

(g) The failure of you or Company to insist upon strict performance of this Noncompetition Covenant irrespective of the length of time for which such failure continues, shall not be a waiver of such party's rights herein. No term or provision of this Noncompetition Covenant may be waived unless such waiver is in writing.

(h) If a court determines that one or more of the provisions contained in this Noncompetition Covenant shall be invalid or unenforceable, such court shall construe, reform or otherwise revise such provision(s) and/or sever such provisions from this Noncompetition Covenant so as to render it enforceable to the maximum extent allowed by law. Any part of this Noncompetition Covenant which is prohibited or which is held to be void or unenforceable shall be ineffective only to the extent of such prohibition without invalidating the remaining provisions of this Noncompetition Covenant.

(i) Except as described in Section (b) of this Noncompetition Covenant, your obligations under this Noncompetition Covenant shall survive the termination of your relationship with the Company regardless of the manner of such termination.

(j) The rights granted to the Company under the Noncompetition Covenant shall inure to the benefit of, and be enforceable by, the successors or assigns of Company.

(k) You agree that you received this Noncompetition Covenant by the earlier of the formal offer of employment that you received from the Company or 10 business days before commencement of your employment with the Company.

(l) Before agreeing to this Noncompetition Covenant, you have the right to consult with counsel. The terms and conditions of this Noncompetition Covenant shall supersede all prior noncompetition covenants between you and Company.

(m) In the event that you breach this Noncompetition Covenant, in addition to any other rights and remedies available to the Company, you agree that the Company shall have the right to deem that any and all vested and unvested shares subject to this stock option grant have been forfeited.

(n) The parties agree that you are employed "at will" and nothing in this Noncompetition Covenant is intended to guarantee employment for any period of time.  Even though the nature of your relationship with the Company is as an "at will" employee, the parties enter this Noncompetition Covenant with the understanding that your position, title, duties and responsibilities could change in a material way in the future and, in light of that understanding, the parties intend that this Noncompetition Covenant shall follow you throughout the entire course of your employment with the Company, and such subsequent material change shall not affect the enforceability or validity of this Noncompetition Covenant.

**Acknowledged and Agreed:**

_____
**Signature**

Michael Hermalyn
_____
**Name**

_____
**Date**

**DRAFTKINGS INC.:**

Jason Robins
CEO



## Certificate Of Completion

Envelope Id: E92957873E2F4E2993FA4D5E78E547E0                                    Status: Delivered
Subject: Your signature is requested on the following documents
Source Envelope:
Document Pages: 13                          Signatures: 0                        Envelope Originator:
Certificate Pages: 4                        Initials: 0                          Cori Galligan
AutoNav: Enabled                                                                 ████████████████
EnvelopeId Stamping: Enabled                                                     IP Address: ████████
Time Zone: (UTC-08:00) Pacific Time (US & Canada)

## Record Tracking

Status: Original                            Holder: Cori Galligan                Location: DocuSign
        8/28/2020 11:40:10 AM                       ████████████████

| Signer Events | Signature | Timestamp |
|---|---|---|
| Michael Hermalyn<br>████████████<br>Security Level:<br>.Email<br>ID: 0d0233a3-b6df-4bec-ab9b-48f8b5b730b4<br>8/28/2020 7:24:28 PM | | Sent: 8/28/2020 11:40:12 AM<br>Viewed: 8/28/2020 7:24:43 PM |
| **Electronic Record and Signature Disclosure:**<br>Accepted: 8/28/2020 7:24:43 PM<br>ID: 4e7a7184-dd40-47ac-9fbf-6c72fb7f16bf | | |

| In Person Signer Events | Signature | Timestamp |
|---|---|---|

| Editor Delivery Events | Status | Timestamp |
|---|---|---|

| Agent Delivery Events | Status | Timestamp |
|---|---|---|

| Intermediary Delivery Events | Status | Timestamp |
|---|---|---|

| Certified Delivery Events | Status | Timestamp |
|---|---|---|

| Carbon Copy Events | Status | Timestamp |
|---|---|---|

| Witness Events | Signature | Timestamp |
|---|---|---|

| Notary Events | Signature | Timestamp |
|---|---|---|

| Envelope Summary Events | Status | Timestamps |
|---|---|---|
| Envelope Sent | Hashed/Encrypted | 8/28/2020 11:40:12 AM |
| Certified Delivered | Security Checked | 8/28/2020 7:24:43 PM |

| Payment Events | Status | Timestamps |
|---|---|---|

## Electronic Record and Signature Disclosure

## ELECTRONIC RECORD AND SIGNATURE DISCLOSURE

From time to time, DraftKings Inc. (we, us or Company) may be required by law to provide to you certain written notices or disclosures. Described below are the terms and conditions for providing to you such notices and disclosures electronically through the DocuSign system. Please read the information below carefully and thoroughly, and if you can access this information electronically to your satisfaction and agree to this Electronic Record and Signature Disclosure (ERSD), please confirm your agreement by selecting the check-box next to 'I agree to use electronic records and signatures' before clicking 'CONTINUE' within the DocuSign system.

### Getting paper copies

At any time, you may request from us a paper copy of any record provided or made available electronically to you by us. You will have the ability to download and print documents we send to you through the DocuSign system during and immediately after the signing session and, if you elect to create a DocuSign account, you may access the documents for a limited period of time (usually 30 days) after such documents are first sent to you. After such time, if you wish for us to send you paper copies of any such documents from our office to you, you will be charged a $0.00 per-page fee. You may request delivery of such paper copies from us by following the procedure described below.

### Withdrawing your consent

If you decide to receive notices and disclosures from us electronically, you may at any time change your mind and tell us that thereafter you want to receive required notices and disclosures only in paper format. How you must inform us of your decision to receive future notices and disclosure in paper format and withdraw your consent to receive notices and disclosures electronically is described below.

### Consequences of changing your mind

If you elect to receive required notices and disclosures only in paper format, it will slow the speed at which we can complete certain steps in transactions with you and delivering services to you because we will need first to send the required notices or disclosures to you in paper format, and then wait until we receive back from you your acknowledgment of your receipt of such paper notices or disclosures. Further, you will no longer be able to use the DocuSign system to receive required notices and consents electronically from us or to sign electronically documents from us.

### All notices and disclosures will be sent to you electronically

Unless you tell us otherwise in accordance with the procedures described herein, we will provide electronically to you through the DocuSign system all required notices, disclosures, authorizations, acknowledgements, and other documents that are required to be provided or made available to you during the course of our relationship with you. To reduce the chance of you inadvertently not receiving any notice or disclosure, we prefer to provide all of the required notices and disclosures to you by the same method and to the same address that you have given us. Thus, you can receive all the disclosures and notices electronically or in paper format through the paper mail delivery system. If you do not agree with this process, please let us know as described below. Please also see the paragraph immediately above that describes the consequences of your electing not to receive delivery of the notices and disclosures electronically from us.

**How to contact DraftKings Inc.:**

You may contact us to let us know of your changes as to how we may contact you electronically, to request paper copies of certain information from us, and to withdraw your prior consent to receive notices and disclosures electronically as follows:
To contact us by email send messages to: ███████████████

**To advise DraftKings Inc. of your new email address**

To let us know of a change in your email address where we should send notices and disclosures electronically to you, you must send an email message to us at ███████████████ and in the body of such request you must state: your previous email address, your new email address.  We do not require any other information from you to change your email address.

If you created a DocuSign account, you may update it with your new email address through your account preferences.

**To request paper copies from DraftKings Inc.**

To request delivery from us of paper copies of the notices and disclosures previously provided by us to you electronically, you must send us an email to ███████████████ and in the body of such request you must state your email address, full name, mailing address, and telephone number. We will bill you for any fees at that time, if any.

**To withdraw your consent with DraftKings Inc.**

To inform us that you no longer wish to receive future notices and disclosures in electronic format you may:

i. decline to sign a document from within your signing session, and on the subsequent page, select the check-box indicating you wish to withdraw your consent, or you may;

ii. send us an email to ███████████████████ and in the body of such request you must state your email, full name, mailing address, and telephone number. We do not need any other information from you to withdraw consent..  The consequences of your withdrawing consent for online documents will be that transactions may take a longer time to process..

**Required hardware and software**

The minimum system requirements for using the DocuSign system may change over time. The current system requirements are found here: https://support.docusign.com/guides/signer-guide-signing-system-requirements.

**Acknowledging your access and consent to receive and sign documents electronically**

To confirm to us that you can access this information electronically, which will be similar to other electronic notices and disclosures that we will provide to you, please confirm that you have read this ERSD, and (i) that you are able to print on paper or electronically save this ERSD for your future reference and access; or (ii) that you are able to email this ERSD to an email address where you will be able to print on paper or save it for your future reference and access. Further, if you consent to receiving notices and disclosures exclusively in electronic format as described herein, then select the check-box next to 'I agree to use electronic records and signatures' before clicking 'CONTINUE' within the DocuSign system.

By selecting the check-box next to 'I agree to use electronic records and signatures', you confirm that:

- You can access and read this Electronic Record and Signature Disclosure; and
- You can print on paper this Electronic Record and Signature Disclosure, or save or send this Electronic Record and Disclosure to a location where you can print it, for future reference and access; and
- Until or unless you notify DraftKings Inc. as described above, you consent to receive exclusively through electronic means all notices, disclosures, authorizations, acknowledgements, and other documents that are required to be provided or made available to you by DraftKings Inc. during the course of your relationship with DraftKings Inc..

# EXHIBIT B

## ATTACHMENT III

## NONCOMPETITION COVENANT

(a) During the period of your Relationship (defined below) with the Company (defined below), you ("you" or "your") agree to not, anywhere within the Restricted Area (defined below), acting individually, or as an owner, shareholder, partner, employee, contractor, agent or otherwise (other than on behalf of the Company), provide services to a Competing Business (defined below) or commit a Threatened Breach (defined below) of such obligation.  For a period of twelve (12) months following termination of your Relationship with the Company you agree to not, anywhere within the Restricted Area, acting individually, or as an owner, shareholder, partner, employee, contractor, agent or otherwise (other than on behalf of Company): (1) provide services to a Competing Business that relate to any aspect of the Business of the Company (defined below) (i.e., FSC (defined below), Gaming (defined below), Marketplace (defined below), Media (defined below), Other Products and Services (defined below), and/or Incidental Products and Services (defined below)) for which you performed services or received Confidential Information (defined below) at any time during the six (6) month period prior to such termination; or (2) commit a Threatened Breach of the obligation set forth in the immediately preceding clause. For example, in the event that you performed services for the FSC aspect of the Business of the Company and received Confidential Information about the Gaming aspect of the Business of the Company during the six (6) month period prior to the termination of your Relationship with the Company, then for twelve (12) months after such termination, you shall not, anywhere within the Restricted Area, acting individually, or as an owner, shareholder, partner, employee, contractor, agent or otherwise (other than on behalf of the Company), provide services to a Competing Business that relates to FSC or Gaming, or commit a Threatened Breach of that obligation.  The foregoing shall not be construed to preclude you from owning up to one percent (1%) of the outstanding stock of a publicly held corporation that constitutes or is affiliated with a Competing Business.

As set out in the Massachusetts Noncompetition Act, Mass. General Laws c. 149, s. 24L, you specifically agree that the opportunity for, or the receipt of, the RSUs (as defined in the first paragraph of this Restricted Stock Unit Grant Notice and Non-Competition Covenant (2020 Incentive Award Plan) (the "Restricted Stock Unit Grant Notice")) granted to you as set forth in this Restricted Stock Unit Grant Notice are fair and reasonable consideration for this Noncompetition Covenant. You and the Company further agree that the opportunity for, or the receipt of, the RSUs is mutually agreed upon consideration for this Noncompetition Covenant. Such consideration is specifically designated and you acknowledge the receipt and sufficiency of the consideration.

For purposes of this Attachment III:

i.   "Business of the Company" shall mean the research, design, development, marketing, broadcasting, streaming, promotion, sales, operations, maintenance and commercial exploitation pertaining to the operation of, and providing products and services for: (1) fantasy sports contests ("FSC"); (2) Gaming; (3) Marketplace; (4) Media; (5) all other products and services that exist, are in development, or are under consideration by the Company during your Relationship with the Company ("Other Products and Services"); and (6) all products and services incidentally related to, or which are an extension, development or expansion of, FSC, Gaming, Marketplace, Media or Other Products and Services ("Incidental Products and Services").

ii.        "Cause" has the meaning ascribed to it in Section (b).

iii.       "Company" shall mean DraftKings Inc., a Nevada corporation, and any person or entity controlled by, controlling, or under common control with DraftKings Inc., a Nevada corporation, including affiliates and subsidiaries. "Control" (and its derivatives) means the direct or indirect possession of the power to direct or cause the direction of the management and policies of an entity, whether through ownership, by contract or otherwise.

iv.        "Competing Business" shall mean any person, firm, association, corporation or any other entity that is engaged in a business or activity (whether online, at a physical location or otherwise) that is competitive with any aspect of the Business of the Company, including, but not limited to: Action Network, Barstool Sports, BetAmerica, BetEasy, Betfair, Betgenius, BetStars, BetQL, Bet365, Bleacher Report, Borgata, Caesars, Candy Digital, Dapper Labs, Entain, ESPN, FanDuel, Flutter Entertainment PLC, FoxBet, FoxSports, GAN, Golden Nugget, Harrah's, Holdings PLC, International Game Technology, Kambi, Light & Wonder, LooksRare, MGM, NiftyGateway, Ocean Casino Resort, Oddschecker, OpenSea, Paddy Power, Pala, Penn National Gaming, Playtech, PointsBet, Pokerstars, Rarible, Resorts, Rivers Casino, Rush Street Interactive, Scientific Games, Sky Betting & Gaming, Sorare, Sportradar, Sportsbet, SugarHouse, theScore, Tropicana, TVG, Unibet, Virgin, Wynn, William Hill, 888, and  any of the foregoing persons or entities later known by a different name, any person or entity that acquires, is acquired by, merges with, is spun off by, or otherwise combines with or separates from any of the foregoing persons or entities or enters into an agreement to do so, any person or entity directly or indirectly controlling, controlled by, or under common control with any of the foregoing persons or entities, including, but not limited to, any direct and indirect subsidiaries, affiliates, and ventures of any of the foregoing persons or entities, and any successor or assign of any of the foregoing persons or entities.

v.         "Confidential Information" shall have the same meaning as set forth in any and all Nonsolicitation, Nondisclosure & Assignment of Invention Agreements, or agreements with respect to substantially similar subject matter, (collectively, the "NDA") that you entered into with the Company. Confidential Information shall also mean all information or a compilation of information, in any form (tangible or intangible or otherwise), that is not generally known to competitors of the Company or the public, which Company considers to be confidential and/or proprietary, including, but not limited to: research and development; techniques; methodologies; strategies; product information, designs, prototypes and technical specifications; algorithms, source codes, object codes, trade secrets and technical data; training materials and methods; internal policies and procedures; marketing plans and strategies; pricing and cost policies; customer, supplier, vendor and partner lists and accounts; customer and supplier preferences; contract terms and rates; financial data, information, reports, and forecasts; inventions, improvements and other intellectual property; product plans and proposed product plans; know-how; designs, processes and formulas; software and website applications; computer passwords; market and sales information, plans and strategies; business plans, prospects and opportunities (including, but not limited to, possible acquisitions or dispositions of businesses or facilities); information concerning existing or potential customers, partners or vendors.  Confidential Information shall also mean information related to Company's current or potential customers, vendors or partners that is considered to be confidential or proprietary to the applicable customer, vendor or partner.

Confidential Information does not include information that is: in the public domain (other than as a result of disclosure by you); approved in writing for unrestricted release by Company; or produced or disclosed pursuant to a valid subpoena or court order, provided you have given Company written notice of such anticipated production or disclosure (to the extent not prohibited by such subpoena or court order) such that Company has an actual, reasonable opportunity to defend, limit or protect such production or disclosure.

vi.   "Control" has the meaning ascribed to it in the definition of Company.

vii.  "FSC" shall mean any fantasy or simulated activity or contest where winning outcomes are determined predominantly by accumulated statistical results of the performance of individuals in athletic or other events; the wining outcome reflects the knowledge and skill of the participant; and a winning outcome is not based solely on the performance of a single team or individual.

viii. "Gaming" shall mean games of chance or skill, pari-mutuel, fixed odds, pools or otherwise (including, but not limited to, lottery, pari-mutuel betting, bingo, horse and dog racing, simulated racing and sporting events, jai alai, sports betting, online casino games/iGaming, social casino, poker and keno) whether played for real money or cash equivalent, virtual currency, free, or otherwise and any type of ancillary service or product related to the foregoing.

ix.   "Incidental Products and Services" has the meaning ascribed to it in the definition of Business of the Company.

x.    "Marketplace" shall mean a digital platform facilitating the purchase and sale of non-fungible tokens and other collectibles.

xi.   "Media" shall mean the development, distribution, procurement and programming of content offerings in audio and video focused media related to sports, Gaming, FSC, Marketplace or Other Products and Services.

xii.  "Noncompetition Covenant" shall mean this noncompetition covenant, Attachment III, as also set forth in the second paragraph of the Restricted Stock Unit Grant Notice.

xiii. "NDA" has the meaning ascribed to it in the definition of Confidential Information.

xiv.  "Other Products and Services" has the meaning ascribed to it in the definition of Business of the Company.

xv.   "Relationship" shall mean your relationship with the Company, whether as an owner, shareholder, partner, employee, contractor, agent, advisor or consultant.

vii.  "Restricted Area" shall mean any place within the United States or anywhere else in the world, since Competing Businesses operate globally and without meaningful limitation to compete caused by geographic locations, and because the Business of the Company is global in nature due to the specialized industries in which the Company and Competing Businesses operate, which Employee acknowledges and agrees is reasonable.

xvi.  "RSUs" has the meaning ascribed to it in Section (a), second paragraph.

xvii.    "Terms and Conditions" shall mean any of terms, conditions, covenants, representations, warranties, duties or obligations set forth in this Noncompetition Covenant.

xviii.   "Threatened Breach" shall mean any attempt by you to engage in conduct that would breach these Terms and Conditions.

(b)  You and the Company agree that this Noncompetition Covenant may not be enforceable against you in the event the Company terminates your Relationship without Cause. In the event of a termination without Cause, all other agreements between you and the Company shall remain in full force and effect. You and the Company acknowledge and agree that "Cause" shall mean, for the purposes of this Noncompetition Covenant: (i) gross misconduct by you, which results in loss, damage or injury to the Company, its goodwill, business or reputation; (ii) your commission or attempted commission of an act of embezzlement, fraud or breach of fiduciary duty, which results or could result in loss, damage or injury to the Company, its goodwill, business or reputation; (iii) your unauthorized or attempted unauthorized disclosure or misappropriation of any trade secret or Confidential Information of the Company or any third party that has a business relationship with the Company; (iv) your conviction of or plea of nolo contendere to, a felony under any state or federal law, which materially interferes or could interfere with your ability to perform your services for the Company or which results or could result in loss, damage or injury to the Company, its goodwill, business or reputation; (v) a breach or Threatened Breach by you, in any material respect, of these Terms and Conditions, the NDA or any other material agreement between you and the Company; (vi) your failure to perform your assigned duties and responsibilities to the reasonable satisfaction of the Company, which failure continues, in the reasonable judgment of the Company, after written notice given to you by the Company; (vii) your use of controlled substances, illicit drugs, alcohol or other substances or behavior by you, in each case, that interferes with your ability to perform your services for the Company or that otherwise results or could result in loss, damage or injury to the Company, its goodwill, business or reputation; (viii) the existence or prior existence of a reasonable basis for the Company's dissatisfaction with you, entertained in good faith, for reasons, including, but not limited to, lack of capacity or diligence, failure to conform to usual standards of conduct, or other culpable or inappropriate behavior; or (ix) there exists or existed grounds for discharge reasonably related, in the Company's good faith judgment, to the needs of the Business of the Company.  Any determination of whether Cause exists shall be made by the Company in its sole and absolute discretion.  Any failure, delay or omission by the Company to make a determination of whether Cause exists will in no way be construed as a waiver of such right to do so at a later time.

(c)  You agree to communicate the contents of all post-Relationship obligations in this Noncompetition Covenant to any Competing Business that you intend to be employed by, associated with, or represent.  You understand and agree that the Company may, in its sole and absolute discretion, also share any post-Relationship obligation in this Noncompetition Covenant with any future (or potential) employer, association, contractor, owner or partner that is a Competing Business that seeks to associate, contract, partner or employ you for your services.

(d)  You agree that the enforcement of this Noncompetition Covenant is necessary, among other things, to ensure the preservation, protection and continuity of the Company's Confidential Information, trade secrets and goodwill.  You agree that, due to the proprietary nature of the Business of the Company and relationships with others, the restrictions during your Relationship with the Company and post-Relationship restrictions set forth herein are

reasonable as to duration and scope.  You acknowledge that this Noncompetition Covenant is necessary because, among other things, the Company's interests cannot be adequately protected through an alternative restrictive covenant, including, but not limited to, the NDA.

(e)  You agree that any breach, Threatened Breach or challenge to the enforceability of this Noncompetition Covenant would cause the Company to suffer immediate and irreparable harm for which monetary damages are inadequate.  Accordingly, in the event of a breach, Threatened Breach or challenge to the enforceability of this Noncompetition Covenant, the Company shall be automatically entitled to a temporary, preliminary and permanent injunction restraining such breach, Threatened Breach or challenge requiring specific performance, in addition to any and all rights and remedies at law and equity. The Company shall not be obligated to present additional evidence of irreparable harm or the insufficiency of monetary damages and, to the extent permitted by law or under applicable court rule, does not need to post a bond or other surety.  Nothing herein shall be construed as prohibiting the Company from pursuing any other remedy available to the Company for such breach, Threatened Breach or challenge.  In the event the Company prevails in any request to enforce your obligations under this Noncompetition Covenant (including pursuant to a temporary restraining order or preliminary or permanent injunction), the Company shall be entitled to receive from you the Company's reasonable attorney's fees, costs and expenses incurred (in addition to any other relief sought, available or awarded under this Noncompetition Covenant).  In the event that you commit a breach, Threatened Breach or challenge of your obligations under this Noncompetition Covenant that causes the Company to incur attorneys' fees, costs or expenses before you relent such breach, threats or challenge, the Company shall be entitled to its reasonable attorney's fees, costs and expenses incurred prior to you relenting (in addition to any other relief sought, available or awarded under this Noncompetition Covenant).

(f)  You and the Company hereby mutually agree to the exclusive jurisdiction of the Business Litigation Session ("BLS") of the Suffolk Superior Court of the Commonwealth of Massachusetts (and, in the event that the BLS declines to accept jurisdiction, to the exclusive jurisdiction of the Suffolk Superior Court of the Commonwealth of Massachusetts) or the United States District Court for the District of Massachusetts for any dispute arising hereunder. Accordingly, with respect to any such court action, you (a) submit to the personal jurisdiction of such courts; (b) consent to service of process by regular mail to your last known address; and (c) waive any other requirement (whether imposed by statute, rule of court, or otherwise) with respect to personal jurisdiction or service of process.  In the event that you commence a legal action or other proceeding outside of Massachusetts against the Company concerning a dispute arising from or relating to this Noncompetition Covenant you shall reimburse the Company for its reasonable attorneys' fees, costs and expenses incurred in the event that the Company prevails in staying, transferring, dismissing or otherwise defending such action or proceeding, regardless of whether such fees, costs and expenses are incurred in the forum where you commenced the action or in a Massachusetts forum. This Noncompetition Covenant shall be governed by the internal substantive laws of Massachusetts, without regard to the doctrine of conflicts of law.

**YOU AND THE COMPANY IRREVOCABLY WAIVE, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT TO A TRIAL BY JURY IN ANY LEGAL PROCEEDING DIRECTLY OR INDIRECTLY ARISING OUT OF OR RELATING TO THIS NONCOMPETITION COVENANT. EACH PARTY HERETO CERTIFIES THAT THIS WAIVER IS KNOWINGLY, WILLINGLY, AND VOLUNTARILY MADE.**

(g) In the event that: (i) you breach, commit a Threatened Breach or challenge the enforceability of this Noncompetition Covenant, or (ii) the Company seeks to enforce these Terms and Conditions, you agree to an extension of the duration of the covenant set forth in Section (a) on the same Terms and Conditions for an additional period of time equal to the time that elapses from the commencement of such breach, Threatened Breach or challenge to the later of: (i) the termination of such breach, Threatened Breach or challenge; or (ii) the final non-appealable resolution of any litigation or other legal proceeding stemming from such breach, Threatened Breach or challenge.

(h) The failure, delay or omission by the Company to enforce any of these Terms and Conditions will in no way be construed as a waiver of these Terms and Conditions and will not affect the right of the Company thereafter to enforce this Noncompetition Covenant in accordance with these Terms and Conditions. No waiver of any of these Terms and Conditions, or breach, Threatened Breach or challenge thereof, shall be deemed a waiver of any of the other Terms and Conditions or breach of this Noncompetition Covenant. In the event the Company provides a waiver or consent on one (1) particular occasion, it is effective only as to that occasion and does not affect other occasions. No Terms and Conditions may be waived or consented to by Company unless such waiver is in writing.

(i) These Terms and Conditions shall be construed as separable and divisible from every other term, condition, covenant, representation, warranty, duty or obligation set forth in this Noncompetition Covenant , and the enforceability of any one (1) term, condition, covenant, representation, warranty, duty or obligation set forth in this Noncompetition Covenant shall not limit the enforceability, in whole or in part, of any other term, condition, covenant, representation, warranty, duty or obligation set forth in this Noncompetition Covenant.  In the event that a court, arbitrator or other body of competent jurisdiction holds any of these Terms and Conditions to be invalid, illegal, void, or less than fully enforceable as to time, scope or otherwise, the parties agree that this Noncompetition Covenant shall be reformed to the minimum extent necessary to cause the term, condition, covenant, representation, warranty, duty or obligation set forth in this Noncompetition Covenant  to be valid, legal, and enforceable while preserving to the greatest extent permissible the original intent of the parties as expressed in, and the benefits to the parties provided by, this Noncompetition Covenant (including, but not limited to, the term, condition, covenant, representation, warranty, duty or obligation set forth in this Noncompetition Covenant held as invalid, illegal, void, or less than fully enforceable).

(j) Except as set forth in the Massachusetts Noncompetition Act, your obligations under this Noncompetition Covenant shall survive the termination of your Relationship with the Company regardless of the manner of such termination.

(k) The rights granted to the Company under this Noncompetition Covenant shall inure to the benefit of, and be enforceable by, the successors or assigns of Company.

(l) This Noncompetition Covenant shall not become effective until the later of (a) at least ten (10) business days after you have received this Restricted Stock Unit Grant Notice, or (b) the date this Noncompetition Covenant is executed by you.  The obligations in this Noncompetition Covenant are intended to supplement – not replace – those in all prior noncompetition agreements between you and the Company; provided, however, that in the event a conflict arises between this Noncompetition Covenant and prior noncompetition covenants between you and the Company, then such conflict or inconsistency shall be resolved by giving precedence to this Noncompetition Covenant.

(m)  Before agreeing to this Noncompetition Covenant, you have the right to consult with counsel. You understand and acknowledge that you have asked any questions needed for you to understand these Terms and Conditions, consequences and binding effect of this Noncompetition Covenant, and you fully understand them, including, but not limited to, the concept that you are waiving the right to a trial by jury.

(n)  In the event that you breach, commit a Threatened Breach, or challenge the enforceability of this Noncompetition Covenant, in addition to any other rights and remedies available to the Company, you agree that the Company shall have the right (in its sole and absolute discretion, for any reason or no reason) to deem that any and all vested RSUs (to the extent not settled in common shares) and unvested RSUs have been forfeited.

(o)  The parties agree that nothing in this Noncompetition Covenant is intended to guarantee your Relationship for any period of time.  The parties enter this Noncompetition Covenant with the understanding that your position, title, duties and responsibilities could change in a material way in the future and, in light of that understanding, the parties intend that this Noncompetition Covenant shall follow you throughout the entire course of your Relationship with the Company, and such subsequent material change shall not affect the enforceability or validity of this Noncompetition Covenant.

**ACKNOWLEDGED AND AGREED:**

| |
|---|
| Michael Hermalyn |
| (Signature) |

| |
|---|
| Michael Hermalyn |
| Name |

| |
|---|
| 16-Aug-2023 06:59 MDT |

**DRAFTKINGS INC.:**

Title:     Chief Executive Officer

**DATE:  16-AUG-2023 06:59 MDT**