**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS**

---

DRAFTKINGS INC.,

        Plaintiff,

   v.

MICHAEL HERMALYN,

        Defendant.

Civil Action No. 1:24-cv-10299

---

**MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFF'S
MOTION FOR PRELIMINARY INJUNCTION**

# TABLE OF CONTENTS

Page

INTRODUCTION ........................................................................................................1

STATEMENT OF FACTS ..........................................................................................7

    A.    **DK and Fanatics Compete in the Digital Sports Entertainment Industry and for VIP Customers** ................................................7

    B.    **Defendant Agreed to DK's Restrictive Covenants** ...............................8

    C.    **Fear of an Investigation into his Misconduct Drives Defendant to Seek Employment with Fanatics—and to Misappropriate DK's Trade Secrets and Confidential Information** ........................................9

    D.    **After Officially Departing from DK, Defendant Immediately Violates His Restrictive Covenants** ........................................13

PROCEDURAL HISTORY .......................................................................................16

ARGUMENT .............................................................................................................17

    I.    ADDITIONAL EVIDENCE CONFIRMS THAT DK IS LIKELY TO SUCCEED ON THE MERITS ..........................................................17

    A.    **Trade Secrets Misappropriation** ......................................................17

        1.    **Defendant Accessed and Downloaded Trade Secrets** ...........18

        2.    **DK Took Reasonable Efforts to Protect Its Trade Secrets** .................19

        3.    **Defendant Misappropriated DK's Trade Secrets** ...................19

    B.    **Breach Of Contract** ............................................................................20

        1.    **Breach of Defendant's Noncompetition Covenant**...............................20

        2.    **Breach of Nonsolicitation Obligations in Defendant's Confidentiality Agreement** .................................................23

        3.    **Breach of Nondisclosure Obligations in Defendant's Confidentiality Agreement** .................................................24

        4.    **Massachusetts Law Governs Defendant's Contracts** .............25

    II.    DK WILL BE IRREPARABLY INJURED ABSENT INTERIM RELIEF .............................25

    III.    THE BALANCE OF EQUITIES FAVORS GRANTING A PRELIMINARY INJUNCTION ......................................................................30

    IV.    A PRELIMINARY INJUNCTION IS IN THE PUBLIC INTEREST .....................30

# TABLE OF AUTHORITIES

**Cases**

*Advanced Micro Devices, Inc. v. Feldstein*,
    2013 WL 10944934 (D. Mass. May 15, 2013) ............................................................19, 23

*Allstate Ins. Co. v. Fougere*,
    2019 WL 4776986 (D. Mass. Sept. 30, 2019) ........................................................19

*Allstate Ins. Co. v. Fougere*,
    79 F.4th 172 (1st Cir. 2023) ...............................................................................18

*Analogic Corp. v. Data Translation, Inc.*,
    371 Mass. 643 (1976) ........................................................................................26

*Anaqua, Inc. v. Bullard*,
    2014 WL 10542986 (Mass. Super. July 24, 2014) ................................................24

*Aspect Software, Inc. v. Barnett*,
    787 F. Supp. 2d 118 (D. Mass. 2011) ..............................................22, 25, 26, 27, 30

*Automile Holdings, LLC v. McGovern*,
    483 Mass. 797 (2020) ........................................................................................24

*Builder Servs. Grp., Inc. v. Harkins*,
    2023 WL 4685943 (D. Mass. July 21, 2023) ....................................................19, 26

*Corp. Techs., Inc. v. Harnett*,
    943 F. Supp. 2d 233 (D. Mass. 2013) ..............................................................28, 29

*CVS Pharmacy, Inc. v. Lavin*,
    951 F.3d 50 (1st Cir. 2020) .................................................................................17

*Darwin Partners, Inc. v. Signature Consultants, LLC*,
    2000 WL 33159238 (Mass. Super. Mar. 24, 2000) ..............................................29

*Diomed, Inc. v. Vascular Sols., Inc.*,
    417 F. Supp. 2d 137 (D. Mass. 2006) ..................................................................18

*EMC Corp. v. Pure Storage, Inc.*,
    2016 WL 7826662 (D. Mass. Aug. 19, 2016) ......................................................18

*Fire 'Em Up, Inc. v. Technocarb Equip. (2004) Ltd.*,
    799 F. Supp. 2d 846 (N.D. Ill. 2011) ..................................................................18

*G&L Plumbing, Inc. v. Kibbe*,
    2023 WL 6881597 (D. Mass. Oct. 18, 2023) ..........................................18, 19, 25

*GES Exposition Servs., Inc. v. Floreano*,
    2007 WL 4323012 (D. Mass. Dec. 7, 2007) .........................................................21

*Hyperactive, Inc. v. Young*,
    2018 WL 4778115 (Mass. Super. July 20, 2018) ..................................................25

*Knox v. Stalk & Beans, Inc.*,
    2021 WL 5626439 (Mass. Super. Oct. 4, 2021) ....................................................28

*Marcam Corp. v. Orchard*,
    885 F. Supp. 294 (D. Mass. 1995) ..................................................................28

*Nat'l Eng'g Serv. Corp. v. Grogan*,
    2008 WL 442349 (Mass. Super. Jan. 29, 2008) ..............................................22

*Nat'l Med. Care, Inc. v. Sharif*,
    2020 WL 6318922 (D. Mass. Sept. 2, 2020) ..............................................22, 27

*New England Cir. Sale v. Randall*,
    1996 WL 1171929 (D. Mass. June 4, 1996) ....................................................30

*New England Controls, Inc. v. Pilsbury*,
    2018 WL 3150223 (D. Mass. June 27, 2018) ..................................................29

*Nuance Commc'ns, Inc. v. Kovalenko*,
    2022 WL 2347112 (D. Mass. June 29, 2022) ..........................................22, 24, 30

*Oxford Glob. Res., Inc. v. Guerriero*,
    2003 WL 23112398 (D. Mass. Dec. 30, 2003) ................................................25

*Perficient, Inc. v. Prior*,
    2016 WL 1716720 (D. Mass. Apr. 26, 2016) ..................................................29

*Ross-Simons of Warwick, Inc. v. Baccarat, Inc.*,
    102 F.3d 12 (1st Cir. 1996) ..........................................................................17

*Shipley Co. LLC v. Kozlowski*,
    926 F. Supp. 28 (D. Mass. 1996) ..................................................................22

*SimpliVity Corp. v. Bondranko*,
    204 F. Supp. 3d 340 (D. Mass. 2016) ......................................................26, 27

*SimpliVity Corp. v. Moran*,
    2016 WL 5122671 (Mass. Super. Aug. 14, 2016) ..........................................21

*Stone Legal Res. Grp., Inc. v. Glebus*,
    2002 WL 35654421 (Mass. Super. Dec. 16, 2002) ........................................29

*Thermal Eng'g Int'l (USA) Inc. v. Lanaville*,
    646 F. Supp. 3d 202 (D. Mass. 2022) ............................................................23

**Statutes**

18 U.S.C. §§ 1836 *et seq.* ........................................................................................17

18 U.S.C. § 1836(b)(1) ..............................................................................................18

18 U.S.C. § 1839(3) ....................................................................................................18

M.G.L. c. 93 §§ 42-42G ............................................................................................17

M.G.L. c. 93, § 42(4) .................................................................................18

M.G.L. c. 149 § 24L(b).................................................................................20

M.G.L. c. 149 § 24L(b)(ii).............................................................................22

M.G.L. c. 149 § 24L(b)(iii)......................................................................20, 21

M.G.L. c. 149 § 24L(b)(iv)............................................................................21

M.G.L. c. 149 § 24L(b)(vi)............................................................................21

M.G.L. C. 149 § 24L(D)...............................................................................21

# INTRODUCTION

In the five weeks since the Court entered the TRO in this case, discovery has uncovered new and overwhelming evidence against Defendant that demonstrates the urgent need for a preliminary injunction. Defendant's theft, deception, and lies are far more extensive and alarming than anyone could have imagined several weeks ago. A mountain of evidence—forensics, witness testimony, and binding admissions by Defendant at his deposition—confirms that Defendant knowingly and intentionally ***downloaded numerous documents containing DraftKings' ("DK") confidential information and trade secrets to his personal devices; solicited key DK employees and customers; attempted to cover his tracks by destroying evidence of his misconduct and lying in his sworn declarations, interrogatories, and deposition testimony; and failed to return all of DK's confidential information as required by the TRO***. Defendant's actions were brazen, egregious, and indefensible. After learning he was being investigated for workplace misconduct in early January, Defendant could have departed DK with integrity and honored his contractual commitments. Instead, he did the opposite.

Defendant's scheme and betrayal strike at the heart of DK's industry-leading VIP business. Rather than compete fairly by building its own VIP program from scratch, Fanatics lured Defendant away to assume the same role he occupied at DK in exchange for a multi-million-dollar compensation package and then schemed with him to circumvent his one-year noncompetition agreement. On his way out the door—including ***while staying at Fanatics' CEO's home in Los Angeles while still employed by DK***—Defendant downloaded or transferred many of DK's closely guarded and most valuable business documents to his personal devices, giving him a precise and actionable roadmap for cloning DK's VIP business at Fanatics, which, in Defendant's own words, is in its "nascent" stage. He tried to hide his misconduct by ***deleting hundreds of documents—***

1

***even after consulting with Fanatics' Chief Legal Officer about his covenants with DK***.  And the day he departed from DK, he solicited two valuable DK employees on the VIP team—from the home of Fanatics' CEO—one of whom ***applied for a job at Fanatics during their phone call***.

DK knew only a small fraction of Defendant's wrongdoing when it moved for a TRO on February 5, 2024, four days after Defendant departed from DK and took a job from a direct competitor in brazen violation of his non-compete.  Nevertheless, on the record DK assembled in that short time, this Court entered a TRO, finding Defendant likely "used improper means in breach of a confidential relationship to acquire and use" DK's trade secrets.  Hr'g Tr. 52:1-3.[1]  The Court relied on evidence that Defendant had accessed four documents before his departure—including after deciding to accept Fanatics' offer.  To preserve the *status quo*, the Court did not prevent Defendant from working at Fanatics but said it "intend[ed] to consider whether DK has met its burden to obtain that form of relief at the preliminary injunction phase."  Hr'g Tr. 56:7-11, 20-25.

The evidence supporting the TRO pales in comparison to the damning evidence developed during limited expedited discovery.  The evidence presented in support of this motion—affidavits from DK employees, a forensic investigation of Defendant's company-issued laptops, Defendant's numerous lies, and Defendant's incriminating deposition testimony—lays bare an egregious pattern of misconduct confirming that Defendant has no regard for his contractual commitments, legal obligations, or following the rules.  Nothing short of a preliminary injunction enforcing the restrictive covenants, including preventing Defendant from working at Fanatics for the duration of his noncompetition covenant, will stop him from continuing his bad faith actions or prevent irreparable harm to DK.

---

[1] As used herein, "Hr'g Tr." refers to the transcript of the February 8, 2024 hearing on DK's request for a TRO.  "Aff." refers to the affidavits and "Decl." refers to the declarations filed concurrently with DK's motion.

**Theft of Confidential Information.** Defendant took many of DK's confidential documents between when he spoke with Fanatics CEO Michael Rubin about a role at Fanatics on January 11 and when he departed from DK on February 1. The evidence is open-and-shut. The day after meeting with Rubin, Defendant began ***downloading highly sensitive DK documents from a non-DK device***—starting with a presentation detailing the organization of DK's VIP team, including its structure and the names and positions of dozens of employees. On January 16, five days after meeting with Rubin, Defendant sent to his own Slack account and then ***downloaded onto a non-DK device*** some of DK's most sensitive business documents—customer and partner lists, marketing and business strategies, details of compensation for thousands of DK employees, and financial information—everything Defendant would need to build a team and clone a business at Fanatics that would directly compete with the VIP team he led at DK. That same evening, Defendant completed multiple "AirDrops" from his DK laptop to an iPhone named MZH X(3), searched "move big files" on Google, and then visited unauthorized file-transfer platforms before deleting his web browsing history to hide his activity.[2] Defendant continued to download DK's confidential information from non-DK devices in the days, and even hours, leading up to his departure—when he downloaded documents to his personal device about DK's VIP Program and plans for the Super Bowl ***while he was staying at Fanatics' CEO's home***.

**Solicitation of Employees.** On the same day he departed from DK and started at Fanatics, Defendant solicited two senior employees on DK's VIP team, Andrew Larracey and Hayden Metz, from Fanatics' CEO's home. He offered millions of dollars in compensation, directed them to

---

[2] Defendant's belated justification—that he was transferring documents from his 16-inch laptop to a "new" 14-inch laptop *two months* after first receiving it—does not explain why he downloaded only select documents onto his new laptop; wiped his original laptop of documents, web browsing history, and iMessages; and wiped his new laptop less than two weeks later.

apply for specific openings with Fanatics, and advised them he was acting with Fanatics' CEO's imprimatur.  Larracey ultimately applied for a VIP role at Fanatics *during his conversation with Defendant*, and Fanatics has continued to communicate with Larracey about the position since the TRO, including as recently as February 20.

**Solicitation of Customers.**  Even before he left for Fanatics, Defendant reached out to a DK VIP—one of its most valuable customers—to alert him to his imminent departure.  Days after the TRO, Defendant communicated with multiple DK VIP customers and key business partners at the Super Bowl, despite the TRO's bar on "soliciting" DK's customers or partners.  Defendant introduced at least one of these customers to a Fanatics' employee on Defendant's VIP team; that Fanatics employee then solicited that DK customer the day after this Court issued its TRO.

**Cover-Up.**  Defendant's consciousness of guilt is equally overwhelming.  To cover his tracks, Defendant went on a deletion spree: first, on January 16, the same day he exfiltrated DK documents, Defendant spoliated hundreds of documents, all his iMessages, and substantial portions of his web browsing history by deleting them from a DK-issued laptop.  He did the exact same thing just 12 days later on a second DK-issued laptop—deleting hundreds of documents, iMessages, and his web browsing history—the very same day he decided to work for Fanatics.[3] In addition to destroying evidence, Defendant instructed at least one witness to lie—telling one of the DK employees he solicited he should deny speaking with Defendant, if questioned by lawyers, regarding his employment offer at Fanatics.

**False and Deceptive Testimony.**  Defendant repeatedly lied about numerous material issues to this Court and to DK.

---

[3] DK exposed Defendant's efforts to cover his tracks by analyzing Defendant's company-issued laptops and without access to his personal devices.

***Solicitation.***   Defendant swore "since my resignation from [DK] … I have not solicited any [DK] employees," ECF 36 ("Def. Decl.") ¶ 40, an affirmation he made on multiple occasions. *See* Goeke Decl. Ex. A ("Def. Ca. Decl.") ¶ 21 (swearing under oath that accusation Defendant "solicit[ed] customers and employees" was "false"); Goeke Decl. Ex. B-1 ("Def. Rog. Resp.") at 16 (stating that Defendant did not "hint or encourage Mr. Larracey or Mr. Metz to leave DraftKings for Fanatics. … certainly had no intention that either Mr. Larracey or Mr. Metz leave DraftKings and was very careful to avoid soliciting—or even appearing to solicit—either of them"); *id.* at 24 (affirming Defendant "has not solicited" Larracey "on behalf of Fanatics").

But this was a lie.   Per the detailed affidavits provided by Larracey and Metz, Defendant unequivocally solicited these two DK employees to work at Fanatics while he was located at the home of Fanatics' CEO.   Faced with their accounts during his deposition, Defendant primarily responded by stating he doesn't "recall" many of the factual circumstances.   While Defendant ultimately denied soliciting Metz and Larracey, his denial is simply not credible based on the evidence on record—including that Larracey, Metz, and Defendant spoke for nearly three hours on the evening of February 1; Larracey and Metz took contemporaneous notes of the discussion of compensation; and Larracey even applied for a position at Fanatics *during* these phone calls. Defendant also used DK's confidential information to solicit Larracey and Metz: he offered them jobs with compensation that was higher than at DK, information he knew only from DK. Defendant initially claimed he spoke to Larracey once, on February 1, but ultimately admitted at his deposition that was a lie since he "did speak to him after the 1st."   *Compare* Def. Rog. Resp. at 15-16; Goeke Decl. Ex. B ("Depo Tr.") at 20:17-21:21, 31:24-32:7, *with* Larracey Aff., Exs. A, E.

***Document Theft.***   Defendant swore he never took confidential information and trade

secrets.  Def. Decl. ¶ 44.  In fact, at the TRO hearing, Defendant's counsel said Defendant "does not have a single piece of [DK's] confidential information" because "[h]e well knows that the death knell for him is if he walked out of [DK] with a shred of information that was their confidential information."  *See* Hr'g Tr. 46:9-15.  But forensic evidence proves he downloaded dozens of documents from a non-DK device, including while in the home of Fanatics' CEO. Defendant has also retained DK documents, including documents on the numerous devices (at least 2 phones and 2 iPads) not disclosed to the Court.

***Fanatics' Offices.***  At the TRO stage, in response to forensic evidence proving Defendant accessed documents from a "Fanatics" IP address, Defendant denied ever being at Fanatics' offices in Los Angeles until after he departed from DK.  But, until confronted at his deposition, Defendant ***never*** disclosed to DK or this Court that he stayed at Rubin's house for days beginning on January 28, where he accessed a "Fanatics" IP address, while still employed by DK.

***Certification.***  Under the TRO, Defendant was required to return to DK all of DK's confidential information and certify that he had done so.  His certification makes clear he has ***not*** returned DK's confidential information, in brazen violation of the TRO.  Defendant claimed he "took steps to segregate all DK information before [his] February 1, 2024 resignation" and specified devices and accounts he turned over to counsel.  Goeke Decl. Ex. B-10 ("Def. Cert.") ¶ 3.  That was misleading at best.  Defendant omitted numerous accounts (including Gmail and Dropbox) and devices (including at least two iPhones and two iPads), which DK's investigation has revealed contain DK documents or were connected to DK's laptops or synced with its Google Workspace.  And Defendant did not even check his iPad or certain Gmail accounts for DK's confidential information before swearing under oath he had turned over all such information.

The evidence of Defendant's theft, destruction of evidence, false declarations and

testimony, and failure to abide by the TRO is overwhelming. Confronted with the evidence at his deposition, Defendant lied, dissembled, obstructed the questioning, or feigned no recollection (more than 100 times) of events occurring weeks ago. This is not a litigant who comes before the Court with clean hands. It is a party who has been caught dead to rights and has no legitimate defense. This Court has broad discretion to protect against misconduct of this kind, irreparably damaging a competitor—through misappropriation of trade secrets, solicitation of employees and customers, and unfair competition—in violation of his valid and enforceable agreements. This is a paradigm case for a preliminary injunction enforcing those covenants. Defendant had every right to leave DK and get another job. But he has no right, and is expressly prohibited from, violating his covenants not to compete, solicit, or disclose or use confidential information.

While the Court declined to enforce the non-compete at the TRO stage, it is now clear that Defendant has little regard for the truth or the Court's orders and cannot be trusted. Nothing short of a preliminary injunction enjoining him from competing against DK, including preventing Defendant from working at Fanatics for the duration of his noncompetition covenant, will prevent Defendant from continuing to irreparably harm DK. The Court must stop him now.

## STATEMENT OF FACTS

**A.     DK and Fanatics Compete in the Digital Sports Entertainment Industry and for VIP Customers**

DK is a leader in the fiercely competitive digital sports entertainment and gaming industry, known for fantasy sports, mobile sports betting, iGaming, collectibles, and media. *See* ECF 1 ("Compl.") ¶¶ 2, 19-20. DK is a leader in the fiercely competitive digital sports entertainment and gaming industry, known for fantasy sports, mobile sports betting, iGaming, collectibles, and media. See ECF 1 ("Compl.") ¶¶ 2, 19-20. DK competes for a small number of key partners— including athletes, celebrities, and professional sports leagues—as well as "VIP" customers. *Id.*

¶¶ 7, 18-20, 26.  DK has spent roughly a decade and substantial resources building an industry-leading VIP team, which is critical to DK's success: the VIP team fosters relationships with DK's most loyal customers and is responsible for a significant share of DK's revenue across all verticals. *Id.* ¶¶ 18, 26, 87.

One of DK's chief competitors is Fanatics, a "digital sports platform, operating" in "betting and gaming," collectibles, and apparel.  Def. Ca. Decl. ¶ 4.  Fanatics recently started building "Fanatics VIP."  The "core … job responsibilities" of "the head of Fanatics' VIP business" are "[b]uilding and maintaining relationships with customers and partners."  *Id.* ¶ 3.  The Fanatics VIP team is still in "a nascent stage."  *Id.* ¶ 19.  It will be Defendant's job to "build[] a VIP [team] across the portfolio brand that Fanatics overse[e]s," Depo. Tr. 44:7-8, including across "all three" Fanatics "verticals of … e-commerce, collectibles, and gaming," *id.* 173:5-11.

## B.     Defendant Agreed to DK's Restrictive Covenants

When he was hired, Defendant agreed to nonsolicitation and nondisclosure restrictions, promising not to use or disclose DK's confidential information and, for twelve months following his employment, not to directly or indirectly solicit DK's customers, clients, vendors, partners, or employees.  Compl. ¶¶ 38-39, 46 & Ex. A (the "Confidentiality Agreement"); *see also* Depo. Tr. 153:20-24.  Defendant knew DK took its confidentiality and restrictive covenants seriously, and "carried the flag" on those policies.  Depo. Tr. 117:22-118:5.  In August 2023, Defendant entered a non-compete covenant (for the thirteenth time).  Compl. ¶¶ 50–51 & Ex. B (the "Noncompetition Covenant").  That covenant prohibited him, for twelve months following termination of his employment, from competing with DK.  *Id.*; *see also* Depo. Tr. 153:20-24.  For that, Defendant was awarded additional equity compensation now valued at more than $4.5 million.  *See* Compl. ¶¶ 50-51; Noncompetition Covenant.

Until his abrupt departure, Defendant was a senior executive at DK, managing its VIP team. ECF 5 ("Karamitis Aff.") ¶¶ 8-13. As the VIP team leader, Defendant was privy to and used DK's most valuable and sensitive trade secrets and highly confidential information. *Id.* ¶¶ 14-16; Henley Aff. ¶¶ 11, 13, 15; Russell Aff. ¶¶ 6, 11. Using DK's financial and informational resources, Defendant helped cultivate DK's relationship with VIP customers—although Defendant rarely recruited VIP customers himself. Depo. Tr. 81:17-21. Also, in his role as head of VIP, Defendant worked cross-functionally with, and received confidential information regarding, all DK's business verticals, including collectibles, ecommerce, apparel, and media. Henley Aff. ¶ 11.

### C. Fear of an Investigation into his Misconduct Drives Defendant to Seek Employment with Fanatics—and to Misappropriate DK's Trade Secrets and Confidential Information

On January 3, 2024, Defendant learned that he was the subject of an internal investigation at DK. Depo. Tr. 91:24-92:3. Subordinates and colleagues had complained about his conduct in late 2023, accusing Defendant of inappropriate behavior. Henley Aff. ¶ 21; *see also* Depo Tr. 92:10-16. On January 11, just eight days after learning of the investigation, Defendant "reached out to Mr. Rubin," CEO of Fanatics, purportedly because Defendant heard a "rumor" that Fanatics was looking to hire a head of VIP. Depo. Tr. 106:2-7; Def. Decl. ¶ 13. Defendant knew that DK viewed Fanatics' recruitment of VIP employees as a "competitive risk." Depo. Tr. 151:20-152:3, 154:17-24. He spoke with Rubin anyway. Def. Decl. ¶ 13. The very next day, Defendant began downloading highly sensitive DK documents. Harris Aff. App. A. He ultimately downloaded dozens of documents from a non-DK device, starting with a presentation containing details about DK's VIP organization, including its organization and structure, and names and positions of dozens of employees. Harris Aff. App. A; Henley Aff. ¶ 34.

Four days later, on January 16, Defendant sent his brother an iMessage that DK's internal investigation "process" was "high, high, high stress and anxiety" and that he did not "want to get

fired." Goeke Decl. Ex. B-6; Depo. Tr. 97:5-20. The same day, Defendant sent to his own Slack account a series of messages attaching 18 unique documents, including confidential information about DK's business partners and contracts, and ***personnel information and compensation for thousands of DK's employees***, including specifically those identified as "Vital Talent" on the VIP team. Goeke Decl. Ex. C ("DK Rog. Resp.") at 11-13; Harris Aff. ¶¶ 31-32. He then downloaded a number of those documents on his personal iPhone. Harris Aff. ¶¶ 31-32. Just fifteen minutes after sending, Defendant searched the phrase "move big files" on Google. Green Aff. ¶ 18. Defendant then visited "Transfernow.net," an online platform for transferring large files, and then repeatedly transferred files from his DK laptop via "AirDrop," a file transfer service built into Apple devices, to an iPhone called "MZH X(3)." Green Aff. ¶ 15, 18 . Both transfer methods are unauthorized, pursuant to DK's Information Sensitivity Policy.[4] Harris Aff. ¶¶ 33, 37. That same day, he accessed Dropbox, a cloud-based file storage service that permits users to sync files across multiple devices, which is also unauthorized pursuant to DK's Information Sensitivity Policy. Harris. Aff. ¶¶ 33, 35, 37. Defendant provides no legitimate explanation for any of this conduct. Depo. Tr. 98:17-99:24, 121:10-17, 122:25-123:9, 125:5-11, 127:4-9, 137:22-138:8, 156:5-14, 159:15-22. Instead, he suggests that the transfer occurred as part of his transition from his 16-inch laptop to his 14-inch laptop, and that he transferred "personal" documents. *Id.* 147:6-17. But DK IT had advised him on setting up his laptop weeks earlier—and not at all on January 16. Hernandez Aff. ¶  DK IT did not recommend, and DK's Information Sensitivity Policy prohibited, Defendant's use of Transfernow.net, Dropbox, or AirDrop. *Id.* Harris Aff. ¶ 33, 35, 37.

Defendant then went on a deletion spree: Defendant intentionally deleted all iMessage and

---

[4] The Information Sensitivity Policy is part of DK's Information Security Policies ("InfoSec"). Harris Aff. ¶ 7. Defendant was most recently trained, and required to acknowledge, DK's InfoSec Policies on December 10, 2023. Harris Aff. ¶ 9.

text message data from his 16-inch laptop, including the message to his brother about DK's internal investigation. Green Aff. ¶ 32-33; *cf.* Depo. Tr. 99:3-21 (admitting "I definitely took off my iMessage or … deactivated my iCloud … at some point."). He deleted the documents he had sent to his own Slack account. Green Aff. ¶¶ 18, 24, 25, 27. He deleted Dropbox files. Green Aff. ¶ 28. And he cleared a substantial portion of his web browsing history. Green Aff. ¶¶ 30, 31. Defendant does not explain why he deleted hundreds of documents, his web browsing history, or his iMessages from his 16-inch laptop and, just 12 days later, his 14-inch laptop. *See* Depo Tr. at 160:4-19, 176:13-20, 137:22-138:11; Green Aff. ¶¶ 27, 30-33.

A week after exfiltrating DK's documents—including information about DK's business partners and contracts and highly sensitive personnel information—and deleting the evidence, on January 23, Defendant met with Rubin at Rubin's Manhattan apartment. Depo. Tr. 170:8-12; Def. Decl. ¶ 13. During that meeting, Defendant and Rubin discussed his DK non-compete covenant— including the fact that it extended to "gaming." Depo. Tr. 171:19-172:25. Later that week, Defendant "met with other members of the Fanatics executive team." Def. Decl. ¶ 13.

In tandem, Defendant continued to download DK's documents from a non-DK device: on January 23, Defendant viewed numerous documents, including a VIP Founders Club document outlining DK's strategy to leverage business partnerships to increase customer loyalty, Def. Decl. ¶ 56; and a presentation about a program to strengthen connections with DK, Harris Aff. App. A; Henley Aff. ¶ 37.[5] The next day, Defendant downloaded from a non-DK device a business

---

[5] At the TRO hearing, Defendant's counsel made much of Defendant's "viewing" of DK documents. Hr'g Tr. 30:15. This Court was not persuaded by that argument. Hr'g Tr. 52:11-20 ("Mr. Harris's declaration, established that Mr. Hermalyn accessed, he says downloaded - I don't see a material difference in those words - three of DraftKings' highly confidential documents …"). In any event, this distinction makes no difference—Defendant's copying material or taking screenshots (as he did frequently) may only be a "view" in the Google Workspace. Green Aff. ¶ 42 n.14.

development weekly report, Harris Aff. App. A; Def. Decl. ¶¶ 58-59; and a document detailing goals, revenues, risks, and team structure for the VIP team. Harris Aff. App. A; Henley Aff. ¶ 37. As for the weekly, report, Defendant claims that he may have reviewed the business development weekly report in advance of a weekly team call. Def. Decl. ¶ 59. But as his colleague Mr. Russell explains, this report was discontinued more than a month earlier, and regardless, was never used in the weekly team calls that Defendant attended. *See* Russell Aff. And of course, at the time, he was in active discussions with Fanatics about running its VIP team and circumventing his Noncompetition Covenant, Depo. Tr. 171:19-172:25.

On January 26, Defendant officially learned the results of DK's investigation and the resulting discipline—including placement on a performance improvement plan, reduced compensation and responsibilities, mandatory harassment training, loss of his corporate credit card and executive assistant support. Henley Aff. ¶ 27. Defendant was not "happy." Depo. Tr. 168:18-20. The same day, he accessed a spreadsheet containing the preferences of over 1,000 of DK's most loyal VIPs and customers. Harris Aff. App. A; Henley Aff. ¶ 37.

One day after learning about the discipline, on January 27, Defendant met with Rubin and Fanatics' Chief Legal Officer, Gregg Winiarski. Depo. Tr. 177:2-178:7. Defendant provided them with a copy of his latest non-compete covenant, and they discussed "next steps" for Defendant to join Fanatics. Depo. Tr. 152:16-153:24, 178:8-16, 179:8-15, 180:4-12. After that conversation, Defendant claims to have officially received a job offer from Fanatics and engaged his own counsel. Def. Ca. Decl. ¶ 14; Depo Tr. 180:21-24, 181:6-11. Later that same day, he told a DK customer, "I want to take you somewhere." DK Rog. Resp. at 35.

The next day, on January 28, Defendant says he decided to accept the Fanatics job and flew to Los Angeles. Def. Decl. ¶ 7. He drafted an email containing a list of words ("Vote Apt Lease

Doctor") that mirror the actions he would later point to as supposedly establishing his California residency in a scheme to avoid his contractual noncompetition obligations. *Compare* Goeke Decl. Ex. F *with* Def.. Decl. ¶ 8. Defendant also—again, ***after conferring with Fanatics' Chief Legal Officer about his restrictive covenants***—deleted hundreds of documents, an unknown number of iMessages, and his web browsing history from his 16-inch DK-issued laptop. Green Aff. ¶¶ 27, 30-33. Defendant did not deny this deletion activity but rather could not "recall" it. Depo. Tr. 161:2-19. He has failed to provide any legitimate explanation for his actions, other than to speculate that some of those materials may have been "personal." Depo. Tr. 159:25-3, 160:4-11, 160:12-18, 161:2-21, 176:13-25. And the night of January 28, Defendant stayed at Rubin's home in Los Angeles. Depo. Tr. 45:14-25, 46:19-21, 55:11-14, 176:6-12, 183:3-11, 186:14-21.

On January 29—while still staying at Rubin's home and still on DK's payroll—Defendant sent an email to his DK colleagues saying his friend had died, and canceled meetings scheduled for January 29 and 30. Compl. ¶ 65. During these days, Defendant responded to only 6 of 365 emails that he received, Harris Aff. ¶ 20, demonstrating that he was clearly not working for DK. But he continued downloading DK confidential documents, including a document containing DK's Super Bowl 2024 strategy (accessible only to 21 of DK thousands of employees) titled Master SB. Harris Aff. App. A; Henley Aff. ¶ 38.; Compl. ¶¶ 60, 67. Defendant says he accessed Master SB to assist another employee, Brittney Goodman; yet another lie. Goodman explains that Defendant had no reason to download it and did not do so to assist her. Goodman Aff. ¶¶ 4-8. Defendant's former colleagues have also provided sworn affidavits showing Defendant had no legitimate business reason to access the balance of the documents. Henley Aff. ¶ 38.

### D. After Officially Departing from DK, Defendant Immediately Violates His Restrictive Covenants

On February 1, Defendant departed from DK to join Fanatics. Def. Decl. ¶ 11. That same

day, and just hours before his Google Workspace access was decommissioned, Defendant *downloaded two confidential DK presentations*: one containing twelve months of detailed operational data from the VIP program, including figures showing customer data, financial performance, calculations relating to potential and actual revenue, and monthly operational goals; and the other reflecting DK's pitch to potential business partners on the value proposition of partnering with DK, including the profile of DK's customers and its other business partnerships. Henley Aff ¶ 38; Harris Aff. ¶ 44, App. A.

On his first day of employment at Fanatics, while he was still at Rubin's home in Los Angeles, Defendant had a series of calls with two of his key lieutenants at DK—Metz, then Senior Director of Growth and Development (and now Defendant's replacement), and Larracey, then Senior Manager of VIP Strategy and Operations—and solicited them to leave DK and join Fanatics. Metz Aff. ¶ 8; Larracey Aff. ¶ 9. Knowing full well Metz and Larracey's DK compensation (and aided by the confidential information he accessed at DK), Depo. Tr. 47:7-47:25, Defendant told Metz and Larracey which positions to apply for, negotiated compensation with them, and represented that he had authority from Fanatics to offer them millions of dollars in cash and equity to incentivize them to join Fanatics. Metz Aff. ¶¶ 7-10; Larracey Aff. ¶¶ 7-11. Defendant even offered to put Rubin on the phone to discuss these employment offers. *Id*.

During those discussions, Larracey submitted a job application through the Fanatics website. Larracey Aff. ¶ 14, Ex. G. Defendant spoke with Larracey again on the morning of February 2 and on February 3, Larracey Aff. ¶¶ 15-16; Depo. Tr. at 66:9-67:10, encouraging him to take meetings with Fanatics and saying it would reflect poorly on Defendant if Larracey did not. Larracey Aff. ¶ 16. Defendant even instructed Larracey to deny their conversation if lawyers asked about it. Larracey Aff. ¶ 17. Fanatics continued to communicate with Larracey about employment

in Fanatics' VIP group as recently as February 20, 2024, Larracey Aff. ¶ 21—weeks after this Court's TRO prohibiting Defendant from soliciting DK's employees.

Defendant originally denied "solicit[ing] any DK Employees," Def. Decl. ¶ 40, and did not disclose his conversations with Larracey on February 2 and February 3. Def. Rog. Resp. at 19; Depo. Tr. at 60:22-61:5. But at his deposition—after he had been confronted by Metz's and Larracey's accounts, as reflected in DK's interrogatory responses—he acknowledged that he directed them to Fanatics' career site, "talked [to Larracey] about how he was going to interview or did apply," and was aware that neither had yet received formal offers of employment from Fanatics. Depo Tr. 41:24-25, 51:18-52:4, 52:7-53:3, 54:13-17, 67:2-15, 69:3-20, 70:25-71:9. Throughout his deposition, Defendant did not squarely deny the content of his conversations with Metz and Larracey, instead claiming to either not recall such statements or that his behavior was acceptable because he was simply "answering" or "responding" to their questions. Depo Tr. 29:13-30:2, 30:18-24, 36:21-25, 38:19-39:5, 41:5-12, 43:20-23, 44:9-45:4, 46:3-13, 46:22-47:3, 49:8-13, 49:23-50:4, 51:2-11, 54:24-55:7, 58:6-11, 65:24-66:5, 73:20-74:19, 75:3-9.

Defendant solicited DK's customers too, including after this Court issued a TRO restraining him from doing so—telling one DK customer on January 27, just days before defecting to Fanatics, "I want to take you somewhere." DK Rog. Resp. at 35. Defendant also attended the Super Bowl in Las Vegas on behalf of Fanatics, and introduced a DK customer to a Fanatics colleague in his VIP group. Def. Rog. Resp. at 19; *see also* Whall Aff. ¶ 4. As recently as February 9, Fanatics has solicited this customer with pointed references to the fact that Defendant now works there. Whall Aff. ¶ 5; *see also* DK Rog. Resp. at 35. Defendant also met with multiple DK partners, telling them that he was now employed by Fanatics. *See* Depo. Tr. 86:17–88:7.

## PROCEDURAL HISTORY

On February 5, 2024, DK moved for a TRO to enjoin Defendant from misappropriating DK's trade secrets, disclosing its confidential information, soliciting its employees and customers, and unfairly competing against it. ECF. 3. On February 6, Defendant moved for a stay in favor of a California proceeding he orchestrated seeking to void his non-compete. *See* ECF. 25, 26. This Court denied his motion, observing that Defendant "signed a confidentiality agreement and noncompetition covenant with DK expressly stating" that Massachusetts law governs. ECF 29.

The Court held a hearing on DK's TRO request on February 8. The Court found that DK had established a likelihood of success on the merits of its trade secrets misappropriation claim and on its claim for breach of the nondisclosure restrictions. Hr'g Tr. 51:20-53:14; 55:16-22. The Court also concluded "that Massachusetts law applies to this dispute." *Id.* 53:15-55:15. In addition, the Court found irreparable harm to DK as to the misappropriation of trade secrets but believed that "a more fulsome consideration of DK's claims on a preliminary injunction motion" was required before enjoining Defendant from continuing to work for Fanatics. *Id.* 56:7-14, 20-25. The Court issued a TRO, observing that its "aim in doing that [was] primarily to preserve the status quo until more of the facts can be determined." Hr'g Tr. 51:7-13; 56:15-19.

The parties commenced the expedited discovery authorized by the Court on February 8, including by serving and responding to interrogatories and taking depositions. The TRO required Defendant to certify that he had returned all of DK's confidential information and identify any disclosures he had made. *See* ECF 44. On February 12, Defendant swore in that Court-ordered certification that he had returned DK-issued physical devices, segregated all DK information, and turned over certain devices to counsel. Def. Cert. ¶ 2. He has since acknowledged that he never disclosed in his certification that his iPad, Dropbox, and other personal email accounts may contain

DK's confidential information.  Depo. Tr. 193:3-19, 136:8-21, 186:2-10.  And after receiving a letter from DraftKings' counsel concerning the deficiencies in his sworn certification, *see* Goeke Decl. Ex. D, his counsel has admitted that he did not turn over one of his personal devices until March 4—two months after he joined Fanatics and nearly a month after his sworn certification. *See* Goeke Decl. Ex. E at 3.

On February 14, Defendant moved for "clarification" of the TRO, claiming that preventing him from "transacting business" with DK's business contacts would impede his ability to work for Fanatics.  *See* ECF 49.  The Court denied the motion.  *See* ECF 59.  Less than a week later, in a California court, Defendant insisted again that unless he can do business with DK's business contacts, his "utility to Fanatics" will be "damage[d]."  Def. Ca. Decl. ¶¶ 22-23.

## ARGUMENT

Courts "consider four factors" in deciding whether to grant a preliminary injunction: (1) likelihood of success on the merits; (2) irreparable harm; (3) the balance of relative hardships; and (4) the public interest.  *CVS Pharmacy, Inc. v. Lavin*, 951 F.3d 50, 55 (1st Cir. 2020).  Likelihood of success is the most important.  *See Ross-Simons of Warwick, Inc. v. Baccarat, Inc.*, 102 F.3d 12, 16 (1st Cir. 1996).  Each factor decisively favors DK.

## I.    Additional Evidence Confirms That DK Is Likely To Succeed On The Merits

### A.    Trade Secrets Misappropriation

At the TRO stage, DK had already "shown a likelihood of success on the merits of its trade secrets misappropriation claim" under the federal Defend Trade Secrets Act ("DTSA"), 18 U.S.C. §§ 1836 *et seq.*, and the Massachusetts Uniform Trade Secrets Act ("MUTSA"), Mass. Gen. Laws ch. 93 §§ 42-42G.  Hr'g Tr. 51:20-52:5.  Since then, DK has uncovered a mountain of evidence showing that Defendant systematically downloaded and transferred documents to his personal

devices—all the information he could possibly need to build Fanatics' nascent VIP program into an unfair competitor to DK's industry-leading program. There is no doubt that: (1) the information Defendant downloaded and transferred constitutes trade secrets; (2) DK took reasonable steps to keep the information secret; and (3) Defendant obtained the information through manifestly improper means. *See* 18 U.S.C. §§ 1836(b)(1), 1839(3); M.G.L. c. 93, § 42(4); *G&L Plumbing, Inc. v. Kibbe*, 2023 WL 6881597, at *3 (D. Mass. Oct. 18, 2023).[6]

### 1. Defendant Accessed and Downloaded Trade Secrets

If the information Defendant accessed, downloaded, sent to his own Slack account, and transferred does not qualify as trade secrets, nothing would. Economic value is "a key factor," *Allstate Ins. Co. v. Fougere*, 79 F.4th 172, 190 (1st Cir. 2023), although courts consider other factors, such as whether "the information is known outside of the business." *See G&L Plumbing, Inc.*, 2023 WL 6881597, at *4.[7]

DK was aware of only four such documents when it sought a TRO. *See* Compl. ¶¶ 60-71. It has since learned Defendant systematically accessed, downloaded from non-DK devices, and sent to his Slack account numerous documents after Defendant spoke to Fanatics' CEO on January 11—including some Defendant downloaded from non-DK devices *after* he resolved to accept Fanatics' job offer *and while staying at Fanatics' CEO's house*. Those documents together gave Defendant—and Fanatics—everything they could need to duplicate DK's industry-leading VIP program. Henley Aff. ¶¶ 33-38. This information is not just economically valuable; it is key to

---

[6] DK's trade secrets pertain to its national and international gaming services, *see* Compl. ¶¶ 18-19, and thus satisfy the DTSA's commerce requirement. *See* 18 U.S.C. § 1836(b)(1).

[7] "[L]ists of … current and prospective business partners," *Fire 'Em Up, Inc. v. Technocarb Equip. (2004) Ltd.*, 799 F. Supp. 2d 846, 850 (N.D. Ill. 2011); business or marketing strategies, *Diomed, Inc. v. Vascular Sols., Inc.*, 417 F. Supp. 2d 137, 145 (D. Mass. 2006); and customer lists, *EMC Corp. v. Pure Storage, Inc.*, 2016 WL 7826662, at *6 (D. Mass. Aug. 19, 2016), all qualify.

one of the most lucrative aspects of DK's business. Karamitis Aff. ¶ 9; Henley Aff. ¶¶ 13-15. Indeed, many of the documents Defendant accessed or downloaded are off limits to all but a fraction of DK's employees. Harris Aff. App. A.; Compl. ¶¶ 60, 62.

## 2. DK Took Reasonable Efforts to Protect Its Trade Secrets

"DK … took reasonable steps to secure the confidentiality of [its] trade secret[s]." Hr'g Tr. 51:20-52:5. DK requires password protection for company laptops and two-factor authentication—and all DK's devices are encrypted and transfers of files are closely monitored. Harris Aff. ¶¶ 14, 16; *see G&L Plumbing, Inc.*, 2023 WL 6881597, at *5. All employees must execute confidentiality agreements upon commencing employment, and DK annually refreshes employees on their confidentiality obligations. Harris Aff. ¶¶ 8, 12; *see Builder Servs. Grp., Inc. v. Harkins*, 2023 WL 4685943, at *6 (D. Mass. July 21, 2023). That is more than enough.

## 3. Defendant Misappropriated DK's Trade Secrets

Defendant's conduct in the weeks before he departed from DK is paradigmatic misappropriation—and a masterclass in acquiring trade secrets through improper means. *See Builder Servs. Grp., Inc.*, 2023 WL 4685943, at *4-6. Theft; breach of a duty to maintain secrecy, *id.* at *6; breach of "contractual duties," *Allstate Ins. Co. v. Fougere*, 2019 WL 4776986, at *24 (D. Mass. Sept. 30, 2019); and downloading confidential information onto a personal device after accepting a job offer from a competitor, *see Advanced Micro Devices, Inc. v. Feldstein*, 2013 WL 10944934, at *2, *9 (D. Mass. May 15, 2013)—Defendant did it all.

Defendant's agreement with DK, and its InfoSec policies, precluded him from using DK's confidential information for unauthorized purposes and from removing such information from the company's systems without authorization. Confidentiality Agreement § 5. But he viewed and downloaded dozens of DK's confidential records *after* he met with the CEO of DK's competitor, including after having decided to take the job at Fanatics, and **while he was at Rubin's home**. *See*

Def. Rog. Resp. at 14, Harris Aff. App. A; Depo. Tr. 45:14-25, 46:14-21, 55:11-14, 176:6-12, 183:3-11, 186:14-21.

Defendant also used file-transfer or file-sharing websites to exfiltrate dozens, if not hundreds, of documents to non-DK devices. Defendant sent documents to his own Slack account and, minutes later, searched the phrase "move big files" on Google. Green Aff ¶ 18. He then accessed "Transfernow.net" and used Dropbox and Airdrop to transfer documents to non-DK devices, *id.*—all of which were unauthorized, pursuant to DK's Information Sensitivity Policy. Harris Aff. ¶¶ 33, 37. Absent a forensic examination of Defendant's personal devices, DK cannot know the full scope of Defendant's theft because Defendant exfiltrated and deleted files from his company-issued devices. But the evidence DK has uncovered, just five weeks after the TRO, clearly shows Defendant exfiltrated highly confidential documents, in violation of DK's policies and his own contractual agreement with DK. That is the use of improper means *per se*.

**B.     Breach Of Contract**

Defendant signed multiple agreements—for which he received significant compensation—barring him from (1) disclosing DK's confidential information, (2) competing with DK, or (3) soliciting DK's employees, customers, or partners. Each restriction is valid and binding—and Defendant has breached and will continue to breach them all.

**1.     Breach of Defendant's Noncompetition Covenant**

Defendant's conduct over the last two months shows callous disregard for his contractual obligations and disdain for any sense of fairness—all in service of a scheme to evade the noncompetition covenants he agreed to in exchange for millions of dollars in compensation, more than sufficient consideration. Less than six months before joining Fanatics, Defendant agreed not to compete against DK—for the thirteenth time. *See* Compl. ¶ 51; Noncompetition Covenant § (a). This Court should require Defendant to abide by his bargained for obligations.

The Noncompetition Covenant is a valid and binding contract, fully enforceable in Massachusetts.  M.G.L. c. 149 § 24L(b).

**Legitimate Business Interests.**  The non-compete is "no broader than necessary to protect [DK's] legitimate business interests"—namely, DK's trade secrets, confidential information, and goodwill.  *See* M.G.L. c. 149 § 24L(b)(iii).  Defendant admits he cannot work for Fanatics without contacting DK's customers and partners using DK's confidential information and goodwill.  *See* Def. Decl. ¶ 19.  The non-compete confirms that DK's "interests cannot be adequately protected through an alternative restrictive covenant."  *See* Noncompetition Covenant § (d); M.G.L. c. 149 § 24L(b)(iii) (non-compete "presumed necessary" where non-solicit or confidentiality agreement would be insufficient).

**Reasonable Duration.**  The non-compete's restricted period does not "exceed 12 months from the date of cessation of employment."  *See* Noncompetition Covenant § (a); M.G.L. c. 149 § 24L(b)(iv).

**Reasonable Scope.**  The non-compete prohibits Defendant from competing only with aspects of DK's business that he worked in, or for which he received confidential information in the six months prior to his termination, making it "presumptively reasonable."  M.G.L. c. 149 § 24L(b)(vi).

**Reasonable Geographic Reach.**  The non-compete's global scope is reasonable because DK maintains offices and customer relationships around the world and competes internationally in the digital sports sectors.  Compl. ¶¶ 19-20; *SimpliVity Corp. v. Moran*, 2016 WL 5122671, at *12 (Mass. Super. Aug. 14, 2016).  Even if a global scope were too broad (it is not), the remedy would be to reform it "to render it valid and enforceable" by substituting a national geographic scope for a global one.  *See* M.G.L. c. 149 § 24L(d); *GES Exposition Servs., Inc. v. Floreano*, 2007

WL 4323012, at *4 (D. Mass. Dec. 7, 2007).  In fact, the parties agreed to a provision that expressly requires this.  *See* Noncompetition Covenant § (i) .

**Other Requirements.**  Defendant's non-compete was in writing, signed by both parties, informed Defendant of his right to consult counsel, provided him 10 business days before the effective date, and is supported by fair and reasonable consideration—namely, the $4.5 million in additional equity that Defendant received in August 2023.  M.G.L. c. 149 § 24L(b)(ii).  With all these requirements satisfied, Defendant's non-compete was, and is, valid and enforceable.

But Defendant breached it.  His new role at Fanatics is essentially the exact same role he had at DK—in fact, he plans to build Fanatics "nascent" VIP program into a competitor with DK's industry-leading program.  *See supra* at 8, 17.  He wasted no time soliciting key members of DK's VIP team.  *See supra* at 3-5, 14-15.  And he freely admits that he cannot do his job at Fanatics without DK's "customers, clients, vendors, or partners."  Def. Ca. Decl. ¶ 19.  Courts regularly issue preliminary injunctions enjoining an employee from working for a competitor under similar circumstances to avoid unfair competition.  *See, e.g.*, *Aspect Software, Inc. v. Barnett*, 787 F. Supp. 2d 118, 131 (D. Mass. 2011).  The fact that Defendant, "within days of leaving [DK] to work for [Fanatics] … suspiciously accessed and copied confidential information from [DK]" underscores the need for injunctive relief.  *Shipley Co. LLC v. Kozlowski*, 926 F. Supp. 28, 30 (D. Mass. 1996).  Likewise, Defendant's "mere 'association with [a] competing product would be enough to raise doubts in the eyes of [DK's] customers as to the relative value of [DK's offerings],'" thereby damaging DK's goodwill.  *Nuance Commc'ns, Inc. v. Kovalenko*, 2022 WL 2347112, at *6 (D. Mass. June 29, 2022).[8]

---

[8] The Noncompetition Covenant extends the duration of Defendant's non-compete to account for the period of time he has been employed by Fanatics.  *See* § (g); *Nat'l Eng'g Serv. Corp. v. Grogan*, 2008 WL 442349, at *7 (Mass. Super. Jan. 29, 2008).

## 2. Breach of Nonsolicitation Obligations in Defendant's Confidentiality Agreement

Defendant brazenly solicited DK's employees and customers after he departed from DK, including by having Fanatics carry the baton on Defendant's solicitation of Larracey after this Court issued a TRO ordering Defendant not to solicit his colleagues. *See supra* at 3-5, 14-15. This conduct establishes a breach of his nonsolicitation restrictions, which expressly prohibit him from soliciting employees, customers, and partners. *See* Confidentiality Agreement §§ 2-3. Massachusetts courts "routinely uph[o]ld" employee nonsolicitation provisions. *Thermal Eng'g Int'l (USA) Inc. v. Lanaville*, 646 F. Supp. 3d 202, 206 (D. Mass. 2022). To be enforceable, a nonsolicitation restriction need only "protect a legitimate business interest," be "reasonably limited in space and time," and be "consonant with the public interest." *Id.* at 205. Defendant's nonsolicitation restrictions easily satisfy these requirements: it protects DK's trade secrets, confidential information, and goodwill, which are legitimate business interests. *See Thermal Eng'g*, 646 F. Supp. 3d at 205. Its terms are reasonably limited in time (it only lasts for one year) and space. *See id.* at 206-07. And it is thus consonant with the public interest.

Defendant repeatedly breached the agreement, blatantly violating his contractual obligations and in contravention of his explicit representations—under oath—that he "did not solicit either Mr. Larracey or Mr. Metz to join Fanatics at any time in February of 2024." Depo. Tr. 70:25-71:9. Solicitation includes even "subtle hints and encouragements," *Advanced Micro*, 2013 WL 10944934, at *11, and a former employee's mere "statement that she wanted" a former colleague "to join her" counts as solicitation. *Id.*

Defendant's solicitation was hardly subtle. His first move after joining Fanatics was to solicit two of his former DK colleagues—Metz and Larracey. *See supra* at 3-5, 14-15. He encouraged them to apply to specific job postings on the Fanatics website, provided details about

the roles in Fanatics' VIP department, represented that he had authority to offer them, and in fact offered them, millions of dollars in compensation, and offered to put them on the phone with Rubin—**all while staying at Rubin's house**. *See supra* at 5. This was solicitation.

Defendant's recruitment efforts did not end there—he solicited DK's customers too. For example, on January 27, days before departing from DK, Defendant told one DK customer "I want to take you somewhere." He introduced a DK VIP customer to a Fanatics colleague at the Superbowl. Whall Aff. ¶ 4. And he met with multiple DK partners during the Super Bowl, telling them that he was now employed by Fanatics. These solicitations, including those in violation of the TRO, demonstrate Defendant's utter disregard for his nonsolicitation restrictions.[9]

### 3. Breach of Nondisclosure Obligations in Defendant's Confidentiality Agreement

At the TRO hearing, the Court concluded that "DK has demonstrated the likelihood of success on the merits … for breach of nondisclosure agreement." Hr'g Tr. 55:16-22. The evidence uncovered since then only confirms that conclusion. Defendant's breach of his nondisclosure obligations necessarily follows from the evidence of trade secret misappropriation. That is because nondisclosure agreements are enforceable even where, as here, the agreement covers confidential information, not just trade secrets. *See Nuance Commc'ns*, 2022 WL 2347112, at *5. Neither "direct evidence of misuse" nor independent economic value is required. *See Anaqua, Inc. v. Bullard*, 2014 WL 10542986, at *14 (Mass. Super. July 24, 2014), *aff'd*, 88 Mass. App. Ct. 1103 (2015). There is no doubt that the information Defendant downloaded and transferred was confidential. *See supra* at 3, 18-19. And Defendant used confidential information to solicit Metz and Larracey, leveraging their confidential compensation to persuade them to leave DK, in a

---

[9] Given Defendant's continued breaches of his nonsolicitation restrictions and the inadequacy of monetary relief for such breaches, Defendant's nonsolicitation restrictions are subject to equitable tolling. *See Automile Holdings, LLC v. McGovern*, 483 Mass. 797, 817 (2020).

further breach of his nondisclosure obligations.

### 4. Massachusetts Law Governs Defendant's Contracts

Despite Defendant's efforts to manufacture California residency to evade his agreements with DK, this Court has already correctly concluded "Massachusetts law applies;" "Defendant signed two choice of law provisions, in the nondisclosure and nonsolicitation and noncompetition agreements saying that those contracts shall be governed by the internal substantive laws of Massachusetts, without regard to the doctrine of conflicts of laws." Hr'g Tr. 53: 17-22.

Those provisions are enforceable. "In general Massachusetts respects contractual choice of law provisions." *Oxford Glob. Res., Inc. v. Guerriero*, 2003 WL 23112398, at *4 (D. Mass. Dec. 30, 2003). The choice of law agreement is fully consonant with public policy: Defendant's employment was with DK—headquartered in Massachusetts, Compl. ¶ 4; Defendant traveled to Massachusetts on numerous occasions for DK work; and the employees Defendant solicited work from and were in Massachusetts. Larracey Aff. ¶ 4; Metz Aff. ¶ 4. Meanwhile, "California has little connection to this case," Hr'g Tr. 55:7-9, beyond Defendant's transparent attempt to evade his Noncompetition Covenant. *See Aspect Software*, 787 F. Supp. 2d at 125-27. Defendant cannot escape enforcement of Massachusetts law by "fleeing the jurisdiction." *Oxford*, 2003 WL 23112398 at *6.[10]

## II. DK Will Be Irreparably Injured Absent Interim Relief

Defendant has demonstrated that he cannot be trusted and has little more than contempt for the agreements he signed—and even this Court's order. DK has suffered irreparable harm

---

[10] DK also asserted claims for breach of duty of loyalty and conversion. Compl. ¶¶ 163-73. As described in DK's memorandum of law in support of the TRO, these claims provide additional independent bases for interim relief, Dkt. 3 at 16-17; *see also Hyperactive, Inc. v. Young*, 2018 WL 4778115, at *2-3 (Mass. Super. July 20, 2018) (duty of loyalty); *G&L Plumbing, Inc.*, 2023 WL 6881597, at *7 (conversion), including on the facts described in the accompanying affidavits.

due to Defendant's misconduct and DK will continue to suffer irreparable harm unless this Court continues to restrain and enjoin Defendant from working at Fanatics.

The irreparable harm DK will continue to suffer is immense, as no-more evident than by Defendant's admission that he cannot work for Fanatics without using DK's confidential information. With limited discovery, DK has uncovered a mountain of wrongdoing which needs to stop immediately. Armed with the information that Defendant improperly transferred, downloaded, viewed and otherwise will inevitably disclose, among other things, Defendant can replicate DK's decade-in-the-making VIP program; interfere with DK's contractual commitments; and continue to solicit DK's employees, customers, and partners. Defendant had oversight over, and access to, detailed information about every aspect of DK's VIP program across all verticals and all critical components of optimizing the economics and efficiencies of the VIP program— including customer acquisition, retention, and operations. Henley Aff. ¶¶ 7-11. The imminent threat of Defendant's continued misuse of DK's confidential information, know-how and good-will cannot be adequately remedied at a later time. The competitive harm to DK's business cannot be undone and must stop now.

Absent a preliminary injunction preventing him from working at Fanatics for the duration of his noncompetition covenant, that irreparable harm will continue to mount.

**Theft.** Where, as here, a former employee misappropriates trade secrets, irreparable harm is presumed based on likelihood of success on the merits. *Builder Servs. Grp.*, 2023 WL 4685943, at *6. The same is true when "a breach of [a] non-compete agreement[] [is] tied to trade secrets concerns." *Aspect Software*, 787 F. Supp. 2d at 130. The injury from violation of a non-compete agreement is "hard to quantify." *SimpliVity Corp. v. Bondranko*, 204 F. Supp. 3d 340, 350 (D. Mass. 2016). While a typical employee may compete against his former employer, "defendants

who … willfully attempted to profit through violation of a confidential relationship need not be placed in as good a position as other, honest competitors." *Analogic Corp. v. Data Translation, Inc.*, 371 Mass. 643, 649 (1976). Defendant's misappropriation of DK's confidential information and trade secrets, and solicitation of its customers and employees, will irreparably harm DK.

**Inevitable Disclosure.** In addition to the overwhelming evidence that Defendant took from DK, Defendant is intimately familiar with all aspects of DK's VIP program—including its confidential strategies regarding operations, acquisition, retention and efficiencies. Henley Aff. ¶¶ 7-11. It is inevitable that he would use that knowledge if permitted to work at Fanatics— precisely what his non-compete is designed to prevent. "[A] defendant in breach of a non-competition agreement, despite his best intentions, often cannot avoid the inevitable disclosure of confidential information." *Bondranko*, 204 F. Supp. 3d at 350 (collecting cases). Inevitable disclosure most often occurs where: (1) the defendant "work[s] at a competing business" and "his duties are likely substantially similar to … duties he performed at" his prior employer, *Nat'l Med. Care, Inc.*, 2020 WL 6318922, at *15; and (2) there is substantial overlap or similarity between the "products and customers" of his "new and old positions," *Bondranko*, 204 F. Supp. 3d at 351.

Defendant has ***admitted and demonstrated*** that he cannot compete without using and disclosing DK's confidential information. His role at Fanatics is essentially identical to his role at DK. His new job is to build a VIP team to rival the very same VIP team he oversaw at DK. Depo. Tr. 43:5-44:8, 197:9-21. Defendant has demonstrated that there is no way to build the same type of organization—let alone a directly competing one—without using DK's confidential information. The documents he accessed and downloaded after he started negotiating his departure with Fanatics were a schematic for building a VIP team: revenues, operations, strategy and employee documents, and customer and partner lists. Henley Aff. ¶¶ 36-40. And there is no way

"all of the information stored in [his] memory" could be "set aside" in his new role. *Aspect Software*, 787 F. Supp. 2d at 130. He simply cannot do his job at Fanatics without being "influenced by the knowledge he possesses" from DK. *Marcam Corp. v. Orchard*, 885 F. Supp. 294, 297 (D. Mass. 1995). Once Defendant uses DK's confidential information to build Fanatics' VIP program, the competitive damage to DK cannot be undone.

Defendant has admitted that he will continue to violate his nondisclosure and nonsolicitation restrictions if he continues to work at Fanatics. Defendant insists that, unless he can do business with ***DK's*** customers and partners, his "utility to Fanatics" will be "damage[d]." Def. Ca. Decl. ¶¶ 22-23. This cannot be over-emphasized: Defendant ***admits that his inability to access and use DK's trade secrets and confidential information severely inhibits his ability to work at Fanatics***. And Defendant is using the same confidential information improperly obtained from DK to serve Fanatics—he *cannot* do his job at Fanatics *without* it. *See* Def. Ca. Decl. ¶ 19.

**Soliciting Customers and Employees.** Where, as here, a former employee uses confidential information to benefit a direct competitor, such as by soliciting employees, customers, or partners, the former employer is gravely and irreparably harmed. *See*, *e.g.*, *Marcam Corp.*, 885 F. Supp. at 297-98. Defendant's conduct plainly qualifies. In the weeks following his departure from DK, Defendant has persistently solicited some of DK's most valued employees, customers, and partners by using the sensitive information he obtained while at DK. *See supra* at 14-15.

Even if these solicitations have not (yet) been successful, a "plausible risk of future customer defections" creates "a risk of irreparable harm." *Knox v. Stalk & Beans, Inc.*, 2021 WL 5626439, at *2 (Mass. Super. Oct. 4, 2021). What's more, Defendant used DK's confidential information for these efforts to benefit his new employer, creating an even greater likelihood of irreparable harm. *See Corp. Techs., Inc. v. Harnett*, 943 F. Supp. 2d 233, 243 (D. Mass. 2013),

*aff'd*, 731 F.3d 6 (1st Cir. 2013).  But even if Defendant did not use confidential information, "[t]he fact that [Defendant] met with [customers]—[including] his own former client[s] at [DK]—so quickly after this start with [Fanatics] illustrates the potential harm [DK] may suffer."  *See New England Controls, Inc. v. Pilsbury*, 2018 WL 3150223, at *8 (D. Mass. June 27, 2018).

These harms cannot be remedied by merely enjoining Defendant from using DK's confidential information or soliciting its employees, customers, and partners.  As long as Defendant is working for Fanatics, he will continue to flout both the Court's order and his own agreements to DK's detriment.  In Defendant's own words, "[t]he effect of [nondisclosure and nonsoliciation] restriction[s] on my ability to do my job at Fanatics is severe. … Each day that I cannot build and maintain such relationships magnifies the harm of this restriction and threatens to further damage my reputation and my utility to Fanatics."  Def. Ca. Decl. ¶¶ 22-23.  Only an order preventing Defendant from working at Fanatics can protect DK from irreparable harm.

**Loss of Goodwill.**  By continuing to work for Fanatics, Defendant will also cause DK an irreparable loss of goodwill.  *See Stone Legal Res. Grp., Inc. v. Glebus*, 2002 WL 35654421, at *6 (Mass. Super. Dec. 16, 2002) ("[L]oss of goodwill has been recognized as being particularly hard to quantify").  Indeed, DK has already suffered "loss of goodwill from [Defendant's] solicitation in violation of [his] restrictive covenant[s]."  *Harnett*, 943 F. Supp. 2d at 243.

Especially so where, as here, any "relationship [that] has been developed by [Defendant]" with DK's customers and partners was developed "while under the employ of [DK]."  *Darwin Partners, Inc. v. Signature Consultants, LLC*, 2000 WL 33159238, at *4 (Mass. Super. Mar. 24, 2000).  Any goodwill Defendant may have with DK's VIPs was acquired through his employment and "was initiated, developed, and maintained through the use of [DK's] resources."  *Perficient, Inc. v. Prior*, 2016 WL 1716720, at *6 (D. Mass. Apr. 26, 2016).  DK paid for the dinners and

services that Defendant offered VIPs—including some of DK's most important customers—to build DK's relationship with them.  Henley Aff. ¶ 7.  By soliciting them through the goodwill generated under DK's auspices, Defendant has and will irreparably damage DK.

## III.    The Balance of Equities Favors Granting A Preliminary Injunction

The harm DK will suffer if a preliminary injunction does not issue outweighs any harm to Defendant.  The parties agreed that any violation of the non-compete would cause DK irreparable harm.  *See* Noncompetition Covenant § (e).  And Defendant would not suffer any harm.  He freely agreed to be bound by the terms of the non-compete in exchange for millions of dollars of compensation.  And "to the extent that [Defendant] suffers from injunctive relief, this harm is a predictable consequence of h[is] breach."  *Nuance Commc'ns*, 2022 WL 2347112, at *10 (quotation marks omitted).

## IV.    A Preliminary Injunction Is In The Public Interest

"It is in society's best interest to recognize and enforce agreements which were voluntarily entered into and accepted."  *New England Cir. Sale v. Randall*, 1996 WL 1171929, at *3 (D. Mass. June 4, 1996).  Injunctive relief in this case would serve "the public … interest in the enforcement of reasonable restrictive covenants in employment contracts," and this Court has regularly granted such relief in the circumstances presented here.  *E.g.*, *Nuance Commc'ns*, 2022 WL 2347112, at *11.  Because Defendant's non-compete and nonsolicitation restrictions would last for no more than twelve months, they are less restrictive than many other covenants upheld by Massachusetts courts, *see Aspect Software*, 787 F. Supp. 2d at 128, and their enforcement would not offend the public's interest in "the free alienability of employees," *Lombard Med. Techs., Inc. v. Johannessen*, 729 F. Supp. 2d 432, 443 (D. Mass. 2010) (quotation marks omitted).

Dated: March 14, 2024

Respectfully submitted,

/s/ Andrew S. Dulberg
William F. Lee (BBO #291960)
Andrew S. Dulberg (BBO #675405)
WILMER CUTLER PICKERING
    HALE AND DORR LLP
60 State Street
Boston, MA 02109
Telephone: (617) 526-6000
E-mail: andrew.dulberg@wilmerhale.com

GIBSON, DUNN & CRUTCHER LLP
Orin Snyder (*pro hac vice*)
Harris M. Mufson (*pro hac vice*)
Justine M. Goeke (*pro hac vice*)
Christine Demana (*pro hac vice*)
Justin M. DiGennaro (*pro hac vice*)
200 Park Avenue
New York, NY 10166-0193
Tel: 212.351.4000
Fax: 212.351.4035
OSnyder@gibsondunn.com
HMufson@gibsondunn.com
JGoeke@gibsondunn.com
CDemana@gibsondunn.com
JDiGennaro@gibsondunn.com

Jason C. Schwartz (*pro hac vice*)
Jacob T. Spencer (*pro hac vice pending*)
1050 Connecticut Avenue, N.W.
Washington, D.C. 20036
Tel: 202.955.8500
JSchwartz@gibsondunn.com
JSpencer@gibsondunn.com

*Attorneys for Plaintiff DraftKings, Inc.*

## CERTIFICATE OF SERVICE

I, Andrew S. Dulberg, counsel for Plaintiff, hereby certify that this document has been filed through the Court's ECF system and will be sent electronically to the registered participants, including counsel of record for Defendant, as identified on the Notice of Electronic Filing (NEF).

/s/ Andrew S. Dulberg
Andrew S. Dulberg