**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| DRAFTKINGS INC., <br><br> Plaintiff, <br><br> v. <br><br> MICHAEL HERMALYN, <br><br> Defendant. | Civil Action No. 1:24-cv-10299-JEK |

**AFFIDAVIT OF ANDREW LARRACEY IN SUPPORT OF PLAINTIFF'S MOTION
<u>FOR PRELIMINARY INJUNCTION</u>**

I, Andrew Larracey, upon being duly sworn, do hereby testify under oath as follows:

1. I am a Director, VIP Operations at DraftKings effective March 1, 2024, where I have worked since February 1, 2021. I am over the age of eighteen.

2. I know Michael Hermalyn, and worked with him before he resigned his employment from DraftKings on February 1, 2024.

3. Shortly after 1:00 PM ET on February 1, 2024, Hayden Metz and I learned from DraftKings' IT department that Mr. Hermalyn's Salesforce account had been shut off.

4. Mr. Metz and I then called Mr. Hermalyn from a conference room in DraftKings' Boston, Massachusetts office. Mr. Hermalyn did not answer but immediately called us back. Mr. Hermalyn asked us to confirm that we were the only people in the conference room. He then ended the telephone call and connected with us by FaceTime video call. He asked us to use the phone's camera to scan the room so that Mr. Hermalyn could confirm that Mr. Metz and I were alone in the DraftKings conference room. Mr. Hermalyn told Mr. Metz and me that he had tendered his resignation with DraftKings to work for Fanatics, and that there were two positions on the Fanatics website to which we should apply. Mr. Hermalyn mentioned a Senior Director position for me and a VP position for Mr. Metz. This conversation was brief, lasting fewer than five minutes. A true and correct screenshot of the call log reflecting this conversation is attached hereto as Exhibit A.

5. After ending the call with Mr. Hermalyn, Mr. Metz and I discussed the news over lunch. Later that evening, I texted Mr. Metz asking if he wished to speak; he replied that he did. A true and correct screenshot of this text message exchange with Mr. Metz on February 1, 2024 is attached hereto as Exhibit B.

6. I called Mr. Metz at or about 10:16 PM ET. A true and correct screenshot reflecting this phone call is attached hereto as Exhibit C. I then used my wife's cell phone, rather than my own, to call Mr. Hermalyn. I then put Mr. Hermalyn (on my wife's phone) and Mr. Metz (on my phone) on speaker, so that the three of us could talk. I used my wife's cell phone to place the call because Mr. Metz and I were under the impression that Mr. Hermalyn did not want us to call him from our own cell phones. Over the course of the evening of February 1, 2024 and the early morning hours of February 2, 2024, Mr. Metz, Mr. Hermalyn, and I had a series of phone calls lasting multiple hours using this speaker phone approach. A true and correct screenshot of the call history reflecting my calls with Mr. Metz's cell phone on February 1, 2024 and February 2, 2024 is attached hereto as Exhibit D. A true and correct copy of screenshots of the calls to Mr. Hermalyn from my wife's phone that began on the evening of February 1, 2024 is attached hereto as Exhibit E.

7. During these discussions, Mr. Hermalyn provided additional details about the roles in the Fanatics VIP department that were available to Mr. Metz and me—namely a Senior Director role for me and a Vice President role for Mr. Metz. During the course of the conversations, I searched the "Careers" page on Fanatics' website for the role Mr. Hermalyn said he had for me; it was listed as "Director, VIP Customer Development," rather than "Senior Director." I raised the difference with Mr. Hermalyn and he said he was offering me the title of Senior Director at Fanatics. As described by Mr. Hermalyn, both of these roles were in Fanatics Enterprise VIP department which includes online sports betting.

8. During our discussion, Mr. Hermalyn made specific offers of compensation to incentivize me and Mr. Metz to accept roles with Fanatics. Mr. Hermalyn offered us base salary, annual bonuses, signing bonuses, and initial equity allocations. At an early stage in these

discussions, and in connection with the Fanatics Senior Director position, Mr. Hermalyn represented that he had authority and would offer me a $400,000 base salary, a $150,000 annual bonus, a $750,000 signing bonus, and an initial equity allocation of at least $2,000,000. Mr. Hermalyn also communicated a compensation package to Mr. Metz. During these discussions, Mr. Metz and I indicated that the initial offers Mr. Hermalyn communicated was not enough of an incentive to leave DraftKings given the risk and disruption that would result from accepting the offers to work at Fanatics, including potential litigation risk since we would be violating our non-competition obligations. After initial discussions, Mr. Hermalyn said that he would speak with someone at Fanatics. Mr. Hermalyn then called me back and relayed increased offers. Ultimately, Hermalyn represented that he had authority and would offer me $400,000 base salary, a $150,000 annual bonus, a $1,500,000 signing bonus, and an initial equity allocation of $4,000,000. This was significantly more compensation than I earn at DraftKings, which Mr. Hermalyn knew. During our discussions, Mr. Hermalyn communicated to me that the initial equity allocation used a $28 billion valuation for Fanatics. Following our conversations, I wrote down the terms of the offers communicated by Mr. Hermalyn in my notes application on my phone. A true and correct screenshot my notes from this call with Mr. Hermalyn on February 1, 2024 and February 2, 2024 is attached hereto as Exhibit F.

9. Mr. Hermalyn represented that he had authority from Fanatics to make these offers. In fact, Mr. Hermalyn represented to us that he was taking the phone call from inside the home of Michael Rubin, the CEO of Fanatics and even offered to put Mr. Rubin on the line to speak with me and Mr. Metz.

10. During our conversations, Mr. Hermalyn reiterated that, despite his assurances regarding these roles with Fanatics, Mr. Metz and I would need to formally apply for the positions to receive written offers.

11. Mr. Hermalyn also mentioned that these positions would likely entail relocating to Los Angeles. He stated that he himself had moved to Los Angeles, in part because of his noncompetition agreements. Mr. Hermalyn indicated Fanatics would indemnify Mr. Metz and me and pay any legal fees associated with any potential dispute with DraftKings regarding our violation of our non-competition obligations to DraftKings.

12. As an alternative to moving to Los Angeles and accepting a role in Mr. Hermalyn's VIP department, Mr. Hermalyn communicated to Mr. Metz and me that we could discuss options concerning other roles that would not require relocating.

13. After around two-and-a-half hours, our call ended with Mr. Hermalyn expressing frustration that Mr. Metz would not entertain the Fanatics offer based on the compensation he had offered. Once we hung up with Mr. Hermalyn, I called Mr. Metz at 1:07 AM ET to discuss our conversation with Mr. Hermalyn. Shortly into our discussion, Mr. Hermalyn again called me—such that all three of us were back on the line—and continued his pitch for us to join Fanatics. This follow-up call lasted nearly an hour. Mr. Hermalyn repeatedly restated his position that Mr. Metz not considering the offer to apply to the VP position within his department was a bad decision.

14. On February 2, 2024—during the discussions with Mr. Hermalyn and Mr. Metz that began in the evening of February 1, 2024—I submitted an application through the Fanatics website for a position as Director, VIP Customer Development. Attached hereto as Exhibit G is a

4

true and correct copy of the email from Fanatics confirming receipt of my application for the Director, VIP Customer Development position, dated February 2, 2024 at 1:16 AM ET.

15. I spoke with Mr. Hermalyn on the morning of February 2, 2024 when he called my wife's phone from a number with a New Jersey area code. Mr. Hermalyn communicated to me that Mr. Hermalyn and Mr. Rubin were excited about my interviewing with Fanatics. A representative from the Fanatics Human Resources department also contacted me on February 2, 2024 to schedule an initial interview at 1:00 PM ET. I responded that I was unavailable. An interview panel was later scheduled for Sunday, February 4, 2024 starting at 1:00 PM ET. Attached hereto as Exhibit H is a true and correct copy of the email correspondence between myself, Niles Brandon, and Deirdre Parlon of Fanatics, dated February 2, 2024 and February 3, 2024.

16. On Saturday, February 3, 2024 at 7:55 AM ET, Mr. Hermalyn contacted me from a phone number with an Austin, Texas area code by calling my wife's cell phone. The call lasted 30 minutes. On this call, Mr. Hermalyn encouraged me to take the meetings with Fanatics and said that it would reflect poorly on him if I did not. Attached hereto as Exhibit I is a true and correct copy of a screenshot of the call from Mr. Hermalyn to my wife's phone, dated February 3, 2024. I have not spoken to Mr. Hermalyn regarding employment at Fanatics since February 3, 2024.

17. At some point in time between February 1 and February 3, Mr. Hermalyn told me that if I was approached by lawyers and asked if we had conversations regarding employment offers at Fanatics I had to say no.

18. On Sunday, February 4, 2024, I had four meetings over Zoom with Fanatics starting at 1:00 PM ET. I met with Tucker Kain, the Chief Strategy and Growth Officer of Fanatics;

Orlando Ashford, the Chief People Officer of Fanatics; Alex Lee, the Senior Vice President and General Manager of Loyalty at Fanatics; and Niles Brandon, VP, Fanatics Human Resources. *See* Ex. H.

19. On the week of February 5, 2024, a representative from Fanatics' Human Resources department called me and said Fanatics would contact me regarding the position the following week.

20. On Friday, February 16, 2024 at 9:13 AM ET, I received a text message from Tucker Kain regarding employment with Fanatics. Mr. Kain congratulated me on the birth of my son and said that he "[c]ame out of our conversation really energized" and asked if I wanted to "catch up this weekend or next week." Mr. Kain texted me again on February 19, 2024 to schedule a call for 11:00 AM ET on February 20, 2024. Attached hereto as Exhibit J is a true and correct copy of the text messages between Tucker Kain and myself, dated February 16, 2024 and February 19, 2024.

21. I spoke with Mr. Kain again when he called me on February 20, 2024. He acknowledged my paternity leave at DraftKings and said he would call me again in the coming weeks. Attached hereto as Exhibit K is true and correct copy of a screenshot of the call from Mr. Kain, dated February 20, 2024.

22. On Wednesday, February 28, 2024, I searched the Fanatics website for the "Director, VIP Customer Development" role Mr. Hermalyn had communicated was available for me. To the best of my recollection, the job listing for "Director, VIP Customer Development" that I viewed on February 28 is identical to the listing I reviewed when I searched for the role Mr. Hermalyn communicated to me on February 1, 2024. As of February 28, the role remained open; however, the compensation associated with that role, as reflected on the public job posting, was

significantly less than Mr. Hermalyn had offered me when we spoke on February 1, 2024. A true and correct copy of the job posting for the "Director, VIP Customer Development" role as of February 28, 2024 is attached hereto as Exhibit L.

I declare under the penalty of perjury that the foregoing facts are true and correct based on my personal knowledge.

Signed this 28th day of February 2024 under the pains and penalties of perjury.

                                                                                                                 Andrew Larracey