UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| DRAFTKINGS INC., <br><br> Plaintiff, <br><br> v. <br><br> MICHAEL HERMALYN, <br><br> Defendant. | Civil Action No. 1:24-cv-10299-JEK <br> PUBLIC VERSION |

**AFFIDAVIT OF BRIAN HARRIS IN SUPPORT OF PLAINTIFF'S MOTION**
**FOR PRELIMINARY INJUNCTION**

I, Brian Harris, upon being duly sworn, do hereby testify under oath as follows:

1. I previously submitted affidavits in support of Plaintiff DraftKings Inc.'s ("DraftKings" or the "Company") Motion for Temporary Restraining Order ("TRO") and in opposition to Defendant Michael Hermalyn's ("Hermalyn") Motion for Clarification and Refinement. I also verified Plaintiff's Responses to Interrogatories 1-3 propounded by Hermalyn in this action.

2. I submit this third affidavit in support of DraftKings' Motion for Preliminary Injunction.

3. I joined DraftKings as its Director of IT in December 2014, and have managed the Company's information technology and security program continuously since then. Today, I hold the title of Chief Information Security Officer and Senior Vice President of Technical Operations. I am responsible for all aspects of DraftKings' information technology and security.

4. I hold a number of industry certifications, including a Certified Information Security Manager (CISM), a Certified Information Systems Security Professional (CISSP), and a Certified Cloud Security Professional (CCSP). These certifications reflect the importance to me and to DraftKings of operating at the cutting edge of information technology and security.

*DraftKings' Information Security*

5. Information security is critically important at DraftKings. Among other types of highly confidential and proprietary information (including the Company's valuable sensitive trade secrets), by virtue of our business, DraftKings is entrusted with sensitive personally identifiable information, as well as banking and financial information of our customers. Safeguarding this information is essential to DraftKings' business.

6. DraftKings deploys numerous information security protection measures through policies regarding how our employees access and handle confidential and proprietary information, as well as sophisticated technological applications that ensures our data is protected from a systems perspective.

7. DraftKings maintains a document titled ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇.



8. At the time of onboarding, all employees receive training on our information security policies and are required to repeat such training on an annual basis thereafter. The training is computer-based and requires employees to actively demonstrate their understanding of the Company's policies. Employees also receive data privacy training on an annual basis. Employees must acknowledge that they have received such training and agree to abide by such policies.

9. Michael Hermalyn most recently completed the ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇.

10. ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇.

11. One of the critical concepts expressly described in our information security policies is the Principle of Least Privilege, whereby employees are to be given "the minimum access

required to perform their specific tasks." It means that employees should not be able to access all Company documents, but only those documents that they actually need. Our information security policies also explain that employees "must maintain data security by protecting the confidentiality" of DraftKings' information, such that "only people who have a legitimate need to know and are authorized to use [certain information] can access it."

12. DraftKings also requires its employees to agree to confidentiality agreements at the commencement of their employment with the Company. DraftKings typically enters into non-disclosure agreements with third-parties with whom it has a need to share its confidential and proprietary information.

13. In addition, DraftKings takes technological measures to ensure the security of the Company's—and its customers'—information. DraftKings provides its employees with laptops that are encrypted and protected by firewalls. It is not possible for employees to turn off the firewalls or the encryption, and the firewalls are designed to protect the laptops from improper external penetration (e.g., hackers).

14. To help ensure that only DraftKings employees log into Company-issued devices, employees are given unique usernames that, in combination with their passwords, are needed to sign in. Employees are required to update their passwords every 90 days. ███████████ ████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████ This is consistent with industry best practices, which are referred to as ISO 27001. DraftKings meets or exceeds the ISO 27001 standard.

15. DraftKings also uses a secure document management system provided by Google called "Google Workspace." █████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

██████████████████████████████████████

16. To access Google Workspace, users are required to provide multi-factor authentication. This typically means that an employee must confirm through a prompt sent to the Duo Authentication application on their mobile phone that they are the individual seeking to access the document database.

17. DraftKings has robust security measures to limit access to particular documents. Once an employee has logged into the Google Workspace repository, they still cannot access all the Company's documents. By default, they can *only* access documents authored by them or affirmatively shared with them. Access to documents may be further limited by restricting a user's privileges to edit, comment on, or view a document. When a user has privileges to view a document, the user is able to both see the contents of the document, as well as copy content from the document into a locally-saved document.

18. In addition to the protections and security measures built into the Google Workspace environment, DraftKings uses additional security measures to limit the ability to share documents outside the Company. Among other things, DraftKings uses technology provided by BetterCloud. In technological terms, BetterCloud is a "protection wrapper" for the Google product suite, providing even more security than Google. It monitors who accesses documents in the

Google Workspace and prevents individuals from accessing documents without permission. By default, DraftKings employees are prohibited from sharing documents with non-DraftKings employees (i.e. individuals that do not possess DraftKings-issued account credentials). If an employee wishes to share a document with an external user, that user must be "whitelisted" (e.g., approved) to receive that document by my team. To be clear, only the IT team has the ability to whitelist individuals to receive Company documents. Absent approval by DraftKings IT, a person outside of the DraftKings organization (and without DraftKings-issued account credentials) is unable to access DraftKings documents in the Google Workspace environment.

*Hermalyn's DraftKings Devices and Accounts*

19.  **DraftKings Email.** DraftKings has maintained in the usual course of business the complete contents of Mr. Hermalyn's DraftKings email account since he began working for the company.

20.  A review of Mr. Hermalyn's DraftKings email account indicates that between January 29, 2024 and January 31, 2024, Mr. Hermalyn received approximately 365 emails, and replied to just 6 of those emails.[1]

21.  I understand that a review of Mr. Hermalyn's emails indicated that on March 17, 2023, Mr. Hermalyn forwarded an email chain among himself, Shawn Henley, and Matt ▇▇▇ to two Gmail accounts, ▇▇▇▇▇▇@gmail.com and ▇▇▇▇▇▇@gmail.com. Neither of these two Gmail accounts are DraftKings accounts. A true and correct copy of this email is attached hereto as Exhibit A.

---

[1] Based on preliminary investigation results, DraftKings stated in its response to Interrogatory 1 that Hermalyn sent replies to 8 of 534 received emails between January 29, 2024 and February 1, 2024. The revised statistics provided here are based on a more complete analysis.

22.     █████████████████████████████████████████████████

████████████████████████████████████████████. █████████

█████████████████████████████████████████████████████

█████████████████████████████████████████████████████

█████████████████████████████████████████████████████

█████████████████████████████████████████████████████

█████████████████████████████████████████████████████

█████████████████████████████████████████████████████

████████████████████████

23.     I have reviewed ███████████████████████████████

█████████████████████████████████████████████████████

██████████████████████████████████████████.

24.     Based on my review █████████████████████████████

█████████████████████████████████████████████████████

█████████████████████████████████████████████  I have

reviewed the list of contacts that I understand Mr. Hermalyn has returned to DraftKings pursuant

to the TRO. █████████████████████████████████████████

██████████████████████.

25.     **DraftKings Devices.**  Over the course of his employment, DraftKings issued Mr.

Hermalyn four Apple MacBook laptops.  Mr. Hermalyn was in possession of three of the devices

at the time of his resignation.  The fourth was returned to DraftKings in April or May 2023.  For

ease of reference, the devices that were in Mr. Hermalyn's possession at the time of his resignation

are identified below in Table 1.  For each device, Table 1 reflects the device name used in our

forensic investigation, the serial number, the date DraftKings issued the device to Mr. Hermalyn, and the date the device was returned to DraftKings.

**Table 1**

| Device Name | Serial Number | Issue Date | Return Date | Model |
|---|---|---|---|---|
| Laptop 1 | WRLHQV76XG | June 27, 2022 | Feb. 4, 2024 | MacBook Pro (16-inch, 2021) |
| Laptop 2 | HTXY6960MH | Nov. 27, 2023 | Feb. 4, 2024 | MacBook Pro (14-inch, 2023) |
| Laptop 3 | C02CG0VWMD6P | Sept. 4, 2020 | Feb. 9, 2024 | MacBook Pro (16-inch, 2019) |

26. I have reviewed Mr. Hermalyn's IT HelpDesk tickets, which are created in the regular course of business at DraftKings. On November 2, 2023, Mr. Hermalyn requested a 14-inch MacBook because he was "traveling a lot and need[ed] something lighter/newer." Mr. Hermalyn was issued a 14-inch MacBook (Laptop 2), which was shipped to Mr. Hermalyn on November 28, 2023. On December 11, 2023, Mr. Hermalyn's former executive assistant emailed IT to request assistance on behalf of Mr. Hermalyn with setting up Laptop 2. Thereafter, on December 22, 2023, a DraftKings IT professional made a note, "George helped" Mr. Hermalyn "with this request from ▮▮▮▮." Mr. Hermalyn retained his old 16-inch laptop (Laptop 1). A true and correct copy of these HelpDesk tickets is attached hereto as Exhibit B.

27. When DraftKings' employees are issued replacement computers, IT will assist in transferring any content needed by the employee from the old machine to the new machine via approved applications when their assistance is requested by the employee. Typically, ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ The use of Dropbox, Slack, "transfernow.net" and any other user-initiated file transfer service is not a standard or approved method of moving files to set up a new DraftKings device.

28. DraftKings hired Stroz Friedberg, a leading risk management firm that specializes in digital forensics, incident response and investigation, eDiscovery, and due diligence matters to conduct a forensic examination of Mr. Hermalyn's DraftKings-issued laptops. Stroz Friedberg also analyzed the following logs and materials: a log export collected by DraftKings IT from a messaging platform, Slack, detailing Mr. Hermalyn's activity occurring between August 7, 2023 and February 1, 2024 (the "Slack Log"); multiple Office 365 Logs (the "Office 365 Logs"); and a Google Drive Logs Export collected by DraftKings IT detailing activity occurring between August 7, 2023 and February 1, 2024. I have reviewed Stroz Friedberg's output and analysis.[2]

29. **Slack.** I and members of my team have reviewed the Slack Log, collected by DraftKings in the ordinary course of business, reflecting Hermalyn's Slack activities during his employment. Slack is an instant messaging communications platform that enables users to share messages, data, and documents. DraftKings employees regularly use Slack for intra-company communications. Much the same way a person can email themselves a message or attachment, Slack users are able to send Slack messages to their own user accounts. This functionality permits a user to access messages, data, and documents at a later time and on any device worldwide where the user logs into their Slack account.

30. On January 16, 2024, between 8:26 p.m. and 8:27 p.m. Eastern Time ("EST"), Hermalyn sent a series of Slack messages to his own DraftKings Slack user account attaching 18 unique documents. (One of the 18 documents was sent twice.) A true and correct copy of these messages is attached hereto as Exhibit C. Hermalyn had access to Slack on his personal devices,

---

[2] I understand that Mitchell Green, a forensic expert at Stroz Friedberg, is also submitting an affidavit in support of the Motion for Preliminary Injunction, which will set forth Stroz Friedberg's findings and conclusions in more detail. In this affidavit, I provide a summary of my understanding of Stroz Friedberg's work for completeness.

and could have downloaded certain of these confidential DraftKings documents onto a personal device. Based on a review of the logs of Mr. Hermalyn's Slack activity, he infrequently sent Slack messages to his own Slack account. Over approximately nine months prior to sending himself the Slack messages on January 16, 2024, Mr. Hermalyn sent just seven other Slack messages to his own Slack account, which consisted of brief notes to himself, attached screenshots, or attached administrative documents such as airline credits. None of the previous Slack messages sent to his own Slack account contained highly confidential DraftKings documents.

31. The documents Mr. Hermalyn sent to his own Slack account on January 16 included the following documents containing DraftKings' confidential information:

- (July2023)VitalTalent_CompAdjustments.xlsx
- alan_kicker.png
- (Confidential)VIPFinancialsReview_030323.pdf
- FoDK __ LOOK BOOK.pdf
- DK-CINCORO-BOTTLES-V2-10_18.pdf
- HermalynResults_March2023.pdf
- Rob Ferrara Letter_07_18_2023.docx.pdf
- Robert Ferrara - 2022 Long-Term Equity Award.pdf
- Screen Shot 2023-06-29 at 8.17.14 AM.png
- Screen Shot 2023-09-15 at 3.59.23 PM.png
- SEO Group Onsite - Larracey Slides (1).pdf

32. I understand that the following seven documents were subsequently downloaded from Slack to a non-DraftKings' iPhone:

- Screen Shot 2023-06-29 at 8.17.14 AM.png5F6
- (July2023)VitalTalent_CompAdjustments.xlsx
- MZH_ExecView.xlsx
- alan_kicker.png
- Screen Shot 2023-09-15 at 3.59.23. PM.png
- Screen Shot 2023-11-15 at 4.39.48 PM.png
- Stream of Consciousness.docx

33. **Web Browsing.** Based on my review of data from our forensics expert, I understand that Stroz Friedberg recovered web browsing logs from Laptop 1 (the 16-inch laptop). Based on my review of the web browsing logs, I understand Hermalyn searched the phrase "move big files" on Google at or about 8:42 p.m. EST on January 16, 2024—approximately 15 minutes after sending nearly a dozen confidential DraftKings documents via Slack to his own Slack account. He then accessed a website at the URL "Transfernow.net" at 8:43 p.m. EST. Under DraftKings' Information Sensitivity Policy, DraftKings' "Confidential Information and Internal Use Information must not be disclosed by any means to non-approved third parties" without express permission from the chief information security officer (me) and, where necessary, only after the third-party has signed a data protection agreement. DraftKings' IT permits limited exceptions to these policies on a case-by-case basis pursuant to DraftKings' Exception Request Policy. I have visited "Transfernow.net," and confirmed that this is an online platform designed for transferring large files and data. Transferring files via unsecured means over the internet poses risks to the security and privacy of DraftKings confidential information. For this reason, websites

such as Transfernow.net are not DraftKings-approved file sharing services. Mr. Hermalyn did not receive an exception pursuant to the Exception Request Policy to use Transfernow.net to transfer DraftKings' confidential information.

34. **Dropbox.** Based on my review of data from our forensics expert, I also understand that Hermalyn visited the website Dropbox.com and various sub-pages of the Dropbox website on January 16, 2024, at or about 4:20 p.m. EST. Dropbox is a cloud-based file storage service which permits its users to sync their files across multiple devices. A document uploaded into the Dropbox cloud on one device could be downloaded on another device where the user was logged into the same Dropbox account. Operating system logs of file activity indicate that a number of DraftKings documents were stored locally on the computer and synced with Hermalyn's personal Dropbox account.[3]

35. Pursuant to DraftKings' Workstation & Mobile Device Policy: "Only DraftKings approved software may be installed on Workstations and Mobile Devices owned or leased by DraftKings." If an employee is "unsure if an application is from an approved source," the Acceptable Use Policy dictates that the employee is to "contact Corporate IT." Under DraftKings' Acceptable Encryption Policy, ███████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████

---

[3] DraftKings interrogatory responses previously identified 132 files stored locally on the computer, which DraftKings believed were historically synced with a DraftKings-related subfolder of Hermalyn's personal Dropbox account. This list included files that DraftKings determined to be DraftKings' documents based on details in the file name relating to DraftKings. I understand that based on further analysis, Stroz Friedberg has determined that 130 documents—rather than 132—were saved to the file path associated with the DraftKings-related subfolder of the local Dropbox installation and likely synced to Mr. Hermalyn's personal Dropbox account.

▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉ Mr. Hermalyn ▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉ ▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉ and therefore his installation and use of Dropbox was in violation of DraftKings' policies. The transfer to and storage on Dropbox of Confidential Information must be encrypted, and records must be retained about the data transfer pursuant to the Acceptable Encryption Policy.

36. Based on my review of data from our forensics expert, it also appears that the Dropbox application was installed locally on at least one of Mr. Hermalyn's DraftKings laptops, Laptop 1 (*see* Table 1), prior to January 16, 2024. The Dropbox installation was linked to Hermalyn's personal email account. As described above, ▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉ is not permitted by DraftKings' Information Security Policies. Contrary to DraftKings' Information Security Policies, ▉



37. **Airdrop.** Based on my review of data from our forensics expert, I understand that Hermalyn attempted seven file transfers via the Airdrop application on January 16, 2024, at or about 7:40 p.m. EST. AirDrop is a file transfer service built into Apple devices—including MacBooks, iPhones, and iPads—that permits users to wirelessly send photos, videos, documents, and other files to nearby devices. AirDrop is not a DraftKings-approved method to transfer Company files between devices and Hermalyn was not authorized to use AirDrop on his DraftKings laptops. Under DraftKings Information Sensitivity Policy, ▉▉▉▉▉▉▉▉

███████████████████████████████████. Further, under DraftKings'

Acceptable Encryption Policy, ███████████████████████████████████

███████████████████████████████████

███████████████████████████ DraftKings' Exception Request Policy.

38. **Google Workspace.** I and members of my team have reviewed multiple activity logs associated with Michael Hermalyn's access to Google Workspace and to his DraftKings email account.

39. We can see precisely which documents Mr. Hermalyn accessed or downloaded from the Google Workspace, and we are able to see the IP address—a unique numeric identifier for each device on the internet—used to access the Google Workspace. After retrieving reports describing Mr. Hermalyn's activity, my team tested the reports to ensure their reliability, and cross-checked the data to confirm its accuracy.

40. Google Workspace records user activity in a drive log. The drive log describes user activity events using particular terms, such as "view," "download," or "print." Accessing a file is synonymous with a "view" event, which is defined by Google as a drive log event that involves a user interacting with a file "using the /htmlview, /embed, /revisions, and other special URLs."[4] This occurs for example, when a user accesses a document and copies and pastes material from the document into another document or email. A "download" event includes when a user moves files "between [Google] Drive and a local device" using the Google Drive application, such that the file exists and can be accessed in local form without revisiting the Google Workspace. Once

---

[4] Drive Log Events, Google, https://support.google.com/a/answer/4579696?product_name=UnuFlow&hl=en&visit_id=638442284488179227-2969407826&rd=1&src=supportwidget0&hl=en#:~:text=Download%20events.-,Download,-Most%20downloads%20are (last visited Feb. 22, 2024).

a file has been downloaded from the Google Drive application, subsequent user interaction with the locally stored version of the DraftKings document will not be reflected in the Google Workspace activity logs.[5] I and members of my team performed a total of 116 actions across 6 different file types to confirm whether a "view" action could be inaccurately logged as a "download" in our Google Workspace. The file types included Google Sheet, Google Presentation, Google Document, Excel, ZIP, PDF. We tested against an iPhone and a MacBook Pro, and observed the same results across both types of devices. We did not identify a single instance where a "view" was logged as a "download." A "print" event is recorded when a user prints a document directly from the Google Workspace.

41. Between January 1 and February 1, 2024, Mr. Hermalyn downloaded or viewed 91 unique documents from DraftKings' Google Workspace. According to DraftKings' records, and based on DraftKings' investigation to date, the names of all files downloaded or viewed by Hermalyn from January 1, 2024 to February 1, 2024 reflected in Hermalyn's Google Workspace report are identified in Appendix A, attached hereto. For each file, Appendix A contains the names, most recent download (for downloaded documents) or most recent view (for viewed documents), date and time of the associated download or view event in descending order from the most recent interaction, the IP address used to download or view the file, and whether the IP address is associated with a non-DraftKings device.

42. DraftKings permits employees to access Google Workspace documents on both DraftKings devices as well as personal devices. Google Workspace does not log the precise device used to access a given document, but does log the IP address. My team used the tools available at whatismyipaddress.com, a free, publicly available website that provides information on a user's

---

[5] *Id.*

IP address, their internet service provider, and their city, region, and country to look up information about the IP addresses used to view or download the Documents listed in Appendix A. Based on my team's analysis, 29 of the documents were viewed or downloaded from an Amazon EC2 public IP addresses (i.e. not DraftKings network endpoints), indicating the activity occurred from a non-DraftKings device. Those documents are highlighted in orange in Appendix A.

43. Table 2 lists all documents downloaded by Mr. Hermalyn from a non-DraftKings devices on or after January 11, 2024, in descending order from most recent interaction.

**Table 2**

| No. | File Name | Event Description | Event Date | Event Time | IP address |
|---|---|---|---|---|---|
| 1. | BD_Gaming101 | Download | 2/1/2024 | 9:32:49 | 44.202.167.22 |
| 2. | VIP BI-MONTHLY UPDATE | Download | 2/1/2024 | 9:17:56 | 100.25.98.49 |
| 3. | (MASTER) SB 2024 | Download | 1/30/2024 | 11:28:48 | 44.201.118.180 |
| 4. | Tax Rate Slide | Download | 1/29/2024 | 9:32:11 | 23.20.147.52 |
| 5. | CUSTOMER QBR // VIP | Download | 1/24/2024 | 10:20:49 | 54.227.67.48 |
| 6. | DK | Super Bowl LVIII Attendees | Download | 1/24/2024 | 9:45:45 | 44.222.178.77 |
| 7. | BD Team Tracker - Weekly Report | Download | 1/24/2024 | 9:00:20 | 44.197.205.186 |
| 8. | Title Slide | Download | 1/23/2024 | 9:27:29 | 3.84.127.26 |
| 9. | VIP, Loyalty, Shop 2024 Goals | Download | 1/22/2024 | 12:04:55 | 3.238.182.206 |
| 10. | ▓▓▓▓▓ | Download | 1/22/2024 | 11:31:45 | 52.90.44.115 |
| 11. | (MZH) Week Of... | Download | 1/22/2024 | 11:05:53 | 54.90.162.52 |
| 12. | TAO_Gaming101 | Download | 1/19/2024 | 10:33:11 | 3.84.209.204 |
| 13. | Mike Hermalyn // Role & Key Activities | Download | 1/19/2024 | 9:44:11 | 44.195.36.220 |
| 14. | ▓▓▓▓▓ | Download | 1/18/2024 | 13:18:02 | 44.204.252.4 |
| 15. | 2024 Super Bowl Gifting - MH | Download | 1/17/2024 | 10:34:31 | 44.211.171.111 |
| 16. | Memo - Formal Fridays | Download | 1/13/2024 | 22:48:33 | 18.234.214.219 |

| 17. | VIP Org Charts | Download | 1/12/2024 | 11:22:23 | 54.81.13.233 |
|---|---|---|---|---|---|
| 18. | Events SteerCo November | Download | 1/12/2024 | 9:34:09 | 44.206.234.34 |
| 19. | ███████████ | Download | 1/11/2024 | 11:37:55 | 54.242.99.61 |
| 20. | ███████████ | Download | 1/11/2024 | 9:41:11 | 34.204.172.187 |
| 21. | ███████████ | Download | 1/11/2024 | 9:41:10 | 3.91.7.92 |
| 22. | Super Bowl LVIII.xlsx | Download | 1/11/2024 | 8:55:32 | 34.201.18.78 |

44. **Message Trace.** To determine the location from which Mr. Hermalyn was sending and receiving emails on January 29, 2024 and January 30, 2024, my team and I used the Message Trace Tool in Microsoft Exchange. For any particular email, the Message Trace Tool allows an administrator to view its entire lifecycle—who sent it, who received it, whether it was deleted, the IP address associated with that email, and similar information. My team and I typed the IP address provided by the Message Trace Tool and associated with Hermalyn's emails into whatismyipaddress.com, which showed that on January 29 and 30, Mr. Hermalyn was sending emails from his DraftKings email account while connected to an internet network called "fanatics.ear2.losangeles1.level3.net."

45. Upon learning that Mr. Hermalyn had tendered his resignation from DraftKings, my team and I began decommissioning his Google Workspace access on February 1, 2024, at or about 12:53 p.m. EST. ███████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████.

I declare under the penalty of perjury that the foregoing facts are true and correct based on my personal knowledge.

Signed this 14th day of March 2024 under the pains and penalties of perjury.

_____
Brian Harris