**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

DRAFTKINGS, INC.,

          *Plaintiff,*

    v.

MICHAEL Z. HERMALYN,

          *Defendant.*

Civil Action No. 1:24-cv-10299-JEK

---

**DEFENDANT MICHAEL Z. HERMALYN'S OPPOSITION TO**
**PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION**

## <u>TABLE OF CONTENTS</u>

<u>Page</u>

PRELIMINARY STATEMENT ....................................................................................1

STATEMENT OF FACTS ...........................................................................................5

      A.      Hermalyn's Hiring by Fanatics .................................................................5

      B.      Hermalyn Did Not Use, Disclose, Or Misappropriate DK Information .................6

              1.      Alleged "Downloads" From "A Non-DK Device" Were In Fact Hermalyn Viewing Documents On His Authorized Phone For DK ...........6

              2.      As DK Knows, Alleged File Activity On January 16 Was Hermalyn Switching From An Old DK Laptop To A New DK Laptop ...................................................................................8

              3.      Hermalyn Has Not Taken, Used Or Disclosed DK Information ..............10

              4.      As Of January 31, Hermalyn Has Had No Access To His DK-Issued Devices, Or Even His Personal Devices And Accounts ...............10

      C.      Hermalyn Did Not Solicit Any DK Employees ....................................................12

      D.      Hermalyn Did Not Solicit Any DK Customers ....................................................14

LEGAL STANDARD ...............................................................................................15

ARGUMENT ...........................................................................................................16

I.      DK FAILED TO SHOW A LIKELIHOOD OF SUCCESS ..............................................16

      A.      DK Failed To Show A Likelihood Of Success On Its Restrictive Covenant Claims (Counts II-III) ............................................................................16

              1.      California Law Applies To The Restrictions And Invalidates Them ........16

              2.      Even If Massachusetts Law Applied, The Post-Employment Non-Compete Is Invalid and Unenforceable ......................................................19

              3.      The Non-Solicit Agreement Is Also Invalid Under Massachusetts Law And, In Any Event, There Was No Breach .......................................21

      B.      DK Failed To Show A Likelihood Of Success On Its Trade Secret and Confidential Information Claims (Counts I, IV-VIII) ..........................................23

              1.      DK Failed To Show Misappropriation .....................................................24

              2.      DK Failed To Show Information Entitled To Trade Secret Protection ...............................................................................................26

II.      DK HAS NOT COME CLOSE TO PROVING IRREPARABLE HARM ......................27

III.      THE BALANCE OF HARDSHIPS STRONGLY FAVORS HERMALYN ...................29

IV.      THE PUBLIC INTEREST DISFAVORS AN INJUNCTION .........................................30

V.      IF THE COURT IS INCLINED TO GRANT INJUNCTIVE RELIEF, DK'S
        PROPOSED ORDER MUST BE NARROWED ............................................................. 30

CONCLUSION .................................................................................................................... 30

# TABLE OF AUTHORITIES

**Page(s)**

### Cases

*7-Eleven, Inc. v. Grewal*,
    60 F. Supp. 3d 272 (D. Mass. 2014) ........................................................................15

*Adv. Micro Devices, Inc. v. Feldstein*,
    2013 WL 10944934 (D. Mass. May 15, 2013) .................................................23, 25

*Agero Admin. Serv. Corp. v. Campolo*,
    366 F. Supp. 3d 170 (D. Mass. 2019) ....................................................................20

*Akebia Therapeutics, Inc. v. Azar*,
    976 F.3d 86 (1st Cir. 2020) .....................................................................................27

*Allscripts Healthcare, LLC v. DR/Decision Res., LLC*,
    386 F. Supp. 3d 89 (D. Mass. 2019) .......................................................................24

*Allstate Ins.Co. v. Fougere*,
    2019 WL 4776986 (D. Mass. Sept. 30, 2019) ........................................................25

*Am. Century Home Fabrics, Inc. v. Ashley Furniture Indus., Inc.*,
    473 F. Supp. 2d 168 (D. Mass. 2007) .....................................................................16

*Am. Sci. & Eng'g, Inc. v. Kelly*,
    69 F. Supp. 2d 277 (D. Mass. 1999) ......................................................................26

*AMN Healthcare, Inc. v. Aya Healthcare Servs., Inc.*,
    239 Cal. Rptr. 3d 577 (Cal. Ct. App. 2018) ...........................................................17

*Application Grp., Inc. v. Hunter Grp., Inc.*,
    72 Cal. Rptr. 2d 73 (Cal. Ct. App. 1998) ..............................................................18

*Aspect Software, Inc. v. Barnett*,
    787 F. Supp. 2d 118 (D. Mass. 2011) .....................................................................18

*Aware, Inc. v. Ramirez-Mireles*,
    2001 WL 755822 (Mass. Super. Ct. Apr. 4, 2001) .................................................17

*Banner Indus. v. Bilodeau*,
    2003 WL 831974 (Mass. Super. Feb. 27, 2003) ....................................19, 25, 29

*Bear, Stearns & Co. v. Sharon*,
    550 F. Supp. 2d 174 (D. Mass. 2008) .....................................................................28

*BNY Mellon, N.A. v. Schauer*,
    2010 WL 3326965 (Mass. Super. Ct. May 10, 2010)............................................................19

*Bruett v. Walsh*,
    2019 WL 2605705 (Mass. Super. Ct. May 19, 2019)............................................................21

*Builder Servs. Grp. v. Harkins*,
    2023 WL 4685943 (D. Mass. July 21, 2023).......................................................................25

*Cognex Corp. v. Eichler*,
    2009 WL 5408166 (Mass. Super. June 17, 2009).................................................................20

*CSC Consulting, Inc. v. Arnold*,
    2001 WL 1174183 (Mass. Super. July 12, 2001) .................................................................28

*Cypress Semiconductor Corp. v. Maxim Integrated Prods., Inc.*,
    186 Cal. Rptr. 3d 486 (Cal. Ct. App. 2015)........................................................................17

*Diomed, Inc. v. Vascular Sols., Inc.*,
    417 F. Supp. 2d 137 (D. Mass. 2006) .................................................................................25

*Edwards v. Athena Capital Advisors, Inc.*,
    2007 WL 2840360 (Mass. Super. Aug. 9, 2007)............................................................19, 20

*EMC Corp. v. Pure Storage, Inc.*,
    2016 WL 7826662 (D. Mass. Aug. 19, 2016) .....................................................................25

*Esso Standard Oil Co. (P.R.) v. Monroig-Zayas*,
    445 F.3d 13 (1st Cir. 2006)..................................................................................................15

*Fidelity Brokerage Servs., LLC v. Callinan*,
    2019 WL 1576097 (Mass. Super. Ct. Feb. 11, 2019) ..........................................................21

*Genzyme Corp. v. Melvin*,
    2023 Mass. Super. LEXIS 31 (Mass. Super. Ct. Apr. 4, 2023)...........................................26

*Gertz v. Vantel Int'l/ Pearls in the Oyster, Inc.*,
    2020 WL 3977404 (D. Mass. July 14, 2020).......................................................................21

*Getman v. USI Hldgs. Corp.*,
    2005 WL 2183159 (Mass. Super. Ct. Sept. 1, 2005)...........................................................22

*Harrell v. Backstage Salon & Day Spa, Inc.*,
    2022 WL 618681 (Mass. Super. Feb. 22, 2022)......................................................19, 20, 29

*IKON Off. Sols., Inc. v. Belanger*,
    59 F. Supp. 2d 125 (D. Mass. 1999) ...................................................................................28

*Knox v. Stalk & Beans, Inc.*,
  2021 WL 5626439 (Mass. Super. Oct. 4, 2021) ........................................................27

*La Casse v. Aurora Loan Servs., LLC.*,
  2016 WL 4535338 (D. Mass. Aug. 30, 2016) ..........................................................21

*Mallet & Co. Inc. v. Lacayo*,
  16 F.4th 364 (3d Cir. 2021) ..................................................................................26, 30

*Marcam Corp. v. Orchard*,
  885 F. Supp. 294 (D. Mass. 1995) ............................................................................29

*Mazurek v. Armstrong*,
  520 U.S. 968 (1997)...................................................................................................15

*Me. Pointe, LLC v. Starr*,
  2011 WL 379279 (D. Mass. Feb. 3, 2011) .............................................................19, 28, 29

*Needham Bank v. Guaranteed Rate, Inc.*,
  2021 WL 2019287 (Mass. Super. Apr. 17, 2021)......................................................27

*Nuance Commc'ns, Inc. v. Kovalenko*,
  2022 WL 2347112 (D. Mass. June 29, 2022) ...........................................................20

*Oxford Global Res., Inc. v. Guerriero*,
  2003 WL 23112398 (D. Mass. Dec. 30, 2003).........................................................18

*Oxford Global Res., LLC v. Hernandez*,
  106 N.E.3d 556 (Mass. 2018) ...................................................................................17

*Oxford Global Res., LLC v. Hernandez*,
  2017 WL 2623137 (Mass. Super. Ct. June 9, 2017), *aff'd* (Mass. 2018) ...............19

*Patriot Homes, Inc. v. Forest River Housing, Inc.*,
  512 F.3d 412 (7th Cir. 2008) ....................................................................................26

*Presidio, Inc. v. People Driven Tech., Inc.*,
  2023 WL 5178345 (S.D. Ohio Aug. 11, 2023).........................................................26

*Robert Half Int'l, Inc. v. Simon*,
  2020 WL 1218988 (Mass. Super. Ct. Jan. 29, 2020).................................................21

*Rohm & Haas Elec. Materials, LLC v. Elec. Circuit Supplies, Inc.*,
  759 F. Supp. 2d 110 (D. Mass. 2010) .....................................................................15, 29

*Roll Sys., Inc. v. Shupe*,
  1998 WL 1785455 (D. Mass. Jan. 22, 1998).........................................................16, 17

*Safety-Kleen Sys., Inc. v. McGinn*,
    233 F. Supp. 2d 121 (D. Mass. 2002) ....................................................................15

*Schram v. PMC Ins. Agency, Inc*.,
    2023 WL 1433420 (D. Mass. Feb. 1, 2023) ..........................................................27

*SimpliVity Corp. v. Bondranko*,
    204 F. Supp. 3d 340 (D. Mass. 2016) ...................................................................28

*Sodexo Operations, LLC v. Abbe*,
    382 F. Supp. 3d 162 (D. Mass. 2019) ...................................................................27

*Sysco Mach. Corp. v. Cymtek Sols., Inc.*,
    2022 WL 17823769 (D. Mass. Dec. 20, 2022) .....................................................23

*Townsend Oil Co. v. Tuccinardi*,
    2020 WL 958520 (Mass. Super. Ct. Jan. 16, 2020) ........................................20, 29

*Travelers Supply, Inc. v. Hilton Head Labs., Inc.*,
    2008 WL 5533434 (D. Mass. Dec. 23, 2008) .......................................................18

*Tri-Nel Mgmt., Inc. v. Bd. of Health of Barnstable*,
    433 Mass. 217 (2001) ...........................................................................................28

*U.S. Elec. Servs., Inc. v. Schmidt*,
    2012 WL 2317358 (D. Mass. June 19, 2012) ..................................................25, 28

*Viken Detection Corp. v. Videray Techs. Inc.*,
    384 F. Supp. 3d 168 (D. Mass. 2019) ........................................................23, 26, 28

*Wash. Trust Advisors, Inc. v. Arnold*,
    646 F. Supp. 3d 210 (D. Mass. 2022) ...................................................................24

*Watkins v. Omni Life Sci., Inc.*,
    692 F. Supp. 2d 170 (D. Mass. 2010) ...................................................................18

*Winter v. Nat. Res. Def. Council, Inc*.,
    555 U.S. 7 (2008) ..................................................................................................15

## **Statutes**

18 U.S.C. § 1836(3)(A)(i)(I) ...........................................................................................24

18 U.S.C. § 1836(b)(1) ...................................................................................................23

18 U.S.C. § 1839(5)(B) ...................................................................................................23

Cal. Bus. & Prof. Code § 16600 ................................................................................17, 18

Cal. Bus. & Prof. Code § 16600.1(c) ........................................................................18

Cal. Bus. & Prof. Code § 16600.5(d)-(e) ...................................................................18

M.G.L. c. 93 § 42(2)(ii) ............................................................................................23

M.G.L. c. 149, § 24L(b)(iii)-(vi), (viii)......................................................................19

M.G.L. c. 149, § 24L(b)(v) .......................................................................................20

M.G.L. c. 149, § 24L(b)(vi).......................................................................................20

M.G.L. ch. 93 § 42A ..................................................................................................24

## **Other Authorities**

16 Fed. Reg. 910 (proposed Jan. 5, 2023) .................................................................30

Cal. Sen. Bill No. 699 (2023-2024 Reg. Sess.) §§ 1(c), (e)......................................17

## TABLE OF ABBREVIATIONS

| Abbreviation | Document |
|---|---|
| Compl. | DraftKings' Complaint (Dkt. 1) |
| MH TRO Dec. | Declaration of Michael Z. Hermalyn In Support of Defendant's Opposition to Plaintiff's Motion for Temporary Restraining Order (Dkt. 36) |
| TRO Hr'g | Temporary Restraining Order Hearing Transcript, February 8, 2024 (Dkt. 46) |
| MH Tr. | March 6, 2024 Deposition of Michael Hermalyn (filed as Ex. A to Beck Dec.) |
| BH Tr. | March 5, 2024 Deposition of Brian Harris (filed as Ex. B to Beck Dec.) |
| MTD | Memorandum of Law in Support of Defendant's Motion to Dismiss (Dkt. 69) |
| PI Mem. | Memorandum of Law in Support of Plaintiff's Motion for Preliminary Injunction (Dkt. 73) |
| Metz Dec. | Affidavit of Hayden Metz in Support of Plaintiff's Motion for Preliminary Injunction (Dkt. 77) |
| Harris Dec. | Affidavit of Brian Harris in Support of Plaintiff's Motion for Preliminary Injunction (Dkt. 79, 90) |
| Russell Dec. | Affidavit of Samuel Russell in Support of Plaintiff's Motion for Preliminary Injunction (Dkt. 80, 91) |
| Goodman Dec. | Affidavit of Brittney Goodman in Support of Plaintiff's Motion for Preliminary Injunction (Dkt. 81, 92) |
| Hernandez Dec. | Affidavit of George Hernandez in Support of Plaintiff's Motion for Preliminary Injunction (Dkt. 82) |
| Goeke Dec. | Affidavit of Justine Goeke in Support of Plaintiff's Motion for Preliminary Injunction (Dkt. 74, 86) |
| Green Dec. | Affidavit of Mitchell Green in Support of Plaintiff's Motion for Preliminary Injunction (Dkt. 75, 87) |
| Larracey Dec. | Affidavit of Andrew Larracey in Support of Plaintiff's Motion for Preliminary Injunction (Dkt. 76, 88) |
| Henley Dec. | Affidavit of Shawn Henley in Support of Plaintiff's Motion for Preliminary Injunction (Dkt. 78, 89) |
| MH PI Dec. | Declaration of Michael Hermalyn in Support of Defendant's Opposition to Plaintiff's Motion for Preliminary Injunction |
| Beck Dec. | Declaration of Russell Beck in Support of Defendant's Opposition to Plaintiff's Motion for Preliminary Injunction |

| Brandon Dec. | Declaration of Niles Brandon in Support of Defendant's Opposition to Plaintiff's Motion for Preliminary Injunction |
|---|---|
| Gwiazdon Dec. | Declaration of Taylor Gwiazdon in Support of Defendant's Opposition to Plaintiff's Motion for Preliminary Injunction |

## **PRELIMINARY STATEMENT**

DraftKings, Inc.'s ("DK") strategy is to attempt to create smoke where there is no fire. DK comes to this Court with over-the-top accusations—that are *directly contrary to the evidence and DK's own internal records*—and inflammatory buzzwords like "theft," "spoliat[ion]," and "consciousness of guilt." Rather than develop credible evidence, DK liberally distorts reality and resorts to unnecessary character assassination of its former employee, Michael Z. Hermalyn. In fact, the evidence shows that Hermalyn did nothing wrong. DK's brazen attempts to torch Hermalyn's reputation by mischaracterizing so-called "evidence" is consistent with DK's go-to playbook. Indeed, DK has a long history of aggressively smearing employees who leave or seek greener pastures with other employers. Underlying DK's attacks is the fact that, since Fanatics announced it was launching an online sportsbook in 2021, *186 DK employees have applied for a position with Fanatics*. This, of course, has nothing to do with Hermalyn, and everything to do with DK employees attempting to flee a culture of retribution. Trying to halt this trend, DK attempts to make an example out of Hermalyn, transparently to instill fear in other DK employees looking to jump ship and halt lawful recruiting activity by Fanatics.

The Court should not be misled by DK's bombast and smoke and mirrors, and should deny DK's requested PI. Hermalyn is not the bad actor here. When DK's "evidence" is actually examined, DK's narrative completely crumbles. As just some examples:

- **DK's claims that Hermalyn "downloaded" documents on a "non-DK device" are outrageous, as Hermalyn was simply *viewing* documents on his personal phone for DK work, as he has done *since Day 1* of his employment there.** DK claims that Hermalyn "downloaded" documents to a "non-DK device" while still a DK employee. But DK **doesn't** tell the Court that the "non-DK device" was Hermalyn's personal phone, which he was *authorized* to use and *routinely used* for DK work during his *entire time* with DK. DK also ignores that it does not even issue company phones to employees, and therefore *all* DK employees are *authorized* to and *routinely use* their personal devices for DK work. DK's very own Chief Information Security Officer, Brian Harris, conceded that *he himself uses his personal phone* to conduct work for DK. Moreover, DK omits that the purported "downloads" were not actually downloads in the traditional sense—rather, they were simply *viewing* activity in the context of ordinary course emails and work for DK.

1

- **<u>DK's other claims that Hermalyn stole data are false, as Hermalyn was simply migrating files between DK-issued devices in the normal course, working with DK IT</u>**. DK repeats that Hermalyn "exfiltrated" and "deleted" files from a DK laptop on January 16, 2024. But DK **<u>doesn't</u>** disclose to the Court that Hermalyn did so for a perfectly legitimate reason—*and DK knows it*: DK issued Hermalyn a new work laptop and Hermalyn was completing the migration of files from his old 16-inch DK laptop to his new 14-inch DK laptop. Hermalyn removed personal information from the old computer before returning it to DK. DK's **own** records—contemporaneous instant messages between Hermalyn and DK IT specialist George Hernandez—confirm that this is exactly what Hermalyn was doing.

- **<u>DK's trade secret claims gloss over the fatal fact that Hermalyn returned *all* DK property, documents, and information before starting at Fanatics</u>**. DK trumpets that Hermalyn "stole" DK documents. But DK **<u>doesn't</u>** tell the Court that before he accepted his offer from Fanatics, Hermalyn went ***above and beyond*** to ensure that he no longer possessed any DK property, documents, or information. He returned all of his DK devices and even surrendered his personal phone, personal email, and other accounts that ***might*** have had any DK information. As Hermalyn testified, he has none of DK's information, because: "***Anything that was in my possession when I worked at DK is in. I have handed [it] over.***" Hermalyn has done more ***voluntarily*** than what some courts have ***ordered*** defendants to do in similar restrictive covenant and trade secret cases.

- **<u>DK's best attempt to concoct a story about customer "solicitation" also falls flat because the customer has done business with Fanatics for *years*</u>**. DK accuses Hermalyn of "introducing" one of its customers to a Fanatics VIP employee at the Super Bowl. But DK **<u>doesn't</u>** tell the Court that this customer was ***already*** a ***long-time customer*** of Fanatics well before Hermalyn joined Fanatics—since ***2018***. Indeed, this customer had attended a dinner with Fanatics' Chairman and CEO months earlier, in October 2023, well before Hermalyn even began discussions about moving to Fanatics earlier this year. Simply put, the customer ***needed no introduction*** and this was not a "solicitation." There is ***no evidence*** that Hermalyn has solicited DK's gaming or other customers (because he has not), let alone that he has used DK's confidential information to do it.

- **<u>DK's employee solicitation theory ignores affirmative outreach by DK's own employees</u>**. DK contends that Hermalyn "solicited" two of its employees. But DK **<u>doesn't</u>** disclose to the Court that these DK employees repeatedly ***reached out to Hermalyn***, not the other way around, less than 24-hours after Hermalyn had started at Fanatics, or, consistent with that, that Hermalyn only responded to questions. Or that these two supposedly virtuous employees—upon whose declarations DK places great reliance—took affirmative steps to ***cover their own tracks*** when reaching out to Hermalyn.  DK also ignores that one of them, Andrew Larracey, had previously applied for a job at Fanatics back ***in 2022***. This is not unusual given the ***high volume of DK employees who have applied for a position with Fanatics*** since 2021. DK also ignores that both purportedly solicited employees remain at DK. Hermalyn has been walled off from hiring at Fanatics.

The story that DK now spins is a fabrication. And key pieces of the story that DK originally concocted when it first filed this lawsuit have now evaporated. For example, DK alleged (under oath, in its verified complaint) that Hermalyn executed a year-long "scheme" as a "double-agent"

before leaving for Fanatics. Compl. ¶¶ 1, 88-97 (Dkt. 1). DK also alleged that Hermalyn solicited DK employees on behalf of Fanatics as far back as 2023, pointing to an email Hermalyn sent to a departing DK employee last July. *Id.* ¶¶ 88-97. But Hermalyn had only briefly met Fanatics' CEO a few times in group settings before 2024, and only began talks with Fanatics about joining the company in mid-January 2024. Moreover, the July 2023 email showed Hermalyn ***supporting DK's efforts to retain*** the DK employee in question, ***not*** soliciting him. MH TRO Dec. ¶¶ 41-43. DK's own counsel admitted at the TRO hearing that there "is a possible innocent explanation" for the email after Hermalyn called that out. TRO Hr'g 16:19-21. DK's PI filings have now completely ***abandoned*** what was once the heart of its salacious narrative–and with good reason: they are fabrications designed to malign and destroy the reputation of a senior employee who had the audacity to seek out a better opportunity.

Just as critically, DK failed to show that it suffered any ***actual harm*** that would warrant the extraordinary injunctive relief it seeks. DK carries the heavy burden of proving—with actual evidence—that it is entitled to a PI that, as DK requests it, would upend the status quo by removing Hermalyn from his job at Fanatics, including his role on the executive team and as Head of its Los Angeles office. DK has not come close. Despite the passage of nearly two months since Hermalyn joined Fanatics, DK does not claim that it has lost a ***single*** customer to Fanatics. Nor does DK claim that it has lost ***any*** employees to Fanatics. To be clear, this is not a case in which an employee was hired to move a book of business from one company to another: Fanatics already has ***100 million customers*** in the U.S., each of DK and Fanatics have ***tens of thousands*** of VIP customers, and it is well known that many if not all those customers ***overlap***. And DK does not even allege any ***ongoing*** solicitation of employees or customers by Hermalyn. DK has not offered ***any*** evidence that Hermalyn actually used or disclosed DK's confidential information or so-called "trade secrets" (a mishmash of 90+ documents that DK does not provide to the Court or describe

beyond generic slogans). Indeed, that would be impossible because *he does not possess* any DK information.  There is no harm, much less *irreparable* harm, justifying DK's requested PI.

In contrast, if DK's proposed PI is entered, Hermalyn would face real irreparable harm. Hermalyn's coveted role as President of Fanatics VIP and Head of Fanatics' Los Angeles office means that he is currently just one of seven people on Fanatics' executive team, out of 16,000 employees, reporting directly to the CEO. If Hermalyn is unable to perform this role for an entire year, then he is concerned that Fanatics will be forced to hire someone else to fulfill it, and he not have this *once in a lifetime career opportunity*.

Finally, DK's requested PI also should be denied because the restrictions it requests are *shockingly overbroad*, void, and unenforceable under any law. There can be no serious dispute that DK's restrictive covenants contravene the law and public policy of California favoring open competition and employee mobility; Hermalyn is entitled to invoke these protections as a California resident. However, even if this Court were to apply Massachusetts law, DK's restrictive covenants are still invalid, as they go far beyond what is needed to protect any legitimate business interest of DK. DK's requested PI essentially seeks to force Hermalyn to be benched as punishment for leaving DK. The PI would apparently bar Hermalyn from not only working at Fanatics, but also from working anywhere else in the sports, betting, and gaming industries, *worldwide*, for an *entire year*. Beyond the non-compete prong, the PI would also, for example, ban Hermalyn from "transacting business" with *any* DK customer or prospective customer—even if he does not solicit such customers, and even if he does not use any of DK's confidential information. DK's requested relief ignores that the average gambler uses multiple gambling applications (Fanatics' average gambler uses 2.9), and many if not all of Fanatics' gaming customers are *also* DK's customers. These sweeping restrictions are unlawful and entirely unwarranted.

For these reasons, DK's motion should be denied in its entirety. All the smoke that DK is pointing to is self-generated by DK's efforts to torch a former employee who chose to leave for the greener pastures at Fanatics, and there is no basis in fact or in law for DK's requested relief.

## STATEMENT OF FACTS[1]

### A.   Hermalyn's Hiring by Fanatics

Prior to joining Fanatics, Hermalyn worked at DK for less than 3.5 years, from September 2020 through January 2024. MH TRO Dec. ¶ 21. In his role at DK, Hermalyn was responsible for managing and acquiring certain categories of customers. *Id.* Hermalyn worked out of DK's New York City office or from his home at the time in New Jersey. *Id.* ¶ 22.

In January 2024, a friend told Hermalyn that Fanatics was looking for someone to lead its VIP team, and Hermalyn decided to reach out to Fanatics' CEO Michael Rubin. MH Tr. 107:3-22, 108:11-18.   On January 11, Hermalyn called Rubin and they briefly discussed scheduling a meeting. *Id.* at 117:10-21. It was not until January 23 that Hermalyn and Rubin had a get-to-know-you meeting. This was the first time they had discussions about Hermalyn potentially working for Fanatics, but they did not discuss position, compensation, or structure. *Id.* at 170:8-19, 171:8-10. On January 27, Hermalyn had a follow-up meeting with Rubin, who offered Hermalyn the position of President of Fanatics VIP and Head of Fanatics' Los Angeles office. *Id.* ¶¶ 16-17. The position was a unique, career-advancing opportunity to join the Fanatics executive team, reporting directly to Fanatics' CEO. MH Tr. 112:8-10 ("[T]he opportunity to work for Mr. Rubin was something that I couldn't pass up. It's running an LA office. It's being on the executive team. There are 18,000 people. There are seven people on the executive team. I am one of them.").[2] The position

---

[1]   A chart summarizing Hermalyn's responses to DK's omissions and mischaracterizations is attached hereto as **Appendix A**.

[2]   It was this opportunity and not any HR investigation at DK that led Hermalyn to explore an option outside of DK. Hermalyn testified he was "surprised" about the investigation and that he had done nothing wrong. MH Tr. 94:19-20, 96:6-8, 111:19-112:7.

required Hermalyn to live and work in California. MH TRO Dec. ¶ 18. On January 28, knowing he was likely to accept Fanatics' offer pending final negotiation of his contract, Hermalyn traveled to California to begin moving there. *Id.* ¶¶ 7-8. While Rubin invited Hermalyn to stay at his California home while he finalized his California residence, "there was nobody else [at the home] in terms of Fanatics employees until [Rubin] arrived [several days later on] Thursday [February 1] after [Hermalyn] resigned" from DK. MH Tr. 185:15-18.

Hermalyn finalized negotiations with Fanatics between January 28-31, and resigned from DK and accepted Fanatics' offer on February 1. MH TRO Dec. ¶¶ 11, 45. Until he finalized the negotiations with Fanatics, Hermalyn remained a DK employee and continued to perform his job duties. It is true, as DK notes, that after January 28, Hermalyn did minimal work for DK. PI Mem. 13. That was for good reason: He knew at that point he was likely to leave, and so wanted to avoid receiving new DK information while he had a pending offer to join Fanatics. MH TRO Dec. ¶ 34.

### B.     Hermalyn Did Not Use, Disclose, Or Misappropriate DK Information

The core of DK's allegations is that between Hermalyn's first outreach to Rubin on January 11 and his resignation from DK on February 1, Hermalyn "stole" DK documents. PI Mem. 3-4, 5-6, 9-12. DK's allegations are false. Moreover, DK's allegations about Hermalyn's pre-resignation file activities are fabricated—Hermalyn turned over all devices and accounts that could have DK information to his counsel in advance of resigning from DK and accepting an offer from Fanatics.

### 1.     Alleged "Downloads" From "A Non-DK Device" Were In Fact Hermalyn Viewing Documents On His Authorized Phone For DK

DK falsely claims that Hermalyn "began downloading" DK's documents from a "non-DK device" after he began speaking with Fanatics. PI Mem. 9, 11-12; Harris PI Dec. ¶ 43. The "non-DK device" was Hermalyn's personal phone, which he was ***authorized by DK to use for work, just like virtually every other DK employee,*** and had done so ***from Day 1 of his employment at DK***. MH Tr. 120:4-17. Hermalyn regularly used his phone to view DK documents in connection

with his DK work—this was not something that he started to do out of the blue after his discussions with Fanatics began.[3] DK insinuates Hermalyn did something wrong because he used his personal phone. But what DK hides from the Court is that DK does not give *any* of its employees company-issued phones, and the use of personal devices for work is ***allowed and widespread*** at DK—indeed, it is required to do the job. BH Tr. 75:2-23. DK employees are also permitted to add Google Drive to their personal devices and access DK's Google Workspace from those devices. *Id.* at 75:20-25, 76:17-18, 128:13-22. Even DK's own Chief Information Security Officer, Brian Harris, admitted that he uses his personal iPhone for work. *Id.* at 193:24-194:11 (admitting that he uses a non-DK device for his DK work). Hermalyn used his personal phone to view documents ***he was authorized to view***. Tellingly, DK **never** alleges that Hermalyn accessed (or "downloaded," "viewed," or "slacked") documents he was not authorized to see. Further, when DK says "downloading," that is highly misleading, because DK counts ***merely viewing*** a document, ***without*** retaining a copy on the device, as "downloading" it. All that DK puts forward about the supposed "downloads" is partial Google Workspace reports, *see* Harris Dec. ¶¶ 38, 41 —which log mere document "views" from devices as "downloads."[4] [5] Further, as

---

[3]  Although it misleadingly presents only "downloads" to a "non-DK device" after January 11, the Harris declaration shows that Hermalyn "downloaded" documents on his personal phone *before* January 11, *see* Harris Dec. ¶ 42 & App'x A, belying DK's assertion that Hermalyn "***began*** downloading" documents only after having a brief call with Rubin on the 11th (PI Mem. at 9).

[4]  The Harris Appendix confirms this. It shows that when Hermalyn viewed a document from Google Workspace on his personal device, it *always* showed up as a "Download" event, including before January 11th, while views from a DK device (presumably a laptop) typically showed up as "Views." Harris Dec. App'x A. This indicates that the "downloads" DK trumpets are in fact mere artifacts of how Google Workspace logs a document view on different devices, and not a "download" as colloquially understood.

[5]  As Harris admitted under oath, Google publications show that in Google Workspace (which is DK's primary document repository), previewing a file in the Drive app on a mobile device is logged as a *Download* event. Google Help, *Drive Log Events*, https://support.google.com/a/answer/4579696?hl=en (accessed Mar. 15, 2024); BH Tr. 131:16-132:17 (acknowledging Google's policy). In a declaration submitted after his deposition, Harris claims that he tested and purportedly did not find a "view" event being logged as a "download" in Google Workspace. Harris Dec. ¶ 40. Harris submits no documentary evidence of what he did or his results. In any event, Google itself is the more authoritative source on its own product.

detailed below, Hermalyn gave his personal phone (among other things) to his counsel on January

31—**_prior_** to resigning from DK—and has not had access since. MH Tr. 189:21-190:3, 191:13-17.

### 2.      As DK Knows, Alleged File Activity On January 16 Was Hermalyn Switching From An Old DK Laptop To A New DK Laptop

DK shamelessly spins a false narrative about Hermalyn's activities on January 16, 2024,

when Hermalyn allegedly accessed Dropbox.com and transfernow.com, searched "move big

files," attempted to Airdrop documents, deleted documents, sent himself several documents via

Slack, and deleted personal files.[6] PI Mem. 1, 10. But DK's own internal documents demonstrate

that these actions were innocent, **_and DK knows it_**, just as DK knew that the centerpiece of its

TRO filing (the July 2023 email) was not as it told the Court. DK had provided Hermalyn a new

(14-inch) DK-issued laptop, and on January 16, Hermalyn was in the process of finishing the

transfer of files from his old (16-inch) DK-issued laptop to the new one.[7] Hernandez Dec. ¶ 2;

Harris Dec. ¶¶ 25-26; MH Tr. 99:12-17, 159:22-160:3, 163:7-14. Hermalyn's contemporaneous

Slack messages on January 16 to DK's desktop support specialist, George Hernandez, confirm

this. Hernandez Dec. ¶ 3.



As Hermalyn stated in
his messages to Hernandez, _id._,
Hermalyn successfully moved
his files from his old laptop and
was also trying to move one

particularly large video file from his old computer to the new one. _Id._ Hermalyn testified at his

deposition, "what you showed me based on [the] George Hernandez conversation, makes it crystal

---

[6] DK repeatedly says that Hermalyn sent documents to his "own" Slack account. PI Mem. 10. This is another blatant mischaracterization: The **_only_** Slack account was a **_DK account_**, not a personal one. MH Tr. 119:15-18, 147:12-5, 149:4-14.

[7] DK refers to the old, 16-inch laptop as "Laptop 1" and the new, 14-inch laptop as "Laptop 2."

clear to me what I was doing [on January 16] where I was transferring files from an old [DK] issued computer to a new [DK] issued computer." MH Tr. 163:9-13; *see also id.* at 138:21-139:6, 146:3-11, 156:21-157:6. DK paints this ordinary course activity as illicit by deflecting, disingenuously pointing again to "downloads" on "a non-DK device." DK claims that on January 16, Hermalyn "downloaded" some of the documents he sent himself via Slack onto his phone. PI Mem. 1, 10. DK admits, however, that Slack reports, like Google Workspace reports, do not even use "download" in the colloquial sense of retaining a copy on the memory of a device.[8] What's more, virtually all, if not *all* DK employees had Slack on their phones. MH Tr. 119:15-18; *see also* BH Tr. 128:13-22 (testifying that DK permits bring your own device for accessing email, Slack, Google Workspace.). Hermalyn gave his personal phone to his counsel on January 31— prior to resigning—and has not had access to it since.[9]

DK's accusation that Hermalyn went on a "deletion spree" on January 16 because he removed browsing history and iMessages and deactivated his iCloud account on the old 16-inch laptop, runs counter to its own internal documents. PI Mem 4, 10-11; *see also* Green Dec. ¶ 55. Hermalyn contemporaneously messaged DK's Hernandez on January 16 that he "either slacked to [him]self or transferred the personal docs" from his old laptop. Hernandez Dec. ¶ 3. Hermalyn testified that any removal of his own personal information from the old 16-inch laptop was part of the process of migrating to the new 14-inch laptop, MH Tr. 99:12-17, 159:22-160:3, as Hermalyn planned to return the old laptop to DK's Hernandez in the following weeks—just as he wrote to him on January 16, Hernandez Dec. ¶ 3. The same is true for the material Hermalyn removed from is DK laptop after January 28. PI Mem. 13; MH Tr. 161:17-24.

---

[8] *See* Goeke Dec., Ex. C (DK 2nd Am. ROG Resp. No. 1), at 14 (Dkt. No. 86-10) ("According to Slack, a document is considered 'downloaded' if it is downloaded in the traditional sense, but can also mean that the document was 'accessed' in Slack itself.").

[9] As for Hermalyn visiting Dropbox.com and transfernow.com, Hermalyn visited these websites in an effort to move the one large (public) video file he mentioned to Hernandez. DK presents no contrary evidence, and Harris conceded that DK did not prevent its employees from using such websites. *See, e.g.*, BH Tr. 199:7-9, 204:16-20; *see also* MH Tr. 146:3-11 ("[T]he only one big left was the panel [video], the 23 gigs."). Hermalyn does not recall using Airdrop. *Id.* at 127:4-9.

Moreover, the iCloud account that DK complains about Hermalyn "deactivating" is the same account Hermalyn ceded to his counsel, in an abundance of caution, on January 31, 2024. MH TRO Dec. ¶ 45.

### 3.      Hermalyn Has Not Taken, Used Or Disclosed DK Information

DK contends that Hermalyn "download[ed]" four DK documents after January 26, but DK's allegations are again false. *See* Harris Dec. ¶ 43 & App'x A; Henley Dec. ¶ 38.

- **It is *impossible* that Hermalyn downloaded two documents on February 1.** DK claims Hermalyn "download[ed]" two documents, "VIP BIMONTHLY UPDATE" and "BD_Gaming101," on February 1—***after*** he resigned from DK on February 1 and ***after*** he already turned in his devices and cut off all access to his accounts on January 31. Harris Dec. App'x A; Henley Dec. ¶ 38. That's impossible because he didn't have any access as of February 1. MH TRO Dec. ¶ 61; MH Tr. 191:10-17. DK is uncharacteristically silent as to the device purportedly used for these alleged "downloads." This incongruity undercuts DK's "forensic" analysis and demonstrates that DK's assertions cannot be trusted.

- **Hermalyn accessed one of the documents to respond to a *request from a DK employee*.** The fourth document is "(Master) SB 2024," which DK describes as an "Excel spreadsheet containing [DK's] plans for entertaining some of its key partners at the 2024 Super Bowl LVIII," Henley Dec. ¶ 38, and which DK purported downloaded January 30. Harris Dec. Ex. A. As Hermalyn previously attested, he accessed this event planning document to assist DK employee, Brittany Goodman, with finalizing invitations to DK's Super Bowl events for VIPs. MH TRO Dec. ¶ 60. Goodman, who is still a DK employee, now disputes aspects of this account, though she admits she communicated with Hermalyn. Goodman Dec. Hermalyn stands by his version of events: Goodman reached out to Hermalyn about the Super Bowl invitations for several specific individuals and others on a list of VIP invitees on January 24, 2024, by sending an email to Hermalyn's personal Gmail account; believing that Goodman emailed his Gmail account in error, the next day, Hermalyn added in his DK email address, replied that he would work on her request, and accessed the "Master (SB) 2024" spreadsheet for that purpose. MH PI Dec. ¶¶ 6-8. Given that the Super Bowl has come and gone, the information in this spreadsheet is public and obsolete.

- **DK fails to allege anything meaningful about the fourth document.** DK also claims Hermalyn "downloaded" a third document, "Tax Rate Slide," on January 29, but alleges nothing of substance about it, or that it is even confidential. Harris Dec. App'x A.

### 4.      As Of January 31, Hermalyn Has Had No Access To His DK-Issued Devices, Or Even His Personal Devices And Accounts

Hermalyn does not possess or have access to, any device or account that is even ***might*** to have any DK information on it. Hermalyn turned over these devices and accounts and provided DK with a certification concerning the same, which was accurate and made in good faith. *See* MH

TRO Dec. ¶¶ 45-47; Beck Dec., Ex. C. In an effort to cut through DK's false allegations, attached as **Appendix B** is a chart of the key devices and accounts that DK references in its moving papers and the actual facts regarding each.

Specifically, on January 31—the night before he resigned—Hermalyn gave to his counsel:

- His DK-issued devices, that is, the old 14-inch and new 16-inch laptops. *See* MH TRO Dec. ¶ 45; *see also* MH Tr. 191:15-17 ("I handed over all of my work related devices . . . to my counsel the night before I resigned").[10]

- His personal phone (the so-called "non-DK device"). MH TRO Dec. ¶ 45. Hermalyn obtained a new phone with a new number that he has used going forward. *Id.*

- Out of an abundance of caution, control of his personal email (a Gmail account), which included numerous personal non-DK documents and messages, and his personal iCloud account, which included numerous personal photos and information. *Id.*[11]

In response, DK deflects by pointing to personal email accounts, an aged Dropbox account, and additional devices ("two iPhones and two iPads"), none of which is likely to contain *any* DK information. *See* PI Mem. 6. Hermalyn turned over all email accounts to his counsel "that even could remotely come close to having any connection with DraftKings." MH Tr. 199:16-21. Hermalyn rarely used the other emails and he has not logged into them since resigning from DK. *See id.* at 200:19-22, 202:6-11. This is also true for his iPad, which he did not use for work. *Id.* at 192:3-5. Nevertheless, he "in good faith hand[ed] it over to counsel." *Id.*[12] And although Hermalyn has "not been in Dropbox since he resigned and [has] no idea when [he] logged in prior to that," he also ceded his Dropbox log-in to counsel once he became aware that DK contended it might contain protected information. *Id.* at 141:16-18; *see also id.* at 138:12-20.[13]

---

[10] He also gave counsel his DK corporate credit card and MiFi device. *Id.*

[11] Hermalyn subsequently found another old laptop that he had not used for some time and promptly gave it to his counsel, although he did not know whether it even belonged to DK. MH TRO Dec. ¶ 47.

[12] DK's memorandum refers to "two iPads." PI Mem. 6. Hermalyn is not familiar with what this second device is as he does not believe he owns a second iPad. Beck Dec., Ex. D. In any event, DK's expert claims that this second iPad was last synched with DK's Google Workspace *in December 2023*, well before Hermalyn began any discussions with Fanatics. Green Dec. ¶ 45. DK also refers to two iPhones that were last synced with DK's Google Workspace *in 2022 and early 2023*. Green Dec. ¶¶ 45-46. These are old phones that Hermalyn no longer possesses; he traded them in for new phones. MH PI Dec. ¶ 5. They are irrelevant.

[13] DK alleges that, in addition to visiting Dropbox.com on January 16, Hermalyn had previously downloaded the Dropbox application onto his old DK laptop, and certain files were synced from that computer to his Dropbox account. Hermalyn testified that he did not use or recall using Dropbox. MH Tr. 125:21-24. In any event, the files DK claims were synced with this Dropbox application are old, from long before the period relevant to this case. *See* Goeke

While Hermalyn has and will continue to act cooperatively with DK, he has done so at no small inconvenience. Because he ceded access to his iCloud account, he cannot tell who any incoming calls or messages are from on his new phone, cannot access his personal and family photographs, and is no longer able to access geo-tracking for his young daughters. Beck Dec., Ex. C ¶ 3. Meanwhile, DK, in an attempt to manufacture a dispute, has made unreasonable demands. For example, when Hermalyn attempted to segregate his Gmail contacts that were arguably business contacts from his work at DK from those that were not, *id.*, DK has been obstructionist, claiming that even Hermalyn's ***grandmother's*** number could belong to DK if she ever considered placing a bet on its platform. Beck Dec., Ex. E.

Hermalyn is unequivocal that he at no time—either before or after February 1—provided or disseminated DK's confidential information to anyone at Fanatics, or discussed, used, or otherwise disclosed protected information in a DK document with anyone at Fanatics. MH TRO Dec. ¶¶ 52-53, 61; *e.g.*, MH Tr. 139:8-9 ("I did not take information. I do not have information."); *see also id.* at 133:5-7, 147:15-17, 161:23-24, 183:20-21; BH Tr. 205:13-19 (Harris knows of no DK information provided to Fanatics). It is not surprising that DK cannot point to a ***single instance*** of misuse of ***any*** confidential information, because it has not happened.

### C.   Hermalyn Did Not Solicit Any DK Employees

It is undisputed that following Hermalyn's resignation on February 1, two of his former DK colleagues—Andrew Larracey and Hayden Metz—affirmatively reached out to Hermalyn, not the other way around. Beck Dec., Ex. F at 15-16; MH Tr. 12:12-13:3. In nearly identical affidavits, submitted after Hermalyn's deposition, Larracey and Metz state that ***they*** contacted Hermalyn on February 1. *E.g.*, Metz Dec. ¶ 4. Later that evening, Larracey reached out to Metz suggesting that

---

Dec. Ex. C (DK's 2nd Am. ROG Resp. No. 1), at 16-19. DK admits that these are not necessarily even confidential documents, let alone trade secrets. *See id.* at 16. Hermalyn confirmed the same. *See* MH Tr. 140:20-141:2.

they *again* contact Hermalyn, which they ultimately did using Larracey's wife's cell phone and another phone placed next to it to avoid a record of a group call. Larracey Dec. ¶ 6. Hermalyn did not direct Larracey to call him from his wife's phone, or from any other phone. MH PI Dec. ¶ 3. Larracey and Metz apparently devised the plan to contact Hermalyn from Larracey's wife's phone and concoct a DIY conference call to cover their own tracks, and to avoid detection and retaliation by DK—which has a well-known history of aggressively pursuing employees who leave.

Hermalyn adamantly disputes Larracey's and Metz's self-serving account of the nature and content of their communications. Hermalyn did not "hint or encourage" either of them to leave DK. Beck Dec., Ex. F at 16. Larracey and DK leave out the fact that ***Larracey has a prior history of applying to work at Fanatics, including as far back as 2022***. *See* Brandon Dec. ¶ 6. This history is not unusual. Indeed, since Fanatics announced it was launching an online sportsbook in 2021, **186** DK employees have applied for a position with Fanatics. Brandon Dec. ¶ 4. And despite a barrage from DK's counsel at his deposition, Hermalyn was steadfast that rather than soliciting or making compensation "offers" to Larracey or Metz—who have not been deposed—Hermalyn was being peppered with questions by his former colleagues and answered them about why he left DK and spoke with them about Metz being his successor at DK. *See* MH Tr. 39:3-42:6, 42:23-43:3, 43:16-45:13, 49:3-20, 49:23-50:4, 50:22-51:17, 53:14-55:10, 58:6-59:13, 62:18-64:13, 64:16-65:12, 65:24-66:19, 70:25-71:9, 73:12-76:4, 76:14-22, 77:13-78:25. Indeed, Metz was told he would be promoted by DK on February 1. Metz Dec. ¶ 5. Moreover, while Larracey did apply to Fanatics on February 1 (just as he did in 2022) and affirmatively engaged with other Fanatics employees about the job opportunity, Fanatics did not make him an offer. Brandon Dec. ¶ 6. Hermalyn has been walled-off from Fanatics' recruitment and interview processes for Larracey and any other DK employees who may apply. *Id.* ¶¶ 7-8. To Hermalyn's knowledge, ***no*** DK employees have been hired by Fanatics since February 1, MH PI Dec. ¶ 3, and DK does not point to any.

### D.      Hermalyn Did Not Solicit Any DK Customers

As an initial matter, DK's customer solicitation claims **make no sense** because customer relationships in the sports betting industry are **not exclusive**. S*ee* MH Tr. 82:11-24. Hermayln was not hired to move a book of business from Fanatics to DK, nor could he. Fanatics already has **100 million customers** in the United States. Gwiazdon Dec. ¶ 4. The average gambler uses multiple gambling applications—in fact, Fanatics' average gambler has 2.9 sports betting applications active in the last three months. *Id.* at ¶ 3. DK is the self-proclaimed "leader in the … digital sports entertainment and gaming industry." Compl. ¶ 2. Each of DK and Fanatics have **tens of thousands of VIP customers**, and it is well known that many if not all **overlap**. Gwiazdon Dec. ¶ 4. This fact is routinely confirmed in "share of wallet" discussions with Fanatics customers about where they play. *Id.* DK and Fanatics likewise share the same business partners too; for example, both have done collaborations with Lebron James and the UFC. *Id.* ¶ 5.

DK has presented no evidence—**none**—that Hermalyn has solicited any of DK's customers to Fanatics. DK alleges a single instance on which, it claims, Hermalyn spoke to a single DK customer at a Super Bowl event. PI Mem. at 15. This event was held Super Bowl weekend and Fanatics was hosting it. But it is no surprise that this customer was at a Fanatics event because he has been a long-time client of Fanatics for **years,** since **2018**, and of Fanatics' subsidiary PointsBet since **2021**. Gwiazdon Dec. ¶¶ 6. As shown here, the customer even posted to his public Instagram account an ad


*Fanatics CEO Rubin (left) at Dinner with Allegedly Solicited Customer (right); Oct. 2023*



marketing PointsBet on March 18, 2022. *Id.* ¶ 7 & Ex. A.  Moreover, Hermalyn did not "introduce"

14

the customer to a "Fanatics colleague"—someone else entirely made that introduction. *Id.* ¶ 10; *see also* MH Tr. at 82:7-83:5. This customer also attended a dinner with Fanatics' CEO Rubin back in October 2023 (pictured above)—***months before*** Hermalyn joined the company. Gwiazdon Dec. ¶ 8 & Ex. B.

In yet another attempt at seeing what sticks, DK claims that Hermalyn told an unnamed DK customer "on or about January 27" that "in sum and substance, 'I want to take you somewhere.'" PI Mem. 15. Hermalyn has no idea what DK is talking about. DK cites only its own lawyer-written interrogatory responses and provides no documentary or even affidavit testimony to support this claim. DK also states, without support, that Hermalyn "met with" unnamed "DK partners." PI Mem. 15. These allegations are extremely vague and should not be credited at all.[14]

## LEGAL STANDARD

"A preliminary injunction [PI] is an extraordinary and drastic remedy that is never awarded as of right." *7-Eleven, Inc. v. Grewal*, 60 F. Supp. 3d 272, 279 (D. Mass. 2014).[15] Plaintiff must show "(1) it has a substantial likelihood of success on the merits, (2) there exists, absent injunctive relief, a significant risk of irreparable harm to it, (3) the balance of hardship weighs in its favor, and (4) granting the injunction will not negatively affect the public interest." *Safety-Kleen Sys., Inc. v. McGinn*, 233 F. Supp. 2d 121, 123 (D. Mass. 2002). "The party seeking the [PI] bears the burden," *Esso Standard Oil Co. (P.R.) v. Monroig-Zayas*, 445 F.3d 13, 18 (1st Cir. 2006), "by a clear showing," *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997) (emph. original). "[P]laintiffs seeking preliminary relief [must] demonstrate that irreparable injury is *likely*" not merely "a possibility." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008) (emph. original). "[W]hen courts are faced with affidavits at odds and must make a credibility determination

---

[14]  If DK is referring to Hermalyn's attending social events at the Super Bowl, he exchanged pleasantries and mentioned no more than that he now worked at Fanatics. *See* MH Tr. 87:23-24, 88:3-14. In any event, individuals in the gaming industry were aware of Hermalyn's move, in part, from the press. *Id.* at 87:4-6.
[15]  Unless otherwise noted, all case citations are cleaned up and emphasis is added.

between them, courts generally do not issue a preliminary injunction, but rather leave the issue for a jury to resolve." *Rohm & Haas Elec. Materials, LLC v. Elec. Circuit Supplies, Inc.,* 759 F. Supp. 2d 110, 125 n.107 (D. Mass. 2010).

DK's motion is largely supported by declarations from individuals who Hermalyn has not deposed, and which were submitted after he testified. Tellingly, although several refer to documents, DK does not actually provide them to the Court or Hermalyn. *See, e.g.*, Harris Dec. ¶¶ 39-40 (referring to "reports" and "test[ing]" not attached to declaration); Henley Dec. ¶¶ 31-38; Goodman Dec. ¶ 5; Russell Dec. ¶ 4. The information that *is* included, particularly by Harris, is incomplete and cherrypicked, and should be given little weight. DK also relies on its own purported "forensic" analysis of certain DK devices from an IT analyst, Mitchell Green, who has also not been deposed. The Court should therefore substantially discount DK's submissions.[16]

## **ARGUMENT**

## I. **DK FAILED TO SHOW A LIKELIHOOD OF SUCCESS**

### A. **DK Failed To Show A Likelihood Of Success On Its Restrictive Covenant Claims (Counts II-III)**

DK cannot demonstrate a likelihood of success on its breach of contract claims for violation of Hermalyn's Non-Compete and Non-Solicit (the "Restrictive Covenants").

#### 1. **California Law Applies To The Restrictions And Invalidates Them**

As detailed in Hermalyn's pending motion to dismiss, the Massachusetts choice-of-law provisions in the Restrictive Covenants should <u>not</u> be enforced. California law, which invalidates them, should instead apply. Massachusetts courts do not enforce choice-of-law provisions where their application "(1) would be contrary to a fundamental policy of a state; which has (2) a materially greater interest than the chosen state in the determination of the particular issue; and

---

[16]    "Without reliable evidence procured through discovery *and* cross examination, the court has no meaningful basis from which to conclude that Plaintiff is sufficiently likely to prevail that a preliminary injunction would be justified." *Am. Century Home Fabrics, Inc. v. Ashley Furniture Indus., Inc.*, 473 F. Supp. 2d 168, 175 (D. Mass. 2007).

which . . . (3) would be the state of the applicable law in the absence of an effective choice of law by the parties." *Roll Sys., Inc. v. Shupe*, 1998 WL 1785455, at *2 (D. Mass. Jan. 22, 1998). Based on these factors and California's strong policy in favor of employee mobility, courts in Massachusetts and elsewhere ***routinely*** apply California law, rather than contractually-chosen law, where a restriction would otherwise impair a California resident and employee, like Hermalyn, from working in California.[17] None of the reasons put forth by DK warrant a different result.

- ***First***, there is no serious dispute that DK's Restrictive Covenants contravene "the fundamental public policy of California favoring open competition and employee mobility." *Oxford*, 106 N.E.3d at 560; MTD 10-11.[18]

- ***Second***, California has a materially greater interest than Massachusetts in the determination of this issue. MTD 10-16. Based on research showing that non-compete and non-solicit provisions "stifle economic development," limit "firms' ability to hire," and "depress innovation and growth," California "ha[s] been clear that [its] public policy against restraint of trade trumps other state laws when an employee seeks employment in California, even if the employee had signed the contractual restraint while living outside of California and working for a non-California employer"—***exactly the situation here***. Beck Dec., Ex. G §§ 1(c), (e). California employer Fanatics VIP also has a substantial interest in protecting its relationship with its in-state employee. "Massachusetts presently has no comparable legislative policy," and its "common-law principles governing the enforceability of noncompetition agreements are less categorical" than California's. *Oxford*, 106 N.E.3d at 565. That Hermalyn was based in New Jersey and New York while working for DK, and thus the "contract was not performed in Massachusetts[,] substantially decreases the Commonwealth's interest in having its laws govern this dispute." *Roll*, 1998 WL 1785455, at *3 n.2. Where the employee "is a California resident working out of California" in his "present employment," "California has a materially greater interest than Massachusetts." *Id.* at *3; *see also Oxford*, 106 N.E.3d at 566-67 (similar).

- ***Third***, California law would apply absent the choice-of-law provision. As noted above, California would apply its law to these facts, and the factors Massachusetts employs to determine the "most significant relationship to the transaction and the parties" favor California law. *Oxford*, 106 N.E.3d at 566 (California had most significant relationship

---

[17] *Roll*, 1998 WL 1785455, at *3 (despite Massachusetts choice-of-law provision, applying California law to restrictive covenants where present employment was in California); *Oxford Global Res., LLC v. Hernandez*, 106 N.E.3d 556, 560 (Mass. 2018) (same); *see also* MTD at 15 n.9 (collecting cases from numerous other states).

[18] That this case involves trade secret and confidentiality claims is irrelevant. *See Aware, Inc. v. Ramirez-Mireles*, 2001 WL 755822, *2 (Mass. Super. Ct. Apr. 4, 2001) (noting lack of "a single reported opinion in which a California court actually has enforced a non-competition agreement or covenant for the purpose of protecting trade secrets"); *see also AMN Healthcare, Inc. v. Aya Healthcare Servs., Inc.*, 239 Cal. Rptr. 3d 577, 591 (Cal. Ct. App. 2018) ("[Cal. Bus. & Prof. Code §] 16600 precludes an employer from restraining an employee from engaging in his or her 'profession, trade, or business,' even if the employee uses information that is confidential, but not a trade secret"); *Cypress Semiconductor Corp. v. Maxim Integrated Prods., Inc.*, 186 Cal. Rptr. 3d 486, 504 (Cal. Ct. App. 2015) (no "inevitable disclosure doctrine" under California law, as it would result in "not merely an injunction against the use of trade secrets, but an injunction restricting employment").

where plaintiff "executed, performed, and allegedly committed a breach of the agreement in California"). Hermalyn **never** lived or worked in Massachusetts and was **never** based out of DK's Boston office; he only allegedly traveled to the Commonwealth for work a handful of times; and **none** of the alleged contractual breaches occurred in Massachusetts. MTD 3-4, 14.[19] The place of performance and location of the subject matter of the Restrictive Covenants are also in California, as those provisions were designed to impact Hermalyn's "subsequent employment which was, in this case, employment by a competitor who is 'located' in California." *Application Grp., Inc. v. Hunter Grp., Inc.*, 72 Cal. Rptr. 2d 73, 87 (Cal. Ct. App. 1998). By contrast, the "[p]laintiff's status as a Massachusetts resident is simply not enough" to create a "substantial interest" or establish Massachusetts as "the most significant relationship." *Travelers Supply, Inc. v. Hilton Head Labs., Inc.*, 2008 WL 5533434, at *7 (D. Mass. Dec. 23, 2008).[20]

The Court's concern at the TRO hearing—that California's connection may be minimal because "Hermalyn moved there one week ago," Hr'g Tr. at 34:7-10—has been allayed. Hermalyn's move to California is real; DK does not (and cannot) contest that Hermalyn is a California resident, he leads his California employer's Los Angeles office, he has spent the vast majority of days since accepting his offer in California, and his and his family's actions have been consistent with a long-term relocation to California. MH TRO Dec. ¶¶ 9-10; MTD Dec. ¶¶ 2-3. The Court should not enforce provisions against Hermalyn that are clearly illegal in California. Cal. Bus. & Prof. Code §§ 16600.1(c), 16600.5(d)-(e). Given that California is now the situs of both performance and the alleged misconduct, its laws apply and void the covenants.

---

[19] That the two employees allegedly solicited by Hermalyn work in Massachusetts, PI Mem. 25, is a non-issue. While "the state in which the injury occurred" is relevant under Massachusetts choice-of-law rules for "tort claims," *Watkins v. Omni Life Sci., Inc.*, 692 F. Supp. 2d 170, 174 (D. Mass. 2010), these are contract claims. Consideration of the employees' location risks penalizing Hermalyn for alleged conduct that is perfectly legal in the jurisdiction where it purportedly occurred, in California, where employee non-solicitation provisions are void. It is worth reiterating that neither employee left DK or has an offer from Fanatics to do so.

[20] DK's cases are distinguishable. In *Oxford Global Res., Inc. v. Guerriero*, 2003 WL 23112398 (D. Mass. Dec. 30, 2003), the covenants were "negotiated and executed in Massachusetts," the parties were "all resident[s] in Massachusetts," the defendants "performed a significant portion of their employment" in Massachusetts, the state in which the post-employment covenants were performed (Texas) expressed a "relatively minimal" interest "in protecting immigrants" (unlike California's vigorous protections), and Hermalyn is not "fleeing the jurisdiction" (he was never present). *Id.* at *5-6. The viability of *Aspect Software, Inc. v. Barnett*, 787 F. Supp. 2d 118 (D. Mass. 2011), is questionable; it preceded the SJC's contrary *Oxford* decision, and its belief that California policy is "non-fundamental" is untenable following California's 2024 amendments to § 16600. *Id.* at 127. The employee also "had an office at [plaintiff's] headquarters in Massachusetts," his "duties largely split between Massachusetts and Tennessee," and he had a narrow covenant that "avoid[ed] implicating" California policy. *Id.* at 122, 126-27.

2.     **Even If Massachusetts Law Applied, The Post-Employment Non-Compete Is Invalid and Unenforceable**

The Non-Compete would still be invalid even if Massachusetts law applied. DK has the burden to show that: (1) its Non-Compete restricts Hermalyn's employee mobility only to the extent "necessary to protect" its trade secrets, confidential information, or goodwill; (2) adequate protection of these "legitimate business interests" cannot be accomplished "through an alternative restrictive covenant"; (3) its Non-Compete is reasonably limited in geography, time, and activities; and (4) its Non-Compete is consistent with public policy. M.G.L. c. 149, § 24L(b)(iii)-(vi), (viii). DK has not met **any** of these factors, let alone **all** of them. Its Non-Compete is a paradigmatic example of an unenforceable covenant designed to protect against "ordinary competition." *Me. Pointe, LLC v. Starr*, 2011 WL 379279, at *3 (D. Mass. Feb. 3, 2011) (denying injunction and refusing to enforce non-compete).

- **No Legitimate Business Interests.** Hermalyn has the *right* under Massachusetts law to use his "knowledge, experience, and skill to compete against the prior employer." *Harrell v. Backstage Salon & Day Spa, Inc.*, 2022 WL 618681, at *5 (Mass. Super. Feb. 22, 2022). Hermalyn was hired at DK and Fanatics to use his skills at connecting people and building relationships. MH Tr. 197:9-21. DK cannot lawfully restrain him from using his skills, even if further developed at DK. *See Banner Indus. v. Bilodeau*, 2003 WL 831974, at *3 (Mass. Super. Feb. 27, 2003) ("[A]n employer cannot by contract prevent his employee from using the skill and intelligence acquired or increased and improved through experience."). An "employee's talent" is not a trade secret and is not something an employer can legitimately tie down with a non-compete. *Edwards v. Athena Capital Advisors, Inc.*, 2007 WL 2840360, at *3 (Mass. Super. Aug. 9, 2007).

- **No Confidential Information-Based Justification.** DK has not met its burden to justify its Non-Compete based on the protection of DK's confidential information. Hermalyn possesses none; he did **not** "steal," take or use DK's confidential information. As described above, Hermalyn took numerous steps to ensure he is not in possession of DK's property or information. DK's inability to identify any misuse of its trade secrets or confidential information, especially since the Court declined to enforce its Non-Compete at the TRO stage, shows that the Non-Compete is not "***necessary*** to protect" those interests.[21]

- **No Goodwill-Based Justification.** Nor has DK met its burden to justify its Non-Compete based on the protection of its goodwill. Goodwill is an employee's who, like Hermalyn, "maintains distinctly personal or professional relationships with customers, so that the

---

[21]   "[R]emembered information," such as "[Hermalyn's] own memory of customers' names, needs, and habits," is not a secret that belongs to DK. *Oxford Global Res., LLC v. Hernandez*, 2017 WL 2623137, at *3 (Mass. Super. Ct. June 9, 2017), *aff'd*, (Mass. 2018).

business entity possesses little of it," *Harrell*, 2022 WL 618681, at *5 (invalidating non-compete because goodwill belonged to employee), and it is "unfair" to enforce "a covenant that effectively appropriates client goodwill that rightfully belongs to" Hermalyn and "harms the interests of third parties"—*i.e.*, those customers who, by their own initiative, wish to do business with Hermalyn at Fanatics. *BNY Mellon, N.A. v. Schauer*, 2010 WL 3326965, at *8 (Mass. Super. Ct. May 10, 2010). "If a customer decides to switch from [DK] to [Fanatics] because they are personally loyal to [Hermalyn], that means that the goodwill as to that customer belongs to [Hermalyn], not [DK]." *Townsend Oil Co. v. Tuccinardi*, 2020 WL 958520, at *4 (Mass. Super. Ct. Jan. 16, 2020).[22]

- **Adequate Protection Through Alternative Covenants.** DK does not (and cannot) explain why, without the Non-Compete, its other restrictive covenants would be inadequate. Courts have declined to enforce non-competes where (as here) other covenants "are sufficient to protect" the former employer. *Cognex Corp. v. Eichler*, 2009 WL 5408166, at *8 n.4 (Mass. Super. June 17, 2009); *see also Agero Admin. Serv. Corp. v. Campolo*, 366 F. Supp. 3d 170, 173-74 (D. Mass. 2019). DK's only "evidence" is its bald misrepresentation of Paragraph 19 of Hermalyn's California Declaration. PI Mem. 21-22. But, Hermalyn did not "admit[ ] he cannot work for Fanatics without contacting DK's customers and partners using DK's confidential information and goodwill," *id.*; he actually said only that it was "critical that I am unrestricted in my efforts to grow and lead the VIP business at Fanatics." Goeke Dec., Ex. A ¶ 19. Hermalyn never claimed he needed DK's confidential information; instead, he said he was suffering harm as a California employee due to DK's illegal restrictive covenants and its smear campaign. *Id.* ¶¶ 20-25.

- **Overbreadth.** The Non-Compete is overbroad in at least two respects. *First*, as the Court recognized, its "worldwide scope" is "quite broad." Hr'g Tr. 18:8-9. While DK claims *its* operations have broad scope, PI Mem. 21, that is irrelevant; it must introduce evidence that its Non-Compete corresponds to "the geographic areas" in which **Hermalyn**—*not* DK— "provided services or had a material presence." M.G.L. c. 149, § 24L(b)(v). It has not done so.[23] The scope of the Non-Compete—globally or even nationwide, as DK now suggests— is thus not supportable. *Second*, the Non-Compete purports to prohibit Hermalyn from performing **any services whatsoever** that are in any way "related to" any DK businesses he was involved with *or* about which he received confidential information. Such a vague and overly broad restriction is not "reasonable in the scope of the proscribed activities in relation to the interests protected," and is in no way "limited to only the specific types of services *provided by the employee*." M.G.L. c. 149, § 24L(b)(vi) (establishing a presumption of reasonableness *only if* restriction is so limited).

_____

[22] Citing *Nuance Commc'ns, Inc. v. Kovalenko*, 2022 WL 2347112, at *6 (D. Mass. June 29, 2022), DK asserts Hermalyn's "mere association" with Fanatics is "enough to raise doubts in the eyes of [DK's] customers as to the relative value of [DK's offerings]," thereby damaging its "goodwill." PI Mem. 22. But that case involved a Director of Product Strategy who controlled the technical aspects of an AI program; her departure thus reflected poorly on her former employer's product. Given his *non*-technical DK position, there is no reason Hermalyn's move to Fanatics says anything about DK's offerings, particularly as "there is no such thing as an exclusive relationship" between "gaming companies with customers." MH Tr. 82:11-24. DK has no evidence, such as customer affidavits, that Hermalyn's move has negatively impacted *its own* goodwill; and its inability to identify a single customer that has left DK for Fanatics since the TRO shows that the Non-Compete is not "***necessary*** to protect" DK's goodwill.

[23] In fact, DK is talking out of both sides of its mouth; it has told the California court that its contacts with that state were so insignificant that California *lacks jurisdiction* over it. Beck Dec., Ex. H at 12-18. And, according to its website, DK's online gambling service is live and legal *in only 5 states* (not California), and its sports betting service is live and legal *in only 25 states* (not California). Beck Dec., Ex. I.

- **Public Policy.** DK ignores the "consistent with public policy" prong. PI Mem. 20-22. Here, DK's Non-Compete would improperly interfere with "the public interest in labor mobility and the employee's freedom to practice his profession and in mitigating monopoly." *Harrell*, 2022 WL 618681, at \*5. When such overbroad prohibitions are combined with an **_unlimited_** geographic scope, as here, it is apparent that the covenant is "intended to restrain ordinary competition" and is therefore invalid. *Edwards*, 2007 WL 2840360, at \*3.

### 3. The Non-Solicit Agreement Is Also Invalid Under Massachusetts Law And, In Any Event, There Was No Breach

DK's Non-Solicit Agreement would likewise be invalid even if Massachusetts law applied, but, in any event, Hermalyn has not breached it. Hermalyn's Non-Solicit is invalid the same reasons as his Non-Compete—DK has no legitimate business interest in need of protection. Like a non-compete, a non-solicit agreement is **only** enforceable if needed to protect the employer's legitimate business interest in its trade secrets, confidential information, or goodwill. *Bruett v. Walsh*, 2019 WL 2605705, at \*2 (Mass. Super. Ct. May 19, 2019). Again, Hermalyn possesses no DK confidential information or trade secrets, and any goodwill belongs to him, not DK. The Non-Solicit also prohibits Hermalyn from transacting <u>any</u> business with customers—including those with whom he did *not* work at DK, and former customers and even "prospective customers" with whom DK has <u>never</u> done business—even if he did not solicit them and they independently chose to work with Fanatics (even before he started working there) or him. Compl., <u>Ex. A</u> ¶ 2. Such provisions are impermissibly overbroad.[24]

Further, DK cannot show breach of the Non-Solicit. With respect to customer solicitation, DK did not plead customer solicitation as a breach; its claim focuses entirely on "Breach of Contract by Employee Solicitation." Compl. ¶¶ 114-122 (Count II). "[A] complaint may not be amended by the briefs." *La Casse v. Aurora Loan Servs., LLC.*, 2016 WL 4535338, at \*10 n.10

---

[24] *See Robert Half Int'l, Inc. v. Simon*, 2020 WL 1218988, at \*7 (Mass. Super. Ct. Jan. 29, 2020) (non-solicit overbroad and unenforceable to extent defendants could not "solicit and serve clients they did not support while working for" prior employer); *Gertz v. Vantel Int'l/ Pearls in the Oyster, Inc.*, 2020 WL 3977404, at \*8 (D. Mass. July 14, 2020) (non-solicit that "limit[ed] the freedom of non-contracting parties" stated plausible claim for declaratory judgment that provision was unenforceable); *Walsh*, 2019 WL 2605705, at \*3-5 (refusing to enjoin former employee from transacting business with customers who reached out to him absent solicitation because it would impermissibly infringe on the goodwill belonging to him and substantially burden customers).

(D. Mass. Aug. 30, 2016). In any event, DK has no cognizable evidence of a breach. That Hermalyn "met with multiple DK partners, telling them that he was now employed by Fanatics," PI Mem. 15, is not improper "solicitation." *See Fidelity Brokerage Servs., LLC v. Callinan*, 2019 WL 1576097, at *6 (Mass. Super. Ct. Feb. 11, 2019) ("simple 'announcement' to his or her former clients of a change in the [defendant's] place of employment is not, by itself, a 'solicitation'"); *Getman v. USI Hldgs. Corp.*, 2005 WL 2183159, at *4 (Mass. Super. Ct. Sept. 1, 2005) (similar). Hermalyn did not talk about Fanatics business and said nothing beyond a polite greeting. MH Tr. 82:18-24; Beck Dec., Ex. F at 19. The January 27 statement alleged by DK ("I want to take you somewhere") does not identify the alleged customer, occurred before Hermalyn left DK or accepted Fanatics' offer, and is so vague as to be meaningless. PI Mem. 12, 15, 24. Nor did Hermalyn solicit a "DK VIP customer" by "introducing" him "to a Fanatics colleague at the Superbowl." *Id.* That customer was well known to the Fanatics VIP team already as he had been *a years' long Fanatics customer since 2018*. *See* Gwiazdon Dec. ¶ 6; MH Tr. 83:3-20. Hermalyn has not talked to a single customer or anybody about moving their business to Fanatics. MH Tr. 84:16-18.

DK also gets it wrong with respect to employee solicitation. The tales offered by Larracey and Metz in made-for-litigation affidavits differ from Hermalyn's account. Hermalyn testified that he did not solicit either; that they reached out to him; that they were the ones "peppering" him with questions, with Metz "throwing out numbers" for potential pay packages; that he "did not have the authority" to offer them Fanatics compensation packages; that he "didn't even understand how HR worked" hours into a new job; that he did not discuss their potential compensation with Fanatics CEO; that he referred them to Fanatics "career site" to, "frankly, try to end the conversation;" and that he emphasized, "I can't be involved in anything." MH Tr. at 40:18-49:7. Nor did he instruct them to keep their conversation secret. *Id.* at 59:7-13.

The following is **undisputed**: Larracey and Metz repeatedly initiated contact with Hermalyn. Larracey Dec. ¶¶ 4, 6; Metz Dec. ¶¶ 4, 6; MH Tr. 12:12-16. They took affirmative steps to avoid detection. Larracey Dec. ¶ 6; Metz Dec. ¶ 6. Larracey had previously applied to Fanatics, and Fanatics has never extended him an offer to this day. Brandon Dec. ¶ 6. Metz has never applied for a position with Fanatics, nor has it ever extended a job offer to him. *Id.* ¶ 5; Metz Dec. ¶ 12. Hermalyn has not spoken to Metz or Larracey since DK filed suit. Larracey Dec. ¶ 16; Metz Dec. ¶ 14. Fanatics walled off Hermalyn from Larrecy's application process, and generally from *all* DK employee interviews and recruitment since he started on February 1. Brandon Dec. ¶¶ 7-8. DK has not identified any employee who has left for Fanatics since Hermalyn's move. Even leaving the credibility determination aside and based only on these undisputed facts, DK has not "show[n] a likelihood [that Hermalyn] will engage in future solicitation" of employees. *Adv. Micro Devices, Inc. v. Feldstein*, 2013 WL 10944934, at *12 (D. Mass. May 15, 2013).

**B.     DK Failed To Show A Likelihood Of Success On Its Trade Secret and Confidential Information Claims (Counts I, IV-VIII)**

DK has also failed to show a likelihood of success on its claims that rely on alleged misappropriation of DK's trade secrets or confidential information. To prevail on a misappropriation claim under both DTSA and MUTSA, DK must show "1) the information at issue constitutes a trade secret, 2) the plaintiff took reasonable measure to secure the confidentiality of the information, and 3) the defendant obtained the trade secret through improper means." *Viken Detection Corp. v. Videray Techs. Inc.*, 384 F. Supp. 3d 168, 177 (D. Mass. 2019) (DTSA and MUTSA standards and definitions "substantially similar"). "Misappropriation" under these statutes includes the "***disclosure or use*** of a trade secret of another." 18 U.S.C. § 1836(b)(1) (providing that owner "of a trade secret that is misappropriated" may bring civil action under DTSA); *id.* § 1839(5)(B) (defining "misappropriation"); *see also* M.G.L. c. 93 § 42(2)(ii); *Sysco Mach. Corp. v. Cymtek Sols., Inc.*, 2022 WL 17823769, at *1 (D. Mass. Dec. 20, 2022).

### 1.    DK Failed To Show Misappropriation

DK does not argue that Hermalyn accessed a document he was not authorized to while at DK. And DK has no answer to the indisputable fact that when he left, Hermalyn ***did not take any of DK's information with him***. As of February 1, Hermalyn no longer had possession of his DK devices or his personal phone or accounts that might have contained DK information—all of which he gave to DK or his counsel. As he testified, "Anything that was in my possession when I worked at [DK] is in. I have handed over." MH Tr. 133:16-25. Hermalyn also testified that he has not used or disclosed any of DK's confidential information to anyone at Fanatics.

In short, ***there is simply no evidence*** that Hermalyn used "improper means" or "disclose[d]" or "use[d]" anything that could be called DK's trade secret. *See Wash. Trust Advisors, Inc. v. Arnold*, 646 F. Supp. 3d 210, 218 (D. Mass. 2022) (denying PI on non-compete where plaintiff had "not shown that [] Defendants took any trade secrets with them" and defendant stated that "he returned or destroyed all of [Plaintiff's] confidential information in his possession before he resigned"); *Allscripts Healthcare, LLC v. DR/Decision Res., LLC*, 386 F. Supp. 3d 89, 95 (D. Mass. 2019) ("[P]roof of misappropriation depends upon whether defendant used and/or disclosed the data without the permission[.]"). DK offers only insinuations and inferences—emphasizing for example Hermalyn's physical presence in Rubin's house on certain days, PI Mem. 19, even though neither Rubin nor any other Fanatics employee were there, and Hermalyn denies downloading or taking any DK documents on his personal phone while there (which would not constitute misappropriation in any event). *See* MH Tr. 183:3-185:18. DK has presented ***no actual evidence*** that Hermalyn took anything, that he disclosed it, or that he (or Fanatics) used it.[25]

---

[25]   DTSA allows a court to issue an injunction to prevent "any actual or threatened misappropriation," but the injunction may not "prevent a person from entering into an employment relationship, and [any] conditions placed on such employment shall be based on evidence of threatened misappropriation and not merely on the information the person knows." 18 U.S.C. § 1836(3)(A)(i)(I); *see also* M.G.L. ch. 93 § 42A (injunction may issue "upon a showing that information qualifying as a trade secret has been or is threatened to be misappropriated"). Here, for the same reasons, there is no "evidence of threatened misappropriation" as Hermalyn does not possess any of DK's information.

Nor can DK rely on indirect evidence that Hermalyn is using or disclosing its information, because there is none. As noted above, there is no evidence that Hermalyn is soliciting DK's customers at all, let alone that Hermalyn is using DK's trade secrets or confidential information to do so. *See Banner Indus.*, 2003 WL 831974, at *4 (plaintiff "cannot claim protection for its client lists . . . absent a showing that [Defendant] has these lists in his possession" and there was "simply no evidence that [Defendants] have solicited [Plaintiff's] clients"). DK does not claim that Hermalyn used the contents of any of the supposedly "stolen" documents in the single (disputed) instance of alleged employee solicitation.[26] DK also cannot rely on the argument that there *might* be future use based on inevitable disclosure, which is insufficient to show likelihood of success. *See U.S. Elec. Servs., Inc. v. Schmidt*, 2012 WL 2317358, at *8 (D. Mass. June 19, 2012) ("allegedly inevitable future misuse of trade secrets" insufficient when plaintiff "alleges that its employee jeopardized trade secrets not by absconding with files or paper documents but rather by relying on his or her own memory and knowledge").

It is instructive to compare this case with the trade secrets cases DK relies on. Unlike here, those cases involved employees deliberately taking a former employer's confidential information and surreptitiously retaining it and bringing it to their new employers. *Cf. Adv. Micro Devices*, 2013 WL 10944934, at *9 (former employees **admitted** they retained confidential information after departing and "made no efforts to return or delete the files"); *Builder Servs. Grp. v. Harkins*, 2023 WL 4685943, at *6 (D. Mass. July 21, 2023) (former employee emailed reports and confidential bids to his personal email address and solicited and accepted work from plaintiff's customers using stolen information).[27] This case has nothing close.

---

[26] DK vaguely contends that Hermalyn "leverage[d]" Metz and Larracey's "confidential compensation," PI Mem. 24, but Hermalyn denies this, and DK has also not established that Metz and Larracey's compensation is even confidential, let alone a trade secret.

[27] DK's other cases are also inapposite. In *Allstate Ins.Co. v. Fougere*, 2019 WL 4776986 (D. Mass. Sept. 30, 2019), there was extensive evidence that defendants took and used specific spreadsheets from a former employer (including affidavits from the defendant's own former employees). *Id.* at *6. In *Diomed, Inc. v. Vascular Sols., Inc.*, 417 F. Supp. 2d 137 (D. Mass. 2006), the court found sufficient evidence of misappropriation to deny summary

### 2.      DK Failed To Show Information Entitled To Trade Secret Protection

DKs' showing on its trade secrets claims is also deficient because DK still has not described the specific information that qualifies for trade secret protection. A plaintiff must show *with specificity* that the information allegedly misappropriated constitutes a trade secret, *see Am. Sci. & Eng'g, Inc. v. Kelly*, 69 F. Supp. 2d 277, 238 (D. Mass. 1999), and injunctions in trade secrets cases that lack this specificity have been vacated on appeal. *See, e.g.*, *Mallet & Co. Inc. v. Lacayo*, 16 F.4th 364, 381-84 (3d Cir. 2021) (vacating PI because plaintiff had failed to adequately specify and describe the specific information that was a trade secret and injunction instead covered "general categories of business and technical information"); *Patriot Homes, Inc. v. Forest River Housing, Inc.*, 512 F.3d 412, 414-15 (7th Cir. 2008) (similar).

The alleged "Confidential Information" DK relies on (and seeks to enjoin the usage of) includes material which on its face is nothing of the sort. *See, e.g.*, Harris Dec. ¶ 43 (documents titled, *e.g.*, "Memo - Formal Fridays," "Tax Rate Slide," "Title Slide"); *see also Genzyme Corp. v. Melvin*, 2023 Mass. Super. LEXIS 31, at *8-9 (Mass. Super. Ct. Apr. 4, 2023) ("marketing or sales techniques strategies, or methods" that employer used in industry were not confidential). DK has only provided lists of 91 document titles, *see* Harris Dec. App'x A, along with generic descriptions and rote references to "sensitiv[ity]" and "confidential[ity]." Henley Dec. ¶ 33. The single document that Hermalyn agrees he reviewed after January 27, the "(Master) SB 2024," is a case in point (*see* Harris Dec. App'x A): Hermalyn reviewed this document legitimately for his DK work, and in any event the information in it (DK's "plans for entertaining some of its key partners at the 2024 Super Bowl," Henley Dec. ¶ 38) could not possibly be a "trade secret"—the information is now ***public*** as the Super Bowl has happened, the attendees were at ***public*** events,

---

judgment where the defendant competitor had no knowledge or plans to enter a particular product market but, after hiring the plaintiff's former employee, was suddenly able to launch a product in under a year. *Id.* at 144. In *EMC Corp. v. Pure Storage, Inc.*, 2016 WL 7826662 (D. Mass. Aug. 19, 2016), the court denied summary judgment on misappropriation claims where there were "emails . . . instruct[ing] [] employees" at the new employer to use the plaintiff's information brought over by former employees. *Id.* at *7. DK has shown nothing like these type of facts.

and the entertainment has passed.[28] That DK pushes this document as a "trade secret" shows how weak DK's showing is and should cause the Court to question its assertions across the board.[29]

## II.     DK HAS NOT COME CLOSE TO PROVING IRREPARABLE HARM

Given that DK cannot show a likelihood of success on the merits, "the remaining elements are of little consequence." *Akebia Therapeutics, Inc. v. Azar*, 976 F.3d 86, 92 (1st Cir. 2020). However, DK clearly cannot show "a significant risk of irreparable harm if the injunction is withheld." *Sodexo Operations, LLC v. Abbe*, 382 F. Supp. 3d 162, 164 (D. Mass. 2019). Hermalyn has been working at Fanatics for seven weeks, and six weeks have passed since the Court's TRO was entered. Despite this significant passage of time, DK, which bears the burden of proof, has ***no evidence*** of customer or employee loss, and ***no evidence*** of any improper use or disclosure of DK's allegedly confidential information. "[I]rreparable harm must be grounded on something more than conjecture, surmise, or a party's unsubstantiated fears of what the future may have in store." *Schram v. PMC Ins. Agency, Inc.*, 2023 WL 1433420, at *12 (D. Mass. Feb. 1, 2023).[30] DK's failure to make any showing of injury, let alone an irreparable one, is fatal to this motion.

- **No Customer Solicitation.** Again, DK has no evidence that Hermalyn has solicited any of its customers since starting at Fanatics, let alone that he has "persistently" or successfully done so. PI Mem. 28. The one customer that DK points to has been a ***long-time customer*** of Fanatics since 2018; he had dinner with Fanatics' CEO Rubin months before Rubin first spoke to Hermalyn about a potential job at Fanatics. With no proof of actual injury, DK

---

[28]  *See Viken*, 384 F. Supp. 3d at 177 ("[M]atters of public knowledge or information generally known in an industry cannot be a trade secret."); *Presidio, Inc. v. People Driven Tech., Inc.*, 2023 WL 5178345, at *17 (S.D. Ohio Aug. 11, 2023) ("[S]tale or obsolete information cannot form the basis for a trade secret claim because the information has no economic value.").

[29]  DK also failed to show likelihood of success on its remaining claims, which it does not develop in its motion. DK's failure to show misappropriation of any of its confidential information is also fatal to the common law confidentiality (Count 6) and contract claims (Count 1). The NDA only provides that an employee may not "use" or "disclose" DK Confidential Information or "remove or transfer" it from DK's systems, and DK has put forward *no* evidence that Hermalyn is doing any of those things. *See* Compl. Ex. A ¶¶ 2, 5. Moreover, MUTSA preempts the contract claim to the extent it is based on anything short of an actual trade secret. *See Needham Bank v. Guaranteed Rate, Inc.*, 2021 WL 2019287, at *8 (Mass. Super. Apr. 17, 2021). The duty of loyalty claim is derivative of DK's misappropriation allegations, and the conversion claim fails because Hermalyn returned all of DK's information before leaving the company. Def.'s TRO Opp. at 18 (Dkt. 33). For the reasons explained below, DK has also failed to show irreparable harm on these claims.

[30]  DraftKings' contractual provision that "any action that violates this Agreement would cause the Company irreparable harm" is insufficient. *See Schram*, 2023 WL 1433420, at *13 ("[A]ll Courts of Appeals that have addressed the issue conclude that the terms of a contract alone cannot require a court to grant equitable relief.").

resorts to false insinuation. It claims Hermalyn's testimony that DK's customer non-solicit has "damage[d] my reputation and my utility to Fanatics," Goeke Dec., Ex. A ¶¶ 19, 22-23, somehow shows he is "flout[ing] both the Court's [TRO] and his own agreements." PI Mem. at 29. Just the opposite; Hermalyn's declaration shows his ongoing *compliance* with that restriction (illegal under California law) and the Court's order.

- **No Risk Of Irreparable Harm From Client Loss.** DK plays fast and loose with the law as well. Citing *Knox v. Stalk & Beans, Inc.*, 2021 WL 5626439, at *2 (Mass. Super. Oct. 4, 2021), DK claims irreparable harm exists where there is "a 'plausible risk of future customer defections.'" PI Mem. 28. But it leaves out the remainder of the quote: "*and that the damages associated with those defections may escape accurate measurement*." 2021 WL 5626439, at *2. DK does not even attempt to meet that requirement. Nor can it. "[L]oss of [customer] revenue is calculable through evidence of past earnings on the accounts and, if necessary, through the use of expert testimony." *IKON Off. Sols., Inc. v. Belanger*, 59 F. Supp. 2d 125, 132 (D. Mass. 1999). That DK maintains "detailed operational data from the VIP program," PI Mem. 14, and "is uniquely skilled at computing the economic value of a given client," *Bear, Stearns & Co. v. Sharon*, 550 F. Supp. 2d 174, 178 (D. Mass. 2008), further undermines its irreparable harm claim. Further, "[e]conomic harm alone … will not suffice as irreparable harm unless the loss threatens the very existence of movant's business." *Tri-Nel Mgmt., Inc. v. Bd. of Health of Barnstable*, 433 Mass. 217, 228 (2001). DK does not meet this requirement, either. During 2023, DK had 2.7 million unique *monthly* players and $3.665 billion in revenue. Beck Dec., Ex. J at 58, 61. DK is not at risk, particularly given that customers in the gaming industry are *not* exclusive (and thus are never "lost" to a competing platform). *See* MH Tr. 82:11-24.

- **No Employee Solicitation.** DK concedes that it cannot show any "successful" instance of employee solicitation, PI Mem. 29, and it has not even alleged any solicitation since it filed suit or the TRO. Every case DK cites relates to customer solicitation, not employee solicitation, *see* PI Mem. 28-29, and it has put forth no evidence that, but for an injunction, it would be irreparably harmed by any employee solicitation.

- **No Loss of Goodwill.** DK's contention that it faces irreparable injury due to the loss of "goodwill" expressly depends on its customer and employee solicitation allegations. PI Mem. 29-30. Because those fail, so does its goodwill claim. DK has offered no *evidence* of any goodwill impairment, such as customer affidavits averring that Hermalyn's move to Fanatics has negatively affected their perception of DK's offerings. And, of course, "loss of good will is frequently valued and recompensed . . . through money damages." *IKON Off. Sols.*, 59 F. Supp. 2d at 132.

- **No Theft.** There was no "theft." Hermalyn *has no confidential DK information* to disseminate or use, and DK has no evidence of improper access or misuse since Hermalyn departed because he took affirmative steps to ensure he was no longer in possession of *any* DK property or confidential information upon his resignation. Hermalyn has also submitted affidavits and provided deposition testimony confirming this, which further undercuts the basis for any injunction. *Me. Pointe, LLC*, 2018 WL 5303038, at *1, *6 (finding "allegedly improper download . . . immediately prior to [plaintiff's resignation]" insufficient for irreparable harm considering plaintiff's attestations). Indeed, courts have *ordered* defendants on PIs to take precisely the same steps Hermalyn took *voluntarily* to cut himself off from DK's information. *See SimpliVity Corp. v. Bondranko*, 204 F. Supp. 3d 340, 352-53 (D. Mass. 2016). Where, as here, the plaintiff's theft claim is "speculative," injunctive

relief "is unwarranted," particularly absent proven misuse. *Viken*, 384 F. Supp. 3d at 179 (denying injunction); *Me. Pointe*, 2018 WL 5303038, at *6.

- **"Inevitable Disclosure".** With no proof of misconduct, DK resorts to implication. It asserts that the similarity between Hermalyn's Fanatics job and his old one means he "cannot avoid the inevitable disclosure of confidential information." PI Mem. 27. But a party may not "rely solely on inevitable future conduct, rather than conduct that has actually occurred, to establish a likelihood of success on the merits of a trade secrets claim," *and*, absent that showing, it cannot use the doctrine "to establish irreparable harm." *U.S. Elec. Servs.*, 2012 WL 2317358, at *9. In addition, "[t]he mere fact that a person assume[s] a similar position at a competitor does not, without more, make it inevitable that he will use or disclose trade secret information so as to demonstrate irreparable injury." *CSC Consulting, Inc. v. Arnold*, 2001 WL 1174183, at *3 (Mass. Super. July 12, 2001) (denying motion); *Harrell*, 2022 WL 618681, at *6 (similar). DK has not established the "more." Hermalyn is entitled to use his "general knowledge, skill, experience, and memory" while working for Fanatics, *id.*, and the fact that he has done so for seven weeks and DK still cannot provide evidence of misuse of protected information shows that, unlike *Marcam Corp. v. Orchard*, 885 F. Supp. 294, 297 (D. Mass. 1995), Hermalyn can do his job at Fanatics without being improperly "influenced by the knowledge he possesses" from DK.

## III.   THE BALANCE OF HARDSHIPS STRONGLY FAVORS HERMALYN

DK has failed to show that any risk of irreparable harm to itself outweighs the harm to Hermalyn from imposing a PI. While DK's interest is, at most, speculative monetary damages, Hermalyn would face real irreparable harm if the Court prohibits him from practicing his chosen profession for an entire year. Hermalyn fears that if he is sidelined by a PI for an entire year, Fanatics will need to hire someone else to fulfill his role as Head of Office and executive team member, and Hermalyn will not have this once in a lifetime, career advancing opportunity. MH PI Dec. ¶ 11.  Such an injunction would also result in a loss of the relationships that Hermalyn has developed and maintained with his personal goodwill. *See Banner Indus.*, 2003 WL 831974, at *4 (employee's right to practice profession outweighs employer's "speculative interest in protecting its investment in its employees, or its monetary interest in stifling adverse competition."); *see also Townsend Oil Co.*, 2020 WL 958520, at *5 (balance of hardships favored employee when employer's risk was merely quantifiable potential loss of customers while PI would "effectively prevent [employee] from working in his field"). Any harm to DK is further diminished because the customer relationships between DK and Fanatics are **not exclusive** and **overlap**.

## IV.    THE PUBLIC INTEREST DISFAVORS AN INJUNCTION

Consistent with national trends, both Massachusetts and California law recognize a public interest in employee mobility, employees' freedom to practice in their chosen professions, businesses' freedom to hire the best talent, and no barriers to fair competition by contractual means. Each of these interests weighs in favor of allowing Hermalyn to compete and outweigh DK's basic and generic interest in enforcing contracts. *See* MTD at 5-6, 10-12; *Rohm & Haas*, 759 F. Supp. 2d at 124 (noting, under Massachusetts law, that "covenant not to compete designed to protect a party from ordinary competition does not protect a legitimate business interest.").[31]

## V.    IF THE COURT IS INCLINED TO GRANT INJUNCTIVE RELIEF, DK'S PROPOSED ORDER MUST BE NARROWED

For the reasons explained, no PI should issue here. But, if the Court is inclined to grant some injunctive relief, the Court should significantly narrow DK's overbroad proposed PI. At most, Hermalyn should only be restricted from competing with DK by using or disclosing DK's confidential information.[32]  He should be permitted to solicit and transact business with customers on behalf of Fanatics so long as he does not use or disclose DK's confidential information to do so—even if those customers are shared, mutual customers with DK. *See* **Appendix C**, Hermalyn's Requested Revisions to DK's Proposed PI (filed contemporaneously with this Memorandum); *see also* Mem. in Supp. of Mot. for Refinement at 3-9 (Dkt. No. 49) (explaining why TRO was overbroad in several respects that prejudiced Hermalyn's ability to effectively work for Fanatics).

## CONCLUSION

For the foregoing reasons, Hermalyn respectfully requests that the Court to deny DK's motion for a preliminary injunction.

---

[31] For example, the FTC has proposed a new rule that would ***ban*** employers from imposing non-competes on their workers, finding such agreements hamper innovation and legitimate competition and block entrepreneurs from starting new businesses. Non-Compete Clause Rule, 16 Fed. Reg. 910 (proposed Jan. 5, 2023).

[32] DK's proposed injunction simply refers to broad categories of information, without any specificity or notice to Hermalyn about what, specifically, he may not use or disclose. *See* [Proposed] PI, Dkt. 72, ¶ a; *Mallet & Co.*, 16 F.4th at 382.

Dated: March 21, 2024                    Respectfully submitted,

                                         *Attorneys for Defendant Michael Z. Hermalyn*

                                         /s/ _____*Russell Beck*_____
                                         Russell Beck (BBO# 561031)
                                         Stephen D. Riden (BBO# 644451)
                                         Beck Reed Riden LLP
                                         155 Federal Street, Suite 1302
                                         Boston, MA 02110
                                         Tel.: (617) 500-8660
                                         Fax: (617) 500-8665
                                         rbeck@beckreed.com
                                         sriden@beckreed.com

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that a true copy of the above document was filed on March 21, 2024, through the ECF System and will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF).

Dated: March 21, 2024                    /s/ *Russell Beck*_____
                                             Russell Beck