# EXHIBIT A
## PUBLIC REDACTED VERSION

# EXHIBIT B

## PUBLIC VERSION

Page 1

1

2    IN THE UNITED STATES DISTRICT COURT

3    FOR THE DISTRICT OF MASSACHUSETTS

4    ------------------------------------------- X

     DRAFTKINGS INC.,

5

6              PLAINTIFF,

7         -versus-

8    MICHAEL HERMALYN,

9                  DEFENDANT.

10

11            CIVIL ACTION NO. 1:24-cv-10299

12   ------------------------------------------- x

13

14                  March 6, 2024

                    10:13 a.m.

15

16         VIDEOTAPED DEPOSITION of MICHAEL

17   HERMALYN, taken pursuant to Notice, held via

18   Zoom, before Fran Insley, a Notary Public of

19   the States of New York and New Jersey.

20

21

22

23

24

25

Page 2

1
2  A P P E A R A N C E S :
3
      GIBSON, DUNN & CRUTCHER LLP
4
         Attorneys for Plaintiff
5
         200 Park Avenue
6         New York, NY 10166
7  BY: ORIN SNYDER, ESQ.
         -and-
8      HARRIS M. MUFSON, ESQ.
         -and-
9      JUSTIN M. DIGENNARO, ESQ.
         -and-
10     JUSTINE GOEKE, ESQ.
         OSnyder@gibsondunn.com
11
12
13  BECK REED RIDEN, LLP
14     Attorneys for MICHAEL HERMALYN
15     155 Federal Street, Ste. 1302
         Boston, Massachusetts 02110
16
17  BY: RUSSELL BECK, ESQ.
         -and-
18     STEPHEN RIDEN, ESQ.
         Rbeck@beckreed.com
19
20
21  MUNGER TOLLES & OLSON, LLP
22     Attorneys for MICHAEL HERMALYN
23     350 South Grand Avenue
         Los Angeles, California 90071
24
25  BY:  MARIAH MASTRODIMOS, ESQ.

Page 3

1
2  A P P E A R A N C E S :  (Continued)
3
4    QUINN EMANUEL URQUHART & SULLIVAN, LLP
5        Attorneys for Fanatics
6        51 Madison Avenue
         New York, New York 10010
7
     BY:  KIMBERLY CARSON, ESQ.
8        Kimberlycarson@quinnemanuel.com
9
10   WINSTON & STRAWN
11       Attorneys for Michael Hermalyn
12       200 Park Avenue
         New York, New York 10166
13
14   BY: JONATHAN AMOONA, ESQ.
         jamoona@winston.com
15
16  ALSO PRESENT:
17   STANTON DODGE, CHIEF LEGAL OFFICER,
18   DRAFTKINGS
19   ANNA ROTHSCHILD, ESQ., DRAFTKINGS
20   ANDREW SHAPIRO, ESQ. DRAFTKINGS
21   CHRIS AZOFF, VIDEOGRAPHER
22   ROB BENIMOFF, CONCIERGE
23
24
25

Page 4

1
2  ---------------- I N D E X -------------------
3  WITNESS          EXAMINATION BY        PAGE
4  MICHAEL HERMALYN  MR. SNYDER            6
5  -------------- E X H I B I T S --------------
6  EXHIBIT 1  RESPONSES/OBJECTIONS        16
7  EXHIBIT 2  SCREENSHOTS                 32
8  EXHIBIT 3  SCREENSHOT                  34
9  EXHIBIT 4  SCREENSHOT                  35
10 EXHIBIT 5  PHOTOGRAPH                  79
11 EXHIBIT 6  TEXT EXCHANGE               97
12 EXHIBIT 7  AIRDROP ACTIVITIES         127
13 EXHIBIT 8  SLACK MESSAGES             142
14 EXHIBIT 9  FEBRUARY 7 DECLARATION     149
15 EXHIBIT 10  CERTIFICATION             188
16
17      (Exhibits produced.)
18
19
20
21
22
23
24
25

Page 5

1
2       THE VIDEOGRAPHER:  Good morning.  We
3  are going on the record at 10:13 a.m.
4  Eastern Standard time on March 6, 2024.
5  Please note that this deposition is being
6  conducted virtually.  Quality of recording
7  depends on the quality of camera and
8  internet connection of participants.  What
9  is seen from the witness and heard on
10 screen is what will be recorded.  Audio
11 and video recording will continue to take
12 place unless all parties agree to go off
13 the record.
14     This is Media Unit 1 of the video
15 recorded deposition of Michael Hermalyn in
16 the matter of DraftKings, Inc. versus
17 Michael Hermalyn filed in the United
18 States District Court for the District of
19 Massachusetts.  Civil Action No.
20 1:24-cv-10299.
21     This deposition is being conducted
22 remotely using virtual technology.  My
23 name is Chris Azoff and I'm the
24 videographer.  The court reporter today is
25 Fran Insley, and we are both from the firm

Hermalyn

1
2 Veritext Legal Solutions.  I am not
3 authorized to administer an oath.  I'm not
4 related to any party in this action nor am
5 I financially interested in the outcome.
6        If there are any objections to
7 proceeding, please state them at the time
8 of your appearance.
9        Counsel and all present, including
10 remotely, will now state their appearances
11 and affiliations for the record beginning
12 with the noticing attorney.
13        MR. SNYDER:  May I proceed?
14 EXAMINATION BY MR. SNYDER:
15    Q.   Mr. Hermalyn, who is Andrew
16 Larracey, L-A-R-R-A-C-E-Y?
17        MR. BECK:  Aren't we identifying
18 ourselves for the record?
19        MR. SNYDER:  I think that's been
20 done.
21        MR. BECK:  Ms. Insley, are you all
22 set with the appearances?
23        THE COURT REPORTER:  I'm all set
24 with the appearances.  I didn't know if
25 you wanted to do it on the record or not.

Hermalyn

1
2        MR. SNYDER:  No, I don't.  That's
3 antiquated.
4        MR. BECK:  That's fine.  And the
5 stipulation -- same stipulations as
6 yesterday all objections except as to form
7 or --
8        MR. SNYDER:  Except I'm requiring --
9 yeah, I'm requiring that the witness be --
10 get a notary for when he signs the
11 deposition.
12        MR. BECK:  Seven days to review and
13 sign and we will sign it with a notary.
14        MR. SNYDER:  Yes.
15 EXAMINATION BY MR. SNYDER:
16    Q.   Mr. Hermalyn, who is Andrew
17 Larracey, L-A-R-R-A-C-E-Y?
18    A.   He's an employee of DraftKings.
19    Q.   Right.  And he was one of your
20 direct reports at DraftKings, correct?
21    A.   No, that's not correct.
22    Q.   He was senior manager of strategy
23 and operations for DraftKings, correct?
24    A.   Yes, that was his title.
25    Q.   Did he work for you, yes or no?

Hermalyn

1
2    A.   He did not directly report to me,
3 no.
4    Q.   Did he work for you?
5    A.   He was in my organization, yes.
6    Q.   Thanks.  And who is Hayden Metz,
7 M-E-T-Z?
8    A.   He is an employee of DraftKings.
9    Q.   Right.  And he was more specifically
10 senior director of VIP growth and development,
11 correct?
12    A.   His title changed since I've left.
13    Q.   He was, when you were there, senior
14 director, VIP of growth and development,
15 correct?
16    A.   No, that was not his title.  He was
17 senior director, but I don't -- he wasn't VIP
18 of growth and development at that point in
19 time.
20    Q.   He worked in your VIP group,
21 correct?
22    A.   Yes, he worked in my organization.
23    Q.   And both of those employees were
24 important to your organization, were they not?
25        MR. BECK:  Objection.

Hermalyn

1
2    Q.   You may answer.
3    A.   Every employee in my organization
4 was important.
5    Q.   That wasn't my question, sir.  My
6 question was, were they important to your
7 organization, yes or no?
8        MR. BECK:  Same objection.
9    A.   Just like everyone in my
10 organization, they were important.
11    Q.   Right.  And that's why you worked so
12 hard to retain both of them in July of 2023
13 when Fanatics was recruiting employees in
14 DraftKings VIP group, correct?
15        MR. BECK:  Objection.
16    A.   I think you're mischaracterizing
17 what happened in July.  I -- I didn't
18 necessarily work so hard to retain them.  I
19 didn't -- they were employees.  They --
20    Q.   Did you make -- I'm sorry, go ahead.
21 Did you make efforts to retain them, yes or no,
22 after Mr. Ferrara left in the summer of 2023,
23 yes or no?
24    A.   There is a group of about 20 or so
25 employees that we, "we" meaning a group of

Hermalyn

1 DraftKings' senior leadership, worked to
2 fortify and retain.
3     Q.   So -- and those two were among them,
4 correct?
5     A.   Correct.  There were two of about
6 20.
7     Q.   Right.  You gave them increased
8 compensation, among other inducements, to
9 retain them, correct, yes or no?
10     MR. BECK:  Objection.
11     A.   Do you mind clarifying what
12 inducements means?
13     Q.   You gave them more -- you gave them
14 more compensation in connection with your
15 retention efforts, correct?
16     MR. BECK:  Objection.
17     A.   Again, just like the rest of the
18 group.
19     Q.   So, that's a yes?
20     A.   I -- we increased compensation for a
21 group of around 20 people at that time.
22     Q.   And were two of them Mr. Larracey
23 and Mr. Metz, yes or no?
24     A.   Two of them of the around 20 people

Hermalyn

1 that we retained or I wouldn't even use the
2 word retain.
3     Q.   Is the answer to my question yes or
4 no?  Do you want me to read it back to you?
5     MR. BECK:  Objection.  It's been
6 asked and answered.
7     Q.   Yes or no?  Did you increase the
8 compensation of Mr. Larracey and Mr. Metz in
9 2023 in connection with the company's retention
10 efforts of the VIP team, yes or no?
11     MR. BECK:  Same objection.
12     THE WITNESS:  Do I answer it again?
13     MR. BECK:  You can answer.
14     A.   Mr. Larracey and Mr. Metz were among
15 a group of about 20 people that at DraftKings
16 we looked to -- I wouldn't use the word
17 "retain" because there wasn't a risk of them
18 necessarily leaving.  It was more about showing
19 support to those 20 in July and yes, those two
20 were among that group.
21     Q.   Thank you for that last answer.
22     And you spoke with Mr. Larracey and
23 Mr. Metz on February 1, 2024, the same day you
24 joined Fanatics, correct?

Hermalyn

1     MR. BECK:  Objection.  Objection to
2 the initial part of the question.
3     Q.   Correct?
4     A.   Do you mind -- do you mind repeating
5 that?
6     Q.   Court reporter can repeat it,
7 please.
8     (Whereupon the record was read back
9 by the reporter.)
10     A.   Thank you.  Yes, that's correct.
11     Q.   And in fact you spoke with them
12 multiple times on February 1, correct?
13     MR. BECK:  Objection.
14     A.   They called me on February 1st.
15 Then they called me again later that evening.
16     Q.   And you submitted responses to
17 DraftKings' interrogatories in this case on
18 February 20, correct?
19     A.   I don't have the exact date in mind,
20 but yes, I submitted interrogatories.
21     Q.   And in those interrogatory responses
22 that you signed, you describe your
23 conversations with Mr. Larracey and Mr. Metz on
24 February 1, correct?

Hermalyn

1     A.   I can't speak to a specific date,
2 but yes, I mentioned that we spoke, yes.
3     Q.   Right.  Okay.  Do you remember
4 signing a verification at the end of all of
5 your interrogatory responses verifying that the
6 responses were true to the best of your
7 knowledge and belief at the time, do you recall
8 doing that?
9     A.   Yes, I do.
10     Q.   And when you signed saying the
11 responses were true to the best of your
12 knowledge and belief, did you have an
13 understanding of what that meant?
14     A.   Just to clarify, you're asking me if
15 I understand what I signed?
16     Q.   What did you mean when you signed
17 your name to the statement that those responses
18 are true?
19     A.   Exactly that.
20     Q.   And can you tell me what you meant
21 in your own words?
22     MR. BECK:  Objection.
23     A.   I think I answered that question,
24 but would you like me to repeat it?

Page 14

Hermalyn

1
2    Q.   What did it mean to you when you
3  signed that, when you said you were being
4  truthful in those responses?
5         MR. BECK:  Objection, asked and
6     answered multiple times.
7    Q.   You may answer.
8    A.   I -- it means what we wrote on that
9  paper, what was written in that document, I
10 signed it being true.
11   Q.   All right, and did you believe it
12 was important to be truthful in the
13 interrogatory answers that were submitted in
14 this case?
15   A.   I think it's always important to be
16 truthful.
17   Q.   You knew that my client, DraftKings
18 would be reviewing your responses, correct?
19        MR. BECK:  Objection.
20   A.   Yes, I assumed they would be.
21   Q.   And you also knew that the Court
22 could rely on those responses, that is, her
23 Honor in the Federal Court in Boston?
24        MR. BECK:  Objection.
25   A.   I just want to make sure I'm clear.

Page 15

Hermalyn

1
2  You're asking if I was -- if I'm -- if I think
3  the Court would see these responses?
4    Q.   Do you think the Court could rely on
5  them in adjudicating this case that was filed
6  against you?
7    A.   I --
8         MR. BECK:  Objection.
9    Q.   You may answer.
10   A.   Yes.
11   Q.   And have you ever been involved in a
12 federal lawsuit before as a party?
13   A.   No, I have not.
14   Q.   Right.  And so, you understood that
15 it was important in these responses to tell the
16 Court the truth?
17   A.   Yes, I think it's always important
18 to tell the truth.
19   Q.   Now, I want to mark as exhibit --
20 Plaintiff's Exhibit 1, Responses And Objections
21 To Plaintiff DraftKings, Inc.'s Amended First
22 Set Of Interrogatories to Defendant, Michael Z.
23 Hermalyn, (NOS. 1-10), a 25-page document
24 captioned, "DraftKings, Inc. versus Michael Z.
25 Hermalyn."  And direct your attention to

Page 16

Hermalyn

1
2  Interrogatory No. 4, and that question asks
3  you, sir, to "Describe all communications you
4  have had with any current or former employees
5  of DraftKings from January 1, 2023 to the
6  present regarding actual or potential
7  employment by Fanatics."  Do you recall being
8  asked this question?
9         (Whereupon Plaintiff's Exhibit 1 was
10    marked for identification.)
11        MR. BECK:  Can we pause for one
12    second.  We are having a technical
13    problem.
14        MR. SNYDER:  Let's go off the
15    record, please.
16        THE VIDEOGRAPHER:  This is the end
17    of Media Unit 1.  We are going off the
18    record.  The time is 10:25 a.m.
19     (Off the record.)
20        THE VIDEOGRAPHER:  This is Media
21    Unit 2.  We are back on the record.  The
22    time is 10:29 a.m.
23   Q.   Mr. Hermalyn, do you remember
24 answering Interrogatory No. 4?
25   A.   Let me pull this up.

Page 17

Hermalyn

1
2    Q.   Page 13.
3    A.   Thank you.
4    Q.   It's on the screen.  This is less
5  than three weeks ago.  Do you remember
6  answering this questions, sir, yes or no?
7         MR. BECK:  He is looking at the
8     question.  He will answer you in a moment.
9    A.   (Witness reviewing document.)  Yes,
10 I do.
11   Q.   Okay.  And you understood when you
12 submitted your response to Interrogatory No. 4
13 on the 20th of February, that the Federal Court
14 in Boston, just twelve days earlier had issued
15 a court order permitting you from soliciting
16 DraftKings' employees from employment, you
17 understood that, on the 20th, correct?
18        MR. BECK:  Objection.
19   A.   That's incorrect.
20   Q.   You believe that under the Court's
21 order of February 8, you are entitled today to
22 solicit DraftKings' employees to work at
23 Fanatics?
24        MR. BECK:  Objection.
25   A.   That's absolutely not what I said.

5 (Pages 14 - 17)

Hermalyn

1
2    Q.   Do you understand that under the
3  court order of February 8, you are today
4  prohibited by a Federal Court order from
5  soliciting DraftKings' employees until the
6  court orders otherwise?
7         MR. BECK: Objection, calls for a
8     legal conclusion.  You can try and --
9     Q.   Do you understand that, sir?
10    A.   My understanding is that at no point
11  am I able to solicit any DraftKings' employees
12  or customers.
13    Q.   And that is because until the court
14  says otherwise, you are subject to a one-year
15  non-solicit under your contracts with
16  DraftKings, correct?
17         MR. BECK: Objection, legal
18     conclusion.
19    Q.   You may answer.
20    A.   I can't speak for the legal side of
21  your question.  I'm not a lawyer.
22    Q.   I'm not asking for a legal side.
23  Did you have an understanding as an executive
24  at DraftKings that you were subject to a
25  one-year non-solicit that you signed time and

Hermalyn

1
2  time again, each time, for example, you got new
3  stock options?
4         MR. BECK: Objection, same objection
5     and compound.
6     Q.   You may answer.
7     A.   Can you please break that down into
8  a couple of pieces?  Am I aware of a
9  non-solicit, yes.
10    Q.   That you signed, correct?
11    A.   As part of me getting paid and
12  earning equities of DraftKings, yes.
13    Q.   Yes, okay.  Thank you.  Now, direct
14  your attention to the last paragraph on page 15
15  of your response and the first part of your --
16  first paragraph of page 16.  You describe a
17  first phone call with Mr. Larracey and Mr. Metz
18  earlier in the day on February 1st; is that
19  correct?
20    A.   Where are you?  I'm sorry.
21    Q.   You describe -- you describe an
22  earlier call and then a second phone call later
23  in the night of February 1st, correct?
24         MR. BECK: Again, where -- you
25     pointed him to some language.  I didn't

Hermalyn

1
2  hear what it was.
3     Q.   I'm not -- I'm not pointing at the
4  language.  You recall that 17 days ago when you
5  answered this interrogatory, you described a
6  first phone call earlier in the day where they
7  called you and then a second phone call,
8  correct?
9         MR. BECK: Is that what is being
10     shown on the page right now?
11    Q.   No.  I'm asking -- I'm asking.  I'm
12  asking you, sir.  Do you remember two calls,
13  one where they called you and then a second
14  call?
15    A.   Both calls they called me, but yes,
16  I remember two on February 1st.
17    Q.   And you state in your interrogatory
18  response on page 16 -- can you highlight that
19  please -- "At No point during either
20  conversation did Mr. Hermalyn hint or encourage
21  Mr. Larracey or Mr. Metz to leave DraftKings
22  for Fanatics," that was your response, correct?
23    A.   Correct.  I'm reading the same thing
24  as you are.
25    Q.   And that was true when you verified

Hermalyn

1
2  it, correct?
3     A.   It still is true.
4     Q.   And so, you swear to the truth of
5  that today, correct?
6         MR. BECK: Objection, asked and
7     answered.
8     A.   Yes, nothing has changed.
9     Q.   You then write, "In responding to
10  questions about his departure from DraftKings,
11  he," meaning you, "certainly had no intention
12  that either Mr. Larracey or Mr. Metz leave
13  DraftKings and was very careful to avoid
14  soliciting-or even appearing to solicit-either
15  of them."  Was that true when you stated that
16  in your in interrogatory response, yes or no?
17    A.   There was no "was."  That is true.
18    Q.   And you swear to that today under
19  your oath here today, correct?
20         MR. BECK: Objection.
21    A.   Yes.
22    Q.   And you took an oath today, did you
23  not?
24         MR. BECK: Objection.
25    A.   I don't think it started with the

Hermalyn

1 
2 oath, did I?  So, no I guess not.
3      Q.   Was the witness not sworn?
4          MR. BECK:  The witness was not
5  sworn.
6          MR. SNYDER:  Can you please swear
7  the witness and then I will ask follow-up
8  questions to make sure that that oath
9  covers and pertains to all of the
10  testimony he provided during this
11  deposition?
12         MR. BECK:  We can stipulate that it
13  does.
14         MR. SNYDER:  Please administer the
15  oath.
16 M I C H A E L  H E R M A L Y N,
17     having been first duly sworn by the
18     Notary Public, was examined and
19     testified as follows:
20      Q.    And that oath that you just took,
21  would you tell the Court that all of your
22  testimony that you have given up to date, you
23  adopt and incorporate now such that it is
24  covered by the oath you just gave?
25         MR. BECK:  Objection.

Hermalyn

1 
2      Q.   You may answer.
3      A.   Yes, I did.
4      Q.   And do you have an understanding,
5  sir, as a lay person, of whether you could
6  potentially face any consequences if you, in
7  this deposition, under that oath, told an
8  untruth?
9          MR. BECK:  Objection.
10      A.    What was the word you used before
11  "person"?
12      Q.   Do you have an understanding, sir,
13  as a lay person, just as an ordinary citizen,
14  witness -- withdrawn.
15         Do you have an understanding, sir,
16  of whether you could potentially face any
17  consequences if you, in this deposition, under
18  oath, lied?
19         MR. BECK:  Objection.
20      A.    I'm not a lawyer but I'm not lying.
21      Q.   Right, but you understand that if
22  you lie here today under oath, you could be
23  facing potentially serious legal consequence,
24  do you have that understanding or not?
25         MR. BECK:  Objection.

Hermalyn

1 
2      Q.   You may answer.
3      A.   I don't know exactly what the
4  consequences are, but I'm not concerned because
5  I'm telling the truth.
6      Q.   Have you ever heard of the phrase
7  perjury?
8          MR. BECK:  Objection.
9      Q.   You may answer.
10         MR. BECK:  Is there a basis for this
11  line of inquiry?
12         MR. SNYDER:  A good faith basis
13  exists.
14      Q.   Sir?  Sir?  Counsel?
15         MR. SNYDER:  I suggest you -- (cross
16  talk) --
17         MR. BECK:  You're harassing the
18  witness is what I said.
19         MR. SNYDER:  That's not an
20  objection.  Are you instructing him not to
21  answer?
22         MR. BECK:  No, I'm not instructing
23  him not to answer, but I would appreciate
24  it if you would actually just ask the
25  witness your questions, and then move on.

Hermalyn

1 
2          MR. SNYDER:  I need to understand,
3  sir, whether the witness understands --
4          MR. BECK:  He did.  He does.  He
5  told you ten times already.
6      Q.   Have you heard of the word "perjury"
7  before?
8          MR. BECK:  Objection.
9      A.   Yes, I have.
10      Q.   And do you have any understanding,
11  sir, that if you lie under oath in this
12  deposition, you could potentially be guilty of
13  the crime of perjury, yes or no?
14         MR. BECK:  Objection, and you
15  know --
16         MR. SNYDER:  Last question, sir,
17  last question on this -- on this line.
18      A.   I'll answer it again.  Yes, I
19  understand.
20      Q.   Thank you.  Mr. Hermalyn,
21  understanding what you just said, I'm going to
22  take a two-minute break and I'm going to tell
23  you what my first question is after the break,
24  restroom break.  My first question after the
25  restroom break is:  Mr. Hermalyn, do you wish

Hermalyn

1
2 now to disavow your response to Interrogatory
3 No. 4? I'm just giving you a heads up that
4 that's going to be my next question and we can
5 reconvene literally at 10:42. I just need to
6 use the restroom.
7         MR. BECK: And I will object on the
8 record before we go off the record.
9         MR. SNYDER: Thank you.
10        THE VIDEOGRAPHER: This is the end
11 of Media Unit 2. We are going off the
12 record. The time is 10:40 a.m.
13        (Off the record.)
14        THE VIDEOGRAPHER: This is Media
15 Unit 3. We are back on the record. The
16 time is 10:43 a.m.
17        MR. SNYDER: I'm prepared to proceed
18 with the question.
19        MR. RIDEN: I understand. This is
20 Stephen Riden. I just want to report
21 yesterday during the deposition
22 Mr. Harris, whenever we took a break,
23 counsel from Gibson went into a conference
24 room, and I didn't go pound on the door
25 every time I wanted to get going again.

Hermalyn

1
2 So what I did was I waited for them to
3 come out and then we started the
4 deposition. So what I don't appreciate
5 here today is when we take a break, you
6 then start hounding us to get back on the
7 screen. So, we will let you know when we
8 are ready to end the break. Does that
9 sound good, Orin?
10        MR. SNYDER: Yeah. I wasn't
11 pounding on any door (cross-talk) --
12        MR. RIDEN: We want you to be a
13 little bit courteous here today and extend
14 the same courtesy I extended to your
15 colleagues yesterday.
16        MR. SNYDER: Well, I apologize if
17 you perceived my comments as discourteous.
18 None -- no discourteousness, if that's a
19 word, was intended. I simply wanted to
20 continue the deposition a pace, so --
21        MR. RIDEN: Go ahead.
22        MR. SNYDER: If you want to confer
23 with your client, please let us know when
24 you are ready.
25        MR. RIDEN: We are ready.

Hermalyn

1
2         MR. SNYDER: Thank you.
3    Q.   Mr. Hermalyn, is it a fact that your
4 interrogatory response about your conversations
5 with Mr. Larracey and Mr. Metz on February 2
6 was untrue?
7         MR. BECK: Objection.
8    A.   The date was February 1st.
9    Q.   Yes.
10   A.   You said February 2.
11   Q.   Oh, February 1st, thank you. I'll
12 ask the question again.
13        Is it a fact that you lied in your
14 interrogatory response, question 4, about your
15 conversations with Mr. Larracey and Mr. Metz on
16 February 1?
17        MR. BECK: Objection.
18   A.   I did not lie.
19   Q.   During the first phone call, did you
20 ask Mr. Larracey and Mr. Metz to confirm that
21 there was no one else in the conference room
22 with them when they made that call, yes or no?
23   A.   I don't recall that.
24   Q.   Did you end the phone call after
25 they called you and then called them back on a

Hermalyn

1
2 Facetime platform, yes or no?
3    A.   I actually just -- I just remember
4 one call and I thought it was Facetime.
5    Q.   Did you ask them to scan the
6 conference room with Mr. Larracey's phone over
7 video to confirm that there was no one else in
8 the conference room other than the two of them,
9 yes or no?
10        MR. BECK: Objection, asked and
11        answered.
12   A.   I don't remember that.
13   Q.   Did you tell Mr. Larracey or
14 Mr. Metz during this Facetime call that there
15 were two positions on the Fanatics website to
16 which they should apply, yes or no?
17   A.   I do not recall that.
18   Q.   Well, I'm asking you whether you
19 recall it, I'm asking did that happen. It was
20 about a month and a couple of days ago. Did
21 that happen, sir, did you tell them during this
22 Facetime call that there were two positions on
23 the Fanatics' website to which they should
24 apply, yes or no?
25        MR. BECK: Objection.

8 (Pages 26 - 29)

Hermalyn

1
2    A.   Again, I don't recall that.
3    Q.   Are you saying it could have
4  happened but you don't remember, or are you
5  saying it didn't happen?  I'm trying to
6  understand how are using the phrase "I don't
7  recall."  Do you understand the difference?
8    A.   Yes, I do.
9    Q.   Just to be clear, I don't recall
10  what I ate for breakfast on February 1st.  I
11  don't remember.  It could have been a lot of
12  things as opposed to I know I didn't eat.
13  Well, if I asked you, did you eat Buffalo meat
14  for breakfast on February 1st, you could say
15  no, you didn't, I recall I never have done that
16  ever in my life or you could say, I don't
17  recall, it's possible, I like Buffalo meat.
18      So, using that framework, what is
19  your answer to my question, yes or no, did you
20  tell Mr. Larracey and Mr. Metz on February 1st
21  that there were two positions on the Fanatics'
22  website to which they should apply?
23      MR. BECK:  Objection.
24    A.   Again, I don't recall, but to your
25  point earlier on the breakfast point, this

Hermalyn

1
2  was -- this was all two hours, an hour after I
3  resigned from a job that I loved and a lot was
4  going on.  So, I don't recall.
5    Q.   Did you tell Mr. Larracey and
6  Mr. Metz on February 1 that you did not want
7  them to call you from their own cell phones,
8  yes or no?
9    A.   No, I did not do that.
10    Q.   Now, you stated in response to
11  Interrogatory 4 that you received a second
12  phone call from Larracey and Metz later that
13  evening, correct?
14      MR. BECK:  Objection.
15    A.   Correct, I did.
16    Q.   But it wasn't just one phone call,
17  was it, Mr. Hermalyn, it was a series of phone
18  calls that you had with those two throughout
19  the evening and into the morning hours of the
20  next day, correct?
21      MR. BECK:  Objection.
22    A.   No, my recollection is there was one
23  call but it did last some time.
24    Q.   Isn't it a fact, sir, that you, on
25  the one hand, and Mr. Larracey and Mr. Metz on

Hermalyn

1
2  the other, exchanged a series of phone calls
3  from 10:46 p.m. on February 1st until 2:18 a.m.
4  on February 2nd Eastern time?
5      MR. BECK:  Objection.
6    A.   Again, my recollection is one call
7  with both of them.
8    Q.   And do you recall that you were on
9  the phone with them for about 168 minutes in
10  total, does that sound right?
11      MR. BECK:  Objection.
12    A.   That sounds a lot longer than I
13  would have thought.
14    Q.   Let me show you what we are going to
15  mark as Exhibit 2.  And I'm representing to you
16  that this is a screen shot taken from
17  Mr. Larracey's wife's phone.  Do you know her
18  name, by any chance, Mr. Larracey's wife?
19      (Whereupon Exhibit 2 was marked for
20      identification.)
21    A.   It's escaping me at the moment.
22    Q.   And that's your phone number there,
23  (201)███████, correct?
24    A.   Yes.
25    Q.   And do you recall dialing

Hermalyn

1
2  Mr. Larracey's wife -- I'm sorry.
3      Do you recall Mr. Larracey calling
4  you from his wife's phone on February 1st, yes
5  or no?
6    A.   At that point, I didn't have most of
7  my -- all of my cell phone numbers, so I can't
8  tell you what phone it was -- it came from.
9    Q.   Prior to February 1st, did
10  Mr. Larracey ever call you from his wife's
11  phone, yes or no?
12      MR. BECK:  Objection.
13    A.   I don't know.
14    Q.   Do you recall speaking with
15  Mr. Larracey and Mr. Metz after Mr. Larracey
16  called you at 10:46 p.m. for 56 minutes, yes or
17  no?
18      MR. BECK:  Objection.
19    A.   As I stated earlier, I remember
20  speaking to both of them.
21    Q.   And, in fact, what happened was
22  Mr. Larracey --
23      MR. BECK:  Excuse me.  He wasn't
24      finished answering the question.  If you
25      are finished, that's fine.  If you're not,

Hermalyn

1
2    please finish your answer.
3        A.   Yeah, that's -- you asked do I
4    remember speaking with them and I said yes.
5        Q.   Okay.  Thank you.  And I'm sorry.
6    Can you turn the volume up?  I'm having trouble
7    hearing.  Thank you.
8            And isn't what happened Mr. Larracey
9    then called Mr. Metz, put Mr. Metz on the
10   speaker phone, and the three of you
11   communicated that way?
12       A.   I don't know how that was done, but
13   I do know that I spoke to both of them and that
14   was the only time I spoke to them.
15       Q.   Okay.  Let me now show you the next
16   exhibit, which will be Plaintiff's 3 and this
17   is another screen shot.  That is your Texas
18   phone number, is it not, (737)          ?
19           (Whereupon Exhibit 3 was marked for
20       identification.)
21       A.   I am not familiar with that number.
22       Q.   Do you recall speaking with
23   Mr. Larracey and Mr. Metz for 57 minutes in a
24   second call at 11:54 p.m.?
25           MR. BECK:  Objection.  That's

Hermalyn

1
2    11:54 p.m. what time zone and what was the
3    other time zone from the other call?
4            MR. SNYDER:  Eastern.  I said
5        Eastern.
6            MR. BECK:  On both?
7        Q.   Let me ask it this way, irrespective
8    of what time it was, do you recall a second
9    call of about an hour with Mr. Larracey or
10   Mr. Metz in the midnight hour of the 2nd into
11   the early morning hours of the 2nd, yes or no?
12       A.   I remember -- like I said earlier, I
13   remember one call.
14       Q.   Let me show you now another screen
15   shot, Exhibit 4.
16           (Whereupon Exhibit 4 was marked for
17       identification.)
18           MR. BECK:  I think it's Exhibit 2,
19       page 4.  Is that what you are talking
20       about?
21           MR. SNYDER:  Exhibit 4.  Thank you.
22           MR. BECK:  We only have two exhibits
23       so far.
24           MR. SNYDER:  Let the team work out
25       the exhibits with you on a break, please.

Hermalyn

1
2    Thank you.
3        Q.   Do you recall calling Mr. Larracey's
4    wife's phone at 1:22 a.m., which would be the
5    early morning hours after your first day on the
6    job at Fanatics, yes or no?
7            MR. BECK:  Objection.
8        A.   I don't recognize that phone number
9    and I do remember speaking with Mr. Larracey
10   after the 1st.  I can't tell you the specific
11   dates, but I did speak to him after the 1st.
12   He was expecting a baby and these two guys were
13   very close friends of mine.
14       Q.   Do you recall after -- do you recall
15   at a certain point, at about 2:00 a.m., they
16   called you back, that is Larracey and Metz, and
17   you spoke for another 19 minutes?
18           MR. BECK:  Objection.
19       A.   Again, I only remember speaking to
20   them the one time together on the 1st.
21       Q.   During those late night phone calls,
22   did you provide details to them on the senior
23   director position that Mr. Larracey should
24   apply for at Fanatics, yes or no?
25       A.   No, I don't recall that.

Hermalyn

1
2        Q.   Did you provide details on a senior
3    director position to Mr. Larracey?
4            MR. BECK:  Objection, it was asked
5        and answered.
6        Q.   Sir, did you?
7            MR. BECK:  Objection.  Go ahead,
8        sir.  You can answer, if you can.
9        A.   When I spoke to both of them on the
10   1st, it was a couple of hours since I resigned
11   from a job that I loved and a place that I
12   really loved, DraftKings, and these are two
13   guys that I worked with and talked to every day
14   for a year and a half plus.  They had no idea I
15   was leaving.  They had no inkling I was leaving
16   and the way they found out earlier that day was
17   through sales force being deactivated and they
18   called me during the day and were fairly
19   panicked about it.  I couldn't talk for long,
20   and frankly, didn't want to, and said, if you
21   wanted to call me later, you can.  They called
22   me later and we spoke, and if you asked me how
23   long, I would have said it was around 45
24   minutes.  That would have been to the best of
25   my recollection.  There was a lot going on that

Page 38

Hermalyn

1
2 day.  It was an emotional day and these two
3 guys, I care about just like a lot of other
4 members of the DraftKings team and organization
5 and I wanted to talk to them as humans and
6 friends and people.
7     Q.   I'm sorry, I didn't mean to
8 interrupt?
9     A.   No.  I'm just saying, like, I --
10 work is a weird thing.  You get to be close
11 with people for a period of time and then you
12 move on.  And these two guys, I was very close
13 with, and I didn't do anything wrong.  I
14 didn't -- they are not employees of Fanatics.
15 And to my understanding, Hayden was promoted,
16 which was always the plan for him to be the
17 successor of mine and I could not be happier
18 for him.
19     Q.   Right.  And isn't it a fact, sir,
20 that you told Mr. Larracey on the phone,
21 amongst those 168 minutes of conversations,
22 that you had authority to offer him the
23 following compensation package at Fanatics,
24 400,000 base salary, 150,000 annual bonus,
25 750,000 signing bonus, and a $2,000,000 initial

Page 39

Hermalyn

1
2 equity allocation of Fanatics stock, yes or no?
3     MR. BECK:  Objection.
4     A.   It's not a yes or no, and the
5 context matters a lot.  So, the answer to that
6 question, the answer is no.  To tell you what
7 happened is I answered questions.  Unlike other
8 situations, and, Mr. Snyder, you are very
9 familiar with this, back in July when Rob
10 Ferrara left to go to Fanatics -- when Rob
11 Ferrara left DraftKings to go to Fanatics,
12 Hayden and Andrew were very familiar with the
13 compensation package and that structure.
14     In addition, Hayden and Andrew, or
15 specifically Hayden, who was very familiar with
16 my compensation at DraftKings, as a human and
17 as friends, they didn't understand why I left
18 and were upset.  And when I say "were," Hayden
19 did most of the talking.  Andrew is a little
20 quieter.  Hayden did most of the talking and he
21 was upset.  And I think he was hurt that I
22 didn't tell him before and I didn't give him a
23 heads up.
24     And while that call was, frankly,
25 uncomfortable for me and while this part of the

Page 40

Hermalyn

1
2 deposition is definitely not fun, if I had to
3 do that exact thing over again, I would because
4 these are people that I care about.  And a
5 friend of theirs left, and they had no heads
6 up.
7     What I -- what I will say that
8 I've -- that piece I have a lot of empathy for
9 them on is how I know how they must feel right
10 now at DraftKings because ███████████████
███████████████████████████████████████████████
███████████████████████████████████████████ that
14 is the only regret I have, to put them in the
15 position that they have been in the last two
16 weeks as you prepare for this deposition.
17     Q.   Did you offer him that compen -- did
18 you offer Mr. Larracey that -- did you tell
19 Mr. Larracey that you had authority to offer
20 him the compensation package I described in my
21 prior question, yes or no?
22     MR. BECK:  Objection, asked and
23     answered.
24     Q.   You can answer.
25     A.   I was hours into a job.  I didn't

Page 41

Hermalyn

1
2 even understand how HR worked, so no, I did not
3 have the authority to do -- I didn't even know
4 what my authority was at that point.
5     Q.   Did you discuss a job that
6 Mr. Larracey should apply for as senior
7 director of the VIP team, yes or no?
8     MR. BECK:  Objection.
9     A.   Earlier I talked about it being a
10 little uncomfortable for me and there was a lot
11 of questions from them on what my comp was, how
12 it was structured.  Hayden spent a lot of time
13 on the equity side, just not understanding what
14 that looks like.  He compared it to ████████████
███████████████████████████████████████████████
███████████████████  And he was frustrated and really peppering
18 me with questions.  Andrew was a lot quieter.
19 And they started throwing -- they, sorry,
20 excuse me, Hayden started throwing out numbers
21 of this what it would -- like, I wouldn't
22 even consider this because ██████████████████.
23 And in the effort to, frankly, try to end the
24 conversation, I said Fanatics is a company with
25 18,000 employees.  There is a career site.  If

11 (Pages 38 - 41)

Hermalyn

1  there is something like -- that's like -- I
2  think I ended it there and just made it clear
3  on that I can't talk about this any further. I
4  can't be involved in anything and I look
5  forward to the next time we could hang out.
6     Q.  Sorry.  Did you -- did you discuss
7  with Mr. Larracey specifically a $400,000 base
8  salary, yes or no?
9        MR. BECK:  Objection, asked and
10     answered multiple times.
11        MR. SNYDER:  He hasn't answered it
12     yet, sir.
13        MR. BECK:  Well, he has.  You just
14     don't like the answer.
15     Q.  Yes or no, did you tell him that
16  Abraham Lincoln was your father?
17        MR. BECK:  Objection.
18     Q.  Yes or no?
19        MR. BECK:  You can answer it.
20     A.  No, I did not tell him that Abraham
21  Lincoln was my father.
22     Q.  Did you tell him that he could have
23  a cash base salary of $400,000 at Fanatics, yes
24  or no?

Hermalyn

1        MR. BECK:  Objection, again.
2     A.  No.
3     Q.  Did you tell Mr. Larracey that he
4  could ask (cross-talk) --
5        MR. BECK:  Excuse me, the record did
6     not reflect his full answer.
7        THE COURT REPORTER:  Well, you're
8     talking over each other.
9        MR. BECK:  Well, I understand that,
10     but Mr. Hermalyn was answering when
11     Mr. Snyder went to his next question.  It
12     answer was no, I did not -- it was no and
13     then something.  I actually couldn't hear
14     the whole answer.
15     A.  Yeah, it's no.  I would like to add
16  context.  So, something I've learned in the
17  last month is that without context, that if you
18  assume that intent, it just looks pretty bad.
19        So, for context there with regards
20  to Andrew, was Hayden was peppering me with
21  questions.  I was doing my best to answer most
22  of them.  Andrew was quiet.  At the end of that
23  conversation, Andrew spoke up and threw out
24  numbers to me.  That's the best I could

Hermalyn

1  remember.  The specifics on what you asked and
2  me offering the job, not only did that not
3  happen, it doesn't make sense.  I don't -- I
4  didn't -- I was less than 24 hours into a job
5  that is rooted in me running the LA office and
6  building a VIP across the portfolio brand that
7  Fanatics overseas.
8     Q.  Did you provide details to Mr. Metz
9  about a vice president, a VIP position, at
10  Fanatics on the 1st, yes or no?
11        MR. BECK:  Objection.
12     A.  Not that I recall, no.
13     Q.  Did you also outline a compensation
14  package on this call with Mr. Metz that
15  included a $500,000 base salary, a $250,000
16  annual bonus, a $1,000,000 signing bonus, and a
17  $3.5 million initial equity allocation, yes or
18  no?
19        MR. BECK:  Objection on multiple
20     grounds, and if you can answer, that go
21     ahead, but my objection stands.
22     A.  It's the same answer.  I had a long
23  conversation with two friends.  They didn't
24  understand.  They understood how Fanatics

Hermalyn

1  works.  They fired off questions.  They talked
2  about compensation.  They knew my compensation.
3  They tried to make sense of it.  And when I say
4  "they," I mean Hayden.  At the end, Andrew --
5  Andrew chimed in.  With regard to your specific
6  question --
7     Q.  No, go ahead.  Please, I'm sorry.
8     A.  With regards to your specific
9  question, he threw out numbers.  I do remember
10  at some point, he threw out a number that was
11  so high and I responded with, oh, that's it?
12  As a joke.
13     Q.  Where were you physically located
14  during these phone calls?
15     A.  I'm in New York City at the Winston
16  Strong offices.
17     Q.  No, where were you on February 1st,
18  sir?
19     A.  Oh, sorry.  February 1st --
20     Q.  When you made these calls?
21     A.  February 1st, I was in Los Angeles.
22     Q.  Weren't you in Mr. Rubin's house
23  when you made these calls, sir, yes or no?
24     A.  Yes.

Hermalyn

1
2     MR. BECK:  Objection.
3     Q.   Didn't you tell them that you were
4  with Mr. Rubin when you were on the phone for
5  168 minutes, yes or no?
6         MR. BECK:  Objection and
7     mischaracterizes the testimony as well.
8  Q.   Yes or no?
9         MR. BECK:  Objection.  You can
10    answer, if you can.
11    A.   I read what was written in their
12 response to DraftKings.  I do not remember
13 that -- recall that.
14    Q.   But you were in Mr. Rubin's home,
15 correct?
16    A.   Mr. Rubin's home is not a small
17 home.  I was in a different section of the
18 home.  Yes, I was in his home.
19    Q.   And were you staying over there that
20 night?
21    A.   Yes, I was.
22    Q.   Okay.  And did you speak to
23 Mr. Rubin at any time on February 1st about
24 your conversations with Mr. Larracey and
25 Mr. Metz, yes or no?

Hermalyn

1
2     A.   I don't remember a specific
3  conversation about those employees.  It was
4  more general about Mr. Rubin asking me how I'm
5  feeling knowing I had a lot of friends at
6  DraftKings.
7     Q.   And you knew the compensation
8  Mr. Larracey and Mr. Metz received when they
9  were at DraftKings because you had input into
10 those compensation packages, correct?
11        MR. BECK:  Objection.
12    A.   Just to reframe, did I know that --
13 did I know what Andrew and Hayden made at
14 DraftKings?  Yes, I did.
15    Q.   Yes.  Thank you.  And you know that
16 that information, employee compensation
17 information, is confidential information to
18 DraftKings, correct?
19        MR. BECK:  Objection, that's a legal
20    conclusion and not accurate.
21    Q.   You understood that, right?
22        MR. BECK:  Objection.
23    A.   My understanding of confidential
24 information is anything that is not public, so
25 yes, I characterize that as confidential.

Hermalyn

1
2     Q.   And before you spoke to Mr. Larracey
3  and Mr. Metz about figures, bonuses, salaries,
4  et cetera, did Mr. Rubin give you the authority
5  to make those compensation pitches?
6         MR. BECK:  Objection to the entire
7     mischaracterization of everything that he
8     said so far.  If you want to ask him a
9     fair question, go ahead, you know, but all
10    you're doing is harassing him with --
11        MR. SNYDER:  Counsel, counsel,
12    counsel, please.  No speaking objections.
13    Sir, no speaking objections, please.
14    Lodge your objections and let me proceed
15    with my questioning, thank you.
16        MR. BECK:  If you're going to
17    continue asking him misleading questions
18    and mischaracterizing prior testimony and
19    ignoring prior testimony and then
20    incorporating your version of events into
21    your question, it is not actually an
22    appropriate way to question the witness.
23    It's not fair to the witness and it's not
24    consistent with the rules.  If you want to
25    ask him an appropriate question, please go

Hermalyn

1
2  ahead and do it.
3     Q.   Before you spoke to Mr. Larracey and
4  Mr. Metz on February 1st, did you discuss
5  potential compensation packages for them with
6  Mr. Rubin, yes or no?
7     A.   Absolutely not.
8     Q.   Do you know during the February 1st
9  calls, did Mr. Larracey and Mr. Metz tell you
10 that the numbers that you discussed with them
11 were not enough of an incentive to leave
12 DraftKings?
13    A.   I don't recall that specific convo.
14 Like I said earlier, there was a -- Hayden was
15 talking a lot about ██████████ and trying
16 to understand equity.  And my understanding
17 from those conversations is not in that Hayden
18 was trying to leave or even thinking about
19 leaving or just trying to really understand why
20 I left.
21    Q.   Did they mention during the call --
22 withdrawn.
23        Did they mention on February 1st
24 potential litigation risks since they would be
25 subject to the same non-compete that you're

Page 50

Hermalyn

1
2 subject to?
3          MR. BECK:  Objection.
4     A.   Not that I recall.
5     Q.   Did you tell them that you would
6 speak with someone at Fanatics about increasing
7 the compensation pitch to them in light of
8 their statement that it wasn't enough to
9 incentivize them to leave?
10          MR. BECK:  Objection with the same
11    objection as before.
12    Q.   You may answer.
13    A.   It's -- I'm sorry, I continue to
14 answer it -- the same answer.  I continue to
15 tell you what happened.
16    Q.   Did you come back to Mr. Larracey
17 and say, I now have authority to offer you a
18 million five speaking bonus -- signing bonus
19 after speaking to Mr. Rubin, yes or no?
20          MR. BECK:  Objection.  You got to
21    slow down.
22    Q.   Did you, in a subsequent call, tell
23 Mr. Larracey you had authority to offer him a
24 million five signing bonus?
25    A.   No, not that I recall.

Page 51

Hermalyn

1
2     Q.   Did you have another conversation
3 with Mr. Larracey on the 1st where you said, I
4 now have authority to up your initial equity
5 allocation from 3.5 million -- I'm sorry,
6 Mr. Larracey, of his initial equity allocation,
7 from 2 million to 4 million, doubling it, yes
8 or no?
9          MR. BECK:  Objection.
10    A.   Again, not that I recall, same
11 context, questions and answers.
12    Q.   And did you tell Mr. Metz that you
13 had authority to offer him a $3,000,000 signing
14 bonus and a $4,000,000 initial equity
15 allocation?
16          MR. BECK:  Objection.
17    A.   I'm sorry, it's the same answer.
18    Q.   Thank you.  Did Mr. Larracey submit
19 an application through the Fanatics website for
20 a position as director of VIP customer
21 development in the -- between 10:46 p.m. on
22 February 1st and 2:18 a.m. on February 2nd, to
23 your knowledge?
24    A.   I can't speak to the title or the --
25 I can't speak to the title or the timing, but

Page 52

Hermalyn

1
2 when we spoke after the 1st, I don't know what
3 day that was, he did tell me he applied for a
4 job.
5     Q.   He didn't tell you on the 1st during
6 and among -- withdrawn.
7          He did not tell you in any of the
8 calls on the 1st into the early morning hours
9 of the 2nd that he was in the process of
10 submitting that application?
11          MR. BECK:  Objection.
12    A.   Not that I recall.  What I do recall
13 is this isn't the first time Mr. Larracey has
14 applied for a job at Fanatics.
15    Q.   That wasn't my question, sir.  My
16 question is:  On this series of calls on the
17 1st, did you tell Mr. Larracey to submit an
18 application for a job, yes or no?
19          MR. BECK:  Objection both to the
20    mischaracterization of prior testimony and
21    to the asked and answered.
22    Q.   You may answer.
23    A.   I believe on the 1st what came out
24 was Mr. Larracey told me, and I believe Hayden,
25 that he applied to a job previously at

Page 53

Hermalyn

1
2 Fanatics.  I don't know the -- I don't recall
3 the specific answer to your question.
4     Q.   But there was -- there was a
5 director of VIP job when you arrived at
6 Fanatics which would report to you, correct?
7          MR. BECK:  Objection.
8     A.   There are a couple of things that
9 are mischaracterized in that.  My understanding
10 is there is always jobs posted in the VIP
11 department publicly, and there are no roles
12 that are currently published or have been that
13 directly report to me.
14    Q.   Do you recall on the 1st telling
15 Mr. Metz that if he didn't consider the offer
16 to apply to the vice president position with
17 Fanatics, that that would be a bad decision,
18 bad career decision for him?
19    A.   No, what I recall is really the
20 opposite of that.  At that point, I was excited
21 about him to, essentially, take my job, which
22 is a much, much needed or earned promotion for
23 him ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
24 and me leaving gave space for him to grow and
25 take on a more senior leader -- more senior

14 (Pages 50 - 53)

Hermalyn

1
2 level.
3    Q.   Did you tell Mr. Larracey and
4 Mr. Metz on the 1st that they would need to
5 formally apply in order to receive written
6 offers, yes or no?
7         MR. BECK:  Objection.
8    A.   I think I answered that.  That goes
9 under the piece of I felt -- at the point where
10 I felt kind of a little bit uncomfortable, not
11 overly uncomfortable but a little uncomfortable
12 because it was clear that they were -- that
13 Hayden was a little upset at this point.  I
14 then talked about if there is any other
15 questions or something along the lines of
16 18,000 employees, public career site.
17   Q.   I'm having trouble understanding
18 your testimony.  Did you or did you not discuss
19 with them the possibility of them coming to
20 work at Fanatics?
21        MR. BECK:  Objection.
22   A.   I'm sorry you don't understand it.
23 I -- they asked -- I answered that.
24   Q.   And in answering the questions, did
25 you, at any time, on the 1st suggest to them

Hermalyn

1
2 that they should consider working with you at
3 Fanatics?
4         MR. BECK:  Objection.
5    Q.   Yes or no?
6         MR. BECK:  Objection.
7    A.   Not that I recall, but at that
8 point, I was so new I didn't even -- I was
9 trying to figure out what I was going to be
10 doing outside of running the office.
11   Q.   How many nights did you stay at
12 Mr. Rubin's house as a brand new employee?
13   A.   As a brand new employee, I stayed
14 there three nights.
15   Q.   Did you have meals with him during
16 those three nights?
17   A.   He arrived on the 1st after I --
18 after I resigned and I had dinner with him and
19 a friend of his one of the three nights.
20   Q.   And did you talk to him on any of
21 the other days that you were in his house, yes
22 or no?
23        MR. BECK:  Objection.  This is
24 actually outside the scope of the
25 deposition, so --

Hermalyn

1
2        MR. SNYDER:  Solicitation of
3 employees beyond the scope of the
4 deposition?
5        MR. BECK:  I'm talking to Mr. Rubin.
6 If you want to ask him about questions
7 about solicitation, go ahead, but this is
8 not solicitation.
9        MR. SNYDER:  This is all about
10 solicitation.
11        MR. BECK:  No, this is about his
12 conversations with Mr. Rubin.  If you want
13 to narrow them to --
14        MR. SNYDER:  Please no more speaking
15 objections.  Thank you.
16        MR. BECK:  Well, you're outside the
17 scope of the order.  And so, I'm trying to
18 get you just to stay within the scope of
19 the order and ask an appropriate question.
20 I have no problem with having him answer
21 questions about solicitation if you want
22 to ask him questions about solicitation.
23   Q.   Sir, during the course of your
24 stay --
25   A.   Can I clarify a statement real quick

Hermalyn

1
2 or a comment?  You asked how many -- how many
3 nights I was staying at Mr. Rubin's house.
4        MR. BECK:  As an employee.
5    A.   As an employee, it was two nights.
6    Q.   Okay.  And did you have any other
7 conversations with him other than at dinner
8 during those two nights and the days in
9 between, yes or no?
10        MR. BECK:  Objection.  Again, if you
11 want to narrow your question to the order,
12 he can answer it, but I'm going to tell
13 him he is not going to answer about
14 questions that are outside the scope of
15 the order.  If you want to ask him --
16   Q.   Please answer.
17        MR. BECK:  -- about any -- any
18 communications with Mr. Rubin about
19 solicitation, feel free.
20        MR. SNYDER:  Please answer the
21 question, sir.
22        MR. BECK:  Don't answer the
23 question.  It's outside the scope of the
24 order.
25   Q.   Sir, were you staying at Mr. Rubin's

15 (Pages 54 - 57)

Hermalyn

1    Hermalyn
2  house in the Hollywood Hills?
3    A.   I was staying -- I'm not sure
4  exactly where it was, but I was staying at
5  Mr. Rubin's LA house, yes.
6    Q.   And during the calls on the 1stm did
7  you offer to Mr. Larracey and Mr. Metz on the
8  phone with Mr. Rubin?
9      MR. BECK:  Objection, asked and
10    answered.
11   A.   I don't recall that now.
12   Q.   And was Mr. Rubin listening in
13 during any of these calls, yes or no?
14   A.   No.
15   Q.   Did you tell Mr. Larracey and
16 Mr. Metz that it would be the, quote, nuclear
17 option, closed quote, for either of them to
18 report the information from the phone call
19 conversations to DraftKings?
20   A.   No, if anything, I would have said
21 something along the lines of this would help
22 them at DraftKings, but no, I do not recall
23 saying that.  It's not something I would say.
24   Q.   And you don't recall telling
25 Mr. Larracey that if he was approached by

Hermalyn

1    Hermalyn
2  lawyers and asked if you two had conversations
3  regarding employment at Fanatics, that they had
4  to deny it?
5    A.   No, that is not something I would
6  say.
7    Q.   So, you didn't tell them to lie
8  about the conversations if confronted by
9  lawyers?
10     MR. BECK:  Objection, asked and
11    answered.
12  Q.   Sir?
13  A.   No, that's not something I would do.
14  Q.   And in your sworn responses to
15 Interrogatory 4 dated February 20, you did not
16 disclose to the Court, did you, the full extent
17 of the conversations you had with these two men
18 on the 1st, did you?
19     MR. BECK:  Objection.
20  A.   I disclosed what I thought answered
21 the questions.
22  Q.   You did not disclose, for example,
23 that during those conversations the topic of
24 compensation, broadly, according to you, came
25 up, correct?

Hermalyn

1    Hermalyn
2      MR. BECK:  Objection.
3    A.   It wasn't according -- it wasn't --
4  the characterization of that is tough.  It
5  wasn't according to me.  It's what happened or
6  (cross-talk) --
7    Q.   Thank you.  You did not disclose to
8  the Court to the -- you did not disclose in
9  your verified interrogatory answers that you
10 discussed compensation matters with these two
11 men on the 1st, correct?
12     MR. BECK:  Objection.
13  A.   Do you mind showing me what -- what
14 the damage he is referring to so I can see
15 exactly what he is reading.
16     MR. BECK:  The interrogatory
17    answers?
18     THE WITNESS:  Yeah.
19  A.   I'm sorry, the answer is during the
20 question asked, I answered it.  I'm a little
21 lost as to what you're -- what you're asking.
22  Q.   Well, let me ask you it this way.
23 You did not disclose to the Court that after
24 the 1st, you had additional phone conversations
25 with Mr. Larracey, did you?

Hermalyn

1    Hermalyn
2      MR. BECK:  Objection.
3    A.   If it's not in there, then no, I did
4  not.  I didn't necessarily think they were
5  relevant.
6    Q.   So, when we asked you to name,
7  identify all of -- communications you had
8  regarding actual potential employment by
9  Fanatics, you did not disclose that you had
10 phone calls on the 2nd with Mr. Larracey and
11 another call on February 3rd, did you?
12     MR. BECK:  Objection.  You're both
13    mischaracterizing the question in the
14    interrogatory, as well as his answer and
15    you are asking him a question that is rife
16    with misstatements.  (Cross-talk) just ask
17    him --
18     MR. SNYDER:  That is an improper
19    speaking objection and I respectfully
20    request again that you refrain from
21    speaking objections and simply lodge an
22    appropriate objection.  Thank you.
23     MR. BECK:  Just for the record, I
24    would appreciate it if you would actually
25    ask him questions that are appropriate

Page 62

Hermalyn

1
2 questions so that he can actually answer
3 them fairly as opposed to
4 mischaracterizing things and then a series
5 of questions that are all premised on a
6 false premise that he's already debunked
7 for you.
8        MR. SNYDER:  Sir, those speaking
9     objections are inappropriate, not
10    permitted by the federal rules, and I,
11    again, respectfully request that you
12    refrain from speaking objections.  Thank
13    you.
14       MR. BECK:  We have been going for an
15    hour.  Can we take a break?
16       MR. SNYDER:  I'm almost done with
17    this line and then we will break.
18    Q.   Do you recall telling Mr. Larracey
19 on the morning of February 2nd that you and
20 Mr. Rubin were excited about him interviewing
21 with Fanatics, yes or no?
22    A.   No.
23    Q.   Do you know that you called
24 Mr. Larracey's wife's phone on the morning of
25 February 2nd at 9:43 a.m., did you do that?

Page 63

Hermalyn

1
2       MR. BECK:  Objection.
3    A.   Two pieces on that, no, I don't
4 remember that, and two, I didn't have a lot of
5 my numbers.  I still don't.  So, I'm unclear on
6 who -- who that number would be, if I was
7 calling -- if I did end up calling his wife.
8    Q.   And do you remember the --
9    A.   The one piece I would like to add is
10 for a minute, I think the detached -- I didn't
11 do anything wrong.  I didn't solicit these
12 guys.  On a human level, these are people that
13 I talk to every day and he was pregnant -- or
14 his wife was pregnant.  He had a -- he ended up
15 having a kid.  He's texted me twice since
16 having a kid of just pictures of the kid.  I
17 responded something like innocuous of like,
18 wow, so happy for you.  I'm so happy that your
19 son is healthy.  I would love to call him.
20       Like, the hardest part of this
21 entire thing is not being able to call him and
22 say, how are you doing as a dad.  Like, this
23 is -- on the -- on a human level, I was talking
24 to people that I spoke to every day that I care
25 about.  They are not employees -- they are not

Page 64

Hermalyn

1
2 employees of Fanatics.  My understanding from
3 talking to Hayden is Hayden is in a better
4 spot, and I'm sure Andrew is too, because I
5 left in the fact that there is more room to
6 grow.  I --
7    Q.   Are you done?
8    A.   I just -- I think this is tough
9 because when you assume that intent and you ask
10 the questions in the way you are asking, it
11 sounds like I did something wrong and I
12 definitively did not.  I was trying to talk to
13 two friends.
14    Q.   Thank you.
15    A.   That I --
16    Q.   On February 3rd, did you call
17 Mr. Larracey's wife's phone in the morning, yes
18 or no?
19       MR. BECK:  Objection.
20    A.   I just -- sorry, I answered that
21 question earlier.  I don't -- I don't recall.
22    Q.   Did you encourage Mr. Larracey to
23 move forward with interviewing with Fanatics?
24       MR. BECK:  Objection.
25    A.   No, I don't recall.

Page 65

Hermalyn

1
2    Q.   Going back to the 1st, did you tell
3 either of these men that the position would
4 likely entail relocating to Los Angeles, yes or
5 no?
6       MR. BECK:  Objection.
7    A.   I made it clear to them at that
8 moment that my job was running the LA office
9 and that I moved to Los Angeles, which was a
10 surprise to them, but no, I don't recall them
11 moving.  I don't know why they would have to or
12 what that would mean or how --
13    Q.   Did you tell them -- did you tell
14 them you were moving to Los Angeles in part
15 because of your non-compete, yes or no?
16       MR. BECK:  Objection.
17    A.   No.  If I -- any conversation about
18 me moving to Los Angeles has to do with the
19 role that I took, which is running the LA
20 office and --
21    Q.   Did you tell them -- I'm sorry.
22    A.   -- and president of VIP, which
23 requires me to be in LA as I run the office.
24    Q.   Did you discuss with them on the 1st
25 that there may be job opportunities which would

17 (Pages 62 - 65)

Hermalyn

1       Hermalyn
2   not require them relocating, that is job
3   opportunities at Fanatics?
4           MR. BECK:  Objection.
5       A.   I don't recall.  I do think the way
6   you're characterizing it is incorrect.  I was
7   answering questions.  If that was a question,
8   I -- I don't recall.
9       Q.   Did you tell Mr. Larracey on
10  February 3rd in a morning phone call that it
11  would reflect poorly on you, Mr. Hermalyn, if
12  Mr. Larracey did not move forward with
13  interviewing with Fanatics?
14      A.   I read that and what DraftKings
15  submitted.  That's not something I would say,
16  so no.  If anything, I -- all I care about is for
17  those guys is what is best for them.  Again,
18  friends of mine.  I would like to be friends
19  with them again.
20      Q.   Mr. Larracey did interview for the
21  senior director position on February 4,
22  correct?
23          MR. BECK:  Objection.
24      A.   I found that out via the document
25  that was sent.

1       Hermalyn
2       Q.   It's your sworn testimony that you
3   had no prior knowledge that Mr. Larracey was
4   interviewing at Fanatics before February 4th?
5           MR. BECK:  Objection.
6       A.   No, that's not -- you didn't
7   characterize that right.  On one of the calls
8   that we had, he talked about how he was going
9   to interview or did apply, something along
10  those lines.
11      Q.   Did you know before February 4th
12  that that was the day he was going to
13  interview, meaning on the 2nd, 3rd or 4th, did
14  you know that before the interview started?
15      A.   I don't recall.
16      Q.   Did you have discussions with anyone
17  at Fanatics about the interview either before
18  or after?
19          MR. BECK:  Objection.
20      A.   No, Fanatics is very good about
21  putting a wall between me and anything that
22  would get me and put me in any harm --
23      Q.   Where were you on February -- where
24  were you on February 4th physically when
25  Mr. Larracey interviewed --

1       Hermalyn
2           MR. BECK:  You didn't get the end of
3   his answer.  After he said, "They would
4   put me in any harm," he said -- you want
5   to finish your answer.  You said, no,
6   Fanatics is very good about putting a wall
7   between me and anything that would give
8   me -- put me in any harm, and then you
9   started to answer.
10      A.   Yeah.  In the -- in the last month,
11  I've operated with an abundance of caution
12  across everything, given everything that is in
13  front of me, especially after the TRO was
14  issued or ordered, I don't know the legal term
15  for that.
16      Q.   Where were you physically on
17  February 4th when Mr. Larracey interviewed for
18  the senior director positions in the VIP group
19  at Fanatics?
20          MR. BECK:  Objection.
21      A.   Do you mind providing me with what
22  day?  I don't have a calendar in front of me.
23      Q.   Sunday.
24      A.   I was in -- I was in New Jersey
25  where my wife and two daughters are living

1       Hermalyn
2   until we -- until school ends.
3       Q.   I'm going to give you these names
4   and ask you whether you have ever spoken to any
5   of them about Mr. Larracey.  Tucker Kain,
6   K-A-I-N, Orlando Ashford, A-S-H-F-O-R-D, Alex
7   Lee, L-E-X, Lee, Nils Brandon.  Did you discuss
8   Mr. Larracey in any respect with any of those
9   individuals at Fanatics, yes or no?
10      A.   At any time?
11      Q.   At any time.
12      A.   Ever?
13          MR. BECK:  It's outside the scope
14  but you can answer it.
15      A.   I don't recall.
16      Q.   Did you discuss -- do you know who
17  those -- have you spoken to any of those
18  individuals since February 1st about
19  Mr. Larracey?
20      A.   I don't recall.  What I can say is
21  as a 18,000-person company, there are a lot of
22  people that apply and anything DraftKings
23  related, make sure the team stays away from me
24  in talking about it.
25          THE COURT REPORTER:  Stay away from

18 (Pages 66 - 69)

Page 70

Hermalyn

1
2  and what?
3        THE WITNESS:  I'm sorry, what was
4  that?
5        THE COURT REPORTER:  I didn't hear
6  the end of your answer.
7    A.   I said anything DraftKings related,
8  we stayed -- the company steers clear of me of
9  talking about it, but no, I don't recall
10 talking about anybody in particular or any
11 individual.
12   Q.   Mr. Kain is the chief strategy and
13 growth officer at Fanatics, correct?
14   A.   Yes.
15   Q.   And did you tell Mr. Kain at anytime
16 since February 1st that Mr. Larracey was a new
17 father?
18   A.   Not that I recall.
19   Q.   Are you aware that Mr. Kain was in
20 contact with Mr. Larracey during the month of
21 February concerning the job at Fanatics to
22 which he applied?
23       MR. BECK:  Objection.
24   A.   Same answer.
25   Q.   So just to be clear, it's your sworn

Page 71

Hermalyn

1
2  testimony that you did not solicit either
3  Mr. Larracey or Mr. Metz to join Fanatics at
4  any time in February of 2024?
5        MR. BECK:  Objection.
6    A.   Correct.  I did not solicit -- to my
7  understanding, there has not been any offers
8  made and both of them are still employees of
9  DraftKings.
10   Q.   At any time in -- from February 1st
11 to the present, have you talked to anybody at
12 Fanatics about any DraftKings employee?
13       MR. BECK:  Objection.
14   A.   Over Super Bowl if I saw somebody
15 that said hi -- I said hi to somebody or
16 somebody gave me a hug and somebody at Fanatics
17 would like to raise that, I most likely said
18 that person works for DraftKings.
19   Q.   Any other -- any other conversations
20 at Fanatics about any DraftKings employee since
21 the 1st?
22       MR. BECK:  Speaker Objection.
23   A.   Nothing more than that in terms of
24 in passing.
25       MR. BECK:  Are we at a breaking

Page 72

Hermalyn

1
2  point yet?  Now it's an hour and 15
3  minutes.
4        MR. SNYDER:  Yes, happy to break.
5  Happy to break.
6        MR. BECK:  Thank you.
7        THE VIDEOGRAPHER:  This is the end
8  of Media Unit 3.  We're going off the
9  record.  The time is 11:36 a.m.
10      (Off the record.)
11       THE VIDEOGRAPHER:  This is Media
12 Unit 4.  We are back on the record.  The
13 time is 11:55 a.m.
14 BY MR. SNYDER::
15   Q.   Mr. Hermalyn, since February 1st,
16 have you communicated with any other employees
17 of DraftKings about potential employment with
18 Fanatics, yes or no?
19       MR. BECK:  Objection.
20   A.   I wouldn't say I talked to any
21 employee about a potential job at Fanatics.
22   Q.   So, just to be clear, since
23 February 1st, you have not had any conversation
24 with any DraftKings employee about them
25 potentially moving over to Fanatics in the VIP?

Page 73

Hermalyn

1
2        MR. BECK:  Objection.
3    A.   Outside of the conversation we just
4  had about Mr. Larracey and Mr. Metz, I answered
5  the questions about the career site, no, I have
6  not.
7    Q.   Have you had a time to reflect on
8  the last line of questioning and your
9  interrogatory response during the break?
10   A.   I wouldn't characterize it as that.
11 I went to the restroom, got a glass of water.
12   Q.   You didn't think about the line of
13 questioning at all during the break?
14       MR. BECK:  Objection.
15   A.   I thought about it without the right
16 context.  Anything that you said could be
17 portrayed as wrong, and then I sat in the truth
18 if I didn't do anything wrong and I simply
19 changed jobs.
20   Q.   And in changing jobs and reflecting
21 on your conversation on the 1st, is it
22 possible, sir, that during those conversations
23 on the 1st, you did, in fact, provide
24 compensation information to Mr. Larracey and
25 Mr. Metz about what a compensation package for

19 (Pages 70 - 73)

Page 74

Hermalyn

1           Hermalyn
2  them would look like at Fanatics?
3           MR. BECK:  Objection, asked and
4  answered and compound.
5      A.   Just so I know, am I answering --
6           MR. BECK:  You can answer that.
7      A.   Okay.  Sorry, do you mind repeating
8  the question?
9      Q.   Yeah.
10          MR. SNYDER:  Can you please read
11  back the question?
12          MR. BECK:  And the objection,
13  please.
14          (Whereupon the record was read back
15  by the reporter.)
16     Q.   You may answer.
17     A.   Thank you.  The answer to that would
18  be on that call where they called me, I
19  answered questions.  They are very familiar
20  about -- with how Fanatics paid Rob Ferrara and
21  very familiar with how I was compensated at
22  DraftKings and there were conversations --
23  there were questions regarding money from them
24  directed to me, but not in the context of
25  offering any job or soliciting them to come

Page 75

1           Hermalyn
2  work for Fanatics.
3      Q.   And what were your responses in
4  words or substance to their questions about
5  specific compensation?
6           MR. BECK:  Objection.
7      Q.   You may answer.
8      A.   I don't remember the exact
9  questions.  I remember the -- like, the spirit
10  of that conversation and that was rooted in
11  three friends talking.  So, I don't know how to
12  answer that outside of how I answered that in
13  the, you know, last hour.
14     Q.   Did the spirit of that conversation
15  include, sir, you, in words, discussing out of
16  your mouth, specific dollar figures?
17          MR. BECK:  Objection.
18     A.   Outside of answering a question, no,
19  it's not something I think I would be aware of
20  or remember.
21     Q.   But even in answering questions, did
22  you, for example, say X base, Y stock, in
23  numbers, in any context during that call?
24          MR. BECK:  Objection.
25     Q.   You can answer.

Page 76

1           Hermalyn
2      A.   X base and Y stock as it pertains to
3  their potential compensation to join Fanatics,
4  no.
5      Q.   Let's just say any context -- let's
6  just say in any context, did you provide
7  figures, compensation figures for positions at
8  Fanatics for whatever reason in response to any
9  question, did you, for example, provide
10  numbers?
11          MR. BECK:  Objection.  Can you just
12  read me the question, please.
13     Q.   I'm going to withdraw the question.
14          In response to questions or
15  otherwise during that call, did you, out of
16  your own mouth, in words, discuss numbers?
17          MR. BECK:  Objection.
18     Q.   Yes or no?
19          MR. BECK:  Objection.
20     A.   I don't know how to answer that
21  other than how I have been answering it.  What
22  do you mean by --
23     Q.   I'll ask you this.  Did you sing the
24  Star Spangled Banner during that call?
25          MR. BECK:  Objection.

Page 77

1           Hermalyn
2      Q.   Did you?
3      A.   No, I did not.
4      Q.   Did you recite poetry?
5           MR. BECK:  Objection.
6      A.   No, I did not recite poetry.
7      Q.   Did you talk about batting average
8  leaders in the Hall of Fame, Ty Cobb, Ted
9  Williams, et cetera?
10          MR. BECK:  Objection.
11     A.   No, we did not talk about Ty Cobb or
12  Ted Williams.
13     Q.   Did you talk about numbers in any
14  context as it relates to Fanatics compensation,
15  yes or no?
16          MR. BECK:  Objection.
17     A.   As it relates to Fanatics
18  compensation, no, that is not something I
19  remember.  Out of -- I said earlier there was a
20  lot of the convo where Hayden was peppering me
21  in a spirited, loving way of how do you
22  possibly value that stock and talked about ███

20 (Pages 74 - 77)

Hermalyn

1
2     Q.   How did Metz and Larracey know your
3  compensation at DraftKings?
4     A.   They -- so, Hayden knew -- knew my
5  compensation before joining the VIP team.  He
6  was on the analytics team at DraftKings, and I
7  guess part of his purview was understanding
8  compensation of different employees.  I don't
9  know what that, like, ranges, but he knew my
10  compensation and we would work on comp planning
11  for the organization.  So -- and Andrew worked
12  for Hayden.  So, that's how I think Andrew knew
13  about it.
14     Q.   So, you didn't tell them?
15     A.   No.
16     Q.   That would not be appropriate to
17  share your DraftKings compensation with your
18  subordinates, correct?
19        MR. BECK:  Objection.
20     A.   I think you're mischaracterizing.
21  These -- these two people looked over
22  operations for the organization, so we looked
23  at how the orders were running, we worked on --
24  worked on job families.
25        Were you going to share the screen?

Hermalyn

1
2     Q.   Oh, yeah.  I'm sorry.  I was about
3  to go to the next exhibit but it went up too
4  soon.
5     A.   Okay.  That was it.
6     Q.   Sir, you recognize this photo?
7     A.   Yes, I do.
8     Q.   That is you standing next to -- in
9  the black shirt -- Mr. ████████ and ████
10  ████, correct?
11     A.   Yes, I'm standing next to ████
12  ████.  ████████ is in the far left.
13     Q.   Right.  I'm going to mark this as
14  the next exhibit, 5.  And you spoke to
15  ████████ and ████████ while you were in Las
16  Vegas for the Super Bowl while working for
17  Fanatics, correct?
18        (Whereupon Exhibit 5 was marked for
19        identification.)
20     A.   I did speak with ████████.  He was
21  a partner of Fanatics and he was at a lunch I
22  attended.  I did not -- despite me standing
23  next to ████████, I did not say hi or
24  introduce myself.  To my understanding, he does
25  not know who I am.

Hermalyn

1
2     Q.   And what did you and ████████ talk
3  about?  Withdraw the question.
4        Did you and ████████ talk about
5  Fanatics business, yes or no?
6     A.   No.
7     Q.   Did he ask you why you left
8  DraftKings?
9     A.   No, no.
10        MR. SNYDER:  I'm going to ask at
11  this point that the lawyers representing
12  Fanatics log off of the link, the Veritext
13  link, and we are going to have some
14  questions now and we will e-mail you as
15  soon as that line is over, which should be
16  very shortly, meaning five minutes or
17  less.
18        MS. CARSON:  Okay.  Will do and I'll
19  get back on when you e-mail me.
20        (Ms. Carson leaves the deposition at
21  this time.)
22
23
24
25

Hermalyn

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

21 (Pages 78 - 81)



Veritext Legal Solutions
212-267-6868                    www.veritext.com                    516-608-2400



Page 86

Hermalyn

Page 88

Hermalyn

15    Q.   Let me ask you this broad question.
16 Since the time this lawsuit was filed against
17 you by my client, DraftKings, have you and
18 Mr. Rubin, outside the presence of lawyers,
19 discussed the lawsuit?
20    A.   The only discussion we had is on
21 a -- on, like, a completely human level of just
22 him asking me how am I doing, which is
23 probably -- probably the thing I appreciate the
24 most in the last month.  You know, the first
25 week of me leaving, especially leading up to

Page 87

Hermalyn

Page 89

Hermalyn

 1 the Super Bowl, I can't tell you how the press
 2 and what was said about me personally has made
 3 me feel.  It's pretty emotional or I'm a pretty
 4 emotional guy, despite whatever was written in
 5 the press.  And what I have been the most happy
 6 with and is Michael's ability to call me and
 7 just say, like, how are you doing and ask about
 8 my wife and kids and, like, from a real human
 9 perspective, like, I could imagine this is
10 tough but, like, we will get through it
11 together.  It's something that I appreciate a
12 lot more than he'll ever know.
13        MR. BECK:  Are you ready to have
14    Quinn back in?
15        MR. SNYDER:  What was that?
16        MR. BECK:  Are you ready to have
17    Quinn back in or are you still on AEO
18    stuff?
19        MR. SNYDER:  Quinn can come back in.
20    Can someone text -- e-mail them.
21        (Ms. Carson re-enters the deposition
22    at this time.)
23        MR. BECK:  I got it.  I'll let them
24    know.

23 (Pages 86 - 89)

Page 90

Hermalyn

1
2    Q.   Sir, on January 3, 2024, your boss,
3  Shawn Henley told you in a meeting that
4  DraftKings was investigating your workplace
5  conduct, correct?
6    A.   Yes, he didn't define it quite like
7  that.  We had -- we had a one-on-one.  Maybe
8  I -- can I respond?
9    Q.   I mean, I asked you yes or no
10  whether that happened.
11      MR. BECK:  He was answering your
12    question.
13      MR. SNYDER:  Can I make a respectful
14    request.  I've been asking the witness a
15    series of yes-or-no questions and rarely
16    does he answer them "yes" or "no."  If the
17    questions are capable of being answered
18    yes or no, I'm going to get to the other
19    parts of it, and you'll have an
20    opportunity to redirect your witness.
21    Q.   But I was just asking yes or no, did
22  Mr. Henley tell you in a meeting on the 3rd,
23  that DraftKings was investigating your
24  workplace conduct, and if the answer is no, the
25  answer is no.  If the answer is yes, it's yes

Page 91

Hermalyn

1
2  and then we can move on.  I don't need you to
3  explain everything to me every time because
4  that just eats up a lot of time on my four
5  hours.  Only if it's possible, sir.
6      MR. BECK:  Objection.
7    A.   I'm sorry, sir.
8    Q.   Let me withdraw the question and ask
9  it even narrower.
10      MR. BECK:  And you are withdrawing
11    your question and the statement as well, I
12    assume?
13      MR. SNYDER:  No, the statement is a
14    general global omnibus statement.
15    Counsel, if you could please instruct your
16    witness that where my answer is
17    susceptible to a yes-or-no answer, he
18    endeavor to answer it "yes" or "no."
19      MR. BECK:  And I will tell you that
20    is exactly what he has been doing.  You
21    may not like his answers, but that's what
22    he is trying to do.
23      MR. SNYDER:  Thank you.
24    Q.   On January 3, 2024, did Mr. Henley
25  tell you that DraftKings was conducting an

Page 92

Hermalyn

1
2  investigation of you?
3    A.   Yes.
4    Q.   And broadly speaking, without going
5  into the details, which I don't have any
6  interest in going into today, you were informed
7  that ███████████████████████ had
8  made complaints about you, correct?
9    A.   Yes.
10 ████████████████████████████████████
11 ████████████████████████████████████
12 ████████████████████████████████████
13 ████████████████████████████████████
14 ████████████████████████████████████
15 ████████████████████████████████████
16 ████████████████████████████████████
17    Q.   Okay.  Were you told by Mr. Henley
18  that other employees, in addition to
19  ██████████, had raised complaints about you?
20    A.   No.  I would say actually no, sir.
21      MR. BECK:  Objection.
22 ████████████████████████████████████
23 ████████████████████████████████████
24 ████████████████████████████████████
25 ████████████████████████████████████

Page 93

Hermalyn

1
2 ████████████████████████████████████
3 ████████████████████████████████████
4 ████████████████████████████████████
5 ████████████████████████████████████
6 ████████████████████████████████████
7 ████████████████████████████████████
8 ████████████████████████████████████
9 ████████████████████████████████████
10 ████████████████████████████████████
11 ████████████████████████████████████
12 ████████████████████████████████████
13 ████████████████████████████████████
14 ████████████████████████████████████
15 ████████████████████████████████████
16 ████████████████████████████████████
17 ████████████████████████████████████
18 ████████████████████████████████████
19 ████████████████████████████████████
20 ████████████████████████████████████
21 ████████████████████████████████████
22 ████████████████████████████████████
23 ████████████████████████████████████
24 ████████████████████████████████████
25 ████████████████████████████████████

24 (Pages 90 - 93)



Page 94

1          Hermalyn

Page 96

1          Hermalyn
2 concluded you had, in fact, engaged in
3 wrongdoing, which you denied, it could
4 potentially lead to you being fired, correct?
5          MR. BECK:  Objection.
6     A.   I didn't think -- I didn't think,
7 really, at any point that I would be fired
8 because I know that I didn't do anything wrong.
9 Do I think I could have been a better leader
10 with regards to our communication at times,
11 absolutely.  Do I think that that process has
12 helped me become a better executive and dad and
13 husband and friend, like, no question, but did
14 I think that could result in me being
15 terminated, no, not -- no.
16     Q.   But it was a brutal process, the
17 investigation process, for you?
18          MR. BECK:  Objection.
19     A.   What was that word?  What was the
20 word you said?
21     Q.   Brutal, B-R-U-T-A-L.
22     A.   It was tough for me.  I was still
23 operating at the highest possible level and
24 there were moments in time where it took a long
25 time to hear back from people or get an

Page 95

1          Hermalyn
2     Q.   Thank you.  But you knew when you
3 learned you were under investigation, you knew
4 it was very serious, correct?
5          MR. BECK:  Objection.
6     A.   No.  If anything, I was -- I looked
7 at this as what Shawn, Mr. Henley, said of,
8 like, this stuff happens, like, just have the
9 conversation and we'll talk after it.  Very
10 serious is no.  I would say any investigation
11 is, of course, serious and did I take it
12 seriously, of course.  I have never been
13 through that and it was tough for me.
14     Q.   In fact, it was anxiety-ridden
15 process, wasn't it?
16          MR. BECK:  Objection.
17     A.   Personal question, but absolutely.
18 It's something that when -- when you wrack your
19 brains for two hours before that call of what I
20 could have done and come up with nothing,
21 it's -- it's a very, very, very hard mental
22 thing for me who, despite what is happening in
23 the last month, care a lot about my reputation
24 and the team that I'm overseeing.
25     Q.   And you knew that if DraftKings

Page 97

1          Hermalyn
2 understanding of where I stood, so yeah, it
3 wasn't easy but I still operated extremely --
4 at the highest level.
5     Q.   Sir, I'm going to show you the next
6 exhibit, No. 6.  A text exchange between you
7 and your brother, Andrew, and I can represent
8 to you that these text messages were recovered
9 from one of your DraftKings laptops.  In the
10 text you say, "This process just high, high,
11 high stress and anxiety.  I just don't want to
12 get fired."  Do you see that?
13          (Whereupon Exhibit 6 was marked for
14     identification.)
15          MR. BECK:  Objection, but you can
16     read what the actual text says.
17     Q.   Do you see where you wrote, "I just
18 don't want to get fired"?
19     A.   Yes.  (Cross-talk) it was me with my
20 brother.
21     Q.   You're surprised to see this text,
22 aren't you, sir?
23          MR. BECK:  Objection.  We are still
24     trying to figure out what it is.
25     A.   No, I --

25 (Pages 94 - 97)

Hermalyn

1
2     Q.    I can represent to you -- I can
3  represent to you that this is a text message
4  recovered from one of your DraftKings issued
5  laptops and it's between you and a gentleman
6  named Andrew Hermalyn.  Is that your brother,
7  Andrew Hermalyn?
8     A.    Yes, he is.  Great guy.
9     Q.    Okay.  And you're surprised to see
10 this document at this deposition, aren't you,
11 sir?
12        MR. BECK:  Objection.
13    A.    I actually didn't -- this is my
14 first deposition.  I didn't know what to expect
15 and tried to come in with an open mind, so no,
16 this isn't surprising.
17    Q.    Isn't it a fact, sir, that you
18 deleted this text message on the 16th?
19        MR. BECK:  Objection.
20    Q.    Yes or no?
21    A.    No.  I mean, I -- when I left
22 DraftKings, I handed over my DraftKings issued
23 devices.  I would assume this is on my iPad.  I
24 would have no reason to delete this and I am
25 not -- I'm not surprised at seeing it or

Hermalyn

1
2  stressed that that was (cross-talk) --
3     Q.    Isn't it a fact, sir, that on the
4  16th, after sending this e-mail to your brother
5  saying, "I just don't want to get fired," you
6  deleted this e-mail from your iMessage of --
7  account on your DraftKings laptop?
8        MR. BECK:  Objection.
9     A.    I -- I would say a couple of things
10 to that because I fell, like, it's a -- it's,
11 like, mischaracterization.  The context is not
12 there.  I definitely took off my iMessage or,
13 like, you know, deactivated my iCloud from my
14 work computer at some point.  I can't tell you
15 what date that was, and the reason for that is
16 there is no reason other than I didn't need it
17 on my work computer.  And in terms of this,
18 it's safe to assume -- I don't even know what
19 day -- what day was this?
20    Q.    The 16th of January.
21    A.    Okay.
22    Q.    Do you remember deleting this from
23 your work laptop, yes or no?
24    A.    No, I don't remember deleting this.
25    Q.    So, now can you tell us what you

Hermalyn

1
2  meant by, "I just don't want to get fired"
3  after talking about the investigation process
4  being high, high, high stress and anxiety?
5        MR. BECK:  Objection.  You can
6     answer.
7     A.    To the best of my memory, I would
8  say even reading this gives me stress, not that
9  you are showing me that -- not that you are
10 showing it to me or thinking that you surprised
11 me with showing it to me.  It's more of,
12 clearly, I was stressed at the time.  I don't
13 remember thinking I was going to get fired from
14 this.  If anything -- if anything, along the
15 way, there was nothing that -- at that point,
16 there was no suspension of the team or the --
17 ██████████████████████████████████████████████
   ████████████████████████████████ So, I had
20 no reason to think that was going to happen,
21 but this looks like a vulnerable moment with an
22 emotional guy, which is me, and my brother and
23 best friend.
24    Q.    And you had -- you had a family to
25 support at the time, obviously, correct?

Hermalyn

1
2     A.    I know it's a yes-or-no question,
3  but that got -- that makes it sound like I need
4  this job to support them.
5     Q.    Well, do you?  Did you need a job to
6  support your family on the 16th of January, yes
7  or no?
8     A.    No, I've invested well.
9     Q.    Do you have independent wealth?  I'm
10 just -- I mean, so you don't need to work to
11 support your family?  I'm not being impolitic
12 here.  I'm just trying to get the fact out.
13        MR. BECK:  Objection.  And it's
14     outside --
15    Q.    Let me withdraw the question.
16        You had a mortgage on a $4,000,000
17 house, correct?
18    A.    Yes.
19    Q.    What's the amount of the mortgage?
20        MR. BECK:  Objection.  This is all
21     outside the scope.  We are not getting
22     into his mortgage.
23    Q.    And you were particularly anxiety
24 ridden, using your words, on the 16th because
25 this was not the first time, was it, in your

Page 102

1           Hermalyn
2 career, sir, that your workplace conduct has
3 been under scrutiny by your employer?
4         MR. BECK: Objection. This is
5 outside the scope as well.
6         MR. SNYDER: Well, it's not. It
7 goes right to the spoliation and
8 downloading that occurred that day, you
9 know that and I know that.
10        MR. BECK: Excuse me. That is --
11 nothing of what you just said is true.
12 There has been no spoliation. There has
13 been no -- and there is no relevance to
14 this. I'm sorry, this is outside the
15 scope of the deposition. So, you can make
16 whatever statements you want to make about
17 it. It's outside the scope of the
18 deposition. If you want to ask him about
19 the actual investigation, fine, ask him
20 about the investigation. If you want to
21 ask him his mortgage or about his
22 finances, that's outside the scope of the
23 deposition.
24   Q.   Your state of mind --
25        MR. BECK: (Cross-talk) prior

Page 103

1           Hermalyn
2   employment issues that may or may not have
3   ever happened.
4   Q.   Your state of mind on the 16th was
5   one of someone who was anxiety ridden, correct?
6         MR. BECK: Objection.
7   A.   No, I wouldn't characterize it as
8   that. There was a communication click with me
9   and my closest friends/brother, and I was
10  operating and continue to operate at the
11  highest possible level for DraftKings while
12  also having this hang out in the back of my
13  mind.
14
15
16
17
18
19
20
21
22
23         I don't -- there were questions
24  that were coming up that caused moments of
25  stress, but in terms of me as a person, I'm --



Page 104

1           Hermalyn
2   I always operated at some level of anxiety.
3   Q.   Do you have a burner phone?
4   A.   No.
5   Q.   Did you at DraftKings?
6   A.   No.
7   Q.   In your sworn statement to the
8   Court, this is your February 7th Declaration,
9   you say you reached out to Mr. Rubin eight days
10  after learning about the investigation, I guess
11  January 11. Is that what happened?
12        MR. BECK: Objection to form.
13  Q.   That you reached out to him eight
14  days after the investigation was disclosed to
15  you?
16        MR. BECK: Objection.
17  A.   It's very tough. I'm really trying
18  to answer your questions yes or no, but you're
19  including pieces in the beginning that have
20  some relevance so maybe I'll separate it.
21  Q.   Then let me withdraw the question if
22  you're finding it objectionable and I say that
23  to be constructive.
24        You say in your affidavit that you
25  first contacted Mr. Rubin about the potentially

Page 105

1           Hermalyn
2   getting a job at Fanatics on January 11. Do
3   you recall that?
4         MR. BECK: Can you put the affidavit
5   in front of him so he can have it --
6         MR. SNYDER: No.
7         MR. BECK: You're asking him about a
8   document. He should be able to see the
9   document.
10        MR. SNYDER: No, sir. You can show
11  it to him. (Cross-talk.)
12  Q.   Fine. Do you recall a few weeks ago
13  swearing to the Court that you first contacted
14  Mr. Rubin on January 11th about a potential job
15  at Fanatics, yes or no?
16        MR. BECK: Objection. And I ask
17  that you put the document in front of him
18  again and not characterize it as swearing
19  in Court.
20  Q.   You can answer. Please answer the
21  question.
22        MR. BECK: If you're able to.
23  A.   Sorry. The back and forth kind of
24  through she off. Do you mind asking me one
25  more time?

27 (Pages 102 - 105)

1           Hermalyn
2     Q.   Did you first reach out to Mr. Rubin
3   on February -- January 11th about a potential
4   job at Fanatics?
5     A.   It wasn't about a potential job, but
6   I first reached out to Mr. Rubin on the 11th,
7   yes, I did.
8     Q.   And you say in your affidavit --
9   your declaration that you reached out because
10  you heard a rumor about Fanatics looking for
11  someone to lead its VIP team.  Do you recall
12  saying that in your sworn statement?
13        MR. BECK:  Objection.  Are you going
14    to put it in front of him so that he can
15    review it?
16    Q.   Do you recall saying that, sir?
17        MR. BECK:  Objection.
18    A.   Can I please see the document that
19  he is referring to?
20    Q.   Well, let me ask you -- no, I'll
21  take it away from the affidavit.  Did you call
22  him on the 11th, yes or no?
23    A.   I texted him on the 11th, yes.
24    Q.   Did you then speak to him on the
25  11th?

1           Hermalyn
2     A.   Yes.
3     Q.   And were you prompted to text him
4   because you heard a rumor that someone was
5   looking for -- Fanatics was looking for someone
6   to lead its VIP team?
7     A.   Yes.
8     Q.   Okay.  And where did you hear that
9   rumor?
10    A.   I heard it from a friend of mine.
11  His name is Martin ████████
12    Q.   And what did he tell you?
13    A.   He said just that.  He said I -- he,
14  Martin, is a long-time friend.  He's an
15  executive at ██████████████ is privy to
16  a lot of open jobs that are in the media,
17  advertising, sports world.  I saw him in a
18  sports bar watching a Michigan championship
19  game, which was a great game, and he said to me
20  very casually, I heard there was a job at
21  Fanatics, are you looking into it and I said,
22  no.
23    Q.   So, why did you text him on the
24  11th?
25    A.   At that point on the -- on the 11th

1           Hermalyn
2   or prior to the 23rd, I met Michael, like, here
3   and there in public settings but we never got
4   to know each other.  We never had, like, a
5   one-on-one sit down.  And I thought about it
6   for a day or two since Martin told me and I
7   texted him just wanting to get together.  I
8   didn't say anything about -- we didn't talk
9   about an actual job.  We just said, let's get
10  together and, you know, get to know each other.
11    Q.   But you reached out to him because
12  you heard a rumor and you were interested in at
13  least learning about the opportunity, correct?
14    A.   At that point, I was more interested
15  in getting to know Michael and getting to know
16  who he was as a person, and if the opportunity
17  arose and if it made sense, then, sure, I would
18  like to talk about an opportunity.
19    Q.   And that -- and that was the first
20  time you contemplated leaving and considering
21  Fanatics as a -- as a possibility, right, on
22  the 11th?
23        MR. BECK:  Objection.
24    A.   Yes, it's hard not to text the CEO
25  of a company and not think for a moment could I

1           Hermalyn
2   leave and could I go there.
3     Q.   Is it your sworn testimony here
4   today that being invest -- being under
5   investigation by DraftKings as a result of
6   claim ████████████████ in no way
7   contributed to your decision to pursue a job
8   with Fanatics?
9         MR. BECK:  Objection.  You can
10    answer.
11    A.   I think the timing is convenient.  I
12  would say by the end of the process, which, you
13  know, the process started, like, on the 23rd
14  when I met him and ended with me resigning on
15  the 1st of February, there were a couple of
16  things that happened at DraftKings that made me
17  think twice about staying, and frankly, made me
18  question my future there.
19    Q.   What were those things?
20    A.   You know, despite -- despite the
21  press -- that was incorrect, I don't have a bad
22  thing to say about DraftKings.  Like, I loved
23  my time there.  I still speak highly about it
24  if anybody asks me.  Anybody that comes to me
25  says, like, man, like, anything totally

Page 110

1              Hermalyn
2  negative, I would say the opposite.  I would --
3  the things that -- pieces that -- and I
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18        Despite all of that, I have nothing
19  bad to say about DraftKings.  I love that place
20  still.  The reason the pieces that pushed me
21  was not because of the way they handled the
22  investigation.  The way they handled it, to my
23  understanding, is that what has to happen.
24  Like, it's a public company, they went through
25  it.  I would say the hardest part about leaving

Page 111

1              Hermalyn
2  by far is not being able to speak to Matt
3  ████████ anymore.  We were good friends and we,
4  like, really made and made it -- like, we built
5  quite a business together and everybody else
6  and Andrew on this call and Stan and I would
7  love to talk to them.  I have nothing bad to
8  say.
9        The pieces that lead it were -- was
10  the investigation a part of it?  It wasn't in
11  the way -- it wasn't in the way DraftKings
12  handled it.  It wasn't in the way what was
13  found.  What was found is the investigation was
14  closed.  I was never suspended.  In some
15  investigations it was -- ████████████████
16  ██████████████████████████████████
17  ██████████████████████████████████
18  ██████████████████.
19        The piece I'm speaking poorly
20  about -- the investigation in terms of the
21  impact, did it -- did it hurt me, yes.  Did I
22  fault DraftKings, no.  When someone makes a
23  claim like that at a public company, it has to
24  handle and I think the way they handled it
25  is -- I've never gone through that and I hope

Page 112

1              Hermalyn
2  to never do that again.  But the way they
3  handled it is something -- like, I know they
4  have to do that.  Was that a piece of it, like,
5  a -- a little, like, thorn in the side of,
6  like, man, that was really hard, yes.  Is that
7  the reason why I left, no.
8        The reason why I left is because the
9  opportunity to work for Mr. Rubin was something
10  that I couldn't pass up.  It's running an LA
11  office.  It's being on the executive team.
12  There are 18,000 people.  There are seven
13  people on the executive team.  I am one of
14  them.  And it's the center of sports that is
15  not just -- that's not just DraftKings'
16  business.  It's sports.  There are three
17  huge -- there's two huge businesses and one
18  that started two years ago in sports value
19  gaming.
20        I would say the other pieces that
21  pushed me at DraftKings were a couple of
22  things.  One, I didn't -- I don't like the way
23  they handle employee matters.  ████████████
24  ████████████████████████████████████,
25  ████████████████████████████████████

Page 113

1              Hermalyn
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18        It's upsetting because it is just
19  not doing the right thing for the employee and
20  me, as a leader, not an executive, but as a
21  member of the senior leadership team, not being
22  able to impact that, that is an example of
23  something that really threw me off across my
24  time at DraftKings.  That is one.
25        Another one is Shawn Henley was a

29 (Pages 110 - 113)





Page 114

Hermalyn

1   Hermalyn
2   great manager, he's great operator, and he's
3   great executive at DraftKings.  There was --
4   what I felt from him throughout the
5   investigation was something of competitiveness
6   that I never felt before, and it is almost this
7   feeling as if he was excited to -- I don't know
8   how else to say it, but, like, put me in my
9   place, which didn't feel good or right.  So I
10  didn't like that.
11          And then the last thing would be one
12  of the pieces that I didn't get to the bottom
13  of because I left but -- was the compensation
14  structure at DraftKings in the -- across the
15  VIP team.
16
17
18
19
20
21
22
23
24          MR. SNYDER:  Counsel, counsel,
25  counsel.  I'm interrupting admittedly.

Page 115

1   Hermalyn
2   The Court has ordered a four-hour
3   deposition.  I asked the witness what were
4   the two things.  The answer is now into --
5   it's going into six minutes.  I'm going to
6   move to strike the entire answer.  I'm
7   just going to make a request, again, on
8   the record that, as this answer
9   exemplifies, if you could please
10  respectfully ask your client, to the best
11  he can, answer my questions either "yes"
12  or "no," or if it calls for a narrative,
13  answer my question or else I may be
14  forced, I just want to state this on the
15  record, to go to the Court, show Her Honor
16  the transcript, and if I need more time,
17  ask for it.  It's the last thing I want to
18  do.  I'm sure we can accomplish this
19  collaboratively and cooperatively.  And I
20  apologize for interrupting the witness.
21          If he wants to continue the answer,
22  of course, he can but I just wanted to
23  make that record in the hope that we can
24  meet and confer in this way to have an
25  orderly deposition that accomplishes what

Page 116

1   Hermalyn
2   I believe the Court contemplated in giving
3   us four hours.  Thank you.
4          MR. BECK:  Just a couple of things.
5   First, is the answer was not six minutes
6   long, number one.
7          Number two is you had asked a broad
8   question that I think he was trying to
9   answer.  I don't have a problem with, as
10  long as he is finished answering the
11  question, with the interruption and he
12  certainly will continue, as he has been
13  all along, to answer your questions as
14  succinctly as he is able.  But your
15  question was, you know, did ask for a
16  narrative and he provided that.
17          Mr. Hermalyn, are you finished with
18  your answer, are you satisfied?
19          THE WITNESS:  Yes.
20          MR. BECK:  And, you know, he will
21  continue to try to answer your question.
22          MR. SNYDER:  It looks like the
23  answer is seven minutes and twelve
24  seconds, but I'm bad at math.
25          MR. BECK:  According to the

Page 117

1   Hermalyn
2   transcript, it does actually look like
3   maybe it was a couple of minutes, but --
4   several minutes, but it was in response to
5   your question, so...
6          MR. SNYDER:  Thank you.  I
7   appreciate that.  Okay.  Let's move on.
8   Q.   On the 11th, sir, what did Mr. Rubin
9   say to you and what did you say to him during
10  the phone call after you reached out to him?
11  A.   It was -- I don't know that I can
12  cite the specifics but I can give you the
13  spirit of it.  The spirit of it was would love
14  to get to know you better.  We didn't talk
15  about a specific role, and I said if you want
16  to make some time to get together, let's do it.
17  It was short.
18  Q.   Did you talk about broadly moving
19  over to Fanatics as a potential outcome of your
20  discussion?
21  A.   No, not then.
22  Q.   Now, you know, as a former
23  DraftKings executive, that DraftKings takes its
24  confidentiality policies very seriously,
25  correct?

30 (Pages 114 - 117)

Page 118

1        Hermalyn
2        MR. BECK:  Objection.
3        A.   Correct.  I actually carried the
4  flag on a lot of new policies we implemented
5  while I was there.
6        Q.   Right.  Right.  For example, after
7  Mr. Ferrara left, you carried the flag and
8  championed reminding the VIP team of those
9  confidentiality obligations in a memorandum,
10  correct, the US compliance draft?
11        A.   Two different things.  This is what
12  I mean by the question that is hard to just
13  answer it.  So, I'll break it up.  The -- Rob
14  Ferrara leaving was a moment in my career that
15  is, like, top three moment of something I'm
16  most proud of in terms of galvanizing the team
17  and taking a loss of somebody that left and
18  marching on into the NFL season.  That is part
19  one.  In terms of memorandum, I don't know what
20  you're referring to.
21        Q.   All right.  Let me ask you this
22  question.  At DraftKings you were issued three
23  laptops, correct, a 16-inch MacBook Pro, a
24  16-inch second MacBook Pro, which you got years
25  later, and then a 14-inch MacBook Pro that you

Page 119

1        Hermalyn
2  got in 2023, correct?
3        A.   I don't know the number of laptops I
4  had.  I know that I did move from a 16-inch to
5  a 14-inch, which was a very big deal for me
6  because not as heavy and that was --
7        Q.   Are you familiar with the
8  application Slack, S-L-A-C-K?
9        A.   Very familiar.  Commonly used among
10  DraftKings employees, yes.
11        Q.   Right.  And it allows you to send
12  messages, share files, team communication,
13  right?
14        A.   Yes.
15        Q.   And you had Slack downloaded on to
16  your personal iPhone, correct?
17        A.   Just like every DraftKings employee,
18  yes.
19        Q.   And do you recall, sir, on
20  January 16th, the same day you sent the text to
21  your brother, just to contextualize the time,
22  at 8:26 p.m. using your DraftKings issued 2021,
23  16-inch MacBook Pro, you sent yourself 19
24  DraftKings confidential business documents
25  through Slack.  Do you recall that?

Page 120

1        Hermalyn
2        MR. BECK:  Objection.
3        A.   No, I don't.
4        Q.   Do you recall downloading or viewing
5  seven of those documents on a non-DraftKings
6  issued phone on the 16th, yes or no?
7        MR. BECK:  Objection.
8        A.   Say that on a non what, excuse me?
9        Q.   DraftKings issued iPhone.
10        A.   There are a couple of points of
11  clarification.  There is not a single person at
12  DraftKings that has a company phone.  So,
13  every -- every device that -- or to my
14  knowledge, every device, and to my explicit
15  knowledge, within the group that I was running,
16  there is not a single person with a DraftKings
17  issued phone.  So that --
18        Q.   That's fine.  Don't read anything
19  into my question.  I'm just trying to
20  establish, did you download or view some of
21  those on your personal iPhone, do you recall
22  that?
23        MR. BECK:  Objection.
24        A.   I'm sorry about that.  The reading
25  into it is not reading into it.  It just

Page 121

1        Hermalyn
2  sounds -- without the context, it sounds like
3  it was something bad when that's how people
4  operated at DraftKings.  Do I recall doing that
5  on that specific date, no.
6        Q.   Yes.
7        A.   Is that the practice to do for me,
8  to send documents from DraftKings' Slack to
9  DraftKings' Slack?  Yes.
10        Q.   Do you recall, sir, on that same day
11  after downloading -- I'm sorry, on that same
12  day, after Slacking yourself 19 documents, you
13  then deleted all 19 of those documents from
14  your DraftKings issued MacBook?  Do you recall
15  that sequence?
16        MR. BECK:  Objection.
17        A.   I do not and not to -- but I will
18  speculate, which is apparently not good.  That
19  could have something to do with the -- was that
20  on my old laptop?  And if it was, was that on
21  my former laptop that I had?
22        Q.   Sir, I'm not here to answer
23  questions with all due respect.  I'm just
24  asking whether you remember that happening.
25        A.   No, I do not remember that, no.

31 (Pages 118 - 121)

Page 122

Hermalyn

1
2     Q.   Thank you.  That's all.  I just
3  wanted to -- and I assume it's your sworn
4  testimony that Slacking yourself 19 documents
5  to yourself and then deleting them from your
6  MacBook had nothing to do with the possibility
7  that you would be moving to Fanatics?
8          MR. BECK:  Objection.  After he
9  answers, I would like to take a break.
10     A.   Absolutely nothing to do with
11  Fanatics, no.
12     Q.   I'll almost be done with this line,
13  so we can take even a lunch break at that point
14  if you want or any kind of break.
15
16
17
18
19
20
21
22
23
24
25     Q.   So just before we break, just to be

Page 123

Hermalyn

1
2  clear, you have no memory on the 16th, the day
3  that you told your brother you were suffering
4  high, high stress and you didn't want to get
5  fired, you have no memory of that day in the
6  evening Slacking 19 documents to yourself and
7  then deleting them all from your laptop?
8          MR. BECK:  Objection.
9     A.   I have no memory of that and those
10  two things are definitely not correlated.
11     Q.   Thank you.
12          MR. SNYDER:  Counsel, how long would
13  you like a break?  Whatever you and the
14  witness is fine with me.
15          MR. BECK:  Yes.
16          MR. SNYDER:  Why don't we take a
17  lunch break now and, Pat -- that's your
18  name, right, Pat?
19          THE VIDEOGRAPHER:  Should I take us
20  off the record first?
21          MR. SNYDER:  No, let's stay on the
22  record because the videographer and the
23  court reporter are the two most important
24  people in this proceeding, and if they
25  want a lunch break, they are entitled to

Page 124

Hermalyn

1
2  one.  They have been working very hard.
3  So, Fran, I'm happy -- let's take a
4  45-minute lunch break and we will
5  reconvene at 1:45.
6          MR. BECK:  Fran, not to put you on
7  the spot, are you okay with 15 minutes or
8  a half an hour for lunch?
9          THE COURT REPORTER:  I can do a half
10  an hour.  Fifteen minutes is too short.
11          MR. BECK:  Half an hour is fine.
12  And does that work for our videographer as
13  well?
14          THE VIDEOGRAPHER:  Yes.
15          MR. BECK:  Orin, are we good for a
16  half an hour then?
17          MR. SNYDER:  Whatever -- again,
18  whatever the support team needs.
19          MR. BECK:  Okay.  All right.  Half
20  an hour.
21          THE VIDEOGRAPHER:  This is the end
22  of Media Unit 4.  We are going off the
23  record.  The time is 12:59 p.m.
24          (Lunch recess.)
25          THE VIDEOGRAPHER:  This is media

Page 125

Hermalyn

1
2  unit five.  We are back on the record.
3  The time is 1:33 p.m.
4 BY MR. SNYDER:
5     Q.   I want to continue on the January 16
6  date.  On that date do you recall visiting
7  Dropbox.com?
8     A.   No, I do not.
9     Q.   Do you recall attempting to transfer
10  files on January 16 using Dropbox?
11     A.   No, I don't recall using Dropbox.
12     Q.   During the course of your ordinary
13  business at DraftKings prior to January 16, did
14  you use Dropbox in your position at the
15  company?
16     A.   In my position at the company I had
17  two roles since being at DraftKings.  I ran
18  business development for the first two years in
19  my employment at DraftKings.  That is what I
20  was hired to do.  In the last year and a half I
21  ran the VIP team.  I don't or I didn't recall
22  using Dropbox ever until it was brought up in
23  one of the statements or interrogatories or a
24  document from DraftKings.
25     Q.   Isn't it a fact, sir, that the

32 (Pages 122 - 125)

Hermalyn

1
2 company that is DraftKings had a policy
3 prohibiting you from using Dropbox or a similar
4 file sharing platforms on the DraftKings
5 devices without express permission?
6         MR. BECK:  Objection and will you
7     show him a document?
8         MR. SNYDER:  No, sir.  Thank you.
9     Q.   You may answer.
10     A.   I was unaware of anything that
11 prohibited specifically Dropbox from being
12 used.
13     Q.   Thank you for answering the
14 question.  Just so you know, your counsel will
15 have an opportunity to ask you any questions at
16 the end of my questioning if there are
17 additional points you and they think need to be
18 made.  I'm just trying to get my questions
19 answered today.  So I do appreciate you have a
20 lot of information to offer.  I promise you
21 will have an opportunity to make all those
22 points.
23         All right.  Do you -- if you were
24 attempting -- withdrawn.
25         Let me ask you now about AirDrop.

Hermalyn

1
2 Do you know what AirDrop is?
3     A.   Yes, yes.
4     Q.   Did you use AirDrop on January 16,
5 2024 to transfer confidential DraftKings'
6 business documents from a DraftKings' laptop to
7 any other device?
8         MR. BECK:  Objection.
9     A.   Not that I recall, no.
10     Q.   Let me see if this refreshes your
11 recollection.  I'm going to show you the next
12 exhibit, Exhibit 7.  This is entitled "Outbound
13 AirDrop Activity" and this I represent to you
14 and counsel captures AirDrop activity on your
15 DraftKings issued Mac pro 16-inch.
16         (Whereupon document was marked
17     Exhibit 7 for identification as of this
18     date.)
19     Q.   I will show you this, sir, as you
20 see this log, I represent to you reflects every
21 instance on January 16 in which there was an
22 AirDrop or attempt to AirDrop data from your
23 DraftKings' issued MacBook to any other device.
24         For context, I will represent to you
25 that this activity occurred about 50 minutes

Hermalyn

1
2 before you used the same MacBook to send 19
3 documents to yourself via Slack.  So with that
4 context, I have a question for you.
5         Do you ever use your initials MZH
6 for any purpose?
7         MR. BECK:  Objection to the context.
8     You can answer the question.
9     A.   I'm sorry should I answer the --
10 which part?  You asked a couple of questions.
11     Q.   I have one question.  Do you ever
12 use MZH to refer to yourself?
13     A.   Those are my initials, so yes, I use
14 them.
15     Q.   Not everyone uses their initials,
16 sir.  So I'm asking you, do you, in your life,
17 use the initials MZH to refer to yourself?
18     A.   No, I don't use it like to refer to
19 myself, but I have MZH on my cuff currently so
20 I do use my initials.
21     Q.   It's on your cup?
22     A.   My cuff.
23     Q.   Oh.  So you like your initials so
24 much that you actually put on a special pair of
25 cufflinks; is that your testimony?

Hermalyn

1
2         MR. BECK:  Objection.
3     A.   Sorry?
4     Q.   I'll withdraw the question.  Why are
5 your initials on your cufflinks?
6         MR. BECK:  Objection.
7     A.   They are not on my cufflinks.  I was
8 trying to answer your question.  I never refer
9 to myself as MZH, but those are my initials and
10 I like my initials.
11     Q.   It's embroidered on your shirt your
12 initials?
13     A.   Every common practice in the Brooks
14 Brothers shirt is monogrammed on the bottom
15 here.
16     Q.   Why do you like your initials on
17 your shirt.  Two sentences.  It's not a trick
18 question.  I'm just trying to understand it.
19     A.   I just -- I don't know how to answer
20 that.  They are my initials.
21     Q.   Now, I'll represent to you, sir,
22 that this Exhibit 7 indicates that you
23 attempted a transfer of data or transfer data
24 from the MacBook to a device MZH X (3).  Do you
25 see that?

Hermalyn

2       MR. BECK: Objection.
3       A.   I actually don't see anything on the
4    screen.
5       Q.   My apologies.  It's coming back up.
6       A.   Yes, I see where you are talking
7    about, recipient name.  What is the other
8    column?  Recipient --
9       Q.   That's the recipient device and then
10   recipient ID.  I don't know the answer to that,
11   but I could get it for you.  Others on my team
12   do.  I do know what recipient device means.
13   That means the device to which the AirDrop was
14   either made or attempted.  Is that MZH X (3),
15   is that a device you own?
16       MR. BECK: Objection.
17       A.   I can't tell based on this if this
18   that is the name of my DraftKings issued
19   computer or the phone I use for DraftKings work
20   and personal.  That is --
21       Q.   I'll represent to you it's none of
22   the above.  I'll represent to you that it's a
23   different device, not your personal phone that
24   you use for work, not any of the DraftKings'
25   issued laptops.

Hermalyn

2       With that representation, my
3    question is what other device do you use that
4    has MZH X (3) attached to it?
5       A.   I'm --
6       MR. BECK: I'm just objecting
7    because the context of this document and
8    what it actually reflects raises a bunch
9    of questions.  So with subject to that,
10   I'm going to get your representations
11   you're going to need a lot more than that
12   to understand the document.  That being
13   said, Mr. Hermalyn can answer your
14   question understanding the concerns about
15   the document.  He's free to do that.
16       MR. SNYDER: Sir, again, I don't
17   want to burn more time, but those
18   objections are improper.  Please limit
19   your objections as permitted under the
20   federal rules and obviously you reserve
21   the right to challenge or dispute anything
22   I say or any document I show you.  Please
23   do not continue to lodge speaking
24   objections.  Thank you.
25       MR. BECK: I mean, you're asking

Hermalyn

2    him -- we can go off the record if you
3    like and you and I can have this
4    conversation separately.  I'm fine doing
5    that.  With the facial expressions that I
6    can see that it shows you are not
7    accurately describing it.
8       MR. SNYDER: Counsel with all due
9    respect, this is probably the tenth
10   admonition and if these speaking
11   objections continue, I am putting you on
12   notice I'm going to raise them with the
13   court.
14       MR. BECK: I understand that.  I'm
15   telling you I'm happy to discuss this off
16   the record out of the earshot of
17   Mr. Hermalyn and I'm telling you off the
18   way you're describing it is not accurate.
19   Do you want to go off the record?
20       MR. SNYDER: I do not.  Thank you.
21   BY MR. SNYDER:
22       Q.   Mr. Hermalyn, do you own another --
23   withdrawn.
24       On January 16, did you own another
25   device that was not the personal iPhone you use

Hermalyn

2    for work; yes or no?
3       MR. BECK: Objection.
4       A.   I can't think of another device that
5    I used for work and what I can tell you is I
6    never taken any documents.  I don't have any
7    documents and that's all I can say.
8       Q.   I'm not asking whether you used
9    another device for work.  I'm asking you
10   whether, on January 16, 2024, you owned for any
11   purpose any other device, iPhone, iPad, MacBook
12   or some other machine to which data can be
13   transferred that may or may not be called MZH X
14   (3)?
15       MR. BECK: Objection.
16       Q.   You may answer.
17       A.   The only thing that was brought to
18   my attention in the last -- I don't know what
19   they call it -- interrogatories, I think that
20   DraftKings provided was mention of an iPad
21   which I turned over to counsel, but I don't
22   believe that has any DraftKings applications on
23   it, so outside of that, no.  Anything that was
24   in my possession when I worked at DraftKings is
25   in.  I have handed over.

34 (Pages 130 - 133)

Page 134

Hermalyn

1
2      Q.    You understand that the iPhone you
3   were using in January 2024 for work was named
4   MZH X (2)?
5           MR. BECK: Objection.  Do you know
6      that?
7      A.    No, I don't.
8      Q.    And it's your sworn testimony here
9   today that you cannot tell the court anything
10  about what device MZH X (3) refers to?
11          MR. BECK: Objection.
12     A.    What I can tell the court is one, I
13  don't know what that refers to and two,
14  anything that at this deposition has been
15  turned over.
16     Q.    Using your DraftKings MacBook on
17  January 16, the same date, do you recall
18  running a series of web searches relating to
19  how to move big files electronically?
20     A.    I didn't recall it up until -- my
21  memory was refreshed after I saw it written in
22  a filing from DraftKings, yes, I recall that.
23     Q.    So you ran -- searched moved big
24  files, TransferNow.net.  Why were you searching
25  those terms on January 16 at and around the

Page 135

Hermalyn

1
2   same time you were slacking yourself documents,
3   deleting documents, air dropping documents; do
4   you have an answer for that?
5           MR. BECK: Objection.
6      A.    I remember this.  I have a file on
7   my -- you mentioned earlier a 16-inch computer
8   which I was moving.  I was changing computers
9   from 16-inch to 14-inch.  In the process of
10  doing that, I wanted to move -- not move, I
11  wanted to share a file, a public file of a
12  panel that myself, Rich ████ -- I think her
13  name was Jamie ████ was on at Dcon what was a
14  conference in Indianapolis or Minnesota, two
15  years prior.  It was an enormous file, 10, 20
16  plus gigabytes.
17          I wanted to share it with Rich
18  ████.  It was not confidential.  It was
19  public.  It was a very funny panel.  I wanted
20  to send it to Rich.  I don't know if he had it.
21  I recall looking up how to do that.
22     Q.    Had you ever, prior to that date,
23  prior to January 16, again the date that you
24  were slacking yourself 19 documents, the
25  leading documents, air dropping your documents

Page 136

Hermalyn

1
2   to personal devices had you ever before
3   searched how to move big files?
4           MR. BECK: Objection.
5      A.    I'll break that up into two pieces.
6      Q.    I'll withdraw the question because I
7   asked a narrow question.
8           Prior to January 16, had you ever
9   done a web search for how to move big files to
10  your knowledge, yes or no?
11     A.    If I was ever removing a big panel
12  like that, yes, but no, I can't pinpoint
13  another time I would do that.
14     Q.    Are you aware that this presentation
15  that you referred to as public was the only one
16  you did not delete on the 16th from your
17  16-inch computer?
18          MR. BECK: Objection.
19     A.    You say it was a 16-inch computer
20  makes me think that the reason why I slacked
21  those files is to move them to my new 14-inch
22  computer.
23     Q.    Sir, I move to strike.  I asked you
24  a very simple question.
25          Are you aware, sir, yes or no, that

Page 137

Hermalyn

1
2   the big presentation that you call public was
3   the only document that you did not delete from
4   your Mac Pro on the 16th?  Are you aware of
5   that?
6           MR. BECK: Objection.
7      Q.    Yes or no?  Either you are or you
8   are not?
9           MR. BECK: Objection.  Please do not
10          yell at the witness.  Please ask the
11          question.
12          MR. SNYDER: I'm not yelling.
13     A.    You have mentioned the 16-inch
14  laptop which makes me believe I was moving
15  files to my other DraftKings 14-inch laptop and
16  using that one on there because I couldn't
17  figure out how to transfer.  That does make
18  sense?
19     Q.    I'm going to move to strike.  Yes or
20  no, are you aware --
21          MR. BECK: Objection.
22     Q.    Are you aware, sitting here today,
23  that the only big file -- are you aware,
24  sitting here today, that presentation you call
25  public is the only file or document that you

Page 138

Hermalyn

1
2 did not delete from your Mac Pro on the 16th;
3 yes or no?
4     MR. BECK: Objection.
5     A.   Based on how I have already
6 answered, I don't recall deleting anything
7 specifically on that date, so I wouldn't recall
8 what was quote, unquote, left there.  On the
9 one note, it wasn't a presentation.  It was a
10 video of a panel that was done in a room of
11 around 200 people.
12     Q.   When did you turn your iPad over to
13 your counsel?
14     A.   When I was made aware of it in
15 the -- I think, correct me if I'm wrong, I
16 think it was interrogatories.  I don't know
17 what the document was called, but you called --
18 somebody called out an iPad.  So I handed it
19 over on.  I don't recall the date, but shortly
20 after it was brought to my attention.
21     Q.   All right.  Next question, just to
22 be clear, because I want your testimony on this
23 to be crystal clear, it's your sworn testimony
24 here today that none of these activities that
25 we have been discussing, the slacking, the air

Page 139

Hermalyn

1
2 dropping, the deletions, has anything to do
3 with your collection of DraftKings information
4 to use in the future at Fanatics?
5     MR. BECK: Objection.
6     A.   Absolutely not.  It has nothing to
7 do with my -- any kind of connection with
8 Fanatics.  I did not take information.  I do
9 not have information.
10    Q.   Before you accepted your job as the
11 head VIP at Fanatics, did you tell Mr. Rubin
12 that on January 16th, when you were fearing
13 that you might be fired, that you transferred
14 19 files over to your personal device?
15     MR. BECK: Objection.
16    Q.   Yes or no?
17    A.   It's not a yes or no question.
18    Q.   Yes, it is.  Yes or no, did you tell
19 him?
20    A.   It's not a yes or no --
21     MR. BECK: Objection.  You can't
22 argue with the witness.
23     MR. SNYDER: Counsel, again, I asked
24 a clear yes or no-answer -- question.  If
25 he's going to give me a speech every time,

Page 140

Hermalyn

1
2     I'm going to ask for more time.  I just
3     want to know yes or know, did you tell him
4     about this electronic activity before
5     joining the company?
6         MR. BECK: Objection.
7     A.   You narrowed the question.  Thank
8 you very much.  Did I tell Mr. Rubin about any
9 file transfer before leaving the company?
10 Absolutely not.
11    Q.   Did you tell him you were under
12 investigation by the company before joining --
13    A.   Yes, sorry.
14    Q.   Before joining the company?
15    A.   Yes, I did.
16    Q.   Can you tell the court why you
17 have -- why you had a Dropbox account
18 containing a folder entitled MISCDK?
19     MR. BECK: Objection.
20    A.   What I have come to learn in the
21 past couple of days since DraftKings alerted me
22 that I had a -- or Gibson or somebody alerted
23 me that I had a Dropbox account is that any
24 file that was in there was prior to me joining
25 and running the VIP team and it's at least a

Page 141

Hermalyn

1
2 year and a half old.  I believe it's from 2022.
3 Those files are a mix of, it looks like from
4 looking at it that I did that to receive files
5 from partner agencies of DraftKings.  There was
6 a transfer from ███████.  The note here is
7 I have not been in my Dropbox account.  All
8 custody and control is with counsel I think
9 it's not with me.
10    Q.   Have you deleted your Dropbox
11 account?
12    A.   No.
13    Q.   Have you deleted the MSCDK folder on
14 your personal Dropbox account?
15     MR. BECK: Objection.
16    A.   I have not been in Dropbox since I
17 resigned and I have no idea when I logged in
18 prior to that.
19    Q.   Staying on the 16th, it was a busy
20 day, did you reach out to DraftKings' IT,
21 George Hernandez, and ask him for assistance in
22 moving large files?
23     MR. BECK: Objection.
24    Q.   Yes or no?
25    A.   You've refreshed my memory which I

36 (Pages 138 - 141)

Hermalyn

1
2 appreciate. I reached out to George Hernandez
3 because to your point earlier about the 16-inch
4 laptop I was moving files from a 16-inch laptop
5 to my new 14-inch laptop.
6    Q.   Let's show you an exhibit which is
7 Exhibit 8. It's a slack message between you
8 and Mr. Hernandez on the 16th and in it you
9 say, "Hey George moved the files off my Mac
10 (old one) -either slacked to myself or
11 transferred the personal docs I had on the
12 drive." Do you see that?
13       MR. BECK: We don't have that
14    exhibit.
15    Q.   Can you please highlight it.
16       MR. BECK: We don't have the
17    exhibit. Okay, we've got it now.
18    Q.   It's Exhibit 8 and I just want you
19 to see that you state moved the files off my
20 Mac old one -- either slacked to myself or
21 transferred the personal docs I had on the
22 drive. Do you see that?
23       (Whereupon document was marked
24    Exhibit 8 for identification as of this
25    date.)

Hermalyn

1
2    A.   Yes, I do.
3    Q.   And that was not a truthful
4 statement that you made to Mr. Hernandez on the
5 16th, was it?
6       MR. BECK: Objection.
7    A.   I actually am very happy to see
8 this. This explains everything you asked in
9 the last couple of minutes. This answers
10 everything.
11    Q.   I'm going to move to strike. I
12 asked a question and you didn't answer it, sir.
13       MR. BECK: Objection.
14    A.   That was my answer. My answer is
15 everything you've asked is answered right here.
16 I was moving files.
17    Q.   Move to strike. That was not my
18 question.
19       MR. BECK: Let me just let the
20    witness read the document that you put up
21    on the screen. Let him just read it.
22       MR. SNYDER: Sir, sir, I just asked
23    the witness a question. You're not
24    allowed to interrupt it and direct him.
25       MR. BECK: I didn't. When you

Hermalyn

1
2 stopped the question. I just want him to
3 read the document you put in front of him
4 which I assume you want him to do.
5       MR. SNYDER: Could you please read
6    the question back?
7       (Whereupon the record was read back
8    by the reporter.)
9       MR. BECK: Objection.
10    A.   "Hey George moved the file off my
11 Mac (old one" -- (witness reading document).
12 This is what happened. This is a follow-up
13 from questions you asked earlier. This makes
14 sense of everything you asked.
15    Q.   Can you answer my question, sir?
16    A.   If I was truthful to George that I
17 moved my files off --
18    Q.   That wasn't my question.
19    A.   I'm sorry.
20       MR. BECK: What is your question,
21    please?
22       MR. SNYDER: Can you please read the
23    question back for the third time.
24       (Whereupon the record was read back
25    by the reporter.)

Hermalyn

1
2       MR. BECK: Objection.
3    A.   If you're referring to what I'm
4 looking at right now, yes, it was truthful.
5    Q.   Thank you. You're telling
6 Mr. Hernandez that you're trying to slack or
7 transfer personal documents, correct?
8       MR. BECK: Objection.
9    A.   I'm reading what you're seeing. I'm
10 not sure --
11    Q.   Is the answer yes?
12    A.   Yes, you asked me to basically read
13 what was written there. The answer is yes I
14 can read it.
15    Q.   I didn't ask you if you can read it.
16 I'm asking is it correct that what you are
17 saying to him is that in the past you slacked
18 yourself or transferred personal documents that
19 you had on the drive, yes or no?
20       MR. BECK: Objection.
21    A.   It doesn't say anything on here
22 about in the past. So no, it doesn't talk
23 about in the past.
24    Q.   Didn't you use the past tense
25 slacked?

37 (Pages 142 - 145)

Page 146

Hermalyn

1
2    MR. BECK: Objection.
3    A.   Either slacked to myself or
4 transferred -- upon seeing this, my memory is I
5 spoke to George about moving, transitioning an
6 older laptop, the 16-inch you referred to
7 earlier to my new computer and he probably
8 offered some sort of solution and that's where
9 I communicated here either moved or slacked to
10 myself and the only one big left was the panel,
11 the 23 gigs.
12    Q.   I'm going to move to strike that
13 answer.
14        Sir, I'm going to continue to ask
15 you to answer my question and we will
16 presenting most of this to the court when I ask
17 for more time. I'm asking you a simple
18 question. Please, I implore you to try to
19 listen.
20        Am I reading this slack correctly to
21 be saying to the DraftKings IT department that
22 you, Mr. Hermalyn, prior to sending this text
23 had, prior to sending the text either slacked
24 to yourself or transferred personal documents
25 from the drive that you are describing there?

Page 147

Hermalyn

1
2 Am I reading that correctly?
3    MR. BECK: Objection.
4    Q.   You may answer.
5    A.   That's how I read that, yes.
6    Q.   Thank you. Now, you did not tell
7 Mr. Hernandez that, in fact, you had slacked to
8 yourself and transferred to yourself numerous
9 confidential DraftKings business documents; is
10 that correct, that you did not tell him that?
11        MR. BECK: Objection.
12    A.   I don't remember what I told him on
13 the phone, but what I do remember is slack is a
14 DraftKings issued application and it lives in
15 slack. So I don't have anything now. I didn't
16 take anything and there was nothing deceptive
17 or dishonest about this at all.
18    Q.   Is the reason why you concealed from
19 Mr. Hernandez when describing your movement of
20 files the fact that you actually moved some of
21 the most sensitive confidential business
22 documents that exist at DraftKings?
23        MR. BECK: Objection.
24    Q.   You may answer.
25        MR. BECK: I'm going to object and

Page 148

Hermalyn

1
2 remind you that please when you ask a
3 question please do not mischaracterize the
4 earlier testimony or make statements that
5 you know are not true.
6        MR. SNYDER: Counsel, both of those
7 objections are inappropriate. Speaking
8 objections are also discourteous to
9 counsel and I'm going to request
10 respectfully once again that you limit
11 your objections to appropriate objections
12 under the civil, federal rules and
13 otherwise. Thank you.
14        Can you read back the last question.
15        (Whereupon the record was read back
16 by the reporter.)
17        MR. BECK: Objection.
18 Mischaracterizes prior testimony and
19 assumes facts not in evidence.
20        MR. SNYDER: The first one is not a
21 proper objection. It's a classic speaking
22 objection which directs the witness as
23 case law recognizes to answer as you just
24 instructed him.
25        MR. BECK: I disagree.

Page 149

Hermalyn

1
2    Q.   Sir, can you answer my question?
3    A.   I don't remember the exact
4 conversation I had with George. He's a more
5 junior level IT guy, great guy, but what I can
6 tell you is that anything that was moved in
7 slack that was a DraftKings file, if you're
8 saying it's confidential, then that means it's
9 not public and confidential, but that is still
10 in the slack, clearly based on this and what
11 you said earlier it's moving from a 16-inch
12 computer to a 14-inch that are both DraftKings
13 devices on DraftKings applications which is
14 slack.
15    Q.   I want to show you a paragraph three
16 of your February 7 declaration. That's Exhibit
17 1 I believe. -- Exhibit 9, a new exhibit.
18        (Whereupon document was marked
19        Exhibit 9 for identification as of this
20        date.)
21    Q.   Let's put up paragraph three,
22 please. In paragraph three you write "When I
23 decided to leave, I knew from past experience
24 with DraftKings that they would likely come
25 after me aggressively and malign me as they

38 (Pages 146 - 149)

Page 150

1              Hermalyn
2   have done with others."
3           MR. BECK:  We still don't have the
4   document and it's too small on the screen.
5   Can you please just provide the document.
6   Let's clarify this is Exhibit 9 you are
7   putting up?
8           MR. SNYDER:  Exhibit 9, yes.
9           MR. BECK:  We will wait for it to be
10   dropped into Exhibit Share.
11          MR. SNYDER:  It's in.
12          MR. BECK:  Just received it.  Thank
13   you.
14      Q.   When you said knew from past
15   experience with DraftKings that they would
16   likely come after me aggressively, let's deal
17   with that part of the sentence.  What past
18   experience are you referring to?
19      A.   I have seen a couple of examples of
20   senior leaders leave and it not going well.
21      Q.   In the past you've received legal
22   hold notices, correct, from legal at
23   DraftKings?
24      A.   Sorry, what do you mean by -- what
25   do you mean?

Page 151

1              Hermalyn
2      Q.   Remember when Fanatics hired Rob
3   Ferrara the company sent you a notice to
4   preserve and not delete all documents because
5   there was a potential litigation between
6   DraftKings and Rob Ferrara over his noncompete?
7      A.   I don't specifically remember that,
8   but I trust you.
9      Q.   Well, forget about trusting me.  You
10   generally recall that, and discussed with
11   senior executives, the possibility of suing
12   Mr. Ferrara after he left for violating his
13   noncompete, correct?
14          MR. BECK:  Objection.
15      A.   The possibility of suing him?
16      Q.   Yes.
17   ███████████████████████████████████████
18   ███████████████████████████████████████
19   ███████████████████████████████████████
20      Q.   I'm not asking about conversations
21   with counsel. I'm asking you, you knew that if
22   you left DraftKings and went to Fanatics, its
23   competitor, in January of 2024, that given your
24   past experience, DraftKings could sue you,
25   correct?

Page 152

1              Hermalyn
2      A.   I'm not a lawyer, but I thought that
3   could be an outcome, yes.
4      Q.   And that's one of the reasons you
5   moved to California and went to the court and
6   asked the court to invalidate your noncompete,
7   correct, so that you would not be subject to a
8   noncompete?
9           MR. BECK:  Objection.
10      A.   No, I moved to California because
11   the job was in California.  The role is in the
12   LA office and president of VIP --
13      Q.   Without -- I'm sorry?
14      A.   And California is a big opportunity
15   for us.  It's a growing office.
16      Q.   Without disclosing any conversations
17   you had with any lawyer on the Fanatics side,
18   when was the first time you had a conversation
19   with any lawyer at Fanatics or representing
20   Fanatics in January of 2024?  Just the date.
21      A.   Saturday, January 27 or 28, whatever
22   that Saturday was.
23      Q.   Twenty-seven, okay.  With whom did
24   you meet? I do not want to know what was
25   discussed.

Page 153

1              Hermalyn
2      A.   I had a first call with anybody at
3   Fanatics' counsel Greg Winarski.
4      Q.   Okay, Greg Winarski.  Now, did you
5   provide him with any documents?
6           MR. BECK:  Until we have more
7   fleshed out about whether that is a
8   privileged communication.
9      Q.   I'm asking about a physical act.
10          MR. BECK:  Did he just provide
11   documents?  He can answer that.
12          MR. SNYDER:  That's exactly what I
13   asked.  It's not if I asked.
14          MR. BECK:  Okay.
15      A.   I provided the documents that went
16   with my last equity grant that I signed.
17      Q.   At DraftKings, correct?
18      A.   Yes, with relation to my employment
19   at DraftKings, yes.
20      Q.   And that contained a noncompete and
21   a nonsolicit, correct?
22      A.   I'm not a lawyer but it contained a
23   bunch of things.  Those two were mentioned in
24   that, yes.
25      Q.   You knew full well that there was a

39 (Pages 150 - 153)

Page 154

Hermalyn

1 one year noncompete on January 27, right, that
2 wasn't something that was a maybe, you knew as
3 well as you knew anything, you were subject to
4 a one year noncompete, correct?
5     MR. BECK: Objection.
6     A.   I knew I was subject to a one year
7 noncompete.  I didn't know the intricacies of
8 the law and what that meant legally, but yes, I
9 totally understood that.
10    Q.   And you knew that DraftKings from
11 the Ferrara experience was concerned about
12 Fanatics raiding its VIP group, correct?
13    MR. BECK: Objection.
14    A.   I wouldn't characterize it like
15 that.
16    Q.   You knew from your experience with
17 Ferrara and your retention for the 62 employees
18 that DraftKings considered Fanatics recruitment
19 efforts to be a competitive risk to DraftKings,
20 correct?
21    MR. BECK: Objection.
22    A.   Just like they do for dozens of
23 other companies, yes.
24    Q.   Now, on January 19, am I correct --
25

Page 155

Hermalyn

1 I'm sorry.  Now, let me go back to the 16th,
2 five days after you spoke with Mr. Rubin for
3 the first time to orient you, the day you
4 texted your brother again that you were
5 concerned that you may be fired, the day you
6 sent 19 DraftKings confidential business
7 documents to yourself, the day you went to
8 Dropbox.com, the day you searched for moving
9 files, the day you went to TransferDrop.net,
10 that's the day we are talking about.
11    The question is, with that date in
12 mind, did you delete nearly 400 documents from
13 the desktop documents folder and downloads
14 folder of your DraftKings MacBook; yes or no?
15    MR. BECK: Objection to the entirety
16 of that.
17    A.   Do I answer that?
18    MR. BECK: Yes.
19    A.   I don't know where to begin with
20 that.  There was a bunch of stuff in the
21 beginning I told you already wasn't true.  By
22 me answering the question does not assume that
23 the first part is true.
24    Q.   Not at all.  But I'll be happy to
25

Page 156

Hermalyn

1 withdraw the question if you're more
2 comfortable and ask a different question, and
3 ask you a different question.
4     Did you delete nearly 400 documents
5 from your desktop documents folder and download
6 file on your MacBook; yes or no?
7     MR. BECK: Objection.
8     A.   I don't remember, but I would say
9 you refreshed my memory as to what happened
10 that day and it sounds like I moved files from
11 a draft King issued laptop to a new DraftKings
12 issued laptop.  But do I recall deleting
13 messages on that?  No.
14    Q.   You said it sounds like, but you
15 have no memory if that's what you actually were
16 doing on that date, correct?
17    A.   After seeing the George Hernandez
18 file that you showed me, I have memory of that
19 now.  So --
20    Q.   So it's your sworn testimony that
21 what you were doing on the 16th, all have to do
22 with moving from one computer to another; is
23 that your story?
24    MR. BECK: Objection.
25

Page 157

Hermalyn

1     A.   Common practice moving from one
2 laptop to another and moving files from one
3 laptop to another and based on what I saw from
4 Mr. Hernandez that confirms that assumption
5 that yes, that's what happened.
6     Q.   Do you know when you were issued
7 your 14-inch computer?
8     A.   I do not.
9     Q.   Would it refresh your memory if I
10 told you it was November of '23?
11    MR. BECK: Objection.
12    A.   No, I, certainly -- I don't know
13 when it was delivered.
14    Q.   Have you heard of the practice, sir,
15 where someone deletes their search history
16 because they don't want people to know what
17 they were searching?  Have you heard of that
18 practice?
19    MR. BECK: Objection.
20    Q.   Yes or no?
21    A.   Search history like on Safari?
22    Q.   No, like -- yes, Safari or Google,
23 either they are embarrassed or they don't want
24 people to know.  I'll give you one, you're
25

40 (Pages 154 - 157)

Hermalyn

1  searching for your old girlfriend.  You're just
2  curious where she is.  You put her name in and
3  your wife says who are you looking at and you
4  say no one because you're not doing anything
5  wrong.  You're just curious where she is.  Your
6  wife goes to the next room, you go to your
7  search history and you delete it, Sharon Smith,
8  you just delete it because you don't want it
9  there.
10  
11      Have you ever heard of that kind of
12  practice in any context where people delete
13  their search history to conceal for whatever
14  reason the search?
15      MR. BECK:  Objection.  You can
16      answer.
17      A.   There are two pieces.  One I'm
18  happily married and two, I understand there is
19  a way to browse privately in general terms.
20      Q.   No, I'm asking whether you ever
21  heard of anyone going into their browsing
22  history and hitting delete to delete the
23  browsing history?
24      A.   With connection working at
25  DraftKings, no, I have not.

Hermalyn

1  
2      Q.   Have you ever heard of that done in
3  any context anywhere by anyone ever?
4      MR. BECK:  Objection.
5      A.   If you open up your iPhone, I
6  believe there is a toggle that you can click on
7  private browsing, so yes, I have seen that
8  option.
9      Q.   That wasn't what I'm asking.  I'm
10  not asking about private browsing.  I'm asking
11  about deleting browsing history.  Do you know
12  that there is a function for that, correct?
13      MR. BECK:  Objection.
14      A.   Broadly I know that that exists.
15      Q.   On the same date January 16th, isn't
16  it a fact that you, sir, affirmatively went
17  into your browsing history, your internet
18  search history from Google Chrome on your
19  DraftKings issued MacBook and deleted I
20  messages, yes or no?
21      MR. BECK:  Objection.
22      A.   I don't remember the specific date,
23  but I do remember transferring computers and if
24  I was transferring computers from the 16-inch
25  laptop to a 14-inch laptop, yes, that is

Hermalyn

1  
2  absolutely something I would do because that is
3  personal and not related to DraftKings at all.
4      Q.   You deleted hundreds of files from
5  your 14-inch MacBook on January 29, didn't you?
6      MR. BECK:  Objection.
7      A.   New date so I can't speak to the
8  date, but if it's an I message account that
9  sounds like something personal which would be
10  okay to delete and okay not to be on that
11  computer altogether.
12      Q.   On January 29, 2024 isn't it a fact
13  that you deleted hundreds of DraftKings'
14  business document files from your 14-inch
15  MacBook; yes or no?
16      A.   DraftKings' files?
17      Q.   Yes.
18      A.   I don't remember that and don't
19  think that is true.
20      Q.   Let me see if this refreshes your
21  memory.  This was two days after you first
22  spoke to Greg Winarski.  Does that refresh your
23  memory?
24      MR. BECK:  I didn't hear the
25      question.

Hermalyn

1  
2      Q.   That was two days after you met up
3  with Greg, the lawyer at Fanatics -- just to
4  orient you in time, this is now Monday, the
5  29th of January -- you already met with a
6  lawyer and sent in your noncompete.  Does that
7  refresh your memory that two days before you
8  gave your laptops to your lawyers and two days
9  after you spoke to Greg and sent him your
10  noncompete, you deleted hundreds of files from
11  your 14-inch MacBook and those files included
12  confidential DraftKings' documents?
13      MR. BECK:  Objection.
14      Q.   Do you know what I'm talking about?
15      A.   I'm sorry, am I okay to answer?
16      Q.   Yes.
17      A.   That date I was moving or already
18  have moved to LA and I don't recall
19  specifically deleting something on that day,
20  but if I did, it was personal, not DraftKings
21  related and most importantly that was a
22  DraftKings issued device that was handed over
23  and I don't have any information.  I didn't
24  take any information.
25      Q.   Why, before turning over your --

41 (Pages 158 - 161)

Hermalyn

1
2 when did you learn that you would be turning
3 over your laptop to the lawyers?  You spoke to
4 Greg on Saturday?
5      A.   Yes.
6      Q.   You deleted hundreds of files on
7 Monday.  You turned over it you say, to your
8 lawyers, your devices on the 31st.  When in
9 that sequence of time did you know you would be
10 turning over your devices to your lawyers?
11          MR. BECK:  Objection.
12     Q.   You can answer.
13          MR. BECK:  Well, the only thing he
14     may not answer though is anything that
15     relates to advice of counsel, but other
16     than that, you can answer to the extent
17     you can.
18     A.   I knew I would be returning my --
19 anything DraftKings related, work related
20 before I resigned and the question at that
21 point, you mentioned that Monday, that Monday
22 is the day I moved to Los Angeles and my
23 contract was still being negotiated.  So it was
24 unclear on the exact date I would be handing
25 over, but it was --

Hermalyn

1
2      Q.   Do you have an explanation for the
3 court why on January 16th you deleted portions
4 of your internet search history from Google
5 Chrome?
6          MR. BECK:  Objection.
7      A.   The explanation for that date is
8 correct, I can't speak to the exact date, but
9 what you showed me based on George Hernandez
10 conversation, makes it crystal clear to me what
11 I was doing where I was transferring files from
12 an old DraftKings' issued computer to a new
13 DraftKings issued computer.  Again nothing
14 personal.
15     Q.   On January 19 you spoke with Shawn
16 Henley concerning the investigation, correct?
17     A.   What day of the week was that?
18     Q.   Friday.
19     A.   Yes, I believe that was the first
20 time we actually spoke about it.
21     Q.   And he told you during this
22 conversation in substance that many of the
23 complaints against you had been substantiated;
24 yes or no?
25     A.   No, I don't think that's accurate.

Hermalyn

1
2      Q.   Did he tell you any of them had been
3 substantiated?
4      A.   It was the first time -- it was the
5 first time we were -- Shawn and I -- it's the
6 first time we were able to speak about it
7 because we were not allowed to speak of it
8 before.  So what I recall of that conversation
9 was the beginning was more about deep breath
10 for both of us like I'm glad we are through
11 this.
12          The day before I spoke to Shawn, I
13 spoke to Matt ██████ who talked through
14 everything and felt really good how we were
15 landing and it was going to be fine, but no
16 there wasn't a conversation about things being
17 substantiated.  There were specific one-off
18 questions that he had.
19     Q.   And how it ultimately landed was not
20 fine.  Am I correct because you received a
21 series of punishments as a result of the
22 investigation?
23          MR. BECK:  Objection.
24     A.   You're talking about two different
25 dates.  I think you're mischaracterizing what

Hermalyn

1
2 happened.  The conversation that you asked me,
3 I just want to be specific to your question.
4      Q.   Let me interrupt you, sir.  Sir, I
5 did not ask you about the 19th.  I asked a
6 broad question because I know that meeting
7 happened on the 22nd.  I'm trying to cut
8 through it.  What I'm saying is in the end how
9 it landed was not fine because you received on
10 the 22nd punishment from the company as the
11 result of the investigation; yes or no?
12     A.   No.
13          MR. BECK:  Objection.
14     Q.   Were you -- a great answer is no?
15     A.   I said, Mr. Snyder represented a
16 date that was incorrect.
17     Q.   Did you receive punishment as a
18 result of the investigation?
19          MR. BECK:  Objection.
20     A.   I received a loose outline., sir.
21     Q.   Sir, I asked if you received
22 punishment.  If the answer is no, tell me no.
23          MR. BECK:  Can you please stop
24     shouting at the witness.
25          MR. SNYDER:  I'm not shouting.  I'm

Page 166

Hermalyn

1
2  really not shouting.  I'm not shouting.
3        MR. BECK:  The video will show and
4  you're arguing with him.  He's trying to
5  answer your question.  You heard what he
6  had to say in response to the premise of
7  your question and now you're telling me
8  that he can't answer it in a way that will
9  actually provide you with a substantive
10  answer that you are looking for.
11        MR. SNYDER:  I'm going to ask again.
12  I'm going to ask a yes or no question.  If
13  he wasn't punished the answer was no and
14  then I will ask my next question, but a
15  speech after every yes or no question is
16  not appropriate.
17     Q.   Having said that, in the end you can
18  answer it however you wish, so I'll ask the
19  question again so we have a clean record.
20        As a result of the investigation,
21  did the company punish you, yes or no?
22        MR. BECK:  Objection.
23     A.   I wouldn't use the word punishment.
24  There was an outline of what the result of that
25  investigation was going to be which was

Page 167

Hermalyn

1
2  delivered the 26th.  I believe that was the
3  Friday in an hour long call, an hour plus long
4  call with Jess ███ and Shawn Henley.
5     Q.   You were told among other things you
6  were not going to get the promotion you were
7  going to get?
8     A.   I didn't tell anyone I was going to
9  get it.  I was told the promotion was not going
10  to happen this cycle.
11     Q.   You were also told that the scope of
12  your responsibilities would be reduced and
13  certain functions would be removed from your
14  specific -- I'll call it business jurisdiction,
15  correct?
16     A.   Kind of.  The events team was moving
17  over so yes, a portion of my team was being
18  redistributed to another team.
19     Q.   Your bonus was being cut, correct?
20     A.   Unclear on what that netted out to
21  be, but yes that was a discussion.
22     Q.   And you weren't permitted to have an
23  executive assistant going forward.  You were
24  told you had to do that work yourself, correct?
25     A.   Yes, that was part of the discussion

Page 168

Hermalyn

1
2  too.
3     Q.   And you were also put on a
4  Performance Improvement Plan or PIP, correct?
5     A.   That was not clear.
6     Q.   And you had to receive harassment
7  training, correct?
8     A.   That also was not made clear.
9     Q.   And you were not happy about this
10  outline of consequences, correct?
11     A.   That is not true.
12     Q.   You were happy?
13     A.   I wasn't happy.
14        MR. BECK:  Objection.
15     A.   Sorry.
16        MR. BECK:  Let me object when it's
17  appropriate to object.
18     Q.   Were you happy with this outcome?
19        MR. BECK:  Objection.
20     A.   Happy, no.
21        MR. BECK:  Objection.
22     A.   Relieved that it was closed, yes.
23     Q.   And being demoted, not getting a
24  promotion, having your job responsibilities
25  shrunk, bonus shrink, having being put on a PIP

Page 169

Hermalyn

1
2  potentially you didn't have a negative reaction
3  to any of those consequences?
4        MR. BECK:  Objection.
5     A.   I was not demoted and I answered
6  your question of I wasn't happy.  I wasn't not
7  happy.  I was relieved that it was over.
8     Q.   I understand you're relieved.  This
9  is a different emotion.  Did you have negative
10  reaction to some of these items on what you
11  call an outline?
12     A.   The question that I asked at the end
13  of the -- at the end of the outline was
14  typically in conversations like this.
15  Employees are provided with a door number two
16  to exit the company, common language for Jess
17  ███ and Shawn to know and some of our
18  employment counsel who was on the call.  I
19  specifically asked after that -- I have to ask
20  is there another option for me taking an exit
21  here and it was made abundantly clear, no
22  absolutely not.  We want you here.  You're a
23  high performer and we are good.
24        So I left the call relieved and
25  happy that it was over and closed and I ended

43 (Pages 166 - 169)

Hermalyn

2 that call definitively asking if it was closed
3 and they definitively answered yes, this is
4 closed.
5    Q.   Thank you.
6    A.   So I ended the call and I was very
7 happy.
8    Q.   Thank you.  Now, on the January 23rd
9 you met with Mr. Rubin; is that correct?
10    A.   Yes, I did.
11    Q.   Where did you meet him?
12    A.   His apartment in New York City.
13    Q.   What did you discuss?
14    A.   It was really getting to know each
15 other and we talked about family and life and
16 friends and interests.
17    Q.   Did you discuss potentially working
18 at Fanatics?
19    A.   The first time I was, yes, we did.
20    Q.   What did he say to you and what did
21 you say to him?
22    A.   The first time I was made aware of
23 the actual job was the day before where Michael
24 called me and told me that he was including the
25 Chief People Officer to join our meeting on the

Hermalyn

2 23rd and so in the meeting on the 23rd we -- he
3 talked about VIP in general, like what does
4 that mean for me.  And we talked about that.
5 And something that has been -- I'm sorry, I'll
6 answer your question.  Yes, we talked about
7 that.
8    Q.   Thank you.  Did he outline any
9 compensation parameters, yes or no?
10    A.   No.
11    Q.   Did he tell you that you would be
12 president of the group?
13       MR. BECK:  Objection.
14    A.   The title was head of the LA office
15 and president of VIP, yes.
16    Q.   Did you talk about timing?
17    A.   Yes, that was a little bit more me
18 than him, but yes we both talked about timing.
19    Q.   Knowing you were subject to a one
20 year noncompete and knowing as you testified
21 earlier that DraftKings takes the noncompete
22 seriously, did you discuss the noncompete
23 problem with Michael as you were discussing
24 joining his company?
25       MR. BECK:  Objection.

Hermalyn

2    A.   To your point earlier about Fanatics
3 being aware of the noncompete as he was aware
4 of it, but that wasn't a focus or that wasn't a
5 big topic of the conversation if anything.
6    Q.   My question was not whether it was a
7 big topic or a focus.  My question was very
8 specific, sir.
9       My question was, did you and
10 Mr. Rubin discuss the noncompete problem; yes
11 or no?
12       MR. BECK:  Objection.
13    A.   I wouldn't characterize it as a
14 problem, but we talked about how I had a
15 noncompete with regards to gaming.
16       MR. BECK:  We would like to take a
17    break after this question.
18    Q.   When this line is done which will be
19 momentarily.  What, if anything -- withdrawn.
20       Tell us exactly what was discussed
21 about the noncompete on the 23rd in Mr. Rubin's
22 apartment?
23    A.   We talked about.  It was brief.  I
24 don't know the answer, but it was noncompete
25 with regards to of the gaming operation, the

Hermalyn

2 focus of the conversation was more about number
3 one what it means from the LA office and what
4 the focus is for California.
5       Two, it was about VIP in general
6 which is -- VIP does not root itself in gaming,
7 but the job is across all three verticals of
8 theirs, e-commerce, collectibles and gaming.
9 And the conversation was about how the
10 noncompete is rooted in gaming, but everything
11 else would be okay.
12    Q.   What do you mean by everything else
13 would be okay?
14    A.   Well, similar to how Rob Ferrara
15 works at Fanatics in the loyalty program not
16 touching gaming, he can still work.  It's --
17 you're free to go take another job.
18    Q.   So did Mr. Rubin say he wasn't
19 concerned about the one year noncompete because
20 you would be doing things other than VIP?
21    A.   I have two pieces in that.  VIP did
22 not equate just the gaming and two, he didn't
23 talk about not being concerned or being
24 concerned.  It just wasn't part of the
25 conversation.

44 (Pages 170 - 173)

Page 174

Hermalyn

2    Q.   Did you discuss knowing that you had
3  a one year noncompete and if it was enforced
4  you could not start a job there until 2025?
5  Did you and Mr. Rubin discuss any strategy for
6  dealing with that issue?
7        MR. BECK:  Objection.
8    A.   No, we did not.
9    Q.   Did he tell you to speak to the
10  lawyers and deal with the lawyers on that
11  issue?
12    A.   No.  Again, this was the first time
13  we met, like the first time we actually got
14  face time and not a huge party.
15    Q.   How did you get in touch with Greg
16  four days later?
17    A.   Four days later, that is Saturday.
18    Q.   Yes.
19    A.   Saturday, met with Michael, it was
20  the first time we talked about any kind of
21  economic structure and following that call, we
22  got on a call.  Following that meeting, we got
23  on a call with Greg.
24    Q.   Who put you on a call with Greg?
25    A.   Michael and I called him together.

Page 175

Hermalyn

2    Q.   Were you employed by Fanatics at the
3  time?
4    A.   No, I was employed at DraftKings.
5    Q.   So tell me what Greg said on that
6  call and what Michael said on that call,
7  please.
8        MR. BECK:  Hold on.  I instruct you
9    not to answer until we figure out whether
10    that is a privileged conversation or not.
11    If it is, you can't answer.  If it is not,
12    we will let him answer.
13        MR. SNYDER:  Okay, counsel, I'm
14    going to take a break now while you
15    contemplate the question of whether -- if
16    an in-house lawyer and a competitor talks
17    to my employee about how to potentially
18    breach my client's agreement, that is
19    protected by any applicable or even
20    contemplatable privilege.  So we will
21    resume at 2:45.  Thank you.
22        THE VIDEOGRAPHER:  This is the end
23    of media unit five we are going off the
24    record.  The time is 2:36 p.m.
25        (Brief recess taken.)

Page 176

Hermalyn

2        THE VIDEOGRAPHER:  This is media
3    unit six.  We are back on the record.  The
4    time is 2:51 p.m.
5  BY MR. SNYDER:
6    Q.   Sir, I want to direct your attention
7  to January 28 now, 2024, which is, if I recall
8  from our discussions, a Sunday.  Where were you
9  on that day staying, at Mr. Rubin's house?
10    A.   That day I flew from New Jersey to
11  Los Angeles and I stayed at Mr. Rubin's LA
12  house, yes.
13    Q.   Do you recall deleting more than a
14  hundred documents from your desktop documents
15  folder and downloads folder on your 14-inch;
16  yes or no?
17        MR. BECK:  Objection.
18    A.   On that Sunday?
19    Q.   Yes.
20    A.   No, I don't recall deleting.
21    Q.   You already told us you don't recall
22  deleting all of your internet search history on
23  the 23rd MacBook either, correct?
24        MR. BECK:  Objection.
25    A.   No, I do not recall that.

Page 177

Hermalyn

2    Q.   I want to go back to your
3  conversation with Greg Winarski and Michael
4  Rubin on the 27th.  Please tell us what
5  Mr. Winarski said and what Mr. Rubin said and
6  what you said during that call.
7    A.   Sure.  I met with Michael.  We met
8  for a while.  It was the first time he
9  presented the economic framework verbally.
10  Nothing in writing.  Towards the end of Michael
11  and me sitting together, we talked about what
12  next steps would be to make this happen and one
13  of the questions or -- not questions, one of
14  the things I wanted to do is to start contract
15  negotiation on my deal with Fanatics.
16        So we called Greg Winarski who is
17  their chief legal officer.  Michael, who is on
18  speaker, it was Michael and I in person, Greg
19  on speaker, and introduced ourselves.  It was
20  the first time I met Greg or even heard his
21  name.  Michael said -- Michael introduced me as
22  somebody that was looking to -- if the terms
23  made sense and worked out, take the role of
24  kind of the LA office and president of VIP that
25  was based in California, in Los Angeles and

45 (Pages 174 - 177)

Page 178

Hermalyn

1
2 Greg then agreed with -- I then mentioned to
3 Greg -- he asked me if I have any questions and
4 I said I would like to hire counsel. I didn't
5 mention counsel at that point. I went home and
6 talked to my wife, but that was -- the
7 conversation was fairly brief.
8    Q.   Did you discuss the noncompete at
9 all with Greg Winarski, issue, issue?
10    A.   I wouldn't refer to it as an issue.
11 He was aware that I was under a noncompete. I
12 asked him if he was aware that DraftKings had a
13 noncompete. I'm not a lawyer, so I don't know
14 the details of it, but I do know I signed
15 something that said I had a twelve month
16 noncompete. That was the extent of that.
17    Q.   What did he say about that?
18    A.   He didn't really get into it. It
19 wasn't the time to do it.
20    Q.   I didn't ask whether he got into it
21 or whether there was time to get into it. I
22 asked what, if anything, did he say about your
23 noncompete in words or substance on that call?
24       MR. BECK: Objection.
25    A.   He said he understands I have a

Page 179

Hermalyn

1
2 noncompete. He asked me if I have any specific
3 concerns and I said what I just said to you. I
4 said I'm not a lawyer, but I would ask counsel.
5 I would like to look to get my own counsel or I
6 would look through it, but it was extremely
7 brief.
8    Q.   It's your sworn testimony that
9 during this conversation Mr. Winarski did not
10 say anything about Fanatics' strategy going
11 forward for dealing with a noncompete?
12    A.   I wouldn't characterize it like
13 that. I would say we didn't -- it wasn't
14 talked about as strategy. It was talking about
15 next steps and what would happen from there.
16    Q.   What were the next steps that you
17 talked about with Mr. Winarski and Mr. Rubin
18 about the noncompete?
19    A.   It wasn't about the noncompete. It
20 was about next steps, frankly employment at
21 Fanatics.
22    Q.   What is the next conversation you
23 had with anyone at Fanatics about the
24 noncompete or -- withdraw the question. I'm
25 not done with in conversation.

Page 180

Hermalyn

1
2    A.   I'm sorry or not sorry, but go for
3 it.
4    Q.   Have you told the court everything
5 that Mr. Winarski said to you on this call
6 about how Fanatics was thinking about the
7 noncompete?
8       MR. BECK: Objection.
9    A.   To the best of my recollection, yes.
10 I remember that being extremely brief and just
11 confirming that he knew I had one and that we
12 would take it step by step.
13    Q.   When did you learn for the first
14 time that Fanatics had hired Quinn Emanuel and
15 Munger Tolles to represent them in California
16 to invalidate your noncompete?
17       MR. BECK: Objection.
18    Q.   You can answer.
19    A.   It wasn't that Saturday. I actually
20 don't know the date. It was some time earlier
21 in either Monday or Tuesday. I knew that, what
22 I know is that Saturday I called a -- somebody
23 that I have known for a long time, Jon Amoona
24 at Winston & Strawn, and told him -- sorry, I
25 can't talk about it.

Page 181

Hermalyn

1
2    Q.   I don't want to know what you
3 discussed with Winston & Strawn because they
4 are your lawyers, correct, sir?
5    A.   Yes.
6    Q.   When did you hire Winston & Strawn?
7 Give me a date. That's all I want to know
8 about Winston & Strawn.
9    A.   Saturday, that Saturday I called
10 him. I made that first call to John about
11 this.
12    Q.   When did you first have a
13 conversation with Munger Tolles or Quinn
14 Emanuel about your noncompete date?
15       MR. BECK: You can talk about a date
16    that you first spoke with Munger Tolles or
17    Quinn. You're not to talk about any of
18    the substance of what you talked to them
19    about and not -- I mean and whether it's
20    about the noncompete or something.
21    Identify just the date that you first
22    spoke to them.
23    A.   Munger I believe was Monday. It all
24 went very fast as you know.
25    Q.   I just asked for a date. Did you

46 (Pages 178 - 181)

Page 182

Hermalyn

1    Hermalyn
2    meet in person or was it on a Zoom or phone?
3        A.   It wasn't in person.  It was likely
4    a Zoom or Teams.
5        Q.   Who else was on that Zoom or Teams
6    the first time you spoke to Munger?
7        A.   I believe my counsel at Winston,
8    potentially Russell Beck, but I don't know.  I
9    don't know if that's exactly when each firm was
10   brought on.  I know it was sometime between
11   Sunday and Tuesday, Sunday and Monday.
12       Q.   In that first Zoom or Teams tell me
13   everything that was discussed.
14           MR. BECK:  No, I'm going to object
15       and instruct him not to answer.  This is
16       an attorney/client communication.
17           MR. SNYDER:  Who is the attorney and
18       who is the client?
19           MR. BECK:  Munger is the attorney.
20           MR. SNYDER:  For whom?
21           MR. BECK:  For Mr. Hermalyn.
22           MR. SNYDER:  Munger doesn't
23       represent the company?
24           MR. BECK:  No.
25           MR. SNYDER:  My apologies.  So let's

Page 183

Hermalyn

1    Hermalyn
2    move on.
3        Q.   When you were at Mr. Rubin's house
4    in Los Angeles, did you download DraftKings
5    documents, DraftKings Google workplace to your
6    personal iPhone while physically present in
7    Mr. Rubin's house; yes or no?
8            MR. BECK:  Objection.
9        A.   I viewed documents from DraftKings'
10   applications that were on my personal phone,
11   yes, I did.
12       Q.   Did you download them to your
13   personal phone, meaning in Mr. Rubin's house
14   you went on to the DraftKings' Google
15   application for documents and extracted
16   documents from the workplace and put them onto
17   your personal phone, transferred them?  Did you
18   do that in Mr. Rubin's house; yes or no?
19           MR. BECK:  Objection.
20       A.   No, I did not.  I didn't take any
21   documents.
22       Q.   So do you have any idea what
23   Fanatics.EAR2.LosAngeles1level3.net is?  Are
24   you familiar with that?
25       A.   No, I am not.

Page 184

Hermalyn

1    Hermalyn
2        Q.   Do you have any explanation, sir,
3    for why, while you were physically present in
4    Mr. Rubin's house, you accessed that network
5    and then sent a series of confidential
6    DraftKings' business documents from the Google
7    file owned by DraftKings to your personal
8    phone?
9            MR. BECK:  Objection.
10       A.   I think you're mischaracterizing
11   what actually happened.  I didn't do that.
12       Q.   Okay.  Thank you.  Appreciate that.
13   So your explanation is you didn't do that,
14   right?
15       A.   No, I didn't download anything
16   that -- anything -- I don't remember
17   downloading anything.
18       Q.   So when you testified in prior sworn
19   statements to this court you never used the
20   Fanatics internet network while you were in
21   California, that wasn't a truthful statement,
22   was it?
23           MR. BECK:  Objection.  That's a --
24       that is such a mischaracterization.  Can
25       you please, if you've got something you

Page 185

Hermalyn

1    Hermalyn
2    want to point him to, please do.
3        Q.   Okay, you may answer.
4        A.   In terms of -- I think you're asking
5    me do I know this particular IP address in
6    which I logged into --
7        Q.   That wasn't my question, sir.  I'll
8    withdraw the question.
9            Did you log into a Fanatics internet
10   network while physically present in Michael
11   Rubin's residence in Los Angeles; yes or no?
12           MR. BECK:  Objection.
13       A.   Not to my knowledge.  I was at
14   Michael Rubin's home and if I did connect to
15   his WI-FI, it was his personal WI-FI and there
16   was nobody else there in terms of Fanatics
17   employees until Michael arrived Thursday after
18   I resigned.
19       Q.   So it's your sworn testimony that
20   you never accessed an internet Fanatics
21   internet network while in Los Angeles?
22           MR. BECK:  Objection.
23       A.   My sworn testimony is that I have
24   never been -- I was never in a Fanatics office
25   and I do not know what the IP address is, that

47 (Pages 182 - 185)

Page 186

Hermalyn

1          Hermalyn
2  Michael Rubin's phone -- but I did access
3  Michael Rubin's phone network while I was in
4  Los Angeles.
5     Q.   Why did you tell the court that you
6  were never in a Fanatics' office but failed to
7  disclose to the court that you were in the
8  personal residence of the Fanatics' CEO and
9  founder for that weekend?
10        MR. BECK:  Objection and that's work
11  product.
12     Q.   You may answer.
13        MR. BECK:  No, he may not.
14     Q.   Sir, did you disclose to the court
15  in any statement you submitted to the court,
16  yes or no, that you spent several nights in
17  Michael Rubin's house while still employed by
18  DraftKings?  Did you disclose that to the court
19  in any filing; yes or no?
20        MR. BECK:  Objection.
21     A.   No, I did not.
22     Q.   The only reason you're testifying
23  about it today is that it's true because I
24  confronted you with the fact that you told
25  Mr. Larracey and Mr. Metz that you were in

Page 187

Hermalyn

1          Hermalyn
2  Mr. Rubin's house; isn't that the only reason
3  why you have come clean here about that?
4        MR. BECK:  Objection.
5  Argumentative.
6     Q.   You can answer.
7        MR. SNYDER:  He may answer.  Just
8  object.  You don't need another speech.
9        MR. BECK:  I am allowed to state the
10  basis for my objection especially when
11  your -- given the nature of your question,
12  the misleading nature of it.
13        MR. SNYDER:  You don't need to state
14  the basis.  You reserve and do not waive
15  any objection.  Just you can say objection
16  and then you can down the line object to
17  it on any actionable ground, but the
18  speeches are getting tiresome.
19        MR. BECK:  I don't need your
20  explanation of what the rules are.  I am
21  well within my rights to respond to the
22  questions.  And to object to the questions
23  that you are asking in a way that actually
24  identifies the problems that you can fix
25  because these are -- many of these are

Page 188

Hermalyn

1          Hermalyn
2  form questions.  Most of these are form
3  objections and you are free to fix them.
4        MR. RIDEN:  I'll also note for the
5  record that yesterday your colleagues gave
6  speaking objections on the record.
7        MR. SNYDER:  I'll withdraw the
8  question as my time is limited.
9  BY MR. SNYDER:
10     Q.   Sir, you knew the Federal court
11  order directed you to file a sworn
12  certification with the court, correct?
13     A.   Yes, this is after the -- just to
14  make sure, the right documents, we are talking
15  about what was issued the Thursday before Super
16  Bowl that I signed that I read that?
17     Q.   Let me show you the documents so
18  there is no confusion.  This is the
19  certification that you filed in compliance with
20  the court order that you filed on February 12,
21  2024, Exhibit 10.  Let's just show him.
22        (Whereupon document was marked
23        Exhibit 10 for identification as of this
24        date.)
25     Q.   Do you recall making a certification

Page 189

Hermalyn

1          Hermalyn
2  to the court, sir?
3     A.   Yes.
4     Q.   Let's go to his signature just --
5        MR. BECK:  We don't have the
6  document yet.  We just got it.  Give us a
7  second.
8     Q.   Is that your signature, sir?
9        MR. BECK:  We are just pulling up
10  the document so he can review it and put
11  it in front of him.
12     A.   (Witness reviewing document).
13     Q.   Is that your signature, sir?
14     A.   Yes, it is.
15     Q.   And you swore to the truth of this
16  document, correct?
17     A.   Correct, yes.
18     Q.   Let's direct your attention, please.
19  To the first page.
20     A.   Okay.
21     Q.   You said here you gave your phone to
22  your personal counsel on January 31, 2024 and
23  have not had access to it since and you
24  purchased a new phone.  Do you see that?
25     A.   Yes, I do.

48 (Pages 186 - 189)

Hermalyn

1
2  Q.   Was that a truthful statement?
3  A.   Yes.
4  Q.   Did you have any other personal
5  devices after January 31 that had access to
6  DraftKings global work space?
7  A.   No, I did not.
8  Q.   Did you read the affidavit of Brian
9  Harris that DraftKings filed in support of its
10 motion for a TRO in Boston, the forensic
11 document?
12      MR. BECK: Objection.
13 A.   I think so.
14 Q.   Did you see that he reports under
15 oath in his affidavit that -- do you remember
16 him saying that after the date you say you
17 turned over all your devices, that you
18 downloaded a document called "biz development
19 gaming 101" from Google DraftKings file to a
20 non-DraftKings device? Do you recall reading
21 that?
22      MR. BECK: Objection. Would you put
23 the document in front of the witness,
24 please?
25      MR. SNYDER: I don't have time to do

Hermalyn

1
2  that. I'm just asking.
3  Q.   Do you recall that DraftKings is
4  accusing you, after turning over your phone to
5  your lawyers, accessing confidential
6  DraftKings' documents and then downloading it
7  to a non-DraftKings' device; do you recall
8  that?
9       MR. BECK: Objection.
10 A.   I recall there being line items that
11 said I accessed DraftKings' documents on
12 February 1st, which is not possible. Yes, I
13 recall that.
14 Q.   And it's not possible why?
15 A.   Because I handed over all of my work
16 related devices to DraftKings or sorry, to my
17 counsel the night before I resigned.
18 Q.   Isn't it a fact that in your
19 certification you did not disclose to the court
20 that you had an iPad?
21      MR. BECK: Objection.
22 A.   I didn't -- I didn't know that I
23 used the iPad for work. The last time I
24 remember using it was for a plane ride with my
25 two daughters watching Netflix and I can't

Hermalyn

1
2  remember ever using that for work.
3  Q.   Did you ever use it for work?
4  A.   Not to my knowledge, no, but I did
5  in good faith hand it over to counsel.
6  Q.   Weren't you required to hand it over
7  before you swore to your certification about
8  your devices?
9       MR. BECK: Objection.
10 A.   That was a personal device. I have
11 zero recollection of ever doing anything
12 related to DraftKings on that device.
13 Q.   Before you certified that you turned
14 over all your devices, did you check that iPad
15 to make sure it didn't contain DraftKings'
16 information, yes or no?
17      MR. BECK: Objection. Objection.
18 A.   I'm sorry, did you asked did I check
19 the iPad?
20 Q.   Yes, before you signed your
21 certification, yes or no? Did you check that
22 iPad to make sure you didn't use it for
23 DraftKings' information, DraftKings' documents?
24      MR. BECK: Objection.
25 A.   No, I don't remember the last time I

Hermalyn

1
2  logged into the iPad.
3  Q.   Are there other -- you knew you had
4  to swear to the court in certification what
5  devices you had, correct?
6       MR. BECK: Objection.
7  Mischaracterizes the order.
8  A.   DraftKings related devices, yes. I
9  didn't think the iPad was that and I still
10 don't.
11 Q.   Well, don't you now know that iPad,
12 in fact, was used by you to conduct DraftKings
13 business and save DraftKings confidential
14 documents?
15      MR. BECK: Objection.
16 A.   I don't know what to think about the
17 data that was provided in the interrogatory
18 response because I know that some of the data
19 is absolutely incorrect. So it makes me
20 question all of it.
21 Q.   Are there other devices that you
22 turned over to counsel since your certification
23 other than the iPad that you turned over later?
24 A.   No. What I did also turn over to
25 counsel with the iPad were three boxes that I

49 (Pages 190 - 193)

Hermalyn

1
2  received from ███████ to my beach house in New
3  Jersey which contained what I believe are Macs
4  from ███ and I assume that because ███ or the
5  person at ███ does not know I am no longer at
6  DraftKings, so I handed over those.
7      Q.   Do you plan to supplement your
8  certification at any time to add the iPad and
9  the items you described?
10         MR. BECK:  Objection.  I'm going to
11     instruct him not to answer on work
12     product.
13     Q.   So let's now go to another topic,
14 sir.  During that meeting that Munger Tolles
15 attended, was Quinn Emanuel the law firm or any
16 of its partners on that video meeting?
17     A.   The only time I remember meeting
18 Quinn Emanuel before resigning or it might have
19 been after me resigning was talking --
20         MR. BECK:  Not the substance,
21     please.  Just the timing.
22     A.   No, I -- Quinn Emanuel has been
23 completely disconnected from my counsel during
24 that period of time.
25     Q.   Did you have any conversation, yes

Hermalyn

1
2  or no, with Quinn Emanuel at any time up until
3  today without telling me the substance?
4      A.   Up until today, yes, I have.
5      Q.   And when?
6      A.   I think the first time --
7          MR. BECK:  Not the substance.  He's
8      just asking when.
9      A.   I think the first time was after I
10 resigned.  I don't believe -- I did not speak
11 to them before I resigned.  I know I spoke to
12 some members of Quinn and some other -- I guess
13 it was just Quinn after I resigned and then --
14     Q.   Thank you.  That's enough.  Thank
15 you.
16         Sir, do you recall, and if you do
17 I'm not going to show you the document, but do
18 you recall in one of the sworn statements you
19 filed in this matter, particularly when you
20 filed in California, calling to the VIP
21 business at Fanatics at a nascent stage?
22         MR. BECK:  Objection.
23     A.   If you show me it, then I could.  It
24 is early on.
25     Q.   I'll ask you this way.  Did you

Hermalyn

1
2  believe -- do you believe that the VIP business
3  at Fanatics is in a nascent stage?
4      A.   When you look at Fanatics as an
5  entire holdings company, a portfolio approach,
6  yes, just starting.
7      Q.   What do you mean by it's just
8  starting?
9      A.   Two core jobs.  One is running the
10 LA office and two is running the IP and the IP
11 is looking over the portfolio of Fanatics.
12 There is three business units, e-commerce,
13 collectibles and gaming and the opportunity of
14 VIP is how do you look at all of our customers.
15     Q.   Sir, that's not my question and I
16 only have twelve minutes.  I just asked you,
17 I'm so sorry, sir, I may have to extend it for
18 a few minutes.  Counsel and I may have to
19 discuss that.
20         My question is the VIP business at
21 Fanatics at a nascent stage and you said yes
22 and my question is what do you mean by the VIP
23 business being at a nascent stage?  Is it just
24 starting out?
25         MR. BECK:  Objection.

Hermalyn

1
2      Q.   Is the VIP business at Fanatics just
3  starting out; yes or no?
4          MR. BECK:  Objection.
5      A.   It's -- I'm sorry, it's not a yes or
6  no.  Other than the gaming side, it's not.  On
7  the rest of the business, it is.  It is
8  starting out.
9      Q.   What makes you qualified to grow and
10 lead the VIP business at Fanatics?
11     A.   That's a great question.  I was
12 hired at DraftKings to run business
13 development.  I've only run VIP for a year and
14 a half.  My life not only career, but in life,
15 something I really enjoy is connecting with
16 people and building community and trust.  It's
17 a skill set of mine and that is ultimately what
18 I am going to be building out at Fanatics with
19 regard to the --
20     Q.   Thank you.
21     A.   -- to the entire industry.
22     Q.   Thank you.  Just one question, you
23 swore in your January -- February 7 declaration
24 that you did not discuss joining Fanatics with
25 Mr. Rubin in 2023.  Do you stand by that

1          Hermalyn
2 statement here today?
3          MR. BECK:  Objection.
4     Mischaracterizes the testimony.  You want
5     to put the affidavit in front of him, he
6     can actually point to the language, look
7     at the language.
8     Q.   Did you discuss joining Fanatics or
9 any of its affiliates with Mr. Rubin or anyone
10 else during 2023; yes or no?
11    A.   I never took a meeting. ████████
████████████████████████████████████████████
████████
14    Q.   Excuse me.  Excuse me.  I'm going to
15 direct you not to discuss anything that could
16 be for DraftKings privileged.  You don't have
17 the right.  I'm just telling you not to
18 disclose that, so I'm going to move to strike
19 that answer.  And probably -- at least strike
20 it for now.
21         My question is, did you discuss
22 joining Fanatics or any of its affiliates with
23 Mr. Rubin or anyone else during 2023; yes or
24 no?
25    A.   Mr. Rubin attempted to meet with me.

1          Hermalyn
2 I never took the meeting.
3     Q.   How many Gmail accounts do you have,
4 sir?
5     A.   Four that I could think of, four.
6     Q.   Did you turn over all four personal
7 Gmail accounts to your counsel or just one?
8          MR. BECK:  Objection.
9     A.   I turned over my current Gmail which
10 is my life and where contacts are sent.  It's
11 the Gmail account I use the most.  The other
12 three are ████████████ at Gmail which I'm
13 using today. ████ --
14    Q.   I'm going to interrupt you again.  I
15 asked a different question.  A very simple
16 question.  Did you turn over all four accounts
17 to your lawyer; yes or no?
18         MR. BECK:  Objection.
19    A.   No, I turned over the only one that
20 even could remotely come close to having any
21 connection with DraftKings.
22    Q.   Did you turn over ████████@Gmail.com?
23    A.   No, I did not.
24    Q.   Are you aware that you used that
25 Google, that Gmail address in the past to

1          Hermalyn
2 conduct DraftKings' business with, for example,
3 the president of DraftKings?
4          MR. BECK:  Objection.
5     Q.   Are you aware of it?
6     A.   No, I'm not.  The note on it -- I
7 don't know if I ever logged into that account.
8 That's an e-mail account that I use to forward
9 myself notes about my kids or funny things my
10 kids said or wife said.  It's almost like a
11 journal, but I'm happy to --
12         MR. BECK:  You don't need to offer
13    up what is in that account.
14    Q.   Is it a fact, sir, that you
15 forwarded to your ████@Gmail.com incredibly
16 confidential and sensitive DraftKings documents
17 in the past?
18         MR. BECK:  Objection.
19    A.   I literally have no recollection of
20 that and most importantly I have not logged
21 into that e-mail account definitely before I
22 left DraftKings.  So --
23    Q.   Before certifying under oath what
24 you did in the certification ordered by the
25 court, why didn't you go into that account to

1          Hermalyn
2 determine whether it contained confidential
3 DraftKings information?
4          MR. BECK:  Objection.
5     A.   Because this is the first time I
6 ever would have thought anything would be in
7 there, but again I have not logged in in quite
8 some time.  I definitely have not logged in
9 before or since I resigned from DraftKings.
10    Q.   That's my whole point.  You don't
11 know what is in there; do you, sir?
12         MR. BECK:  Objection.
13    A.   Like I said earlier, I used that
14 account to forward myself funny notes I have
15 from my family or wife or kids.  It could be
16 notes from a teacher or something I wanted to
17 keep.  I looked at it as almost a journal, but
18 I have not looked into that account.  I have
19 not accessed that account since I left
20 DraftKings.
21    Q.   Right.  You can't tell the court
22 whether that Gmail account, for example,
23 contains some of the most confidential
24 documents generated during your time at
25 DraftKings, so you haven't logged into it and

51 (Pages 198 - 201)

Page 202

Hermalyn
1
2 you have no idea what is in there, correct?
3          MR. BECK:  Objection.
4    Q.    Yes or no?
5          MR. BECK:  Objection.
6    A.    I do not believe anything that is
7 confidential to DraftKings is in that e-mail,
8 is in that e-mail account, but most importantly
9 I have not logged into that e-mail account
10 since I have left.  And I don't use it often,
11 if ever.
12          MR. SNYDER:  We are going to take a
13 break now and resume in five minutes.
14 Thank you.
15          THE VIDEOGRAPHER:  This is the end
16 of media unit six.  We are going off the
17 record.  The time is 3:25 p.m.
18          (Brief recess taken.)
19          THE VIDEOGRAPHER:  This is media
20 unit seven.  We are back on the record.
21 The time is 3:35 p.m.
22          MR. SNYDER:  Thank you.  I have no
23 further questions at this time.
24          MR. BECK:  Thank you.  The only
25 thing I'm putting on the record is there

Page 203

Hermalyn
1
2 were a lot of questions about documents
3 that Mr. Hermalyn was not shown.  Thank
4 you very much for the deposition and thank
5 you all for your assistance with it.
6          MR. SNYDER:  Looking forward to
7 meeting you all in person.
8          MR. BECK:  Likewise.
9          THE VIDEOGRAPHER:  We are off the
10 record at 3:36 p.m. Eastern Standard time
11 and this concludes today's testimony given
12 by Michael Hermalyn.
13          The total number of media units used
14 was seven and will be retained by Veritext
15 Legal Solutions.
16          (Time noted:  3:36 p.m.)
17
18
19
20
21
22
23
24
25

Page 204

Hermalyn
1
2          A C K N O W L E D G M E N T
3
4 STATE OF        :
                    :ss
5 COUNTY OF       :
6
7      I, MICHAEL HERMALYN, hereby certify
8 that I have read the transcript of my testimony
9 taken under oath in my deposition on the 6th
10 day of March, 2024; that the transcript is a
11 true, complete record of my testimony and that
12 the answers on the record as given by me are
13 true and correct.
14
15     ------------------------
         MICHAEL HERMALYN
16
17 Signed and subscribed to before
     me this          day of
18              , 2024.
19
20 -------------------------------------
     Notary Public of the State of
21
22
23
24
25

Page 205

Hermalyn
1
2
3      C E R T I F I C A T E
4      I, FRAN INSLEY, hereby certify that the
5 Deposition of MICHAEL HERMALYN was held before
6 me on the 6th day of March, 2024; that said
7 witness was duly sworn before the commencement
8 of testimony; that the testimony was taken
9 stenographically by myself and then transcribed
10 by myself; that the party was represented by
11 counsel as appears herein;
12      That the within transcript is a true
13 record of the Deposition of said witness;
14      That I am not connected by blood or
15 marriage with any of the parties; that I am not
16 interested directly or indirectly in the
17 outcome of this matter; that I am not in the
18 employ of any of the counsel.
19      IN WITNESS WHEREOF, I have hereunto set
20 my hand this 7th day of March, 2024.
21
22 - - - - - - - - - - - - -
         FRAN INSLEY
23
24
25

52 (Pages 202 - 205)

Page 206

1          Hermalyn
2          VERITEXT LEGAL SOLUTIONS
3    NAME OF CASE: DRAFRKINGS v. HERMALYN
     DATE OF DEPOSITION: March 6, 2024
4    NAME OF DEPONENT:  MICHAEL HERMALYN
5    PAGE   LINE(S)    CHANGE          REASON
6    ____|_____|_____|_____
7    ____|_____|_____|_____
8    ____|_____|_____|_____
9    ____|_____|_____|_____
10   ____|_____|_____|_____
11   ____|_____|_____|_____
12   ____|_____|_____|_____
13   ____|_____|_____|_____
14   ____|_____|_____|_____
15   ____|_____|_____|_____
16   ____|_____|_____|_____
17   ____|_____|_____|_____
18   ____|_____|_____|_____
19   ____|_____|_____|_____
20          _____
21   SUBSCRIBED AND SWORN TO BEFORE ME
     THIS___DAY OF _____, 20__.
22
23
24   (NOTARY PUBLIC)   MY COMMISSION EXPIRES:
25

Veritext Legal Solutions
212-267-6868                www.veritext.com                516-608-2400

Federal Rules of Civil Procedure

Rule 30

(e) Review By the Witness; Changes.

(1) Review; Statement of Changes. On request by the
deponent or a party before the deposition is
completed, the deponent must be allowed 30 days
after being notified by the officer that the
transcript or recording is available in which:

(A) to review the transcript or recording; and

(B) if there are changes in form or substance, to
sign a statement listing the changes and the
reasons for making them.

(2) Changes Indicated in the Officer's Certificate.
The officer must note in the certificate prescribed
by Rule 30(f)(1) whether a review was requested
and, if so, must attach any changes the deponent
makes during the 30-day period.

DISCLAIMER: THE FOREGOING FEDERAL PROCEDURE RULES
ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY.
THE ABOVE RULES ARE CURRENT AS OF APRIL 1,
2019. PLEASE REFER TO THE APPLICABLE FEDERAL RULES
OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS

COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the
foregoing transcript is a true, correct and complete
transcript of the colloquies, questions and answers
as submitted by the court reporter. Veritext Legal
Solutions further represents that the attached
exhibits, if any, are true, correct and complete
documents as submitted by the court reporter and/or
attorneys in relation to this deposition and that
the documents were processed in accordance with
our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining
the confidentiality of client and witness information,
in accordance with the regulations promulgated under
the Health Insurance Portability and Accountability
Act (HIPAA), as amended with respect to protected
health information and the Gramm-Leach-Bliley Act, as
amended, with respect to Personally Identifiable
Information (PII). Physical transcripts and exhibits
are managed under strict facility and personnel access
controls. Electronic files of documents are stored
in encrypted form and are transmitted in an encrypted

fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.