# EXHIBIT E



Beck Reed Riden LLP
155 Federal Street | Suite 1302
Boston | Massachusetts 02110
Tel. (617) 500-8660 | Fax (617) 500-8665
BeckReedRiden.com

Russell Beck
Direct: (617) 500-8670
rbeck@beckreed.com

February 21, 2024

<u>Via E-Mail</u>

Harris M. Mufson, Esq.
Gibson, Dunn & Crutcher LLP
200 Park Avenue
New York, NY 10166-0193
HMufson@gibsondunn.com

  Re: *DraftKings Inc. v. Michael Hermalyn*, Civil Action No. 1:24-cv-10299

Dear Harris:

  This letter responds to your February 15, 2024 correspondence in which you claim that Mr. Hermalyn has failed to comply with his obligations under the Court's February 8, 2024 Temporary Restraining Order (the "Order"). Respectfully, we disagree. To the best of his knowledge and ability, Mr. Hermalyn has "return[ed] to DraftKings all DraftKings' Confidential Information (as defined in the Confidentiality Agreement)" (Dkt. No. 44, Order § (f)), and a review protocol is necessary to determine what additional information, if any, is subject to return. That position does not constitute a violation of the Order. To the contrary, it reflects Mr. Hermalyn's good faith attempt to work cooperatively with DraftKings to further ensure his compliance with the Order.

  As you know, before resigning from DraftKings, Mr. Hermalyn took steps to make sure that he was no longer in possession of DraftKings' property or confidential information. He gave his counsel (1) both DraftKings-issued computers in his possession; (2) his MiFi device; and (3) his corporate credit card. He subsequently located a third computer and provided it to counsel. Hermalyn Cert. ¶ 2. As your letter does not dispute, these devices and property were promptly returned to DraftKings.

  Moreover, prior to resigning from DraftKings, Mr. Hermalyn also attempted to segregate information that DraftKings may contend belongs to it from the information that clearly belongs to him personally. Hermalyn Cert. ¶ 4. Without conceding that contact information constitutes any sort of trade secret or is otherwise Confidential Information, out of abundance of caution, Mr. Hermalyn has returned to DraftKings those contacts that Mr. Hermalyn believes DraftKings would likely contend are DraftKings' contacts.

  To further ensure that he did not retain anything that DraftKings could contend is its property or confidential information, Mr. Hermalyn also identified and segregated a third category of contacts: those that he believes are his even though he met the contacts during the period he worked for DraftKings. *Id.* So that the parties can reach a good-faith resolution of this issue, Mr. Hermalyn's counsel (Bethany Kristovich) has repeatedly proposed meeting and conferring



regarding this third category of contacts since this dispute arose. On Saturday, February 10, you sent a letter requesting that Mr. Hermalyn turn over to DraftKings all contacts in this third category. I responded the next day that I appreciated your client's belated focus on this issue and asked that you coordinate with Ms. Kristovich for a time to discuss the issue. A call was subsequently scheduled for the next day, Monday, February 12.

During that call, we explained the steps that Mr. Hermalyn had taken (outlined above) and asked for your client's position. You stated that DraftKings' position was that Mr. Hermalyn should turn over essentially all of his contacts other than those that are purely personal. As you put it, Mr. Hermalyn could then explain to DraftKings why he believes any of the contacts that he turned over are his, and then DraftKings would (at some unknown point) unilaterally determine whether or not to return them. We then attempted to discern the boundaries of your client's position with two examples.

The first example we provided was Mr. Hermalyn's hairstylist. We asked whether DraftKings would consider Mr. Hermalyn's hairstylist to be a DraftKings contact if Mr. Hermalyn shared the hairstylist's contact information with a DraftKings client, thereby helping the client and presumably strengthening the relationship with the client. Your response (with the caveat that it was off-the-cuff) was that the hairstylist would be transformed into a DraftKings contact that would need to be turned over.

We next asked if you would consider Mr. Hermalyn's grandmother's contact information to belong to DraftKings if she had ever considered placing a bet on DraftKings' platform. With the same caveat as above, you answered yes. Perplexed, we pointed out that your position would mean that Mr. Hermalyn could not, for example, contact his grandmother to wish her a happy birthday unless and until DraftKings agreed that he may have her contact information back. You acknowledged that to be the case. There is no support for such a position in law, equity, or fact.

We explained that we viewed your responses—and, in turn, DraftKings' position on this third category of contacts—as overreaching, unreasonable, and punitive. After discussing how to arrive at a workable approach, we invited you to propose a reasonable drawing line—for example, all individuals who Mr. Hermalyn met at events paid for by DraftKings. You responded that you would do so. To date, however, we have not received any such proposal.

Instead, DraftKings has doubled down. Your February 15 letter asserts that "[t]o the extent Mr. Hermalyn is unsure whether such business contacts are DraftKings' property, he must promptly return them to DraftKings so that our client can consider whether they are, in fact, DraftKings' property." Ltr. at 2. But nothing in the Court's order gives DraftKings the unilateral authority to classify Mr. Hermalyn's contact information. Nor does the order require Mr. Hermalyn to grant DraftKings unfettered access to his personal devices and accounts for the



purpose of rummaging through information that Mr. Hermalyn believes belongs to *him*. Indeed, the Court was clear during the parties' February 8 hearing that Mr. Hermalyn was *not* required to turn over his personal phone or accounts for forensics to be run on those devices or accounts. *See* Feb. 8, 2024 Hr'g Tr. at 58:3-8 (rejecting DraftKings' request for a forensic audit of Mr. Hermalyn's devices and accounts and stating that it was the Court's view that "the document requests, and *especially the request to conduct a forensic audit of all of Mr. Hermalyn's devices[,] are overbroad and highly . . . burdensome*, particularly where Mr. Hermalyn bought a new device after turning over his devices to DraftKings or counsel" (emphasis added)).

In light of the above, we once again urge DraftKings to work with us in good faith by proposing a protocol or procedure for reviewing documents and contacts on Mr. Hermalyn's personal devices and accounts. Alternatively, we could meet with you to discuss each of the contacts and negotiate a resolution. We are open to a variety of approaches.

Please let us know **by Friday, February 23,** whether you will propose a protocol or procedure for reviewing the category of disputed information. We are reluctant to burden the Court with this issue, as we believe that the parties can and should work cooperatively to identify what additional information, if any, DraftKings is entitled to receive, especially given that Mr. Hermalyn is unable to access any of it, regardless of whom it belongs to. However, if DraftKings refuses to engage in our efforts to negotiate a compromise, we will have no other choice but to seek appropriate relief from the Court.

Finally, in response to your request, we confirm that Mr. Hermalyn's personal devices remain preserved and out of his possession. As Mr. Hermalyn explained in his certification, his inability to access his personal devices has been burdensome: He is currently unable to access photographs of his family and his children; he cannot access location-tracking information for his young daughters; and without his personal contacts, his new phone does not identify who is calling or sending him messages. Hermalyn Cert. ¶ 3. Following the extraction and review of whatever information remains on these devices, Mr. Hermalyn should be permitted to access his personal information, including his personal contacts. To the extent you think any forensic preservation is appropriate, we invite you to raise that issue.

We respectfully request that if DraftKings files a copy of your February 15, 2024, letter with the Court, you also file a copy of this letter, as well.

We look forward to your response.



Very truly yours,

Russell Beck

cc: Stephen D. Riden, Esq.
Brad Brian, Esq.
Bethany Kristovich, Esq.
Anne Conley, Esq.