**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS**

DRAFTKINGS INC.,

              Plaintiff,

     v.

MICHAEL HERMALYN,

            Defendant.

Civil Action No. 1:24-cv-10299

**REPLY IN SUPPORT OF PLAINTIFF'S
MOTION FOR PRELIMINARY INJUNCTION**

**TABLE OF CONTENTS**

Page

INTRODUCTION.................................................................................................1

THE RECORD REFUTES DEFENDANT'S EXCUSES AND LIES........................5

    Defendant Stole Confidential Information and Destroyed Evidence ...................5

    Defendant Brazenly Solicited DK's Employees and Customers.......................7

ARGUMENT ....................................................................................................9

    DK Is Likely To Succeed On Its Trade Secrets Claims.................................9

    DK Is Likely To Succeed On Breach of Noncompetition Obligations ...........10

    DK Is Likely To Succeed On Breach of Nonsolicitation Obligations............12

    DK Will Suffer Irreparable Harm Absent a Preliminary Injunction.............13

    The Court Should Issue The Proposed Order ........................................14

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Advanced Micro Devices, Inc. v. Feldstein*,
    2013 WL 10944934 (D. Mass. May 15, 2013) ........................................................... 13

*Am. Sci. & Eng'g, Inc. v. Kelly*,
    69 F. Supp. 2d 227 (D. Mass. 1999) ............................................................................ 9

*Aspect Software, Inc. v. Barnett*,
    787 F. Supp. 2d 118 (D. Mass. 2011) ........................................................................ 10

*Bos. Centerless, Inc. v. DeSantis*,
    2022 WL 16639138 (D. Mass. Nov. 2, 2022) ............................................................. 9

*Corp. Techs., Inc. v. Harnett*,
    731 F.3d 6 (1st Cir. 2013) .......................................................................................... 13

*Fid. Brokerage Servs., LLC v. Callinan*,
    2019 WL 1576097 (Mass. Super. Feb. 11, 2019) ..................................................... 12

*G&L Plumbing, Inc. v. Kibbe*,
    2023 WL 6881597 (D. Mass. Oct. 18, 2023) .............................................................. 9

*Harrell v. Backstage Salon & Day Spa*,
    2022 WL 618681 (Mass. Super. Feb. 22, 2022) ....................................................... 10

*Modeski v. Summit Retail Sols., Inc.*,
    470 F. Supp. 3d 93 (D. Mass. 2020) ......................................................................... 14

*Nat'l Eng'g Serv. Corp. v. Grogan*,
    2008 WL 442349 (Mass. Super. Jan. 29, 2008) ....................................................... 15

*Nat'l Med. Care, Inc. v. Sharif*,
    2020 WL 6318922 (D. Mass. Sept. 2, 2020) ............................................................. 11

*SimpliVity Corp. v. Bondranko*,
    204 F. Supp. 3d 340 (D. Mass. 2016) ....................................................................... 11

*SimpliVity Corp. v. Moran*,
    2016 WL 5122671 (Mass. Super. Aug. 14, 2016) ..................................................... 11

*Thermal Eng'g Int'l (USA) Inc. v. Lanaville*,
    646 F. Supp. 3d 202 (D. Mass. 2022) ....................................................................... 12

*U.S. Elec. Servs., Inc. v. Schmidt*,
    2012 WL 2317358 (D. Mass. June 19, 2012) ........................................................... 14

**Statutes**

M.G.L. c. 149 § 24L(b)(v) .............................................................................................. 11

M.G.L. c. 149 § 24L(b)(vi) ................................................................................................12, 15

M.G.L. c. 149 § 24L(e) ................................................................................................10

# INTRODUCTION

The Court granted a TRO on a record of just *four* documents DK was able to uncover on an emergency basis—confidential business documents accessed by Defendant *after* he decided to run Fanatics' nascent VIP business but *before* he departed DK's VIP business.  In just a few weeks of limited expedited discovery, DK has uncovered substantial new evidence showing those were not four isolated incidents, but the tip of the iceberg—part of a multi-week campaign of brazen theft and cover-ups that struck at the very heart of DK's industry-leading VIP business.  Defendant's wrongdoing culminated in egregious misconduct in this litigation, including false testimony, spoliation, and contempt of this Court's TRO.  The evidence proves that during the week before Defendant departed DK (January 28 to February 1), he was *living in the Los Angeles home of Fanatics CEO Michael Rubin* and planning litigation to evade the restrictive covenants he willingly signed thirteen times in return of millions of dollars in compensation.  In parallel, and just days before joining Fanatics, Defendant stole more confidential DK documents and systematically spoliated evidence.  And the day he departed DK, he *solicited two of DK's most valuable VIP employees using confidential compensation information he had taken from DK*.

In the face of this evidence, Defendant made a fateful decision in this litigation—rather than come clean, he lied in his sworn declarations, verified interrogatories, sworn deposition testimony, court-ordered certification, and now in his opposition to DK's preliminary injunction motion:

1. Defendant swore under oath he had "not solicited any [DK] employees," ECF 36 (Def. TRO Decl.) ¶ 40; ECF 74-2 (Depo. Tr.) 63:10-12, and talked with Metz and Larracey only "on February 1," ECF 103-6 (Def. Rog. Resp.) 15-16.  Confronted at his deposition with phone record evidence that he talked with them for **168 minutes** between 10 p.m. EST on February

1 and 2:00 a.m. EST on February 2, Defendant admitted he talked to them late into the night, including about compensation, ***directed Metz and Larracey to Fanatics' career website (where Larracey applied for a job during those conversations)***, and spoke with Larracey multiple times over the following days. Depo. Tr. 12:12-12; 37:2-40:23; 41:5-25; 52:15-53:3; 53:3-23. The sworn declarations of Metz and Larracey, substantiated by contemporaneous notes, lay bare Defendant's direct solicitation. ECF 77 (Metz Aff.) ¶¶ 4, 7-13; ECF 76 (Larracey Aff.) ¶¶ 7-17. Nevertheless, without any supporting evidence, Defendant proclaims he did not do it. ECF 104 (Def. Opp. Decl.) ¶ 4.

2. Defendant swore he turned over all his devices and accounts that could contain DK information to counsel the day he departed DK. Def. TRO Decl. ¶ 45; ECF 55-3 ¶¶ 2-3. At every turn, Defendant trumpets this purported fact. *E.g.*, ECF 101 (Opp.) 10-11. But it is a lie. Confronted with the evidence in DK's interrogatory responses and at his deposition, Defendant admitted he did not turn over his iPad or Dropbox—which contained DK confidential information[1]— until ***nearly one month later***, and only ***after DK demanded he explain himself***. Defendant continues to obstruct the truth-seeking process by refusing to return all DK confidential information, despite the TRO ordering him to do so.[2]

3. Defendant told this Court in a sworn declaration opposing DK's motion for a TRO—premised in part upon the allegation that Defendant downloaded documents from a Fanatics IP address— that he did not visit Fanatics offices until February 6. Def. TRO Decl. ¶ 17; *see also* ECF 33

---

[1] On January 16, when Defendant deleted his Dropbox from his 16-inch laptop, it contained DK confidential information in an "miscdk" folder. ECF 75 (Green Aff.) ¶ 28; ECF 78 (Henley Aff.) ¶ 36. Defendant used two iPads to sync to DK Google Workspace. Green Aff. ¶ 45. Defendant turned only one iPad over to counsel, but denies knowledge of the second. ECF 74-15 at 3-4.

[2] In addition to the Gmail account Defendant identifies in his sworn declarations and certification, DK uncovered evidence that Defendant sent himself a document containing confidential DK information to a second Gmail account. ECF 90 ¶ 21; 90-2.

at 18 n.10. This was a lie by omission. Defendant concealed from this Court and DK that he accessed some of DK's most highly confidential documents while connected to a Fanatics IP address and ***staying at the home of Fanatics' CEO*** as he executed the final stages of his scheme.

Defendant did not just lie to hide his wrongdoing. He also systematically destroyed and spoliated evidence. DK's forensic investigation of Defendant's DK laptops revealed Defendant deleted hundreds of DK documents, thousands of iMessages and text messages, and the vast majority of his web-browsing history. He did so on January 16—after talking with Fanatics' CEO about a new job a few days prior, after texting his brother that he was afraid of "get[ting] fired" in connection with DK's misconduct investigation into his behavior, and after downloading a cache of confidential documents giving him a precise roadmap to recreating DK's VIP program. He did so again on January 28—***after meeting with Fanatics' Chief Legal Officer to discuss his contractual obligations to DK and "next steps,"*** Depo Tr. 179:15, while anticipating that DK would seek to enforce in court its restrictive covenants, after accepting the offer to run Fanatics' VIP business, and while preparing to bring suit in California against DK. Defendant had a duty to retain this information, among other reasons, because he was preparing to sue DK and therefore had more than a reasonable anticipation of litigation. The fact that he thereafter deleted information relevant to this case provides evidence of wanton spoliation that is open-and-shut.[3]

Defendant now comes before this Court and asks it to take him at his word when he offers flimsy and self-serving excuses for his misconduct. But when a litigant lies over and over again, and spoliates evidence, it is not just consciousness of guilt. It is also bad faith and unclean hands,

---

[3] DK anticipates that it will seek all appropriate relief once DK has a complete record, including from an audit of Defendant's personal devices. DK reserves its rights to seek sanctions—including adverse inferences and determinations of liability.

and fully justifies drawing an adverse inference.

There is no plausible innocent explanation for his systematic theft of confidential information, spoliation, or solicitation. He was not "just doing his job" when he accessed DK's highly sensitive information from the Fanatics' CEO's house. *See* Opp. 6. He had already stopped working for DK, stopped responding to DK email, anticipated litigation by DK, and plotted to evade his contracts by suing DK—all while on DK's payroll. On January 16, he was *not* "simply migrating files between DK-issued devices in the normal course, working with DK IT." Opp. 2. Defendant does not even attempt to explain why, from January 16 through January 28, he ***deleted nearly every file from both laptops***, ***deleted his unauthorized Dropbox account***, or ***deleted his incriminating Google search histories.*** Green Aff. ¶¶ 30-31, 48. Defendant's story is further belied by the fact that this was not a wholesale migration of documents from an older laptop to a newer laptop, but rather a cherry-pick transfer of DK's most confidential information ***to his personal iPhone***. *Id.* ¶¶ 17, 19; Henley Aff. ¶¶ 33-35. And it makes no difference whatsoever whether Metz and Larracey called him first or asked him questions. Defendant pointed them to Fanatics' job website, discussed compensation, and spoke with Larracey, including on Larracey's wife's phone, multiple times over the following days, which clearly shows he was soliciting them to join Fanatics. Overwhelming record evidence destroys every one of these excuses and explanations Defendant proffers.

Defendants' flimsy excuses and explanations do nothing to rebut DK's overwhelming record evidence. And Defendant's own admissions, undisputed evidence, and Defendant's purported failures to recall alone show that DK ***will ultimately prevail*** on its claims—far exceeding its limited burden to show likelihood of success based only on a preliminary record. Defendant *admits* he accessed confidential documents *from* Rubin's house *after* he planned to work for

Fanatics. He *admits* he directed Metz and Larracey to Fanatics' jobs website and discussed compensation with them. He *admits* to deleting evidence while planning to sue DK. And he *admits* he wants to compete against DK by cloning DK's VIP program for a direct competitor. In many cases, he has no explanation for this incriminating evidence, and can say only he does not recall why he took these actions—incredibly, he testified he could not recall events and actions occurring just weeks before more than 100 times at his deposition,[4] while Metz and Larracey had clear and consistent recollections of precisely what they discussed with the Defendant.

The totality of the evidence requires the issuance of a preliminary injunction to prevent immediate and irreparable harm to DK. Defendant cannot be trusted to abide by the contracts he willingly signed, and anything less than an order enjoining him from working for Fanatics will not suffice to protect DK.

## THE RECORD REFUTES DEFENDANT'S EXCUSES AND LIES

**Defendant Stole Confidential Information and Destroyed Evidence.** On January 16, fearing for his job,[5] Defendant sent highly sensitive and confidential DK documents to his Slack account—including spreadsheets identifying hundreds of DK's current and former business partners and outlining key information regarding DK's contracts ("MZH_ExecView.xlsx"), and detailing compensation for thousands of DK employees ("(July2023)VitalTalent_ CompAdjustments.xlsx"). ECF 79 (Harris Aff.) ¶ 31; Henley Aff. ¶ 35. Defendant then *downloaded these documents on his personal iPhone*,[6] searched for ways to "move big files" on

---

[4] *E.g.*, Depo Tr. 29:12-30:2, 30:18-24, 36:21-25, 44:9-13, 46:3-13, 46:22-47:3, 49:8-13, 49:23-50:4, 51:2-11, 54:24-55:7, 58:6-11, 63:3-7; 64:16-25; 65:24-66:5, 75:3-9, 77:13-19, 99:22-24, 121:10-25, 123:9-10, 125:5-11, 127:4-9, 147:12-13, 156:5-14, 160:18-19, 161:14-19, 176:13-25.

[5] Defendant sent his brother an iMessage on January 16, showing that he was under "high stress and anxiety" and worried about "get[ting] fired." ECF 74-8.

[6] There is no "material difference" between accessing a document and viewing it, under these circumstances. TRO H'rg Tr. 52:11-20. But the evidence shows he downloaded. Harris Aff. ¶ 40.

Google, visited Dropbox and "Transfernow.net," transferred files from his DraftKings laptop to his personal iPhone via "AirDrop,"[7] and went on a deletion spree. ECF 73 (P.I. MOL) 9-11.

Defendant's excuse that he transferred "personal" files from an old 16-inch laptop to a 14-inch laptop—just five days after reaching out to Fanatics' CEO about a job—is not credible. *See* Opp. 8-9. The forensic evidence shows the files he transferred on January 16 were not "personal"—they were "highly sensitive documents relating to DraftKings' VIP team." Henley Aff. ¶ 35; Harris Aff. ¶ 31. And "*the majority of the files* [*Defendant*] *transferred from* [*the 16-inch laptop*] *were never downloaded to* [*the 14-inch laptop*]." Green Aff. ¶ 53. Instead, they were transferred to an iPhone. Green Aff. ¶ 19 (Slack); ¶ 15 (AirDrop).[8]

Defendant provides *no explanation* for why he subsequently deleted hundreds of files from the 16-inch laptop on January 16 and then hundreds of files from the 14-inch laptop—*the same laptop to which he was purportedly transferring files*. Green Aff. ¶¶ 27, 37, 54. It defies logic for Defendant to assert he was transferring files to the same laptop he was in the process of wiping. Defendant also insists (at 9) he deleted only "personal information." Opp. 9. This is another lie. At the precise moment he feared for his DK job and was just days away from meeting the Fanatics executive team, he deleted *every user-created file except for one* on the 16-inch laptop, and *all but two* from the 14-inch laptop. Green Aff. ¶¶ 27, 37. He deleted all of the files he sent to his

---

[7] Despite evidence that Defendant made seven AirDrop attempts, Green Aff. ¶ 15, Defendant disclaims *any* memory of using Apple's AirDrop function. Depo. Tr. 127:4-9; Opp. 9 n.9.

[8] In the Slack messages, he lied to DK IT by saying he was transferring personal files, when the forensics show he transferred a treasure trove of confidential documents. Harris Aff. ¶¶ 31, 32; Henley Aff. ¶ 35. There are no "contemporaneous instant messages *between* Defendant and DK IT specialist George Hernandez" in any event. Opp. 2 (emphasis added). Hernandez did not receive Defendant's Slack messages until the morning of January 17, did not respond, and did not speak with Defendant on the phone on January 16 or any time thereafter. ECF 82 (Hernandez Aff.) ¶¶ 10-11; *cf.* Depo. Tr. 146:3-11; 146:20-147:17; 149:2-14. If Defendant were really "work[ing] with DK IT," he would have used the file-transfer method they instructed him to use in December, not a method he Googled. Hernandez Aff. ¶ 2; Green Aff. ¶ 52; Harris Aff. ¶ 27

DK Slack account (including the documents described above). Harris Aff. ¶¶ 31-32.

Defendant's conduct from January 27 (the day he received his Fanatics job offer) to February 1 (the day he departed DK) also proves he engaged in willful misappropriation. Defendant does not dispute he downloaded or accessed DK confidential information *after resolving to accept the Fanatics job, while staying at Rubin's home and planning for litigation against DK*. And incontrovertible evidence refutes his self-serving plea (at 6) he was just "continu[ing] to perform his job" by accessing these documents. He accessed documents he had no legitimate business justification for accessing. *See* ECF 80 (Russell Aff.) ¶¶ 5, 7, 8; Henley Aff. ¶¶ 35, 38. He had stopped responding to virtually all DK email, Harris Aff. ¶ 20, and had stopped working for DK almost entirely: After January 28, and "given that [he] expected to join Fanatics VIP," Hermalyn "purposely" "avoid[ed] hearing information about [DK] while [he] had an offer pending from Fanatics." Def. TRO Decl. ¶ 34. He was already working for his future employer Fanatics—stealing DK's VIP playbook just days before assuming the leadership of Fanatics' nascent VIP business.

Defendant also lies when he says he "turned over all devices and accounts that could have DK information to his counsel in advance of resigning from [DK] and accepting an offer from Fanatics." Opp. 6.[9] Defendant admits he did not turn over his personal iPad and Dropbox account, which contain DK confidential information, to counsel until March—more than a month after departing DK. ECF 74-15 at 3.

**Defendant Brazenly Solicited DK's Employees and Customers.** Conclusive evidence, including sworn affidavits supported by contemporaneous notes from Metz and Larracey and

---

[9] The Opposition's statement that Defendant "obtained a new phone *with a new number*," Opp. 11, is false. *See* ECF 74-15 at 3.

Defendant's own admissions, prove that the same day Defendant departed from DK and started at Fanatics—while he was staying in Rubin's residence—he solicited Metz and Larracey, his two valuable lieutenants on DK's VIP team. P.I. MOL 13-15; Metz Aff. ¶¶ 7-10; Larracey Aff. ¶¶ 7-11. Knowing their DK compensation (including from confidential documents he had already taken), Defendant told them which positions to apply for, offered them multi-million dollar employment packages, and advised he was acting with Rubin's imprimatur. *Id.* Defendant even instructed Larracey to deny their conversation if lawyers asked about it. Larracey Aff. ¶ 17.

Confronted with Metz's and Larracey's sworn accounts, Defendant disputes whether his conduct amounts to "solicitation." *See* Def. Opp. Decl. ¶ 3. Defendant's own admissions confirm it does. Defendant directed these key DK employees to Fanatics' career site and "talked [to Larracey] about how he was going to interview." Depo. Tr. 41:24-25, 51:18-52:4, 52:7-53:3, 54:13-16, 67:2-15, 69:3-20, 70:25-71:9. He did not deny offering to put Rubin on the phone, or suggesting "that they should consider working with [him] at Fanatics." *Id.* at 46:3-13; 54:24-55:7, 58:6-11; 64:22-25; 67:6-10. With the evidence stacked against him, Defendant purported not to "recall" those details—so the evidence in the record stands undisputed. Even now, Defendant has no explanation for the multiple calls with Larracey after February 1.[10]

Defendant's general denials and efforts to downplay the evidence of customer solicitation also fall short. *See* Opp. 24. Defendant *admits* he spoke to DK customers during Super Bowl weekend. Def. Rog. Resp. 19. DK marshalled evidence of customer solicitation *without the benefit of document discovery*, *deposing any Fanatics employees other than Defendant, or issuing*

---

[10] Fanatics' VP of Human Resources, Niles Brandon, admits Larracey applied for a Fanatics position on February 1. ECF 105 (Brandon Decl.) ¶ 6(b). Fanatics interviewed him **three days later on Sunday**, February 4. *Id.* Brandon is conspicuously silent regarding Defendant's involvement with Larracey's "recruitment" and "hiring process" *on or before February 1. Id.* ¶ 8.

*a single subpoena.  See* ECF 74-13 (DK Rog. Resp.) 35[11]; ECF 83 (Whall Aff.) ¶ 4.  And it does not matter whether Defendant's efforts were aimed at relationships that are "not exclusive."  Opp. 14 (emphasis omitted).  A bet placed at Fanatics is not placed at DK.

## ARGUMENT

**DK Is Likely To Succeed On Its Trade Secrets Claims.**  Defendant cannot provide innocent explanations for his serial misappropriation of DK's trade secrets.  Defendant cannot dispute that the documents he accessed in the leadup to his departure provide a blueprint for recreating DK's VIP program.  *See* Henley Aff. ¶¶ 34-38.[12]  Instead, Defendant quibbles with the titles of a few documents that are *not among the documents alleged to contain trade secrets*.  Opp. 26 (citing Harris Aff. ¶ 43).  And his only substantive response—that DK's strategic plan for the Super Bowl loses trade secret protection because that sporting event is over—is ridiculous.  *Id.*

Using unauthorized file-transfer services to exfiltrate documents, downloading or viewing confidential information after resolving to take another job, deleting massive amounts of documents from multiple devices (in some cases after preparing to sue DK), and failing to disclose personal devices and accounts—or turn them over to counsel for a month—is more than enough to show likelihood of success.  True, without document and forensic discovery of Defendant's devices, DK cannot know the full scope of his disclosure or use of DK's trade secrets.  *See* Opp. 24.  But, record evidence already shows he engaged in misappropriation.  *See* P.I. MOL 19-20.[13]

---

[11] Defendant argues (at 15) the Court should disregard DK's "lawyer-written interrogatory responses."  On a preliminary injunction, the Court may rely on otherwise inadmissible evidence.  *See G&L Plumbing, Inc. v. Kibbe*, 2023 WL 6881597, at *2 n.4 (D. Mass. Oct. 18, 2023).

[12] Henley's descriptions of the documents are more than enough to identify the trade secrets.  In Defendant's example, "lack of specificity" left unclear "exactly what 'trade secrets' were … misappropriated."  *Am. Sci. & Eng'g, Inc. v. Kelly*, 69 F. Supp. 2d 227, 238-39 (D. Mass. 1999).

[13] *E.g.*, *Bos. Centerless, Inc. v. DeSantis*, 2022 WL 16639138, at *1 (D. Mass. Nov. 2, 2022) (finding misappropriation when defendant "emailed to his personal email accounts multiple spreadsheets containing Plaintiff's trade secrets and confidential information").

9

**<u>DK Is Likely To Succeed On Breach of Noncompetition Obligations</u>.**  Defendant does not dispute he is in breach of his non-compete—nor could he, since his role at Fanatics is ***the same*** as his prior role at DK.  Instead, Defendant tries ***for the fourth time*** to persuade the Court to apply California law and invalidate his agreements.  This Court should reject that again.  "***Massachusetts law applies to this dispute*.**"  ECF 46 (TRO Hr'g Tr.) 53:17.  The parties agreed Massachusetts law would govern, *e.g.*, ECF 1-2, and under Massachusetts law, that agreement is enforceable because the Commonwealth has "a substantial relationship to the parties" and California does not have "a materially greater interest than Massachusetts."  TRO Hr'g Tr. 33:23-34:10.[14]

Defendant again cites the same cases this Court distinguished.  *See* Opp. 17-18; TRO Hr'g Tr. 55:12-15; ECF No. 69 (Def. MTD Mem.) 14-15.  He has yet to identify ***any*** case applying California law to a restrictive covenant between a non-California company and an employee who never lived in California until (at best) the eve of litigation—a result that would be "unfair" and allow California to dictate restrictive covenant law for the entire nation.[15]

Defendant's argument (at 19-20) that his non-compete is invalid under Massachusetts law is equally misguided.  Regardless of whether Defendant *stole* DK's confidential information (he did), he undisputedly *accessed* a blueprint for recreating DK's VIP program, information the non-compete protects.  *See* P.I. MOL 21.  The goodwill associated with DK's customer, client, partner and vendor relationships was developed on DK's dime and belongs to DK.[16]  *See* P.I. MOL 29-

---

[14] Contrary to Defendant's argument, Opp. 18 n.19, DK experiences contract injuries in Massachusetts. *See Aspect Software, Inc. v. Barnett*, 787 F. Supp. 2d 118, 126 (D. Mass. 2011).

[15] The fact that Defendant says (at 18) he has continued to work in California cannot make a difference—otherwise, an employee could *always* void restrictive covenants by fleeing to California before final judgment. *Cf.* M.G.L. c. 149 § 24L(e) (invalidating conflicting choice-of-law provisions only if employee lived or was employed in Massachusetts at least 30 days before *termination of employment*).

[16] Defendant is not a "hair stylist" with personally loyal clients, *Harrell v. Backstage Salon & Day Spa*, 2022 WL 618681, at *1 (Mass. Super. Feb. 22, 2022).

30. Defendant's non-solicit (breached the day he departed DK) and his confidentiality agreement (repeatedly breached) cannot adequately protect DK's legitimate business interests given the expertise Defendant developed at DK about how to build a VIP business, which is the lifeblood of any online gaming company. *See Nat'l Med. Care, Inc. v. Sharif*, 2020 WL 6318922, at *12 (D. Mass. Sept. 2, 2020); *SimpliVity Corp. v. Bondranko*, 204 F. Supp. 3d 340, 350 (D. Mass. 2016).

Defendant's complaints about the scope of the non-compete fare no better. DK's business is "global in its scope"; it offers "betting for major U.S. and international sports"; and its VIP customers "frequently have residences in multiple jurisdictions throughout the world." ECF 1 (Compl.) ¶ 20; *see also* ECF 5 (Karamitis Aff.) ¶ 3. Defendant was directly responsible for DK's "events and experiences business," which includes events that take place around the globe (*e.g.*, Super Bowl, Formula One). Compl. ¶ 26; *see also* Henley Aff. ¶ 9; Karamitis Aff. ¶ 12. At DK, Defendant thus "provided services" or "had a material … influence" *globally*. M.G.L. c. 149 § 24L(b)(v); *see also* Karamitis Aff. ¶ 18. Given the nature of gaming it is "reasonable" to prevent Defendant from competing against DK no matter where he lives. *See SimpliVity Corp. v. Moran*, 2016 WL 5122671, at *12 (Mass. Super. Aug. 14, 2016). As Defendant agreed in signing the non-compete § (a)(vii), global scope "is reasonable" because DK "operate[s] globally."

As the head of DK's VIP team, Defendant oversaw all facets of VIP "across all [DK's] product verticals." Henley Aff. ¶ 5. In *addition* to his focus of gaming and fantasy sports, *id.* ¶¶ 5, 16; Compl. ¶¶ 3, 27, 87, Defendant worked with ecommerce, apparel, and collectibles teams to develop branded clothing and sport-related memorabilia, Henley Aff. ¶ 11; *see also id.* ¶ 10; Def. Opp. Decl. ¶ 10. Defendant *also* "had access to highly confidential [DK] customer and strategic business information across all product verticals." Henley Aff. ¶ 13; *see also id.* ¶¶ 7, 34-38; Karamitis Aff. ¶¶ 14-16, 22-29; Compl. ¶¶ 27-28. And the confidential information he took before

his departure included identifying information for "media companies" and "content companies." Henley Aff. ¶ 35; *see also* Karamitis Aff. ¶ 26. Defendant **admits** he provided services to DK in "FSC [fantasy sports]," "Ecommerce," and "Marketplace [apparel and collectibles]"—and does not dispute he received confidential information about all of those areas and "Media." Def. Opp. Decl. ¶ 10. Thus, the "scope" of the non-compete is reasonable "in relation to the interests protected." M.G.L. c. 149 § 24L(b)(vi). Defendant does not dispute the Court can blue-pencil the non-compete if needed (it is not). *See* P.I. MOL 21-22.

**DK Is Likely To Succeed On Breach of Nonsolicitation Obligations.** Defendant has no answer to the Massachusetts cases that "routinely uph[o]ld non-solicitation agreements." *Thermal Eng'g Int'l (USA) Inc. v. Lanaville*, 646 F. Supp. 3d 202, 206 (D. Mass. 2022). He concedes such agreements are enforceable to protect "trade secrets, confidential information, or goodwill." Opp. 21. He testified that DK employee compensation (included in the documents he downloaded) is confidential. *See* Depo. Tr. 47:23-25. He overlooks that DK has a "legitimate interest in preserving the … goodwill of its employees"—including Metz and Larracey. *Thermal Eng'g*, 646 F. Supp. 3d at 206. His argument about the non-solicit's scope ignores that it prohibits solicitation of those about whom he "learned Confidential Information" or with whom he "had some involvement or knowledge," ECF 1-1 ("Confidentiality Agreement") § 2—prohibitions that are reasonably tailored to directly protect DK's trade secrets, confidential information, and goodwill.

Undisputed evidence confirms he breached the non-solicit. Defendant's *own case* warns "verbal departure announcements are innately problematic." *Fid. Brokerage Servs., LLC v. Callinan*, 2019 WL 1576097, at *7 n.7 (Mass. Super. Feb. 11, 2019). Yet Defendant does not dispute he "met with multiple DK partners, telling them he was now employed at Fanatics." Opp. 22. Worse, Defendant *admits* he spoke with Larracey multiple times, Depo. Tr. 36:8-36:13; 37:2-

38:6; 51:18-52:4, and discussed compensation, Fanatics' "career site," *id.* at 41:9-25, and Larracey's interview and application, *id.* at 67:6-10. In response to sworn testimony that he encouraged Metz and Larracey to work at Fanatics, offered to put them on the phone with Rubin, and later encouraged Larracey to move forward with interviewing, Defendant testified he could not "recall," *id.* 54:25-55:7, 58:6-11, 64:22-25, so that evidence stands unrebutted. And it is clearly "solicitation" under Massachusetts law. *E.g.*, *Advanced Micro Devices, Inc. v. Feldstein*, 2013 WL 10944934, at *11 (D. Mass. May 15, 2013) ("subtle hints and encouragements").[17]

**DK Will Suffer Irreparable Harm Absent a Preliminary Injunction.** DK has suffered and will continue to suffer irreparable harm if Defendant is not enjoined from working for Fanatics to build its "nascent" VIP program—a role Defendant would be entirely unsuited for absent the confidential information and relationships DK provided him. Defendant has **no answer** to cases holding that irreparable harm is presumed where, as here, an employee misappropriates trade secrets and breaches a non-compete agreement. *See* P.I. MOL 26. He insists (at 27-28) there is no evidence of solicitation or use of DK's confidential information since he departed DK. But the evidence, even after limited discovery, is overwhelming.

Defendant regrets his admission in California that his "utility to Fanatics" will be "damage[d]" if he cannot use DK's confidential information, *see* Opp. 27-28, but his declaration is binding and speaks for itself. *See* Def. Opp. Decl. ¶ 11. Defendant doubled down here, conceding he wants California law to apply because it supposedly "affords its residents **free rein to compete against their former employers even using confidential information**." Def. MTD Mem. 15 (emphasis altered). He could not build out Fanatics' VIP program *without* using DK's

---

[17] It makes no difference whether Defendant or Metz and Larracey placed the initial phone call. *See Corp. Techs., Inc. v. Harnett*, 731 F.3d 6, 11 (1st Cir. 2013).

confidential information—making this a *textbook* inevitable disclosure case.[18]

**The Court Should Issue The Proposed Order.** Defendant ends his brief with a two-sentence argument that the Court should narrow DK's proposed order. He forfeited any such argument by failing to develop it. *See Modeski v. Summit Retail Sols., Inc.*, 470 F. Supp. 3d 93, 110 (D. Mass. 2020). Defendant's argument is also meritless. Narrowly restricting Defendant "from competing with DK" or soliciting DK's customers only if he uses or discloses DK's confidential information (Opp. 30) is entirely insufficient under the circumstances. *Supra* p. 11.

Defendant punts argument to a five-row appendix redlining DK's proposed order. *See* ECF 102. If the Court considers the appendix, it should reject Defendant's redlines:

**Row No. 1**: Defendant ***admits*** he provided services to DK in all areas other than media—and does not dispute he received confidential information about ***all***. *Supra* pp. 11-12. Based on undisputed evidence, the Court should include DK's proposed finding (and ignore Defendant's carve-outs of granular areas within Gaming, such as dog but not horse racing). ECF 102 at 1-2.

**Row No. 2**: The Court should reject Defendant's attempt (ECF 102 at 2-3) to rewrite the plain text of Section (g) of the Noncompetition Covenant, which in fact—and as Defendant does not dispute—extends the duration of Defendant's non-competition obligation as set forth therein.

**Row No. 3**: The Court should enjoin Defendant from violating his non-compete for 12 months from the date of its order—not the date Defendant departed DK. *See* ECF 102 at 3. The non-compete expressly provides that it extends from "the time" any "breach" or "threatened breach" is terminated, Noncompetition Covenant § (g), and even in the appendix Defendant offers no argument against that extension. This Court should not permit Defendant to "benefit[] from his

---

[18] Defendant's *own case* "make[s] clear that the inevitable disclosure doctrine may be used to establish irreparable harm once a party seeking an injunction has already established a likelihood of success." *U.S. Elec. Servs., Inc. v. Schmidt*, 2012 WL 2317358, at *9 (D. Mass. June 19, 2012).

breach of the non-compete provisions" by subtracting the time he has been working for Fanatics. *Nat'l Eng'g Serv. Corp. v. Grogan*, 2008 WL 442349, at *7 (Mass. Super. Jan. 29, 2008).

The Court should reject Defendant's attempt to pare back the scope of the non-compete. It is undisputed on this record that Defendant "performed services or received Confidential Information" for Gaming, FSC, Marketplace, Ecommerce, and Media during the six months before he departed DK. Noncompetition Covenant § (a). And the non-compete is *narrower* than Massachusetts law allows, because it applies only a six-month look back, rather than the presumptively reasonable two-year look back. M.G.L. c. 149 § 24L(b)(vi).

Similarly, Defendant's insistence that the geographic scope of the non-compete should be limited to a handful of states (ECF 102 at 4) ignores the undisputed record evidence about the national and global scope of DK's business and Defendant's activities—and his own contractual acknowledgment that the global scope is reasonable, which he should not be allowed to dispute now. *Supra* p. 11. It also blinks reality: preventing Defendant from directly competing against DK in only a few states when both DK's and Fanatics' platforms are **accessible from anywhere in the United States with an internet connection** would be absurd.

**Rows 4 and 5**: This Court has already rejected Defendant's efforts to redline the non-solicit provisions. ECF 59; *see* ECF 49. As the Court explained, the limitations imposed "are qualified" and protect DK's "confidential information and trade secrets." ECF 59. That is all the more obvious in light of the new evidence DK has presented to this Court. Nor should the Court revise his non-solicit agreement to protect *only* confidential information and trade secrets; that agreement is valid and enforceable as written and should be enforced to prevent irreparable harm.

\* \* \*

The Court should grant DK's Motion for Preliminary Injunction. ECF Nos. 72, 72-1.

Dated: March 28, 2024

Respectfully submitted,

/s/ Andrew S. Dulberg
William F. Lee (BBO #291960)
Andrew S. Dulberg (BBO #675405)
WILMER CUTLER PICKERING
    HALE AND DORR LLP
60 State Street
Boston, MA 02109
Telephone: (617) 526-6000
william.lee@wilmerhale.com
andrew.dulberg@wilmerhale.com

GIBSON, DUNN & CRUTCHER LLP
Orin Snyder (*pro hac vice*)
Harris M. Mufson (*pro hac vice*)
Justine M. Goeke (*pro hac vice*)
Christine Demana (*pro hac vice*)
Justin M. DiGennaro (*pro hac vice*)
200 Park Avenue
New York, NY 10166-0193
Tel: 212.351.4000
Fax: 212.351.4035
OSnyder@gibsondunn.com
HMufson@gibsondunn.com
JGoeke@gibsondunn.com
CDemana@gibsondunn.com
JDiGennaro@gibsondunn.com

Jason C. Schwartz (*pro hac vice*)
Jacob T. Spencer (*pro hac vice*)
1050 Connecticut Avenue, N.W.
Washington, D.C. 20036
Tel: 202.955.8500
JSchwartz@gibsondunn.com
JSpencer@gibsondunn.com

*Attorneys for Plaintiff DraftKings Inc.*

## CERTIFICATE OF SERVICE

I, Andrew S. Dulberg, counsel for Plaintiff, hereby certify that this document has been filed through the Court's ECF system and will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF).

/s/ Andrew S. Dulberg
Andrew S. Dulberg