# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

|  |  |  |
|---|---|---|
| DRAFTKINGS INC., | ) | |
| Plaintiff, | ) | |
| v. | ) | No. 1:24-cv-10299-JEK |
| MICHAEL HERMALYN, | ) | |
| Defendant. | ) | |

## MEMORANDUM AND ORDER ON PLAINTIFF'S MOTION FOR A PRELIMINARY INJUNCTION AND DEFENDANT'S MOTION TO DISMISS OR ALTERNATIVELY TO STAY THIS ACTION

**KOBICK, J.**

On February 1, 2024, defendant Michael Hermalyn left his job as a Senior Vice President at plaintiff DraftKings, Inc. to join its digital sports entertainment and gaming competitor, Fanatics, Inc., in a nearly identical role. This lawsuit followed four days later. DraftKings claims that, in connection with his departure, Hermalyn misappropriated its trade secrets and confidential business information in violation of state and federal law, and breached his contractual confidentiality, non-solicitation, and noncompete obligations. After a hearing, the Court granted in part and denied in part DraftKings's motion for a temporary restraining order.

Following a period of limited discovery, DraftKings has moved for a preliminary injunction against Hermalyn. Hermalyn opposes that motion and has moved to dismiss this action on *forum non conveniens* grounds or alternatively to stay this case pursuant to *Colorado River Water Conservation District v. United States*, 424 U.S. 800 (1976), in favor of the first-filed California state court action, which he initiated against DraftKings to, among other things, invalidate his restrictive covenants. For the reasons to be explained, the Court will grant

DraftKings's motion for a preliminary injunction. DraftKings has established a substantial likelihood of success on its claims that Hermalyn breached his contractual commitments and misappropriated its trade secrets, and that the remaining equitable considerations favor injunctive relief. The Court will also deny Hermalyn's motion to dismiss or alternatively to stay this case. This Court is the appropriate forum for the litigation, and the *Colorado River* abstention doctrine does not warrant a stay.

## FACTUAL BACKGROUND

The following facts are drawn from the parties' evidentiary submissions, including their supporting affidavits and exhibits, the witnesses' testimony at the April 16, 2024 evidentiary hearing, and, in a few instances, the verified complaint. Except where otherwise noted, the facts are undisputed.

## I.    Hermalyn's Employment at DraftKings.

### A.    Hermalyn's Job Responsibilities.

DraftKings is in the competitive digital sports entertainment and gaming industry. ECF 5, ¶ 3. It competes with other online sports platforms, including Fanatics, for valuable individual customers and key partners, such as celebrities and athletes. *Id.* ¶¶ 9, 19, 22; ECF 36, ¶ 19. DraftKings is incorporated in Nevada and has a principal place of business in Boston, Massachusetts. ECF 1, ¶ 12. Its fantasy sports products are available to customers in over 40 states, and its sports betting is offered in 24 states. ECF 5, ¶ 3. DraftKings also has offices and operates in Canada, Israel, and parts of Europe. *Id.*

DraftKings employed Hermalyn from September 14, 2020 until he resigned on February 1, 2024. *Id.* ¶¶ 6-7; ECF 89, ¶ 3. Hermalyn started as DraftKings's Senior Vice President of Business Development before becoming, in May 2022, the "Senior Vice President of Growth,

Customer," primarily responsible for developing and maintaining relationships with high-value individuals or so-called "VIP" customers. ECF 89, ¶¶ 3-5. He was well compensated as a senior executive at DraftKings. ECF 1, ¶¶ 1, 4-5, 51, 97. As part of his duties, Hermalyn oversaw DraftKings's VIP acquisition team, managed the VIP Hosts program, and was responsible for DraftKings's events, as well as its strategy and enablement team. ECF 89, ¶¶ 6-10. Hermalyn was also involved in DraftKings's customer loyalty team. *Id.* ¶ 11.

In those roles, Hermalyn had access to proprietary, confidential, and sensitive business information concerning DraftKings's VIP customers; its strategies for cultivating loyal customers; its plans to develop celebrities and influencers; and its ecommerce, collectibles, and apparel teams. *Id.* ¶¶ 7, 11, 13. According to DraftKings's Chief Customer Officer, Shawn Henley, that information could give DraftKings's competitors an unfair advantage by enabling them to capitalize on its business strategies and developments and, in turn, "to jump in the market at the highest levels" based on DraftKings's work. *Id.* ¶¶ 2, 14. Hermalyn also had access to compensation information regarding employees in the VIP department, which could be used by competitors to solicit those employees. *Id.* ¶ 17.

Hermalyn primarily worked for DraftKings from his house in New Jersey or at its office in New York City. ECF 28, ¶ 9; ECF 74-1, ¶¶ 2, 9. He also traveled to Boston for DraftKings business 25 times between May 2021 and November 2023. ECF 98-1, at 7-9. That amounts to visiting Massachusetts, on average, approximately once every six weeks. ECF 97, at 4.

**B.     Hermalyn's Employment Contracts.**

When Hermalyn joined DraftKings, he signed several employment contracts central to this case. On August 31, 2020, he signed a "Nonsolicitation, Nondisclosure & Assignment of Inventions Agreement." ECF 1-1; ECF 74-1, ¶ 14 & Ex. A. As part of that agreement, Hermalyn

agreed, for a period of twelve months after the end of his relationship with DraftKings, not to solicit DraftKings's customers, clients, vendors, employees, or contractors. ECF 1-1, §§ 2-3. Specifically, for that twelve-month period, he agreed that he would not:

> directly or indirectly either for [himself] or for any other person, partnership, legal entity, or enterprise, solicit or transact business, or attempt to solicit or transact business with, any of the Company's customers, clients, vendors or partners, or with any of the Company's prospective customers, clients, vendors or partners about which [Hermalyn] learned Confidential Information . . . . or which [Hermalyn] had some involvement or knowledge related to the Business of the Company.

*Id.* § 2. Likewise, for that twelve-month period, he agreed that he would not:

> directly or indirectly either for [himself] or for any other person, partnership, legal entity, or enterprise: (i) solicit, in person or through supervision or control of others, an employee, advisor, consultant or contractor of the Company for the purpose of inducing or encouraging the employee, advisor, consultant or contractor to leave his or her relationship with the Company or to change an existing business relationship to the detriment of the Company, (ii) hire away an employee, advisor, consultant or contractor of the Company; or (iii) help another person or entity hire away a Company employee, advisor, consultant or contractor.

*Id.* § 3.

In the same contract, Hermalyn agreed that he would "not directly or indirectly either for [himself] or for any other person, partnership, legal entity, or enterprise use or disclose any such customer, partner, or vendor information except as may be necessary in the normal conduct of the Company's business for the specific customer, partner, or vendor," and "that at the end of [his] relationship with the Company, or upon request by the Company, [he would] return to the Company any materials containing such information." *Id.* § 4. Hermalyn further agreed that he would not:

> during or after [his] employment: (i) use any Confidential Information for any purpose that is not authorized by the Company; (ii) disclose any Confidential Information to any person or entity, except as authorized by the Company in connection with [his] job duties; or (iii) remove or transfer Confidential Information from the Company's premises or systems except as authorized by the Company.

*Id.* § 5. The agreement added that upon his termination, Hermalyn would "immediately surrender to the Company all Company property in [his] possession, custody, or control, including any and all documents, electronic information, and materials of any nature containing any Confidential Information, without retaining any copies." *Id.*

That same day, Hermalyn also signed a noncompetition covenant with DraftKings. *Id.* at 10-14. Later, on August 16, 2023, in exchange for a multimillion-dollar equity grant, Hermalyn executed another "Noncompetition Covenant" that prohibited him from competing with DraftKings for twelve months after his employment ended. ECF 1-2, at 1, 11-17; ECF 74-1, ¶ 15 & Ex. B; *see* ECF 1, ¶ 97; ECF 89, ¶ 15. More specifically, Hermalyn:

> agree[d] to not, anywhere within the Restricted Area, acting individually, or as an owner, shareholder, partner, employee, contractor, agent or otherwise (other than on behalf of Company): (1) provide services to a Competing Business that relate to any aspect of the Business of the Company . . . for which [he] performed services or received Confidential Information . . . at any time during the six (6) month period prior to such termination; or (2) commit a Threatened Breach of the obligation set forth in the immediately preceding clause.

ECF 1-2, at 11, § (a). Each of those capitalized terms was defined in the agreement. *See id.* at 11-14, § (a). "Restricted Area," for example, meant "any place within the United States or anywhere else in the world." *Id.* at 13, § (a)(vii).

Hermalyn also "agree[d] that the enforcement of this Noncompetition Covenant is necessary, among other things, to ensure the preservation, protection and continuity of the Company's Confidential Information, trade secrets and goodwill," and "that, due to the proprietary nature of the Business of the Company and relationships with others, the restrictions during [his] Relationship with the Company and post-Relationship restrictions set forth herein are reasonable as to duration and scope." *Id.* at 14-15, § (d). He further "acknowledge[d] that this Noncompetition Covenant is necessary because, among other things, the Company's interests

cannot be adequately protected through an alternative restrictive covenant." *Id.* at 15, § (d). In addition, Hermalyn "agree[d] that any breach, Threatened Breach or challenge to the enforceability of this Noncompetition Covenant would cause the Company to suffer immediate and irreparable harm for which monetary damages are inadequate." *Id.* at 15, § (e).

## II.   <u>Hermalyn's Departure from DraftKings and Move to Fanatics.</u>

On January 3, 2024, Hermalyn learned that he was under investigation by DraftKings for workplace misconduct. ECF 89, ¶ 20. On January 11, he met with Shawn Henley, his direct supervisor, concerning the investigation. *Id.* ¶¶ 3, 23. That same day, Hermalyn contacted the CEO of Fanatics, Michael Rubin, to ask about applying for a head of VIP position at Fanatics. ECF 36, ¶ 13. Rubin and Hermalyn spoke that night and met in Rubin's New York City apartment on January 23. *Id.*; ECF 130, at 47:18-20. Hermalyn also met with other members of the Fanatics executive team during the week of January 23. ECF 36, ¶ 13; ECF 130, at 47:25-48:2.

Hermalyn learned the results of DraftKings's investigation of his potential workplace misconduct on January 26. ECF 89, ¶ 27. Henley told Hermalyn that he would be put on a performance improvement plan, lose his Senior Vice President title, receive reduced incentive compensation and responsibilities, and no longer have access to his hospitality cards or an executive assistant. *Id.*

On January 27, Hermalyn met Rubin in person in Pennsylvania, and Rubin offered Hermalyn a job at Fanatics. ECF 36, ¶ 14. That same day, Hermalyn's close friend passed away. *Id.* ¶ 30. On January 28, Hermalyn decided that he would accept the position at Fanatics, subject to an agreement on the key terms, and he traveled to Los Angeles that night. *Id.* ¶ 7; ECF 71, ¶ 2.

While he was in Los Angeles, from January 28 to February 1, 2024, Hermalyn stayed in the house of the Fanatics CEO, Michael Rubin. ECF 86-1, at 55:11-14. In his February 7 declaration in opposition to the temporary restraining order ("TRO") motion, Hermalyn represented that he "did not visit Fanatics' Los Angeles office—or any Fanatics office—prior to accepting Fanatics VIP's offer of employment" on February 1. ECF 36, ¶ 17. He failed to disclose, however, that he was staying in Rubin's house while he was in Los Angeles. ECF 130, at 57:7-58:7. Hermalyn also misrepresented his location to DraftKings colleagues in the final days of January. On a January 30 phone call with DraftKings's Senior Director for Events, Brittney Goodman, Hermalyn said that he was with his family in New Jersey grieving the passing of their mutual friend. *Id.* at 216:23-217:5.

Hermalyn made arrangements for his move to California on January 29, including leasing an apartment there, obtaining a California driver's license, purchasing a car, registering to vote in the State, and scheduling appointments with a doctor and a dentist in the area. ECF 36, ¶¶ 9-10. Between January 29 and January 31, 2024, Hermalyn avoided attending DraftKings's meetings and responding to work emails because, in his telling, he did not want to "hea[r] information about DraftKings while [he] had an offer pending from Fanatics." ECF 36, ¶ 34. During that time, he received roughly 365 work emails but only replied to six of them. ECF 90, ¶ 20.

On February 1, 2024, Hermalyn formally accepted the job as President of Fanatics VIP and the Head of Fanatics's Los Angeles office. ECF 74-1, ¶ 3. In his new role, he plans "to further build out [his] Fanatics VIP team" because it "is in a nascent stage." *Id.* ¶¶ 5, 19. This includes developing all three of Fanatics's business verticals: "e-commerce, collectibles, and gaming." ECF 86-1, at 196:9-14. He also "oversee[s] the planned consolidation of the greater

Los Angeles-area offices (including Fanatics' Irvine location) into a single location in Los Angeles." ECF 74-1, ¶ 7.

### III.   Hermalyn's Interactions with Confidential DraftKings Documents.

DraftKings alleges that, between January 12, 2024 and February 1, 2024, in anticipation of joining Fanatics, Hermalyn improperly accessed or downloaded a number of its highly confidential documents. Hermalyn denies any impropriety in his interactions with the documents and contends that he was authorized to access each one of them.

The following facts regarding Hermalyn's interactions with DraftKings's confidential documents are undisputed. As an employee of DraftKings, Hermalyn had access to DraftKings's Google Workspace and, through its document repository, had access to many confidential documents that had been affirmatively shared with him. ECF 90, ¶¶ 15, 17. He did not have a DraftKings-issued cell phone, but he was authorized to use his personal cell phone and Slack, a messaging platform that enables users to share messages, data, and documents, for work, so long as he adhered to DraftKings's information security policies. ECF 90, ¶¶ 29, 42; ECF 130, at 200:14-18, 207:12-15. Hermalyn was not authorized to use Airdrop, a file transfer service for Apple devices, or Dropbox, a cloud-based file storage service, for work. ECF 90, ¶¶ 34-37.

The parties agree that, in mid-December 2023, Hermalyn requested a new work laptop because he wanted something lighter and newer than his 16-inch 2021 MacBook Pro. ECF 90, ¶¶ 25-26. DraftKings gave him a replacement 14-inch 2023 MacBook Pro. *Id.* On December 22, 2023, Hermalyn spoke with George Hernandez, a senior desktop support specialist, about how to transfer files from one work laptop to another. *Id.* ¶ 26; ECF 93, ¶¶ 1-2. Hernandez instructed Hermalyn to use Microsoft OneDrive to transfer files. ECF 93, ¶ 2. It is undisputed that

Hermalyn was not authorized to use AirDrop, Dropbox, Transfernow.net, or Slack to transfer files from his old 16-inch laptop to his new 14-inch laptop. ECF 90, ¶¶ 27, 37.

Aside from these undisputed facts, the parties' factual narratives, and the inferences drawn therefrom, differ in significant respects. The Court thus sets forth each party's view of the relevant facts.

### A.    DraftKings's Account.

DraftKings's allegations concerning Hermalyn's interactions with its confidential documents center on three time periods: (1) January 12, the day after Hermalyn first contacted Rubin; (2) January 16 to 17, when Hermalyn undertook significant file transfers and deletions; and (3) January 23 to February 1, when Hermalyn was meeting with Rubin and staying in his house.

**January 12, 2024:** DraftKings contends that Hermalyn began misappropriating its confidential documents on January 12, one day after he contacted Rubin, the CEO of Fanatics, about applying for a Head of VIP job at Fanatics. That day, Hermalyn accessed two documents from DraftKings's Google Workspace. ECF 89, ¶ 34. The first document, entitled "2024-VIP," is a slide deck that is, according to Henley, "essentially a playbook for DraftKings's VIP business operation and divulges VIP goals and organizational structure," to which only six other individuals had access. *Id.* The second document, named "VIP Org Charts," is another slide deck containing non-public information that, in Henley's view, "a competitor could misappropriate to replicate DraftKings' customer-facing workstreams" and "would be invaluable to a competitor for recruiting purposes." *Id.*

**January 16 and 17, 2024:** On January 16, Hermalyn transferred and deleted a large number of personal documents and DraftKings documents using different devices and programs.

First, on his 16-inch laptop, he visited Dropbox.com, which is not an approved website, for three hours. ECF 90, ¶¶ 34-36; ECF 87, ¶ 14. Without access to Hermalyn's Dropbox account, DraftKings cannot know whether he transferred any files to that account. ECF 87, ¶ 14. Next, Hermalyn attempted to transfer seven files—five successfully—from his 16-inch laptop to an iPhone via Airdrop, which is again not authorized by DraftKings. ECF 90, ¶ 37; ECF 87, ¶ 15.[1] Hermalyn then sent himself eighteen confidential DraftKings files over Slack and accessed seven of those documents on a personal phone. ECF 90, ¶¶ 30-31; ECF 89, ¶ 35. The files included a July 2023 spreadsheet, "(July2023)VitalTalent_CompAdjustments.xlsx," that detailed compensation for thousands of DraftKings employees, and another spreadsheet, "MZH_ExecView.xlsx," that described DraftKings's contracts and identified hundreds of its current and former business partners. ECF 89, ¶ 35; ECF 90, ¶ 31; ECF 114, at 5. At the hearing, DraftKings's Chief Information Security Officer, Brian Harris, testified that Hermalyn could have exfiltrated the data in these files by taking a screenshot or cutting and pasting the material into another document. ECF 130, at 208:11-17.[2]

Later that evening, Hermalyn searched "move big files" on Google and accessed Transfernow.net, which is not a DraftKings-authorized website. ECF 90, ¶ 33; ECF 87, ¶ 18. DraftKings's Information Sensitivity Policy specifically states that its "Confidential Information and Internal Use Information must not be disclosed by any means to non-approved third parties" without Harris's express permission. ECF 90, ¶ 33.

---

[1] DraftKings cannot, at this time, identify what specific files Hermalyn transferred or to which device those files were transferred via AirDrop. ECF 87, ¶ 15.

[2] The declaration of Mitchell Green, Stroz Friedberg's Manager in the Digital Forensics and Incident Response Group, includes, for example, an appendix listing 61 screenshots that he was able to recover from Hermalyn's laptops. *See* ECF 87, ¶¶ 2, 42 n.15; ECF 87-3.

DraftKings alleges that over the next two weeks, Hermalyn engaged in a cover-up by deleting hundreds of files from his laptops. For instance, on January 17, Hermalyn removed the Dropbox application from his DraftKings laptop and thereby deleted, based on the file names, numerous sensitive business development and personnel documents. ECF 90, ¶¶ 34 n.3, 36. The presence of that application on his laptop violates DraftKings's Workstation & Mobile Device Policy, which provides that "[o]nly DraftKings approved software may be installed on Workstations and Mobile Devices owned or leased by DraftKings." *Id.* ¶ 35. Around that same time, Hermalyn also deleted or attempted to delete numerous files and data from both his 16-inch and 14-inch laptops. ECF 87, ¶¶ 20, 24. In particular, 237,351 files were permanently deleted from his 16-inch laptop between January 16 and 17, 2024. *Id.* ¶ 25. He also cleared his web browsing history. *Id.* ¶¶ 30-31. Likewise, between January 17 and January 28, 2024, 120 files and at least 115 user-created files were permanently deleted from his 14-inch laptop. *Id.* ¶¶ 35, 37. According to Green's forensic analysis, this "deletion activity . . . is consistent with an intentional effort to manually delete substantially all user-created files from the laptops," rather than a factory reset wipe. *Id.* ¶ 23; *see id.* ¶¶ 24, 38. Green also points out that, according to the user activity report, Hermalyn began using that 14-inch laptop nearly one month earlier, on December 18, by syncing with Google Workspace and using Google Chrome, and that 14 of 18 the files that he allegedly transferred via Slack from his old laptop were never downloaded to his new laptop. *Id.* ¶¶ 52-53.

**January 23 to February 1, 2024:** On January 24, one day after meeting with Rubin at Rubin's New York City apartment, Hermalyn accessed a document entitled "BD Team Tracker – Weekly Report," which was dated November 27, 2023. ECF 90, ¶ 43; ECF 91, ¶ 6. DraftKings's Senior Manager in Business Initiatives, Samuel Russell, who is responsible for managing those

weekly reports, stated in an affidavit that, after November 2023, "[n]o one at DraftKings would have had a legitimate business need to access" that report. ECF 91, ¶¶ 2, 4-7. Accessible to fewer than thirty employees, the report contained "a highly sensitive" 181-page chart detailing DraftKings' "short-term and long-term priority deals and projects," "then-ongoing contracts and their current status," "target markets, media, and platforms," and "internal questions and comments . . . reflecting DraftKings' confidential business strategies." *Id.* ¶¶ 6, 11. According to Russell, Hermalyn did not need to review the report for his weekly team calls after he transitioned from business development to VIP in May 2022. *Id.* ¶¶ 7-8.

Between January 29 and February 1, 2024, after deciding to accept a job with Fanatics and while staying at Rubin's house, Hermalyn downloaded, among other files, three documents from DraftKings's Google Workspace that contained confidential business information. ECF 89, ¶ 38. He did so while connected to a network called "fanatics.ear2.losangeles1.level3.net." ECF 90, ¶ 44. It is possible, according to Harris, that Fanatics "may automatically have access to those files" because the downloads occurred on Rubin's network. ECF 130, at 214:9-14.

The first document, a presentation called "BD_Gaming101," was downloaded by Hermalyn on January 29, January 30, and February 1, the same day that he resigned from DraftKings. ECF 6, ¶ 17; ECF 90, ¶ 43. It "is a pitch deck used to demonstrate DraftKings's value proposition to its prospective business partners" and "contains DraftKings' confidential strategies for building partnerships with potential business partners." ECF 5, ¶ 28. According to Henley, Hermalyn had no "legitimate business reason to access" the document. ECF 89, ¶ 38.

The second document is a PowerPoint presentation entitled "VIP BI-MONTHLY UPDATE." ECF 89, ¶ 38; ECF 90, ¶ 43. Hermalyn downloaded it on February 1. ECF 90, ¶ 43.

This document could "allow a competitor to see what's working for DraftKings and what's not" and "assist a competitor in recruiting high-performing talent." ECF 89, ¶ 38.

The third document, which Hermalyn accessed on January 30, is an Excel spreadsheet entitled "(Master) SB 2024" containing DraftKings's plans for entertaining some of its business partners at the 2024 Super Bowl and listing those partners. ECF 89, ¶ 38; ECF 90, ¶ 43; ECF 92, ¶¶ 5-6. The document remains confidential today because those enclosed invitees "are strategic drivers for [DraftKings's] business, throughout the year." ECF 130, at 218:7-12.

According to DraftKings, Hermalyn could have downloaded "BD_Gaming101" and "VIP BI-MONTHLY UPDATE" on February 1 despite having purportedly turned over his phone and two DraftKings laptops to counsel the night before. ECF 130, at 181:6-14. Harris testified that Hermalyn could have accessed those two documents on any device with the Google Workspace application that had previously been authenticated. *Id.* at 181:17-182:15.

### B. Hermalyn's Account.

Hermalyn maintains that he did not improperly access any DraftKings document or share any confidential information or trade secrets with Fanatics. In his February 7 declaration, Hermalyn averred that he "did not . . . provide DraftKings' confidential information or any DraftKings documents to Fanatics or any of its affiliates, including Fanatics VIP." ECF 36, ¶ 52. At his March 6 deposition, he similarly testified that he "handed over" "[a]nything that was in [his] possession when [he] worked at DraftKings." ECF 86-1, at 133:23-25. He reiterated in his more recent March 21 declaration that he "did not take any of DraftKings' confidential information in anticipation of leaving; [he] did not use or disclose any DraftKings confidential information other than for DraftKings business; and [he] do[es] not have or have access to any of DraftKings' confidential information." ECF 104, ¶ 9. Hermalyn likewise testified at the hearing

that he did not "disclos[e] any DraftKings' confidential information to Fanatics" or "anybody else," and that he does not possess any such information. ECF 130, at 89:3-90:1.

With respect to the January 16 file transfers, Hermalyn testified at his deposition that he did not recall using Dropbox or AirDrop that day. ECF 86-1, at 125:5-11, 127:4-9. He also testified that, at first, he did not recall Slacking himself eighteen confidential DraftKings documents. ECF 130, at 37:1-15; ECF 86-1, at 119:19-121:25. After being shown Slack messages he sent to Hernandez that night, however, Hermalyn stated that he knew "exactly" what he was doing at the time: conducting an "ordinary course migration" in switching from his old 16-inch laptop to his new 14-inch one. ECF 130, at 37:15-25, 36:19-25, 42:18-21; *see* ECF 86-1, at 134:16-135:21, 141:19-142:5, 156:9-20. In those messages, Hermalyn stated that he "either slacked to [himself] or transferred the personal docs [he] had on the drive." ECF 93, ¶ 3. He testified at the hearing that he Slacked himself DraftKings business documents and AirDropped his personal files from the laptop to his iPhone. ECF 130, at 36:11-14, 38:19-25, 39:12-16, 46:15-22. The Slacked business documents could then be available on his new laptop whenever he opened Slack. ECF 130, at 79:7-15. Hermalyn does not refute that he accessed the "(July2023)VitalTalent_CompAdjustments" spreadsheet or that he viewed it on his phone. *Id.* at 39:18-40:22; *see* ECF 90, ¶¶ 31-32. He also does not refute that he deleted files from his old laptop and cleared his browser history. ECF 130, at 41:1-12, 42:11-17, 51:24-52:2.

As to the period after he met with Rubin on January 23, Hermalyn testified that he "operated in extreme caution," and did so "specifically on the 28th." *Id.* at 87:13-14. Accordingly, at the end of January, he deleted only personal files from his laptop, not DraftKings material, because he did not have a separate personal computer. *Id.* at 54:1-18, 77:11-78:7. He added that, in the event that he did delete DraftKings documents, he "would have been positive

[they] were somewhere saved on the Cloud" or, in other words, DraftKings's Google Workspace. *Id.* at 52:23-53:8, 78:13-25.

Hermalyn does "not believe" that he accessed or downloaded the "BD Team Tracker – Weekly Report" on January 24, but stated in an affidavit that if he did access or download that document, he did not do so to share its contents with anyone at Fanatics. ECF 36, ¶¶ 58-59. He denies accessing any DraftKings documents from Los Angeles on February 1 because he turned his phone and laptops over to counsel the night before so, in his view, it would have been impossible to do so. ECF 130, at 65:6-66:5, 89:3-17. He thus denies accessing or downloading the confidential "VIP BI-MONTHLY UPDATE" on February 1. With respect to the "BD_Gaming 101" presentation, Hermalyn stated that he did "not believe" that he accessed or downloaded it on January 29 or January 30, and he denied accessing it on February 1. ECF 36, ¶ 61. He also swore that he did not "give it, or the information in it, to Fanatics or any of its affiliates, including Fanatics VIP, or anyone else." *Id.* At the hearing, he similarly testified that he "didn't think [he] opened that document." ECF 130, at 60:21-61:23.

Hermalyn admitted to accessing the "(Master) SB 2024" spreadsheet. ECF 36, ¶ 60; ECF 104, ¶ 6. In his February 7 declaration, he stated that he accessed the spreadsheet on January 30 to address Goodman's inquiry about VIP customers who still needed invitations to DraftKings's then-upcoming Super Bowl events. ECF 36, ¶ 60. In his March 21 declaration, Hermalyn corrected his prior declaration, swearing—consistent with Goodman's declaration—that she reached out about DraftKings's business partners, not VIP customers. ECF 104, ¶ 7. He also previously stated that he "did not give the '(Master) SB 2024' spreadsheet, or the information in it, to Fanatics or any of its affiliates, including Fanatics VIP," and that he does "not have access to, or any copies of," it. ECF 36, ¶ 60.

Hermalyn represented that, on January 31, before resigning from DraftKings on February 1, he turned over his personal phone and his two DraftKings laptops to his counsel. ECF 36, ¶ 45; ECF 86-1, at 189:21-190:7, 191:3-17. He also represented that he later provided his counsel with an older laptop, which he had not used for several months and did not know if it belonged to DraftKings. ECF 36, ¶ 47. Hermalyn further testified to turning his iPad over to counsel roughly one month after February 1, which he similarly did not recall using for DraftKings work. ECF 86-1, at 138:12-20, 191:18-194:6; ECF 114, at 7. He represented that he turned over his Dropbox account to counsel at the same time. ECF 114, at 7.

## IV.   Hermalyn's Phone Calls with DraftKings Employees.

DraftKings also alleges that Hermalyn solicited two of its employees—Hayden Metz and Andrew Larracey—after he left DraftKings and began work at Fanatics on February 1. At DraftKings, Metz and Larracey reported to Hermalyn as part of the VIP team and he worked "very close[ly]" with them. ECF 130, at 16:1-3; ECF 89, ¶ 40. The parties present the following contradictory accounts of the interactions among Hermalyn, Metz, and Larracey during a series of phone calls from February 1 through February 3, 2024.

### A.   DraftKings's Account.

Larracey and Metz submitted affidavits in support of DraftKings's preliminary injunction motion and testified at the evidentiary hearing. *See* ECF 77; ECF 88; ECF 127. Metz, currently DraftKings's Vice President of VIP Management, and Larracey, currently DraftKings's Director of VIP Operations, worked under Hermalyn at DraftKings. ECF 89, ¶¶ 40-41. Larracey and Metz live and work in Massachusetts. ECF 130, at 108:21-22, 152:5-6.

On the afternoon of February 1, 2024, Metz and Larracey called Hermalyn from a conference room in DraftKings's Boston office after discovering that his Salesforce account had

been shut off. ECF 77, ¶¶ 3-4; ECF 88, ¶¶ 3-4. While Hermalyn did not initially answer, he immediately called them back and asked them to verify that no one else was in the room. ECF 77, ¶ 4; ECF 88, ¶ 4. He then transitioned the call to FaceTime and asked Metz and Larracey to use the phone's video camera to scan the room and confirm that they were indeed alone. ECF 77, ¶ 4; ECF 88, ¶ 4; ECF 130, at 105:15-23, 147:15-148:5. Over a call lasting less than five minutes, Hermalyn said that he had resigned from DraftKings to work for Fanatics, and that Fanatics had two open positions for them in its VIP department: a Vice President role for Metz and a Senior Director role for Larracey. ECF 77, ¶ 4; ECF 88, ¶ 4.

That night, starting at 10:16 p.m. EST, Hermalyn, Metz, and Larracey spoke again for over two hours. ECF 77, ¶ 6; ECF 77-2, at 2; ECF 88, ¶ 6. During that call, Hermalyn described the two available positions at Fanatics and offered both Metz and Larracey specific base salaries, annual and signing bonuses, and initial equity allocations. ECF 77, ¶ 7; ECF 88, ¶ 8. Larracey and Metz both wrote down the numbers contained in Hermalyn's offers,[3] and Larracey took additional notes on the contents of those calls.[4] *See* ECF 77-3; ECF 88-3. One of the numbers Larracey wrote down—"$2.5 @ $28B," ECF 88-3, at 4—referred to the fact that Fanatics was valued at 28 billion dollars at that time. ECF 130, at 109:2-3. Hermalyn stated that he had authority from Fanatics to make those offers and suggested that the CEO of Fanatics, Rubin, could join the call, given that Hermalyn was calling from inside Rubin's house. ECF 77, ¶ 8; ECF 88, ¶ 9.[5] After Metz and Larracey responded that they would not accept those initial offers,

---

[3] It is undisputed that Hermalyn was aware of Metz and Larracey's compensation at DraftKings. ECF 130, at 23:9-22, 110:16-22.

[4] At the hearing, Larracey testified that he started the notes on February 1 and made edits to some of the headings and the title "within a few weeks" of the two calls but before speaking with DraftKings's legal counsel. ECF 130, at 103:4-104:21.

[5] At his deposition, Hermalyn testified that Rubin returned to staying at his house on February 1, 2024. ECF 86-1, at 55:17-18.

Hermalyn briefly left the call to speak to someone at Fanatics. ECF 77, ¶ 7; ECF 88, ¶ 8. Ten minutes later, he rejoined and offered to increase the signing bonus and equity allocation for both Metz and Larracey. ECF 130, at 12:9-14; ECF 77, ¶ 7; ECF 88, ¶ 8; *see* ECF 88-3, at 4. Hermalyn told Metz and Larracey that reporting this conversation to DraftKings would be the "nuclear option," which Metz and Larracey understood to mean that the discussion should remain secret. ECF 77, ¶ 9.

Following that call, at 1:16 a.m. EST on February 2, 2024, Larracey applied for the position at Fanatics that Hermalyn had suggested. ECF 88-4; ECF 88, ¶ 14. Larracey did not submit anything substantive with his application, such as a resume or information about his current employer or job title. ECF 130, at 111:25-112:12. Instead, he merely provided Fanatics with his name, email address, and phone number. *Id.* at 111:17-24. Six minutes later, at 1:22 a.m. EST, Larracey, Metz, and Hermalyn talked again. *Id.* at 113:13-24. Larracey told Hermalyn that he had applied for the Fanatics job, and Metz and Hermalyn continued to negotiate Metz's offer at Fanatics. *Id.* at 113:15-114:4. At 1:59 a.m. EST, Larracey and Hermalyn spoke for another nineteen minutes. *Id.* at 114:6-10. During that call, Hermalyn said that he was excited about Larracey's application and indicated that it was the right move. *Id.* at 114:11-20. Hermalyn expressed similar sentiments during a call that began on 9:43 a.m. EST on February 2, 2024. *Id.* at 115:3-6. He also mentioned during that follow-up call that someone from Fanatics's Human Resources team would be reaching out to Larracey about interviews, and that Rubin was excited for Larracey to join Fanatics. *Id.* at 115:8-22.

About an hour later, at 11:04 a.m. EST, Larracey received an email from the Recruiting Manager for the Fanatics's Holding Company about scheduling an interview that day. ECF 88-5, at 7. In contrast, when Larracey applied for a different position at Fanatics in 2022, he did not

receive a response or an interview. ECF 130, at 112:16-113:7. The Recruiting Manager followed up that evening about scheduling interviews with the Vice President of Human Resources and three other Fanatics employees, including Tucker Kain, Fanatics's Chief Strategy & Growth Officer, over the next two days, a Saturday and Sunday. ECF 88-5, at 4-6. Larracey did not respond that day. *Id.* at 4.

The next morning, on Saturday, February 3, 2024, Hermalyn called Larracey to encourage him to meet with those Fanatics employees and to say that "it would reflect poorly on [Hermalyn] if [Larracey] did not." ECF 88, ¶ 16. Hermalyn also mentioned that he had spoken to Kain about Larracey. ECF 130, at 118:15-20. This call between Larracey and Hermalyn lasted thirty minutes. ECF 88, ¶ 16; ECF 88-6. Larracey ultimately had Zoom interviews with four Fanatics employees on the afternoon of Sunday, February 4. ECF 88, ¶ 18; ECF 88-5, at 2-3. During Kain's interview of Larracey, Kain mentioned that he was not worried about Larracey's background or experience because he had already spoken with Hermalyn about Larracey. ECF 130, at 119:12-19.

During one of the calls between February 1 and February 3, 2024, Hermalyn told Larracey that, if approached by DraftKings's lawyers, Larracey should inform them that he did not have any conversations with Hermalyn about any employment offers at Fanatics. ECF 88, ¶ 17. Larracey ultimately told DraftKings about his communications with Hermalyn at the end of February. ECF 130, at 120:12-121:5.

### B.      Hermalyn's Account.

In his February 7 declaration, Hermalyn averred that he never "encouraged any of [his] DraftKings colleagues" to join Fanatics "or put any of [his] colleagues in touch with Fanatics' CEO or any other Fanatics executives." ECF 36, ¶ 39. He also swore that, "[s]ince [his]

resignation from DraftKings, . . . [he has] not solicited any DraftKings employees." *Id.* ¶ 40. Hermalyn similarly averred in a subsequent declaration that he did not "improperly solici[t]" Larracey or Metz. ECF 104, ¶ 3. Likewise, his interrogatory response stated: "At no point during either conversation did Mr. Hermalyn hint or encourage Mr. Larracey or Mr. Metz to leave DraftKings for Fanatics." ECF 86-2, at 16. He testified similarly at the hearing. *See* ECF 130, at 12:24-13:2, 17:1-14.

Hermalyn agreed with Metz and Larracey that they initially called him "on their own volition." ECF 104, ¶ 3. During the call on the afternoon of February 1, Hermalyn was likely in Rubin's house. ECF 130, at 14:16-15:11. He could not recall asking Larracey or Metz to scan the room on FaceTime to confirm that no one else was present. *Id.* at 18:2-25. He testified that he did not tell either of them that there were positions at Fanatics for which they could apply. *Id.* at 19:11-14.

During the series of calls on the evening of February 1, Hermalyn was in Rubin's house. *Id.* at 15:10-11, 24:2-5. Hermalyn testified that his memory was that he had "one call" that evening with Metz and Larracey and that he "thought it was under an hour." *Id.* at 96:16-20. He nevertheless said that he does not deny talking with Larracey and Metz for 168 minutes over the course of multiple phone calls, including about Fanatics's public career site. *Id.* at 23:23-24:1, 24:14-16. Hermalyn testified that he did not make specific compensation offers to them on the phone calls but that "numbers did come up." *Id.* at 21:22-25, 84:3-9. He acknowledged that the "$28B" in Larracey's contemporaneous notes represented the valuation of Fanatics at the time and was relevant to Hermalyn's evaluation of his own compensation offer from Fanatics. *Id.* at 22:24-23:8. Hermalyn testified that he did not suggest that Metz or Larracey should come to Fanatics and did not learn that Larracey had applied to Fanatics until the morning of February 3.

*Id.* at 21:6-9, 31:17-25. Hermalyn also said that he did not encourage Larracey to interview with Fanatics on February 2 or February 3. *Id.* at 27:2-28:2. In addition, he denied discussing Larracey with Kain and using the term "nuclear option." *Id.* at 94:24-95:4.

## V.    Hermalyn's Communications with DraftKings's Customers.

Hermalyn stated in his declaration that he neither solicited DraftKings's customers nor met with any of its partners. ECF 104, ¶ 4. DraftKings nonetheless asserts that, on January 27, 2024, Hermalyn told one of its customers, "I want to take you somewhere." ECF 86-10, at 35. DraftKings's Senior Manager of VIP, Jordan Whall, also averred that Hermalyn approached a DraftKings customer at Fanatics's Super Bowl event and introduced him to a Fanatics employee. ECF 94, ¶¶ 1, 4. This customer has since contacted that employee about partnering with Fanatics. *Id.* ¶ 5. Hermalyn responds that the customer "was well known to the Fanatics VIP team already as he had been a years' long Fanatics customer since 2018." ECF 101, at 22.

### PROCEDURAL BACKGROUND

DraftKings filed its verified complaint and motion for a TRO on February 5, 2024. ECF 1, 3. The complaint asserts eight claims: breach of the non-disclosure agreement (Count 1); breach of the agreement not to solicit DraftKings employees (Count 2); breach of the noncompetition agreement (Count 3); misappropriation of trade secrets in violation of the Defend Trade Secrets Act, 18 U.S.C. § 1836 (Count 4); misappropriation of trade secrets in violation of the Massachusetts Uniform Trade Secrets Act, M.G.L. c. 93, §§ 42 to 42G (Count 5); misappropriation of confidential business information (Count 6); breach of the duty of loyalty (Count 7); and conversion (Count 8). ECF 1, ¶¶ 105-173. On February 6, DraftKings moved for expedited discovery and, in light of the February 11 Superbowl, sought a hearing that same day. ECF 7, 9. The Court denied DraftKings's request for a February 6 hearing, ordered Hermalyn to

respond to the TRO motion and the motion for expedited discovery by February 7, and set a hearing on the motions for February 8. ECF 22-24.

In an oral ruling made at the conclusion of the hearing, the Court granted in part and denied in part DraftKings's motion for a TRO. ECF 46. The main purpose of the order was to preserve the status quo pending DraftKings's forthcoming preliminary injunction motion. *Id.* at 51:8-12. The Court determined, at that early stage, that DraftKings had demonstrated a likelihood of success on the merits of its federal and state law claims for misappropriation as well as its claim alleging breach of the non-disclosure agreement. *Id.* at 51-55. The Court also found that DraftKings would suffer irreparable harm if the TRO were not granted because the preliminary evidence revealed that Hermalyn downloaded its confidential documents containing DraftKings's business partner lists, VIP lists, and business plans while in California and after receiving a job offer from Fanatics. *Id.* at 55-56. The Court, in turn, restrained Hermalyn from using DraftKings's confidential information and trade secrets, as well as soliciting its clients and employees, but did not restrain him from working for Fanatics. *Id.* at 56-57.

Also on February 8, the Court granted in and denied in part DraftKings's motion for expedited discovery. ECF 42. The Court permitted both parties to propound up to ten interrogatories, subject to the Court's review, *id.*,[6] and allowed DraftKings to depose Hermalyn and allowed Hermalyn to depose Harris, each for up to four hours. *Id.* In addition, the Court set a briefing schedule for DraftKings's motion for a preliminary injunction and Hermalyn's motion to dismiss, and set a hearing on both motions for April 2, 2024. ECF 41.

After hearing argument on April 2, the Court concluded that it could not make credibility determinations regarding the contradictory facts contained in the parties' evidentiary submissions

---

[6] On February 16, the Court struck one of Hermalyn's proposed interrogatories. ECF 53.

supporting and opposing the preliminary injunction motion without an evidentiary hearing. *See* ECF 115; *Campbell Soup Co. v. Giles*, 47 F.3d 467, 470 (1st Cir. 1995) ("[W]hen the parties' competing versions of the pertinent factual events are in sharp dispute, such that the propriety of injunctive relief hinges on determinations of credibility, 'the inappropriateness of proceeding on affidavits [alone] attains its maximum.'" (quoting *SEC v. Frank*, 388 F.2d 486, 491 (2d Cir. 1968))). An evidentiary hearing was held on April 16 to address the disputed material facts. ECF 115-16, 127. Six witnesses testified at the hearing: Michael Hermalyn, Andrew Larracey, Hayden Metz, Brian Harris, Brittney Goodman, and Mitchell Green. ECF 127.

## MOTION FOR A PRELIMINARY INJUNCTION

### I.     Standard of Review.

"'A preliminary injunction is 'an extraordinary and drastic remedy' . . . [that] is never awarded as of right." *Voice of the Arab World, Inc. v. MDTV Med. News Now, Inc.*, 645 F.3d 26, 32 (1st Cir. 2011) (citations omitted). To secure a preliminary injunction, the plaintiff bears the burden to demonstrate: "'(1) a substantial likelihood of success on the merits, (2) a significant risk of irreparable harm if the injunction is withheld, (3) a favorable balance of hardships, and (4) a fit (or lack of friction) between the injunction and the public interest.'" *NuVasive, Inc. v. Day*, 954 F.3d 439, 443 (1st Cir. 2020) (quoting *Nieves-Márquez v. Puerto Rico*, 353 F.3d 108, 120 (1st Cir. 2003)). The first "factor weighs most heavily in the preliminary injunction analysis," *CVS Pharmacy, Inc. v. Lavin*, 951 F.3d 50, 55 (1st Cir. 2020), and is considered "'the main bearing wall of the four-factor framework,'" *Corp. Techs., Inc. v. Harnett*, 731 F.3d 6, 10 (1st Cir. 2013) (quoting *Ross-Simons of Warwick, Inc. v. Baccarat, Inc.*, 102 F.3d 12, 16 (1st Cir. 1996)).

II.     **Likelihood of Success on the Merits.**

A.      **Breach of Contract Claims.**

DraftKings contends that Hermalyn breached three contracts signed in the course of his employment with DraftKings: a noncompetition agreement, an agreement not to solicit DraftKings's employees and customers, and a non-disclosure agreement. The contracts contain a Massachusetts choice of law provision and forum selection clause. Applying the Commonwealth's choice of law principles, the Court concludes that DraftKings's breach of contract claims must be analyzed under Massachusetts law, and that DraftKings has established a likelihood of success on the merits on its claims that Hermalyn breached his noncompetition agreement, his agreement not to solicit DraftKings employees, and his non-disclosure agreement.

1.      Choice of Law.

The Nonsolicitation, Nondisclosure & Assignment of Inventions Agreement and the Noncompetition Covenant between Hermalyn and DraftKings specify that the agreements "shall be governed by the internal substantive laws of Massachusetts, without regard to the doctrine of conflicts of law." ECF 1-1, § 9; ECF 1-2, at 15, § (f). Hermalyn nevertheless maintains that the agreements should be analyzed under California law, rather than under Massachusetts law.

To determine which state's substantive law applies to the breach of contract claims, the Court looks to Massachusetts choice of law principles because the Commonwealth is the forum state for this lawsuit. *See NuVasive*, 954 F.3d at 443 (citing *Klaxon Co v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496 (1941)). Under Massachusetts law, courts will enforce a choice of law provision in a contract unless the provision is contrary to public policy. *Oxford Global Resources, LLC v. Hernandez*, 480 Mass. 462, 468 (2018). A choice of law provision may be contrary to public policy if "'(a) the chosen state has no substantial relationship to the parties or

the transaction and there is no other reasonable basis for the parties' choice, or (b) [where] application of the law of the chosen state would be contrary to a fundamental policy of a state which has a materially greater interest than the chosen state [in the determination of the particular issue]' and is the State whose law would apply . . . 'in the absence of an effective choice of law by the parties.'" *Id.* at 469 (quoting *Hodas v. Morin*, 442 Mass. 544, 550 (2004)) (alterations in original).

The first exception to the enforceability of the parties' choice of law provisions does not apply here. Massachusetts has a "substantial relationship to the parties or the transaction" because DraftKings is headquartered in Massachusetts. *See id.* (because the employer was "headquartered here, Massachusetts ha[d] a 'substantial relationship' to the transaction" (citation omitted)); *Taylor v. Eastern Connection Operating, Inc.*, 465 Mass. 191, 197 (2013) (same).

The second exception to the enforceability of the parties' choice of law provisions does not apply, either, because California does not have "a materially greater interest" than Massachusetts in this litigation and California law would not apply in the absence of the choice of law provisions. Massachusetts courts look to the state with "the most significant relationship to the transaction and the parties" to determine the state law that would apply absent a choice of law provision, paying particular attention to "'(a) the place of contracting, (b) the place of negotiation of the contract, (c) the place of performance, (d) the location of the subject matter of the contract, and (e) the domicil, residence, nationality, place of incorporation and place of business of the parties.'" *Oxford Global Resources*, 480 Mass. at 467 (quoting *Bushkin Assocs., Inc. v. Raytheon Co.*, 393 Mass. 622, 632 (1985), and Restatement (Second) of Conflict of Laws § 188(2) (1971)).

Applying these factors, California law would not govern in the absence of the choice of law provisions, and California's interest in this lawsuit is not materially greater than Massachusetts's interest. When DraftKings and Hermalyn agreed to contracts with Massachusetts choice of law provisions, Hermalyn was a New Jersey resident and DraftKings was headquartered in Massachusetts. Although Hermalyn primarily worked for DraftKings from New Jersey and New York, he traveled to Massachusetts for work at least 25 times between May 2021 and November 2023, or approximately once every six weeks. Hermalyn does not contend, nor is there evidence, that he performed any of his work responsibilities for DraftKings from California. (Nor, for that matter, does Hermalyn contend that New York or New Jersey law should apply to the breach of contract claims.) Further, as explained below, Hermalyn likely solicited two Massachusetts-based DraftKings employees, Metz and Larracey, on his first days of work at Fanatics. Any harms flowing from Hermalyn's likely violation of his noncompetition, non-solicitation, and non-disclosure agreements will be felt by DraftKings in Massachusetts, not California. *See Nuance Communications, Inc. v. Kovalenko*, No. 22-cv-10656-DJC, 2022 WL 2347112, at *5 & n.1 (D. Mass. June 29, 2022); *Aspect Software, Inc. v. Barnett*, 787 F. Supp. 2d 118, 127 (D. Mass. 2011).

California, in contrast, has only a minimal connection to this lawsuit. Hermalyn established residency there a few days before his resignation from DraftKings and a week before this litigation commenced. He intends to move his family to California and has primarily lived there since February to work at Fanatics. The likely breach of his contracts with DraftKings occurred in part in California and in part in Massachusetts. These facts do not give California a materially greater interest in this case than Massachusetts. Nor, contrary to Hermalyn's argument, is California's public policy against the enforceability of noncompetition agreements

26

superior to Massachusetts's public policy. California unquestionably has a "'settled legislative policy in favor of open competition and employee mobility,'" embodied in Cal. Bus. & Prof. Code §§ 16600, 16600.1, and 16600.5. *Oxford Global Resources*, 480 Mass. at 469 (quoting *Edwards v. Arthur Andersen LLP*, 44 Cal. 4th 937, 946 (2008)). But, through the Massachusetts Noncompetition Agreement Act, M.G.L. c. 149, § 24L, Massachusetts likewise has adopted a considered legislative policy. Under the Massachusetts statute, noncompetition agreements must meet "minimum requirements" to be "valid and enforceable," and are not enforceable as to certain categories of workers, including many types of vulnerable workers. M.G.L. c. 149, § 24L(b)-(c); *see* J. Cohen, K. Breda, & T. Carey, Jr., *Employee Noncompetition Laws and Practices: A Massachusetts Paradigm Shift Goes National*, 103 MASS. L. REV. 31, 39 (2022) ("The Act dramatically reduces the number of Massachusetts employees who can be subjected to enforceable noncompetition agreements[.]"). Where the legislatures of California and Massachusetts have reached different judgments about whether, and under what circumstances, noncompetition agreements may be enforceable, the Court cannot say that either state's legislative policy is more fundamental or compelling.

The facts of this case are not comparable to the facts in *Oxford Global Resources*, in which the Supreme Judicial Court determined that California had a materially greater interest than Massachusetts in the litigation, and that California law would apply absent the parties' choice of law provision. *See* 480 Mass. at 467-72. Hernandez, the employee in *Oxford Global Resources*, had worked in the California office of his prior Massachusetts-based employer, Oxford, and had never "conducted Oxford-related business in Massachusetts." *Id.* at 468. He had "interviewed for his position [with Oxford] in California, signed the agreement in California, trained in California, and performed all of his job duties in California." *Id.* In addition, the

"subject matter of the contract—Hernandez's employment with Oxford—was located exclusively in California," and Hernandez had allegedly solicited clients of Oxford's that were located in California. *Id.* None of these facts are present in this case; to the contrary, during his employment at DraftKings, Hermalyn had regular contact with Massachusetts and no connection to California. *See* ECF 98-1, at 7-9; ECF 74-1, ¶ 2.

Thus, under the Commonwealth's choice of law principles, any disputes arising out of Hermalyn's contracts with DraftKings are governed by Massachusetts substantive law.

### 2.   Noncompetition Agreement.

Hermalyn contends that, even if Massachusetts law applies, his noncompetition agreement is unenforceable. The Massachusetts Noncompetition Agreement Act, M.G.L. c. 149, § 24L, governs the enforceability of noncompetition agreements, like Hermalyn's, entered into on or after October 1, 2018. *Automile Holdings, LLC v. McGovern*, 483 Mass. 797, 807 n.15 (2020). To be "valid and enforceable," the agreement: (i) must be in writing, be signed by employer and employee, and state that the employee has the right to consult with counsel before signing; (ii) must "be supported by fair and reasonable consideration independent from the continuation of employment" if signed after commencement of employment, and provide the employee with ten business days' notice before becoming effective; (iii) must "be no broader than necessary to protect" the employer's trade secrets, confidential information, or goodwill, each of which constitute "legitimate business interests"; (iv) may not exceed twelve months from the last day of employment, unless the employee has breached a fiduciary duty or unlawfully taken property belonging to the employer, in which case the agreement may not exceed two years from the last day of employment; (v) must "be reasonable in geographic reach in relation to the interests protected"; (vi) must "be reasonable in the scope of proscribed activities in relation

to the interests protected"; (vii) must "be supported by a garden leave clause or other mutually-agreed upon consideration between the employer and the employee"; and (viii) must be "consonant with public policy." M.G.L. c. 149, §§ 24L(b)(i)-(viii).

Hermalyn contends that his noncompetition agreement with DraftKings is not supported by any legitimate business interest and is invalid because DraftKings's interests could have been protected by alternative covenants. But in the contract, Hermalyn agreed that the restriction was "necessary . . . to ensure the preservation, protection and continuity of [DraftKings's] Confidential Information, trade secrets and goodwill," and he likewise agreed that DraftKings's "interests cannot be adequately protected through an alternative restrictive covenant." ECF 1-2, at 14-15, § (d). The facts of this case bear out the nexus between the agreement and DraftKings's legitimate interest in preserving its confidential information and trade secrets. As a Senior Vice President, Hermalyn had access to many DraftKings documents that contained confidential information and trade secrets, including business strategy documents; documents with customer, business partner, and VIP lists; documents portraying DraftKings's strategy for maintaining customer loyalty; and documents containing employee salary information. At the hearing, Hermalyn agreed that these documents are confidential. The disclosure of its trade secrets or confidential information to a competitor would put DraftKings at a competitive disadvantage: the information in the documents could, among other things, allow competitors to profit from DraftKings's work in developing information about customers and VIPs or give competitors information that could facilitate successful recruitment of customers or employees. *See Nuance Communications*, 2022 WL 2347112, at *5 (legitimate business interest when employee was exposed to array of confidential documents concerning business strategy, customer programs, client development, and product development); *Cynosure LLC v. Reveal Lasers LLC*, No. 22-cv-

11176-PBS, 2022 WL 18033055, at *11 (D. Mass. Nov. 9, 2022) (legitimate business interest in protecting confidential information where company "introduced evidence demonstrating that [the] senior executives ha[d] detailed knowledge [of its] business strategies and logistics").

The conclusion that Hermalyn's noncompetition agreement was likely no broader than necessary to protect DraftKings's legitimate business interest in its trade secrets and confidential information does not, however, mean that *any* DraftKings employee's noncompetition agreement would be adequately justified by that same interest. As a highly compensated senior executive with access to some of the company's most confidential information, Hermalyn was uniquely positioned, and DraftKings's legitimate interests would not have been protected through alternative restrictive covenants. *See* ECF 89, ¶¶ 13, 17; ECF 1, ¶¶ 1, 4-5, 51, 97. But "the reasonableness of covenants restraining competition" must be assessed "'in light of the facts in each case,'" and this case does not, for example, involve a contract of adhesion or contain evidence of inequitable bargaining power between an employer and an employee. *Automile Holdings*, 483 Mass. at 809 (quoting *Boulanger v. Dunkin' Donuts Inc.*, 442 Mass. 635, 639 (2004)). Quite the contrary: Hermalyn received a multimillion-dollar equity grant in exchange for signing the noncompetition agreement. *See* ECF 1, ¶ 97; ECF 74-1, ¶ 15; ECF 89, ¶ 15.

Hermalyn next challenges the reasonableness of the scope of the noncompetition agreement and its worldwide geographic reach. Under the Massachusetts statute, a noncompetition agreement "must be reasonable in the scope of proscribed activities in relation to the interests protected." M.G.L. c. 149, § 24L(b)(vi). In his contract, Hermalyn agreed not to "provide services to a Competing Business that relate to" aspects of DraftKings for which he "performed services or received Confidential Information" during the six-month period before his termination. ECF 1-2, at 11, § (a). This restriction is reasonably tied to DraftKings's interest

in protecting its confidential information and trade secrets: it limits Hermalyn's ability to provide a competitor services relating to the work he did for DraftKings or confidential information he received in connection with that work.

Under the Massachusetts statute, a noncompetition agreement must also "be reasonable in geographic reach in relation to the interests protected." M.G.L. c. 149, § 24L(b)(v). While the Legislature specified that a "geographic reach that is limited to only the geographic areas in which the employee, during any time within the last 2 years of employment, provided services or had a material presence or influence is presumptively reasonable," the statute does not require a noncompetition agreement's scope to be limited to the geographic areas in which the employee worked. *Id.* Rather, the focus of the inquiry is on the interests protected by the covenant.

There is scant evidence that DraftKings must restrict Hermalyn anywhere in the world to protect its confidential information and trade secrets. DraftKings's Chief Revenue Officer avers that DraftKings has offices and operates in Canada, Israel, and parts of Europe, but there is no evidence as to the products or services DraftKings offers in these locations. ECF 5, ¶ 3. On the other hand, there is evidence, at this stage in the proceedings, that a nationwide restriction on Hermalyn would be more appropriately tailored to protect DraftKings's confidential information and trade secrets. DraftKings's daily fantasy sports products are available to customers in over 40 states and its retail sports betting is offered in 24 states. *Id.* Hermalyn's extensive access to confidential documents and information concerning DraftKings business partners, VIPs, customers, and employees could, as described, unfairly benefit a company seeking to compete with DraftKings on these products. Because the Massachusetts Noncompetition Agreement Act gives courts discretion to "reform or otherwise revise a noncompetition agreement so as to render it valid and enforceable to the extent necessary to protect the applicable legitimate business

interests," M.G.L. c. 149, § 24L(d), the Court determines that Hermalyn's noncompetition agreement is enforceable only to the extent it has a nationwide, rather than worldwide, geographic scope. *See Nuance Communications*, 2022 WL 2347112, at *6 (nationwide enforcement of noncompetition agreement was reasonable when employer "conduct[ed] business on a wide scale"); *Lombard Med. Techs., Inc. v. Johannessen*, 729 F. Supp. 2d 432, 439-40 (D. Mass. 2010) (noncompetition agreement with nationwide scope was reasonable because the employer sought out clinical sites across the country).

Hermalyn does not dispute that, if his noncompetition agreement is enforceable, he breached it by starting work for Fanatics on the same day that he resigned from DraftKings. Fanatics is a direct competitor of DraftKings, and it hired Hermalyn into a virtually identical role to the position he held at DraftKings. *See Aspect Software*, 787 F. Supp. 2d at 129 (likely breach of noncompetition agreement where the old and new employers were "intense competitors" and the employee was hired by the new employer in "precisely the field in which [he] ha[d] encyclopedic knowledge of [the old employer's] trade secrets"). Because, at this stage in the proceedings, DraftKings has established that the noncompetition agreement is enforceable with a narrower geographic scope, DraftKings has shown a likelihood of success on the merits of its claim that Hermalyn breached his noncompetition agreement.

3.     <u>Non-Solicitation Agreement.</u>

Hermalyn similarly contends that, even if Massachusetts law applies, his non-solicitation agreement is unenforceable because it is untethered to any legitimate business interest held by DraftKings. Under Massachusetts common law, non-solicitation agreements are reasonable, and therefore enforceable, if they are "(1) necessary to protect a legitimate business interest, (2) reasonably limited in time and space, and (3) consonant with the public interest." *Automile*

*Holdings*, 483 Mass. at 808. And "[i]n the employer-employee context, the legitimate business interests that may be protected consist of trade secrets, confidential information, and good will." *Id.* at 810.

The non-solicitation agreement, like the noncompetition agreement, is enforceable. When he signed the non-solicitation agreement, Hermalyn agreed that the restriction was "necessary . . . to ensure the preservation, protection and continuity of [DraftKings's] Confidential Information, trade secrets and goodwill." ECF 1-1, at 8, § 14. And the evidence demonstrates that the agreement is necessary to protect DraftKings's same legitimate interests in its confidential information and trade secrets. As described, Hermalyn had access to confidential information concerning employee salary, customer loyalty, and the identities and personal preferences of DraftKings's customers, business partners, and VIPs. This information could facilitate a competitor's efforts to hire DraftKings's employees or solicit DraftKings's customers. *Cf. Automile Holdings*, 483 Mass. at 813 (upholding non-solicitation agreement signed by executive who was "well placed to identify key employees integral to the company's success," and "could use his inside knowledge of the company, including its salary structure and internal management dynamics," to solicit employees).

DraftKings contends that Hermalyn breached his agreement not to directly or indirectly solicit DraftKings employees when he encouraged Metz and Larracey to apply for jobs with Fanatics in the series of phone calls on February 1 through 3, 2024. Because the parties' accounts of those phone calls conflicted, the Court held an evidentiary hearing to assess the credibility of Metz, Larracey, and Hermalyn. *See* ECF 115-16, 127; *Campbell Soup*, 47 F.3d at 470.

Having evaluated the evidentiary submissions and viewed the witnesses' testimony, the Court concludes that Larracey and Metz testified credibly and Hermalyn's account of the phone

calls is not credible. Larracey and Metz's accounts of the phone calls were consistent with one another.[7] They recalled with specificity the substance of the discussions and the concrete representations and statements made by each of the parties to the calls. Both of their accounts were supported by contemporaneous notes. Metz's notes listed Hermalyn's initial offer and Metz's counteroffer. ECF 77-3; ECF 130, at 153:4-155:1. Larracey's notes, which show that they were created in the iPhone Notes app on February 1, 2024, detailed the substance of the call on the afternoon of February 1; listed the specific compensation numbers offered to him and Metz by Hermalyn, as well as his counteroffer, during the evening calls; listed the titles of the jobs at Fanatics that Hermalyn suggested for him and Metz; and summarized the reasons why Hermalyn said that he left DraftKings. ECF 88-3. Larracey and Metz's notes on the initial compensation figures offered by Hermalyn to Metz match. One of the numbers in Larracey's notes—the "$28B"—referred to Fanatics's valuation at the time and was relevant to the initial equity allocation offered. ECF 88-3, at 4. Hermalyn acknowledged that "$28B" refers to the "valuation of the company," but did not explain how Larracey could have known the valuation of Fanatics other than through the conversation with him. ECF 130, at 22:24-23:8.

The sequence of the events that occurred during the night of February 1 and 2, 2024 bolsters Larracey and Metz's credibility. The documentary record shows that Larracey applied to the "Director, VIP Customer Development" job at Fanatics that Hermalyn pointed out for him at 1:16 a.m. EST on Friday, February 2. ECF 88-4. Larracey credibly testified that when he applied, he did not submit a resume, identify his current employer or job title, or mention anything about his background, experience, or undergraduate education. ECF 130, at 111:25-

---

[7]   The only difference was that Metz, unlike Larracey, did not recall Hermalyn raising the fact that Metz had not been promoted as a reason for Hermalyn's departure from DraftKings. *Compare* ECF 130, at 168:1-18, *with id.* at 107:12-15, *and* ECF 88-3, at 5 ("Hayden promo" was one "thin[g] that upset [Hermalyn]").

112:12. He nevertheless heard from Fanatics that same day, requesting that he interview with four company executives over the weekend, on Sunday, February 4. ECF 88-5. It is difficult to conceive, given the dearth of information submitted by Larracey in his early morning application, how Larracey could have secured weekend interviews with Fanatics executives without Hermalyn's involvement.

Hermalyn's account of the series of phone calls, in contrast, is not credible. He gave evasive answers to certain questions and could not remember whether key aspects of Larracey and Metz's account occurred, even though the calls occurred one month before his deposition and two and a half months before his hearing testimony. He thought, for example, that he had one call with Metz and Larracey that evening, not a series of calls, though he later said he did not deny that a series of calls occurred over 168 minutes. ECF 86-1, at 31:24-32:13; ECF 130, at 24:14-16. He could not remember whether he asked Metz and Larracey to use Facetime to scan the conference room to ensure that no one else was there during the call on the afternoon of February 1. ECF 86-1, at 28:19-29:12; ECF 130, at 18:2-25. And he could not remember whether he spoke with Rubin about his phone calls with Larracey and Metz, even though he was with Rubin in his house. ECF 86-1, at 46:22-47:6. Hermalyn did, however, deny that he hinted or encouraged Larracey and Metz to join Fanatics, ECF 130, at 17:1-7; deny that he told Metz and Larracey that there were two positions at Fanatics for which they should apply, *id.* at 21:6-9; deny that he made Metz and Larracey specific offers of compensation, *id.* at 21:22-25; ECF 86-1, at 38:19-39:6; and deny that he said he had authority to make specific offers of compensation, ECF 86-1, at 40:17-41:4. In light of the credibility of Metz and Larracey's directly contradictory testimony and the documentary record, the Court does not credit Hermalyn's denials.

Hermalyn's lack of credibility is reinforced by other record evidence. Hermalyn told his colleague, Brittney Goodman, that he was home in New Jersey mourning the death of their mutual friend on January 30, 2024, when in fact he was in California at Rubin's house. ECF 130, at 216:23-217:5. And when, during the TRO proceedings, DraftKings submitted evidence that Hermalyn appeared to be in California using a Fanatics wireless network on January 29 and 30, ECF 6, ¶¶ 19-23, Hermalyn responded by insisting in a sworn affidavit that he "did not visit Fanatics' Los Angeles office—or any Fanatics office—prior to accepting Fanatics VIP's offer of employment" on February 1, ECF 36, ¶ 17. At best, his failure to disclose that he was using a Fanatics wireless network because he was staying at the home of the Fanatics CEO was highly misleading. And taken as a whole, the evidence submitted at this stage in the proceedings suggests that Hermalyn has struggled with candor to the Court.

As recounted by Metz and Larracey's credible testimony, Hermalyn offered Metz and Larracey specific base salaries, annual and signing bonuses, and initial equity allocations for two positions at Fanatics on the evening of February 1. ECF 77, ¶ 7; ECF 88, ¶ 8; *see* ECF 77-3; ECF 88-3. Hermalyn stated that he had authority from Fanatics to make those initial offers and the subsequent counteroffers. ECF 77, ¶ 8; ECF 88, ¶ 9. After applying for one of the positions on morning of Friday, February 2, Larracey received an email from Fanatics about scheduling an interview that day, even though he only submitted his name, email address, and phone number— no resume, cover letter, or any details about his experience. ECF 88-4; ECF 88, ¶ 14; ECF 88-5, at 7; ECF 130, at 111:17-112:12. Larracey and Hermalyn spoke again twice that day and again the following day, and during those calls, Hermalyn encouraged Larracey to move forward with the interviews. ECF 130, at 114:6-115:22; ECF 88, ¶ 16. On Saturday, February 3, Hermalyn also mentioned that he had spoken to a Fanatics employee, Kain, about Larracey, which Kain

confirmed during the interview on Sunday, February 4. ECF 130, at 118:15-20. Taken together, these facts establish that Hermalyn likely breached his agreement not to directly or indirectly solicit DraftKings's employees for one year after his termination. *See* ECF 1-1, § 3. DraftKings has, therefore, demonstrated a likelihood of success on merits of this claim.

DraftKings has not, on the other hand, established that it is likely to succeed on a claim that Hermalyn breached his agreement not to solicit DraftKings's customers. As an initial matter, although DraftKings presses this claim in its preliminary injunction motion, it did not assert a breach of contract claim based on the customer non-solicitation agreement in its verified complaint, and "a party cannot amend its Complaint by assertions made in briefs." *Calvary Chapel of Bangor v. Mills*, 542 F. Supp. 3d 24, 37 (D. Me. 2021), *aff'd*, 52 F.4th 40 (1st Cir. 2022). But even if the complaint had asserted such a claim, DraftKings has not submitted sufficient evidence to support it. DraftKings asserts that Hermalyn told one of its customers on January 27, 2024—before he resigned—"I want to take you somewhere." ECF 86-10, at 35. Hermalyn also, according to Whall's affidavit, introduced a DraftKings customer to a Fanatics employee at a Fanatics Super Bowl event, and that customer has since asked the employee about partnering with Fanatics. ECF 94, ¶¶ 1, 4-5. These vague allegations are insufficient to establish that Hermalyn likely solicited—"directly or indirectly"—any DraftKings customers. ECF 1-1, § 2; *see NuVasive, Inc. v. Day*, No. 19-cv-10800, 2019 WL 2287709, at *6 n.3 (D. Mass. May 29, 2019), *aff'd*, 954 F.3d 439 (1st Cir. 2020) (denying preliminary injunction as to the alleged breach of defendant's agreement not to solicit plaintiff's employees because of vague and conclusory allegations). Accordingly, DraftKings has not shown a likelihood of success on its brief's claim that Hermalyn breached his agreement not to solicit its customers.

4.      Non-Disclosure Agreement.

DraftKings also contends that Hermalyn violated his non-disclosure agreement. In that agreement, Hermalyn agreed that he would not:

> during or after [his] employment: (i) use any Confidential Information for any purpose that is not authorized by the Company; (ii) disclose any Confidential Information to any person or entity, except as authorized by the Company in connection with [his] job duties; or (iii) remove or transfer Confidential Information from the Company's premises or systems except as authorized by the Company.

ECF 1-1, § 5. He also agreed to "immediately surrender to the Company," upon his termination, "all Company property in [his] possession, custody, or control, including any and all documents, electronic information, and materials of any nature containing any Confidential Information." *Id.*

DraftKings has established that it is likely to succeed on its claim that Hermalyn breached this non-disclosure agreement. The evidence reveals, at a minimum, that Hermalyn "remove[d] or transfer[red] Confidential Information from the Company's . . . systems" without its authorization, and that he did not "immediately" turn over all of his devices and confidential documents to DraftKings when he resigned. *Id.* In particular, Hermalyn stored and deleted DraftKings's files on Dropbox and used AirDrop to transfer documents, even though neither service is authorized by DraftKings. ECF 90, ¶¶ 33, 36-37; ECF 87, ¶¶ 15, 28, 48. Hermalyn also failed to immediately turn over to DraftKings an older laptop, an iPad, and his Dropbox account when he resigned on February 1, 2024. ECF 36, ¶ 47; ECF 86-1, at 138:12-20, 191:18-194:6; ECF 114, at 7. In addition, as explained, Hermalyn likely used DraftKings's confidential compensation information to solicit Metz and Larracey to join Fanatics, a "purpose that is not authorized by" DraftKings, ECF 1-1, § 5. This evidence is sufficient, at this stage, to establish that DraftKings is likely to succeed on its claim alleging breach of the non-disclosure agreement.

**B.      Misappropriation Claims.**

DraftKings separately claims that Hermalyn misappropriated its trade secrets in violation of the Defend Trade Secrets Act ("DTSA"), 18 U.S.C. § 1836, and the Massachusetts Uniform Trade Secrets Act ("MUTSA"), M.G.L. c. 93, §§ 42-42G.[8] The DTSA provides a private right of action to "[a]n owner of a trade secret that is misappropriated." 18 U.S.C. § 1836(b)(1). The MUTSA similarly authorizes injunctive relief when a plaintiff demonstrates "that information qualifying as a trade secret has been or is threatened to be misappropriated." M.G.L. c. 93, § 42A(a).

The parties agree that the elements of a claim under the DTSA and MUTSA are essentially the same. *See* ECF 73, at 18; ECF 101, at 23; *Allstate Ins. Co. v. Fougere*, 79 F.4th 172, 187 (1st Cir. 2023) (assuming that "'[t]he standard for misappropriation under the DTSA is substantially similar to that under Massachusetts law'" (quoting *Viken Detection Corp. v. Videray Techs. Inc.*, 384 F. Supp. 3d 168, 177 (D. Mass. 2019))).[9] To prevail on its DTSA and MUTSA claims, DraftKings "must establish that 1) the information at issue constitutes a trade secret, 2) the plaintiff took reasonable measures to secure the confidentiality of the information and 3) the defendant obtained the trade secret through improper means." *Viken Detection Corp.*,

_____

[8] DraftKings's preliminary injunction motion does not meaningfully press its common law claim for misappropriation of confidential business information or its claims for breach of the duty of loyalty and conversion. *See* ECF 1, ¶¶ 156-73; ECF 73, at 25 n.10.

[9] The key statutory definitions are substantially similar. The DTSA defines "misappropriation" as the "acquisition of a trade secret of another by a person who knows or has reason to know that the trade secret was acquired by improper means" or the "disclosure or use of a trade secret of another without express or implied consent by a person who . . . used improper means to acquire knowledge of the trade secret." 18 U.S.C. § 1839(5). The MUTSA similarly defines "misappropriation" as "an act of acquisition of a trade secret of another by a person who knows or who has reason to know that the trade secret was acquired by improper means" or "an act of disclosure or of use of a trade secret of another without that person's express or implied consent by a person who . . . used improper means to acquire knowledge of the trade secret." M.G.L. c. 93, § 42(2).

384 F. Supp. 3d at 177; *see Jet Spray Cooler, Inc. v. Crampton*, 377 Mass. 159, 165 (1979) ("The essence of an action for the wrongful use of trade secrets is the breach of the duty not to disclose or to use without permission confidential information acquired from another.").[10] DraftKings has demonstrated a likelihood of success on the merits on each element.

1.  The Information at Issue Constitutes a Trade Secret.

DraftKings has established, at this preliminary stage, that Hermalyn likely accessed its trade secrets. The DTSA and MUTSA overlap in their definitions of trade secrets. *Compare* 18 U.S.C. § 1839(3), *with* M.G.L. c. 93, § 42(4). In essence, a "trade secret" consists of any confidential information used in a business that provides the owner "'an opportunity to obtain an advantage over competitors who do not know or use it.'" *Burten v. Milton Bradley Co.*, 763 F.2d 461, 463 n.2 (1st Cir. 1985) (quoting *J.T. Healy & Son, Inc. v. James A. Murphy & Son, Inc.*, 357 Mass. 728, 736 (1970)).

The evidence shows with sufficient specificity that, from mid- to late-January 2024, Hermalyn accessed DraftKings documents that contained trade secrets. On January 16, he transferred 18 confidential DraftKings documents to his Slack account and then accessed or downloaded at least seven of the documents on a personal phone. ECF 90, ¶¶ 30-31; ECF 89, ¶ 35.[11] The files included a spreadsheet that detailed compensation for thousands of DraftKings employees, a slide deck that described VIP financials and strategy, and a spreadsheet that described DraftKings's contracts and identified hundreds of its current and former business partners. ECF 89, ¶ 35; ECF 90, ¶ 31; ECF 114, at 5. On January 24, Hermalyn accessed a 181-

---

[10] To succeed on the DTSA claim, DraftKings must also show that "the trade secret is related to a product or service used in, or intended for use in, interstate or foreign commerce." 18 U.S.C. § 1836(b)(1). DraftKings has done so here. *See* ECF 5, ¶ 3; ECF 1, ¶¶ 18-19.

[11] Harris testified at the hearing that subsequent analysis showed that ten of these documents were downloaded to Hermalyn's phone. ECF 130, at 207:16-21.

page chart, entitled "BD Team Tracker – Weekly Report," that detailed DraftKings's current contracts, target markets, and short- and long-term projects. ECF 90, ¶ 43; ECF 91, ¶¶ 6, 11. On January 29 and 30, at a minimum, Hermalyn accessed a pitch deck presentation called "BD_Gaming101" that "contains DraftKings' confidential strategies for building partnerships with potential business partners." ECF 5, ¶ 28. On January 30, he also accessed a spreadsheet entitled "(Master) SB 2024," which contained DraftKings's plans for entertaining some of its partners at the 2024 Super Bowl and listing those partners. ECF 89, ¶ 38; *see* ECF 90, ¶ 43; ECF 104, ¶¶ 6-8.

DraftKings derives economic value from keeping the information in these documents— information about its business strategies and compilations of its business partners and VIP relationships—secret from its competitors. *See Allstate Ins.*, 79 F.4th at 190-91, 198 (describing economic value as "a key factor" in determining whether information constitutes a trade secret and treating customer lists as a trade secret); *Diomed, Inc. v. Vascular Sols., Inc.*, 417 F. Supp. 2d 137, 144-45 (D. Mass. 2006) ("marketing strategy information" constitutes a trade secret (citing *Campbell Soup*, 47 F.3d at 469 n.4)). There is no suggestion that the information contained in the documents was a matter of public knowledge or ascertainable by competitors at the time Hermalyn accessed the documents. *See Allstate Ins.*, 79 F.4th at 189 ("'[M]atters of public knowledge or of general knowledge in an industry cannot be appropriated' by an entity as a trade secret." (quoting *Burten*, 763 F.2d at 463 n.2)). Hermalyn contends that the information in the "(Master) SB 2024" spreadsheet is no longer a trade secret because "the information is now public as the Super Bowl has happened [and] the attendees were at public events." ECF 101, at 26-27 (emphases omitted). But the information about the Super Bowl became public "*after* the alleged misappropriation began," and thus does not lose its protection following the Super Bowl.

*Diomed*, 417 F. Supp. 2d at 144 (emphasis in original). In any event, the spreadsheet's "compilations would not have been known outside of [DraftKings], and, to the extent they were duplicable, could only be recreated at immense difficulty." *Allstate Ins.*, 79 F.4th at 190. DraftKings has therefore shown a likelihood that the files at issue contained trade secrets.

2.     DraftKings Took Reasonable Steps to Protect Its Trade Secrets.

Hermalyn does not dispute that DraftKings took reasonable steps to preserve the secrecy of those trade secrets. "To determine whether a company took reasonable steps to protect its trade secrets, courts have considered '1) the existence or absence of a [confidentiality agreement], 2) the nature and extent of precautions taken, 3) the circumstances under which the information was disclosed and 4) the degree to which the information has been placed in the public domain or rendered readily ascertainable.'" *Id.* at 192 (quoting *TouchPoint Sols., Inc. v. Eastman Kodak Co.*, 345 F. Supp. 2d 23, 29 (D. Mass. 2004)). Weighing these four factors, DraftKings easily satisfies this secrecy element. DraftKings's employees like Hermalyn must, for example, sign confidentiality agreements when they begin their employment and annually acknowledge that they have received the security and data privacy policy trainings. ECF 90, ¶¶ 8, 12. DraftKings also requires employees to use laptops that are encrypted and protected by firewalls, to change their computer passwords every ninety days, and to use multi-factor identification when reviewing files on its secure document managing system, Google Workspace. *Id.* ¶¶ 13-16. Accordingly, at this preliminary stage of the litigation, DraftKings has established that it likely adopted reasonable measures to protect the secrecy of its confidential information. *See, e.g.*, *Builder Servs. Grp., Inc. v. Harkins*, No. 23-cv-11375-DJC, 2023 WL 4685943, at *6 (D. Mass. July 21, 2023); *G&L Plumbing, Inc. v. Kibbe*, No. 23-cv-40056-MRG, 2023 WL 6881597, at *5 (D. Mass. Oct. 18, 2023).

3.      Hermalyn Likely Obtained Trade Secrets Through Improper Means.

DraftKings is likely to demonstrate that Hermalyn employed improper means to obtain and disclose its trade secrets.[12] First, the evidence at this stage of the proceedings shows that, on January 16, 2024, Hermalyn used an unauthorized method—that is, Slack—to transfer to himself documents containing DraftKings's trade secrets. While Hermalyn was generally authorized to use Slack for work purposes, he was not authorized to use Slack to transfer files from one work computer to another. ECF 90, ¶¶ 27, 37. In the nine months before his resignation, Hermalyn had not used Slack to transfer confidential documents, *id.* ¶ 30; ECF 130, at 214:23-215:14, and he had been instructed by an IT specialist in late December 2023 to use Microsoft OneDrive to transfer files from his 16-inch laptop to his new 14-inch laptop, ECF 93, ¶ 2. Although Hermalyn claimed he was merely transferring the files from one laptop to another, 14 of the 18 documents were not downloaded to his new laptop. ECF 130, at 242:17-22; ECF 87, ¶ 53. Further, Hermalyn later viewed or downloaded at least seven of those documents on his personal phone. ECF 87, ¶ 19. Harris testified regarding the ways the trade secrets in those documents could have been exfiltrated from Hermalyn's phone to another device—for example, by screenshotting or copying and pasting. ECF 130, at 208:7-17. Comparable conduct has been deemed sufficient to establish a likelihood of use of improper means under the DTSA or MUTSA. *See, e.g.*, *Bos. Centerless, Inc. v. DeSantis*, No. 1:22-cv-11729-RGS, 2022 WL 16639138, at *1 (D. Mass. Nov. 2, 2022) (finding likely misappropriation where "Defendant, on his last day of employment with

---

[12] The DTSA defines "improper means" to include "theft, bribery, misrepresentation, breach or inducement of a breach of a duty to maintain secrecy, or espionage through electronic or other means." 18 U.S.C. § 1839(6)(A). The MUTSA similarly defines "improper means" to include "theft, bribery, misrepresentation, unreasonable intrusion into private physical or electronic space, or breach or inducement of a breach of a confidential relationship or other duty to limit acquisition, disclosure or use of information." M.G.L. c. 93, § 42(1); *see G&L Plumbing*, 2023 WL 6881597, at *5 (the MUTSA and DTSA "'contai[n] very similar language'").

the Company and without the Company's permission, emailed to his personal email accounts multiple spreadsheets containing Plaintiff's trade secrets and confidential information, including Plaintiff's proprietary and competitively sensitive customer information"); *FrontRunner HC, Inc. v. Waveland RCM, LLC*, No. 20-cv-10230-DJC, 2020 WL 7321161, at *11 (D. Mass. Dec. 11, 2020) (similar); *Builder Servs.*, 2023 WL 4685943, at *3-4, 6 (similar).

Second, the evidence shows that on January 29 and 30, 2024, Hermalyn downloaded two documents—"BD_Gaming101" and "(Master) SB 2024"—with DraftKings's trade secrets while he was staying in the home of the Fanatics CEO and connected to a network named "fanatics.ear2.losangeles1.level3.net." ECF 90, ¶¶ 43-44; ECF 6, ¶ 17; ECF 130, at 196:15-18.[13] Hermalyn admits accessing the latter document and does not believe he accessed the former, but he does not specifically deny it. ECF 36, ¶¶ 60-61.[14] He downloaded these documents after he had decided to accept the new job at Fanatics and while he was, as he admits, avoiding DraftKings's meetings and disengaging from DraftKings's emails. *Id.* ¶ 34; ECF 90, ¶ 20. Harris testified that because these downloads occurred over a Fanatics network in Rubin's house, Fanatics "may automatically have access to those files" by virtue of "their own electronic systems." ECF 130, at 214:5-14. Together, these episodes amount to a likelihood that Hermalyn misappropriated DraftKings's trade secrets through improper means.

Hermalyn responds, and has repeatedly testified, that he "did not take any of DraftKings' confidential information in anticipation of leaving; [he] did not use or disclose any DraftKings confidential information other than for DraftKings business; and [he] do[es] not have or have

---

[13] Harris credibly testified that he and his team ran multiple tests to determine that these documents were downloaded rather than merely viewed, ECF 130, at 183:3-184:13, 194:7-12, 195:18-25, 196:15-197:7, but the Court's analysis here does not depend on the distinction.

[14] The parties also dispute whether Hermalyn accessed confidential documents on February 1. The Court does not rest its determination that Hermalyn used improper means on those February 1 documents.

access to any of DraftKings' confidential information." ECF 104, ¶ 9; *see also* ECF 36, ¶ 52; ECF 130, at 89:3-90:1. At this stage in the proceedings, the Court does not credit these denials. The Court's view of Hermalyn's credibility here is colored by its determination, discussed previously, that Hermalyn did not credibly testify about whether he solicited Metz and Larracey. And it is further reinforced by the memory lapses, evidentiary gaps, and inconsistencies in Hermalyn's account of his interactions with DraftKings's confidential documents. For example, on January 16 and January 24, Hermalyn accessed two highly confidential DraftKings documents that, according to the evidence, were far afield from his job responsibilities. The spreadsheet entitled "(July2023)VitalTalent_CompAdjustments.xlsx," which Hermalyn Slacked himself on January 16 and then viewed or downloaded on his personal phone, detailed compensation for thousands of DraftKings employees. ECF 89, ¶ 35; ECF 90, ¶ 31; ECF 114, at 5. Harris testified that Hermalyn "should not have been accessing" that spreadsheet because it was not "material to his role." ECF 130, at 191:5-11. Henley similarly stated in his affidavit that "Hermalyn should not have received this document, and he had no legitimate business reason to be looking at it." ECF 89, ¶ 35. On January 24, the day after meeting with Fanatics CEO Rubin in his apartment, Hermalyn accessed the "BD Team Tracker – Weekly Report" document, dated November 27, 2023, that detailed DraftKings's short-term and long-term priority deals and projects over its 181 pages. ECF 90, ¶ 43; ECF 91, ¶¶ 6, 11. According to Russell's affidavit, "[n]o one at DraftKings would have had a legitimate business need to access" that report after November 2023. ECF 91, ¶¶ 5-7. Hermalyn, for his part, has offered no explanation for why he was interacting with these documents at the same time as he was engaging with Rubin about a potential move to Fanatics.

Hermalyn's account of his January 16 file transfers was marked by memory gaps and inconsistencies. Hermalyn does not recall using Dropbox.com that day, despite the forensic evidence that he spent more than three hours on the website. ECF 86-1, at 125:5-11; ECF 87, ¶ 14; ECF 130, at 35:14-23. When initially asked in his deposition about his Slack activity that day, Hermalyn testified that he had no memory of using Slack or later viewing or downloading certain confidential Slacked documents on his phone. ECF 86-1, at 119:7-121:5, 122:25-123:10. He subsequently testified that he remembered using Slack that day to transfer files upon seeing his Slack messages to Hernandez. ECF 86-1, at 145:24-146:11. Hermalyn has not explained why he used Slack rather than Microsoft OneDrive to migrate to a new computer or why he started Slacking himself confidential DraftKings documents in mid-January, despite no track record of similar file transfers. Nor has he explained why he later viewed or downloaded some of the Slacked documents on his phone, if he was, as he asserts, undertaking a computer-to-computer transfer. *See* ECF 130, at 210:2-10. Assessed as a whole, Hermalyn's testimony about his interactions with DraftKings's confidential documents and trade secrets in January 2024 does not bear sufficient hallmarks of credibility to overcome DraftKings's conflicting evidence. *See Advanced Micro Devices, Inc. v. Feldstein*, No. 13-cv-40007-TSH, 2013 WL 10944934, at *9-10 (D. Mass. May 15, 2013) (finding likelihood of success on the merits of misappropriation claim after refusing to credit denials and alternative explanations provided by employees).

Finally, this Court has repeatedly held that a former employee who breaches his contractual obligations to obtain trade secrets has, as a matter of law, used improper means. *See, e.g.*, *Optos, Inc. v. Topcon Med. Sys., Inc.*, 777 F. Supp. 2d 217, 240 (D. Mass. 2011) (citing *Data Gen. Corp. v. Grumman Sys. Support Corp.*, 36 F.3d 1147, 1165 (1st Cir. 1994), *abrogated on other grounds by Reed Elsevier, Inc. v. Muchnick*, 559 U.S. 154 (2010)); *SpeeDee Worldwide,*

*LLC v. Toppa*, No. 24-cv-10274, 2024 WL 1558386, at *4 (D. Mass. Apr. 10, 2024); *Builder Servs.*, 2023 WL 4685943, at *6; *FrontRunner HC*, 2020 WL 7321161, at *11. As discussed, Hermalyn's non-disclosure agreement prohibited him from "remov[ing] or transfer[ring] Confidential Information from the Company's . . . systems" without its authorization and required him, upon termination, to "immediately" turn over his devices and confidential documents to DraftKings. ECF 1-1, § 5. His likely breach of that agreement constitutes evidence of improper means as well. *See Bos. Sci. Corp. v. Lee*, No. 13-cv-13156-DJC, 2014 WL 1946687, at *5 (D. Mass. May 14, 2014); *Advanced Micro Devices*, 2013 WL 10944934, at *9.

DraftKings has, accordingly, demonstrated a likelihood that it will prevail on the merits of its misappropriation claims under the DTSA and MUTSA.

## II.  **Irreparable Harm.**

To establish irreparable harm, a plaintiff must demonstrate that "its legal remedies are inadequate," not "that the denial of injunctive relief will be fatal to its business." *Ross-Simons of Warwick, Inc. v. Baccarat, Inc.*, 102 F.3d 12, 18 (1st Cir. 1996). This Court has routinely held that irreparable harm is presumed at the preliminary injunction stage when the plaintiff shows a likelihood of success on its claims for misappropriation of trade secrets. *See, e.g.*, *SpeeDee Worldwide*, 2024 WL 1558386, at *4; *Builder Servs.*, 2023 WL 4685943, at *6; *G&L Plumbing*, 2023 WL 6881597, at *7; *Bos. Centerless*, 2022 WL 16639138, at *1; *Bos. Sci. Corp.*, 2014 WL 1946687, at *6; *EchoMail, Inc. v. Am. Exp. Co.*, 378 F. Supp. 2d 1, 4 (D. Mass. 2005). The presumption of irreparable harm recognizes that a "trade secret once lost is, of course, lost forever." *FMC Corp. v. Taiwan Tainan Giant Indus. Co.*, 730 F.2d 61, 63 (2d Cir. 1984); *see TouchPoint Sols.*, 345 F. Supp. 2d at 32 ("once the trade secret is lost, it is gone forever"). It "is particularly applicable where . . . the trade secrets are misappropriated by a direct competitor."

*Ooyala, Inc. v. Dominguez*, No. 17-cv-10943-GAO, 2018 WL 3360759, at \*7 (D. Mass. July 10, 2018).

A finding of irreparable harm is also triggered where the defendant has likely violated his noncompetition agreement. *Aspect Software*, 787 F. Supp. 2d at 130; *see Oxford Glob. Res., Inc. v. Guerriero*, No. 03-cv-12078-DPW, 2003 WL 23112398, at \*11 (D. Mass. Dec. 30, 2003) ("[T]he 'task of quantifying the consequences of violating a noncompetition clause is a particularly difficult and elusive one.'" (quoting *Kroeger v. Stop & Shop Companies, Inc.*, 13 Mass. App. Ct. 310, 322 (1982)); *Boulanger v. Dunkin' Donuts Inc.*, 442 Mass. 635, 643 n.12 (2004) ("[W]orking for a competitor of the defendant makes it likely that the information the plaintiff possesses will be used, yet it might be impossible to detect or prove."). And Hermalyn agreed, in his noncompetition agreement, that "any breach, Threatened Breach or challenge to the enforceability of this Noncompetition Covenant would cause [DraftKings] to suffer immediate and irreparable harm for which monetary damages are inadequate." ECF 1-2, at 15, § (e); *cf. Allstate Ins. Co.*, 79 F.4th at 191 (relying on clause in employment agreement stating that "misuse of the company's confidential information would case 'irreparable damage' which, by definition, cannot be adequately compensated or remedied by any monetary award or damages"). The risk of irreparable harm is compounded by Hermalyn's likely solicitation of DraftKings employees.

Since, as explained, Hermalyn likely misappropriated DraftKings's confidential information and breached his noncompetition agreement through his employment at Fanatics, DraftKings has established that it would suffer irreparable harm absent injunctive relief.

**III.**     **Balance of the Equities and Public Interest.**

The balance of equities considers "the hardship to the nonmovant if enjoined as contrasted with the hardship to the movant if no injunction issues." *Ross-Simons*, 102 F.3d at 15. Hermalyn claims that he would suffer irreparable harm if enjoined because he would be prohibited from working in his practice area for an entire year. But, as DraftKings points out, he signed a noncompetition agreement in August 2023, "agree[ing] that any breach . . . would cause the Company to suffer immediate and irreparable harm for which monetary damages are inadequate." ECF 1-2, at 15, § (e). Thus, "to the extent that [Hermalyn] suffers from injunctive relief, 'this harm is a predictable consequence' of [his likely] breach." *Nuance Communications*, 2022 WL 2347112, at *10 (quoting *Get In Shape Franchise, Inc. v. TFL Fishers, LLC*, 167 F. Supp. 3d 173, 203 (D. Mass. 2016)). The "harm is . . . the consequence of enforcing any covenant not to compete and that 'fact alone does not make such covenants unenforceable.'" *Bio-Imaging Techs., Inc. v. Marchant*, 584 F. Supp. 2d 322, 330 (D. Mass. 2008) (quoting *Marine Contractors, Co., Inc. v. Hurley,* 365 Mass. 280, 289 (1974)). Accordingly, any hardship felt by Hermalyn is outweighed by the potential harm—including possible disclosure of its confidential information and trade secrets—that DraftKings would suffer absent a preliminary injunction.

In addition to the balance of equities, the public interest also supports issuing a preliminary injunction. Both the federal government and Massachusetts have a public policy favoring the protection of trade secrets. *See Bos. Centerless*, 2022 WL 16639138, at *2 (citing 18 U.S.C. § 1836 *et seq.*; M.G.L. c. 93, § 42 *et seq.*); *Jet Spray Cooler*, 377 Mass. at 166 n.8. It also "is 'beneficial to the public that contracts for the partial restraint of trade should be upheld to a reasonable extent.'" *Corp. Techs., Inc. v. Harnett*, 943 F. Supp. 2d 233, 245 (D. Mass.), *aff'd*,

731 F.3d 6 (1st Cir. 2013) (quoting *New England Tree Expert Co. v. Russell,* 306 Mass. 504, 508-09 (1940)). Given the public interest in enforcing valid contracts and protecting trade secrets, this factor weighs in favor of a preliminary injunction.

## IV.   Scope of Relief.

Hermalyn contends that even if the Court were to grant preliminary injunctive relief, it should narrow DraftKings's proposed order. *See* ECF 72-1. Hermalyn generally argues that he "should only be restricted from competing with [DraftKings] by using or disclosing [its] confidential information." ECF 101, at 30. He also requests specific revisions to the proposed order, including, for example, limiting the aspects of DraftKings's business that are covered by the noncompete, permitting him to respond to unsolicited outreach from DraftKings's employees, and starting the twelve-month clock for the noncompete and non-solicitation provisions on February 1 (when he resigned) rather than the date of this Order. *See* ECF 102.

To the extent DraftKings's proposed preliminary injunction order goes beyond the parties' agreements, it will not be entered. Nor will the Court accept Hermalyn's invitation to revise the parties' agreements. Rather, the scope of the preliminary injunction will reflect the text of the contracts signed by the parties, to the extent DraftKings has established a likelihood of success on the merits of its breach of contract claims. The scope of relief will thus track the language of the non-disclosure agreement, the agreement not to solicit DraftKings's employees, and the noncompetition agreement, save for the narrowing of the geographic scope of the latter agreement. The noncompetition agreement is qualified: it prevents Hermalyn from "provid[ing] services to a Competing Business that relate to any aspect" of DraftKings's business "*for which [he] performed services or received Confidential Information* . . . at any time during the six (6) month period prior to such termination." ECF 1-2, at 11, § (a) (emphasis added). Thus, Hermalyn

will not be enjoined from working for Fanatics; rather, he will be enjoined from providing services to Fanatics that relate to any aspect of DraftKings's business for which he performed services or received confidential information, as defined in the agreement, during the six months before February 1, 2024.

The Court agrees with Hermalyn, however, that the period of restriction is twelve months from the date of his February 1 resignation from DraftKings, not from the date of this Order. Both Hermalyn's noncompetition and non-solicitation agreements provide "for a [restriction] period of twelve (12) months" after the end of his relationship with DraftKings. ECF 1-1, § 3; ECF 1-2, at 11, § (a). There is no basis for extending the non-solicitation provision to one year from the date of this Order. In support of extending the noncompete, DraftKings cites section (g) of the noncompetition agreement, which states that Hermalyn "agree[d] to an extension of the [12-month] duration . . . for an additional period of time equal to the time that elapses from the commencement of [any] breach, Threatened Breach or challenge to the later of: (i) the termination of such breach, Threatened Breach or challenge; or (ii) the final non-appealable resolution of any litigation or other legal proceeding stemming from such breach, Threatened Breach or challenge." ECF 1-2, at 16, § (g). It is unclear whether this clause is enforceable under Massachusetts Noncompetition Agreement Act, which provides that "[i]n no event may the stated restricted period exceed 12 months from the date of cessation of employment, unless the employee has breached his or her fiduciary duty to the employer or the employee has unlawfully taken, physically or electronically, property belonging to the employer, in which case the duration may not exceed 2 years from the date of cessation of employment." M.G.L. c. 149, § 24L(b)(iv). The Court has not made a final determination on the merits whether DraftKings will prevail on any of its claims; rather, this opinion, rendered at a preliminary stage in the

proceedings without a complete record, addresses only whether DraftKings has established a likelihood of success on the merits of its breach of contract and misappropriation claims. Accordingly, the preliminary injunction order will run for twelve months only, starting on February 1, 2024.

## MOTION TO DISMISS OR STAY

Hermalyn moves to dismiss this action on *forum non conveniens* grounds or, in the alternative, to stay the case pursuant to the *Colorado River* abstention doctrine in favor of the first-filed California action. Hermalyn's motion will be denied because this Court is the proper forum for the litigation and *Colorado River* does not support a stay.[15]

## I.     *Forum Non Conveniens.*

"*Forum non conveniens* gives courts the discretion 'to dismiss a case because the chosen forum (despite the presence of jurisdiction and venue) is so inconvenient that it would be unfair to conduct the litigation in that place.'" *Curtis v. Galakatos*, 19 F.4th 41, 46 (1st Cir. 2021) (quoting *Nandjou v. Marriott Int'l, Inc.*, 985 F.3d 135, 140 (1st Cir. 2021)). "[T]he bar for a district court to dismiss a suit pursuant to the doctrine is a high one." *Nandjou*, 985 F.3d at 141. To prevail on his *forum non conveniens* argument, Hermalyn "'bears the burden of showing both that an adequate alternative forum exists and that considerations of convenience and judicial efficiency strongly favor litigating the claim in the alternative forum.'" *Imamura v. Gen. Elec.*

---

[15] Hermalyn's motion will not, as DraftKings urges, be construed as a motion for reconsideration subject to a heightened standard of review. At the TRO hearing, the Court made clear that its assessments were preliminary and set a briefing schedule for the motion to dismiss. *See* ECF 41; ECF 46, at 57:9-14, 62:4-7. Additionally, Hermalyn did not raise the *Colorado River* doctrine when he previously sought to stay this action. As the Court observed then, Hermalyn made "no argument that any abstention doctrine warrants a stay of this litigation." ECF 29.

*Co.*, 957 F.3d 98, 106 (1st Cir. 2020) (quoting *Iragorri v. Int'l Elevator, Inc.*, 203 F.3d 8, 12 (1st Cir. 2000)).[16]

"At the first step, an adequate alternative forum exists when '(1) all parties can come within that forum's jurisdiction, and (2) the parties will not be deprived of all remedies or treated unfairly.'" *Id.* (quoting *Mercier v. Sheraton Int'l, Inc.*, 935 F.2d 419, 424 (1st Cir. 1991)). The defendant generally satisfies this prong by "establish[ing] 'that the alternative forum addresses the types of claims that the plaintiff has brought and that the defendant is amenable to service of process there.'" *Id.* (quoting *Iragorri*, 203 F.3d at 12). At the second step, courts "perfor[m] a balancing test to determine whether the defendant has demonstrated that 'the compendium of factors relevant to the private and public interests implicated by the case strongly favors dismissal.'" *Id.* at 107 (quoting *Iragorri*, 203 F.3d at 12).

The parties dispute, at the first step, whether the California state court is an adequate alternative forum for deciding the issues contested in this case. This Court need not decide that question, however, because Hermalyn has not carried his burden at the second step to show that the private and public interests at stake here strongly favor dismissal.

 Where, as here, the parties have agreed to a forum selection clause, "they waive the right to challenge the preselected forum as inconvenient or less convenient for themselves or their witnesses, or for their pursuit of the litigation." *Atl. Marine Const. Co. v. U.S. Dist. Ct. for W. Dist. of Texas*, 571 U.S. 49, 64 (2013). Courts must, as a result, "deem the private-interest factors to weigh entirely in favor of the preselected forum" and "consider arguments about public-interest factors only." *Id.* Section 9 of Hermalyn's confidentiality agreement and section (f) of

---

[16] When evaluating motions to dismiss on *forum non conveniens* grounds, courts can consider materials outside of the pleadings, including affidavits. *See Curtis*, 19 F.4th at 51; *Mercier v. Sheraton Int'l, Inc.*, 935 F.2d 419, 425 (1st Cir. 1991).

his noncompetition covenant both provide, in pertinent part, that Hermalyn "submit[s] to the personal jurisdiction of" "the United States District Court for the District of Massachusetts for any dispute arising hereunder" and "waive[s] any other requirement (whether imposed by statute, rule of court, or otherwise) with respect to personal jurisdiction or service of process." ECF 1-1, at 6, § 9; ECF 1-2, at 15, § (f). A forum selection clause, like this one, "is 'prima facie valid' and, absent a 'strong showing' by the resisting party that the clause is 'unreasonable under the circumstances,' it should not be set aside." *Claudio-De Leon v. Sistema Universitario Ana G. Mendez*, 775 F.3d 41, 48 (1st Cir. 2014) (quoting *M/S Bremen v. Zapata Off-Shore Co.*, 407 U.S. 1, 10 (1972)). Hermalyn does not argue that this provision is invalid under Massachusetts law, ECF 118, at 58:7-13, and the Court has already concluded that his contracts are governed by Massachusetts law. Accordingly, the private interest factors "weigh entirely in favor of the preselected forum." *Atl. Marine Const. Co.*, 571 U.S. at 64.

Hermalyn relies instead on the public interest factors to carry the day. The "public interest factors include 'the administrative difficulties flowing from court congestion; the local interest in having localized controversies decided at home; the interest in having the trial of a diversity case in a forum that is at home with the law that must govern the action; the avoidance of unnecessary problems in conflict of laws, or in the application of foreign law; and the unfairness of burdening citizens in an unrelated forum with jury duty.'" *Imamura*, 957 F.3d at 107 (quoting *Piper Aircraft Co. v. Reyno*, 454 U.S. 235, 241 n.6 (1981)). Those factors "may sometimes provide support for rejecting enforcement of an otherwise valid forum-selection clause, but '. . . will rarely defeat' such a clause." *Amyndas Pharms., S.A. v. Zealand Pharma A/S*, 48 F.4th 18, 33 (1st Cir. 2022) (quoting *Atl. Marine Const. Co.*, 571 U.S. at 64).

Pointing principally to the second and third factors, Hermalyn contends that DraftKings's breach of contract claims are governed by California law and that California has a stronger interest than Massachusetts in the substance of this litigation. The Court has already explained why the breach of contract claims are governed by Massachusetts law, not California law. Thus, Hermalyn's argument that this case will involve novel questions of California law is misplaced. Hermalyn also contends that "California has a longstanding and fundamental policy interest . . . in ensuring the rights of its residents and companies to compete free of restrictive covenants that impede employee choice and the ability of California employers to access the national talent pool." ECF 113, at 1. True enough. But, as described, California has no greater interest than Massachusetts in enforcing its laws on restrictive covenants. While California law renders noncompetition agreements unenforceable "regardless of where and when the contract was signed," Cal. Bus. & Prof. Code § 16600.5(a), Massachusetts's Noncompetition Agreement Act provides that noncompetition agreements can be "valid and enforceable" under certain circumstances, M.G.L. c. 149, § 24L(b). Where Massachusetts law governs the breach of contract claims at issue in this case, California does not have a local interest in adjudicating this matter that supersedes Massachusetts's local interest.

This is not the exceptional case where the public interest factors warrant disregarding an enforceable Massachusetts forum selection clause on *forum non conveniens* grounds. *See Amyndas Pharms.*, 48 F.4th at 35 (the "public interest factors will rarely tip the balance" because "'forum-selection clauses should control except in unusual cases'" (quoting *Atl. Marine Const. Co.*, 571 U.S. at 64)). Hermalyn's motion to dismiss is, accordingly, denied.

II.   ***Colorado River* Abstention.**

In the alternative, Hermalyn seeks a stay of this case pending the outcome of the California case pursuant to the *Colorado River* abstention doctrine. This doctrine "allows federal courts in limited instances to stay or dismiss proceedings that overlap with concurrent litigation in state court." *Jimenez v. Rodriguez-Pagan*, 597 F.3d 18, 21 (1st Cir. 2010). But "'[a]bstention from the exercise of federal jurisdiction is the exception, not the rule.'" *Barr v. Galvin*, 626 F.3d 99, 107 (1st Cir. 2010) (quoting *Colorado River*, 424 U.S. at 813).

In assessing whether to apply *Colorado River* abstention, courts consider the following non-exhaustive factors: "'(1) whether either court has assumed jurisdiction over a res; (2) the [geographical] inconvenience of the federal forum; (3) the desirability of avoiding piecemeal litigation; (4) the order in which the forums obtained jurisdiction; (5) whether state or federal law controls; (6) the adequacy of the state forum to protect the parties' interests; (7) the vexatious or contrived nature of the federal claim; and (8) respect for the principles underlying removal jurisdiction.'" *Jiménez*, 597 F.3d at 27-28 (quoting *Rio Grande Cmty. Health Ctr. v. Rullan*, 397 F.3d 56, 71-72 (1st Cir. 2005)). The ultimate decision to stay "a federal action because of parallel state-court litigation . . . [rests] on a careful balancing of the important factors as they apply in a given case, with the balance heavily weighted in favor of the exercise of jurisdiction." *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 16 (1983). "The crux of the *Colorado River* doctrine is the presence of 'exceptional' circumstances displaying 'the clearest of justifications' for federal deference to the local forum in the interest of 'wise judicial administration, giving regard to conservation of judicial resources and comprehensive disposition of litigation.'" *Nazario-Lugo v. Caribevisión Holdings, Inc.*, 670 F.3d 109, 115 (1st Cir. 2012) (quoting *Colorado River*, 424 U.S. at 817-19).

As a threshold matter, however, "to create the possibility of abstention under *Colorado River*, . . . the state action must resolve all of the claims in the federal case." *Glassie v. Doucette*, 55 F.4th 58, 64 (1st Cir. 2022). This is because "*Colorado River* 'necessarily contemplates that the federal court will have nothing further to do in resolving any substantive part of the case.'" *Id.* (quoting *Moses H. Cone Mem'l Hosp.*, 460 U.S. at 28). Accordingly, "'it would be a serious abuse of discretion to grant [a] stay . . . ' '[i]f there is any substantial doubt' 'that the parallel state-court litigation will be an adequate vehicle for the complete and prompt resolution of the issues between the parties.'" *Id.* (quoting *Moses H. Cone Mem'l Hosp.*, 460 U.S. at 28).

Hermalyn's request for abstention falters at the outset because the California action will not resolve all of the claims at issue here. This action, unlike the California case, involves claims for misappropriation of trade secrets in violation of the DTSA, MUTSA, and common law, as well as common law claims for conversion and breach of the duty of loyalty. ECF 1, ¶¶ 130-73. None of those claims are at issue in the California action, which principally seeks to invalidate Hermalyn's non-solicitation and noncompetition agreements with DraftKings. *See* ECF 27-1, ¶¶ 73-92. The duplicative contract claims are "not enough to justify a stay of this federal action." *Glassie*, 55 F.4th at 64. And Hermalyn's argument that "a ruling in the California Action that the restrictive covenants are unenforceable would moot (or at least dramatically limit) DraftKings' misappropriation claims" fares no better. ECF 113, at 7. The First Circuit rejected a similar argument in *Glassie* that "the state-court actions 'are likely to moot, or at the very least inform, [the plaintiff's] federal claims.'" *Glassie*, 55 F.4th at 64. This Court is similarly not "convince[d] . . . that [it] would have 'nothing further to do' after the state-court actio[n]." *Id.*

While there is consequently "no need to consider the additional factors drawn from *Colorado River* and its progeny," *see id.* at 65 n.4, the Court does so here for the sake of

completeness and concludes that Hermalyn has failed to establish extraordinary circumstances that warrant abstention under *Colorado River*. The parties agree that the first factor, the assumption of jurisdiction over *res*, is inapplicable here. The second factor, the inconvenience of the federal forum, weighs against abstention because, as explained, Hermalyn "contracted to litigate in Massachusetts," *Covidien LP v. Esch*, 280 F. Supp. 3d 284, 286 (D. Mass. 2017) (citing *Atl. Marine Const. Co.*, 571 U.S. at 64), and thus "submit[ted] to the personal jurisdiction of" this Court, ECF 1-1, at 6, § 9; ECF 1-2, at 15, § (f).

The third factor, the avoidance of piecemeal litigation, marginally supports a stay. Hermalyn contends that permitting this action and the California case "to proceed creates the substantial risk of conflicting results," given that "both actions are based on identical acts and overlapping legal issues." ECF 69, at 18. But while there is some risk of inconsistent rulings on some of the claims, abstention "'is not warranted simply because related issues otherwise would be decided by different courts, or even because two courts otherwise would be deciding the same issues,'" and is instead reserved for "'exceptional'" cases. *KPS & Assocs., Inc. v. Designs By FMC, Inc.*, 318 F.3d 1, 10 (1st Cir. 2003) (citations omitted).

The fourth factor—concerning the order in which the forums obtained jurisdiction—is not neutral, as Hermalyn contends, but cuts against a stay. ECF 69, at 18. As the Supreme Court has explained, "priority should not be measured exclusively by which complaint was filed first, but rather in terms of how much progress has been made in the two actions." *Moses H. Cone Mem'l Hosp.*, 460 U.S. at 21. While the California action was filed first, the state court has not issued injunctive relief, addressed whether DraftKings is subject to personal jurisdiction there, or ordered discovery. *See* ECF 97, at 20; ECF 98-5; *Michael Z. Hermalyn & FVP, LLC v. DraftKings, Inc.*, No. 24STCV02694 (Cal. Super. Ct.). Here, by contrast, the Court has entered a

TRO, authorized the parties to conduct limited discovery, conducted an evidentiary hearing, and entered a preliminary injunction. This case is, therefore, more advanced than the California action. *See Villa Marina Yacht Sales, Inc. v. Hatteras Yachts*, 947 F.2d 529, 535 (1st Cir. 1991) ("The preliminary injunction hearing . . . covered the merits of the [disputed] claim, and thus represented significant development of the case.").

Neither the fifth nor sixth factors weigh in favor of a stay because, as stated, Massachusetts law, not California law, is applicable to the state-law claims at issue in this case and federal law controls the DTSA claim. The seventh factor, concerning the vexatious or contrived nature of the federal claim, weighs against a stay. The Court has already found that DraftKings is likely to succeed on the merits of its DTSA claim. Hermalyn insists, however, that "DraftKings filed this action at least in part to avoid a California court applying California's new laws and its longstanding public policy against restrictive covenants." ECF 69, at 20. But this Court has concluded that Massachusetts law controls, and DraftKings did not go "to federal court solely in reaction to its failure in the [state] court," because the California state court has not resolved Hermalyn's claims. *Villa Marina Yacht Sales, Inc. v. Hatteras Yachts*, 915 F.2d 7, 15 (1st Cir. 1990). DraftKings's federal claim is neither vexatious nor contrived.

The eighth and final factor—respect for the principles underlying removal jurisdiction—is inapplicable here. This factor is only "relevant if a plaintiff was attempting to evade the policy in 28 U.S.C. § 1441 that only a defendant be able to remove a lawsuit from state court to federal court." *United States v. Fairway Cap. Corp.*, 483 F.3d 34, 44 (1st Cir. 2007). The fact that DraftKings, as the defendant, twice sought to remove the California state court action to federal court in California is irrelevant to this inquiry. As a plaintiff here, DraftKings did not, for example, "file a lawsuit in state court, dismiss it and then refile the same action in federal court."

*Villa Marina Yacht Sales*, 947 F.2d at 536. DraftKings initiated this action in federal court and, therefore, did not interfere with Hermalyn's ability to remove the case.

Weighing these factors "heavily . . . in favor of the exercise of jurisdiction," *Moses H. Cone Mem'l Hosp.*, 460 U.S. at 16, a stay based on the *Colorado River* abstention doctrine is not warranted and Hermalyn's motion is denied.

## CONCLUSION AND ORDER

For the foregoing reasons, DraftKings's motion for a preliminary injunction, ECF 72, is GRANTED. The Court will issue a separate Order of Preliminary Injunction consistent with this opinion. The temporary restraining order previously entered, ECF 44, is hereby DISSOLVED. Hermalyn's motion to dismiss or alternatively to stay, ECF 68, is DENIED.

SO ORDERED.

/s/ Julia E. Kobick
Julia E. Kobick
Dated: April 30, 2024                                    United States District Judge