T THISIN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

DRAFTKINGS INC.,

                          Plaintiff,

        v.

MICHAEL HERMALYN,

                          Defendant.

Civil Action No. 1:24-cv-10299

## JOINT STATEMENT PURSUANT TO
## FED. R. CIV. P. 16(b) & 26(f) AND LOCAL RULE 16.1(d)

Counsel for Plaintiff DraftKings Inc. ("DraftKings") and Defendant Michael Z. Hermalyn ("Hermalyn" and together with DraftKings, the "Parties") hereby submit the following Joint Statement to the Court pursuant to Federal Rule of Civil Procedure 26(f)(1), Local Rule 16.1(d), and this Court's May 17, 2024 Notice of Scheduling Conference. *See* ECF 148. This Court has set a scheduling conference in this action for June 17, 2024. ECF 151.

## I.      PRELIMINARY STATEMENT OF THE CASE

### A.      DraftKings' Preliminary Statement

DraftKings is a leader in the digital sports entertainment and gaming industry, where it competes with other online sports platforms, including Fanatics, Inc. *See* ECF 132 ("P.I. Opinion") at 2. Hermalyn worked for DraftKings as a senior employee overseeing VIP customer acquisition and retention until February 1, 2024. *See id.* Over the course of his employment, Hermalyn signed non-disclosure, non-solicitation, and—thirteen times, in return for millions of dollars in compensation—non-competition agreements. *See id.* at 3–4; ECF 1 ¶¶ 38–39, 46, 50–51 & Exs. A–B. Hermalyn breached each of these agreements. After misappropriating DraftKings' trade secrets

1

and confidential information, Hermalyn departed DraftKings on February 1 to work for Fanatics in a nearly identical role—where he immediately solicited two of his former colleagues to join him. *See* P.I. Opinion at 32, 33–37, 38.

**Temporary Restraining Order.**  DraftKings brought this action and sought a temporary restraining order on February 5, alleging breach of contract, misappropriation of trade secrets under both the Defend Trade Secrets Act and the Massachusetts Uniform Trade Secrets Act, breach of duty of loyalty, and conversion.  ECF 1, 3.  On February 8, this Court issued a temporary restraining order enjoining Hermalyn from, among other things, using or disclosing DraftKings' confidential information or soliciting DraftKings' customers or employees but allowing Hermalyn to continue to work at Fanatics.  ECF 44 at (a)–(e).  The TRO also directed Hermalyn to return to DraftKings all DraftKings' confidential information and certify his compliance under the pains and penalties of perjury.  *Id.* at (f).

**Preliminary Injunction.**  On March 14, after limited, expedited discovery, DraftKings filed a motion for a preliminary injunction supported by nine sworn affidavits, thirty-six exhibits, and four appendices—totaling hundreds of pages of evidence.  ECF 72-84.  On April 2, this Court heard argument on DraftKings' request for a preliminary injunction and Hermalyn's motion to dismiss or stay this action.  *See* ECF 118.  This Court held an evidentiary hearing to resolve credibility issues and heard live testimony from six witnesses on April 16 on DraftKings' motion for preliminary injunction.  ECF 130.

On April 30, this Court issued an opinion granting, in large part, DraftKings' motion for preliminary injunction and denying Hermalyn's motion to dismiss.  *See* P.I. Opinion.  This Court found that, "taken as a whole, the evidence submitted at this stage in the proceedings suggests that Hermalyn has struggled with candor to the Court."  *Id.* at 36.  Based upon the evidence and its

credibility assessments, this Court concluded that DraftKings was likely to succeed on the merits on the bulk of its claims and would suffer irreparable harm absent preliminary injunctive relief. *See id.* at 32, 37, 38, 47–48. Accordingly, this Court preliminarily enjoined Hermalyn from, among other things, violating his non-compete and employee non-solicit agreements until their expiration on February 1, 2025, and from using, disclosing, or destroying DraftKings' confidential information at any time.[1] *See* ECF 133.

**Appeal.** Hermalyn filed a notice of appeal on May 2, ECF 134, but did not seek a stay pending appeal from either this Court or the First Circuit. The First Circuit granted Hermalyn's motion for expedited consideration of the appeal, and, on May 22, Hermalyn filed his appellate brief seeking reversal of this Court's decision applying Massachusetts, rather than California, substantive law under Massachusetts choice-of-law principles. Hermalyn also argued—for the first time in his brief—that California should be carved out from his non-compete agreements. On appeal, Hermalyn has not challenged any of this Court's factual findings; its legal conclusions with respect to DraftKings' trade secrets, non-disclosure, or non-solicitation claims; or any portion of the preliminary injunction other than the non-compete provision. The First Circuit has scheduled argument on the appeal for July 22, 2024.

**California Action.** During the pendency of this action, including after the Court issued its preliminary injunction, Hermalyn has repeatedly asked a California state court to "restrain[] and enjoin[]" DraftKings "from enforcing in California, including against Fanatics," Hermalyn's non-

---

[1] In the wake of this Court's decision, news outlets reported Fanatics saying it was a "bit dismayed at the breadth of the court's ruling," but that Hermalyn "is looking forward to rolling up his sleeves and building Fanatics' business consistent with the court order." Nate Raymond, *Ex-DraftKings Executive's Work at Fanatics Restricted by US Judge*, Reuters (April 30, 2024), https://www.reuters.com/legal/litigation/ex-draftkings-exec-likely-took-trade-secrets-can-remain-fanatics-judge-2024-04-30/.

compete and non-solicit obligations.  *See* Proposed Order Granting Preliminary Injunction, attached hereto as Exhibit 1.  Most recently, on May 13, Hermalyn (along with a Fanatics affiliate that purports to employ him) filed an *ex parte* application for a temporary restraining order or an order to show cause regarding a preliminary injunction, **claiming irreparable harm has resulted from this Court's preliminary injunction**.  *See* Notice of *Ex Parte* Application for (1) A Temporary Restraining Order and (2) An OSC Re: Preliminary Injunction, attached hereto as Exhibit 2, at 3–5.

In connection with the California state court proceedings, the parties agreed to limited discovery on Hermalyn's purported California residency, as well as his and the Fanatics affiliate's claims of irreparable harm.  *See* Transcripts from the Depositions of Orlando Ashford and Michael Hermalyn, attached hereto as Exhibits 3 and 4.  During his deposition in connection with the California state court proceedings, Hermalyn made numerous admissions inconsistent with his prior representations that he is currently a California resident.[2]  Hermalyn's request for relief in California makes clear that Hermalyn is seeking either an improper antisuit injunction that would impermissibly prohibit DraftKings from enforcing its agreements with Hermalyn in this Court, or an equally improper advisory opinion that would do nothing to remedy any purported harm (all of which is, again, premised on this Court's preliminary injunction).

In the California litigation, Hermalyn—lacking any true exigency—has repeatedly sought

---

[2]   For example, Hermalyn admitted he signed a lease for a California apartment owned by a friend on January 29, filed his California action on February 1 (wherein he claims to be a California resident), and then immediately broke the lease for that apartment without ever furnishing it, paying any rent for it, or even sleeping in it. Exhibit 4 at 22:7–23:14, 50:3–7, 55:13–14. He then returned home to New Jersey and spent the majority of his time over the next four months either with his family in New Jersey or traveling outside of California. Exhibit 6 (an annotated calendar produced by Hermalyn in the California action reflecting his location on each date from January 1 to May 24, 2024). He even texted a broker in mid-March that he and his wife "live . . . in Bay Head, NJ," but "are moving" to California "this summer." Exhibit 7 (March 9, 2024 text message chain between Hermalyn and a real estate agent produced by Hermalyn in the California action).

to front-run and circumvent this federal court action. For example, during a May 31 case management conference, Hermalyn requested that trial for the California state court proceeding take place *this summer*. *See* Rough Transcript from May 31 Case Management Conference, attached hereto as Exhibit 5 at 21:3–10. The California court refused to grant the request—requiring Hermalyn to file a formal motion—and expressing doubt that such a request is procedurally appropriate given DraftKings' pending jurisdictional challenge there. *Id*. at 21:19–22:10. Most recently, on June 3—the day before the scheduled hearing on Hermalyn's order to show cause for a preliminary injunction—the California court cancelled the hearing, explicitly finding that Hermalyn's request lacks "exigency," and "it is sensible and prudent for the matter of personal jurisdiction to be decided before reaching the merits of any request for injunctive relief." Minute Order at 1 attached hereto as Exhibit 8.[3] Nonetheless, Hermalyn's repeated attempts to expedite a ruling from the California state court are plain evidence that he intends to continue to attempt to circumvent this Court's orders, evade his contracts, and exacerbate the harm caused to DraftKings by his unlawful conduct, including by attempting to interfere with DraftKings' ability to litigate this action.

**Hermalyn's Post-Preliminary Injunction Conduct.** Hermalyn's testimony in the California action has caused DraftKings grave concern that Hermalyn continues to violate his agreements with DraftKings and flout this Court's orders. Hermalyn claims to be in compliance with this Court's preliminary injunction order, but he admitted during his deposition in the

---

[3] The California court converted the request into a regularly noticed motion that will not be heard until after it resolves DraftKings' jurisdictional challenge. *See* Exhibit 8 at 1. That jurisdictional challenge is fully briefed as of June 6. Contrary to Hermalyn's assertions in this statement that the Fanatics affiliate is "Los Angeles-based" and "California-based," the briefing on that jurisdictional challenge has revealed that the Fanatics affiliate has no California offices and has changed its principal office address to New York. *See* Exhibit 10 at 11.

California action that he remains employed by Fanatics, regularly checks his Fanatics email, uses his Fanatics corporate credit card, and has been attending sporting events and parties attended by Fanatics' executives, VIPs, athletes, and other celebrities.  *See* Exhibit 4 at 78:12–20, 79:12–14, 91:15–16, 99:22–100:3.  Specifically, Hermalyn admitted attending a party on May 18, 2024 (mere weeks after this Court's preliminary injunction issued) at Fanatics' CEO Michael Rubin's Los Angeles home to celebrate the NFL rookie premiere.  *Id.* at 93:12-24.  His post-hoc rationalization— that he was not at the Fanatics party in his capacity as a Fanatics executive, but instead as a "guest" of Michael Rubin—is not credible.  *Id.* at 91:1-92:12.  This most recent gambit shows Hermalyn learned nothing about candor since this Court remarked on April 30 that his omission—that he was at Fanatics' CEO's home, and not at Fanatics' offices—was "highly misleading."  P.I. Opinion at 36.  Even now, Hermalyn is using word games and manipulations to cover his misconduct.  Only discovery will reveal how close to the sun Hermalyn is flying while attending these events in terms of his compliance with this Court's orders and his contractual obligations.

**Relief.**  DraftKings has already proven a likelihood of success on the merits on its claims for breach of contract and trade secret misappropriation with the first, expedited discovery phase of this case.  P.I. Opinion at 24–47.  DraftKings believes that the additional evidence uncovered during further discovery will bolster this Court's prior findings and conclusively prove that Hermalyn is liable to DraftKings for his unlawful conduct.  DraftKings intends to seek all available relief, including but not limited to compensatory and punitive damages, attorney's fees, and additional injunctive relief to redress Hermalyn's wrongs.  To that end, DraftKings' positions and proposals set out in this Joint Statement are directed towards securing a "just" and "speedy" determination of this action.  Fed. R. Civ. P. 1.

B.      **Mr. Hermalyn's Preliminary Statement**

In the short time this case has been pending, it has no doubt become clear to the Court that this is not a typical single-employee restrictive covenant and misappropriation of trade secrets case.  It is a scorched Earth litigation by DraftKings with the not-so-ulterior purpose of preventing ordinary competition by an upstart competitor, Fanatics.  This Joint Statement itself, and the fact that DraftKings has converted a routine administrative filing into an opportunity for full blown merits briefing with hundreds of pages of exhibits attached, which therefore necessitated a substantive response from Mr. Hermalyn, should demonstrate that DraftKings' unnecessary, turbo-charged proposed schedule is unrealistic, prejudicial, and disproportionate.

Michael Hermalyn came to DraftKings in September 2020 as a Vice President of Business Development after a career in the entertainment industry, bringing with him his ***own*** unique skillset and his ***own*** substantial relationships from both the entertainment and sports worlds.  It was not until May 2022 that Mr. Hermalyn moved from DraftKings' business development team to its VIP group, which he was a part of for ***less than eighteen months***.  It is Mr. Hermalyn's personal talents and skills for developing and maintaining relationships and providing exceptional experiences to customers that have made him an asset in the market.  In January 2024, Mr. Hermalyn was offered a once in a lifetime, career-advancing opportunity at Fanatics, including reporting directly to Fanatics' CEO, serving as a member of Fanatics' small executive committee, leading Fanatics' VIP business, and being the head of its Los Angeles office.  Mr. Hermalyn accepted that offer on February 1, 2024. He relocated to California in connection with his new job, continues to live in California to this day, and he and his wife have taken a number of steps to make a long-term relocation to California

seamless for their young family, including enrolling their children in schools in Los Angeles for the upcoming academic school year this fall.[4]

Just as key pieces of the story that DraftKings originally concocted when it first filed this lawsuit evaporated under scrutiny, Mr. Hermalyn expects that when the full record is developed and revealed, DraftKings' sensational allegations will not support liability or any award of permanent injunctive relief, damages, or other relief in connection with any of DraftKings' claims against him. DraftKings' claims generally fall into two categories: (1) alleged misappropriation of DraftKings' purported trade secrets and/or "confidential information," and (2) alleged breaches of Mr. Hermalyn's post-employment restrictions, including noncompete and employee non-solicit covenants, in the contracts Mr. Hermalyn had with DraftKings.[5]

*First,* with respect to DraftKings' claims for misappropriation of its purported trade secrets and/or confidential information, discovery in this action will show that DraftKings' alleged "trade secrets" and confidential information are nothing of the sort, as they consist of information that is stale, generally known in the industry, and/or available in the public domain. Additionally, Mr. Hermalyn did ***not*** take or misappropriate any of DraftKings' purported trade secrets or confidential information, and he did ***not*** and has ***not*** disclosed them or used them outside of his employment with DraftKings. Indeed, before submitting his resignation to DraftKings and accepting his employment

---

[4]   DraftKings' contentions concerning the separate action filed by Mr. Hermalyn and the California-based Fanatics affiliate which employs him, FVP LLC, are addressed briefly below.

[5]   As the Court noted in its April 30, 2024 Memorandum and Order, DraftKings did not bring a claim for violation of any customer/client non-solicit covenant against Mr. Hermalyn and, in any event, has not shown that it is likely to succeed on such a claim.  ECF No. 132 at 37 ("As an initial matter, although DraftKings presses this claim in its preliminary injunction motion, it did not assert a breach of contract claim based on the customer non-solicitation agreement in its verified complaint . . . But even if the complaint had asserted such a claim, DraftKings has not submitted sufficient evidence to support it.").

with Fanatics on February 1, 2024, Mr. Hermalyn took affirmative steps to ensure that he no longer possessed DraftKings' property, confidential information, or so-called "trade secrets," and he took none to his new employer.  Mr. Hermalyn's skills and abilities—including his own relationships and associated good will—belong to Mr. Hermalyn, not to DraftKings.  Discovery will show that Mr. Hermalyn is not liable for misappropriation or any related claims, and that DraftKings' alleged "trade secrets" do not qualify as such.  Moreover, discovery will show that DraftKings has no monetary damages attributable to any alleged misappropriation, or grounds for permanent injunctive relief.

*Second,* Mr. Hermalyn further maintains his position that California law governs the post-employment restrictions, including the noncompete and non-solicit covenants, that DraftKings seeks to enforce against him.  These restrictions are ***illegal and void*** in California—where Mr. Hermalyn resides and where his employer is located.  During the initial stages of this case, the Court found that Massachusetts law applies.  Mr. Hermalyn, as is his right, has appealed that legal issue to the First Circuit.  *Hermalyn v. DraftKings Inc.*, No. 24-1443.  The First Circuit granted Mr. Hermalyn's request for an expedited briefing schedule, *see* Order, *Hermalyn v. DraftKings, Inc.*, No. 24-1443 (1st Cir. May 10, 2024) (Dkt. No. 20), and that court set oral argument in the appeal for July 22, 2024—during the first session on the first day of the court's July 2024 sitting.  Notice, *Hermalyn v. DraftKings, Inc.*, No. 24-1443 (1st Cir. June 6, 2024) (Dkt. No. 36).

Even if Massachusetts law applies, discovery will show that DraftKings' covenants are unenforceable and that DraftKings has no legitimate business purpose for the noncompete covenant or its other restrictive covenants that it seeks to enforce against Mr. Hermalyn.  Indeed, DraftKings cannot justify its restrictive covenants based on a need to protect allegedly confidential or "trade secret" information, and given the nature of both Mr. Hermalyn's role with DraftKings and the sports gambling business, DraftKings does not possess goodwill that it may seek to protect vis-à-vis

9

restrictive covenants.  Rather, discovery will demonstrate that DraftKings is impermissibly seeking to restrain *ordinary competition*, a purpose that does not permit enforcement of restrictive covenants under Massachusetts law.  DraftKings and its Co-Founder and CEO Jason Robins are concerned about the threat posed by Fanatics, an upstart competitor in the online gambling and sports betting space where DraftKings is one of just two dominant market leaders (the other being FanDuel) that control the market.  DraftKings is targeting Mr. Hermalyn in an effort to stifle competition—here, competition from a much smaller competitor, Fanatics, which has only recently entered that market after DraftKings unlawfully and purposely tried to obstruct it from doing so by seeking to derail Fanatics' acquisition of the U.S. assets of PointsBet Sportsbook in 2023.  Discovery will further demonstrate that DraftKings is seeking to make an example out of Mr. Hermalyn by gratuitously and falsely attacking him with alleged wrongdoing—all in an attempt to chill fair competition and lawful recruiting activity by its rival, Fanatics and to instill fear throughout its employee ranks.

DraftKings' efforts to continue to attack and smear Mr. Hermalyn are once again fully on display in this submission.  Contrary to DraftKings' ***spin***, Mr. Hermalyn attended one Rangers baseball game last month with a ***personal*** friend, who has nothing to do with DraftKings, *see* Ex. 4 at 87:6-88:9, and attended a social gathering on May 18, 2024 as a guest at his boss's house; there is nothing untoward or improper about any of that.  Of course, this Court ***did not*** bar Mr. Hermalyn from socializing, or interacting with his Fanatics colleagues or his own friends, which is what Mr. Hermalyn did.  Ex. 4 at 101:10-12 ("I stuck to speaking with Fanatics employees and friends of mine that I knew prior to being at DraftKings."); *see also* 92:18-19, 94:15-95:8.  Indeed, this Court permitted Mr. Hermalyn to continue working at Fanatics in a noncompetitive role.[6]  And to be clear—

---

[6]  While Fanatics is seeking to find such a role for Mr. Hermalyn, it has not been able to do so yet, but Mr. Hermalyn and Fanatics are continuing to actively explore potential options.  *Id.* at 13:1-3, 94:22-25.

Mr. Hermalyn was not doing VIP work (or any work at all, even though he is *not* barred from doing so in a non-competitive position) at the May 18 party, *see id.*, and Mr. Hermalyn did not recognize any DraftKings VIP customers at the party and has no awareness of whether any may have even attended. *Id.* at 101:8-10.

**Third**, in addition to the noncompete covenant, Mr. Hermalyn challenges the enforceability of the employee nonsolicit covenant under California and Massachusetts law. Mr. Hermalyn disputes that he solicited or attempted to solicit two DraftKings employees on or about February 1, 2024, neither of whom left DraftKings and both of whom remain employed by DraftKings to this day. Further, Mr. Hermalyn expects discovery to show, among other things, that (a) he did not encourage any DraftKings employees to join Fanatics while he worked for DraftKings, as DraftKings' complaint falsely accuses him of doing; (b) he did not solicit DraftKings' employees to join Fanatics, including following the Court's February 8, 2024 Temporary Restraining Order (Dkt. No. 44); and (c) he has been walled off from hiring at Fanatics, and has not and will not engage in any solicitation of DraftKings' employees pursuant to the Court's April 30, 2024 Order on Preliminary Injunction (Dkt. No. 133). DraftKings has not suffered any harm, nor will it be able to prove that it is entitled to any damages based on its employee solicitation claims.

Discovery will uncover and establish the full extent of DraftKings' unclean hands, bad faith conduct, and improper purposes and tactics. Moreover, this Court restrained Mr. Hermalyn from competing with DraftKings for his new employer on April 30, 2024. PI Order at ¶ 3 (Dkt. No. 133). Mr. Hermalyn served as head of VIP for his new employer for a mere 89 days, the majority of which were subject to the constraints of the February 8, 2024 Temporary Restraining Order (Dkt. No. 44). DraftKings will not be able to show any harm or damages relating to Mr. Hermalyn's brief period of

circumscribed competitive activity, and Mr. Hermalyn is confident that when the full record is revealed, DraftKings' allegations will be shown to be false across the board.

*Finally*, DraftKings' invocation of the separate, first-filed lawsuit brought by Mr. Hermalyn and his employer in California is a red herring, as the proceedings in that case are not relevant to the issues before this Court at the upcoming scheduling conference.  In that action, Mr. Hermalyn and Mr. Hermalyn's Los Angeles-based employer, FVP LLC, seek a declaration of their rights under California law, which renders null and void restrictive covenants like those at issue here, in the state of California.  Mr. Hermalyn and FVP LLC have sought relief on an expedited basis in that action, to prevent DraftKings from interfering with Mr. Hermalyn's employment in California, and they also seek other forms of injunctive relief and damages.

As DraftKings knows, its description of the factual record in the California case (*see* n.2, *supra*) is completely misleading and inaccurate.  In fact, the expedited discovery that has taken place in the California action—at DraftKings' insistence—has further added to ***the voluminous evidence that Mr. Hermalyn is indeed a California resident***, and is also in the process of moving his young family across the country with him.  Mr. Hermalyn produced various documents and testimony demonstrating that he has rented two apartments in California.  He signed the lease for the first apartment on January 29, 2024, with the intent to live there, but shortly thereafter found a different Los Angeles residence that he preferred.  Ex. 4 at 46:12-50:8, 54:2-9; 55:10-21, 56:20-57:3.  Mr. Hermalyn leased the second apartment on February 4, 2024, and furnished it.  *Id.* at 53:23-55:6, 89:7-10.  Mr. Hermalyn has lived at that apartment since then, and he has also signed a new lease on a family home in Los Angeles that begins once the rest of his "family follow and come out after the school year."  *Id.* at 21:14-22:4, 25:21, 98:12-14.  DraftKings hides from this Court that Mr. Hermalyn's March 9, 2024 text message to a Los Angeles real estate broker (Ex. 7) was about moving

*his family*, including his young school-aged daughters, to California to join him over the summer, as was "always the plan." Ex. 4 at 21:25-26:4.  Discovery also showed that the days that Mr. Hermalyn was not in California were accounted for by the fact that his wife and children remained in New Jersey, as well as Passover, a family vacation, business travel, and travel to Boston for the instant litigation. *See id.* at 30:4-12; *see also* Ex. 6.

## II.    PROPOSED PRETRIAL SCHEDULE

The Parties' respective proposals regarding the pretrial schedule are reflected in the chart below.

| Discovery Deadline | Plaintiff's Proposed Schedule | Defendant's Proposed Schedule |
|---|---|---|
| Initial Disclosures | June 14, 2024 | June 14, 2024 |
| Deadline for Plaintiff to serve Trade Secret Disclosure Pursuant to M.G.L. c. 93, § 42D(b) | *Already satisfied, see* **Section III.A** *below for further discussion.* | June 28, 2024 *Mr. Hermalyn's position is detailed in* **Section III.B.** *below.* |
| Deadline for Parties to Serve First RFPs | June 28, 2024 | July 12, 2024 |
| Deadline for Parties to Serve Second RFPs | August 27, 2024 | October 18, 2024 |
| Deadline to Serve ROGs | August 27, 2024 | October 18, 2024 |
| Substantial Completion of Document Discovery | September 30, 2024 | January 31, 2025 |
| Deadline to serve RFAs | October 1, 2024 | February 14, 2025 |
| Completion of Party Document Discovery | November 25, 2024 | February 28, 2025 |
| Deadline to Amend Pleadings / Add a Party[7] | October 30, 2024 | October 30, 2024 |
| Completion of all Fact Depositions | November 22, 2024 | May 22, 2025 |
| Final Fact Discovery Deadline | November 25, 2024 | June 5, 2025 |
| Plaintiff's Expert Reports | December 20, 2024 | July 31, 2025 |

---

[7]  For the avoidance of doubt, this deadline also applies to any answer or otherwise responsive pleading on behalf of Mr. Hermalyn, including any counterclaims.

| Discovery Deadline | Plaintiff's Proposed Schedule | Defendant's Proposed Schedule |
|---|---|---|
| Defendant's Expert Reports | January 31, 2025 | September 4, 2025 |
| Expert Deposition Deadline | February 16, 2025 | October 2, 2025 |
| Opening Summary Judgment + Daubert Briefs | February 28, 2025 | November 21, 2025 |
| Summary Judgment and Daubert Oppositions | April 4, 2025 | December 12, 2025 |
| Summary Judgment and Daubert Replies | April 18, 2025 | December 23, 2025 |

DraftKings' Position

This is a case of ordinary complexity and great urgency.  DraftKings is a single plaintiff pursuing claims against a single individual defendant.  While there may be some discovery relating to events dating back to last year, the evidence presented during the preliminary injunction hearing clearly demonstrated that the overwhelming majority of discovery will focus on just a few weeks prior to Hermalyn's February 1 resignation and the mere months since his departure from DraftKings and his move to Fanatics.  In addition, the parties have agreed to abide by the local defaults for depositions and written discovery, and there is nothing to suggest that anything other than normal course discovery will take place in this case.

Under the circumstances, the parties should abide by the Court's instruction in its Notice of Scheduling Conference dated May 17, 2024 that they "should propose a schedule that calls for the completion of fact discovery, expert testimony, and pretrial motion practice within one calendar year" from the June 17, 2024 "date of the scheduling conference."  ECF 148 at 2.  But there is another critical reason for why all discovery and pretrial motion practice should be completed within a year: Hermalyn has misappropriated DraftKings' trade secrets and confidential information and

they remain in his possession.  DraftKings needs to take proportionate and reasonable discovery soon so that it may uncover whether Hermalyn has shared any of its trade secrets and confidential information with Fanatics, the extent to which such information has been used or disclosed, and if necessary, determine whether it needs to seek further emergency relief.

DraftKings proposes that the parties complete discovery and pretrial motion practice by April 4, 2025.[8]  DraftKings' fair and appropriate proposed schedule follows the Court's directive. By contrast, Hermalyn proposes an unfair and inappropriately elongated schedule that pushes the conclusion of discovery and summary judgment briefing by a full year, with summary judgment not to be fully briefed until December 23, 2025.[9]  DraftKings respectfully submits there is no good reason to delay the schedule in this fashion, and the only purpose served by Hermalyn's proposed schedule is to delay the "just" and "speedy" resolution of this action.  Fed. R. Civ. P. 1.

Numerous aggravating factors support DraftKings' proposal for a case schedule consistent with the Court's instruction.  Statements made by Hermalyn's (and Fanatics') counsel[10] during a May 28 meet and confer, along with other factors discussed below, have fueled DraftKings' concerns about whether Hermalyn seeks to delay the truth-seeking process of civil discovery, while attempting to challenge and evade his obligations under his agreements and under this Court's preliminary injunction—including by attempting to front-run this action with proceedings in California.

The following aggravating factors have given rise to DraftKings' request for the schedule

---

[8]   The table in Section II of this Joint Statement sets out the parties' competing schedules.

[9]   Hermalyn proposes summary judgment oppositions and replies on 21 and 14 day turns—during and immediately preceding Jewish and Christian holidays—presumably to avoid the optics of a schedule that drags into 2026.

[10]   Hermalyn's lawyers in this action represent Hermalyn and Fanatics affiliate FVP LLC in the California litigation.

DraftKings proposes in this Joint Statement:

***Delay of Litigation.***  Hermalyn's efforts to stall discovery are already evident.  DraftKings' counsel attempted to hold a Rule 26(f) conference on May 9 (in which Hermalyn's counsel did not meaningfully participate) and then repeatedly requested a meet-and-confer the week of May 21. Hermalyn's counsel continued, unilaterally, to refuse to participate for weeks.  When Hermalyn's counsel finally shared Hermalyn's proposed discovery schedule on May 28, that schedule extended the conclusion of summary judgment briefing by ***260 days*** (from DraftKings' original proposal) to March 2026—nearly a year after the deadline in the Court's default schedule.

***Demand for Additional Trade Secret Disclosure.***  During that same May 28 call, Hermalyn's counsel reiterated its meritless position that DraftKings must provide some additional separate disclosure of its trade secrets by the end of June—even in the face of DraftKings' prior disclosures in its complaint, interrogatory responses, and sworn affidavits, *see* ECF 1 ¶¶ 27, 59– 74; ECF 74-13 at 7–26; ECF 78 ¶¶ 31–38; ECF 80 ¶ 6, and despite the Court's determination that DraftKings has already identified its trade secrets with the requisite specificity to support injunctive relief, *see* ECF 46 at 52:7–10; P.I. Opinion at 40.  When DraftKings' counsel asked Hermalyn's counsel to explain what precisely was inadequate about the prior disclosures, his counsel could not articulate any identifiable deficiency.  Under the circumstances, DraftKings' counsel expressed the concern that Hermalyn's request for further trade secret disclosures before the commencement of trade secrets discovery is a classic trade secret shell game—in which the defendant demands an ever-more-particularized trade secrets disclosure—resulting in continuing litigation delay.  As discussed in Section III, DraftKings respectfully submits that no further disclosure is required by the Massachusetts Uniform Trade Secrets Act under the circumstances of this case.

16

***Delay of Review of DraftKings' Confidential Information.***   Other comments made by Hermalyn's counsel during the May 28 meet and confer call raised more red flags.  This Court's February 8 temporary restraining order directed Hermalyn to return to DraftKings any confidential information stored on the personal devices in the possession of his counsel.  ECF 44 ¶ (f).  The order required Hermalyn to complete this process by February 11.  *See id*.  The parties have exchanged voluminous correspondence concerning Hermalyn's compliance with this obligation.  As of April 26, Hermalyn's counsel stated Hermalyn would review contacts on his personal devices to segregate possible DraftKings' contacts from his personal contacts so that Hermalyn's counsel can discuss the return of the former with DraftKings only *that following week*.  And for the first time during the parties' meet and confer on May 28, Hermalyn's counsel revealed that Hermalyn **only recently started** reviewing the contacts he had committed to reviewing approximately a month earlier.  This delay, coupled with the other conduct Hermalyn's counsel disclosed during the meet and confer, heightened DraftKings' concerns that Hermalyn is approaching this case with disregard for the Court's findings in both its temporary restraining order and preliminary injunction rulings, and for DraftKings' legal rights under those orders to protect its trade secrets and confidential information.

***Hermalyn's Efforts To Circumvent This Court's Jurisdiction Preliminary Injunction and Front-Run the California Case.***   Since this Court issued its preliminary injunction, Hermalyn has attempted to undermine this Court's jurisdiction and circumvent its preliminary injunction by seeking expedited relief in California.  First, on May 9 and May 13, he repeatedly requested that the California court issue  "emergency" relief invalidating his contractual restrictions.  Then, on May 31, he requested that the California court set a trial date within the next few months.  *See* Rough Transcript from May 31 Case Management Conference, attached hereto as Exhibit 5 at

21:3–10.   While Hermalyn seeks to delay this case schedule, he is doing the opposite in California—all to avoid compliance with his contracts and this Court's orders.

In the face of these facts, Hermalyn says DraftKings did an "about-face" between the schedule it proposed at the outset of the meet-and-confer process and DraftKings' proposed schedule reflected in this Joint Statement.   While it is true that DraftKings revised its schedule proposal several days after making its first proposal, this was done for informed and considered reasons and in the utmost good faith.   As noted above, the meet-and-confer process—and Hermalyn's California litigation gambits—show Hermalyn will attempt to use a longer schedule and other delay tactics (like requiring ever more "specificity" for DraftKings' trade secrets disclosures) to prolong his discovery obligations and further conceal his unlawful conduct—the full scope of which is unknowable to DraftKings without his document productions and other discovery.

In these circumstances, where this Court has already found a likelihood of success on DraftKings' trade secrets, competition, and solicitation claims, DraftKings respectfully submits that the schedule it proposes is reasonable and consistent with securing a "just, speedy, and inexpensive determination" of this action. Fed. R. Civ. P. 1.  DraftKings' proposed schedule gives the parties nearly 3.5 months for document discovery, 5 months to complete fact depositions, and 10 months for summary judgment motions to be fully submitted, with trial likely occurring around one year from the Court's June 17, 2024 scheduling conference.  This gives the parties more than enough time to complete discovery and other pretrial proceedings, as well as prepare their respective cases.

A defendant accused of trade secrets theft and serious contractual breaches—both of which strike at the very heart of personal and professional integrity—should want vindication before a

court swiftly and decisively.  Under normal circumstances, a defendant in Hermalyn's shoes would be demanding an early trial.  But he is not.  Instead he presses a proposal under which document discovery will not finish *until next year*, fact depositions will not be completed until *nearly a year after* the Court's June 17, 2024 scheduling conference, and summary judgment motions will not be fully submitted until mere days before *2026*, with trial likely occurring *approximately two years after* the Court's June 17, 2024 scheduling conference.  The schedule proposed by Hermalyn is excessive, unnecessary, and will serve only to prolong the "just, speedy, and inexpensive determination" of this action.  Fed. R. Civ. P. 1.  There is simply no basis for such a protracted schedule.[11]  Hermalyn's suggestion that an expeditious schedule will somehow prejudice him is wrong.  Hermalyn is an individual defendant with a discrete set of documents and communications that should be readily identifiable as relevant to this litigation.  While forensic inspection will be critical to revealing **what happened** to the DraftKings documents Hermalyn sent to his personal devices; contrary to Hermalyn's litigation position, at this stage, forensic inspection should be limited to devices *Hermalyn* used.[12]  The relevant time period at issue for the parties in this case

---

[11]   The only component of the schedule Hermalyn seeks to accelerate is the deadline by which a party must amend its pleading or add a party.  DraftKings proposes a deadline of October 30, 2024 to amend the complaint. That proposal assumes that by October 30, DraftKings will have received adequate discovery to make an informed decision as to any amendment, and to comply with the requisite 14-day notice window to add a new party under Local Rule 15.1.  Hermalyn, whose counsel also represents Fanatics in the California action, agreed to DraftKings' proposed date for this deadline.  But the October 30 deadline is wholly untenable under Hermalyn's proposed schedule, which would prolong fact discovery until June 5, 2025—almost an entire year from today, and eight months after the deadline to amend will have passed.  Given the protracted discovery period Hermalyn proposed, Hermalyn's agreement to the October 30 deadline to amend the complaint to join a new party is no agreement at all.

[12]   Forensic examination of the personal devices of DraftKings' employees Hayden Metz and Andrew Larracey, is neither warranted nor proportionate to the needs of the case.  Mr. Metz and Mr. Larracey are not parties to this case, and their devices contain discrete, responsive documents, which can be sought in discovery through the ordinary course.  In contrast, Hermalyn is a named party in a trade secret misappropriation case, where his devices are the very instruments of his misconduct.  The Court already found that Hermalyn "stored and deleted DraftKings's files on Dropbox and used

is—at most—approximately one year preceding Hermalyn's February 1 departure from DraftKings.  This is not a complex securities or antitrust case necessitating voluminous discovery by multiple corporate parties pertaining to disputes many years in the making.[13]  This is a case of ordinary complexity that easily can and should be concluded according to the schedule proposed by DraftKings.

In contrast, DraftKings will be severely prejudiced by Hermalyn's protracted proposal.  This Court has already found "the evidence submitted at this stage in the proceedings suggests that Hermalyn has struggled with candor to the Court," P.I. Opinion at 36,  and DraftKings is likely to succeed on the merits on the bulk of its claims.  *See id.* at 32, 37, 38, 47–48.  Coupled with the latest revelations that Hermalyn is attending events surrounded by the very individuals whom this Court's orders and his contractual obligations prevent him from soliciting, Exhibit 4 at 91:15–16, 99:22–100:3, Hermalyn's long schedule leaves DraftKings exposed to his continued wrongdoing with no prospect of a viable remedy *for at least another two years*.

Mr. Hermalyn's Position

---

AirDrop to transfer documents," "failed to immediately turn over to DraftKings an older laptop, an iPad, and his DropBox account," and "transferred 18 confidential DraftKings documents to his Slack account and then accessed or downloaded at least seven of the documents on a personal phone." ECF 132 at 38, 40.

[13]   DraftKings' proposal for document-by-document logs is neither extraordinary nor an excuse for Hermalyn's proposed discovery delays.  An individualized, document-by-document log would neither be unduly burdensome nor time-consuming; indeed, it is the First Circuit's preferred approach.  *See* Local Rule 34.1; *In re Grand Jury Subpoena*, 274 F.3d 563, 575–76 (1st Cir. 2001).  And given Hermalyn's correspondence with Fanatics' attorneys during a critical time in this case, a document-by-document log here is necessary to ensure privilege is properly asserted.  See ECF 74:2 at 180:13-21 (Hermalyn testifying that he learned about Fanatics hiring outside counsel on January 22 or 23); *id.* at 177:2-180:12 (testifying regarding communications with in-house counsel for Fanatics); ECF 130 at 50:3-24 (same).  By contrast, a categorical privilege log, as Hermalyn has proposed, would render such scrutiny impossible.  *See Neelon v. Krueger*, 2015 WL 1037992, at *3 (D. Mass. Mar. 10, 2015) (affirming that a categorical privilege log was inadequate because "it asserted privilege as to categories of documents (as opposed to individual documents)").

Far from "protracted," Mr. Hermalyn has proposed a reasonable, realistic, and indeed expedited schedule for this action, under which all fact discovery and fact depositions would be completed in less than one year, and summary judgment motions (if any) briefed in under 18 months from now.  Mr. Hermalyn's proposal is, in fact, *already* a highly accelerated schedule, particularly compared with both the norm for civil cases in this District and for cases of this complexity involving alleged breaches of restrictive covenants as well as confidential information and trade secret misappropriation.[14]  There is no cause for the chaotically fast schedule DraftKings has proposed, particularly given that Mr. Hermalyn is subject to this Court's Preliminary Injunction Order; no document discovery has been done to date, so the parties will be starting from square one; DraftKings has made clear, as is indicated in its proposed discovery topics, that it will not be seeking discovery just from Mr. Hermalyn; and DraftKings has yet to identify its purported trade secrets with the particularity required by M.G.L. c. 93, § 42D(b), leaving this Court and Mr. Hermalyn without the information needed prior to commencing discovery.  Indeed, as detailed below in Section III.B., discovery should not even begin until DraftKings serves on Mr. Hermalyn its particularized trade secret disclosure statement, which will allow this Court to appropriately guide discovery.  *See* M.G.L. c. 93, § 42D(b).

Mr. Hermalyn's proposed schedule takes into account the scope of the discovery that DraftKings has indicated it will seek here from Mr. Hermalyn *and* from various third parties—as well as his ***own*** right to take discovery from DraftKings in order to defend himself against its allegations.  As the Court is aware, DraftKings previously requested forensic examinations of Mr. Hermalyn's devices and accounts, *see* Mem. in Supp. of Mot. for Expedited Disc. at 1, 4-5 (Dkt.

---

[14]   *See* U.S. Courts, *Federal Court Management Statistics*, at 4 (showing as of December 31, 2023, **a median of 34.6 months** from filing to trial in *all* civil cases in the District of Massachusetts), https://www.uscourts.gov/sites/default/files/fcms_na_distprofile1231.2023_0.pdf.

No. 8), which contain some of Mr. Hermalyn's most private (and also irrelevant) information and materials, including communications with his wife and photos of his family.  While Mr. Hermalyn does not concede the appropriateness of any specific forensic discovery or searches at this point, whatever forensic examinations and ensuing discovery that may take place must be undertaken pursuant to an approved protocol, proportionate to the needs of this case, and with care—allowing Mr. Hermalyn and his counsel sufficient time to review any documents before they are produced to protect Mr. Hermalyn's privileged materials, as well as his and his family's privacy.  Any forensic discovery would also necessarily involve devices (for example, Mr. Hermalyn's laptop computers), to which Mr. Hermalyn has had no access and which are in the hands of DraftKings and DraftKings *alone*.  DraftKings has made various allegations about those laptop computers, among other devices, but Mr. Hermalyn has *never* had access to them in this litigation to test or challenge DraftKings' cherry-picked assertions or "reports."  He must have the ability and sufficient time to do that.  Mr. Hermalyn also anticipates requiring forensic discovery of devices that DraftKings squarely put at issue in this case, including but not limited to DraftKings' employees Hayden Metz's and Andrew Larracey's devices, from which Mr. Hermalyn was admittedly only provided incomplete screenshots and date information.

Any proposed forensic discovery would be ***on top of*** document discovery between the parties.  To that end, DraftKings has also indicated that it plans to subpoena various third parties over whom Mr. Hermalyn has no control, including Mr. Hermalyn's family members, as well as discovery from DraftKings' competitor, Fanatics, going back ***over eighteen months***, even though Mr. Hermalyn did not leave DraftKings until February 1, 2024.  Discovery in this action must be a two-way street; Mr. Hermalyn is entitled to obtain responsive documents and information from DraftKings and third parties (detailed further below in Section IV.B), and to review those

documents before deposing fact witnesses and mounting his defense.  And while Mr. Hermalyn has suggested that the parties exchange categorical privilege logs—which are permissible and routine in this District—DraftKings has proposed that the parties prepare and exchange ***document-by-document*** privilege logs, another process that would require sufficient time to complete.  Mr. Hermalyn anticipates that the parties will continue to confer about this issue, and to the extent a dispute remains, the parties may raise it with the Court at the proper time.

The bottom line is that fact discovery and expert discovery realistically take a significant amount of time and attention, and neither party should be prejudiced by a case schedule.  Mr. Hermalyn's proposed schedule is, under the circumstances, appropriate and quite expedited.  Meanwhile, DraftKings' lightning-speed schedule is highly prejudicial to Mr. Hermalyn's ability to prepare his defenses—which are appropriately tethered and highly relevant to the enforceability of the covenants at issue and DraftKings' true motives—and does not bother to take into account scheduling conflicts that will inevitably arise for witnesses, as well as counsel.  For example, Mr. Hermalyn's counsel team, including co-lead counsel, has previously scheduled trials in other matters in September 2024, January 2025, February 2025, and March 2025.

Finally—and ***briefly***—in response to DraftKings' disingenuous contentions in this submission relating to the parties' meet and confers, Mr. Hermalyn's counsel has consistently approached that process in good faith and has attempted to seek a reasonable compromise for a case schedule that is appropriate and takes into account the realities of fact and expert discovery.  If anything, it is DraftKings that has taken the opposite approach.  For example, DraftKings never even mentioned, let alone provided, a proposal for a case schedule to Mr. Hermalyn until sending one at 8:47 p.m. on May 24—the Friday night before Memorial Day weekend.  Nevertheless, Mr. Hermalyn and his counsel diligently reviewed DraftKings' proposal and held a conferral and

provided a counterproposal the next business day, on Tuesday, May 28. The next day, on May 29, DraftKings did a complete about-face and proposed a *much faster* schedule than its initial May 24 proposal, and has not budged from its position since then, despite its representations to the contrary. And when Mr. Hermalyn has sought to compromise by shortening the summary judgment schedule, he is baselessly accused of trying to encroach upon next year's winter holidays, despite the fact that DraftKings' proposed fact and expert discovery deadlines blaze right through the Thanksgiving and winter holidays *of this year*. For the avoidance of doubt, the parties' full email chain with respect to the meet-and-confer process is attached hereto as Exhibit 9.

DraftKings' other contentions to attempt to justify its lightning-speed proposal are similarly meritless. As detailed herein, requesting a trade secrets disclosure from DraftKings is not a "shell game," but rather is ***statutorily required and necessary to ensure an orderly and proportional discovery process and to allow Mr. Hermalyn to prepare his case***. And, as DraftKings concedes above, Mr. Hermalyn has ***already returned to DraftKings*** the entries in his Google Contacts account that he believes DraftKings will claim are its business contacts. The review of the remainder of Mr. Hermalyn's contacts has been underway pursuant to a protocol agreed by both sides.

## III.   TRADE SECRETS DISCLOSURES

<u>DraftKings' Position</u>

DraftKings has satisfied Massachusetts' trade secret disclosure requirement such that discovery should commence without delay on that claim. Under the Massachussetts Uniform Trade Secrets Act (MUTSA), "[b]efore commencing discovery relating to an alleged trade secret, the party alleging misappropriation shall identify the trade secret with sufficient particularity *under the circumstances of the case* to allow the court to determine the appropriate parameters of discovery

and to *enable reasonably other parties to prepare their defense*." Mass. Gen. Laws ch. 93, § 42D(b) (emphasis added); *see also Cynosure, LLC v. Reveal Lasers LLC*, 2023 WL 8880346, at *1 (D. Mass. Dec. 22, 2023) (quoting Mass. Gen. Laws ch. 93, § 42D(b)). Within the circumstances of this case, DraftKings has done so.

In its verified complaint filed on February 5, 2024, DraftKings clearly described the categories of trade secrets to which Hermalyn had access during his employment and which are at risk of his misappropriation. *See* ECF 1 ¶ 27. These categories include: (i) comprehensive VIP player lists containing a wide range of information critical to forging personal connections with VIP players; (ii) research and development regarding DraftKings' efforts to identify loyal customers, provide tailored incentives, promotions, and rewards, as well as build relationships and ongoing loyalty; (iii) relationships and points of contact with DraftKings' critical business partners, such as teams, leagues, casinos, athletes, celebrities, influences, vendors, and corporate officers and directors, as well as other organizations and individuals, that are essential to the advancement of DraftKings' marketing strategy; and (iv) employee lists, compensation information, and performance reviews and metrics for a wide range of DraftKings' employees. *Id.*

On February 16, 2024, Hermalyn propounded interrogatories on DraftKings. Interrogatory No. 1 asked DraftKings to identify each item it contends Hermalyn misappropriated, and Interrogatory No. 2 asked DraftKings, for each such item, to explain why it is a trade secret and why DraftKings believes that Hermalyn misappropriated it. *See* ECF 74-13. DraftKings served a series of interrogatory responses as it obtained additional information, eventually serving its second amended responses on March 7, containing 20 pages of detailed responses to Interrogatory Nos. 1 and 2. *See* ECF 74-13 at 7–26. These responses outlined precise file names for: (i) the confidential documents alleged to have been misappropriated in the Verified Complaint; (ii) two confidential

documents that Hermalyn downloaded on January 12, 2024; (iii) nearly one dozen confidential documents that Hermalyn sent to his own Slack user account on January 16, and the subset of those confidential documents that he later viewed or downloaded on a non-DraftKings device; (iv) more than 100 documents stored in the "miscdk" file path at the time DropBox was last synced to Hermalyn's personal DropBox account; (v) seven confidential documents that Hermalyn downloaded and/or accessed during the week he interviewed with Fanatics; (vi) one document related to tax rates and revenue shares that Hermalyn downloaded on January 29; and (vii) one confidential document containing detailed operational data from DraftKings' VIP program that Hermalyn accessed and downloaded on February 1—the day he started working for Fanatics—while residing at the CEO of Fanatics' home. *Id.* In addition to providing the file names, DraftKings also provided detailed descriptions concerning the content of these documents (to the extent such content was knowable based upon the forensic information available), as well as an explanation for how these documents could be exploited by Fanatics for an unfair competitive advantage. *Id.*

Then, in support of its March 14, 2024 motion for a preliminary injunction, DraftKings submitted affidavits from two employees with personal knowledge of the documents that Hermalyn accessed and downloaded in the days and weeks prior to his resignation. Shawn Henley, DraftKings' Chief Customer Officer and Hermalyn's former boss, and Samuel Russell, DraftKings' Senior Manager in Business Initiatives, described in detail the contents of the various documents Hermalyn misappropriated, as well as why such documents would provide an unfair competitive advantage to Fanatics, among other information. *See* ECF 78 ¶¶ 33–38; ECF 80 ¶¶ 4–8. Hermalyn tries to shrug these affidavits off as "vague" and faults them for failing to "label any document or information within a document as a 'trade secret.'" But this Court found these percipient witnesses who used and understood these documents as part of their day-to-day business to have described

with sufficient particularity the trade secret nature of these documents.  *See* P.I. Opinion at 40–41

(citing Henley and Russell affidavits, among others, as "evidence" that "shows with sufficient

specificity that, from mid- to late-January 2024, Hermalyn accessed DraftKings documents that

contained trade secrets," including "a slide deck that described VIP financial and strategy, and a

spreadsheet that described DraftKings's contracts and identified hundreds of its current and former

business partners").  Indeed, the fact that these witnesses described the specific documents at issue

is *because* DraftKings identified them.  In short, DraftKings has clearly complied with MUTSA's

mandate to provide "sufficient particularity" to allow Hermalyn to prepare his defense, such that no

separate document identifying DraftKings' trade secrets is now necessary.

　　　*Cynosure, LLC v. Reveal Lasers LLC* is instructive on this point.  There, the parties

(including defendants represented by counsel for Hermalyn in this action) submitted, and this Court

entered, scheduling orders after preliminary injunction proceedings that did not include a separate

MUTSA statement.  *See* Docket Order (Scheduling), No. 1:22-cv-11176-PBS (D. Mass Oct. 25,

2022) (Dkt. No. 155); *id.* at Dkt. Nos. 148, 149 (plaintiffs' and defendants' proposed scheduling

orders submitted on October 21, 2022).[15]  Instead, and on-point with the circumstances here, this

Court later considered whether plaintiffs had "sufficiently" described their trade secrets in response

to defendants' interrogatories such that those descriptions "enable[d] the defendants to prepare their

defense" under MUTSA.  *Cynosure*, 2023 WL 8880346, at *3.  One of the plaintiffs had described

"eight categories of information that it alleged comprised the relevant trade secrets" in response to

defendants' interrogatories; the Court ruled that because the categories were "described at length,

---

[15]  In *Amyndas Pharam., S.A. et al. v. Alexion Pharm., Inc., et al.*, No. 1:20-cv-12254-LTS (D. Mass.),
to which Hermalyn cites, the parties had *jointly* proposed a separate MUTSA disclosure deadline in
their "Joint Submission Regarding Discovery Plan and Proposed Scheduling Order" (Dkt. 89), which
requirement and deadline this Court adopted in its subsequent scheduling order (Dkt. 100).  That case
also did not involve preliminary injunction proceedings.

often with examples of the types of documents that would tend to contain those secrets," the "plaintiffs' identification of its alleged trade secrets [was] sufficient." *Id*. at *2–3; *see also Adimab, LLC v. Linkedup Bioscience, Inc.*, 2022 WL 16839215, at *1 (Mass. Super. June 8, 2022) (disclosure is sufficient "absent a showing that the details alone, without further explanation, are inadequate to permit the defendant to discern the boundaries of the trade secret so as to prepare available defenses") (internal citation omitted).[16]

DraftKings' disclosures to date have gone further than in *Cynosure*, providing the file names and descriptions of the misappropriated documents themselves. *See Mirakl, Inc. v. VTEX Commerce Cloud Solutions LLC*, 544 F. Supp. 3d 146, 147 (D. Mass. 2021) (holding MUTSA disclosure requirement satisfied by plaintiff providing "file names for the documents it alleges defendants misappropriated and which contain its trade secrets"). That is precisely why, when entering the temporary restraining order, this Court held that DraftKings "has identified *with specificity* the nature of the trade secrets and the confidential information contained in the documents that Mr. Hermalyn accessed," ECF 46 at 52:7–10 (emphasis added), and why, in the Court's subsequent decision entering the preliminary injunction, the Court again held that "[t]he

---

[16]   Hermalyn cites three cases in support of his theory that DraftKings has not met its burden of identifying its alleged trade secrets with particularity—all of which are inapposite. *L-3 Comm'ns Corp. v. Reveal Imaging Techs., Inc.*, 2004 WL 2915743, at *8 (Mass. Super. Dec. 2, 2004), the court stated that "[t]he trade secrets in issue are not specifically spelled out and, therefore, are not readily knowable" such that a separate statement identifying the trade secrets was deemed necessary before the court there would grant a preliminary injunction. Here, this Court granted a preliminary injunction and found that DraftKings' trade secrets were sufficiently particular. *Alnylam Pharms., Inc. v. Dicerna Pharms., Inc.*, 2016 WL 4063565 (Mass. Super. Apr. 6, 2016) was a case in which the court found that interrogatory responses either did not describe highly technical trade secrets in a way a non-technical person could understand or contained overbroad categories. And *Milliman, Inc. v. Gradient A.I. Corp.*, 2022 WL 18032957 (D. Mass. July 11, 2022) rejected a trade secret description as lacking particularity where "the disclosure essentially recites allegations from plaintiffs' complaint with the addition of a few dates" such that "much is left to the imagination in determining precisely what trade secrets are at issue here." *Id*. at *2. DraftKings' disclosures are entirely distinct and far more detailed.

evidence shows with *sufficient specificity* that, from mid- to late-January 2024, Hermalyn accessed DraftKings documents that contained trade secrets." P.I. Opinion at 40 (emphasis added).

Despite DraftKings' detailed disclosures, Hermalyn continues to insist that DraftKings must submit a separate piece of paper "specifying" its trade secrets under MUTSA. He argues (below) that DraftKings' responses to the contention interrogatories *he drafted* (asking DraftKings to broadly "state the basis" for its claims) are insufficient. Yet those are the types of interrogatories that were directly at issue in *Cynosure*, which this Court noted was a reason for the plaintiff's "broad" responses there, and which it found sufficient under MUTSA. 2023 WL 8880346, at *2. And to the extent DraftKings objected to Hermalyn's Interrogatory Nos. 1 and 2 because the way *he* drafted them was unclear in differentiating between "confidential" and "trade secret" information, that does not make DraftKings' disclosures insufficient. Hermalyn cannot argue that he is unable to "prepare his defense" from DraftKings' disclosures under the "circumstances of this case"—he knows full well what is at issue, down to the document level, for the purposes of discovery.

Nonetheless, Hermalyn continues to push form over substance in insisting that DraftKings provide a new document with the disclosures it has already provided (and his counsel continues to insert additional time to the case schedule for this unnecessary exercise). Again, Hermalyn's demand reiterating DraftKings' trade secret disclosures before the commencement of discovery is a classic "specificity" shell game—in which Hermalyn will demand an ever-more-particularized trade secrets disclosure resulting in continuing delay of this action. It is not necessary where DraftKings has already complied with MUTSA and would needlessly cause delay where time is of the essence.[17]

---

[17]    Nevertheless, should this Court decide to grant Hermalyn's request for a separate document identifying DraftKings' trade secrets, DraftKings can provide such a document within days, not

Mr. Hermalyn's Position

It is Mr. Hermalyn's position that after this Court's scheduling order—as is typical in this district and in accordance with M.G.L. c. 93, § 42D(b)—DraftKings must serve on Mr. Hermalyn its particularized trade secret disclosure statement.  DraftKings is not permitted to begin discovery until its trade secret disclosure is served, and that statement may not be amended without the Court's leave and upon a showing of good cause.  DraftKings has brought a trade secret misappropriation claim (Count V) under the Massachusetts Uniform Trade Secrets Act ("MUTSA"), Compl. ¶¶ 144-55 (Dkt. No. 1); *see also* M.G.L. c. 93, §§ 42–42G, which specifically requires that:

> **_Before commencing discovery_** relating to an alleged trade secret, the party alleging misappropriation **_shall identify the trade secret with sufficient particularity_** under the circumstances of the case to allow the court to determine the appropriate parameters of discovery and to enable reasonably other parties to prepare their defense.[18]

---

weeks, and would request that the creation of that document not unduly delay discovery nor alter DraftKings' proposed schedule, which would cause significant prejudice to DraftKings.

[18]   DraftKings also brings a federal trade secrets claim (Count IV).  The federal claim concerns the same facts as DraftKings' Massachusetts trade secrets claim.  The Court should not allow DraftKings to start discovery on its federal claim until it has complied with MUTSA because doing so would blatantly circumvent M.G.L. c. 93, § 42D(b) and render its requirements null.  The same is true with respect to DraftKings breach of contract and duty of loyalty claims (Counts I, II, III, and VII), which concern DraftKings' purported trade secrets, both as a basis for Mr. Hermalyn's alleged liability and for enforcing the underlying restrictive covenants, and therefore cannot be reasonably severed for purposes of disclosure or discovery.  *See Milliman, Inc. v. Gradient A.I. Corp.*, 2022 WL 18032957, at *3 (D. Mass. July 11, 2022) ("Where all these claims either directly reference plaintiffs' 'trade secrets' or the subject of those trade secrets . . . the court finds that plaintiffs have failed to demonstrate that their non-trade secrets claims do not 'relat[e] to' their alleged trade secrets for purposes of § 42D. . . . [and] defendants will not be required to respond to plaintiffs' discovery requests as to all claims until plaintiffs serve them with a revised trade secret disclosure").  And, as further detailed below, DraftKings has refused to distinguish between its so-called confidential information and trade secrets; therefore, absent disclosure it is unclear how discovery can proceed on its misappropriation of confidential business information claim (Count VI).  DraftKings' final claim, conversion (Count VIII), also concerns alleged possession of trade secrets and confidential information.

M.G.L. c. 93, § 42D(b) (emphasis added). Providing such a disclosure, separate from the initial pleadings, is a regular practice for trade secrets plaintiffs in this district. *See, e.g.*, Scheduling Order, *Amyndas Pharm., S.A. et al. vs. Alexion Pharm., Inc., et al.*, No. 1:20-cv-12254-LTS (D. Mass. Nov. 21, 2022) (Dkt. No. 108).

Courts have refused to allow discovery to begin when a plaintiff's trade secret disclosure contained only "general descriptions" of documents leaving much "to the imagination in determining precisely what trade secrets are at issue." *Milliman*, 2022 WL 18032957, at *2 (granting protective order and requiring plaintiff to revise its "general and incomplete descriptions" which even combined with the documents "were insufficient disclosure"); *cf. Alnylam Pharms., Inc. v. Dicerna Pharms., Inc.*, 2016 WL 4063565, at *2 (Mass. Super. Ct. Apr. 6, 2016) (requiring a revised trade secret disclosure when a 21-page document attached to interrogatory responses contained broad "categorical descriptions" but was not "specific about what [plaintiff] claims are really the trade secrets").

The above requirements are in place for good reason; they allow the Court to appropriately guide discovery and Mr. Hermalyn to prepare his defenses, as M.G.L. c. 93, §§ 42D contemplates, without fear of DraftKings adopting a shifting sands approach to discovery and to its claims while "rummaging through [Defendant's]" files. *Alnylam*, 2016 WL 4063565, at *2. "Both for the defendants to respond to the charges against them, and for the Court to make appropriate findings and rulings on the case, there must be a clear designation that distinguishes unique or proprietary material from the vast body of" information generally alluded to in DraftKings' pleading and preliminary injunction materials. *L-3 Commc'ns Corp. v. Reveal Imaging Techs., Inc.*, 2004 WL 2915743, at *13 (Mass. Super. Ct. Dec. 2, 2004) (citation omitted).[19]

---

[19]   DraftKings contends that pre-MUTSA cases are not relevant, but as shown by the cited cases

As things currently stand, Mr. Hermalyn is in the dark in terms of what DraftKings is actually alleging are "trade secrets" in this case.  DraftKings has never produced the documents, or even described with the requisite particularity the portions of the documents, it claims constitute or contain "trade secrets," as required under MUTSA prior to discovery commencing.  Instead, DraftKings' descriptions of its "trade secrets" are hopelessly vague and generic.  For example, one document, apparently entitled "BD Team Tracker – Weekly Report," is allegedly a DraftKings document that is _**181 pages long**_, but DraftKings has not identified the pages or information that it contends constitutes a "trade secret."  *See* Russell Aff. ¶ 6 (Dkt. No. 80).  Additionally, as described further below, DraftKings has *already* shifted its positions as to which documents and information purportedly constitute "trade secrets."  The statute requires that DraftKings provide that information to the Court and Mr. Hermalyn now.  Indeed, a trade secret disclosure is especially important in this case, where DraftKings has indicated that it plans to try to take discovery of various third parties, including its competitor, Fanatics, and also Mr. Hermalyn's family members.  DraftKings should not be allowed to engage in uncabined and unfettered discovery into Mr. Hermalyn's information or a competitor's business under the guise of searching for evidence of alleged "trade secret" misappropriation.  The statute's express purpose is to require identification of alleged trade secrets with sufficient particularity ***prior to the commencement of discovery*** to allow the Court to draw appropriate and proportionate lines around permissible discovery and to prevent such an approach to discovery by DraftKings.

Mr. Hermalyn's position should not be controversial.  But DraftKings contends that it has properly identified its purported trade secrets.  DraftKings first points to a single paragraph of its Complaint listing sweeping categories of information that it claims are somehow "trade secrets."

---

themselves, the MUTSA requirement codified previous practice in Massachusetts courts.

Compl. ¶27 (Dkt. No. 1).   But references to DraftKings' pleading are insufficient to satisfy the statutory requirement.  *See Milliman*, 2022 WL 18032957, at *2, n.1 (explaining that "before entering the discovery phase of litigation, the statute requires a plaintiff to 'identify the trade secret with sufficient particularity,' rather than provide mere notice" (quoting M.G.L. c. 93, § 42D(b)). DraftKings then attempts to push past this glaring deficiency by contending that it added the requisite particularity in three filings, and that the Court's orders on initial injunctive relief confirm its position. However, as detailed below, the filings and orders that DraftKings references do ***not*** satisfy the statutory requirements, nor do they provide the clarity needed for the Court to appropriately limit discovery and for Mr. Hermalyn to prepare his defenses.

*First*, DraftKings claims that its responses to Mr. Hermalyn's Interrogatory Nos. 1 and 2 identify its trade secrets.  *See* 2nd Am. Resp. & Obj. to Interrog. Nos. 1 and 2 at 7-26 (Dkt. No. 74-1).  That is incorrect.  Mr. Hermalyn's Interrogatory No. 1 focused on alleged misappropriation, not identification of DraftKings' trade secrets.  *See* 2nd Am. Resp. & Obj. to Interrog. No. 1 at 6 (Dkt. No. 74-1) ("Identify with specificity each Document, tangible thing, ESI, and Confidential Information that DraftKings contends Hermalyn misappropriated . . . .").  And, more importantly, DraftKings explicitly did ***not*** identify its purported trade secrets in its response.  Mr. Hermalyn's Interrogatory No. 2 requested that DraftKings "State the Basis" for its claim that anything it "identified" Mr. Hermalyn as having "misappropriated" was a trade secret.  *Id.* at 24.  In response, DraftKings ***refused*** to identify what, if anything, was a trade secret.  Indeed, DraftKings ***objected*** that the term "trade secret" called for a legal conclusion, declined to distinguish so-called trade secrets from information that was (allegedly) merely confidential, and stated that it would construe the term "trade secret" to mean "Confidential Information," which is defined extraordinarily broadly in DraftKings' contracts.  *Id.*  DraftKings' blatant refusal to identify its alleged trade secrets curtails

proper discovery and impairs Mr. Hermalyn's ability to prepare his defenses, as DraftKings brings causes of action that distinguish between trade secrets (Counts IV and V) and confidential information (Count VI).

DraftKings' interrogatory responses also demonstrate the broad stroke approach that DraftKings is taking with respect to its "trade secrets," which does not come close to meeting the statutory specificity requirement.   Subject to the objections and provisos mentioned above, DraftKings then merely listed out a significant number of documents by file name, but failed (and still fails) to state that *any* actually were or contained trade secrets.  *See id.* at 7-8, 11-13, 20-23. Moreover, DraftKings represented that many of the documents were *voluminous* spreadsheets or presentations, yet did not indicate whether it was claiming that all or only some portions of those documents were purportedly "trade secrets."   *E.g.*, *id.* at 11 ("a 73-slide deck"), 13 ("excel spreadsheet . . . contains multiple tabs").  ***DraftKings' response even noted that "DraftKings does not currently contend that all of the below files contain DraftKings' Confidential Information," let alone trade secrets***.  *Id.* at 16.  DraftKings cannot rely on these types of admittedly vague and limited discovery responses to satisfy the particularized trade secret disclosure that M.G.L. c. 93, § 42D(b) requires.

***Second***, DraftKings' references to other filings, such as the Affidavit of Shawn Henley, do not transform its deficient interrogatory responses into proper Section 42D(b) trade secret disclosures.  *See*  Henley Aff.  ¶¶ 31-38 (Dkt. No. 78).  Under a heading simply referred to as "Confidential Information," Henley's Affidavit just lists documents by file name and vaguely describes the alleged types of information that some may contain, essentially mirroring DraftKings' response to Interrogatory No. 1. *Id.* at 8, ¶¶ 34-38.  The Henley Affidavit does not label any document or information within a document as a "trade secret."   Similarly, the Affidavit of Samuel Russell

addresses just one document—the *181-page* "BD Team Tracker – Weekly Report," and was focused on addressing whether Mr. Hermalyn had a business reason for accessing the document, but nowhere describes the information within that document with particularity or characterizes that document or any of the information within it as a trade secret. *See generally* Russell Aff. (Dkt. No. 80).

      **Third**, the Court's orders on preliminary injunctive relief do not absolve DraftKings of its statutory requirement now that the case is past the pleading stage. The Court found DraftKings' submissions sufficient at the pleading stage in connection with preliminary relief only, *while the MUTSA requirement is about identifying trade secrets prior to and in anticipation of discovery*, which has not yet taken place in this case. Moreover, the Court has not ruled that DraftKings satisfied the requirements of the statute (it has not). The Court's order on DraftKings' motion for a preliminary injunction referenced alleged documents *different from* those referenced in the filings that DraftKings now claims identify its trade secrets with particularity. *Compare* Mem. & Order at 40-41 (Dkt. No. 132) (referencing 18 documents that Mr. Hermalyn sent to his DraftKings' Slack account and only 3 other documents), *with* 2nd Am. Resp. & Obj. to Interrog. No. 1 at 7-26 (Dkt. No. 74-13) (referencing just 7 of the documents sent via Slack and discussing a substantial number of other documents).

      DraftKings' position as to the actual documents and information at issue that it claims constitute purported trade secrets is highly relevant to formulating appropriate discovery parameters, and Mr. Hermalyn is statutorily entitled to that information to prepare his defenses prior to the commencement of discovery in this action.

## IV.    SCOPE OF DISCOVERY

### A.    Phased Discovery

The Parties have reached an agreement that further discovery will not be phased.  The parties

reserve the right to seek appropriate protective orders and other orders from this Court to ensure a

fair, even-handed, and orderly discovery process that is proportional to the needs of this case.

### B.    Subjects On Which Discovery May Be Needed

<u>DraftKings' Position</u>

DraftKings anticipates needing to take discovery concerning Hermalyn's and/or Fanatics'

use and disclosure of DraftKings' trade secrets and confidential information; Hermalyn's and/or

Fanatics' actual or attempted solicitation of DraftKings' customers, clients, vendors, partners, or

employees; Hermalyn's employment with Fanatics; and Hermalyn's breach of his duty of loyalty

to DraftKings.  For example, DraftKings will seek discovery on at least the following subjects for

the period from January 1, 2023 to the present:

1. Hermalyn's access to and use, disclosure and/or misappropriation of DraftKings' trade secrets and confidential information, including but not limited to forensic examinations of all devices and accounts Hermalyn used to access, view, download, or transfer DraftKings' trade secrets or confidential information (whether or not those devices and accounts belong to Hermalyn), and Hermalyn's communications (including communications with Fanatics) regarding DraftKings' trade secrets and confidential information;

2. Hermalyn's communications with current or former DraftKings customers, clients, vendors, partners, or employees, and Hermalyn's communications with third parties (including but not limited to Fanatics) regarding current or former DraftKings customers, clients, vendors, partners, or employees;

3. Hermalyn's employment with Fanatics, including but not limited to: Hermalyn's recruitment by Fanatics and the circumstances of Hermalyn's departure from DraftKings; Hermalyn's employment agreements with Fanatics (including negotiation of the same); Hermalyn's compensation from Fanatics (including equity compensation); Hermalyn's current or anticipated role, responsibilities, and scope of employment with Fanatics; and Hermalyn's performance of his employment responsibilities, including actions taken by Hermalyn on behalf of Fanatics or in connection with his employment with Fanatics, evaluations or summaries of

Hermalyn's performance with Fanatics, and Hermalyn's compliance with the temporary restraining order and preliminary injunction issued in this action;

4. Fanatics' products, services and operations that may rely or build upon, or are otherwise derivative of or based on, DraftKings' trade secrets and/or confidential information used, disclosed and/or misappropriated by Hermalyn;

5. Fanatics' business operations and business considerations related to competing with DraftKings in the market (including but not limited to the fantasy sports, sports betting and gaming, online marketplace, eCommerce, collectibles, and media markets) for customers, clients, vendors, partners, and employees;

6. Hermalyn's claimed residency in California, including information relating to his and his family's residency in New Jersey;

7. Hermalyn's self-dealing by funneling a DraftKings' contract to restaurants owned by an entity with which, on information and belief, he was affiliated without disclosing such affiliation, as well as his misuse of corporate funds for his own personal gain;

8. Hermalyn's conduct on behalf of Fanatics while still employed by DraftKings, including but not limited to the use, disclosure and/or misappropriation of DraftKings' trade secrets and confidential information;

9. DraftKings' damages, including but not limited to the loss of goodwill, business opportunities, and other compensable damages attributable to Hermalyn's breaches of contract, use, disclosure and/or misappropriation of DraftKings' trade secrets and confidential information, and other unlawful acts; and

10. Hermalyn's preservation of evidence in anticipation of litigation and/or spoliation of such evidence.

Hermlayn's answer includes allegations and raises defenses that are untethered from the facts of the case and appear to be a calculated attempt to improperly broaden the scope of discovery in this matter, as confirmed by Hermlayn's proposed topics for discovery. This case is about Hermlayn's theft of DraftKings' trade secrets, blatant violations of his contractual non-compete and non-solicit obligations, destruction of evidence, and subsequent lies about his conduct—including to the Court. Hermlayn's answer includes gratuitous examples of immaterial, impertinent, and scandalous information that bear no relation to a viable defense. For example, Hermlayn's allegations related to purported attempts to chill Fanatics from recruiting employees or to prevent

Fanatics from entering into the sports betting and gaming industry could not form the basis for a viable defense of Hermalyn's misconduct, even if they were true (and they are not).  Similarly, allegations related to DraftKings' financials are not connected to Hermalyn's restrictive covenants. Thus, any purported manipulation—and there was none—does not relate to any viable defense in this case.  Accordingly, DraftKings objects to the proposed discovery topics outlined by Hermalyn. That said, disputes about the appropriate scope of discovery can be addressed promptly and need not delay the case.

    <u>Mr. Hermalyn's Position</u>

    Mr. Hermalyn does not agree with the scope of discovery that DraftKings proposes above, which is overly broad and disproportionate to the needs of the case.  Mr. Hermalyn will respond in good faith to DraftKings' discovery requests, and expects DraftKings will do the same.  Indeed, Mr. Hermalyn is entitled to discovery from DraftKings to rebut its claims and to support his affirmative defenses, on topics including, but not limited to, the following:

- The nature of DraftKings' purported trade secrets and confidential information, including whether they were ascertainable from the public domain, the steps DraftKings took to protect them, and whether they have independent economic value.

- DraftKings' allegations concerning purported misappropriation of its so-called trade secrets and confidential information, including the specific trade secrets and confidential information that it alleges and intends to press in this case.

- DraftKings' allegations concerning Mr. Hermalyn's alleged solicitation of its employees or customers.

- DraftKings' actions that are intended to restrain lawful competition from Fanatics and others. Such discovery will support Mr. Hermalyn's contention that DraftKings is not asserting its restrictive covenants for any legitimate purpose under Massachusetts law, but instead is attempting to use the restrictions to stifle lawful competition by Fanatics.

- DraftKings' unlawful attempts to prevent market entry by Fanatics into the sports betting and gaming industry, by, among other things, attempting to derail Fanatics' acquisition of PointsBet Sportsbook's U.S. assets.

- DraftKings' actions that are intended to chill lawful recruiting by Fanatics.

- DraftKings' efforts to retain employees in 2023 and Mr. Hermalyn's involvement to help DraftKings retain its employees, and the involvement of DraftKings' current counsel, Gibson Dunn & Crutcher, in those efforts.

- DraftKings' VIP customers and partners, including the nature of DraftKings' customer and partner relationships and the non-exclusive nature of such relationships in the VIP sports gambling market.

- DraftKings' improper conduct in connection with its financials and failure to pay earned compensation to Mr. Hermalyn.

### C.    Discovery Limitations

The Parties agree that each Party shall be limited to 25 interrogatories, 25 requests for admissions,[20] 2 separate sets of requests for production, and 10 fact depositions per side, provided that each Party expressly reserves the right to seek additional discovery consistent with the Federal Rules of Civil Procedure and Local Rules.

<u>DraftKings' Position</u>

DraftKings maintains that the limit of 25 interrogatories should exclude interrogatories served by either party in connection with this Court's February 8, 2024 order granting expedited discovery.  ECF 42.

Hermalyn makes the misguided assertion that the interrogatories DraftKings served with its motion for expedited discovery at a very early stage of this case— indeed, just one day after DraftKings filed its complaint and five days after Hermalyn's departure—should count against the limit on interrogatories.  DraftKings propounded early interrogatories to develop an evidentiary record for emergency injunctive relief—"to stop [Hermalyn] from continuing to violate his contractual obligations" and "prevent further irreparable harm."  Since those interrogatories were

---

[20]   The foregoing are the default limits on these discovery events in Local Rule 26.1(c).

served, the needs of the case have changed.  Given the strictly limited and expedited nature of initial discovery in this case, and this Court's directive that discovery at that stage be "narrowly tailored," ECF 46 at 57:15–58:2, DraftKings sees no basis for counting the interrogatories propounded by either party against going-forward discovery limitations.

> Mr. Hermalyn's Position

Mr. Hermalyn's position is that the interrogatories already served by both parties during the preliminary injunction phase of this case should be included in the limit of 25 interrogatories per side.  Those interrogatories concerned issues central to DraftKings' claims and Mr. Hermalyn's defenses, and both parties are cognizant of their obligations to supplement their responses as necessary pursuant to Fed. R. Civ. P. 26(e)(1)(A).  Accordingly, DraftKings' proposal, which would result in interrogatories above the default limit provided by the Local Rule, is unwarranted and disproportionate to the needs of the case.

### D.     Protocols Governing Discovery

The Parties have agreed to meet and confer in good faith to resolve disputes regarding a reasonable and appropriate protective order, a protocol governing discovery of electronically stored information ("ESI"), and a forensic review protocol for investigation of Hermalyn's personal and DraftKings-issued devices. The parties will promptly present unresolved disputes, if any, regarding such protocols to the Court.

The Parties have agreed to retain and preserve all electronically stored information relevant to DraftKings' claims and Mr. Hermalyn's defenses and represent that individuals over which they have control who are likely to have relevant information have been instructed to retain and preserve such information.

**V.      SETTLEMENT PROPOSALS**

Pursuant to Local Rule 16.1(c), DraftKings presented a confidential written settlement proposal to Hermalyn on May 24, 2024.  Mr. Hermalyn responded to DraftKings' proposal in writing on June 7, 2024.  The parties were not able to reach a resolution.

**VI.     TRIAL BY MAGISTRATE JUDGE**

At present, the parties do not consent to trial before a United States Magistrate Judge.

**VII.    LOCAL RULE 16.1(D)(3) CERTIFICATIONS**

Mr. Hermalyn filed the certification required by Local Rule 16.1(d)(3) on May 31, 2024 (ECF 152).  DraftKings will file its certification concurrently with this Joint Statement.

Dated: June 7, 2024

DRAFTKINGS INC.

By its attorneys,

*/s/ Andrew S. Dulberg*
Andrew S. Dulberg (BBO #675405)
William F. Lee (BBO #291960)
WILMER CUTLER PICKERING HALE AND DORR LLP
60 State Street
Boston, MA 02109
william.lee@wilmerhale.com
andrew.dulberg@wilmerhale.com

*/s/ Orin Snyder*
Orin Snyder (*pro hac vice*)
Harris Mufson (*pro hac vice*)
Justine Goeke (*pro hac vice*)
Christine Demana (*pro hac vice*)
Justin M. DiGennaro (*pro hac vice*)
GIBSON, DUNN & CRUTCHER LLP
200 Park Ave
New York, NY 10166-0193
osnyder@gibsondunn.com
hmufson@gibsondunn.com
jgoeke@gibsondunn.com
cdemana@gibsondunn.com
jdigennaro@gibsondunn.com

Jason C. Schwartz (*pro hac vice*)
Jacob T. Spencer (*pro hac vice*)
GIBSON, DUNN & CRUTCHER LLP
1050 Connecticut Avenue, N.W.
Washington, D.C. 20036
jschwartz@gibsondunn.com
jspencer@gibsondunn.com

Respectfully submitted,

MICHAEL Z. HERMALYN

By his attorneys,

*/s/ Russell Beck*
Russell Beck (BBO# 561031)
Stephen D. Riden (BBO# 644451)
BECK REED RIDEN LLP
155 Federal Street, Suite 1302
Boston, MA 02110
Tel.: (617) 500-8660
rbeck@beckreed.com
sriden@beckreed.com

*/s/ Aliki Sofis*
Aliki Sofis (BBO #675777)
Alexander S. del Nido (BBO #711857)
QUINN EMANUEL URQUHART
 & SULLIVAN, LLP
111 Huntington Avenue, Suite 520
Boston, MA  02199-3600
Tel.: (617) 712-7100
alikisofis@quinnemanuel.com
alexdelnido@quinnemanuel.com

Kimberly E. Carson (*pro hac vice*)
QUINN EMANUEL URQUHART
 & SULLIVAN, LLP
51 Madison Avenue, 22nd Floor
New York, NY 10010
Tel.: (212) 849-7000

Christopher G. Michel (*pro hac vice*)
QUINN EMANUEL URQUHART
& SULLIVAN, LLP
1300 I Street NW, Suite 900
Washington, D.C. 20005
Tel.: (202) 538-8000
christophermichel@quinnemanuel.com